IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| **SBI CRYPTO CO., LTD.,**  *Plaintiff*,  v.  **WHINSTONE US, INC.,**  *Defendant*. | Civil Action No.: 6:23-cv-252 |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff, SBI Crypto Co. Ltd., ("SBIC") files this Complaint against Defendant, Whinstone US, Inc. ("Whinstone"), and alleges as follows:

**I.**
**PARTIES**

1. Plaintiff SBIC is a foreign company duly organized and existing under the laws of Tokyo, Japan with its principal place of business located at 1-6-1 Roppongi, Minato-ku, Tokyo, Japan.

2. Defendant Whinstone is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business at 2721 Charles Martin Hall Road, Rockdale, Texas 76567, and may be served by personal service through its national registered agent, National Registered Agents, Inc., at 1999 Bryan St. Suite 900, Dallas, Texas 75201-3136.

**II.**
**JURISDICTION AND VENUE**

3. Personal jurisdiction and venue are proper in this Court pursuant to an agreement between the parties, as more fully described herein. Specifically, the

aforementioned agreement provides that "the parties hereby consent to the exclusive jurisdiction of the Texas courts."

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a). Complete diversity of citizenship exists, and the amount in controversy exceeds $75,000, exclusive of costs and interest.

### III.
### FACTUAL ALLEGATIONS

**A.     Introduction and Summary**

5. SBIC is a cryptocurrency mining company.

6. Cryptocurrency mining companies generally use specially designed computing equipment to calculate a hash solution that secures validated transactions on a blockchain network, and add that transaction to the distributed ledger so that it becomes immutable. In so doing, companies like SBIC compete to "mint" new cryptocurrency such as Bitcoin.

7. The computing power necessary to engage in large scale mining results in high electrical and cooling costs. Thus, the performance of mining equipment directly correlates with electrical power and environmental conditions. Conversely, inadequate cooling, ventilation, and dust filtration negatively impact the speed and efficiency of mining equipment.

8. A mining company maximizes its computational hash or operational output when operating mining equipment in an optimal environment. Stated differently, operating mining equipment in an optimal environment generates the highest opportunity to achieve potential profits in the form of newly minted crypto coins (or "mining rewards"). Consequently, maintaining an optimal environment by ensuring the

highest speed and performance of mining equipment is essential to maximize mining operation profitability.

9. Whinstone operates a cryptocurrency mining facility and datacenter in Rockdale, Texas.

10. Mining facilities provide mining operators an optimal environment to operate their mining machines. To secure crypto mining businesses, Whinstone promised to provide a secure location with a consistent and stable source of electrical power, sufficient heat dissipation, and a managed operating environment which are standardized and set forth in the parties' hosting service agreement.

11. In July 2019, Whinstone and SBIC entered into an agreement for a Whinstone to host 20,000 cryptocurrency miners in Pyote, Texas. That agreement, however, fell through.

12. Following the failure of that agreement, Whinstone made numerous representations and warranties concerning power capacity, permits, and operating conditions to induce SBIC to enter into a new hosting service agreement at Whinstone's Rockdale facility.

13. Whinstone's representations about its Rockdale facility, however, were false. Specifically, Whinstone deliberately misled SBIC into believing it held the requisite building permits and power contracts to perform as promised, then concealed the substandard conditions at its facility.

14. The lack of permits and power contracts delayed the ramp-up of SBIC mining operations and lead to millions in SBIC's lost revenue. Whinstone's failure to provide a datacenter environment in accordance with the parties' agreement and basic industry standards directly led to underperformance of SBIC mining operations and

damage to SBIC's mining equipment.

15. In sum, Whinstone's deceptive acts and omissions caused SBIC to lose millions in lost profits and millions more in damaged mining equipment.

**B. Whinstone fraudulently induces SBIC to enter into Hosting Service Agreement**

16. In early 2019, SBIC visited and negotiated with several potential datacenters to host its mining equipment before ultimately deciding to enter into an agreement with Whinstone.

17. In April 2019, SBIC signed a $30 million purchase order for 40,000 Avalon A10 mining machines from Canaan, Inc. ("Canaan"). Half (20,000) of those machines were sent to the Whinstone facility with the other half delivered to another datacenter facility in 2021.

18. On July 10, 2019, SBIC and Whinstone entered into a hosting service agreement for a facility in Pyote, Texas. That agreement anticipated the commencement of operations in October 2019.

19. Despite the parties' agreement, SBIC's mining operations were delayed after Whinstone failed to secure sufficient electrical power for the Pyote facility.

20. On October 24, 2019, Whinstone persuaded SBIC to enter into a new agreement (the "Hosting Service Agreement") by offering hosting space and management services at its facility in Rockdale, Texas.

21. In late 2019, SBIC delivered to Whinstone 20,000 A10-model mining machines along with $3.4 million in power supply unit ("PSUs") (collectively, "SBIC's Equipment" or "SBIC Equipment"). SBIC also prepaid to Whinstone $9,685,000 for power and fees to help Whinstone finance the final buildout of the Rockdale facility.

22. As part of its efforts to induce SBIC to enter into the new Hosting Service Agreement, Whinstone represented it had "secured for commercial access up to one (1) gigawatt of aggregated electricity that can be delivered to the Data Center, of which a portion of that may be incrementally offered to [SBIC]."

23. This representation was false at the time it was made because Whinstone had not, in fact, secured commercial access to one (1) gigawatt of aggregated electricity for the Rockdale facility and would not secure signed power contracts until just before operations began in the summer of 2020.

24. Nevertheless, following Whinstone's failure to secure sufficient electricity for the proposed Pyote facility, the aforementioned (false) representation (that Whinstone had secured commercial access to one (1) gigawatt of aggregated electricity for the Rockdale facility) was a material addition to and modification of the parties' prior agreement. Moreover, the representation was material to SBIC's decision to enter into the new Hosting Service Agreement in October 2019.

25. Additionally, Whinstone's representation regarding secured electrical capacity constituted a material representation because it served as an assurance to SBIC that Whinstone could quickly provide the requisite scale and capacity to host SBIC and its other customers at the inception of operations. Further, because a facility with a one (1) gigawatt capacity yields volume discounts in electricity pricing, Whinstone's misrepresentation constituted a further inducement to SBIC to enter into the new Hosting Service Agreement.

26. SBIC relied on Whinstone's misrepresentations as an inducement to enter into the new Hosting Service Agreement. To be sure, were it not for Whinstone's express assurance that it secured one (1) gigawatt of electricity for commercial use, SBIC would

have elected to discontinue its relationship with Whinstone, given Whinstone's prior failure to secure sufficient electrical power for the Pyote facility.

27. Once operations commenced—despite its prior (false) representation that it already secured one (1) gigawatt of electricity—Whinstone's failure delayed sufficient electricity supply to SBIC's mining operations.

28. Further, to induce SBIC to enter into the new Hosting Service Agreement, Whinstone represented that additional building permits, city inspections, and certifications were "not required with regard to providing services" under the Hosting Service Agreement. This representation was also false. Specifically, in the months before June 2020 (when delayed operations finally began), SBIC learned that certain certifications and inspections were, in fact, required to turn on power, despite Whinstone's prior false representations to the contrary.

29. Finally, in late June 2020, Whinstone began operation of a small number of SBIC's Equipment and operations continued to increase through August 2020. Whinstone's failure to obtain sufficient electrical power and its additional failure to obtain certain permits and certifications necessary to operate at full capacity meant that Whinstone could not ramp-up and operate SBIC's Equipment at full capacity.

30. Whinstone's inability to operate SBIC's Equipment at full capacity, along with other delays in operations at the facility, directly caused SBIC to lose out on the Bitcoin rewards it would have otherwise obtained.

31. The Hosting Service Agreement requires Whinstone to provide SBIC with notice of power outages and curtailments. But during this period, Whinstone regularly failed to provide SBIC with any such notice despite the occurrence of multiple power outages and curtailments. Whinstone also regularly failed to provide invoices and power

meter data (which is the basis for Whinstone's fees) as required under the Hosting Service Agreement.

### C. Whinstone fraudulently conceals from SBIC the substandard conditions at the Rockdale facility

32. Whinstone delayed in ramping up the number of miners in use—going from approximately 8,000 machines in August 2020 to 16,200 in September 2020. The number of machines up and running then declined to approximately 14,600 in April 2021 and never reached full usage of the 20,000 machines delivered to Whinstone.

33. Over time, SBIC determined that when compared to another mining facility operating the exact same SBIC mining equipment, its mining equipment at the Rockdale facility did not perform hash calculations as expected. *See supra* at ¶ 17.

34. When SBIC brought this underperformance to Whinstone's attention, Whinstone blamed the software provided by Northern Data[1] and the mining equipment manufactured by Canaan.

35. On multiple occasions, SBIC, Whinstone, and Northern Data discussed the lack of power monitoring data and inconsistent invoicing. The parties agreed to install and use power meter data for future invoices. Yet, despite this change, the total number of hosted SBIC machines (20,000) were never fully operational and per/machine output continued to show substandard computational performance.

36. At the same time, SBIC attempted to open communication channels between Canaan and Whinstone. For its part, Canaan complained about Whinstone's general unresponsiveness to its requests for information. Whinstone eventually ceased all

---

[1] In late 2019, it was publicly announced that Whinstone would be merging with Northern Data AG ("Northern Data"), a software and datacenter management company. Northern Data provided datacenter management software at the Rockdale facility.

communications with Canaan in December 2020.

37. Canaan's review of Whinstone data logs indicated that SBIC's machines were overheating and additionally, the data logs contained other indicia of poor datacenter conditions.

38. When Canaan requested access to Whinstone's facility and VPN,[2] Whinstone refused. Instead, Whinstone opened up circuit boards allegedly provided by Canaan, took photographs of the circuit boards, and proceeded to accuse Canaan of providing poorly manufactured PSUs.

39. To correct the alleged problem, Whinstone recommended SBIC purchase replacement PSUs from Whinstone, directly. Thus, in April 2021, at Whinstone's insistence, SBIC purchased 4,000 PSUs from Whinstone at a cost to SBIC of $72,000.

40. Whinstone falsely represented to SBIC in the Hosting Services Agreement that it would provide an installation environment for SBIC's Equipment, including but not limited to specific "Licensed Areas" in two separate buildings as well as rack systems, electricity supply (including a power distribution unit), transforming equipment, and free airflow and an evaporative-cooling system. But despite its contractual representations, Whinstone failed to provide the separate buildings, adequate rack systems, and electricity supply.

41. The new Hosting Service Agreement called for an evaporative cooling system as a primary measure to dissipate heat and prevent the overheating of SBIC's Equipment.

42. However, Whinstone failed to operate an evaporative cooling system,

---

[2] Virtual Private Network.

despite its representations that additional permits, city inspections, or certifications were not required for Whinstone to successfully provide services pursuant to the Hosting Service Agreement.

43. Whinstone repeatedly represented to SBIC that the facility contained an evaporative cooling system and that regardless, any heating issues at the facility could be resolved without an evaporative cooling system. Specifically, even though Whinstone installed cooling sheets at the facility, the facility contained no running water until June 2021. Whinstone never informed SBIC of the unavailability of water for evaporative cooling and repeatedly and falsely communicated that the facility did not experience any heat related problems.

44. During its visit to the facility in June 2021, SBIC first learned of the facility's dirty conditions, lack of dust filters, and non-operating water-cooling curtains.

45. SBIC took photos of dust collecting inside the datacenter, the machines, and on racks.

*[Photographs of some of the conditions at the facility are contained on the next page]*






46. At the onsite visit, SBIC's representatives opened up a miner in front of Ashton Harris, Whinstone's co-founder and chief information officer, and the individual responsible for managing the information and computer systems. Even Mr. Harris observed and acknowledged the high levels of dust and corrosion build-up.

47. The facility also housed equipment belonging to other Whinstone customers. During the aforementioned onsite visit, SBIC observed that Whinstone provided its other customers' equipment with dust filters—the same dust filters which were noticeably absent on SBIC's Equipment housed in the very same facility. This was a

shocking discovery, considering that on more than one occasion, Whinstone confirmed with SBIC that dust filters had been installed on SBIC's Equipment.

48. On June 25, 2021, SBIC accessed data provided by miners using Whinstone's VPN portal. The data contained in the miners indicated a low hash rate (a measure of computational power utilized for mining), overheating, and misconfiguration of equipment. In fact, some equipment was never changed from its default configuration and thus, never put into use for SBIC's mining operations.

49. Whinstone's deceptions of SBIC are numerous, including but not limited to the following misrepresentations:

    (1) that the datcenter was well designed, and conformed to industry standards;

    (2) that the datcenter and racks were built and configured to contractual requirements;

    (3) that building or other permits, city inspections, or certifications were not required with regard to providing services under the Hosting Service Agreement;

    (4) that the facility was not experiencing problems related to heat or dust (deliberately hiding concealing contractual breaches, and failing to notify SBIC of issues as required to prevent equipment damage);

    (5) that one (1) gigawatt of power was available at its Rockdale site and that 50 megawatts of power had been secured on October 24, 2019; and

    (6) Whinstone repeatedly misrepresented in 2019 and 2020 the availability of power after delays despite not securing power until May 2020.

50. Moreover, Whinstone breached the Hosting Service Agreement in multiple ways, including but not limited to the following:

    (1) Whinstone relocated SBIC Equipment and placed another customer's equipment in the space used by SBIC while failing to provide sufficient advanced smart hands services.

    (2) Whinstone needed additional permits, inspections or certification to provide services.

(3) Whinstone failed to install all SBIC Equipment within 30 days of the October 3, 2019, Ready for Use ("RFU") date and did not intend to do so during the said 30-day period while continuing to make misrepresentations that it would.

(4) Whinstone failed to maintain an intake temperature of less than 29 degrees Celsius due to its failure to operate evaporative cooling walls, and willfully concealed this fact; and failed to turn off machines with an intake temperature of greater than 29.5 degrees Celsius, and failed to provide reports to SBIC that there were problems with heat.

(5) Whinstone failed to prevent the mixing of hot exhaust air with cool air due to poor design of sizing of hot and cold aisles and insufficient air pressurization and did not use exhaust or intake fans at all despite industry knowledge that fans create a positive pressure system for efficient airflow and reduce hot-cold air mixing.

(6) Whinstone failed to use filters in the air intake system designed to prevent dust and dirt, while only using louvers and screens to prevent large objects and precipitation from entering the datacenter.

(7) Whitestone failed to ensure the datacenter and air inside was free of dust, dirt, insect particles, and corrosion which was found on the insides SBIC's equipment.

(8) Whinstone did not measure actual power consumption for billing purposes for several months as power meters were not installed.

(9) Whinstone did not adhere to requirements of § 3.12.2 of the Hosting Service Agreement.

(10) Whinstone failed to maintain hashrate to performance guarantees or specifications due to poor heat and dust control inside the datacenter.

(11) Whinstone failed to provide services or a datacenter in accordance with industry standards. Whinstone's poor design, poor control of dust and heat, and its efforts to hide those issues are contrary to any professional standard. Additionally, several industry experts who observed Whinstone's datacenter attest that Whinstone has a poor datacenter design and poor management of dirt and airflow inside the datacenter.

(12) Whinstone failed to provide maintenance or regular reports when hashrate fell below threshold levels.

(13) Whinstone failed on several occasions to give 24-hours' notice of downtime when it was known in advance or, when it was not known in advance, provide notice as soon as possible afterwards. SBIC gave several warnings to Whinstone regarding notifications.

(14) Whinstone failed to issue reports when 10 percent of machines were offline, and in almost all instances, did not respond within the

        required time.

    (15)    Whinstone did not secure up to one (1) gigawatt of electricity and had not signed power contracts until just before operations began in summer 2020, despite its explicit representation that it had done so.

51. Notice of these misrepresentations and breaches were enumerated in written correspondence from SBIC to Whinstone on May 27, 2022 and June 3, 2022, respectively.

### D. SBIC suffers millions in damages as a result of Whinstone's deceptions and its breaches of the Hosting Service Agreement

52. A month prior to SBIC's issuance of the June 3, 2022 notice to Whinstone, Whinstone announced its election to unilaterally terminate the Hosting Service Agreement. In response, SBIC's Equipment was prepared for shipment and moved out of the Whinstone facility and into storage for potential reuse or resale.

53. However, following their use at the Rockdale Facility, SBIC could not find buyers for the SBIC Equipment due to the equipment's poor and damaged condition. Indeed, the substandard operating conditions at the Rockdale facility became widely known by potential buyers after industry media coverage of Whinstone's sale to another company, Riot Blockchain, Inc., unwittingly revealed pictures of dust and corrosion at the facility.

54. Whinstone's conduct constitutes fraud, fraudulent inducement of contract, fraud by nondisclosure, negligent bailment, and breach of the Hosting Service Agreement.

55. At the time the parties entered in the Hosting Service Agreement, demand for electric capacity was significantly lower and space for cryptocurrency mining equipment was more readily available. Since the termination of the Hosting Service Agreement, demand for electric capacity has increased substantially and SBIC has been unable to find an economically viable company able to host its mining equipment at a

capacity close to the size of the facility promised by Whinstone.

56. Whinstone's conduct was knowing, intentional, willful, malicious, wanton, and contrary to law.

57. As a direct result of Whinstone's acts and omissions, SBIC suffered lost profits in excess of $15,000,000.

58. As a direct result of Whinstone's acts and omissions, SBIC suffered additional damages in excess of $16,000,000, which is the approximate cost of the equipment damaged at the Rockdale facility.

59. SBIC also incurred attorneys' fees and costs related to hiring counsel to pursue these claims and is entitled to indemnity pursuant to ¶ 8.3 of the Hosting Service Agreement.

## IV.
## CAUSES OF ACTION

### A.  Count I – Breach of Contract

60. SBIC adopts and reincorporates the allegations in paragraphs 1 through 59 as set forth herein.

61. SBIC and Whinstone entered into a valid and enforceable contract, the Hosting Service Agreement, dated Oct. 24, 2019.

62. SBIC delivered to Whinstone 20,000 A10-model mining machines and other equipment and timely paid all requisite costs and fees to Whinstone under the Hosting Service Agreement.

63. As outlined above and documented in SBIC's June 3, 2022 notice to Whinstone, Whinstone breached numerous terms of the Hosting Service Agreement.

64. As a proximate result of Whinstone's breaches, SBIC suffered benefit-of-

the-bargain damages as a result of Whinstone's breach, including lost profits in excess of $15,000,000, damages related to the cost of damaged equipment in excess of $16,000,000, as well as other out-of-pocket costs in reliance on the parties' agreement.

65. SBIC is entitled to recover its reasonable attorneys' fees against Whinstone pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code and the indemnity provision found in ¶ 8.3 of the Hosting Service Agreement.

**B.    Count II – Fraud/Fraudulent Inducement**

66. SBIC adopts and reincorporates the allegations in paragraphs 1 through 59 as set forth herein.

67. As outlined above, Whinstone made material misrepresentations to SBIC, including (1) that the datacenter was well designed and conformed to industry standards; (2) that the datacenter could be built to contractual requirements; (3) that building permits, city inspections, or other additional certifications were not required with regard to providing services under the Hosting Service Agreement; (4) that the Rockdale facility was not experiencing problems related to heat or dust; (5) that Whinstone had one (1) gigawatt of aggregate electrical power was available at its Rockdale site on or before October 24, 2019; (6) that 50 megawatts of power had been secured on October 24, 2019; and (7) that construction of the Rockdale facility was fully complete or near full completion.

68. At the time it made these representations, Whinstone knew they were false or lacked knowledge of the truth concerning these representations.

69. Whinstone intended that SBIC should rely and act on these misrepresentations by, *inter alia*, entering into the new Hosting Service Agreement and/or continuing to perform its obligations under the same.

70. SBIC relied on Whinstone's misrepresentations as inducement for entering into the new Hosting Service Agreement and/or continuing to perform its obligations under the same.

71. As a proximate result of Whinstone's intentional misrepresentations upon which SBIC relied, SBIC suffered benefit-of-the-bargain damages, including lost profits in excess of $15,000,000, damages related to the cost of damaged equipment in excess of $16,000,000, as well as other out-of-pocket costs in reliance on Whinstone's fraudulent misrepresentations.

72. Whinstone's fraudulent acts and omissions were committed knowingly, intentionally, willfully, maliciously, or with wanton and gross negligence for which SBIC should be awarded exemplary damages.

73. SBIC is entitled to recover its reasonable attorneys' fees against Whinstone pursuant to the indemnity provision provided in ¶ 8.3 of the Hosting Service Agreement.

**C.    Count III – Fraud by Nondisclosure**

74. SBIC adopts and reincorporates the allegations in paragraphs 1 through 59 as set forth herein.

75. Whinstone concealed from and/or failed to disclose certain facts to SBIC, including (1) that the datacenter was not properly designed and did not conform to industry standards; (2) that the datacenter was not built to contractual requirements; (3) that additional building permits, city inspections, or other certifications were, in fact, required with regard to Whinstone's ability to provide services under the Hosting Service Agreement; (4) that the Rockdale facility was experiencing significant problems related to heat or dust; (5) that Whinstone had not in fact secured one (1) gigawatt of aggregate electrical power at its Rockdale site as of October 24, 2019; (6) that not even 50 megawatts

of power had been secured on October 24, 2019; and (7) that construction of the Rockdale facility was fully complete or near full completion.

76. Whinstone had a duty to disclose these full facts to SBIC because (i) Whinstone discovered new information which made one or more prior representations misleading or untrue, (ii) Whinstone created a false impression by making one or more partial disclosures of certain facts, or (iii) Whinstone voluntarily disclosed some information and therefore had a duty to disclose the whole truth.

77. These undisclosed facts were material and Whinstone knew that (i) SBIC was ignorant of the facts, (ii) SBIC did not have an equal opportunity to discover the facts, and/or (iii) Whinstone was deliberately silent when it had a duty to speak.

78. By failing to disclose the foregoing facts, Whinstone intended to induce SBIC to enter into the new Hosting Service Agreement, perform its (SBIC's) obligations under the same, and refrain from further investigating Whinstone's false representations. SBIC relied on Whinstone's nondisclosures.

79. As a proximate result of Whinstone's failure to disclose, SBIC suffered benefit-of-the-bargain damages, including lost profits in excess of $15,000,000, damages related to the cost of damaged equipment in excess of $16,000,000, as well as other out-of-pocket costs in reliance on Whinstone's fraudulent misrepresentations.

80. Whinstone's fraudulent acts and omissions were committed knowingly, intentionally, willfully, maliciously, or with wanton and gross negligence for which SBIC should be awarded exemplary damages.

81. SBIC is entitled to recover its reasonable attorneys' fees against Whinstone pursuant to the indemnity provision provided in ¶ 8.3 of the Hosting Service Agreement.

### D. Count IV – Negligent Bailment

82. SBIC adopts and reincorporates the allegations in paragraphs 1 through 59 as set forth herein.

83. Alternatively, Whinstone's acts and omissions constitute negligent bailment.

84. SBIC delivered personal property in the form of 20,000 A10-model mining machines along with PSUs to Whinstone for the specific purpose of operating and maintaining a cryptocurrency mining facility on behalf of SBIC.

85. Whinstone accepted delivery of SBIC's mining equipment, and the parties entered into an agreement whereby Whinstone agreed to operate and maintain SBIC Equipment.

86. Whinstone understood that the SBIC Equipment would be returned to SBIC and that the equipment would be maintained and operated according to industry standards and the conditions provided in the Hosting Service Agreement.

87. Whinstone, however, failed to maintain and operate the equipment according to the terms of the Hosting Service Agreement or consistent with industry standards, which resulted in the harm, destruction, and/or waste of SBIC's Equipment.

88. As a proximate result of Whinstone's acts and omissions, SBIC incurred damages related to the cost of damaged equipment in excess of $16,000,000, as well as other out-of-pocket costs.

89. Whinstone's acts and omissions were committed knowingly, intentionally, willfully, maliciously, or with wanton and gross negligence for which SBIC should be awarded exemplary damages.

90. SBIC is entitled to recover its reasonable attorneys' fees against Whinstone

pursuant to the indemnity provision provided in ¶ 8.3 of the Hosting Service Agreement.

## V.
### REQUEST FOR ATTORNEYS' FEES

91. SBIC is entitled to recover its attorneys' fees and costs for this action, pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code, and/or the indemnity provision found in ¶ 8.3 of the Hosting Service Agreement, and SBIC hereby seeks such recovery from Whinstone of all its reasonable and necessary attorneys' fees and costs for prosecuting this action and obtaining the relief requested herein.

## VI.
### JURY DEMAND

92. SBIC demands a trial by jury on all claims and issues so triable

## VII.
### REQUESTED RELIEF

WHEREFORE, SBIC respectfully prays and requests that Whinstone be cited to appear and answer and that further, the Court award to SBIC the following:

A. All actual and consequential damages it has suffered;

B. Exemplary damages;

C. All reasonable and necessary attorneys' fees, expenses, and costs incurred in this action;

D. Prejudgment and post-judgment interest; and

E. All such other and further relief, special or general, legal or equitable as SBIC may be shown to be justly entitled to receive, including but not limited to its costs for bringing this suit.

Respectfully submitted,

*/s/ Joshua M. Sandler*
Joshua M. Sandler
Texas Bar No. 24053680
jsandler@winstead.com
Cory Johnson
Texas Bar No. 24046162
cjohnson@winstead.com
**WINSTEAD PC**
2728 N. Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (214) 745-5103
Facsimile: (214) 745-5390

**ATTORNEYS FOR PLAINTIFF
SBI CRYPTO CO. LTD**