# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

SBI CRYPTO CO., LTD.,

    Plaintiff,

  v.

WHINSTONE US, INC.,

    Defendant.

Civil Action No. 6:23-cv-252-ADA-JCM

## DEFENDANT WHINSTONE US, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION TO PLAINTIFF SBI CRYPTO CO., LTD.

TO: Plaintiff SBI Crypto Col, LTD ("SBI"), by and through its attorney of record, Joshua M. Sandler, Winstead PC, 2728 N. Harwood Street, Suite 500, Dallas, Texas 75201, jsandler@winstead.com.

  Pursuant to Federal Rule of Civil Procedure 34, Defendant Whinstone US, Inc. ("Whinstone") serves its First Set of Request for Production ("Requests") upon SBI.

  Your answers to these Requests, together with the production of responsive documents, shall be produced to Foley & Lardner, LLP, Attn: Robert T. Slovak, 2021 McKinney Avenue, Suite 1600, Dallas, Texas 75201, within 30 days from the date of these Requests.

DATED:  August 22, 2023                    Respectfully submitted by:


                                            */s/Robert T. Slovak*
                                            Robert T. Slovak
                                            Texas Bar No. 24013523
                                            rslovak@foley.com
                                            Brandon C. Marx
                                            Texas Bar No. 24098046
                                            bmarx@foley.com
                                            FOLEY & LARDNER LLP
                                            2021 McKinney Avenue, Suite 1600
                                            Dallas, Texas 75201
                                            Telephone: (214) 999-3000
                                            Facsimile: (214) 999-4667

                                            **ATTORNEYS FOR DEFENDANT**
                                            **WHINSTONE US, INC.**


## **CERTIFICATE OF SERVICE**

        I certify that, on August 22, 2023, a true and correct copy of the foregoing was served via electronic mail to all counsel of record.


                                            */s/ Brandon C. Marx*
                                            Brandon C. Marx

## <u>DEFINITIONS AND INSTRUCTIONS</u>

1.      Unless otherwise indicated, the use in the requests of the name of any party, person or business organization shall specifically include all agents, employees, shareholders, owners, officers, directors, joint venturers, representatives, general partners, limited partners, predecessors, successors, attorneys, divisions, subsidiaries, parent corporations, affiliates and all other persons acting or purporting to act through, on behalf of, at the direction of, or under the control of the subject party, person or business organization.

2.      The terms "and" and "or" shall be construed either conjunctively or disjunctively to bring within the scope of these requests any information that might otherwise be construed to be outside their scope.

3.      The terms "refer," "referring to," "relate," "regarding," or "relating to" mean, without limitation, having a legal, factual or logical connection, relationship, correlation, or association with the subject matter of the Request.

4.      The terms "COMMUNICATION" and "COMMUNICATIONS" means, without limitation, any oral or written utterance, notation, inquiry, discussion, statement, conversation, correspondence, negotiation, meeting, remark, question, answer, dialog, agreement, consultation, interview, telephone conversation, letter, note, telegram, telex, electronic memorandum, e-mail, text message, advertisement, and/or any other form of act or process by which information or knowledge is transmitted or conveyed.

5.      "DOCUMENTS" has the broadest meaning ascribed to it under the Federal Rules of Civil Procedure and includes, but is not limited to, ESI, COMMUNICATIONS, and any written, printed, typed, electronically recorded, handwritten or graphic matters, drafts, originals, copies, nonconforming copies which contain deletions, insertions, handwritten notes or comments, however produced or reproduced, and to any other means of retention of information or otherwise recorded matter of whatever character.

6.      Production of Electronic and Magnetic Data ("ESI"):

A.  As used herein, ESI includes potentially relevant Information electronically, magnetically, or optically stored as:

i.      Digital communications (e.g., e-mail, voice mail, text messages, instant messaging);

ii.     Word processed documents (e.g., Word or WordPerfect files, documents, and drafts);

iii.    Spreadsheets and tables (e.g., Excel or Lotus 123 documents)

iv.     Accounting application data (e.g., QuickBooks, Money, Peachtree data files);

v.   Image and facsimile files (e.g., .pdf, .tiff, .jpg., .gif images);

vi.   Sound recordings (e.g. .wav and .mp3 files);

vii.   Video and animation files (e.g., .avi and .mov files);

viii.   Databases (e.g., Access, Oracle, SQL server data, SAP);

ix.   Contact and relationship management data (e.g., Outlook, ACT!);

x.   Calendar and diary application data (e.g., Outlook PST, Yahoo, blog tools or files);

xi.   Online access data (e.g., temporary Internet files, web history, cookies);

xii.   Presentations (e.g., PowerPoint, Corel Presentations)

xiii.   Network access and server activity logs;

xiv.   Project management and application data;

xv.   Computer aided design/drawing files;

xvi.   Backup and archival files (e.g., .zip, .gho)

B.   Production of electronic or magnetic data responsive to these requests is specifically requested in the form in which it is kept in the ordinary course of business. Specifically, all documents responsive to these requests should be produced in electronic or digital format with all metadata intact in the following forms:

(a)   Delimited text files (.txt.), in which the TAB character (ASCII Character code 009) typically separates each field of text; or

(b)   comma separated values text files (.csv), in which the comma character (,) typically separates each field of text.

C.   To the extent that electronic or magnetic data responsive to these requests exists, which cannot be produced in the format in which it is kept in the ordinary course of business and as set forth in 6.a above, you are instructed to produce it in its native format, along with all metadata, and to convert the items into a format reasonably compatible with and readable by computers running the Windows operating systems and Microsoft Office software. Specifically, image files of such documents should be produced in PDF or TIF format; text data should be produced in ASCII format; any field-based data

should be produced in an ASCII delimited text format, identifying the delimiters. You are requested to identify each such document that was converted, the file format from which it was converted, and the program needed to access the file in its native format.

D. In the event that the electronic and magnetic data responsive to these requests cannot be converted into formats as described above, you are instructed to make the hard drives containing such information and documents responsive to these requests available for inspection and review.

7. The term "INFORMATION" means information in all forms in which it is stored and communicated, and includes ESI, COMMUNICATIONS, and DOCUMENTS.

8. "PERSON(S)," as used herein, means all individuals and entities, and shall be deemed to include natural persons, firms, partnerships, associations, organizations, joint ventures, corporations, and/or any other entities.

9. "SBI" means SBI Crypto Co., Ltd.

10. "WHINSTONE" means Whinstone US, Inc.

11. "JULY HOSTING AGREEMENT" means the Hosting Service Agreement dated July 5, 2019 between SBI and WHINSTONE.

12. "OCTOBER HOSTING AGREEMENT" means the Hosting Service Agreement dated October 14, 2019 between SBI and WHINSTONE.

13. "HOSTING AGREEMENTS" means the JULY and OCTOBER HOSTING AGREEMENTS, collectively.

14. "COMPLAINT" means SBI's Amended Complaint filed on July 6, 2023 in the above-captioned lawsuit against WHINSTONE, and any amendments or supplements thereto.

15. "THILLAINATHAN" means Aroosh Thillainathan.

16. "HARRIS" means Chad Harris.

17. "A. HARRIS" means Ashton Harris.

18. "CANAAN" means Canaan Inc.

19. "FACILITY" means WHINSTONE's data center facility in Rockdale, Texas.

20. "YOU" and "YOUR" means SBI.

21. These requests are continuing. If, after producing INFORMATION in response to these requests, you obtain or become aware of any further INFORMATION responsive to these requests, you are required to produce such additional INFORMATION.

22.     Unless otherwise indicated herein, the relevant timeframe of each request is January 1, 2019 to the present.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**  YOUR COMMUNICATIONS regarding the negotiation of the HOSTING AGREEMENTS.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 2:**  YOUR COMMUNICATIONS regarding the drafting of the HOSTING AGREEMENTS.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 3:**  YOUR COMMUNICATIONS regarding the execution of the HOSTING AGREEMENTS.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 4:**  YOUR COMMUNICATIONS regarding the performance of the HOSTING AGREEMENTS.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 5:**  YOUR COMMUNICATIONS regarding any breach of the HOSTING AGREEMENTS.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 6:**  YOUR COMMUNICATIONS regarding the termination of the HOSTING AGREEMENTS.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 7:**  All INFORMATION reflecting YOU provided WHINSTONE with notice of any breach of the HOSTING AGREEMENTS.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 8:**  All contracts between YOU and WHINSTONE.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 9:**  INFORMATION regarding the amount of power to be provided to YOU at the FACILITY.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 10:** INFORMATION regarding the amount of power that was provided to YOU at the FACILITY.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 11:** INFORMATION reflecting the type of mining equipment YOU used to mine cryptocurrency at the FACILITY.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 12:** INFORMATION reflecting the performance (including the hash rate) of the mining equipment YOU used to mine cryptocurrency at the FACILITY.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 13:** All technical specifications, user guides, and field manuals for any mining equipment YOU used to mine cryptocurrency at the FACILITY.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 14:** INFORMATION reflecting the number of miners YOU use to mine cryptocurrency at the FACILITY.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 15:** INFORMATION reflecting the type of mining equipment YOU use to mine cryptocurrency at any other location than the FACILITY.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 16:** INFORMATION reflecting the performance (including the hash rate) of the mining equipment YOU use to mine cryptocurrency at any other location than the FACILITY.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 17:** All technical specifications, user guides, and field manuals for any mining equipment YOU used to mine cryptocurrency at any other location than the FACILITY.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 18:** INFORMATION reflecting the number of miners YOU use to mine cryptocurrency at any other location than the FACILITY.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 19:** All COMMUNICATIONS regarding the maintenance of YOUR mining equipment at the FACILITY.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 20:** All COMMUNICATIONS regarding the maintenance of YOUR mining equipment at any other location than the FACILITY.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 21:** As alleged in paragraph 11 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that the JULY HOSTING AGREEMENT "fell through."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 22:** As alleged in paragraph 12 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone made numerous representations and warranties concerning power capacity, permits, and operating conditions to induce SBIC to enter into a new hosting service agreement at Whinstone's Rockdale facility."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 23:** As alleged in paragraph 13 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone's representations about its Rockdale facility were false."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 24:** As alleged in paragraph 13 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone deliberately misled SBIC into believing it held the requisite building permits and power contracts to perform as promised and then concealed the substandard conditions at its facility."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 25:** As alleged in paragraph 14 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[t]he lack of permits and power contracts delayed the ramp-up of SBIC mining operations and cost SBIC millions in lost revenue."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 26:** As alleged in paragraph 14 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone's failure to provide a datacenter environment in accordance with the parties' agreement and basic

industry standards directly led to the underperformance of SBIC mining operations and damage to SBIC's mining equipment."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 27:**  As alleged in paragraph 15 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone's deceptive acts and omissions caused SBIC to lose millions in profits and millions more in damaged mining equipment."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 28:**  As alleged in paragraph 16 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[i]n early 2019, SBIC visited and negotiated with several potential datacenters to host its mining equipment before ultimately deciding to enter into an agreement with Whinstone."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 29:**  As alleged in paragraph 17 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[i]n April 2019, SBIC signed a $30 million purchase order for 40,000 Avalon A10 mining machines from Canaan, Inc."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 30:**  All YOUR COMMUNICATIONS with CANAAN regarding the 40,000 Avalon A10 mining machines that YOU alleged to have purchased from CANAAN.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 31:**  As alleged in paragraph 17 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[h]alf (20,000) of those machines were sent to the Whinstone facility with the other half delivered to another datacenter facility in 2021."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 32:**  As alleged in paragraph 20 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone persuaded SBIC to enter into a new agreement . . . by offering hosting space and management services at its facility in Rockdale, Texas."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 33:**  As alleged in paragraph 21 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[i]n late 2019, SBIC delivered to Whinstone 20,000 A10-model mining machines along with $3.4 million in power supply units."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 34:**  INFORMATION reflecting the type of power supply units YOU used to mine cryptocurrency at the FACILITY.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 35:**  All technical specifications, user guides, and field manuals for the power supply units YOU used to mine cryptocurrency at the FACILITY.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 36:**  INFORMATION reflecting the type of power supply units YOU used to mine cryptocurrency at any other location than the FACILITY.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 37:**  All technical specifications, user guides, and field manuals for the power supply units YOU used to mine cryptocurrency at any other location than the FACILITY.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 38:**  As alleged in paragraph 21 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "SBIC also prepaid to Whinstone $9,685,000 for power and fees to help Whinstone finance the final buildout of the Rockdale facility."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 39:**  As alleged in paragraph 22 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[a]s part of Whinstone's efforts to induce SBIC to enter into the new Hosting Service Agreement, Whinstone represented it had 'secured for commercial access up to one (1) gigawatt of aggregated electricity that can be delivered to the Data Center, of which a portion of that may be incrementally offered to [SBIC]."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 40:**  As alleged in paragraph 23 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[t]his representation was false at the time it was made because Whinstone had not, in fact, secured

commercial access to one (1) gigawatt of aggregated electricity for the Rockdale facility and would not secure signed power contracts until just before operations began in the summer of 2020."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 41:**  As alleged in paragraph 24 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "following Whinstone's failure to secure sufficient electricity for the proposed Pyote facility, the aforementioned (false) representation (that Whinstone had secured commercial access to one (1) gigawatt of aggregated electricity for the Rockdale facility) was a material addition to and modification of the parties' prior agreement."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 42:**  As alleged in paragraph 24 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "the representation was material to SBIC's decision to enter into the new Hosting Service Agreement in October 2019."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 43:**  As alleged in paragraph 25 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone's representation regarding secured electrical capacity constituted a material representation because it served as an assurance to SBIC that Whinstone could quickly provide the requisite scale and capacity to host SBIC and its other customers at the inception of operations."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 44:**  As alleged in paragraph 25 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "because a facility with a one (1) gigawatt capacity yields volume discounts in electricity pricing, Whinstone's misrepresentation constituted a further inducement to SBIC to enter into the new Hosting Service Agreement."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 45:**  As alleged in paragraph 26 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "SBIC relied on Whinstone's misrepresentations as an inducement to enter into the new Hosting Service Agreement."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 46:**  As alleged in paragraph 26 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "were it not for Whinstone's express assurance that it secured one (1) gigawatt of electricity for commercial use,

SBIC would have elected to discontinue its relationship with Whinstone, given Whinstone's failure to secure sufficient electrical power for the Pyote facility."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 47:**  As alleged in paragraph 27 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[o]nce operations commenced—despite its prior (false) representation that it already secured one (1) gigawatt of electricity—Whinstone's failure delayed sufficient electricity supply to SBIC's mining operations."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 48:**  As alleged in paragraph 27 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "SBIC only learned of Whinstone's misrepresentation through press releases and SEC filings by Whinstone and its parent company, Riot Blockchain, in the later half of 2021."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 49:**  As alleged in paragraph 28 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "to induce SBIC to enter into the new Hosting Service Agreement, Whinstone represented that additional building permits, city inspections, and certifications were 'not required with regard to providing services' under the Hosting Agreement."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 50:**  As alleged in paragraph 28 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[t]his representation was also false."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 51:**  As alleged in paragraph 28 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[i]n the months before June 2020 (when delayed operations finally began), SBIC learned that certain certifications and inspections were, in fact, required to turn on power, despite Whinstone's prior false representations to the contrary."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 52:**  As alleged in paragraph 29 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[i]n late June 2020, Whinstone began operation of a small number of SBIC's Equipment and operations continued to increase through August 2020."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 53:** As alleged in paragraph 29 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone's failure to obtain sufficient electrical power and its additional failure to obtain certain permits and certifications necessary to operate at full capacity meant that Whinstone could not ramp-up and operate SBIC's Equipment at full capacity."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 54:** As alleged in paragraph 30 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone's inability to operate SBIC's Equipment at full capacity, along with other delays in operations at the facility, directly caused SBIC to lose out on the cryptocurrency rewards it would have otherwise obtained."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 55:** As alleged in paragraph 31 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "during this period Whinstone regularly failed to provide SBIC with any such notice despite the occurrence of multiple power outages and curtailments."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 56:** As alleged in paragraph 31 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone also regularly failed to provide invoices and power meter data (which is the basis for Whinstone's fees) as required under the Hosting Service Agreement."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 57:** As alleged in paragraph 32 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[i]n August and September 2020, SBIC complained to Whinstone that, based on the production of cryptocurrency mined, it appeared to SBIC that not all of its machines were up and running at full capacity."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 58:** As alleged in paragraph 32 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[w]hen SBIC communicated to Whinstone that its equipment was underperforming, Ashton Harris at Whinstone blamed the software provided by Northern Data and the mining equipment manufactured by Canaan."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 59:** As alleged in paragraph 32 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[i]n August of

2020, Whinstone opened up circuit boards manufactured by Canaan, took photographs of the circuit boards, and Whinstone's CEO, Chad Harris, accused Canaan of providing poorly manufactured PSUs."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 60:** As alleged in paragraph 32 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Chad Harris further asserted that there were no heating or other issues at the facility."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 61:** As alleged in paragraph 33 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[b]ased on Whinstone's claims that Canaan had provided poorly manufactured equipment, SBIC attempted to open communication channels between the two."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 62:** As alleged in paragraph 33 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Between September and November 2020, Canaan complained about Whinstone's general unresponsiveness to its requests for information."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 63:** As alleged in paragraph 33 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[b]y November 2020, Canaan's review of Whinstone data logs indicated that SBIC's machines were overheating, as well as other indicia of poor datacenter conditions, which Ashton Harris and others at Whinstone denied."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 64:** As alleged in paragraph 34 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[w]hen Canaan requested physical access to Whinstone's facility and VPN to verify its preliminary analysis, Whinstone refused and insisted that there were no issues at the facility."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 65:** As alleged in paragraph 35 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[f]rom approximately February 2020 to the first half of 2021, SBIC's employees could not freely travel to and from Japan because of Covid travel restrictions."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 66:** As alleged in paragraph 35 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "SBIC relied on Whinstone's active concealment and false representations that the facility did not suffer from overheating and other environmental issues."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 67:** As alleged in paragraph 35 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[i]nstead of fully disclosing the actual cause of the underperformance of SBIC's equipment, Whinstone recommended SBIC purchase replacement PSUs from Whinstone, directly."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 68:** As alleged in paragraph 35 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "in April 2021, SBIC purchased 4,000 PSUs from Whinstone at a cost to SBIC of $72,000."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 69:** As alleged in paragraph 36 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "despite its contractual representations, Whinstone failed to provide the separate buildings, adequate rack systems, and electrical supply."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 70:** As alleged in paragraph 38 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone failed to operate an evaporative cooling system, despite its representations that additional permits, city inspections, or certifications were not required for Whinstone to successfully provide services pursuant to the Hosting Service Agreement."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 71:** As alleged in paragraph 39 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone repeatedly represented to SBIC that the facility contained an evaporative cooling system and that regardless, any heating issues at the facility could be resolved without an evaporative cooling system."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 72:** As alleged in paragraph 39 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "even though Whinstone installed cooling sheets at the facility, the facility contained no running water until June 2021."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 73:**  As alleged in paragraph 39 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone . . . repeatedly and falsely communicated that the facility did not experience any heat related problems."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 74:**  As alleged in paragraph 40 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "on May 28, 2021, Whinstone notified SBIC of its termination of the Hosting Service Agreement."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 75:**  As alleged in paragraph 41 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "SBIC employees visited the facility on June 10, 2021."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 76:**  As alleged in paragraph 41 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "the visit revealed to SBIC the dirty floors and racks, lack of dust filters, inadequate recirculation of air, and the non-operating water-cooling curtains at the facility."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 77:**  As alleged in paragraph 41 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[p]rior to its employees visiting the facility on June 10, 2021, SBIC relied on the multiple representations from Whinstone's representatives concerning the causes of SBIC's Equipment underperformance."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 78:**  The photographs contained in paragraph 42 of the COMPLAINT.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 79:**  All DOCUMENTS and COMMUNICATIONS that YOU contend provided YOU the right to take the photographs contained in paragraph 42 of the COMPLAINT.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 80:** As alleged in paragraph 43 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[a]t the onsite visit, SBIC's representatives opened up a miner in front of Ashton Harris, Whinstone's co-founder and chief information officer, and the individual responsible for managing the information and computer systems."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 81:** As alleged in paragraph 43 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[e]ven Mr. Harris observed and acknowledged the high levels of dust and corrosion build-up."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 82:** As alleged in paragraph 44 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[d]uring the aforementioned onsite visit, SBIC observed that Whinstone provided its other customers' equipment with dust filters—the same dust filters which were noticeably absent on SBIC's Equipment housed in the very same facility."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 83:** As alleged in paragraph 44 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "on more than one occasion, Whinstone confirmed with SBIC that dust filters had been installed on SBIC's equipment."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 84:** As alleged in paragraph 45 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[o]n June 25, 2021, SBIC accessed data provided by miners using Whinstone's VPN portal."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 85:** As alleged in paragraph 45 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[t]he data contained in the miners indicated a low hash rate (a measure of computational power utilized for mining), overheating, and misconfiguration of equipment."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 86:** As alleged in paragraph 45 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[i]t was then that SBIC learned that some equipment was never changed from its default configuration and thus, never put into use for SBIC's mining operations."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 87:**  As alleged in paragraph 46 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "SBIC's equipment was moved out of the facility in July and August of 2021."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 88:**  As alleged in paragraph 47 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "SBIC spent months looking to reuse its equipment at another facility."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 89:**  As alleged in paragraph 47 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "the substandard operating conditions at the Rockdale facility became widely known by potential buyers after industry media coverage of Whinstone's sale to Riot Blockchain, Inc., unwittingly revealed pictures of dust and corrosion at the facility."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 90:**  As alleged in paragraph 48(5) of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that Whinstone "misrepresent[ed] 50 megawatts of power had been secured on October 24, 2019."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 91:**  As alleged in paragraph 48(6) of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that Whinstone "misrepresent[ed] in 2019 and 2020 the availability of power after delays despite not securing power until May 2020."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 92:**  As alleged in paragraph 49(1) of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone relocated SBIC Equipment and place another customer's equipment in the space used by SBIC while failing to provide sufficient advance smart hands services."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 93:**  As alleged in paragraph 49(2) of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone failed to install all SBIC Equipment within 30 days of the October 3, 2019, Ready for Use ('RFU') date and did not intend to do so during the said 30-day period while continuing to make misrepresentations that it would."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 94:**  As alleged in paragraph 49(3) of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone failed to maintain an intake temperature of less than 29 degrees Celsius due to its failure to operative cooling walls, and willfully concealed this fact; and failed to turn off machines with an intake temperature of greater than 29.5 degrees Celsius, and failed to provide reports to SBIC that there were problems with heat."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 95:**  As alleged in paragraph 49(4) of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone failed to prevent the mixing of hot exhaust air with cool air due to poor design of sizing of hot and cold aisles and insufficient air pressurization and did not use exhaust or intake fans at all despite industry knowledge that fans create a positive pressure system for efficient airflow and reduce hot-cold air mixing."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 96:**  As alleged in paragraph 49(5) of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone failed to use filters in the air intake system designed to prevent dust and dirt, while only using louvers and screens to prevent large objects and precipitation from entering the datacenter."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 97**  As alleged in paragraph 49(6) of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone failed to ensure the datacenter and air inside was free of dust, dirt, insect particles, and corrosion which were found on the insides [sic] SBIC's equipment."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 98:**  As alleged in paragraph 49(7) of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone did not measure actual power consumption for billing purposes for several months as power meters were not installed."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 99:**  As alleged in paragraph 49(8) of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone did not adhere to requirements of § 3.12.2 of the Hosting Service Agreement."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 100:** As alleged in paragraph 49(9) of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone failed to maintain hashrate to performance guarantees or specifications due to poor heat and dust control inside the datacenter."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 101:** As alleged in paragraph 49(10) of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "several industry experts who observed Whinstone's datacenter attest that Whinstone has a poor datacenter design and poor management of dirt and airflow inside the datacenter."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 102:** As alleged in paragraph 49(11) of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone failed to provide maintenance or regular reports when hashrate fell below threshold levels."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 103:** As alleged in paragraph 49(12) of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone failed on several occasions to give 24-hours' notice of downtime when it was known in advance or, when it was not known in advance, provide notice as soon as possible afterwards. SBIC gave several warnings to Whinstone regarding notifications."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 104:** As alleged in paragraph 49(13) of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone failed to issue reports when 10 percent of machines were offline, and in almost all instances, did not respond within the required time."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 105:** As alleged in paragraph 49(14) of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone . . . had not signed power contracts until just before operations began in summer 2020, despite its explicit representation that it had done so."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 106:** All INFORMATION reflecting the date that YOU first became of aware of Whinstone's alleged breaches of contract.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 107:**  All INFORMATION reflecting the date that YOU first became of aware of Whinstone's alleged fraudulent inducement.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 108:**  All INFORMATION reflecting the date that YOU first became of aware of Whinstone's alleged fraud.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 109:**  All INFORMATION reflecting the date that YOU first became of aware of Whinstone's alleged fraud by nondisclosure.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 110:**  All INFORMATION reflecting the date that YOU first became of aware of Whinstone's alleged fraudulent concealment.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 111:**  As alleged in paragraph 54 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "While looking to resale or reuse its equipment, SBIC spent several months moving that equipment to storage."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 112:** As alleged in paragraph 54 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "SBIC timely noticed breach of contract on June 2, 2022, after its efforts mitigate its damages proved futile."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 113:** As alleged in paragraph 55 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[a]t the time the parties entered in the Hosting Service Agreement, demand for electric capacity was significantly lower and space for cryptocurrency mining equipment was more readily available."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 114:** As alleged in paragraph 55 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "[s]ince the termination of the Hosting Service Agreement, demand for electric capacity has increased substantially and SBIC has been unable to find an economically viable company able to host its mining equipment at a capacity close to the size of the facility promised by Whinstone."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 115:** As alleged in paragraph 58 of the COMPLAINT, all DOCUMENTS and COMMUNICATIONS supporting YOUR contention that "Whinstone's conduct was knowingly, intentional, willful, malicious, wanton, and contrary to law."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 116:** As alleged in paragraph 59 of the COMPLAINT, all INFORMATION supporting YOUR contention that "[a]s a direct result of Whinstone's acts and omissions, SBIC suffered lost profits of $15,000,000 when SBIC's Equipment went unused, underperformed, and was damaged by the conditions at Whinstone's facility."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 117:** As alleged in paragraph 60 of the COMPLAINT, all INFORMATION supporting YOUR contention that "[a]s a direct result of Whinstone's acts and omissions, SBICE suffered additional damages in excess of $16,000,000, which is the approximate cost of the SBIC Equipment damaged at the Rockdale facility, which otherwise could have been resold at a profit.."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 118:** As alleged in paragraph 61 of the COMPLAINT, all INFORMATION, including but not limited to engagement letters and invoices (redacted for privilege), supporting YOUR contention that "SBIC also incurred attorneys' fees and costs related to hiring counsel to pursue these claims and is entitled to indemnity pursuant to ¶ 8.3 of the Hosting Service Agreement."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 119:** As alleged in paragraph 64 of the COMPLAINT, all INFORMATION, including but not limited to DOCUMENTS and COMMUNICATIONS reflecting the amounts and dates paid, supporting YOUR contention that SBI "timely paid all requisite costs and fees to Whinstone as agreed . . ."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 120:** As alleged in paragraph 65 of the COMPLAINT, all INFORMATION supporting YOUR contention that "SBIC suffered benefit-of-the-bargain damages as a result of Whinstone's breach, including lost profits, damages related to the cost of damaged equipment, and/or out-of-pocket costs in reliance on the parties' agreement . . . ."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 121:** As alleged in paragraph 70 of the COMPLAINT, all INFORMATION supporting YOUR contention that "Whinstone made material misrepresentations to SBIC, including . . . . that construction of the Rockdale facility was fully complete or near full completion."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 122:** As alleged in paragraph 71 of the COMPLAINT, all INFORMATION supporting YOUR contention that "Whinstone knew its representations were false at the time it made representations . . . and/or lacked knowledge of the truth concerning certain representations, and/or had no intention of performing certain obligations at the time promised, and/or no intention of performing in the future."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 123:** As alleged in paragraph 72 of the COMPLAINT, all INFORMATION supporting YOUR contention that "Whinstone intended that SBIC should rely and act on their misrepresentations by, *inter alia*, entering into the new Hosting Service Agreement and/or continuing to perform its obligations under the same after operations began."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 124:** As alleged in paragraph 73 of the COMPLAINT, all INFORMATION supporting YOUR contention that "SBIC relied on Whinstone's misrepresentations as inducement for entering into the new Hosting Service Agreement and/or continuing to perform its obligations under the same after operations began."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 125:** As alleged in paragraph 75 of the COMPLAINT, all INFORMATION supporting YOUR contention that SBI "should be awarded exemplary damages."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 126:** As alleged in paragraph 79 of the COMPLAINT, all INFORMATION supporting YOUR contention that "Whinstone had a duty to disclose these full facts to SBIC because (i) Whinstone discovered new information which made one or more prior representations misleading or untrue, (ii) Whinstone created a false impression by making one or more partial disclosures of certain facts, or (iii) Whinstone voluntarily disclosed some information and therefore had a duty to disclose the whole truth."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 127:** As alleged in paragraph 80 of the COMPLAINT, all INFORMATION supporting YOUR contention that "[t]hese undisclosed facts were material and Whinstone knew that (i) SBIC was ignorant of the facts, (ii) SBIC did not have an equal opportunity to discover the facts, and/or (iii) Whinstone was deliberately silent when it had a duty to speak."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 128:** As alleged in paragraph 81 of the COMPLAINT, all INFORMATION supporting YOUR contention that "[b]y failing to disclose the foregoing facts, Whinstone intended to induce SBIC to enter into the new Hosting Service Agreement, perform its (SBIC's) obligations under the same, and refrain from further investigating Whinstone's false representations. SBIC relied on Whinstone's nondisclosures."

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 129:** All of YOUR COMMUNICATIONS with WHINSTONE, including, but not limited to, HARRIS and A. HARRIS, regarding YOUR mining equipment at the FACILITY.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 130:** All of YOUR COMMUNICATIONS with any third party regarding YOUR mining equipment at the FACILITY.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 131:** All DOCUMENTS and COMMUNICATIONS reflecting any payments YOU have made to CANAAN.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 132:** YOUR COMMUNICATIONS with THILLAINATHAN regarding this lawsuit, the HOSTING AGREEMENTS, the FACILITY, and/or WHINSTONE.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 133:** All DOCUMENTS and COMMUNICATIONS concerning YOUR purchase of any mining equipment that was used at a location other than the FACILITY to mine cryptocurrency.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 134:** All DOCUMENTS and COMMUNICATIONS concerning YOU reselling any mining equipment that was used at a location other than the FACILITY to mine cryptocurrency.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 135:** All DOCUMENTS and COMMUNICATIONS relating to WHINSTONE paying YOU approximately $7 million in June 2021, including, but not limited to, the reasons for such payment.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 136:** All DOCUMENTS and COMMUNICATIONS relating to WHINSTONE paying YOU approximately $237 thousand in February 2022, including, but not limited to, the reasons for such payment.

**ANSWER:**