# EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN
DISTRICT OF TEXAS WACO DIVISION

|  |  |
|---|---|
| **SBI Crypto Co., Ltd.,** | |
| *Plaintiff,* | |
| v. | Civil Action No.: 6:23-cv-252-ADA-JCM |
| **Whinstone US, Inc.,** | |
| *Defendant.* | Jury Trial Demanded |

## <u>DISCOVERY DISPUTE SUMBISSION CHART</u>

| Discovery Dispute at Issue | Requesting Party's Position | Responding Party's Position |
|---|---|---|
| **Purported "Clawed-back" Documents:**<br><br>SBI produced three emails (inclusive of attachments) in October 2023 that were used in depositions of SBI's former CEO and CFO, Carson Smith and Jonathan Tanemori, respectively, in August 2024. Def.'s Dep. Ex. No. 5, attached as Exhibit 1; Def.'s Dep. Ex. No. 18, attached as Exhibit 2; Def.'s Dep. Ex. No. 19, attached as Exhibit 3. Separately, a PowerPoint presentation from that same production was used in | SBI waived privilege to Exhibit Nos. 5, 18, 19, and 36.<br><br>First, "privilege may be waived . . . by [failing] to assert it when information subject to privilege is sought during the course of legal proceedings." *E.g., Crossroads Sys. (Tex.), Inc. v. Dot Hill Sys. Corp.,* No. A-03-CA-754-SS, 2006 WL 1544621, at *1 (W.D. Tex. May 31, 2006). With "inadvertent disclosure," courts apply the following five-factor test: "(1) the reasonableness of precautions taken to prevent disclosure; | SBI inadvertently disclosed Exhibit Nos. 5, 18, 19, and 36, and has requested to clawback the documents.<br><br>The five-factor test favors the finding of inadvertent disclosure. Discovery has been extensive in this case with tens of thousands of pages of documents produced. SBI has itself produced well over 10,000 pages of documents with the bulk of discovery centering on various communications both internal |

SBI's corporate representative deposition of Carson Smith on April 15, 2025. Def.'s Dep. Ex. No. 36, attached as Exhibit 4. SBI did not object to the use of or to the many substantive questions about these deposition exhibits' contents. *E.g.*, J. Tanemori Dep. Tr. (Aug. 15, 2024) at 125:14-127:17, attached as Exhibit 5. In response to some of those substantive questions, Mssrs. Smith and Tanemori's admitted that SBI owed an additional $4.9 million under the at-issue contract and had personally formulated a plan to sue Whinstone—which was not disclosed as part of the settlement process post-contract termination. Whinstone asserted counterclaims for breach of contract and fraudulent inducement on November 25, 2024. Am. Answer (Nov. 25, 2024) (ECF No. 61). Moreover, SBI admitted it received millions of dollars' worth in Northern Data convertible bonds (*i.e.*, "free money"), in part, as compensation for any delays.

For the next a year-and-a-half SBI made no claim that Deposition Exhibit Nos. 5, 18, and 19 were privileged. And, SBI even served amended interrogatory responses on April 11, 2024 (*i.e.*, just two business days before SBI's corporate representative deposition)

(2) the amount of time taken to remedy the error; (3) the scope of discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness." *Id.*, at *2.

Here, the exhibits: (1) were produced over a year-and-a-half ago; (2) were the subject of extensive and unimpeded questioning during three SBI witness depositions (two of which occurred over eight months ago); (3) are part of the evidentiary record; and (4) support Whinstone's counterclaims and defenses in this case. Two were even affirmatively cited by SBI as evidence of notice of SBI's claims. It would be patently unfair to find waiver did not occur. Texas federal courts routinely agree. *E.g.*, *AHF Cmty. Dev., LLC v. City of Dallas*, 258 F.R.D. 143, 148 (N.D. Tex. 2009); *Crossroads*, 2006 WL 1544621, at *1.

Second, "the attorney-client privilege 'was intended as a shield, not a sword.'" *Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir. 1989). When a "litigant 'place[s] information protected by it in issue through some affirmative act for his own benefit,'" "fairness demands treating the defense as a waiver of the privilege.'" Under the offensive-use doctrine, waiver also occurs when: "(1) the party asserting privilege is seeking

and external. This is the typical inadvertent disclosure where a small handful of privileged documents were lost in the voluminous sea of non-privileged documents produced in this case. *See Myers v. City of Highland Vill., Tex.*, 212 F.R.D. 324, 328 (E.D. Tex. 2003). The fact that certain privileged documents were produced in October 2023 along with thousands of non-privileged documents shows that the production was inadvertent. Also, SBI's counsel was not alerted to the privileged nature of certain documents when they were presented for the first time at the depositions of Carson Smith and Jonathon Tanemori in August 2024 because the emails at issue have no lawyer referenced or cc'd on the face of the documents. However, during the deposition of SBI's corporate representative, Carson Smith, SBI's counsel confirmed that certain documents were created at the direction of SBI's in-house counsel and therefore seeks to claw them back in accordance with the terms of the Agreed E-Discovery Order. At a minimum, Whinstone has no basis to assert that

that affirmatively cited two of these allegedly privileged documents—Whinstone Deposition Exhibit Nos. 18 and 19—as proof of when SBI became aware of circumstances giving rise to its breach of contract claims to Whinstone. *E.g.*, SBI Am. Interrog. Resp. No. 2, attached as Exhibit 6.

Despite its failure to object to prior questions about and its own reliance on these allegedly privileged documents, on April 15, 2025, SBI claimed—during its corporate representative deposition of the same Carson Smith deposed in August 2024—that Whinstone Deposition Exhibit Nos. 5, 18, and 19 were privileged ***after*** additional questioning about the substance of these documents. *E.g.*, C. Smith (Apr. 15, 2025) (Rough) at 88:6-90:4, attached as Exhibit 7. SBI instructed its witness not to answer certain questions as well.

For its part, SBI made no claim of "privilege" for Deposition Exhibit No. 36 until April 23, 2025—when SBI's counsel sent a cursory email requesting the document be clawed back without explanation.

These documents are material including to notice issues and the upcoming

affirmative relief; (2) the privileged information sought must be such that, if believed by the fact finder, in all probability it would be outcome determinative of the cause of action asserted; and (3) disclosure of the privileged information is the only means by which the aggrieved party may obtain the evidence." *Maryland Cas. Co. v. Acceptance Indem. Ins. Co.*, No. A-08-CA-697 RP, 2009 WL 10669797, at *3 (W.D. Tex. Oct. 8, 2009).

Here, SBI sued for breach of contract. To recover, SBI must establish it provided notice of its claims to Whinstone within 12 months of SBI becoming "aware of the circumstances giving rise to the claim." Def.'s Mot. Dismiss (Jun. 16, 2023) Ex. 1 § 8.11 (ECF No. 10). The "privileged" documents show SBI knew (at the very latest) of the "circumstances" giving rise to its claims by May 30, 2021—but notice of those claims was not given until June 3, 2022 (*i.e.*, more than 12 months). *Compare* Ex. 2 *with* Def.'s Dep. Ex. 13, attached as Exhibit 8. Moreover, SBI knew it could resell its equipment in June 2021—which SBI now claims is worthless and claims damages. Ex. 3. SBI cannot seek relief but shield from disclosure dispositive

any privilege was intentionally waived because the documents do not appear to privileged on their face. Nor did the testimony of the Tanemori and Smith regarding the documents reveal they were created at the request of SBI's in-house counsel.

At a minimum, SBI did not intentionally waive any privilege and Whinstone has no basis for the broad subject matter waiver that it is seeking. Under Federal Rule of Evidence 502(a), a waiver extends to undisclosed communications or information "only if: (1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness be considered together." None of the elements are met here. SBI at most failed to instantly recognize the documents as privileged, but did not intentionally waive privilege. *First Am. CoreLogic, Inc. v. Fiserv, Inc.*, No. 2:10-CV-132-TJW, 2010 WL 4975566, at *5 (E.D. Tex. Dec. 2, 2010). Rule 502(a) is "limited to situations in which a party intentionally puts protected

dispositive motion deadline on May 23, 2025. *See* Fourth Am. Sched. Order (Jan. 24, 2025) at 2. Whinstone therefore requests that the Court hold that Whinstone Deposition Exhibit Nos. 5, 18, 19, and 36 cannot be clawed-back as any privilege has been waived or, alternatively, the documents themselves are not privileged. And, in either event, Whinstone may use these documents as evidence.

facts fatal to its case—which is fraud upon the Court.

Finally, SBI has not met its evidentiary burden proving privilege exists.

**Requested Relief**:

Whinstone requests the Court overrule SBI's privilege objections, hold the Whinstone Deposition Exhibits 5, 18, 19, and 36 may be used in evidence, compel the production of all such other communications regarding the same subject matter with 5 days, and order the re-opening of SBI's corporate representative for questioning on these documents.

information in the litigation in a selective, misleading, and unfair manner." *In re Washington Prime Group Inc.*, No. 21-31948, 2024 WL 4615552, at *8 (Bankr. S.D. Tex. Oct. 29, 2024). Furthermore, there is no basis to compel the re-opening of the deposition of SBI's corporate representative as, according to Whinstone, they have conducted two depositions on SBI's officers at which these documents were the subject of "extensive and unimpeded questioning" by Whinstone's counsel.

Finally, the inadvertently disclosed documents are privileged as the communications and analysis contained therein were created or drafted at the direction of SBI's in-house counsel.

**Requested Relief**

SBI requests that the Court sustain SBI's privilege objections to Exhibits 5, 18, 19, and 36, order Whinstone to return these documents to SBI, deny Whinstone's motion to compel the production of communications

| | | regarding the same subject matter, and deny Whinstone's request to re-open the deposition of SBI's corporate representative. |
| --- | --- | --- |
| | | |

Respectfully submitted,

*/s/Joshua Sandler (with permission)*
Joshua M. Sandler
Texas Bar No. 24053680
jsandler@winstead.com
Cory Johnson
Texas Bar No. 24046162
cjohnson@winstead.com
**WINSTEAD PC**
2728 N. Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (214) 745-5103
Facsimile: (214) 745-5390

**ATTORNEYS FOR PLAINTIFF
SBI CRYPTO CO. LTD**

*/s/Brandon C. Marx*
Robert T. Slovak
Texas Bar No. 24013523
rslovak@foley.com
Brandon C. Marx
Texas Bar No. 24098046
bmarx@foley.com
FOLEY & LARDNER LLP
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
**ATTORNEYS FOR DEFENDANT
WHINSTONE US, INC.**

# EXHIBIT 1

**From:** Jonathan Tanemori (SBI Holdings, Inc.)
**Sent:** Sunday, June 20, 2021 10:50 PM CDT
**To:** Carson Smith (cbsmith@sbigroup.co.jp) <cbsmith@sbigroup.co.jp>; Carson Blake <carson@sbicrypto.com>
**CC:** 奥田　愛梨 (SBI Crypto) <aiokuda@sbigroup.co.jp>
**Subject:** Whinstone 80% counter calculation
**Attachment(s):** "Whinstone counter calc.xlsx"

Carson,

Based on contract's 80% min. payment under Sec. 3.13.1, the table below shows the 80% amount billed vs. what we actually paid. **The difference is $4.9M potential counter-claim by Whinstone, SHOULD they actually raise this issue and counter.**
This is more than the balance of the one-time payment due SBI of approx. $4.3 M.

Push-back to their counter:
- The entire contract was premised on 20,000 miners running and being maintained by Whinstone; this was never the case and Whinstone did not follow directions under Advanced Smart Hands to increase the # of miners running
- Whinstone never billed us for these amounts, initially because there was a delay in installation and ramp-up power availability. Agreed to just bill on actual usage.
- Revenue loss, damage to the miners, loss in resale value due to Whinstone service exceeds this differential. If Whinstone wants to claim 80% min. payment, then we will go after damages.

| | # Days | 80% Min. | Actually pd. | Counter Amt. |
|---|---|---|---|---|
| Payment for July 2020 | 23 | 728,640.00 | 60,400.00 | 668,240.00 |
| Payment for August 2020 | 31 | 982,080.00 | 352,572.64 | 629,507.36 |
| Payment for September 2020 | 30 | 950,400.00 | 706,037.36 | 244,362.64 |
| Prepayment for October 2020 | 31 | 982,080.00 | 1,034,300.00 | -52,220.00 |
| Prepayment for November 2020 | 30 | 950,400.00 | 996,900.00 | -46,500.00 |
| Prepayment for December 2020 | 31 | 982,080.00 | 685,441.73 | 296,638.27 |
| Prepayment for January 2021 | 31 | 982,080.00 | 679,906.25 | 302,173.75 |
| Prepayment for February 2021 | 28 | 887,040.00 | 493,839.42 | 393,200.58 |
| Prepayment for March 2021 | 31 | 982,080.00 | 868,070.77 | 114,009.23 |
| Prepayment for April 2021 | 30 | 950,400.00 | 289,961.03 | 660,438.97 |
| Prepayment for May 2021 | 31 | 982,080.00 | 702,837.16 | 279,242.84 |
| Prepayment for June 2021 | 30 | 950,400.00 | 505,887.37 | 444,512.63 |
| Adjustment for May/June | | | -959,721.64 | 959,721.64 |
| | | 11,309,760.00 | 6,416,432.09 | 4,893,327.91 |

Jonathan Tanemori

SBIH, Overseas Business Administration
03-6229-0118
Extension #3834



EXHIBIT
Tanemori
5  8/15

| Invoice # | Date Issued | Description | Amount $ | Note |
|---|---|---|---|---|
| 1 | 1133 10/31/2019 | One-time Prepay+Oct/Nov 2019+installation pr | 8,582,430.00 | used for security deposit |
| 2 | 1134 10/31/2019 | Prepayment for December 2019 | 1,102,000.00 | used for security deposit |
| 3 | 1149 11/12/2019 | Customs Duty | 225,329.95 | |
| 4 | 1165 11/25/2019 | Customs Duty | 170,276.28 | |
| 5 | 1006 11/26/2019 | Customs Duty | 182,332.27 | |
| 6 | 1067 11/27/2019 | Customs Duty | 282,332.27 | |
| 7 | 1003 12/6/2019 | Customs Duty | 196,767.05 | |
| 8 | 1009 12/13/2019 | Customs Duty | 252,144.44 | |
| 9 | 1010 12/13/2019 | Customs Duty | 238,654.70 | |
| 10 | 1321 12/18/2019 | Shipping Charges | 190,810.00 | |
| 11 | 1299 10/21/2020 | Payment for July 2020 | 80,400.00 | July actual |
| 12 | 1300 10/25/2020 | Payment for August 2020 | 282,579.84 | Aug actual |
| 13 | 1301 10/25/2020 | Payment for September 2020 | 708,037.39 | Sep actual |
| 14 | 1505 10/31/2020 | Prepayment for October 2020 | 1,034,306.00 | |
| 15 | 1506 10/23/2020 | Prepayment for November 2020 | 898,600.00 | |
| 16 | 1519 10/30/2020 | Security Deposit | 545,000.00 | Balance against $2.5M security deposit |
| 17 | 1518 11/01/2020 | Prepayment for December 2020 | 685,441.73 | Oct adjustment |
| 18 | 1537 12/08/2020 | Prepayment for January 2021 | 679,085.35 | Nov adjustment |
| 19 | 15624 01/01/2021 | Prepayment for February 2021 | 483,836.43 | Dec adjustment |
| 20 | 1015 01/01/2021 | Prepayment for March 2021 | 888,076.77 | Jan adjustment |
| 21 | 202003 04/2021 | Prepayment for April 2021 | 288,661.03 | Feb adjustment |
| 22 | 1556804/13/2021 | Prepayment for May 2021 | 702,657.18 | March adjustment |
| 23 | 1560 05-05/01/2021 | Prepayment for June 2021 | 605,657.37 | April adjustment |
| | | Adjustment for May/June | (659,721.64) | |
| | | | **Total** 18,607,369.18 | |
| | | missing | 8,418,432 | |

| | # Days | 33% Min. | Actually pd. | Counter Amt. |
|---|---|---|---|---|
| Payment for July 2020 | 23 | 726,640.00 | 80,400.00 | 658,240.00 |
| Payment for August 2020 | 31 | 982,080.00 | 282,579.84 | 699,507.36 |
| Payment for September 2020 | 30 | 950,400.00 | 708,037.39 | 344,362.64 |
| Prepayment for October 2020 | 31 | 982,080.00 | 1,034,306.00 | -52,226.00 |
| Prepayment for November 2020 | 30 | 950,400.00 | 898,600.00 | -46,605.00 |
| Prepayment for December 2020 | 31 | 982,080.00 | 685,441.73 | 296,638.27 |
| Prepayment for January 2021 | 31 | 982,080.00 | 679,806.35 | 302,173.75 |
| Prepayment for February 2021 | 28 | 887,040.00 | 483,836.43 | 305,203.58 |
| Prepayment for March 2021 | 31 | 982,080.00 | 868,070.77 | 114,009.23 |
| Prepayment for April 2021 | 30 | 950,400.00 | 288,661.03 | 690,438.97 |
| Prepayment for May 2021 | 31 | 982,080.00 | 702,657.18 | 279,342.84 |
| Prepayment for June 2021 | 30 | 950,400.00 | 605,657.37 | 444,512.63 |
| Adjustment for May/June | | | -659,721.64 | 659,721.64 |
| | | 11,309,760.00 | 8,418,433.04 | 4,893,237.84 |

# EXHIBIT 2

**From:** Carson Smith <carson@sbicrypto.com>
**Sent:** Sunday, May 30, 2021 8:10 AM CDT
**To:** Jonathan Tanemori (SBI Holdings, Inc.) <jotanemori@sbigroup.co.jp>
**Subject:** Emailing New Whinstone Hosting Agrt - 20191023 - final.pdf
**Attachment(s):** "New Whinstone Hosting Agrt - 20191023 - final.pdf"

I highlighted sections of breaches and note in pursuing claims of damages in yellow.
Our breaches in red.
Notes of interest to check or pursue in court discovery in green
Other notes in other colors

1. Pursue damages related to return of 90% of installation fee.
2. Pursue 5% penalty interests on all payments wherever possible.
3. Pursue damages for delayed start (we may lose this due to not claiming within 12 months of becoming aware. Highlighted section on this term due)
4. Pursue damages of shipment, lost revenue
5. Confidentiality notice. Pursuit of special damages arriving from breach. (Riot or Whinstone owes us our mining revenue for remaining term?)
Chad told me riot will use our space. Given that he also admitted miners started arriving before acquisition. The quick time to terminate, not certainly read our contract, was aware of the change of control clause, and it played a material consideration in their valuation of the deal and to proceed forward.



CONFIDENTIAL

SBIC0000068

Initial: _____

# Hosting Service Agreement

This Hosting Service Agreement ("Agreement") shall be effective upon the date of receipt of the electronic signature by Whinstone US, Inc.

BY AND BETWEEN

Whinstone US, Inc., a company having its registered office located at 4304 Firestone Road, Metairie, LA 70001 ("Whinstone")

AND

SBI Crypto Co., Ltd., a registered company in Tokyo, Japan located at 1-6-1 Roppongi, Minato-ku, Tokyo, Japan, ("Customer").

Whinstone and the Customer are referred to individually as "Party" and collectively as "Parties"

WHEREAS

    (A)    The Parties entered into an agreement for Whinstone to provide, and the Customer to purchase, services to host, provide electrical power and ventilation, and maintain the Customer's cryptocurrency mining equipment at its Data Center on 10 July 2019, and

    (B)    The Parties want to continue that arrangement under modified terms

NOW THEREFORE, the parties hereby agree as follows

## I.   DEFINITIONS

1.1    In this Agreement the following words and expressions shall have the meanings set out below. Additional terms may be defined in the context of particular provisions of this Agreement:

"AUP" or "Acceptable Usage Policy" means Whinstone Acceptable Usage Policy, from time to time which, at the date of this Agreement, is set out in Schedule to this Agreement.

"Advanced Remote Hands Service" means repair and maintenance services that require taking Customer Equipment off rack as detailed in Clause 2.4 below.

"Basic Remote Hands Service" means repair and maintenance services performed without taking Customer Equipment off rack as detailed in Clause 2.3 below.

"Business Day" means a day which is not a Saturday, Sunday or a public holiday in United States or Japan.

"Change of Control" means the sale of all or substantially all the assets of a Party; any merger, consolidation or acquisition of a Party with, by or into another corporation, entity or person, or any change in the ownership of more than fifty percent (50%) of the voting capital stock of a Party in one or more related transactions.

"Confidential Information" means the terms of this Agreement and all information whether in written or any other form which has been or may be disclosed in the course of the

1

CONFIDENTIAL

SBIC0000069

Initial _____

discussions leading up to the entering into or performance of this Agreement and which is identified as confidential or is clearly by its nature confidential including information relating to this Agreement or the Services, data used or generated in the provision of the Services, or any of Customer's products, operations, processes, plans or intentions, know - how, trade secrets, market opportunities, customers and business affairs.

"**Customer Equipment**" means the Customer equipment installed in the Licensed Area,

"**Data Center**" means the Whinstone leased site located at the former Alcoa Rockdale Energy Sandow Mine facility in Rockdale, Texas; located on FM 1736, Rockdale, TX 76567.

"**Data Center Rules**" means the rules applying to the Customer's use of the Data Center.

"**Data Protection Laws**" means the laws and regulations governing the use of personal data.

"**Defaulting Party**" means the Party that is in default of its obligations under this Agreement.

"**Extended Term**" shall have the meaning set out in Clause 13.1 below.

"**Force Majeure**" means any event beyond the reasonable control of either or both of the parties including but without limitation to war, civil war, armed conflict or acts of terrorism or a public enemy or other catastrophes, riot, civil commotion, malicious damage, compliance with any law or governmental order, rule or regulation or direction coming into force after the date of this Agreement, epidemics, pressure waves caused by devices traveling at supersonic speeds, nuclear accident, and acts of God and strikes, slowdowns, lockouts or other labor stoppages excluding employee(s) of Whinstone affecting third parties which in each case causes either party to be unable to comply with all or a material part of its obligations under this Agreement.

"**Hosting Service**" means service providing electrical power and ventilation to the Customer Equipment as detailed in Clause 2.2 below;

"**Initial Term**" shall have the meaning set out in Clause 13.1 below.

"**Intellectual Property**" means all intellectual property, including patents, utility models, trade and service marks, trade names, domain names, rights in designs, copyrights, moral rights, topography rights, rights in databases, trade secrets and know-how, in all cases whether or not registered or registrable and including registrations and applications for registration of any of these and rights to apply for the same, rights to receive equitable remuneration in respect of any of these and all rights and forms of protection of a similar nature or having equivalent or similar effect to any of these anywhere in the world.

"**IP Connection Service**" means the connection to the Customer Equipment permitting communication with the Internet as specified in the Service Details.

"**Licensed Area**" means the floor area for operating or storing Customer Equipment

"**Maintenance**" means any work carried out by Whinstone in order to upgrade, improve or maintain the Service including any modification, change, addition or replacement which does not detract from, reduce or impair the overall quality or performance of the Service;

2

Initial: _____

"**Miners**" means cryptocurrency mining machines, which are part of the Customer Equipment that connect using the IP Connection Service and send computation results to the Mining Pool;

"**Mining Pool**" is the pooling of resources by Miners, who share their processing power over a network, to split the reward equally, according to the amount of work they contributed to the probability of finding a block;

"**Party**" means Whinstone and the Customer (as the case may be) and shall include their permitted assignees and "**Parties**" shall mean both of them;

"**Personal Data**" shall have the meaning as defined under the Data Protection Laws;

"**RFU Date**" means the Ready For Use Date, which is the date Whinstone will fully provide the Customer the Services under Clause 3.13.1.

"**Representatives**" means, in relation to any party, its officers, employees and agents;

"**Scheduled Maintenance**" means Maintenance that is: (i) carried out between the hours of 12:00 am to 6:00 am; and (ii) notified to the Customer at least five (5) Business Days in advance;

"**Service Details**" means service details in the format provided by Whinstone pursuant to which the Customer may request Services;

"**Services**" collectively means Hosting Service, Basic Remote Hands Service, and Advanced Remote Hands Service;

"**Specified Power Draw**" shall have the meaning set out in Clause 3.13 below; and

"**Whinstone Equipment**" means any equipment which is supplied by or on behalf of Whinstone to the Customer for the purpose of providing the Services and includes any equipment specified in Service Details

1.2    In the event of any conflict between any of the documents referred to in this Clause 1.2, they shall be given the following order of priority:

    1.2.1    the terms of the relevant Service Details;

    1.2.2    the terms set out in this Agreement; and

    1.2.3    the terms set out in the AUP

1.3    In the Agreement

    1.3.1    references to Clauses, paragraphs and sub-paragraphs are references to clauses, paragraphs, sub-paragraphs of or to this Agreement;

    1.3.2    the headings contained in this Agreement are for convenience only and shall not influence the interpretation of this Agreement;

    1.3.3    any reference to a statute, statutory provision, subordinate legislation, code or guideline ("legislation") is a reference to such legislation as amended and in force

3

SBIC0000071

Initial: _____

           from time to time and to any legislation which re-enacts or consolidates (with or without modification) any such legislation

1.4     Whinstone and the Customer each represents and warrants to each other that it has the power to enter into, exercise its rights under and perform and comply with its obligations under this Agreement and all actions, conditions and things required to be taken, fulfilled and done by it to so enter into, exercise its rights under and perform and comply with its obligations under this Agreement and ensure that those obligations are valid, legally binding and enforceable have been taken, fulfilled and done

## 2.     SERVICE DESCRIPTION

2.1     Data Center Facilities

     2.1.1     Whinstone will provide an installation environment for the Customer Equipment including, but not limited to, the Licensed Area in two buildings, rack systems, electricity supply (including PDU), transforming equipment, free air cooling (including evaporative-cooling), smoke detection, IP Connection Service and physical security. Physical security includes 24-hour patrol, camera security, and a fence around the Licensed Area

     2.1.2     Whinstone shall grant the Customer, free of charge, escorted access to the Data Center for equipment inspections, installation, removal, additions, subtractions or physical maintenance by prior appointment

     2.1.3     With written prior consent of the Customer, Whinstone may relocate the Customer Equipment within the Data Center or to another facility operated by Whinstone provided that there are no changes to the terms of this Agreement. Any such relocation of the Customer Equipment will be carried out by Whinstone. Any costs incurred in relation to such relocation will be borne by Whinstone. The Customer shall reserve the right to inspect the new facility beforehand.

     2.1.4     When the Customer visits the Data Center or accesses the Data Center network remotely the Customer shall at all times comply with the Data Center Rules that have been provided to the Customer in advance; provided, however, that the Customer shall only be obligated to comply with such Data Center Rules to the extent that they are reasonable. Whinstone shall provide the Customer a copy of the Data Center Rules and shall send a new copy if there are any changes made therein

     2.1.5     Whinstone represents and warrants that building or other permits, city inspection, or certification is not required with regard to providing services under this Agreement

2.2     Overview of Hosting Service

     Whinstone shall be responsible for the following:

     2.2.1     License of the Licensed Area

     2.2.2     Provision of the cabling for a connection to the IP Connection Service by way of a CAT 5e Ethernet cable

4

CONFIDENTIAL

SBIC0000072

Initial: _____

2.2.3.    Escorted access by the Customer's employees to the Customer Equipment at any time from 10 am to 5 pm Monday through Friday.

2.2.4    [Electrical alarm and security sell out service.]

2.2.5    Physical Security. The facility will be surrounded by fence and monitored by security cameras. Whinstone shall implement Access control policies to ensure non-authorized persons are not able to enter the facility [cameras etc. and will be monitored at times.]

2.2.6    IT Security: Whinstone will install a firewall and implement an IT security policy to prevent unauthorized access physically or remotely, viruses and ransomware.

2.2.7.    Fire detection and alarm system.

2.2.8    Equipment parts storage and inventory management.

2.2.9    Acceptance of delivery of the Customer Equipment between 10:00 am to 4:00 pm on Business Days, subject to two (2) Business Days' notice to Whinstone, to be stored prior to installation.

2.2.10.    Whinstone will be solely responsible for handling any complaints from third parties with respect to the noise from the Customer Equipment and shall hold the Customer harmless from any responsibility or costs arising out of or in relation to such complaints.

2.2.11.    Whinstone will install all customer equipment on the Data Center racks, provide power and internet connection within thirty (30) days of RFU Date. Installation includes unpacking, assembly and installation, LAN cable and power connection, initial setting, and garbage disposal.

2.2.12    Whinstone will provide stable power supply to the Customer's equipment at 240V. The manufacturer specifications for turbo-mode power consumption of the equipment is 2.361 kW. The equipment's power consumption may be adjusted by following instructions from the manufacturer. Whinstone will comply with any request from the Customer to adjust the power consumption if the total power consumption of all Customer equipment does not exceed the Specified Power Draw, or fall below eighty percent (80%) of the Specified Power Draw, unless both Parties mutually agree to do so.

2.2.13    Whinstone will follow the Service Level Agreement in Clause 4 and make its best efforts to ensure:

i    Average air intake temperature into the Customer's miners is not greater than twenty-nine (29) degrees Celsius by maintaining sufficient airflow, preventing mixing of cool and hot exhaust air from the equipment in the Data Center, and using evaporative cooling;

ii    [This is not part of the air intake system of the Data Center facility, and the air inside the Data Center is free of dust, moisture, corrosion, and condensation.]

5

Initial: _____

    iii.    [redacted]

    iv.    [redacted]

2.2.14  Whinstone will label all the Customer Equipment, cables, replacement parts to track inventory, replacement parts, and to make Basic Remote Hand Service the most efficient.

    i.    Whinstone will reference miners with a unique identifiable identification number when giving reports to the Customer.

    ii.    For equipment other than miners which may not have a unique ID number, Whinstone will properly label and store the equipment separate from other customers in the Data Center.

2.2.15  Whinstone will provide monthly reports to the Customer. These reports shall contain a summary of metrics gathered from Whinstone's monitoring system, summary of equipment maintenance queue, and stock numbers of all Customer equipment, monthly power draw as measured from power consumption meters.

2.2.16  In pursuance of Clause 2.2.6, Whinstone will provide Basic Remote Hands Service at no extra charge as outlined in Clause 2.3.1, and will offer Advanced Remoted Hands Service for additional cost as outline in Clause 2.3.2

2.2.17  Customer may inspect the site before shipping its equipment and supplies to bring the Customers miners online. Upon completion of the inspection, the Customer may reduce the Specified Power Draw cited in Clause 3.13.1 if the site does not meet Customer's expectations, and reduce the Advanced Remote Hands Service fee by the same proportionate amount as the reduction of Specified Power Draw

2.3    Basic Remote Hands Service

2.3.1  Basic Remote Hands Service is available twenty-four (24) hours a day, seven (7) days a week. Where requested by the Customer, Whinstone staff shall be available to perform the following tasks only on the instructions of the Customer in respect of the Customer Equipment

    i.    Remote monitoring of equipment performance and status;

    ii.    Remote fault diagnosis;

    iii.    Pushing a button;

    iv.    Switching a toggle;

    v.    Power cycling (turning on/off) the Customer Equipment;

    vi.    Re-setting, rebooting the Customer Equipment;

    vii.    Securing cabling to connections;

    viii.    Observing, describing and/or reporting to the Customer indicator lights or display information on machines or consoles;

6

Initial: _____

    ix.    Cable organization;

    x.    Modifying basic cable layout, labelling and/or re-labelling of the Customer Equipment,

    xi.    Cable patching;

    xii.    Checking alarms for faults, and/or

    xiii.    Inserting/removing discs or equivalent storage devices into/ from the Customer Equipment

2.4    Advance Remote Hands Service

    2.4.1    The following Advanced Remote Hands Services, are not included in the Basic Remote Hands Service, but may be provided by Whinstone to the Customer on a best effort basis pursuant to the prior agreement between the parties. Unless explicitly expressed in Clause 2.3.1, in cases of ambiguity between Advanced Remote Hands Services and Basic Remote Hands Services, Advanced Remote Hands Services shall come into effect if the Customer Equipment must be taken off the rack

        i.    Installing applications or software to the Customer Equipment,

        ii.    Uploading of data to the Customer Equipment,

        iii.    Configuring the Customer Equipment operating system,

        iv.    Configuring any software or applications on the Customer Equipment,

        v.    Customer Equipment component fault diagnosis;

        vi.    Software component fault diagnosis;

        vii.    Rectifying problems caused by the Customer Equipment or software;

        viii.    Rectifying problems caused by the Customer; or

        ix.    Any service whatsoever requiring the opening of the outer casing of any of the Customer Equipment

    2.4.2    Communication for Advance Remote Hands Service shall be done via email or Whinstone's ticketing system. Whinstone will follow the Service Level Agreement as well as the work schedule specified in Clause 4

    2.4.3    Advanced Remote Hands Service shall be provided by Whinstone to the Customer from the time Customer Equipment is being installed for a fixed monthly charge as detailed in Clause 3.12, separately from Hosting Fees which includes only the Basic Remote Hands Service

## 3.    CHARGES AND PAYMENTS

3.1    In consideration of the provision of the Services, the Customer shall pay charges in accordance with this Clause 3

7

SBIC0000075

Initial _____

3.2    Whinstone shall issue a monthly invoice to the Customer no later than the tenth day of the following month containing all charges and fees for providing the Services under this Agreement, including the Hosting Fees prepayment under Clause 3.11.2. The Customer shall pay the undisputed amounts of such invoice no later than the last day of the month in which the Customer receives it.

3.3    If the Customer requests Whinstone to provide any services other than contemplated in this Agreement, Whinstone shall be entitled to invoice the Customer for any and all changes to such services pursuant to the agreement between the parties.

3.4    If the either Party fails to pay any amount owed under this Agreement by the dates set forth herein.

    3.4.1    The Party to receive payment shall be entitled but not obliged to charge the Customer interest five percent (5%) per year on the overdue amount commencing three (3) business days after the due date up to the date of actual payment.

    3.4.2    Actual power consumption is measured at the end of each month, and a credit or debit is applied toward the next hosting fee prepayment invoice. If the credit or debit is not paid or applied on that invoice, the Party to receive payment shall be entitled but not obliged to charge the other Party interest five percent (5%) per year on the overdue amount commencing three (3) business days after the due date of the invoice to the date of actual payment.

3.5    All charges and payments referred to in this Agreement are inclusive of value-added or sales tax (if applicable) and all similar taxes and duties payable in respect of such payments. To the extent that additional tax is properly chargeable to the Customer, the Customer shall pay at the by the end of the month following the date the invoice was received by the Customer.

3.6    All amounts due under this Agreement shall be paid in accordance with all work performed and services provided.  In the event that the parties change the scope of the Services, Whinstone and the Customer will agree on all billing changes and handle each credit or debit once there is a mutual agreed amount.

3.7    In the event of any failure by the either Party to make full payment to other Party of any and all amounts due to pursuant to this Agreement, the Party owing payment shall be responsible for all costs and expenses (including legal fees) which the other party reasonably incurs in collecting such amounts.

3.8    The Parties may combine charges and invoices and offset any amounts owed to the other Party.

3.9    Security Deposit

    3.9.1    The Customer will pay a security deposit of United States dollars two million five hundred thousand only (US$2,500,000) by October 31, 2019 into a third-party escrow account mutually agreed upon by both Parties. Both Parties shall equally bear escrow costs and fees thereof. The escrow fund must pay interest on security deposit at a commercially reasonable rate. All interest earned on the funds in the escrow account shall remain with the Customer.

8

CONFIDENTIAL

SBIC0000076

Initial: _____

3.9.2    The Customer may repossess the security deposit in full upon termination of the contract.

3.9.3    Whinstone shall notify the Customer of delinquent payments. If not cured within seven (7) business days, Whinstone may withdraw the delinquent amount from the security deposit upon notification to the Customer.

3.9.4    Neither party shall withdraw for any other reason from the escrow account without mutual consent of the Parties.

3.10    Installation Fees

3.10.1    The Customer shall pay an installation fee of **United States dollars thirty-three only (US$33)** per miner for installation service and initial configuration. Fifty percent (50%) is due before installation begins, fifty percent (50%) is due after installation is complete.

3.10.2    Installation is considered complete when the miner is seen remotely connecting to the Mining Pool and sending computation. In cases of faulty equipment, installation will be considered complete when Whinstone diagnoses the fault, sends a report to the Customer, and completes installation of alternative equipment.

3.10.3    If Whinstone fails to install the Customer equipment within thirty (30) days of the RFU Date, the Whinstone shall pay the Customer United States dollars fifteen only (US$15) per miner installed after thirty (30) days past the RFU date.

3.11    Hosting Fees

3.11.1    The Hosting Fees cover all services and items specified in this Agreement except for Installation Fees in Clause 3.10 and Advanced Remote Hands Service in Clause 3.12 and is calculated based on the power consumption of the Customer's equipment and shall not include Whinstone's own equipment (PUE) or the equipment of Whinstone's other customers. The Hosting Fee rate shall be **three and one third United States cents per kilowatt-hour ($0.033/kWh)** ("Hosting Fee Rate"). Whinstone will install power consumption meters between the breaker panel and the server racks holding the Customer's equipment.

3.11.2    Hosting Fee prepayments will be invoiced sixty (60) days in advance according to forecasted power consumption for the number of days in the applicable billing month. Actual power consumption for all billing months will be measured from the power consumption meters at the end of each month and adjustments for actual power not consumed or overconsumed will be made as a credit or debit on the next invoice. Whinstone shall provide Customer with relevant payment details, such as the destination bank account and other relevant information, and keep the Customer updated from time to time.

3.11.3    Forecasted usage for the first two months after the RFU date for 20,000 machines will be calculated using 2.361 kW per machine X 20,000 machines X $Hosting Fee Rate = $1,558.26/hour, or $37,398.24/day. From the third billing month of the initial contract term, Whinstone will invoice an average consumption rate for the Hosting Fee prepayment.

9

Initial: _____

    3.11.4  Whinstone shall **deduct United States dollars one hundred fifty thousand only (US$150,000)** each month during the Initial Term for twenty-four (24) consecutive months from any invoiced Hosting Fee prepayments in 3.11.3 above.

3.12.    Advanced Remote Hands Service Fee

    3.12.1  Whinstone will invoice the Customer a fixed monthly fee of **United States dollars twenty-five thousand only (US$25,000)** for the Advanced Remote Hands Services based on a scale of 20,000 Miners. If Whinstone provides the service for less than 20,000 Miners, this fee will be reduced by a proportionate amount. Whinstone will invoice Advanced Remote Hands Services together with the Hosting Fees and the applicable period for services rendered shall be the same month as the Hosting Fees unless otherwise specified.

    3.12.2  Whinstone will adhere to all sections of the Service Level Agreement in Clause 4 as well as those specifically detailed for the Advanced Remote Hands Service.

3.13.    **Specified Power Draw**

    3.13.1  Whinstone will provide the Customer with at least five (5) MW of power available for the Services by October 31, 2019, and at least fifty (50) MW ("Specified Power Draw") for the Customer equipment by 15 December 2019. As a minimum commitment from the RFU date, regardless of power consumption, the Customer shall pay for Hosting Fees for greater than or equal to eighty percent (80%) of the Specified Power Draw at the rate specified in Clause 3.11.1. As an example only and not intended by the parties to change the above provision:

        For a 30-day month: 80% * 50,000kW * Hosting Fee * 24 hours * 30days = $950,400.00
        For a 31-day month: 80% * 50,000kW * Hosting Fee * 24 hours * 31days = $982,080.00

    3.13.2  If the Customer uses less than two percent (2%) over and above the Specified Power Draw, the Customer will be charged for additional usage at the Hosting Fee Rate. The Customer acknowledges and understands that Whinstone cannot provide more than two percent (2%) over the Specified Power Draw. If Customer wants to use a power draw for more than two percent (2%) over and above the Specified Power Draw, the Parties must first enter into a separate written agreement, under which Whinstone shall offer the Customer the Hosting Fee Rate for two (2) years.

    3.13.3  If Whinstone determines that the over-usage of power cannot be reasonably permitted, Whinstone reserves the right to require the Customer to remove or deactivate sufficient Customer Equipment to prevent such over-usage within twenty-four (24) hours of notification, which will describe in detail the reasons for the removal or deactivation. Whinstone shall consult with the Customer in good faith before determine to remove or deactivate.

3.14.    One-time Prepayment

    3.14.1  The Customer will pay a one-time prepayment of **United States dollars seven million five hundred thousand only (US$7,500,000)** by October 31, 2019. Whinstone shall use that prepayment to provide the Services ("One-time Prepayment").

CONFIDENTIAL

SBIC0000078

Initial: _____

3.14.2   If this Agreement is terminated by Whinstone during the Initial Term, if the Customer terminates the Agreement because Whinstone is a Defaulting Party during the Initial Term, or if this Agreement is terminated due to a Change of Control, Whinstone shall return a portion of One-time Prepayment amount as calculated based on the differential between 3.75 cents/kWh less Hosting Rate and # of months from RFU to date of termination x $150,000.

$$\text{Amount to Repay} = \text{One-time Prepayment} - \frac{(\$0.0375 - \text{Hosting Rate})}{\text{kW/h}} \times 24 \text{ hours/day}$$

$$\times\ 2.361 \text{ kW/h} \times 1.05 \text{ PUE} \times 20,000 \text{ [# of miners]}$$

$$\times\ (730.25 \text{ [days in 2 yrs.]} - \text{# of days to Initial Term date})$$

$$-\ \$150,000 \times (24 - \text{# of calendar months remaining in the Initial Term})$$

Example: Early Termination date 365 days prior to Initial Term

| | | |
|---|---|---|
| Start (RFU) | 2019/12/15 | |
| End | 2021/12/14 | |
| **Early Termination Date** | **2020/12/14** | |
| # Days in Intial Term | 730.3 | |
| Days from Termination to End | 365.0 | |
| | | |
| One-time Prepayment | **7,500,000** | |
| | | |
| LESS (A) + (B) | | |
| **(A) Variable Use Amount** | **1,955,822** | Days paid x $ repaid per day |
| Rate differential | 0.0045 | =0.0375-0.033 |
| hours/day | 24 | |
| kW per hour (2.361 x 1.05) | 2.479 | |
| # of miners | 20,000 | 5,354.75  $ repaid per day |
| Days paid during Intial Term | 365.3 | (730.5   # from termination) |
| | | |
| | | |
| **(B) Fixed Monthly Amount** | **1,800,000** | |
| Monthly return | 150,000 | |
| # months to termination | 12 | |
| Months paid | 12 | |
| | | |
| **Amount to repay** | **3,744,178** | **49.9%** |

3.14.3   Whinstone shall return said amount to the Customer within thirty (30) days of termination of the Agreement, unless otherwise agreed upon by both Parties.

## 4.   OPERATIONS AND SERVICE LEVEL AGREEMENT ("SLA")

4.1   Whinstone reserves the right to vary the technical specifications of the Services where necessary for operational reasons and without detracting from, reducing or impairing the overall quality or performance of the Services, after giving reasonable written notice to the Customer (except in the case of an emergency where notice is not possible; provided, however, that in such case, Whinstone shall provide notice to the Customer then as soon as reasonably possible).

11

SBIC0000079

Initial _____

4.2    Without prejudice to Clause 4.1, Whinstone reserves the right to, after providing the Customer with reasonable advanced written notice (provided, however, that in the event of an emergency, as soon as reasonably possible) at any time to make any change, addition to or replacement of any part of the Services where this is required to conform with any applicable safety, statutory or legal requirement, provided that this does not detract from, reduce or impair the overall quality or performance of the Services.

4.3    The Customer may report any claims including failures of performance of the Services by Whinstone to the Whinstone support center at any time. Whinstone shall take all actions necessary to remedy such failures as soon as possible.

4.4    Interface or access to inventory, monitoring and Hashtrend software is provided to the Customer at no additional charge.

4.5    Uptime Guarantee

    4.5.1    Whinstone guarantees an uptime percentage (percentage of time to maintain uninterrupted performance of the total Customer Equipment) of ninety-eight point thirty-five percent (98.35%) and no more than six (6) days of planned downtime due to loss of power, construction, or network outage.

    4.5.2    Whinstone will give at least twenty-four (24) hours advance notice to the Customer via email before any Data Center downtime, or any downtime affecting more than one hundred (100) machines at one time.

    4.5.3    If any unplanned event causes more than ten percent (10%) of equipment to go offline, Whinstone will acknowledge the alert within 1 hour and report immediately to the Customer. Whinstone will attempt to begin remedy of the issue within one (1) hour of alert acknowledgement and shall provide a full incident report within five (5) business days of alert acknowledgement to the Customer.

4.6    Performance Guarantee

    4.6.1    Whinstone will perform maintenance and repairs to ensure total daily average hashrate of all machines does not fall by more than five percent (5%) below the Customer Equipment manufacturer's specified range.

    4.6.2    If total hourly average hashrate of all Customer Equipment falls more than ten percent (10%) compared to the previous hour, Whinstone will respond to the incident within one (1) hour and provide a full incident report within five (5) business days of the incident to the Customer.

    4.6.3    Whinstone will make best effort to employ a monitoring system to monitor uptime, performance and other machine metrics.

    4.6.4    Whinstone shall maintain average hashrate over all Customer Equipment within the tolerance range of the equipment manufacturer's specifications.

    4.6.5    Whinstone shall acknowledge alerts from its monitoring system within thirty (30) minutes, and respond within one (1) hour. If the problem cannot be corrected, the

12

Initial: _____

equipment will be place in a maintenance queue and reported to the Customer by the next business day

4.6.6    Whinstone will reply to notices from the Customer on the same business day

4.6.7    Whinstone shall maintain an intake temperature of less than twenty nine point five (29.5) degrees Celsius. If any machines are overheating, Whinstone shall turn them off as soon as possible and report the issue to the Customer.

4.7    Advanced Remote Hands Service

4.7.1    Whinstone will provide Advanced Remote Hands Service from 9 am to 9 pm, seven (7) days a week. This service includes repairs, unracking/racking units, and replacement of parts such as hashboards, fans, controller boards.

4.7.2    If the hourly hashrate performance of a single miner drops more than ten percent (10%), Whinstone will respond within thirty (30) minutes, and attempt to repair or replace faulty parts and components within 1 hour. If the issue cannot be resolved within one (1) hour, Whinstone will place the equipment into a maintenance repair queue

4.7.3    Whinstone shall reduce the maintenance repair queue at all times it is not responding to any incidents.

## 5.    WHITELABELING OF SERVICES

5.1    The Customer may white label the Services and arrangements under this Agreement on a back-to-back basis to specifically named third parties upon thirty-day notification to Whinstone, and Whinstone shall accept such execution of this right provided there are no changes to the terms of this Agreement. Any requested changes to warranties, representations, obligations, or service levels to be provided by Whinstone shall be negotiated in good faith by the Parties. Unless prior arrangement is made, the Customer shall be responsible for billing and collection associated with any white label offering.

## 6.    OWNERSHIP AND INTELLECTUAL PROPERTY

6.1    The Parties acknowledge and agree that the Customer Equipment is the sole property of the Customer. In no event shall Whinstone claim ownership of any of the equipment

6.2    The Parties acknowledge and agree that any outcomes or productivities, including but not limited to, block chains, hash and digital currencies, generated from the operation of the equipment are the sole property of the Customer. In no event shall Whinstone claim the ownership of any of such outcomes or productivities

6.3    Whinstone shall not sell or create any mortgage, lien, or any kind of encumbrance on the Customer Equipment, the Intellectual Property, or any outcomes or productivities owned by the Customer

6.4    The Customer will have a non-transferable license to use any IP address allocated by Whinstone to the Customer for the duration of this Agreement. If this Agreement is

13

SBIC0000081

Initial _____

terminated for any reason, the Customer's license to use the IP address shall automatically terminate

6 5    Customer owns any Developed IP. "Developed IP" means any intellectual property other than Background IP created or discovered by the parties in connection with this Agreement, including without limitation any reports Whinstone provides to Customer. "Background IP" means all intellectual property owned or licensed by a party before starting services under this Agreement or independent of services under this Agreement. The Developed IP is a work made for hire to the extent permitted by applicable law, and Customer retains all intellectual property rights in the Developed IP. To the extent that Contractor or its personnel own any rights in the Developed IP, Contractor assigns, or will procure the assignment of, all rights, title, and interest in the Developed IP to Customer. If applicable law prevents future assignments, Contractor will assign, or will procure the assignment of, such rights as these are created. If applicable law prevents Contractor from transferring ownership of any Developed IP to Customer, Contractor grants Customer a perpetual, irrevocable, exclusive, royalty-free, fully-paid, transferable, worldwide license, with the right to sublicense, to: (1) reproduce, prepare derivative works of, distribute, publicly perform, publicly display, and otherwise use such Developed IP; and (2) make, use, sell, offer for sale, import, export any component of, and otherwise dispose of such Developed IP. This agreement does not transfer any rights associated with Background IP, which will remain vested with their owners

6 6    Whinstone will defend Customer and its affiliates, and indemnify them against liabilities in any third-party legal proceeding to the extent arising from an unaffiliated third party's allegation that Customer or its affiliate's use of the Services or any deliverable under this Agreement from Whinstone infringes or misappropriates the third party's Intellectual Property Rights

## 7.    CONFIDENTIALITY

7 1    The parties agree that Confidential Information

7 1 1    shall be used solely for the purpose for which it was furnished in connection with performance of this Agreement,

7 1 2    shall be maintained in strict confidence and shall not be disclosed to third parties, provided, however, that Whinstone and the Customer may disclose Confidential Information to its affiliates and sub-contractors and their respective employees who need to have access to such Confidential Information for the purposes of providing the Services on the condition that Whinstone and the Customer shall procure compliance by such sub-contractors or affiliates and their respective employees with the terms of this Clause 7; provided, however, that Whinstone and the Customer shall be responsible for any breach of the obligations set forth in this Clause 7 by such sub-contractors or affiliates and their respective employees; and

7 1 3    upon termination of this Agreement shall be returned to the disclosing party, together with all copies, or (at the disclosing party's option) destroyed

7 2    Any disclosure of Confidential Information permitted under Clause 7 1 2 shall be in confidence, and only be to the extent that any persons to whom the information is disclosed

14

CONFIDENTIAL

SBIC0000082

Initial: _____

need to know the same for the performance of their duties and the receiving party shall be obliged to procure that all such persons are aware of the obligation of confidentiality and undertake to comply with it

7.3      The obligations of confidentiality and restricted use set out in Clauses 7.1 and 7.2 are not applicable to Confidential Information that:

7.3.1    was previously or becomes known to the receiving party, free from any obligation to keep the same confidential (provided that Confidential Information disclosed in contemplation of the provision of the Services shall still remain subject to such obligations);

7.3.2    is or becomes generally available to the public, other than as a direct or indirect result of unauthorized disclosure by the receiving party, its affiliates or a person engaged by the receiving party or its affiliates contrary to their respective obligations of confidentiality;

7.3.3    is shown to have been independently developed by the receiving party, its officers, employees, agents or contractors;

7.3.4    the parties agree in writing that it need not be kept confidential; or

7.3.5    is required to be disclosed by law or by regulation or by the order of any governmental authority or court provided that, to the extent permitted by law, prior to any disclosure, the receiving party notifies the disclosing party of the information to be disclosed and the circumstances in which the disclosure is alleged to be required as early as reasonably possible before such disclosure must be made and, at the disclosing party's request and cost, assists the disclosing party in avoiding or limiting any such disclosure

7.4      Without prejudice to any other rights and remedies that the disclosing party may have, the receiving party agrees that if Confidential Information is used or disclosed or threatened to be used or disclosed other than in accordance with the terms of this Agreement, the disclosing party shall, without proof of special damage, be entitled to seek an injunction, specific performance or other equitable relief for any actual or threatened breach of this Clause 7.

7.5      Notwithstanding Clause 7.1, Whinstone will request in writing to the Customer and request the customer to participate in its advertising and/or promotional literature and other materials The Customer has the right to opt out of any and all advertising requests

7.6      In order for Whinstone to provide the Services, the Customer will need to supply certain information or data. Where such information or data constitutes Personal Data, Whinstone will comply with the Data Protection Laws The parties shall duly observe and comply with all their obligations under the Data Protection Laws in relation to any Personal Data processed in connection with this Agreement and shall render such assistance and cooperation as is reasonably necessary or reasonably requested by the other party in respect thereto

7.7      It shall be the Customer's responsibility to keep any Personal Data provided to Whinstone up to date and the Customer warrants and undertakes to Whinstone that all of its Personal Data and contact details are accurate and complete

15

SBIC0000083

Initial _____

7.8    Whinstone may pass the Customer's Personal Data to Whinstone affiliates and to any third-party suppliers Whinstone may use to provide services that involve processing data on Whinstone's behalf for the purpose of providing the Services and as contemplated by the terms of this Agreement, provided, however, that Whinstone shall be responsible for any breach of the obligations set forth in this Clause 7 by such affiliates and third party suppliers

## 8.    LIABILITY, REPRENSATIONS, WARRANTIES, AND IDEMNIFICATIONS

8.1    Both Parties represent and warrant that they have the right and capacity to enter into this Agreement and fully perform their respective obligations hereunder;

8.2    Whinstone shall perform the Services as described herein and shall provide the Services in a professional manner consistent with industry standards.

8.3    Whinstone hereto agrees to indemnify and hold harmless the Customer and any of its respective successors, licensees and assignees, from any and all losses, costs, liabilities, damages and expenses, including but not limited to, reasonable attorney fees resulting from any breach of any obligations, representation, warranty and/or covenant under this Agreement Notwithstanding any provisions herein, Whinstone agrees to indemnify the Customer for any losses directly or indirectly caused by gross negligence or intentional or willful misconduct of Whinstone in its performance of obligations under this Agreement, including but not limited to, faulty operations, bad design, or misuse of the facilities in the Data Center

8.4    If electrical supply is suspended for five (5) or more consecutive days, or more than seven (7) days in any twelve (12) month period due to any cause other than due to force majeure event, the Customer is entitled to suspend or terminate this Agreement by giving a written notice to Whinstone. Written notice will be signed and emailed to Whinstone, and a physical copy will be sent to Whinstone's registered address. The timestamp of the email will be considered the date of the receipt of such notice. If the Customer terminates this Agreement for the aforementioned reason, Whinstone shall pay for the costs to decommission, clean, package onto pallets and for the shipping cost to transport all Customer's equipment to a new location

8.5    Neither party excludes or limits its liability to the other party for

    8.5.1    death or personal injury caused by its negligence;

    8.5.2    fraud or fraudulent misrepresentation

8.6    

8.7    Subject to Clause 8.5 but notwithstanding anything else in this Agreement, the aggregate liability of

16

SBIC0000084

Initial: _____

8.7.1    the Customer to Whinstone for damage to property, in contract, (including negligence) or otherwise arising under or in connection with this Agreement shall be limited to a sum equal to the aggregate Charges payable by the Customer to Whinstone in the twelve-month period immediately prior to the date on which the cause of action first arose or, if the Agreement has been in force for less than twelve months on such date, the annualized amount of the Charges payable by that date; and

8.7.2    Whinstone to the Customer for damage to property, in contract, tort (including negligence) or otherwise arising under or in connection with this Agreement shall be limited to a sum equal to the aggregate Charges payable by the Customer to Whinstone in the twelve-month period immediately prior to the date on which the cause of action first arose or, if the Agreement has been in force for less than twelve months on such date, the annualized amount of the Charges payable by that date

8.8    In no event will Whinstone have any liability for non-provision or delay in the provision of the Services which

8.8.1    can be reasonably attributed to the acts or omissions of the Customer, its affiliates, employees, workers, sub-contractors, agents or customers including but not limited to failure to provide complete, accurate information in a timely manner for Whinstone;

8.8.2    arises from or as a consequence of use of the Services other than in accordance with the express terms of this Agreement, and/or

8.8.3    occurs during any period of suspension in accordance with Clause 12, provided, however, that this Clause 8.8 shall not apply in the case of willful misconduct or negligence by Whinstone, its affiliates, employees, workers, subcontractors or agents

8.9    The Customer acknowledges that Whinstone would not enter into this Agreement at the prices herein without the foregoing limitations of liability. Each party acknowledges that the allocation of risk in this Agreement (including the exclusions and limitations set out in this Clause 8) has been freely negotiated at arm's length and is regarded by it as reasonable. The Customer acknowledges that it has had an opportunity to consider adequate insurance cover and to obtain professional advice in relation to this Clause 8.

8.11    Whinstone shall not be liable for any claim arising under this Agreement unless the Customer gives Whinstone written notice of the claim within twelve months of becoming aware of the circumstances giving rise to the claim.

8.12    

8.13    Whinstone represents and warrants to the Customer that it has secured rights to at least one hundred (100) acres of leased land for at least (2) two years for the Data Center and secured for commercial access up to one (1) gigawatt of aggregated electricity that can be delivered to the Data Center, of which a portion of that may be incrementally offered to the Customer

17

Initial: _____

## 9.    ASSIGNMENT

9.1    This Agreement and all rights and obligations hereunder, in whole or in part, may not be assigned or transferred by either Party without the prior written consent of the other Party. The Party is and shall remain liable to the other Party for any act or omission of any of its Representatives and/ or customers.

9.2    Whinstone may, upon receipt of the Customer's prior written consent, assign, sub- license or deal in any other manner with this Agreement or any rights under the Agreement, or sub-contract any or all of any or all of obligations under this Agreement to one or more of its affiliates or to any third party upon a sale of all or substantially all of its assets and will provide notice to the Customer of any such assignment, provided, however, that the Customer is provided with the Services under the same terms and conditions as those of this Agreement until the expiration of the Initial Term or the relevant Extended Term, as the case may be, of this Agreement.

## 10.    FORCE MAJEURE

10.1    Neither party shall in any circumstances be liable to the other for any loss of any kind whatsoever including any damages whether directly or indirectly caused or incurred by the other party by reason of any failure or delay in the performance of its obligations hereunder which is due to Force Majeure.

10.2    If either of the parties becomes aware of circumstances of Force Majeure it shall cease to be in breach of the liable to be in the performance of any obligations on its part, insofar as it is not reasonably possible, and in any event after than five (5) Business Days after commencement, in of the Force Majeure gives notice in termination the other party's appropriate the notifies and extent of the circumstances giving rise to Force Majeure.

10.3    If either party is prevented from performance of substantially all of its obligations by Force Majeure for more than two (2) months in total, the other party may terminate this Agreement by giving notice in writing to the other party at any time, in which case neither party shall have any liability to the other except that rights and liabilities which accrued prior to such termination shall continue to subsist.

## 11.    NOTICES

11.1    All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the Party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective Parties at their address as set forth below, or to such e-mail address, as subsequently modified by written notice given in accordance with this Clause 11 herein.

18

Initial _____

11.2. The addresses of the parties for the purposes of Clause 11.1 are

    11.2.1  **Whinstone US, Inc.**
            **4304 Firestone Road Metairie, LA 70001**
            **Marked for the attention of: Lyle Theriot**
            **Email: Lyle.Theriot@whinstone.us**
            **Attention:  Lyle Theriot**

    11.2.2  **SBI Crypto Co., Ltd.**
            **1-6-1 Roppongi, Minato-ku, Tokyo, Japan**
            **Email: cbsmith@sbigroup.co.jp**
            **Attention: Carson Blake Smith**

11.3. In proving service, it shall be sufficient to prove that the envelope containing such notice was addressed to the address of the relevant party set out in Clause 11.2 (or as otherwise notified by that party under this Clause) and delivered to that address

## 12. SUSPENSION OF SERVICE

12.1  Whinstone reserves the right to suspend the Services for the following reasons

    12.1.1  to carry out Maintenance with the prior written consent of the Customer;

    12.1.2  to make any modification, change, addition to, or replacement of, the Whinstone Equipment or any part of the IP Connection Service or the Services where this is required to conform with any applicable safety, statutory or legal requirements, provided that such modification, change, addition or replacement does not detract from, reduce or impair the overall quality or performance of the Services with prior written consent of the Customer;

    12.1.3  where the Customer fails to pay any undisputed Charges in accordance with Clause 3;

    12.1.4  where Whinstone is obliged to comply with an order, instruction or request of Government, court, law enforcement agency or other competent administrative or regulatory authority, in which case Whinstone shall provide notice to the Customer as soon as possible, and cooperate with the Customer to mitigate losses or take other appropriate actions.

    12.1.5  in an emergency; or

    12.1.6  where Whinstone has reason to suspend the Services in accordance with its terms

12.2  Where suspension of the Services is necessary in accordance with the provisions of Clause 12.1.2, Whinstone will carry out such work as Scheduled Maintenance but in circumstances where this is not possible, Whinstone shall use all reasonable endeavors to perform such work between the hours of midnight and 6am and shall restore the Services as soon as reasonably practical in the circumstances

19

SBIC0000087

Initial _____

12.3.  ████████████████████████████████████████
       ████████████████████████████████████████
       ██████████████████████████████████████ch ████████

## 13.  TERMINATION

13.1   This Agreement shall commence on the Effective Date and shall continue for a period of
       twenty-four (24) months from the RFU Date ("Initial Term") unless and until terminated in
       accordance with this Clause 13.

       This Agreement shall be automatically extended for a period of twenty-four (24) months
       ("Extended Term") at the end of the Initial Term and at the end of each Extended Term.
       Notwithstanding above, the Customer can terminate the Agreement at the end of the twelfth
       month of the Initial Term or during any Extended Term with no penalty by notifying
       Whinstone in writing sixty (60) days prior to the end of the Agreement.

13.2   Termination for Cause. Either party (the "Non-Defaulting Party") may terminate this
       Agreement (without prejudice to its other rights and remedies) with immediate effect by
       written notice to the other party (the "Defaulting Party") if:

       13.2.1  the Defaulting Party commits a material breach of any of its material obligations
               under this Agreement (including failing to pay any sums payable under this
               Agreement by the due date) and if the breach is capable of remedy, fails to remedy it
               during the period of thirty (30) days starting on the date of receipt of notice from the
               Non-Defaulting Party specifying the breach and requiring it to be remedied; or

       13.2.2  the Defaulting Party becomes insolvent including being unable to pay its debts as
               they fall due and/or that the value of its assets is less than the amount of its liabilities
               taking into account its contingent and prospective liabilities, proposes an individual,
               company or partnership voluntary arrangement, has a receiver, administrator or
               manager appointed over the whole or any part of its business or assets, if any petition
               shall be presented, order shall be made or resolution passed for its winding up (except
               for the purpose of a bona fide amalgamation or reconstruction), bankruptcy or
               dissolution (including the appointment of provisional liquidators/interim receivers or
               special managers); if it shall otherwise propose or enter into any composition or
               arrangement with its creditors or any class of them, if it ceases or threatens to cease to
               carry on business or if it claims the benefit of any statutory moratorium; or

       13.2.3  the Defaulting Party suffers, or there occurs in relation to that party, any event which
               is analogous to any of the events referred to in Clause 13.2.2 in any part of the world.

       13.2.4  In the case that the Customer terminates this Agreement due to Whinstone's failure to
               cure a default, or the matters specified in Clause 13.3 or 13.4, Whinstone will pay for
               the costs to decommission, clean, package onto pallets and ship the Customer
               equipment to a new location. Whinstone will also pay Customer's lost revenue from
               mining resulting from such termination converted to US dollars, which shall be
               calculated based on the average market price of the mined digital asset and mining
               difficulty levels for a period of four calendar weeks from the date of the termination

20

Initial: _____

13.3  Either Party may terminate this Agreement by thirty (30) days prior written notice to the other Party upon occurrence, at any time, of any Change of Control event. For the avoidance of doubt, any mergers or consolidation, transfer or acquisition of stock within the SBI Group shall not be a Change of Control event.

13.4  It is in the best interest of both Parties to pursue all reasonable efforts to remedy any issues with the Services or Service Level Agreement without termination or penalties. In cases of negligence or failure to maintain the Service Level Agreement for more than two (2) consecutive months, the Customer shall be entitled to the right to terminate the Agreement

13.5.  If Whinstone fails to install all of the Customer Equipment within sixty (60) days of the RFU Date, the Customer shall be entitled to terminate or suspend the Agreement, and Whinstone shall refund the customer ninety percent (90%) of the installation charges.

13.6.  Either party may terminate this Agreement with immediate effect by written notice and without further obligation or liability to the Customer if required by any law enforcement or other government or regulatory organization or authority or by the courts

13.7  All rights and obligations of the parties shall cease to have effect immediately upon termination of this Agreement, except that termination shall not affect

13.7.1  accrued rights and obligations of the parties at the date of termination, and

13.7.2  the continued survival and validity of the rights and obligations of the parties under Clauses 7, 8, this Clause 13.7 and Clauses 15, 17 and 19 and any other provisions of this Agreement necessary for the interpretation or enforcement of this Agreement

13.8  For the avoidance of doubt, save where otherwise agreed in writing between the parties, termination of any Services at a Site does not constitute termination of this Agreement, and, where this Agreement has been terminated in accordance with its terms, all Services will automatically terminate upon such termination

13.9  Upon termination of this Agreement, the Customer shall at its own cost and expense return to Whinstone all IP addresses provided to it by Whinstone.

## 14.  ANTI-BRIBERY AND CORRUPTION

Each party warrants and represents that it has not and will not carry out any act that could be an offense under anti-bribery laws

## 15.  APPLICABLE LAW

This Agreement shall be governed by Texas Law and the parties hereby submit to the exclusive jurisdiction of the Texas courts

## 16.  GENERAL

16.1  No failure or delay of either party in exercising its rights hereunder (including the right to require performance of any provision of this Agreement) shall be deemed to be a waiver or release of such rights. Any waiver or release must be specifically granted in writing signed by the party waiving its rights and shall

21

CONFIDENTIAL

SBIC0000089

Initial _____

16.1.1   be confined to the specific circumstances in which it is given;

16.1.2   not affect any other enforcement of the same or any other right; and

16.1.3   unless it is expressed to be irrevocable, be revocable at any time in writing

Any single or partial exercise of any right, power or remedy provided by law or under this Agreement shall not preclude any other or further exercise of it or the exercise of any other right, power or remedy.

16.2    If at any time any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, that shall not affect or impair

16.2.1   the legality, validity, or enforceability in that jurisdiction of any other provision of this Agreement; or

16.2.2   the legality, validity, or enforceability under the law of any other jurisdiction of that or any other provision of this Agreement.

16.3    All work performed by Whinstone under this Agreement shall be performed as an independent contractor and not as an agent of the Customer and neither party shall be, nor represent itself to be, the employee, agent, representative, partner or joint venture of the other Neither party shall have the right or authority to assume or create an obligation on behalf of or in the name of the other or to otherwise act on behalf of the other. The performing party shall be responsible for its employees' compliance with all applicable laws, rules, and regulations while performing work under this Agreement.

16.4    No modification, amendment or other Change may be made to this Agreement or any part thereof unless reduced to writing and executed by authorized representatives of Whinstone and the Customer. Unless expressly so agreed, no modification or variation of this Agreement shall constitute or be construed as a general waiver of any provisions of this Agreement, nor shall it affect any rights, obligations or liabilities under this Agreement which have already accrued up to the date of such modification or waiver, and the rights and obligations of the parties under this Agreement shall remain in full force and effect, except and only to the extent that they are so modified or varied.

## 17.   ENTIRE AGREEMENT

17.1    This Agreement constitutes the entire understanding between the parties concerning the subject matter of the Agreement and supersedes any previous agreement or understanding between the parties in relation to the subject matter.

17.2    With effect from the date of this Agreement all Services shall be provided solely in accordance with the terms of this Agreement and all prior agreements and understandings between the parties in relation to the same shall be deemed terminated from the date hereof Save in respect of rights and liabilities arising prior to such date, all such prior agreements and understandings shall cease to be of effect from the date of signature of this Agreement. In no event shall the pre-printed terms and conditions found on any Customer purchase order, acknowledgement, or other form be considered an amendment or modification of this Agreement, even if such documents are signed by representatives of both parties, such pre-printed terms and conditions shall be null and void and of no force and effect.

22

CONFIDENTIAL

Initial _____

17.3  Each party acknowledges and agrees that in entering into the Agreement or in amending any part of this Agreement, it has not relied on any statement, representation, warranty, understanding, undertaking, promise or assurance (whether negligently or innocently made) of any person (whether party to this Agreement or not) other than as expressly set out in the Agreement. Each party irrevocably and unconditionally waives all claims, rights and remedies which but for this clause it might otherwise have had in relation to any of the foregoing.

17.5  Nothing in Clauses 17.1 to 17.3 (inclusive) shall limit or exclude any liability for fraud.

## 18.  COUNTERPARTS

18.1  This Agreement shall be executed in two originals, each Party shall retain one original respectively. This Agreement shall not be effective until each of the parties has executed at least one counterpart.

18.2  Each counterpart shall constitute an original, but all the counterparts shall together constitute one and the same instrument.

## 19.  THIRD PARTIES

It is agreed that this Agreement is not intended to and does not give to any other person who is not a party to this Agreement any rights to enforce directly any provisions contained in this Agreement except for any person to whom the benefit of this Agreement is assigned or transferred in accordance with Clause 9.

## 20.  FURTHER ASSURANCE

Each party shall, if requested by the other party and at the other party's cost, execute or cause to be executed all documents and do or cause to be done all further acts and things as may be necessary in order to vest in and secure to the other party and its successors in title the full benefit of the assets, rights and benefits to be transferred or granted to the other party under this Agreement and for the protection and enforcement of the same and otherwise to give effect to this Agreement and to the rights and obligations contained within this Agreement.

## 21.  TERMINATION OF PRIOR HOSTING AGREEMENT

Both Parties confirm and hereby acknowledge that this Agreement replaces the Hosting Service Agreement executed July 5, 2019 ("Prior Hosting Agreement") and that the Prior Hosting Service Agreement is hereby terminated.

The Agreement shall come into force from the seal or signature date by both parties, and this Agreement is made out in two original copies, one copy to held by each party in witness thereof

<Signature Page Follows>

23

CONFIDENTIAL

SBIC0000091

Initial _____

## Signatory page for Hosting Service Agreement

CUSTOMER                                WHINSTONE

On behalf of SBI Crypto Co . Ltd        On behalf of Whinstone US. Inc

_____                 _____

Name:  Carson Blake Smith               Name

Title  Representative Director          Title

Date                                    Date

24

CONFIDENTIAL

SBIC0000092

# EXHIBIT 3

**From:** Jonathan Tanemori (SBI Holdings, Inc.)
**Sent:** Thursday, June 03, 2021 7:24 PM CDT
**To:** Carson Smith (cbsmith@sbigroup.co.jp) <cbsmith@sbigroup.co.jp>; Carson Blake <carson@sbicrypto.com>
**Subject:** Whinstone options
**Attachment(s):** "Whinstone options.pptx"

Here is a slide of the options I see. Feel free to modify/update and share with Legal as you see fit. Will send this to you by Slack as well

Jonathan



CONFIDENTIAL

SBIC0003254

**Early termination:** June 28, 2021 vs. Dec 2021

**Lost revenue:** ~331 BTC (55~56 BTC/m. x 6)

- $2.7M/month (@BTC $48K) = $16.6M

**Whinstone to Return:** $3.6 prepay + 0.6K security + June adj = approx. $4.5M

```
                    ┌──────────┐
                    │ OPTIONS  │
                    └──────────┘
      ┌──────────────────┼──────────────────┐
┌───────────┐      ┌──────┐        ┌──────┐    ┌────────────┐
│ Litigation│      │ Move │        │ Sell │    │ Settlement │
└───────────┘      └──────┘        └──────┘    └────────────┘
```

**Litigation**

**Potential Claims**
- Representations
- Confidentiality
- Delay in service start
- SLA quality

**Court injunction?**
- No use of power by either party

**BUT**
- Current position weak
- Expenses

**Move**

**1. Russia**
- Space: Ok
- Timing: Ok
- Hosting rate: Ok
- Customs: X

**2. Iceland**
- Space: Ok
- Timing: Ok
- Hosting rate: X
- Customs: X

**3. New in US:**
Difficult
- timing, higher rate

**Sell**

**Sales Price: $1000?**
BUT: declining price trend due to market conditions
Proceeds: $15~$20M

**Purchase price: $1000/miner**
Avg. book value: 72,500 yen

**Note:** This means partial exit, reduction in BTC production

**Settlement**

**1. Host thru Initial Term**

**2. Leave end of June, but pay premium to avoid legal action, compensate for loss**

CONFIDENTIAL

SBIC0003255

# EXHIBIT 4

24 Jan 2020

# Northern Data AG: SBI Crypto Convertible Notes Purchase

**Background**
1. Northern Data has 20M convertible note, of which 14.4M subscribed
2. From strategic partnership between SBI Crypto and Whinstone, SBI Crypto offered opportunity to purchase balance of notes, with 4.46M~5.6M Euros remaining

**Key Conditions:**
- SBI Crypto must be the purchaser and may not resell notes
- Subscription Agreement based on fixed Terms & Conditions must be executed by 31 January 2020

**Considerations**
- Existing shareholders would like to purchase the remaining notes
- Conversion price of 8 Euros vs. current 29 Euros share price

**Milestones**

| Date | Event |
|---|---|
| 2014 | Whinstone established |
| 2016 | Northern Bitcoin established |
| 2018.10 | Northern Bitcoin IPO: Deutsche Börse XETRA IPO (NB2) |
| 2019.7 | SBI Crypto enters hosting contract with Whinstone |
| 2019.11 | Whinstone and Northern Bitcoin AG merge |
| | Parent: Northern Bitcoin / Whinstone 100% subsidiary |
| | Whinstone CEO (Aroosh) ⟶ Northern Bitcoin CEO |
| 2019.12 | Northern/Whinstone visit to SBIH |
| 2020.1 | Northern Bitcoin AG changes name to Northern Data AG |
| 2020.1.15 | SBI Crypto offered Convertible Note purchase opportunity |
| 2020.1.31 | Deadline for note purchase / Subscription Agreement |
| 2020.2.5 | Payment deadline (3 business days later) |

1

CONFIDENTIAL

SBIC0002594

# Convertible Notes Transaction

**AMOUNT: 5.6M Available, but.....**
Private placement bond, issued in 2018 and was closed

20.0M total
14.4M subscribed
5.6M remaining

**... 4.46M guaranteed to SBI**

- 4.46M guaranteed to SBI (no claims or restrictions), regulatory deadline of 1/31
- *1.14M MUST BE OFFERED TO "FREE FLOAT" MARKET (German requirement) thru 2/17*
  *ç Any unclaimed amount can be further purchased by SBI*

**Documentation**



Subscription Agrt. (2 pg.)
Appendix 1: T & C

Appendix 1: Terms & Conditions (40 pg.)

*No changes allowed*

**TIMELINE**

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|
| 19 | 20 | 21 | 22 | 23 | 24 TODAY | 25 |
| 26 | 27 | 28 | 29 (Offer to free float?) | 30 | 31 Sub. Agrt. | 1 |
| 2 | 3 | 4 | 5 Payment (3 biz. days) | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 Deadline by Free | 17 | 18 | 19 | Sub. Agrt. #2 for unsubscribed amount | 22 | |

CONFIDENTIAL

SBIC0002595

2

# Convertible Note Conversion: 4.46M Euros ~5.6% share

**Northern Data AG** (as of 22 Jan 2020)

| | |
|---|---|
| Market Cap | 217.292 M EUR |
| Shares Outstanding | 7.44 Mill. |
| Share price | 29.21 EUR |

| | |
|---|---|
| Bond size: | 20M |
| Notes: | 20,000 @1,000 Euros/note |
| **Purchased to date: 14.4M** | |
| Interest: | 5% p.a. |
| Maturity: | 15 November 2024 |
| Conversion period: | from 15 May 2020 |
| Conversion price: | 8 Euros/share |
| Conversion ratio: | 1 note : 125 shares |
| Share type: | Only one single type, all equal |

**Remaining:** **5.60M Euros**
- SBI: 4.46M guaranteed
- Free Float offer: 1.14M (17 Feb. deadline)

**20M Euros**

CONFIDENTIAL

SBIC0002596

3

# Stakeholder Structure

Update d

**Northern Data AG**
(Xetra: NB2)

ISSUER

Convertible Notes: 20M Euros (5%)
Conversion: 2020.5.15~ @8 Euro
Maturity: 2024.11.15

Note Holders

100%

**Whinstone US, Inc.**
(Texas mining center,
1GW power)

Strategic Partnership
• Hosting in Texas
• SBI Mining Pool, etc.

**5.6M Open Portion**
- Free float: Small existing
shareholders have right
to purchase up to 1.14M
- **SBI**: Min. 4.46M + any
remaining unpurchased

**Major Shareholders**
⊕ Purchased: 14.4M

**Market: Free Float**
Unpurchased portion: 1.14M

**SBI Crypto: 4.46M~5.6M**

**TK (?)**
1. SBI Sonpo
2. Others....

Internal structure: TBD/WIP

# Subscription ~ Delivery

Exchange Custodial Bank

**Clearstream Banking AG**

Release order

Issuer Agent

mwb fairtrade

④ Release order

**Custody Acct: Daiwa
(Europe)?**
UNDER CONFIRMATION

Subscription Agrt.

**Northern Data**

⑤ Delivery

③ Release order

**SBI
Crypto**

Payment

**Nassauische Sparkasse
Bank**

① 

②

CONFIDENTIAL

SBIC0002597

# Northern Data AG Company Profile

https://www.bloomberg.com/quote/NB2:GR

## Northern Data AG

Northern Data AG operates as an information technology company. The Company provides solutions for crypto-currency, as well as offers infrastructures to the bitcoin and its blockchain. Northern Data serves customers worldwide.

**CURRENT PRICE**
**NB2:GR** 29.20 EUR ▲ +1.20 +4.29% AS OF 01/22/2020 <u>SEE QUOTE</u>

| SECTOR | INDUSTRY | SUB-INDUSTRY | FOUNDED |
|---|---|---|---|
| Technology | Technology Services | IT Services | 09/26/2016 |

| ADDRESS | PHONE | WEBSITE | NO. OF EMPLOYEES |
|---|---|---|---|
| Thurn-und-Taxis-Platz 6 Frankfurt am Main, 60313 Germany | 49-69-3487-5225 | www.northernbitcoin.com | 9 |

## Executives

NAME/TITLE

**Aroosh Thillainathan**
Chairman-Mgmt Board/CEO/Co-founder

**Mathis Schultz**
Chief Financial Officer

**Julian Handte**
Chief Operating Officer

## Board Members

NAME/COMPANY

**Dr Simon Nebel**

**Dr Bernd Hartmann**
Northern Data AG

CONFIDENTIAL

SBIC0002598



Northern Data AG Stock Performance

CONFIDENTIAL

SBIC0002599

# Northern Data AG Financials: 2019, January – June

- 2019/H1 Profit & Loss – BEFORE Whinstone merger

| No. | Item | H1/2019 EUR | H1/2019 EUR | EUR | H1/2019 EUR | H1/2018 EUR |
|---|---|---|---|---|---|---|
| 1. | Revenues | 1,490,473.67 | 1,099,570.40 | | | |
| 2. | Change in stock of finished and unfinished goods | 315,534.99 | 29,965.55 | | | |
| 3. | Gross profit | 1,898,008.58 | 1,129,423.95 | | | |
| 4. | Other operating income | | | | | |
| a) | Income from the release of provisions | 0 | 9,671.52 | | | |
| b) | Miscellaneous operating income | 4,372.03 | 2,438.163 | | | |
| | – Of which from currency translation EUR 224 (EUR 0.00) | 4,372.03 | 12,108.15 | | | |
| 5. | Cost of materials | | | | | |
| a) | Cost of raw materials, consumables and supplies and goods for sales | 10,814.08 | 62,414.21 | | | |
| b) | Cost of purchased services | 3,990,154.23 | 1,706,337.26 | | | |
| | | 4,000,968.29 | 1,770,751.47 | | | |
| 6. | Personnel expenses | | | | | |
| a) | Wages and salaries | 412,038.71 | 30,853.87 | | | |
| b) | Social security and post-employment costs | 51,642.09 | 3,961.31 | | | |
| | | 463,680.80 | 33,815.19 | | | |
| 7. | Amortization | | | | | |
| a) | Amortization and write-downs of intangible assets | 394,814.58 | 220,414.41 | | | |
| 8. | Other operating expenses | | | | | |
| a) | Lease expenses | 47,703.11 | 22,252.18 | | | |
| b) | Insurances, contribution and utilities | 6,402.50 | 4,296.78 | | | |
| c) | Repairs and maintenance | 6,855.68 | 0 | | | |
| | transfer | -60,751.27 | -3,010,283.06 | -60,751.27 | -3,010,283.06 | -1,059,617.90 |
| | | | -29,468.94 | | | -26,483.34 |
| d) | Vehicle costs | | | 285.33 | | 103.59 |
| e) | Advertising and travel expense | | | 308,694.79 | | 95,067.52 |
| f) | Various operating expenses | | | 369,075.13 | | 268,202.97 |
| g) | Miscellaneous operating expenses | | | 2,854.08 | | 1,386.42 |
| | – of which from currency translation EUR 1081.74 (EUR 0.00) | | | 539,960.60 | | 39,104.94 |
| 9. | Interest and other expenses | | | 30,375.60 | | 10,126.00 |
| | – of which from affiliated companies EUR 26,800.00 (EUR 8,400.00) | | | | | |
| 10. | Earnings after taxes | | | -3,556,619.66 | -3,556,619.66 | -1,534,323.80 |
| 11. | Deficit of the year | | | 3,556,619.66 | 3,556,619.66 | 1,534,323.80 |

H1 Revenue: $1.6M
- Sale of miner modules
- Self-mining, etc.

Largest expense: engineering works

Negative profits

CONFIDENTIAL

SBIC0002600

# Northern Data AG Financials: 2019, January – June

- 2019/H1 Balance Sheet – BEFORE Whinstone merger
- Assets largely material for modules
- Negative net worth
- Liabilities largely debt



CONFIDENTIAL

SBIC0002601

SBIC0002602

# Northern Data AG Financials: 2018/2019 Financials

- ## 2017 / 2018 Profit & Loss

| | | 2018 € | 2017 € |
|---|---|---|---|
| 1. | Revenues | 2,548,892.08 | 51,935.74 |
| 2. | Change in stock of finished and unfinished goods | 120,485.25 | 0.00 |
| 3. | Other operating income | 18,447.95 | 224.64 |
| | of which from currency translation € 0.00 (previous year: € 224.64) | | |
| 4. | Cost of materials | | |
| | a) Cost of raw materials, consumables and supplies and goods for resale | -62,414.21 | 0.00 |
| | b) Cost of purchased services | -5,700,300.12 | 0.00 |
| | | -5,762,714.33 | 0.00 |
| 5. | **Gross profit** | **-3,074,889.05** | **52,160.38** |
| 6. | Personnel expenses | | |
| | a) Wages and salaries | -689,484.33 | -345,723.78 |
| | b) Social security and post-employment costs | -77,596.02 | -37,598.91 |
| 7. | Amortization of intangible and tangible assets | -747,050.35 | -383,322.69 |
| 8. | Other operating expenses | -624,891.80 | -5,736.53 |
| | of which from currency translation: € 8,701.32 (previous year: € 262.38) | -1,122,558.80 | -343,680.22 |
| 9. | **Operating profit** | **-5,569,190.10** | **-680,579.06** |
| 10. | Interest and other expenses of which from | -28,932.96 | -18,256.85 |
| | affiliated companies: € 23,482.96 (previous year: € 16,236.58) | | |
| 11. | **Earnings after taxes** | **-5,598,123.06** | **-698,835.91** |
| 12. | **Deficit for the year** | **-5,598,123.06** | **-698,835.91** |
| 13. | Loss carried forward from previous year | -3,304,297.60 | -2,605,461.69 |
| 14. | **Net accumulated deficit** | **-8,900,420.66** | **-3,304,297.60** |

CONFIDENTIAL

9

# Northern Data AG Financials: 2018/2019 Financials

- ## 2017 / 2018 Balance Sheet

Main Balance Sheet as at December 31, 2018

| ASSETS | 12/31/2018 € | 12/31/2017 € |
|---|---|---|
| **A. FIXED ASSETS** | | |
| I. Intangible assets | | |
| Purchased concessions, industrial and similar rights and assets, and licenses for such rights and assets | 1,390.00 | 1,039.00 |
| II. Tangible assets | | |
| Other equipment, operating and office equipment | 4,837,429.00 | 3,188.00 |
| | 4,863,320.00 | 4,227.00 |
| **B. CURRENT ASSETS** | | |
| I. Inventories | | |
| Finished goods | 120,485.25 | 0 |
| II. Receivables and other assets | | |
| Other assets | 171,217.39 | 32,302.45 |
| III. Cash in hand and bank balances | 2,990,274.39 | 794,187.66 |
| | 3,280,977.03 | 829,490.11 |
| **C. ACCRUALS AND DEFERRALS** | 56,092.02 | 4,395.24 |
| **D. DEFICIT NOT COVERED BY EQUITY** | 718,936.86 | 652,342.60 |
| | 8,910,336.71 | 1,487,454.95 |

| EQUITY AND LIABILITIES | 12/31/2018 € | 12/31/2017 € |
|---|---|---|
| **A. EQUITY** | | |
| I. Subscribed capital | 7,441,500.00 | 2,255,000.00 |
| – Conditional capital: € 228,455.00 (previous year: € 1,025,000.00) | | |
| II. Capital reserves | 739,985.00 | 366,855.00 |
| – Amount paid in during the financial year: € 343,030.00 (previous year: € 385,130.00) | | |
| III. Net accumulated loss | | |
| 1. Loss carried forward | -3,304,297.80 | -2,605,461.89 |
| 2. Net loss for the year | -5,596,123.08 | -699,835.91 |
| | -8,900,420.88 | -3,304,297.80 |
| Cumulative losses not covered by equity | 718,935.88 | 852,342.80 |
| | 0 | 0 |
| **B. CONTRIBUTIONS MADE FOR THE IMPLEMENTATION OF THE CAPITAL INCREASE** | 0 | 568,530.00 |
| **C. PROVISIONS** | | |
| Other provisions | 38,000.00 | 124,050.00 |
| **D. LIABILITIES** | | |
| 1. Trade payables | 2,801,148.60 | 22,505.02 |
| 2. Liabilities to affiliated companies | 6,088,220.24 | 590,473.37 |
| 3. Other liabilities | 191,958.87 | 181,896.56 |
| of which from taxes: € 19,008.01 (previous year: € 8,647.10) | | |
| of which relating to social security: € 837.83 (previous year: € 1,008.69) | | |
| | 8,881,338.71 | 794,874.95 |
| | 8,910,336.71 | 1,487,454.95 |

10

CONFIDENTIAL

SBIC0002603

# EXHIBIT 5

1               UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF TEXAS

3                 WACO DIVISION

4                   --o0o--

5   SBI CRYPTO CO., LTD.,      )
                              )

6             Plaintiff,     )
                              )

7         vs.          ) 6:23-cv-252-ADA-JCM
                              )

8   WHINSTONE US, INC.,       )
                              )

9             Defendant.     )

10

11     ** Confidential -- Attorneys' Eyes Only **

12  ———————————————————————————————————————————

13             VIDEO DEPOSITION OF

14            JONATHAN TANEMORI

15            August 15, 2024

16  ———————————————————————————————————————————

17      DEPOSITION OF JONATHAN TANEMORI, produced as

18  a witness, duly sworn by me at the instance of the

19  DEFENDANT, was taken in the above-styled and numbered

20  cause on August 15, 2024, from 9:01 A.M. to 5:16 P.M.,

21  before BRANDON D. COMBS, CSR, RPR, in and for the State

22  of Texas, reported by computerized machine shorthand

23  at:

24      2728 North Harwood Street, Fifth Floor,

25                Dallas, Texas

Confidential -- Attorneys' Eyes Only
Transcript of Jonathan Tanemori
Conducted on August 15, 2024                    125

| | | |
|---|---|---|
| 1 | Q.   There weren't times.  It was your | 11:53:41 |
| 2 | calculation that was less than the amount of power | 11:53:44 |
| 3 | called for in the contract, is what you all | 11:53:47 |
| 4 | ultimately paid; right? | 11:53:50 |
| 5 | MR. JOHNSON:  Objection.  Form. | 11:53:51 |
| 6 | THE WITNESS:  I'm sorry, what are you | 11:53:53 |
| 7 | trying to get at? | 11:53:55 |
| 8 | Q.   (BY MR. SLOVAK)  Well, I'm not trying to | 11:53:56 |
| 9 | get at anything.  I'll just use your words and not | 11:53:57 |
| 10 | mine. | 11:54:00 |
| 11 | Let's go to -- let's introduce this as | 11:54:01 |
| 12 | Exhibit -- let's just call this 5, Brandon.  Well, | 11:54:03 |
| 13 | actually -- yeah, let's call it 5, that's fine. | 11:54:08 |
| 14 | (Whereupon, Exhibit 5 was marked for | 11:54:40 |
| 15 | identification.) | 11:54:40 |
| 16 | Q.   (BY MR. SLOVAK)  Handing you what's been | 11:54:40 |
| 17 | marked as Exhibit 5.  This is an email from you to | 11:54:41 |
| 18 | Carson Smith dated June 20, 2021. | 11:54:45 |
| 19 | Do you see that? | 11:54:48 |
| 20 | A.   Yes. | 11:54:48 |
| 21 | Q.   And in it you say, based on contract's | 11:54:49 |
| 22 | 80 percent minimum payment under Section 3.31, the | 11:54:52 |
| 23 | table below shows the 80 percent amount billed | 11:54:55 |
| 24 | versus what we actually paid. | 11:55:01 |
| 25 | Do you see that? | 11:55:04 |

Confidential -- Attorneys' Eyes Only
Transcript of Jonathan Tanemori
Conducted on August 15, 2024                    126

| | | |
|---|---|---|
| 1 | A. Yes. | 11:55:04 |
| 2 | Q. And those are your words, not mine; right? | 11:55:05 |
| 3 | A. Yes. | 11:55:07 |
| 4 | Q. The difference is 4.9 million potential | 11:55:07 |
| 5 | counterclaim by Whinstone, should they actually | 11:55:11 |
| 6 | raise this issue and counter. | 11:55:16 |
| 7 | Did I read that correctly? | 11:55:17 |
| 8 | A. Yes. | 11:55:19 |
| 9 | Q. So you all paid, according to your | 11:55:19 |
| 10 | calculation, 4.893, 327.91, less than what the | 11:55:22 |
| 11 | contract called for; right? | 11:55:26 |
| 12 | MR. JOHNSON: Objection. Form. | 11:55:29 |
| 13 | THE WITNESS: We paid what was invoiced to | 11:55:32 |
| 14 | us. | 11:55:33 |
| 15 | Q. (BY MR. SLOVAK) Did you misunderstand my | 11:55:34 |
| 16 | question? | 11:55:36 |
| 17 | A. No. | 11:55:36 |
| 18 | Q. Okay. Your email says that, we have a | 11:55:37 |
| 19 | potential counterclaim by Whinstone for 4.9 million. | 11:55:43 |
| 20 | Did I read that right? | 11:55:48 |
| 21 | A. Yes. | 11:55:49 |
| 22 | Q. That calculation represents the amount | 11:55:49 |
| 23 | that you paid under the 80 percent minimum payment | 11:55:52 |
| 24 | in Section 3-point -- 3.13.1 of the contract between | 11:55:57 |
| 25 | Whinstone and SBI; right, sir? | 11:56:02 |

Confidential -- Attorneys' Eyes Only
Transcript of Jonathan Tanemori
Conducted on August 15, 2024                    127

| | | |
|---|---|---|
| 1 | A.    Yes. | 11:56:04 |
| 2 | Q.    And it's your math; right? | 11:56:05 |
| 3 | A.    Yes. | 11:56:07 |
| 4 | Q.    Okay.  And you would agree, as we sit here | 11:56:08 |
| 5 | today, that if we decided to sue you for that | 11:56:10 |
| 6 | $4.9 million, that your calculation was fair and | 11:56:14 |
| 7 | accurate to the best of your mathematical ability; | 11:56:18 |
| 8 | right, sir? | 11:56:21 |
| 9 | MR. JOHNSON:  Objection.  Form. | 11:56:22 |
| 10 | THE WITNESS:  Based upon what I calculated | 11:56:26 |
| 11 | at the time, there's a difference. | 11:56:28 |
| 12 | Q.    (BY MR. SLOVAK)  Okay.  And you weren't | 11:56:30 |
| 13 | lying when you calculated this; right? | 11:56:31 |
| 14 | A.    That's correct. | 11:56:33 |
| 15 | Q.    You weren't intending to mislead anyone; | 11:56:34 |
| 16 | right? | 11:56:37 |
| 17 | A.    Right. | 11:56:37 |
| 18 | Q.    I want to finish out this line of | 11:56:38 |
| 19 | questions before we go to lunch, but you had | 11:56:40 |
| 20 | mentioned that the third factor that persuaded SBIC | 11:56:42 |
| 21 | to enter into this agreement was some representation | 11:56:49 |
| 22 | about expertise. | 11:56:51 |
| 23 | Did I understand that correctly? | 11:56:53 |
| 24 | A.    Experience and expertise in being a data | 11:56:57 |
| 25 | center operator for Bitcoin miners. | 11:56:59 |

Confidential -- Attorneys' Eyes Only
Transcript of Jonathan Tanemori
Conducted on August 15, 2024                     294

```
1                    CERTIFICATE OF REPORTER

2

3          I, BRANDON D. COMBS, a Certified Shorthand
    Reporter, hereby certify that the witness in the
4    foregoing deposition was by me duly sworn to tell
    the truth, the whole truth, and nothing but the
5    truth in the within-entitled cause;

6          That said deposition was taken in
    shorthand by me, a disinterested person, at the time
7    and place therein stated, and that the testimony of
    the said witness was thereafter reduced to
8    typewriting, by computer, under my direction and
    supervision;
9          That before completion of the deposition,
    review of the transcript was requested.  If
10   requested, any changes made by the deponent (and
    provided to the reporter) during the period allowed
11   are appended hereto.

12         I further certify that I am not of counsel
    or attorney for either or any of the parties to the
13   said deposition, nor in any way interested in the
    event of this cause, and that I am not related to
14   any of the parties thereto.

15

16         DATED: August 29, 2024

17

18

19        Brandon Combs

20   _____
    BRANDON D. COMBS
21   RPR, Texas CSR 10927, California CSR 12978

22

23

24

25
```

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

|  |  |
|---|---|
| SBI Crypto Co., Ltd.,<br><br>*Plaintiff,*<br><br>v.<br><br>Whinstone US, Inc.,<br><br>*Defendant.* | Civil Action No.: 6:23-cv-252-ADA-JCM |

## PLAINTIFF SBI CRYPTO CO., LTD.'S FIRST AMENDED OBJECTIONS AND ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES

To:     Defendant Whinstone US, Inc., by and through its attorneys, Robert T. Slovak and Brandon C. Marx, Gibson, Foley & Lardner LLP, 2021 McKinney Avenue, Suite 1600, Dallas, Texas 75201.

Plaintiff SBI Crypto Co., Ltd. ("SBIC") serves these Amended Objections and Answers to Defendant's First Set of Interrogatories on Defendant Whinstone US, Inc. ("Whinstone") pursuant to Federal Rule of Civil Procedure 33.

## I.
## General Objections

The following objections shall apply to all of the interrogatories:

1.     SBIC objects to the definitions portion of Defendant's First Set of Interrogatories to the extent that it purports to impose obligations on SBIC that are not required by the Federal Rules of Civil Procedure.

2.     SBIC objects to the Interrogatories insofar as they seek to impose upon SBIC any duty of supplementation beyond that imposed by Federal Rule of Civil Procedure 26(e).

3.     SBIC objects to the Interrogatories insofar as they may be construed as calling for information subject to a claim of privilege, including, without limitation, the attorney work-product doctrine set forth in Federal Rule of Civil Procedure 26(b)(3).

4.    SBIC objects to the Interrogatories insofar as they might be construed as calling for information relating to experts beyond the scope of discovery provided for in Federal Rule of Civil Procedure 26(b)(4).

5.    SBIC objects to the Interrogatories insofar as they may be construed as calling for documents or information subject to the attorney-client privilege.

6.    SBIC objects to the Interrogatories insofar as they require SBIC to marshal all its evidence.

7.    SBIC objects to the Interrogatories to the extent they are overbroad, vague, ambiguous, unduly burdensome, or fail to clearly specify the information sought.

8.    SBIC objects to the Interrogatories to the extent they seek documents or information relating to documents that are not relevant to the subject matter of the pending action or are not reasonably calculated to lead to the discovery of admissible evidence in this case.

9.    SBIC objects to the Interrogatories to the extent that they can be interpreted to seek information regarding SBIC's representatives, agents, or employees on the ground that such information is not relevant to the subject matter of the pending action nor reasonably calculated to lead to the discovery of admissible evidence in this case.

10.   SBIC has made reasonable efforts to answer the following Interrogatories as SBIC understands and interprets them. If SBIC subsequently assert an interpretation which differs from that of SBIC, SBIC reserves the right to supplement these answers and objections accordingly.

11.   SBIC objects to the Interrogatories to the extent they might be interpreted as requiring SBIC to concede the relevance, materiality, or admissibility of the information sought by the Interrogatories. The answers set forth below are subject to, without waiving and they are not intended to waive:

a.    All questions or objections as to competency, relevancy, materiality, privilege, or admissibility as evidence, or for any other purpose, of any of the documents referred to or answers given herein, or the subject matter thereof, in any subsequent proceeding or trial in this or any other action;

b.    The right to object to other discovery proceedings involving or related to the subject matter of the interrogatory to which these answers are directed; and

c.    The right at any time to revise, correct, add to or clarify any of the answers, or any of them, all of which are given subject to correction of any such omissions or errors.

12.   These objections applicable to all interrogatories are incorporated by reference in each of the answers made below, as though fully set forth therein, which answers

are made without waiver of any of the foregoing objections applicable to all interrogatories.

## II.
### OBJECTIONS AND ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 1:** Identify each PERSON that was involved in the negotiation of the HOSTING AGREEMENTS.

> **ANSWER:** SBIC objects to Interrogatory No. 1 because the term "involved in" is vague and ambiguous.

> Subject to the foregoing objection, SBIC responds to this Interrogatory as follows: Carson Smith (SBIC), Jonathan Tanemori (SBIC), Aroosh Thillainathan (Whinstone), Chad Harris (Whinstone), Lyle Theriot (Whinstone).

**INTERROGATORY NO. 2:** For each breach of contract that YOU allege in the DEMAND LETTER, identify the date YOU first became aware of the circumstances giving rise to each breach.

> **ANSWER:** SBIC objects to Interrogatory No. 2 because the terms "first became aware of the circumstances giving rise to each breach" are vague and ambiguous and because, to the extent that the Interrogatory requires SBIC to interpret a term of the Rockdale Hosting Services Agreement, the Interrogatory calls for one or more legal conclusions. To the extent that "first became aware of the circumstances giving rise to each breach" refers to when SBIC became aware of each circumstance that gave rise to each breach, SBIC objects because the Interrogatory is overbroad and unduly burdensome and because it seeks information which is not relevant nor calculated to lead to the discovery of admissible evidence.

> Subject to the foregoing objections, and to the extent that "first became aware of the circumstances giving rise to each breach" means when SBIC had sufficient knowledge of all circumstances necessary to give rise to a breach of the Rockdale Hosting Services Agreement, SBIC responds to this Interrogatory as follows: SBIC became aware of Whinstone's failure to meet the December 15, 2019 RFU date on the passing of December 15, 2019. Following several months delay, SBIC notified Whinstone of its claim no later than August 11, 2020. See SBIC 0001897. SBIC notified Whinstone on a number of occasions thereafter. See WHIN_SBI_5097; SBIC0000258-237; WHIN_SBI_0004979; SBIC0000068-92; SBIC00037777-79; SBIC00003254-55; WHIN_SBI_0006303; WHIN_SBI_0006999. SBIC became aware of the circumstances giving rise to the breaches described in the Demand Letter on June 10, 2021. SBIC also became aware of Whinstone's breach of the Confidentiality provision of the Rockdale Hosting Service Agreement through discovery in this case with the production of certain documents and communication by Riot Platforms, Inc. ("Riot") on March

26, 2025.

Discovery is ongoing and SBIC reserves its right to amend this answer pursuant to the Federal Rules of Civil Procedure following the deposition of Whinstone's corporate representative on April 17, 2025 and a review of documents produced by Whinstone on April 11, 2025.

**INTERROGATORY NO. 3:** For each act of fraud that YOU allege in the DEMAND LETTER, identify the date YOU first became aware of the circumstances giving rise to each act.

**ANSWER:** SBIC objects to Interrogatory No. 3 because it seeks information which is not relevant nor calculated to lead to the discovery of admissible evidence, because it requires SBIC to marshal all of its evidence, and because the terms "first became aware of the circumstances giving rise to each act" are vague and ambiguous.

Subject to the foregoing objections, SBIC responds to this Interrogatory as follows: SBIC became aware of the misrepresentations related to the environmental conditions in the Rockdale Facility on June 10, 2021. SBIC also became aware of misrepresentations related to the Rockdale Hosting Service Agreement shortly after Riot Blockchain, Inc. filed its Form 8-K with the United States Securities and Exchange Commission on May 26, 2021. SBIC also became aware of Whinstone's fraud related to its unlawful concealment that it had disclosed the terms of the Rockdale Hosting Service Agreement to Riot through discovery in this case with the production of certain documents and communications produced by Riot on March 26, 2025. Through discovery, SBI also learned that the original hosting service agreement regarding the anticipated facility in Pyote, Texas was procured through fraud following the testimony of Chad Harris on March 7, 2025. *See also*, SBIC's Demand Letter to Whinstone, dated June 3, 2022. [SBIC0000393-416].

Discovery is ongoing and SBI reserves its right to amend this answer pursuant to the Federal Rules of Civil Procedure following the deposition of Whinstone's corporate representative on April 17, 2025 and a review of documents produced by Whinstone on April 11, 2025.

**INTERROGATORY NO. 4:** For each breach of contract that YOU allege in the COMPLAINT, identify the date YOU first became aware of the circumstances giving rise to each breach.

**ANSWER:** SBIC objects to Interrogatory No. 4 because the terms "first became aware of the circumstances giving rise to each breach" are vague and ambiguous and because, to the extent that the Interrogatory requires SBIC to interpret a term of the Rockdale Hosting Services Agreement, the Interrogatory calls for one or more legal conclusions. To the extent that "first became aware of the circumstances giving rise to each breach" refers to when SBIC became aware of each circumstance that gave rise to each breach, SBIC objects because the Interrogatory is overbroad and unduly burdensome and because it seeks information which is not relevant nor calculated to lead to the discovery of admissible evidence.

Subject to the foregoing objections, and to the extent that "first became aware of the circumstances giving rise to each breach" means when SBIC had sufficient knowledge of all circumstances necessary to give rise to a breach of the Rockdale Hosting Services Agreement, SBIC responds to this Interrogatory as follows: SBIC became aware of the circumstances giving rise to the breaches alleged in the Complaint on June 10, 2021. SBIC also became aware of Whinstone's breach of the Confidentiality provision of the Rockdale Hosting Service Agreement through discovery in this case with the production of certain documents and communication by Riot on March 26, 2025. *See also*, SBIC's Demand Letter to Whinstone, dated June 3, 2022. [SBIC0000393-416].

Discovery is ongoing and SBIC reserves its right to amend this answer pursuant to the Federal Rules of Civil Procedure following the deposition of Whinstone's corporate representative on April 17, 2025 and a review of documents produced by Whinstone on April 11, 2025.

**INTERROGATORY NO. 5:** For each act of fraud that YOU allege in the COMPLAINT, identify the date YOU first became aware of the circumstances giving rise to each act.

**ANSWER**: SBIC objects to Interrogatory No. 5 because it seeks information which is not relevant nor calculated to lead to the discovery of admissible evidence, because it requires SBIC to marshal all of its evidence, and because the terms "first became aware of the circumstances giving rise to each act" are vague and ambiguous.

Subject to the foregoing objections, SBIC responds to this Interrogatory as follows: SBIC became aware of the misrepresentations related to the environmental conditions in the Rockdale Facility on June 10, 2021. SBIC also became aware of misrepresentations related to the Rockdale Hosting Service Agreement shortly after Riot Blockchain, Inc. filed its Form 8-K with the United States Securities and Exchange Commission on May 26, 2021. SBIC also became aware of Whinstone's fraud related to its unlawful concealment that it had disclosed the terms of the Rockdale Hosting Service Agreement to Riot through discovery in this case with the production of certain documents and communications produced by Riot on March 26, 2025. Through discovery, SBI

also learned that the original hosting service agreement regarding the anticipated facility in Pyote, Texas was procured through fraud following the testimony of Chad Harris on March 7, 2025. *See also*, SBIC's Demand Letter to Whinstone, dated June 3, 2022. [SBIC0000393-416].

Discovery is ongoing and SBIV reserves its right to amend this answer pursuant to the Federal Rules of Civil Procedure following the deposition of Whinstone's corporate representative on April 17, 2025 and a review of documents produced by Whinstone on April 11, 2025.

**INTERROGATORY NO. 6:** For each claim YOU assert in the COMPLAINT, identify the amount of damages that YOU seek to recover and include the calculation thereof.

**ANSWER:** SBIC objects to Interrogatory No. 6 because it is duplicative in that it seeks information that SBIC has already provided in its Initial Disclosures and because the request is premature. SBIC will provide timely provide calculations of its damages consistent with the discovery deadlines in this case, including expert reports.

Subject to the foregoing objection, SBIC responds to this Interrogatory as follows: First, SBIC contends that, as a proximate result of Whinstone's breaches of the Hosting Services Agreement, SBIC suffered benefit-of-the-bargain damages, including lost profits, damages related to the cost of damaged equipment, and/or as out-of-pocket costs in reliance on the Parties' Hosting Services Agreement. SBIC is entitled to recover its reasonable attorneys' fees for prevailing in its breach of contract claim against Whinstone pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code and the indemnity provision found in ¶ 8.3 of the Hosting Service Agreement. Second, SBIC contends that, as a proximate result of Whinstone's intentional misrepresentations upon which SBIC relied, SBIC suffered benefit-of-the-bargain damages, damages related to the cost of damaged equipment in excess of, as well as out-of-pocket costs in reliance on Whinstone's fraudulent misrepresentations. Additionally, Whinstone's fraudulent acts and omissions were committed knowingly, intentionally, willfully, maliciously, or with wanton and gross negligence for which SBIC should be awarded exemplary damages. Third, SBIC contends that, as a proximate result of Whinstone's failure to disclose certain material facts to SBIC, SBIC suffered benefit-of-the-bargain damages, including lost profits, damages related to the cost of damaged equipment, as well as other out-of-pocket costs in reliance on Whinstone's fraudulent misrepresentations. Whinstone's fraudulent acts and omissions were committed knowingly, intentionally, willfully, maliciously, or with wanton and gross negligence for which SBIC should be awarded exemplary damages. SBIC is entitled to recover its reasonable attorneys' fees against Whinstone pursuant to the indemnity provision provided in ¶ 8.3 of the Hosting Service Agreement. Fourth, SBI's reliance on Whinstone's misrepresentations and/or breach of the RFU date resulted in the expiration of the warranties on the miners. Consequently, even if

SBI's A10 miners had a manufacturing defect, which SBI disputes, Whinstone's breach and fraudulent conduct directly caused SBI to suffer damages from being unable to timely exercise its rights and protections available under the warranties accompanying SBI's miners and/or timely resell, replace, or redeploy its equipment. SBIC's damages will be supported by calculations provided by its designated experts as well as SBIC's representatives and personnel. SBIC reserves the right to supplement these Disclosures in accordance with the Parties' Scheduling Order and the Federal Rules of Civil Procedure.

SBIC incorporates by reference herein the expert reports of Dr. Randall Valentine and Michael Schuler for their calculations on SBIC's damages.

Discovery is ongoing and SBIC reserves its right to amend this answer pursuant to the Federal Rules of Civil Procedure following the deposition of Whinstone's corporate representative on April 17, 2025 and a review of documents produced by Whinstone on April 11, 2025.

**INTERROGATORY NO. 7:** Identify each PERSON at WHINSTONE with whom YOU communicated regarding YOUR mining equipment at the facility.

**ANSWER:** SBIC objects to Interrogatory No. 7 because the terms "at Whinstone" and "communicated" is vague and ambiguous.

Subject to the foregoing objections, SBIC responds to this Interrogatory as follows: Chad Harris, Ashton Harris, Lyle Theriot, Sara Draper, David Schatz, Luis Diaz, Lauren Matherne, Heath Davidson, and Anthony Brown.

**INTERROGATORY NO. 8:** Identify the amount of power that YOU contend WHINSTONE was obligated to provide to YOU under the OCTOBER HOSTING AGREEMENT.

**ANSWER:** SBIC objects to Interrogatory No. 8 because it seeks information that may be more easily obtained from other sources, specifically the Rockdale Hosting Services Agreement and SBIC's Amended Complaint.

Subject to the foregoing objection, SBIC responds as follows: Per the Rockdale Hosting Services Agreement, Whinstone promised to provide at least 5 megawatts by October 31, 2019, 50 megawatts by December 15, 2019, and further represented, as an inducement for entering into the Rockdale Hosting Services Agreement, that it had "secured for commercial access up to one (1) gigawatt of aggregated electricity that can be delivered to the Data Center, of which a portion of that may be incrementally offered to [SBIC]." *See also*, SBIC's Demand Letter to Whinstone, dated June 3, 2022. [SBIC0000393-416].

Discovery is ongoing and SBIC reserves its right to amend this answer pursuant to the Federal Rules of Civil Procedure following the deposition of Whinstone's corporate representative on April 17, 2025 and a review of documents produced by Whinstone on April 11, 2025.

**INTERROGATORY NO. 9:** Identify the certifications and inspections that YOU allege in the COMPLAINT that WHINSTONE was required to obtain.

**ANSWER:** SBIC objects to Interrogatory No. 9 because the Interrogatory requires SBIC to marshal all of its evidence, because the Interrogatory is premature as discovery is ongoing, and because Whinstone has equal, if not better, access to the information requested.

Subject to the foregoing objection, Section 2.1.5 of the Rockdale Hosting Services Agreement provides that "Whinstone represents and warrants that building or other permits, city inspection, or certification is not required with regard to providing services under this Agreement." In its Amended Complaint, SBIC alleges that "certain certifications and inspections were, in fact, required to turn on power." Whinstone was required to secure a stormwater permit from the Texas Commission on Environmental Quality. Whinstone was also required to secure permission from the Rockdale Facility's landlord securing sufficient access to non-potable water for industrial purposes. *See also*, SBIC's Demand Letter to Whinstone, dated June 3, 2022. [SBIC0000393-416].

Discovery is ongoing and SBIC reserves its right to amend this answer pursuant to the Federal Rules of Civil Procedure following the deposition of Whinstone's corporate representative on April 17, 2025 and a review of documents produced by Whinstone on April 11, 2025.

**INTERROGATORY NO. 10:** Identify each attempt YOU made to resell YOUR mining equipment used at the FACILITY, including by listing the party to who resale was offered, the manner of each communication offering to the resale, the price for each offer of resale, and the response to each offer of resale.

**ANSWER:** SBIC objects to Interrogatory No. 10 because the terms "resell," "resale," and "offered" are vague and ambiguous.

Subject to the foregoing objection, SBIC responds to the Interrogatory as follows: SBIC discussed the sale of its Avalon A10 miners with Ray Redding of Smith & Associates in late July 2021, however nothing came of the discussions. SBIC had other informal discussions regarding the sale of its mining equipment, including with Kaboomracks, but those discussions also did not result in a sale. SBIC ultimately sold 2,400 A10 miners along with unused PSU's to Computing Limited. *See* SBIC0006421 & SBIC0006425.

Discovery is ongoing and SBIC reserves its right to amend this answer pursuant to the Federal Rules of Civil Procedure following the deposition of Whinstone's corporate representative on April 17, 2025 and a review of documents produced by Whinstone on April 11, 2025.

**INTERROGATORY NO. 11:** Describe the factual bases for why YOU contend that WHINSTONE's payments to YOU of approximately $7 million in July 2021 and $237 thousand in February 2022 did not settle all claims concerning the HOSTING AGREEMENTS.

> **ANSWER:** SBIC objects to Interrogatory No. 11 because the term "settle" is vague and ambiguous and because the Interrogatory requires SBIC to marshal all of its evidence.
>
> Subject to the foregoing objection, SBIC responds to the Interrogatory as follows: Payments Whinstone made to SBIC following the termination of the Rockdale Hosting Services Agreement constituted the return of un-applied portions SBIC's one-time prepayment and security deposit. The parties did not have a legitimate dispute that SBIC regarding the repayment under the express terms of the Rockdale Hosting Services Agreement. The parties did not enter into a settlement agreement and did not otherwise specifically, implicitly, or intentionally agree with plain, definite, or certain language, to discharge "all claims" concerning the Rockdale Hosting Services Agreement. Furthermore, the amounts described in this Interrogatory do not constitute a full satisfaction of SBIC's claims against Whinstone.
>
> Discovery is ongoing and SBIC reserves its right to amend this answer pursuant to the Federal Rules of Civil Procedure following the deposition of Whinstone's corporate representative on April 17, 2025 and a review of documents produced by Whinstone on April 11, 2025.

**INTERROGATORY NO. 12:** As alleged in paragraph 12 of the COMPLAINT, identify each alleged misrepresentation YOU contend Whinstone made, including by listing the date the misrepresentation was made, the method of communication, where the misrepresentation occurred, and the identity of the person making the misrepresentation.

> **ANSWER:** SBIC objects to Interrogatory No. 12 because the terms "paragraph 12" and "each alleged misrepresentation" are vague and ambiguous and because the Interrogatory requires SBIC to marshal all of its evidence. Paragraph 12 of SBIC's Amended Complaint does not independently identify alleged misrepresentations. To the extent that "paragraph 12" and "each alleged misrepresentation" means the misrepresentations alleged in both paragraphs 12

and 13, SBIC objects to the Interrogatory because it seeks, in part, information that may be more easily obtained from other sources, specifically paragraphs 12 and 13 of SBIC's Amended Complaint.

Subject to the foregoing objections, SBIC responds to the Interrogatory as follows: SBIC alleges in paragraphs 12 and 13 of the Amended Complaint that Whinstone's representations and warranties concerning (1) power capacity, (2) permits, and (3) operating conditions were false because Whinstone misled SBIC into believing it held the requisite building permits and power contracts to perform as promised and then concealed the substandard conditions at its facility. Whinstone's power capacity misrepresentations were made during conversations between representatives of SBIC and Aroosh Thillainathan near the Rockdale Facility during September 2019 while representatives of SBIC visited the Rockdale Facility and in the Rockdale Hosting Services Agreement itself. Whinstone's permits misrepresentations were made in the Rockdale Hosting Services Agreement itself and in verbal conversations with Aroosh Thillainathan and Chad Harris in the first half of 2020. In August 2020, Chad Harris tried to deflect blame away from the conditions of the Rockdale Facility by accusing Canaan of providing poorly manufactured equipment. Whinstone's other operating conditions misrepresentations were made during calls between representatives of SBIC and Ashton Harris.

Additionally, SBIC alleges that Whinstone fraudulently induced it to enter into the Rockdale Hosting Service Agreement by executing the original hosting services agreement with SBI failing to disclose that the owner of the HODL Ranch in Pyote, Texas had rescinded its agreement for Whinstone to construct its facility there. Instead of informing SBIC that the deal was dead, Whinstone strung-along SBIC for another two months with the belief that Whinstone was still going forward with construction of the Pyote facility and that SBIC's miners would be fully up and running by October 2019. Whinstone then executed a bait-and-switch by falsely representing that it could build a facility in Rockdale that would only delay ramp-up of SBI miners two months—with a new "Ready For Use" date of December 15, 2019 ("RFU Date"). Had Whinstone simply disclosed certain objective facts, Whinstone falsely represented that it had secured 1GW of power despite having not secured a power purchase agreement ("PPA"), falsely represented it did not have to secure any permits despite having to secure a storm water permit as well as water rights from the landlord, and falsely represented that it would use the same design as the proposed Pyote facility. Whinstone also falsely represented that the Rockdale facility would utilize filters and exhaust fans and would maintain an intake temperature below 29.5 Celsius. Whinstone had no intent to perform these obligations under the Rockdale Hosting Service Agreement. *See also*, SBIC's Demand Letter to Whinstone, dated June 3, 2022. [SBIC0000393-416].

Discovery is ongoing and SBIC reserves its right to amend this answer pursuant to the Federal Rules of Civil Procedure following the deposition of

Whinstone's corporate representative on April 17, 2025 and a review of documents produced by Whinstone on April 11, 2025.

**INTERROGATORY NO. 13:** For each alleged misrepresentation identified in response to Interrogatory No. 13, identify each act that YOU contend constitutes reliance upon the same.

**ANSWER:** SBIC objects to this Interrogatory because it contains a misleading description of the law as it applies to SBIC's claims, because the term "act" is vague and ambiguous, and because the Interrogatory requires SBIC to marshal all of its evidence.

Subject to the foregoing objections, SBIC responds to the Interrogatory as follows: To the extent that "act" includes decisions not to act in reliance upon Whinstone's misrepresentations, SBIC's decisions to enter into the Rockdale Hosting Services Agreement and not to remove its equipment from the Rockdale Facility constitute reliance on the misrepresentations alleged in paragraph 12 of SBIC's Amended Complaint. SBIC also provided prepayment for Whinstone's hosting services in excess of $8 million to facilitate the rapid construction of the Rockdale Facility and the deployment of SBIC's miners by December 15, 2019. SBI's reliance on Whinstone's misrepresentations and/or breach of the RFU date resulted in the expiration of the warranties on the miners. Consequently, even if SBI's A10 miners had a manufacturing defect, which SBI disputes, Whinstone's breach and fraudulent conduct directly caused SBI to suffer damages from being unable to timely exercise its rights and protections available under the warranties accompanying SBI's miners and/or timely resell, replace, or redeploy its equipment. *See also*, SBIC's Demand Letter to Whinstone, dated June 3, 2022. [SBIC0000393-416].

Discovery is ongoing and SBIC reserves its right to amend this answer pursuant to the Federal Rules of Civil Procedure following the deposition of Whinstone's corporate representative on April 17, 2025 and a review of documents produced by Whinstone on April 11, 2025.

**INTERROGATORY NO. 14:** As alleged in paragraph 22 of the COMPLAINT, identify each alleged misrepresentation YOU contend Whinstone made, including by listing the date the misrepresentation was made, the method of communication, where the misrepresentation occurred, and the identity of the person making the misrepresentation.

**ANSWER:** SBIC objects to Interrogatory No. 14 because the terms "paragraph 12" and "each alleged misrepresentation" are vague and ambiguous and because the Interrogatory requires SBIC to marshal all of its evidence. Paragraph 22 of SBIC's Amended Complaint does not independently identify alleged misrepresentations. To the extent that "paragraph 22" and "each alleged misrepresentation" means the one misrepresentation alleged in both paragraphs 22 and 23, SBIC objects to the

Interrogatory because it seeks, in part, information that may be more easily obtained from other sources, specifically paragraphs 22 and 23 of SBIC's Amended Complaint.

Subject to the foregoing objections, SBIC responds to the Interrogatory as follows: SBIC alleges in paragraphs 22 and 23 of the Amended Complaint that Whinstone's representation that it had secured for commercial access up to one gigawatt of aggregated electricity that can be delivered to the Data Center was false at the time it was made because Whinstone had not, in fact, secured commercial access to that amount of electricity. This misrepresentation was made during conversations between representatives of SBIC and Aroosh Thillainathan near the Rockdale Facility during the fall of 2019 while representatives of SBIC visited the Rockdale Facility and in the Rockdale Hosting Services Agreement itself. *See also,* SBIC's Demand Letter to Whinstone, dated June 3, 2022. [SBIC0000393-416].

Discovery is ongoing and SBIC reserves its right to amend this answer pursuant to the Federal Rules of Civil Procedure following the deposition of Whinstone's corporate representative on April 17, 2025 and a review of documents produced by Whinstone on April 11, 2025.

**INTERROGATORY NO. 15:** As alleged in paragraph 28 of the COMPLAINT, identify each alleged misrepresentation YOU contend Whinstone made, including by listing the date the misrepresentation was made, the method of communication, where the misrepresentation occurred, and the identity of the person making the misrepresentation.

**ANSWER:** SBIC objects to Interrogatory No. 15 because it is unreasonably cumulative and duplicative of Interrogatory No. 12 and because it seeks, in part, information that may be more easily obtained from other sources, specifically paragraph 28 of SBIC's Amended Complaint.

Subject to the foregoing objection, SBIC responds to the Interrogatory as follows: SBIC alleges in paragraph 28 of the Amended Complaint that Whinstone representations that additional building permits, city inspections, and certifications were not required with regard to providing services under the Hosting Service Agreement were false. This misrepresentation was made in the Rockdale Hosting Services Agreement itself.

SBIC alleges that Whinstone fraudulently induced it to enter into the Rockdale Hosting Service Agreement by executing the original hosting services agreement with SBI failing to disclose that the owner of the HODL Ranch in Pyote, Texas had rescinded its agreement for Whinstone to construct its facility there. Instead of informing SBIC that the deal was dead, Whinstone strung-along SBIC for another two months with the belief that Whinstone was still going forward with construction of the Pyote facility and that SBIC's miners would be fully up and running by October 2019. Whinstone then executed a bait-and-switch by falsely

representing that it could build a facility in Rockdale that would only delay ramp-up of SBI miners two months—with a new "Ready For Use" date of December 15, 2019 ("RFU Date"). Had Whinstone simply disclosed certain objective facts, Whinstone falsely represented that it had secured 1GW of power despite having not secured a power purchase agreement ("PPA"), falsely represented it did not have to secure any permits despite having to secure a storm water permit as well as water rights from the landlord, and falsely represented that it would use the same design as the proposed Pyote facility. Whinstone also falsely represented that the Rockdale facility would utilize filters and exhaust fans and would maintain an intake temperature below 29.5 Celsius. Whinstone had no intent to perform these obligations under the Rockdale Hosting Service Agreement. *See also*, SBIC's Demand Letter to Whinstone, dated June 3, 2022. [SBIC0000393-416].

Discovery is ongoing and SBIC reserves its right to amend this answer pursuant to the Federal Rules of Civil Procedure following the deposition of Whinstone's corporate representative on April 17, 2025 and a review of documents produced by Whinstone on April 11, 2025.

**INTERROGATORY NO. 16:** As alleged in paragraph 33 of the COMPLAINT, identify all YOUR attempts "to open communication channels" between WHINSTONE and CANAAN.

**ANSWER**: SBIC objects to Interrogatory No. 16 because it requires SBIC to marshal all of its evidence. Subject to the foregoing objection, SBIC responds to the Interrogatory as follows: Carson Smith of SBIC added Ashton Harris of Whinstone to a WeChat group with representatives of Canaan in October 2020. The parties discussed issues with SBIC's mining equipment and the Rockdale Facility between October and December. Screen captures of that WeChat exchange will be produced as a mutually agreeable time and place.

Discovery is ongoing and SBIC reserves its right to amend this answer pursuant to the Federal Rules of Civil Procedure following the deposition of Whinstone's corporate representative on April 17, 2025 and a review of documents produced by Whinstone on April 11, 2025.

**INTERROGATORY NO. 17:** As alleged in paragraph 33 of the COMPLAINT, identify all YOUR attempts "to open communication channels" between WHINSTONE and CANAAN.

**ANSWER:** SBIC objects to this Interrogatory because it is duplicative of Interrogatory No. 16.

**INTERROGATORY NO. 18:** As alleged in paragraph 34 of the COMPLAINT, identify

all facts to support YOUR contention that WHINSTONE refused CANAAN's request for physical access to the FACILITY.

> **ANSWER:** SBIC objects to Interrogatory No. 16 because it requires SBIC to marshal all of its evidence. Subject to the foregoing objection, SBIC responds to the Interrogatory as follows: Despite Canaan's desire to physically access the Rockdale Facility, and after Representatives of Canaan and Ashton Harris had verbal discussions, Whinstone did not grant Canaan access to inspect SBIC's mining machines and the environmental conditions of the Rockdale Facility.

> Discovery is ongoing and SBIC reserves its right to amend this answer pursuant to the Federal Rules of Civil Procedure following the deposition of Whinstone's corporate representative on April 17, 2025 and a review of documents produced by Whinstone on April 11, 2025.

**INTERROGATORY NO. 19:** As alleged in paragraph 47 of the COMPLAINT, identify all facts to support YOUR contention that YOU spend months looking to reuse YOUR equipment at another facility.

> **ANSWER:** SBIC objects to Interrogatory No. 19 because the term "spend" is a vague and ambiguous.

> Subject to the foregoing objection, SBIC responds to the Interrogatory as follows: Once Whinstone terminated its agreement with SBIC, SBIC placed its mining machines in storage, initially hoping to reuse the machines in a Russian facility where SBIC was then operating identical mining machines. However, the war in Ukraine forced SBIC to change its plans regarding the Russian mining facility. SBIC ultimately sold 2,400 A10 miners along with unused PSU's to Computing Limited. *See* SBIC0006421 & SBIC0006425.

> Discovery is ongoing and SBIC reserves its right to amend this answer pursuant to the Federal Rules of Civil Procedure following the deposition of Whinstone's corporate representative on April 17, 2025 and a review of documents produced by Whinstone on April 11, 2025.

**INTERROGATORY NO. 20:** As alleged in paragraph 48 of the COMPLAINT, identify each alleged misrepresentation and/or omission YOU contend Whinstone made, including by listing the date the misrepresentation and/or omission was made, the method of communication, where the misrepresentation and/or omission occurred, and the identity of the person making the misrepresentation and/or omission.

> **ANSWER:** SBIC objects to Interrogatory No. 20 because it is unreasonably cumulative and duplicative of Interrogatory Nos. 12, 14, and 15, because the Interrogatory requires SBIC to marshal all of its evidence, and because it seeks, in

part, information that may be more easily obtained from other sources, specifically paragraph 48 of SBIC's Amended Complaint.

Subject to the foregoing objections, SBIC responds to the Interrogatory as follows: SBIC alleges in paragraph 48 of the Amended Complaint that Whinstone made the following misrepresentations:

(1)    misrepresenting that the datacenter was well designed, and conformed to industry standards after operations began (while actively concealing the truth of the same); these misrepresentations were made during conversations between representatives of SBIC and Aroosh Thillainathan near the Rockdale Facility during September 2019 while representatives of SBIC visited the Rockdale Facility and in the Rockdale Hosting Services Agreement itself;

(2)    misrepresentations that the datacenter and racks were built and configured to contractual requirements (actively concealing the truth of the same); these misrepresentations were made in the Rockdale Hosting Services Agreement itself;

(3)    misrepresenting in the Hosting Service Agreement that building or other permits, city inspections, or certifications were not required with regard to providing services pursuant to the parties' contract; these misrepresentations were made in the Rockdale Hosting Services Agreement itself and in verbal conversations with Aroosh Thillainathan and Chad Harris in the first half of 2020;

(4)    misrepresenting that the facility was not experiencing problems related to overheating or excessive dust (deliberately concealing harmful environmental conditions at the facility which inevitably caused suboptimal performance SBIC equipment and physical damage to the same); these misrepresentations were made in verbal conversations with Chad Harris during 2020 and during SBIC's site visit in June 2021;

(5)    misrepresenting in the Hosting Service Agreement that one (1) gigawatt of power was available at its Rockdale site and that 50 megawatts of power had been secured on October 24, 2019; these misrepresentations were made during conversations between representatives of SBIC and Aroosh Thillainathan near the Rockdale Facility during September 2019 while representatives of SBIC visited the Rockdale Facility and in the Rockdale Hosting Services Agreement itself; and

(6)    misrepresenting in 2019 and 2020 the availability of power after delays despite not securing power until May 2020; these misrepresentations were made during conversations between representatives of SBIC and Aroosh Thillainathan near the Rockdale Facility during September 2019 while representatives of SBIC visited the Rockdale Facility and in the Rockdale Hosting Services Agreement itself.

Additionally, SBIC alleges that Whinstone fraudulently induced it to enter

into the Rockdale Hosting Service Agreement by executing the original hosting services agreement with SBI failing to disclose that the owner of the HODL Ranch in Pyote, Texas had rescinded its agreement for Whinstone to construct its facility there. Instead of informing SBIC that the deal was dead, Whinstone strung-along SBIC for another two months with the belief that Whinstone was still going forward with construction of the Pyote facility and that SBIC's miners would be fully up and running by October 2019. Whinstone then executed a bait-and-switch by falsely representing that it could build a facility in Rockdale that would only delay ramp-up of SBI miners two months—with a new "Ready For Use" date of December 15, 2019 ("RFU Date"). Had Whinstone simply disclosed certain objective facts, Whinstone falsely represented that it had secured 1GW of power despite having not secured a power purchase agreement ("PPA"), falsely represented it did not have to secure any permits despite having to secure a storm water permit as well as water rights from the landlord, and falsely represented that it would use the same design as the proposed Pyote facility. Whinstone also falsely represented that the Rockdale facility would utilize filters and exhaust fans and would maintain an intake temperature below 29.5 Celsius. Whinstone had no intent to perform these obligations under the Rockdale Hosting Service Agreement.

Following the execution of the Rockdale Hosting Service Agreement, Whinstone continued its pattern of stringing SBIC along by not disclosing that the December 15, 2015 was "impossible" and suggesting that construction was moving at a record pace despite not having secured a storm water permit necessary for construction or a PPA to actually deliver power for SBI's miners. Contrary to its contractual representations, Whinstone constructed the Rockdale Facility without dust filters or fans for proper air flow, and without secure sufficient water rights from the landlord to operate the evaporative curtains as intended. When ramp-up of SBI's miners began in July and August of 2020, Whinstone failed to disclose that the facility was suffering from numerous design issues which detrimentally impacted and damages SBI's Equipment, including the lack of a completed heat wall, over pressurization of the heat aisle due to the lack of fans, recirculation of heat through the miners, and excessive dust accumulation due to the lack of dust filters. Instead of acknowledging the "heat issues" to which it had been notified, Chad Harris and Ashton Harris instead claimed that the issues with SBIC's Equipment was due to faulty or undersized power supply units. Having provided some information related to the performance of SBI's equipment, Whinstone owed SBI a duty to disclose information related to inadequate airflow, dust accumulation and other environmental conditions at the Rockdale Facility. Chad Harris and Aston Harris also falsely represented to Carson Smith that there were no heat issues at the facility.

When Whinstone notified SBI that it was being acquired by Riot in April 2021, Whinstone secured a consent from SBI that SBI would not invoke the "Change of Control" provision and terminate the contract due to the acquisition. Chad Harris also communicated that Whinstone would remain "loyal" and not

terminate the parties' agreement. Having made these representations to SBI, Whinstone had a duty to had inform SBI that it had breached the Rockdale Hosting Service Agreement, by disclosing the confidential terms of its agreement to Riot in early 2021 as part of the due diligence process, including the "Change of Control" provision. Whinstone also had a duty to disclosed that it had also explicitly pitched the idea of terminating SBI's contract directly to Riot as incentive to acquire Whinstone and take over the space and power allocated for SBI's miners. Following the termination of the Rockdale Hosting Services Agreement on May 28, 2021, Chad Harris of Whinstone and Jason Les of Riot also falsely represented to Carson Smith that Riot had not reviewed the terms of the Rockdale Hosting Services Agreement prior to the closing of Riot's acquisition on May 26, 2021, when in fact, Chad Harris and Jason Les had expressly discussed the Change of Control provision and termination of SBI's contract weeks prior because Riot was seeking to allocate SBI's space in Building B with its own miners. *See also*, SBIC's Demand Letter to Whinstone, dated June 3, 2022. [SBIC0000393-416].

Discovery is ongoing and SBIC reserves its right to amend this answer pursuant to the Federal Rules of Civil Procedure following the deposition of Whinstone's corporate representative on April 17, 2025 and a review of documents produced by Whinstone on April 11, 2025.

**INTERROGATORY NO. 21:** As alleged in paragraph 49(10) of the COMPLAINT, identify each "industry expert[] [that] observed Whinstone's datacenter" that will "attest that Whinstone has a poor datacenter design and poor management of the dirt and airflow inside the datacenter," including by listing the identity of the expert, the date the expert observed the Facility, and the nature of the expert's opinion.

**ANSWER:** SBIC objects to this Interrogatory to the extent that it seeks to require SBIC to designate Expert Witnesses prior to the deadline established by the parties' Proposed Scheduling Order.

Subject to the foregoing objection, SBIC responds to the Interrogatory as follows: Nick Foster of Kaboomracks. Additionally, SBIC refers Whinstone to SBIC's Expert Designations and incorporates by reference herein the expert reports of Phil Isaak and Charles Byers.

Discovery is ongoing and SBIC reserves its right to amend this answer pursuant to the Federal Rules of Civil Procedure following the deposition of Whinstone's corporate representative on April 17, 2025 and a review of documents produced by Whinstone on April 11, 2025.

**INTERROGATORY NO. 22:** As alleged in paragraph 35 of the COMPLAINT, identify each "Covid travel restriction[]" between "approximately February 2020 to the first half of 2021" that prevented "SBIC's employees" from "freely travel[ing] to and from Japan."

**ANSWER:** The relevant COVID-19 policies include the following: COVID-01-Basic Policy on Countermeasures against COVID-19-20200422; COVID-02-New measures to strengthen border control (10)-20210318; COVID-03-New measures to strengthen border control (12)-20210512. SBIC will produce documents responsive to this Interrogatory at a mutually agreeable time and place.

Respectfully submitted,

**WINSTEAD PC**

By: */s/ Joshua M. Sandler*
Joshua M. Sandler
Texas Bar No. 24053680
jsandler@winstead.com
Cory Johnson
Texas Bar No. 24046162
cjohnson@winstead.com
Andrew Patterson
Texas Bar No. 24131573
apatterson@winstead.com
2728 N. Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (214) 745-5103
Facsimile:   (214) 745-5390

-AND-

Jeremy A. Oliver, *pro hac vice*
Tennessee Bar No. 029329
joliver@winstead.com
1221 Broadway, Suite 2030
Nashville, Tennessee 37203
Telephone: (615) 949-2352
Facsimile: (615) 949-2349

**ATTORNEYS FOR PLAINTIFF
SBI CRYPTO CO. LTD**

## CERTIFICATE OF SERVICE

I certify that, on April 11, 2025, a true and correct copy of the foregoing was served via electronic mail to all counsel of record.

/s/ Andrew Patterson
Andrew Patterson

# EXHIBIT 7

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
2                       WACO DIVISION

3                           )
    SBI CRYPTO CO., LTD.,    )
4                           )
                            )
5            PLAINTIFFS,     )
                            ) CIVIL ACTION
6    VS.                     )
                            ) No. 6:23-cv-252-ADA-JCM
7                           )
    WHINSTONE US, INC.,      )
8                           )
                            )
9                           )
             DEFENDANTS.     )

10

11

    ------------------------------------------------
12              ATTORNEY'S EYES ONLY
    ORAL AND VIDEOTAPED DEPOSITION OF CARSON SMITH
13    BY AND THROUGH ITS DESIGNATED REPRESENTATIVE
                OF SBI CRYPTO CO
14              APRIL 15, 2025
    ------------------------------------------------
15

16      ORAL AND VIDEOTAPED DEPOSITION OF CARSON SMITH,

17  produced as a witness at the instance of the DEFENDANT,

18  and duly sworn, was taken in the above-styled and

19  numbered cause on the APRIL 15, 2025, from 9:08 a.m. to

20  6:31 p.m., before Kelly Bryant, CSR in and for the State

21  of Texas, reported by machine shorthand, Winstead, 2728

22  N. Harwood Street, Suite 500, Dallas, Texas 75201,

23  pursuant to the Federal Rules of Civil Procedure and the

24  provisions stated on the record or attached hereto.

25

ATTORNEY'S EYES ONLY
Transcript of Carson Smith, Designated Representative
Conducted on April 15, 2025                          95

| | | |
|---|---|---|
| 1 | Q.  (BY MR. SLOVAK)  And was there a signed | 11:35:42 |
| 2 | agreement in writing documenting what you just said, | 11:35:44 |
| 3 | sir? | 11:35:44 |
| 4 | A.  There was not a signed agreement in writing. | 11:35:49 |
| 5 | MR. SLOVAK:  And if you'll take a look at | 11:35:51 |
| 6 | what was previously marked as Exhibit 5 in the Tanemori | 11:35:53 |
| 7 | deposition. | 11:36:07 |
| 8 | (Defendant's Exhibit No. 5 marked) | 11:36:07 |
| 9 | Q.  (BY MR. SLOVAK)  You understand that this was | 11:36:21 |
| 10 | Mr. Tanemori's calculation of what would be owed if the | 11:36:22 |
| 11 | power had been paid at 80 percent; is that correct, sir? | 11:36:26 |
| 12 | MR. JOHNSON:  Objection, form. | 11:36:30 |
| 13 | A.  This is not 80 percent of what was owed.  We | 11:37:05 |
| 14 | paid what was owed as there was an agreement not to bill | 11:37:09 |
| 15 | 80 percent of 50 megawatts.  The ultimate agreement | 11:37:13 |
| 16 | between all the parties that was including Whinstone and | 11:37:17 |
| 17 | Northern Data CFO -- and when I say Whinstone, I mean | 11:37:22 |
| 18 | Chad Harris and the CEO of Whinstone, Aroosh | 11:37:25 |
| 19 | Thillainathan -- to not bill this 80 percent.  And the | 11:37:34 |
| 20 | amounts owed would be the -- essentially, the actual | 11:37:36 |
| 21 | power consumption as shown on the invoices, not the 80 | 11:37:39 |
| 22 | percent of the 50 megawatts. | 11:37:43 |
| 23 | This e-mail here is dated after, too, | 11:37:46 |
| 24 | the -- the May 29th e-mail.  This is part of the ongoing | 11:37:51 |
| 25 | risk assessment that we're doing at -- when we're con -- | 11:37:55 |

ATTORNEY'S EYES ONLY
Transcript of Carson Smith, Designated Representative
Conducted on April 15, 2025                                    96

| | | |
|---|---|---|
| 1 | considering potential litigation.  And this is part -- | 11:37:59 |
| 2 | this is also, too, related to, as I just previously | 11:38:03 |
| 3 | said, the discussion with SBI Holdings, their press -- | 11:38:06 |
| 4 | their investor relations department, because that can | 11:38:15 |
| 5 | affect as a public company.  That -- obviously, they | 11:38:17 |
| 6 | are -- need to be involved.  SBI SVPs and SBI Crypto | 11:38:21 |
| 7 | board members, as well as the SBI Holdings legal | 11:38:28 |
| 8 | department. | 11:38:28 |
| 9 | MR. JOHNSON:  Whoa, whoa, whoa, whoa. | 11:38:28 |
| 10 | Q..  (BY MR. SLOVAK)  Who was -- | 11:38:30 |
| 11 | MR. JOHNSON:  Hold on.  Let's go off the | 11:38:31 |
| 12 | record.  Hold on.  Let's go off the record one sec. | 11:38:32 |
| 13 | VIDEOGRAPHER:  We are going -- we are going | 11:38:34 |
| 14 | off the record.  The time is 11:38 a.m. | 11:38:36 |
| 15 | (Break taken) | 11:38:43 |
| 16 | VIDEOGRAPHER:  We are going back on the | 11:40:23 |
| 17 | record.  The time is 11:40 a.m. | 11:40:24 |
| 18 | MR. JOHNSON:  Plaintiff's counsel for SBI | 11:40:26 |
| 19 | Crypto has reviewed this document, and in consultation | 11:40:31 |
| 20 | with its client determined this document was produced | 11:40:37 |
| 21 | pursuant to and at the direction of counsel to obtain | 11:40:42 |
| 22 | legal advice.  Accordingly, we are demanding that | 11:40:46 |
| 23 | this -- that this particular doc -- document be clawed | 11:40:51 |
| 24 | back and returned to Plaintiff as privileged under the | 11:40:57 |
| 25 | terms of the e -- e-discovery agreement in this case. | 11:41:02 |

**ATTORNEY'S EYES ONLY**
Transcript of Carson Smith, Designated Representative
Conducted on April 15, 2025                                  97

| | | |
|---|---|---|
| 1 | MR. SLOVAK:  Okay.  We continue to take the | 11:41:07 |
| 2 | position that that privilege is waived and that you've | 11:41:09 |
| 3 | done nothing to establish that this was a privileged | 11:41:12 |
| 4 | communication. | 11:41:14 |
| 5 | Q.  (BY MR. SLOVAK)  So who is A-I-O-K-U-D-A at | 11:41:15 |
| 6 | SBIGroup.co.jp? | 11:41:21 |
| 7 | MR. JOHNSON:  I'm going to ask you that you | 11:41:21 |
| 8 | don't answer questions beyond what the persons and the | 11:41:23 |
| 9 | subject matter at the top of this agreement, but not any | 11:41:30 |
| 10 | of the substance below. | 11:41:36 |
| 11 | A.  So the characters in this say Okuda Airi and | 11:41:37 |
| 12 | she is an office assistant for SBI Crypto. | 11:41:40 |
| 13 | Q.  (BY MR. SLOVAK)  Is she a lawyer? | 11:41:45 |
| 14 | A.  She is not a lawyer. | 11:41:46 |
| 15 | Q.  Was the communication that's being clawed back | 11:41:47 |
| 16 | provided to any inside or outside legal counsel? | 11:41:52 |
| 17 | A.  Yes, it was. | 11:41:56 |
| 18 | Q.  To whom was it provided? | 11:41:56 |
| 19 | A.  This would be Okuyama, Masashi Okuyama. | 11:41:58 |
| 20 | Sasaoka, I don't know his full name.  And also Frank | 11:42:04 |
| 21 | Jacob Chauncey. | 11:42:15 |
| 22 | Okuyama is -- they're both in-house | 11:42:15 |
| 23 | counsel.  He's licensed in Ohio.  And Jake is I believe | 11:42:18 |
| 24 | in Missouri. | 11:42:23 |
| 25 | Q.  In what form was it provided to them? | 11:42:24 |

**ATTORNEY'S EYES ONLY**

Transcript of Carson Smith, Designated Representative

Conducted on April 15, 2025

328

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
 2                          WACO DIVISION

 3                                   )
          SBI CRYPTO CO., LTD.,      )
 4                                   )
                                     )
 5                PLAINTIFFS,        )
                                     ) CIVIL ACTION
 6        VS.                        )
                                     ) No. 6:23-cv-252-ADA-JCM
 7                                   )
          WHINSTONE US, INC.,        )
 8                                   )
                                     )
 9                                   )
                  DEFENDANTS.        )
10

11

      ------------------------------------------------
12
                     REPORTER'S CERTIFICATION
13               DEPOSITION OF CARSON SMITH
                        APRIL 15, 2025
14    ------------------------------------------------

15        I, Kelly Bryant, Certified Shorthand Reporter in

16    and for the State of Texas, hereby certify to the

17    following:

18        That the foregoing deposition of CARSON SMITH, the

19    witness, hereinbefore named was, at the time named,

20    taken by me in stenograph on APRIL 15, 2025 having been

21    first duly cautioned and sworn to tell the truth, the

22    whole truth, and nothing but the truth, and the same

23    were thereafter reduced to typewriting by me or under my

24    direction.

25
```

ATTORNEY'S EYES ONLY
Transcript of Carson Smith, Designated Representative
Conducted on April 15, 2025                                         329

1       I further certify that pursuant to FRCP Rule

2    30(f)(1) that the signature of the deponent:

3

4           _____ was requested by the deponent or a party

5    before the completion of the deposition and is to be

6    returned within 30 days from date of receipt of the

7    transcript.  If returned, the attached Changes and

8    Signature Page contains any changes and the reasons

9    Therefor;

10

11          __XXX__ was not requested by the deponent or a

12   party before the completion of the deposition.

13       I further certify that I am neither counsel for,

14   related to, nor employed by any of the parties in the

15   action in which this proceeding was taken, and further

16   that I am not financially or otherwise interested in the

17   outcome of the action.

18       GIVEN UNDER my hand of office on April 26th, 2025.

19

20       *Kelly Bryant*
         _____

21       KELLY BRYANT
         Texas CSR No. 5772

22       Expiration Date:  07/31/25

23

24

25

# EXHIBIT 8

**From:** Carson Smith <carson@sbicrypto.com>
**Sent:** Friday, June 03, 2022 9:51 AM CDT
**To:** CHAD HARRIS <c.harris@whinstone.us>
**CC:** Lyle Theriot <Lyle.Theriot@whinstone.us>; Jonathan Tanemori (SBI Holdings, Inc.) <jotanemori@sbigroup.co.jp>; legal@whinstone.us <legal@whinstone.us>
**Subject:** Re: Notice of Claim
**Attachment(s):** "Claim for Damages Letter.pdf"

Whinstone US, Inc.
2721 Charles Martin Hall Road
Rockdale, TX 76567

Dear Chad Harris, Lyle Theriot:
<c.harris@whinstone.us>, <Lyle.Theriot@whinstone.us>
CC: Alex Travis <legal@whinstone.us>

I have attached a signed letter to follow up with more details of a claim in regard to SBI Crypto's claim notice sent below on May 27, 2022 in this same email thread.

A written version of this letter was also sent by express mail as well using the updated Rockdale notice address you provided. We consider the date of receipt of the attached signed letter as during today's business hours, June 3, 2022.

Please note the specific list of misrepresentations and breaches by Whinstone US Inc. is a non-exhaustive list. We are seeking payment of damages outlined in the letter; however, if the demand is not met, we may seek other damages, including but not limited to, interest charges, damages for other misrepresentations and breaches referenced in the letter (not limited to those listed on pages 3 and 4), punitive damages, legal fees, airfare and lodging, and other reasonable expenses.

Your prompt attention and resolution to this matter is appreciated.

Sincerely,
Carson Smith
Representative Director and CEO
SBI Crypto Co., Ltd.

On Fri, May 27, 2022, 19:52 CHAD HARRIS <c.harris@whinstone.us> wrote:
Carson,

I have received your notice, I would request to contact Alex Travis.

The below address has not been used since 2019 and does not receive forwarded mail from that location.

Alex Travis
Deputy General Counsel
Whinstone US, Inc.
E: legal@whinstone.us

On May 27, 2022, at 3:31 AM, Carson Smith <carson@sbicrypto.com> wrote:

Whinstone US, Inc.
4304 Firestone Road Metairie, LA 70001
2721 Charles Martin Hall Road, Rockdale, TX 76567
<Lyle.Theriot@whinstone.us>, <c.harris@whinstone.us>
Attention: Lyle Theriot, Chad Harris,

This email serves as written notice of a claim under Clause 8.11 of the Hosting Service Agreement between Whinstone US, Inc. and SBI Crypto Co., Ltd.

We will send details of our claim shortly.

Regards,
Carson Blake Smith
Representative Director and CEO
SBI Crypto Co., Ltd.

Chad Harris
Chief Executive Officer
Whinstone US, INC
2721 Charles Martin Hall Road
Rockdale, Texas 76567


EXHIBIT,
Tanemori,
13  8/15

CONFIDENTIAL

SBIC0000393

504-415-6669
c.harris@whinstone.us

SBIC0000394

SBI Crypto Co., Ltd.
1-6-1 Roppongi
Minato-ku, Tokyo, Japan 106-6019

**Claim for Damages**

June 3, 2022
Attention: Chad Harris <c.harris@whinstone.us>
Attention: Lyle Theriot <Lyle.Theriot@whinstone.us>
CC: Alex Travis <legal@whinstone.us>

Whinstone US, Inc.
2721 Charles Martin Hall Road
Rockdale, Texas 76567
(formerly 4304 Firestone Road Metairie, LA 70001)

Dear Chad Harris, Lyle Theriot:

I am following up on our claim notice sent on May 27, 2022 (Central Time) to provide more details of a claim. SBI Crypto Co., Ltd. ("SBIC") provides details in this letter for its claim for damages from significant financial losses suffered due to misrepresentations, failure to meet standard market practices, and breaches of agreements by Whinstone US, Inc. ("Whinstone").

SBIC learned of several misrepresentations made by Whinstone during its visit to Whinstone's datacenter on June 10, 2021, and after Whinstone's acquisition by Riot Blockchain, Inc. ("Riot Blockchain"), through further review of ongoing media coverage of Whinstone, publications by Whinstone, as well as publications and reports by Riot Blockchain.

Since the first meeting between Whinstone and SBIC in New Orleans, Louisiana on April 24, 2019, Whinstone has made multiple misrepresentations in order to induce SBIC to contract with Whinstone to host SBIC equipment and to continue to keep SBIC equipment under contract with Whinstone despite multiple issues that would cause material damages to SBIC.

SBIC has operated in good faith to cooperate with and support Whinstone, despite contract breaches and delays, in its actions including but not limited to:
1) Negotiating and executing a hosting agreement during cryptocurrency bear market to operate 50MW SBIC equipment at Whinstone's planned site in Pyote, Texas;
2) purchasing new miners for the purpose of mining at Whinstone's facility after meeting Whinstone and beginning negotiations;
3) cooperating with Whinstone in a move to Rockdale, Texas after months of delay, around the time SBIC expected to already begin mining;
4) Providing requested financing in the form of an interest-free $8.5m one-time prepayment for construction at the Rockdale site despite financing previously being unnecessary for the first planned site;
5) shipping half of SBIC mining equipment via express shipping to ensure equipment would be ready for Whinstone to start operations during 2019;
6) providing emergency financing in January 2020 upon request after further issues and delays;

SBIC0000395

7) offering further financing of up to US$32 million for Whinstone if Whinstone were to request relief from less advantageous loan conditions from another lender and customer;

8) not exploring litigation, nor terminating SBIC's agreements with Whinstone to continue to work with Whinstone in good faith instead of a Whinstone competitor or sell SBIC equipment at a 100%+ profit after nine months of delays;

9) not terminating its agreements nor pursuing litigation when various breaches of SLAs repeatedly occurred.

We believe Whinstone had an incentive to make these misrepresentations in order to induce SBIC to become a customer and to keep SBIC as a customer in order to: (1) establish enough credibility and financing to secure the power contracts, land, etc., it needed to function as a datacenter; (2) to avoid having to immediately repay the upfront financing providing by SBIC; and (3) to make it a more attractive purchasing target of a company like Riot Blockchain.

When in negotiations for an acquisition of Whinstone by Riot Blockchain, representatives from Whinstone and Riot Blockchain assured SBIC that they would continue to host SBIC's equipment at the site, as SBIC had a concern due to a change of control clause that would allow Whinstone to terminate SBIC's agreement. However, Whinstone terminated the contract immediately upon its acquisition by Riot Blockchain.

SBIC also recently learned through press releases and SEC filings by Riot Blockchain that Whinstone made profits in excess of US$125 million selling power through power arbitrage. SBIC believes this was accomplished by turning off SBIC's equipment against Whinstone's contractual obligations, causing financial damages to SBIC.

CONFIDENTIAL

SBIC0000396

**Whinstone's Liability Limits**

Pursuant to Clause 8.3 of the Hosting Service Agreement, Whinstone agrees to indemnify SBIC for any losses directly or indirectly caused by gross negligence or intentional or willful misconduct of Whinstone in its performance of obligations under the Hosting Service Agreement, including but not limited to, faulty operations, bad design, or misuse of the facilities in the datacenter.

Additionally, pursuant to Clause 8.5.2, Whinstone does not exclude or limit its liability to SBIC for fraud or fraudulent misrepresentation.

**Whinstone's Misrepresentations**

1. that the datacenter is well designed, conforms to industry standards; [1]
2. that the datacenter could be built to contractual requirements;
3. That building or other permits, city inspection, or certification is not required with regard to providing services under the Hosting Service Agreement;
4. was not experiencing problems related to heat or dust, attempted to hide contract breaches, and failed to notify SBIC of issues as required to prevent equipment damage;[2]
5. that 1GW of power was available at its Rockdale site and that 50MW was secured on October 24, 2019;[3]
6. Whinstone misrepresented repeated times in 2019 and 2020 regarding availability of power after delays despite not securing power until May 2020, and construction being much further behind than represented.[4]

---

[1] This expert opinion was first learned when SBIC requested Kaboomracks to assess the Whinstone datacenter in Rockdale and SBIC miner conditions. SBIC later spoke with several industry experts that have visited Whinstone's datacenter have noted problems of recirculation of equipment-damaging hot air and insufficient airflow in designs of airflow, intake and exhaust areas of the building designs used for SBIC equipment. SBIC also learned through interviews with former mining industry expert contractors that worked with Whinstone, that Whinstone was warned of but ignored potential airflow and heat problems in its designs in 2019 and 2020.

[2] SBIC learned that evaporative cooling curtains were never operated, that air filters were never installed, and that equipment components were coated in a thick layer of corrosive, heat-insulating dust.

[3] SBIC learned that a contract to secure power was not signed until May 2020 through publications by Whinstone and review of SEC filings by Riot Blockchain, Inc.

[4] After repeated delays of financing between October to December 2019, Whinstone represented that some construction had already begun in 2019 and some partial power could be provided in December 2019 or January 2020 for a reduced number of machines using temporary solutions such as containers, despite construction being much further behind than represented and no significant power available due to lack of necessary power contracts and power infrastructure. After delays became excessive around February 2020, SBIC became unable to audit the site itself due to growing COVID-19 pandemic conditions around the world.

**Whinstone's Contractual Breaches**

1. Whinstone failed to install smoke detectors. (2.1.1)
2. Whinstone provided the Licensed Area in only one building. (2.1.1)
3. Whinstone relocated SBIC equipment and placed another customer's equipment in the spot used by SBIC when failing to provide sufficient advanced smart hands services. (2.1.3)
4. Whinstone failed to provide SBIC with a copy of the Data Center Rules. (2.1.4)
5. Whinstone did need several permits, inspections or certification to provide services. (2.1.5)
6. Whinstone failed to install all SBIC equipment within 30 days of the RFU date and did not intend to do so during the said 30-day period while continuing to make misrepresentations that it would. (2.2.11)
7. Whinstone failed to maintain an intake temperature of less than 29 degrees Celsius due to failure to operate evaporative cooling walls, and willfully concealed this fact. [5] (2.2.13 i)
8. Whinstone failed to prevent mixing of hot exhaust air with cool air due to poor design of sizing of hot and cold aisles and insufficient air pressurization. (2.2.13 i)
9. Whinstone failed to use filters in the air intake system designed to prevent dust and dirt, while only using louvers and screens to prevent large objects and precipitation from entering the datacenter. (2.2.13 ii)
10. Whitestone failed to ensure the datacenter and air inside is free of dust, dirt, insects, and corrosion which can be found on the insides of the miners. [6] (2.2.13 ii)
11. Whinstone failed to prevent dust, trash and insect particles from collecting inside SBIC equipment. (2.2.13 iii)
12. Whinstone did not use exhaust or intake fans at all despite industry knowledge fans create a positive pressure system for efficient airflow and reduced hot-cold air mixing. (2.2.13 iv)
13. Whinstone failed to provide required monthly reports to SBIC. (2.2.15)
14. Whinstone did not report to SBIC status or overviews of indicator lights. (2.3.1 viii)
15. Whinstone failed to provide Advanced Smart Hands service, failed to maintain cooperation with the manufacturer, did not provide ticketing systems or reports, and maintained poor communication with all those involved. (2.4.1, 2.4.2)
16. Whinstone did not measure actual power consumption for billing purposes for several months as power meters were not installed. (3.4.2)
17. Whinstone did not adhere to requirements of 3.12.2.
18. Whinstone failed to install or operate equipment by the RFU date. (3.13.1)
19. Whinstone failed several times to remedy issues reported as soon as possible. (4.3)

---

[5] During testing with the manufacturer, SBIC determined that intake temperatures exceeding 29 degrees Celsius would degrade mining equipment performance and potentially damage the mining server or power supply unit. Without evaporative cooling walls intake temperatures would be the same as ambient weather which often far exceeds 29 degrees Celsius.

[6] Oxidizing materials in dirt buildup on circuit boards and metal components inside miners causes corrosion. Dirt buildup that also becomes damp due to humidity causes corrosion.

**CONFIDENTIAL**

20. Software for inventory and monitoring was plagued with multiple issues, Whinstone discontinued using the software and failed to provide an alternative so that SBIC could remotely view datacenter conditions to see problems with heat (4.4)

21. Whinstone failed to maintain an uptime percentage of 98.35%, particularly during periods when Whinstone would engage in 4CP load shaving, or would turn off SBIC's equipment to sell power that SBIC had rights to for profits at SBIC's expense, none of which was permitted by the contract. [7] [8]

22. Whinstone failed on several occasions to give 24-hours' notice of downtime when it was known in advance or notice as soon as possible afterwards when it was not known in advance. SBIC gave several warnings to Whinstone regarding notifications. (4.5.2)

23. Whinstone failed to issue reports when 10% of machines were offline, and in almost all instances did not respond within required time. (4.5.3)

24. Whinstone failed to provide maintenance or regular reports when hashrate fell below threshold levels. (4.6.1, 4.6.2)

25. Whinstone monitoring system faced many issues and Whinstone staff themselves complained about it (4.6.3). A monitoring system is key for catching issues early, and discovering problems such as heat caused by poor airflow and dirt buildup.

26. Whinstone failed to maintain hashrate to performance guarantees or specifications due to poor heat and dust control inside the datacenter. (4.6.4)

27. Whinstone failed to maintain the required intake temperature, failed to turn off machines with an intake temperature of greater than 29.5 degrees Celsius, and failed to provide reports to SBIC that there were problems with heat. (4.6.7)

28. Whinstone failed to provide services or datacenter in accordance with industry standards. Whinstone's poor design, poor control of dust and heat, efforts to hide those issues is contrary to any professional standard. Additionally, several industry experts who have seen Whinstone's datacenter attest that Whinstone has a poor datacenter design and poor management of dirt and airflow inside the datacenter. (8.2)

29. Whinstone did not secure up to 1 GW of electricity and had not signed power contracts until just before operations began in summer 2020 despite making explicit representation that it had done so. [9] (8.13)

---

[7] SBIC first learned through Riot Blockchain's SEC filings in August 2021 that Whinstone made profits in excess of $100 million USD by turning off equipment and selling power at inflated power prices, when Whinstone otherwise made representations that it was power was forcefully shut off and that Whinstone was not profiting from this. Whinstone sold power during other occasions as well.

[8] SBIC proposed Whinstone to amend the Hosting Agreement uptime guarantees to allow for power selling using software by Lancium, a company introduced by SBIC, such that SBIC would receive at minimum the expected amount of mining revenue plus a small percentage of the power sale profit as an incentive in exchange for giving up upside of cryptocurrency price appreciation. Whinstone failed to respond to negotiations and sold power anyway, unauthorized.

[9] SBIC learned of delay in Whinstone signing a power contract through press releases and filings by Whinstone and Riot Blockchain during the latter half of 2021.

CONFIDENTIAL

6

**Damages**

SBIC seeks compensation for the following damages:

1. $44,400,000 USD in replacement costs of SBIC equipment with a total maximum computing power of at least 740 PH/s[10,11] to replace equipment damaged by dust, heat and corrosion due to Whinstone's gross negligence, misrepresentation of datacenter conditions and bad datacenter design.
2. $17,595,301 USD in lost mining profits due to SBIC equipment failures and lost mining revenue caused by dust, heat and corrosion due to Whinstone's gross negligence, misrepresentation of datacenter conditions and bad datacenter design in the period between July 1, 2020 and June 30, 2021. [12]

---

[10] 740 PH/s is the maximum rated computing power of the machines, 37 TH/s per machine running in high-power mode, provided by SBIC running under proper mining farm conditions without issues of heat and dust.

[11] Manufacture of Avalonminer A10 series machines used by SBIC has been discontinued. It is no longer feasible to obtain large quantities of suitable replacements and SBIC was unable to recognize the expected economic value of the equipment due to long initial delays and misrepresentations by Whinstone. Replacement cost is estimated using current market price of $60/TH of recent generation equipment.

[12] Lost mining profits are calculated as the difference of actual operating profit in poor operational conditions vs expected operating profit. Operating profit is calculated on a daily basis using mining revenue in USD minus a daily prorated amount for power and advanced smart hands charges. Mining revenue is calculated on the basis of 900 BTC/day in mining rewards and the BTCUSD closing price on the day of which the mining activity occurred. Additionally, a 1% pool fee, 99% uptime, 98% efficiency and 1.01 PUE are added in to reduce expected mining revenue.

CONFIDENTIAL

SBIC0000400

**Demand**

SBIC requests that Whinstone acknowledge intent to pay damages listed herein this letter within 7 days of the receipt of this letter.

Bank Name: Silvergate Bank
Branch Name: Silvergate Bank
Branch Address: 4250 Executive Square Suite 300, La Jolla, CA 92037 USA
ABA/TRC Routing Code: 322286803
SWIFT Code: SIVGUS66
Beneficiary Account Number:  5090019414
Beneficiary: SBI Crypto, Co., Ltd.
Address: 1-6-1, Roppongi Minato-ku, Tokyo, 106-6019 Japan

If payment is not received within 30 days, SBIC will charge additional interest to the maximum amount allowed by the State of Texas starting from the earliest date allowed calculated from the date of this letter. It should be noted that at this point, SBIC is not demanding interest on the amounts listed in the previous page.

SBIC will then proceed to use all legal theories and remedies available to seek the payment for the compensatory damages above and for other compensation including but not limited to punitive damages which may exceed compensatory damages, compensation for attorney and legal fees, compensation for business class airfare and lodging, and all other reasonable expenses.

CONFIDENTIAL

8

**Evidence**

Communications with Whinstone, testimony from third party mining experts and contractors, videos, and pictures of which you may find a few attached below.



SBIC0000402



Dirt in the Power Supply Unit (PSU) causing failure

CONFIDENTIAL



11





CONFIDENTIAL

12





CONFIDENTIAL

13



CONFIDENTIAL

14



SBIC0000408

Other Damage



Extensive Dirt in datacenter



CONFIDENTIAL

16



Dirt that traveled through miners to reach hot aisle, collecting on the floor and hot aisle walls.



CONFIDENTIAL

17



CONFIDENTIAL

18



CONFIDENTIAL



CONFIDENTIAL



Dust collecting on louvers at air intake

CONFIDENTIAL

21





CONFIDENTIAL

SBIC0000415

22

Sincerely,

Carson Smith
Representative Director and CEO
SBI Crypto Co., Ltd.

CONFIDENTIAL