**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

|  |  |
|---|---|
| **SBI Crypto Co., Ltd.,**<br><br>*Plaintiff*,<br><br>v.<br><br>**Whinstone US, Inc.,**<br><br>*Defendant.* | Civil Action No.: 6:23-cv-252-ADA-DTG |

## PLAINTIFF'S DAUBERT MOTION TO EXCLUDE THE TESTIMONY OF RICHARD PETERS UNDER FEDERAL RULE OF EVIDENCE 702

Plaintiff SBI Crypto Co., Ltd. ("Plaintiff" and/or "SBI") files this *Daubert* Motion to Exclude the Expert testimony of Richard Peters under Federal Rule of Evidence 702 and respectfully shows this Court the following.

### I.
### INTRODUCTION

Richard Peters is a cybersecurity expert.

Defendant Whinstone US, Inc. ("Defendant" or "Whinstone") designated Richard Peters ("Peters") as an affirmative and rebuttal expert, offering opinions on (1) the resale value of SBI's cryptocurrency mining equipment, and (2) whether the underperformance and failure of SBI's miners was caused by a product defect or environmental factors at the Rockdale facility. Again, Peters is a cybersecurity expert, with no education, professional or litigation experience, or other specialized knowledge required by Federal Rule of Evidence 702 to provide such opinions. Peters lacks any expertise on the resale of IT equipment, the design or manufacturing computing equipment, the design or operation of data centers, the impact of environmental conditions on the performance of computing

equipment, or any relevant failure mode analysis. Because Peters lacks relevant expertise, he simply repeats the contents of various emails, Slack messages, and other communications as his "expert" opinions without offering any additional analysis. Furthermore, to make up for his lack of experience, Peters relies on "common sense." Even worse, Peters goes as far as to rubber stamp what he admits are speculative statements of Whinstone's own witnesses.

The Fifth Circuit has made clear the need for specific expertise on the subject matter of the opinions offered. Courts consistently and routinely exclude expert opinions involving identical facts as those operating in this case. Peters admitted at his deposition to a lack of any educational background, professional experience, certifications, licenses, memberships to any professional associations or committees, publications, or conference presentations related to the topics on which he opines. Simply put, Peters does not have the specialized knowledge required under Rule 702 to offer his opinions, and his opinions are unreliable and unhelpful to the jury. Therefore, the Court should exclude the testimony of Peters as it pertains to his valuation of SBI's miners contained in his initial report, his rebuttal opinions to Michael Schuler's valuation of SBI's miners contained on paragraphs 1 and 13 through 31 of Peters' rebuttal report, and his rebuttal opinions to Charles Byers on causation contained in paragraphs 32 through 89 of Peters' rebuttal report, including but not limited to any opinions as to the presence of any defects in the power supply units or miners, the design of the Rockdale Facility, and the presence of environmental conditions and impact on SBI's miners.

## II.
### FACTUAL BACKGROUND

Whinstone fraudulently induced SBI to enter into a contract wherein Whinstone

agreed to construct a datacenter in Rockdale, Texas (the "Rockdale Facility") pursuant to certain industry and contractual standards, and then install, maintain, and operate SBI's Canaan Avalon A10 miners ("SBI's miners") (the "Agreement"). Whinstone agreed it would have the Rockdale Facility ready-for use by mid-December 2019. Upon completion of the Rockdale Facility, Whinstone would install, maintain, and operate SBI's miners, and guaranteed the miners would average at least a 98.35% uptime percentage. The Agreement required Whinstone to design the Rockdale Facility to mitigate a number of environmental conditions, including dust, airflow, and heat.

After a significant delay in the installation and operation of SBI's miners, the Rockdale Facility failed to meet numerous contractual and industry standards, including but not limited to the failure to install filters to prevent the accumulation of dust and debris on the miners, the failure to operate evaporative cooling curtains, the failure to install intake and exhaust fans, the failure to ensure air intake temperatures below 29 degrees Celsius, over-pressurization of the hot aisle, and the failure to prevent the recirculation of hot air into the cold aisle.

SBI alleges, among other things, that Whinstone's various breaches and fraudulent conduct resulted in the accumulation of dust and debris inside its miners, recirculation of hot air back through the miners and into the cold aisle, and excessive air intake temperatures, all of which contributed to or caused significant damage to and the underperformance of SBI's miners. Whinstone continuously concealed these substandard conditions and instead, represented that the miners and/or their power supply units ("PSUs") were defective—a position it maintains in this litigation.

As a result, a central issue the jury will have to decide is whether the environmental conditions at the Rockdale Facility caused or contributed to the underperformance

and/or destruction of SBI's miners. To assist the jury in answering this question, SBI designated two experts—Phil Isaak and Charles Byers—to testify on these issues. Isaak is an industry leader in the design, operation, and maintenance of industrial data centers. Similarly, Byers has 35 years' worth of experience in computer engineering, with specific experience researching, designing, and consulting on various projects involving cooling infrastructure for high-power servers, including advanced crypto-miner cooling concepts. He holds 134 patents. Approximately two dozen of those patents relate to high-power computing and networking equipment.

Additionally, as part of its damages, SBI claims the exposure to and damage from the Rockdale Facility's environmental conditions eliminated any resale value the miners might have otherwise had. SBI designated Michael Schuler, a leader in the IT secondary market with over 40 years of experience in the field, as an expert to provide testimony on the resale value of SBI's miners, or lack thereof.

Whinstone designated Peters, first, as an affirmative expert and provided his initial expert report on March 28, 2025. A true and correct copy of Peters' Initial Report is attached hereto as **Exhibit "A,"** and incorporated herein by reference. Peters describes himself as a "senior information security advisor" that specializes in "cybersecurity, investigations, and compliance." A true and correct copies of Peters' Curriculum Vitae and Peters' Deposition Excerpts are attached hereto as **Exhibits "B" and "C,"** and incorporated herein by reference.

In his initial report, Peters opines that SBI should sell its cryptocurrency miners to mitigate its damages and that it should have sold them in 2021 when prices for SBI's miners were higher. **Exhibit "A,"** at 1; **Exhibit "C,"** at 12:19-13:5. Notably, Peters never worked or consulted for a company that resells, repairs, or refurbishes IT equipment:

> Q.    All right. And, Mr. Peters, have you -- have you ever worked for a reseller of IT equipment?
> OPPOSING COUNSEL. Objection, form.

> **A.    No.**

> Q.    Have you ever worked for a company that repairs or refurbishes IT equipment?
> OPPOSING COUNSEL. Objection, form.

> **A.    No.**

> Q.    Have you ever specifically, in consulting capacity, consulted for a reseller of IT equipment?
> OPPOSING COUNSEL. Objection, form.

> **A.    Not that I can recall.**

**Exhibit "C,"** at 75:24-76:12.

Nor has he ever previously worked for or with any brokers to resell used mining equipment, or any IT equipment whatsoever:

> Q.    And a broker would have been able to give them, according to you, a valuation of the miners and whether or not there is a market for them?

> **A.    In general, brokers of used cryptominers can give you a good idea. They'll broker those transactions, find the buyers. They put the buyers and sellers together. There's also the websites that post the current bids and asks for this type of hardware. All of those could be reviewed together.**

> Q.    And you've never worked for any of those brokers, right?

> **A.    Correct.**

*Id.* at 126:24-127:8.

> Q.    Sure. Have you ever engaged with a broker to sell a fleet of mining equipment before?
> OPPOSING COUNSEL. Objection, form.

> **A.    No.**

> Q.    In any of your litigation -- in your prior litigation experience, have you coordinated with any brokers to sell a fleet of mining equipment before?
> OPPOSING COUNSEL: Objection, form.

> **A.    Outside of gathering pricing data, that's been the extent of the interactions. I've never participated in the brokering process or participated in the -- that buy or sell.**
>
> Q.    And that's not just for mining equipment, right? You haven't -- you haven't been a broker for any kind of IT equipment before?
> Opposing Counsel. Objection, form.
>
> **A.    That I know of. I mean, I may have sold hardware myself that I purchased, refurbished, but these are generalized IT equipment, not cryptominers.**

*Id.* at 128:13-129:8.

He has never published any materials, served on any committees, or presented on any topics related to the resale of used IT equipment:

> Q.    Do you currently serve on any committees on the resale of IT equipment?
> Opposing Counsel. Objection, form.
>
> **A.    No.**
>
> Q.    Do you belong to any professional associations that relate to the resale of used IT equipment?
> Opposing Counsel. Objection, form.
>
> **A.    No.**
>
> Q.    Are you familiar with CompTIA, C-o-m-p-T-I-A?
>
> **A.    Yes.**
>
> Q.    Are you a member of CompTIA?
>
> **A.    I don't think I have any of their certifications, no.**

*Id.* at 81:11-25.

> Q.    Have you ever published any materials as it relates to the valuation of used IT equipment?
> Opposing Counsel. Objection, form.
>
> **A.    Not that I can think of in that context.**

*Id.* at 82:19-22.

> Q.    Have you ever presented at a conference on a topic of the IT secondary market?

> **A.    No.**

*Id.* at 83:20-22.

In fact, Peters has been retained only once to even offer an opinion on the value of used mining equipment; he has never been retained to assess the impact of physical contamination on the value of used IT equipment, including miners. *Id.* at 55:22-56:7, 61:22-62:8.

Whinstone designated Peters as a rebuttal expert and served his rebuttal report on July 18, 2025. A true and correct copy of his rebuttal report is attached hereto as **Exhibit "D,"** and incorporated herein by reference. Peters offered rebuttal opinions on Schuler's report and Byers' report. *See generally* **Exhibit "D."** Specifically, regarding Byers' opinions, Peters opines that SBI's miners underperformed because of a defect in the miner or its power supply unit, and that the environmental conditions of the Rockdale Facility either did not exist or did not cause SBI's miners to underperform. *Id.* at ¶ 1, 32-89.

However, Peters does not hold himself out as an expert in the design or manufacture of computing equipment, nor does he believe he is an expert on the design or operation of data centers:

> Q.    Nowhere in your CV do you claim to hold yourself out as an expert on the design or manufacturing of computing equipment; is that fair?
> OPPOSING COUNSEL. Objection, form.
>
> **A.    Correct.**
>
> Q.    And nowhere in your CV do you claim to hold yourself out as an expert in the operation or design of data centers; is that right?
> OPPOSING COUNSEL. Objection, form.
>
> **A.    Correct.**

**Exhibit "C,"** at 74:21-75:6.

Unsurprisingly, Peters does not have any degree in any field of engineering—he has a B.B.A. in Finance. *Id.* at 18:5-7. He has no educational background in engineering. *Id.* at 78:1-4. He has never taught any courses on engineering, thermodynamics, or data center design:

> Q.    Did you teach any courses on computer engineering?
>
> **A.    No. Outside of cybersecurity topics within this course, this is the only one.**
>
> Q.    And did your teaching include any courses on thermodynamics?
>        OPPOSING COUNSEL. Objection, form.
>
> **A.    No.**

*Id.* at 33:4-11.

> Q.    [Y]ou did not teach any courses on the topic specifically of data center design; is that right?
>        OPPOSING COUNSEL. Objection, form.
>
> **A.    Correct.**

*Id.* at 34:3-7. He has never worked or consulted for any company that manufactures or designs cryptocurrency mining equipment, power supply units, or any high-power computing equipment and does not have any prior involvement in the design or manufacturing process:

> Q.    Have you ever worked for a manufacturer of cryptomining equipment?
>
> **A.    No.**
>
> Q.    Have you ever worked for a manufacturer of power supply units?
>
> **A.    No.**
>
> Q.    Have you ever specifically consulted for a company that manufactures or designs cryptocurrency mining equipment?
>
> **A.    No.**
>
> Q.    Have you ever specifically consulted for a company that manufactures or designs power supply units?

> **A.    No.**

*Id.* at 76:8-77:1.

> Q.    Okay. Have you ever been involved in the
> manufacturing or design of a cryptocurrency miner?
> OPPOSING COUNSEL. Objection, form.
>
> **A.    No.**
>
> Q.    Have you ever been involved in the manufacturing or
> design of a power supply unit?
> OPPOSING COUNSEL. Objection, form.
>
> **A.    No.**
>
> Q.    Have you ever been involved in the manufacturing or
> design of any high powered computing equipment?
> OPPOSING COUNSEL. Objection, form.
>
> **A.    Outside of personally-built systems and
> servers, no context outside of that.**

*Id.* at 78:16-79:4.

He has never designed or managed a data center:

> Q.    Have you ever specifically worked for a company that
> designs data centers?
> OPPOSING COUNSEL. Objection, form.
>
> **A.    Not as an employee, no.**
>
> …
>
> Q.    All right. But you didn't contribute to the design of any
> data centers in your professional experience; is that
> correct?
>
> **A.    No. I believe the context was around disaster
> recovery and backups and safety equipment.**
>
> Q.    Have you ever managed a data center before?
> OPPOSING COUNSEL. Objection, form.
>
> **A.    No.**

*Id.* at 77:2-25. He does not serve on any committees related to the design of data

centers or operation of cryptocurrency mining equipment:

> Q.    Do you currently serve on any committees related to
> the design of data centers?
>
> **A.    No.**

> Q.   Do you currently serve on any committees related to the operation of cryptocurrency mining equipment?
>
> **A.   No.**

*Id.* at 81:4-10. He has never published any materials or presented at a conference on the topics of data center design, the operation of bitcoin mining equipment, or the impact of environmental conditions on computing equipment:

> Q.   Okay. Have you ever contributed to or authored any industry standards for the design or operation of data centers?
> OPPOSING COUNSEL. Objection, form.
>
> **A.   No.**
>
> Q.   Have you ever published any materials as it relates to the impact of environmental conditions such as dust or high ambient air temperature on computing equipment?
> OPPOSING COUNSEL. Objection, form.
>
> **A.   Not that I can recall.**
>
> ...
>
> Q.   Sure. Have you ever published any user manuals or guides for the operation of bitcoin mining equipment?
>
> **A.   I'd say no in that context.**

*Id.* at 82:1-15.

> Q.   Have you ever presented at a conference on the topic of data center design?
> OPPOSING COUNSEL. Objection, form.
>
> **A.   No.**
>
> Q.   Have you ever presented at a conference on the topic of environmental conditions and the impact they may have on computing equipment?
> OPPOSING COUNSEL. Objection, form.
>
> **A.   Not that I can think of, no.**

*Id.* at 83:11-19. He does not hold any patents. *Id.* at 83:25-84:7. He has never been retained to opine on a product defect, *id.* at 209:18-23, to analyze the impact of dust or heat on a miner, *id.* at 80:19-81:3, 153:7-20, and 155:12-16, to analyze the physical

condition of mining equipment, *id.* at 62:3-8, to analyze the condition of mining or other computing equipment hosted at a data center, *id.* at 68:23-69:15, or to opine on the environmental conditions present at a data center, *id.* at 80:10-18.

Instead, rather than rely on any specialized knowledge—of which he has none—Peters relied on what he considered to be "common sense":

> Q.   Do you have a trade paper or a journal article that you can point me to that says that that's the proper way to evaluate a miner, is to do the miner specification for normal mode?
>
> **A.   I don't know of any document for that outside of -- again, you could probably go to about any website that tells you the pricing calculators for miners, they use those, and I guess common sense, it doesn't make sense to use a high power mode.**

*Id.* at 116:6-15.

> Q.   I'm not asking if anyone did any testing, I'm not asking about any of that. I'm wanting to know what your specific expertise or specialized knowledge is that you are relying on to make your opinion about whether or not there could have been hot air recirculating into the cold aisle. Is it your statement here today that you are just relying on your common sense?
> OPPOSING COUNSEL. Objection, form.
>
> **A.   Yeah, I would say I'm relying on common sense.**

*Id.* at 174:23-175:8.

Peters' lack of qualifications across the board reveals itself in the methodology and lack of any real analysis provided. Peters bases his valuation opinions on internal emails and on research he claims to have conducted, but he fails to identify or provide this research. *See generally* **Exhibit "A"** and **"D."** Similarly, he did not conduct any testing, perform any calculations, or take any measurements to support any of his opinions, other than the simple arithmetic performed in his valuation. **Exhibit "C,"** at 134:6-11, 137:4-

16, 171:4-19 (testing), 124:25-125:4, 138:8-23, 139:16-23, 148:25-149:3, 169:5-8, 201:12-25, 237:2-238:1 (calculations) 168:14-169:4 (measurements). Peters has no qualifications, did not have any reliable methodology, or does not provide any analysis helpful to the jury. As such, the Court should exclude his expert testimony.

### III.
#### ARGUMENT AND AUTHORITIES

### A.    Legal Standard

Under Federal Rule of Evidence 702, in order to provide opinion testimony to a jury, an expert witness must be qualified by "knowledge, skill, experience, training, or education." Courts have the fundamental responsibility to perform a "gatekeeping function" to ensure an expert is qualified and that his testimony is both reliable and relevant before allowing the expert to testify. *Daubert*, 509 U.S. at 597 (1993). This gatekeeping obligation "applies not only to testimony based on scientific knowledge, but also to testimony based on technical and other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

As the proponent of the expert testimony, Whinstone has the burden to prove, by a preponderance of the evidence, that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;

(b) the testimony is based on sufficient facts and data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED R. EVID. 702.

The Fifth Circuit has repeatedly held that "a district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a

particular field or on a given subject." *Huss*, 571 F.3d at 452. (citing *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir.1999)). Generalized expertise in a related field does not suffice. *Wilson*, 163 F.3d at 938 (5th Cir. 1999) (excluding expert where the expert's experience in one technical area did not qualify him to opine on another). The witness's expertise must match the subject matter of the witness's testimony. *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1101 (8th Cir. 2006); *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007) (the primary concern is the application of the science to the facts of the case).

Courts routinely strike experts as unqualified when they opine on issues outside of their specific expertise, especially when the opinion goes towards causation or product defects. *See Smith*, 495 F.3d at 227 (excluding the opinions of a polymer scientist because, although tires involve issues related to polymer science, the expert had no experience applying polymer science to tires); *Childs v. Entergy Mississippi, Inc.*, 411 Fed. Appx. 699, 701 (5th Cir. 2011) (finding that an expert in low-voltage electrical systems was not qualified to offer opinions on high-voltage electrical systems).

**B.    Peters' Opinions Regarding Mitigation Should be Excluded Because He is Not Qualified to Opine on the Resale or Valuation of Cryptocurrency Mining Equipment, and His Opinions Lack any Specialized Knowledge or Analysis.**

Experts must have specific experience applying their expertise to the subject matter of their opinion. *See Smith*, 495 F.3d at 227; *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 201 (5th Cir. 2016). In *Smith v. Goodyear Tire & Rubber Co.,* the court excluded the opinions of a polymer scientist because the expert had no experience applying his expertise in polymer science to tires. 495 F.3d at 227. The court noted the expert never worked in any job related to the design or manufacture of tires; his only

experience with tires came from using them as a consumer. *Id.*

In the case at bar, Peters is, at best, a consumer of cryptocurrency miners who tinkers with them in his personal (not professional) life. This limited experience is not sufficient to permit him to testify as to appraising or reselling a fleet of cryptocurrency mining equipment.

Furthermore, an expert is unqualified if they lack any work experience or educational background on the specific subject matter of the opinion. *Van Winkle v. Rogers*, 82 F.4th 370, 380 (5th Cir. 2023). For example, in *Van Winkle v. Rogers*, the court found that Van Winkle's expert, Allen, was not qualified to testify because Allen's own admissions showed that, although he was familiar with trucks and tires, he never worked for a tire manufacturer, never worked for a company that manufactured or retreaded tires, did not have any educational background in the manufacturing of tires, had never consulted with a company that recapped or retreaded tires, never published any materials relating to the retreaded or recapping of tires, and never presented on any of these topics either. *Id.*

Here, Peters confirmed in his deposition that he has never worked for or engaged with a broker regarding selling a fleet of mining equipment. **Exhibit "C,"** at 127:2-11, 128:13-16. Further, Peters admitted he is not part of any professional associations related to the resale of IT equipment, nor does he serve on any committees related to the sale of IT equipment. *Id.* at 81:11-25. Also, Peters has never published any materials regarding the valuation of IT equipment. *Id.* at 82:19-22.

Not only does Peters lack the requisite experience in the resale of cryptocurrency mining equipment, his opinions also fail to apply any specialized knowledge or analysis. For example, Peters claims SBI could have sold its miners overseas, but he does not

identify any specific country or estimate how much the miners could sell for abroad. *Id.* at 117:1-23, 119:16-7. Peters also opined that SBI should conduct a market analysis to determine the current demand and optimal pricing but admitted that he did not perform that analysis himself. *Id.* at 121:5-14.

Peters further opined that SBI should have contacted existing broker platforms to assess whether the miners had value in foreign markets. *Id.* at 121:15-122:3. But during his deposition, he admitted that the only broker he reached out to in this case is someone he could only recall as "Mark V" from Lonestar Miners. *Id.* at 122:4-124:10. Peters admitted he did not take any notes from the conversation, did not exchange any emails, or otherwise maintain any written record of this discussion. *Id.* at 123:23-124:10. As a result, there is no way to validate the opinion he attributed to "Mark V."

Peters also opined that SBI should have evaluated the logistics of transporting its miners, including analyzing shipping costs, export controls, tariffs, and import regulations. **Exhibit "A,"** at ¶ 20; **Exhibit "C,"** at 124:11-20. But he conducted no analysis of any of these factors and could not identify any relevant important regulations or export controls that may affect SBI's ability to sell its miners overseas. **Exhibit "C,"** at 124:21-125:17.

Finally, Peters based all but one of his valuations on a handful of email communications between the parties. **Exhibit "A,"** at ¶ 14; **Exhibit "C,"** at 91:5-10, 95:5-96:14, 99:18-100:4. These emails discussed potential prices for the miners before anyone had inspected or appraised them. *Id.* He did not conduct any independent analysis regarding these values. Of course, expert testimony is not needed to simply read party emails and do simple math. *See Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005) (finding that simple mathematical calculations are not the sort of statistical

determination which require the special "knowledge, skill, experience, training, or education" that requires expert testimony).

Peters' resume and testimony confirm he does not possess the specialized knowledge necessary to qualify him as an expert in the resale of cryptocurrency mining equipment. *See generally* **Exhibit "B"**; **Exhibit "C."** Further, Peters' analysis is unverifiable and relies heavily on unsupported party emails to come up with a value of what SBI could have sold the miners for. **Exhibit "A,"** ¶ 14.

Because Peters lacks experience in resale markets and valuation of cryptocurrency miners, his opinions about what SBI "should have done" are speculative, outside his expertise, and inadmissible under *Daubert*, and the Court should exclude them.

## C.    Peters' Rebuttal Opinions on Causation Are Likewise Outside His Expertise and Unsupported by any Specialized Methodology.

In his rebuttal report, Peters challenges SBI's engineering expert, who concluded that the miners' underperformance and damage resulted from various environmental conditions including, but not limited to high air intake temperatures, over-pressurization of the hot aisle at the Rockdale Facility, recirculation of hot air into the cold aisle, dust accumulation, and other substandard facility designs. *See* Rebuttal Report of Richard Peters at ¶¶ 1, 44, 52-61, 77-81, a true and correct copy of which is attached hereto as **Exhibit "D"** and incorporated herein by reference. Peters testified in his deposition— without testing or analysis—that "common sense" suggests other causes could be responsible. **Exhibit "C,"** at 134:6-11, 137:4-16, 171:4-19 (testing), 124:25-125:4, 138:8-23, 139:16-23, 148:25-149:3, 169:5-8, 201:12-25, 237:2-238:1 (calculations) 168:14-169:4 (measurements), 116:6-15, 174:23-175:8 (common sense).

As an initial matter, Peters does not have any expertise in the design,

manufacturing, or operation of data centers, mining equipment, or the analysis of the impact of environmental conditions on computing equipment or mining equipment. *See* discussion *supra* II at p. 5-6. This lack of expertise and experience alone is sufficient to strike Peters' testimony, especially for opinions on product defects and causation. *Wilson*, 163 F.3d at 938 (5th Cir. 1999); *Smith*, 495 F.3d at 227; *Childs*, 411 Fed. Appx. at 701.

In fact, in *Wilson v. Woods*, Wilson's expert, Rosenhan, possessed multiple engineering degrees and focused the majority of his career on fire reconstruction and investigation. 163 F.3d at 937. Nevertheless, the appellate court affirmed the lower court's exclusion of his testimony on accident reconstruction based on the evidence presented that Rosenhan never taught an accident reconstruction course or any other course that involved automobile accident reconstruction, had no degree or certification in accident reconstruction, had not completed the requirements for certification by the Association of Accident Reconstructionists, and lastly, although he testified in various cases, one court refused to qualify him as an expert in vehicle accident reconstruction based on his lack of qualifications. *Id*. In short, the court found that Rosenhan's "expertise" in accident reconstruction was no greater than that of any other individual with a general scientific background. *Id*. at 938.

Similarly, as discussed above, Peters' deposition testimony confirmed his lack of relevant experience and expertise. *See* discussion *supra* II at p. 5-6. In fact, Peters admitted that he is not an expert in designing or manufacturing computing equipment, and he is not an expert in designing or operating data centers. **Exhibit "C,"** at 74:21-75:6.

Peters stated that he has never worked for or consulted with any company that designs or manufactures mining equipment, and he has never participated in designing

or manufacturing this type of equipment. *Id.* at 76:13-77:1, 78:16-79:4. He has never published any materials, taught any courses, served on any committees, belonged to any professional associations or presented at any conferences on the design, manufacturing, or impact of environmental conditions on the performance of computing equipment. *Id.* at 81:4-10, 82:1-18, 83:11-19, 33:4-11, 34:3-18. Peters has never been retained to inspect or opine on the physical condition of IT equipment, the impact of environmental conditions on IT equipment, the impact of dust or heat on mining equipment, or on the defectiveness of any computing equipment. *Id.* at 68:18-69:15, 153:17-20, 155:12-16, 158:3-13, 209:18-23; **Exhibit "A,"** at 14-15. Peters has never previously conducted any testing on any mining equipment used at a data center. **Exhibit "C,"** at 44:3-8. Peters is not an engineer, nor does he have any experience with thermodynamics. *See generally id.*

Similarly, Peters testified that he has no experience with data centers. **Exhibit "C,"** at 77:6-25. His only work with data centers involves cybersecurity related to data centers. *Id.* at 58:8-19. He has no experience in the design, construction, or operation of data centers. *See generally* **Exhibit "B."**

Critically, Peters made clear during his deposition that he conducted absolutely no testing or analysis related to his rebuttal opinions at all. Peters repeatedly regurgitates unreliable, speculative evidence from Whinstone's employees without conducting any independent analysis. *See* **Exhibit "D,"** at ¶ 35-46. In one example, Peters relied solely upon a communication from Chad Harris to support his opinion that SBI's miners had defective PSUs and that the miners' defects were not related to heat. *Id.* at ¶ 42. Peters admitted in his deposition that Harris' communication was simply speculation. **Exhibit "C,"** at 213:21-214:11.

Instead of basing his expert opinions on testing or any other reliable scientific

method, Peters repeatedly described his rebuttal opinions as grounded in "common sense," not specialized knowledge. *Id*. at 116:6-15, 174:23-175:8.

His reliance on "common sense" underscores that Peters' opinions are not the product of reliable methods or expertise. Courts routinely exclude such "common sense" reasoning. *Tendeka, Inc. v. Glover*, No. H-13-1764, 2015 WL 2212601, at *25 (excluding an expert witness's testimony because the expert acknowledged that part of his report was based on commons sense); *United States v. Zajanckauskas*, 441 F.3d 32, 39 (1st Cir. 2006) ("Expert testimony does not assist where the [trier of fact] has no need for an opinion because it easily can be derived from common sense, common experience, the [trier of fact's] own perceptions, or simple logic"); *Jones v. Pramstaller*, 874 F.Supp.2d 713, 720 (W.D. Mich. 2012) ("To the extent that Dr. Walden's arguments are based on common sense rather than his own expertise and experience, they will not be helpful to the jury."); *U.S. Bank Nat'l. Ass'n. v. James*, 741 F. Supp. 2d 337, 343 (D. Me. 2010) ("'Expert' testimony about matters of common sense is not helpful to a jury and carries the risk of unfair prejudice."); *Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 367 F.Supp.2d 413, 417 (W.D.N.Y. 2005) (excluding an expert's opinions "based in large part on common sense and facts which would be obvious to any reasonable adult"). An expert who merely substitutes his own intuition for analysis provides no assistance to the trier of fact. *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 992 (5th Cir. 1997) (finding that the lower court did not err when excluding expert testimony that was based on the expert's experience without a scientific approach).

In yet another example of going far afield from his experience in cybersecurity, Peters opined that Building B was constructed "with a high degree of thermal mass as its steel frame and concrete slab would have moderated temperature fluctuations and

reduced heat accumulation and at a minimum is a shaded environment." **Exhibit "D,"** at ¶ 60; **Exhibit "C,"** at 236:9-19. When asked what experience he had in determining the thermal mass of a building, he testified that he viewed the building and, "in Texas we're used to the heat," but that he is not an engineer. **Exhibit "C,"** at 236:20-237:1. He has never measured thermal mass previously. *Id.* at 237:2-17. And in this case, he did not perform any calculations or review any design documents to make the opinion. *Id.* 237:24-238:4.

Because Peters lacks specific qualifications surrounding the causation issues here—and because his rebuttal opinions rely on common sense, rather than any specialized knowledge, testing, or methodology—his causation opinions should also be excluded.

## III.
### CONCLUSION

For the foregoing reasons, SBI respectfully requests that the Court exclude the testimony and opinions of Defendant's expert, Richard Peters, in their entirety under Federal Rule of Evidence 702 and *Daubert*. In the alternative, SBI requests that the Court preclude Peters from offering any opinions concerning:

1.  The valuation, resale, or mitigation of SBI's cryptocurrency miners, including but not limited to any opinions contained in his Initial Report and in paragraphs 1 and 13 through 31 of his Rebuttal Report; and

2.  The causes of, or data relating to, the performance or failure of SBI's miners and the design of the Rockdale Facility, including any opinions contained in Paragraphs 32 through 89 of his Rebuttal Report.

Respectfully submitted,

By: */s/ Joshua M. Sandler*
Joshua M. Sandler
  Texas Bar No. 24053680
  jsandler@winstead.com
Cory Johnson
  Texas Bar No. 24046162
  cjohnson@winstead.com
Andrew Patterson
  Texas Bar No. 24131573
  apatterson@winstead.com
John D. Janicek
  State Bar No. 24125636
  jjanicek@winstead.com
**WINSTEAD PC**
2728 N. Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (214) 745-5103
Facsimile: (214) 745-5390
**ATTORNEYS FOR PLAINTIFF
SBI CRYPTO CO. LTD**

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served in accordance with the Texas Rules of Civil Procedure via the court's e-filing system on October 28, 2025.

*/s/ Andrew Patterson*
Andrew Patterson