IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| SBI CRYPTO CO., LTD.,<br><br>    Plaintiff,<br><br>v.<br><br>WHINSTONE US, INC.,<br><br>    Defendant. | Civil Action No. 6:23-cv-252 |

# DEFENDANT WHINSTONE US, INC.'S MOTION TO STRIKE THE EXPERT OPINIONS OF MICHAEL SCHULER

Robert T. Slovak
Texas Bar No. 24013523
rslovak@foley.com
Steven C. Lockhart
Texas Bar No. 24036981
slockhart@foley.com
Brandon C. Marx
Texas Bar No. 24098046
bmarx@foley.com
Foley & Lardner LLP
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667

**ATTORNEYS FOR DEFENDANT
WHINSTONE US, INC.**

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579 (1993), Defendant Whinstone US, Inc. ("Defendant" or "Whinstone") moves to exclude the opinions and testimony of Michael Schuler, who Plaintiff SBI Crypto Co, Ltd. ("Plaintiff" or "SBI") designated to testify on the marketability of SBI's cryptocurrency miners on the resale market.

## I. SUMMARY OF ARGUMENT

Expert testimony is only admissible when it will assist the trier of fact by offering specialized knowledge grounded in reliable principles and methods—not speculation untethered to relevant experience or tested analysis. Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702, an expert must be both qualified in the pertinent field and must apply a reliable methodology to form their opinions.

SBI's designated "resale expert," Michael Schuler, meets neither requirement. His deposition testimony reveals that he possesses no meaningful familiarity—let alone expertise—with cryptocurrency mining hardware in general or the specific Avalon Miner A10 series ("A10") and Bitmain Antminer S-9 ("S9") cryptocurrency miners at-issue in this case. Indeed, when asked about such equipment, Mr. Schuler resorted to vague phrases such as "I imagine" (*See e.g.* M. Schuler Dep. Tr. (Oct. 17, 2025) at 76:23-77:8, attached as Exhibit 1) and "I knew of crypto being out there," (Ex. 1 at 26:12-22) while expressly conceding that he only knew about cryptocurrency "anecdotally" (Ex. 1 at 26: 1-6), has "not dealt with crypto" (Ex. 1 at 71:15-72:5), and that "[n]obody in our [Information Technology Asset Disposition] space" is "very familiar with cryptomining equipment (Ex. 1 at 48:16-20). He further admitted that he has:

- Never appraised or performed an evaluation of cryptocurrency mining equipment (Ex. 1 at 73:17-22);

**MOTION TO STRIKE MICHAEL SCHULER** <span style="float:right">2</span>

- Admitted he did not talk to any potential buyer when formulating his opinion of that "no reasonable buyer would purchase [the A10 miners]" (Ex. 1 at 129:14-132:14, 167:5-169:17);

- Admitted his opinion that no reasonable buyer would purchase the miners was subjective and was not tested (Ex. 1 at 167:25-169:13, 158:9-16);

- No familiarity with crypto-mining equipment prior to this case (Ex. 1 at 71:15-72:5);

- No idea as to the difference between an A10 or S9 miner (Ex. 1 at 81:10-12); and

- Never operated a miner or otherwise tested to see if the miners could derive economic value by mining cryptocurrency profitably (Ex. 1 at 44:19-45:19, 61:6-17, 63:2-17).

Mr. Schuler also admitted that he conducted no testing, inspection, or empirical analysis to determine whether any of the miners at issue could be resold. Ex. 1 at 129:14-132:14, 158:9-159:23, 167:5-169:17. Instead, his opinions rest entirely on generalized impressions that are based on a career reselling a broad spectrum of information technology products to his own curated list of resellers, but never actually reselling ASIC hardware[1] or talking to people about potentially purchasing SBI's miners. *Id.* Equally problematic, Mr. Schuler testified that he did not even attempt to resell the equipment at issue in this lawsuit. Ex. 1 at 168:25-169:13. Rather, he merely concluded, without foundation, that none of his resale customers—who do not even purchase ASIC miners—would purchase the equipment offered. Ex. 1 at 129:14-132:14. Mr. Schuler makes no attempt to conform his approach to **any** standards accepted in the relevant field or to quantify error rates, control variables, or otherwise validate his conclusions. That is not the "reliable principles and methods" contemplated by Rule 702; it is conjecture developed solely for purposes of this case, uninformed by established industry data or practice.

---

[1] The first and only time Mr. Schuler has ever tried to resell cryptocurrency miners was in 2016 when he attempted to sell used GPU miners that were past their useful life. *See generally* Ex. 1 at 31:14-37:5, 41:10-23, 42:4-9. Critically, these miners were not ASIC miners, like the ones at issue in this case, and Mr. Schuler only attempted to resell these miners for a week before he declared that they were scrap. Ex. 1 at 32:6-8, 40:8-14, 44:2-5, 46:20-47:17.

**MOTION TO STRIKE MICHAEL SCHULER**  3

Because Mr. Schuler lacks the requisite qualifications in the subject matter, and because his so-called methodology is neither reliable nor tied to the facts, his testimony fails *Daubert's* reliability and "fit" requirements. It offers nothing that would assist the trier of fact in resolving a technical question about cryptocurrency miner resale, and instead invites the jury to rely on his speculation. This is precisely the type of unsupported, litigation-driven opinion *Daubert* and Rule 702 were designed to exclude. The Court should strike Mr. Schuler's opinions in their entirety.

## II. STANDARD OF REVIEW

An expert may only testify in the form of opinion if they meet the requirements of qualifications, reliability and fit. Fed. R. Civ. P. 702. Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case."

Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). "The party offering the expert must prove by a preponderance of the evidence that the proffered testimony satisfies the [R]ule 702 test." *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002). The Supreme Court assigned to trial courts the responsibility of determining whether expert testimony under Rule 702 is "not only relevant, but reliable." *Daubert*, 509 U.S. at 589. In this gate-keeping role, trial courts make "a

**MOTION TO STRIKE MICHAEL SCHULER** 4

preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93.

The *Daubert* opinion lists a number of factors that a trial court may use in determining an expert's reliability. Trial courts are to consider the extent to which a given technique can be tested, whether the technique is subject to peer review and publication, any known potential rate of error, the existence and maintenance of standards governing operation of the technique, and, finally, whether the method has been generally accepted in the relevant scientific community. *See id.* at 593–94. These factors are not mandatory or exclusive; the district court must decide whether the factors discussed in *Daubert* are appropriate, use them as a starting point, and then ascertain if other factors should be considered. *See Black v. Food Lion*, 171 F.3d 308, 311–12 (5th Cir.1999).

"[C]onclusions and methodology are not entirely distinct from one another." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). Rule 702 specifically requires that the expert's testimony be based upon sufficient facts or data. *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1330–31 (5th Cir.1996). A court "must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 153 (3d Cir. 1999). "An expert's opinion must be preceded by facts in evidence and cannot be the basis of speculation or conjecture." *Lewis v. Parish of Terrebonne*, 894 F.2d 142, 146 (5th Cir.1990). An expert is not allowed to give opinions based on speculation or erroneous facts. *Slaughter v. S. Talc Co.*, 919 F.2d 304, 307 (5th Cir.1990).

## III. ARGUMENTS & AUTHORITIES

**A.     Mr. Schuler's opinion rests exclusively on his unverifiable, subjective belief.**

Rule 702 specifically requires that an expert's testimony be based upon sufficient facts or data. Fed. R. Evid. 702(b). Proposed expert testimony "must be supported by appropriate validation – i.e. good grounds, based on what is known." *Daubert*, 509 U.S. at 590 (punctuation omitted). "Where an expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Eng'red Materials, Inc*, 555 F.3d 383, 388 (5th Cir. 2009); *see also Seaman*, 326 F. App'x at 725. Therefore, expert testimony must be supported by "more than subjective belief or unsupported speculation." *Paz*, 555 F.3d at 388. It "must be reliable at each and every step or it is inadmissible. The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Seaman v. Seacor Marine L.L.C.*, 326 F. App'x 721, 725 (5th Cir. 2009); *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 515 (5th Cir. 2013) ("Although the *Daubert* reliability analysis is flexible and the proponent of expert testimony need not satisfy every one of its factors … the existence of sufficient facts is … in all cases mandatory.") "Overall, the trial court must strive to ensure that the expert, 'whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) *quoting Kumho Tire*, 526 U.S. at 152.

"[W]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir.1987). For example, in *Hathaway v. Bazany*, the court excluded an opinion grounded solely in general experience where the witness failed to conduct a meaningful analysis tied to the facts of the case and his opinion was not based on any "discernable training in or use of a scientific methodology." 507

**MOTION TO STRIKE MICHAEL SCHULER**                                                                                          6

F.3d at 318. Similarly, in *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc), the court held that an expert must furnish "some objective, independent validation of the [his] methodology. The expert's assurances that he has utilized generally accepted scientific methodology is insufficient."

Mr. Schuler's primary opinion that "there is <u>no</u> resale value for [SBI's] used units after deployment" is pure ipse dixit. Schuler Rpts. at 15, attached as Exhibit 2. Mr. Schuler's opinion rests on a single, untested premise: that the people he knows in the used-electronics resale world would not purchase SBI's A10 miners because, in his subjective view, they are dirty. Ex. 1 at 129:14-132:14., 167:5-169:17. Critically, Mr. Schuler undertook no investigation to confirm whether his assumption was accurate, either by surveying prospective buyers, seeking market data, or otherwise testing his hypothesis. *Id.* Mr. Schuler also arrived at his conclusion without first inspecting the miners. Ex. 1 at 125:7-25. Mr. Schuler's after-the-fact "methodology"[2] consisted solely of inspecting the exterior condition of 30 unknown A10 miners and dissembling 3 unknown A10 miners. Ex. 1 at 207:3-209:25. From this superficial review, Mr. Schuler declares that SBI's miners have "no value" and that "no one" in his resale network would purchase them. *See* Ex. 1 at 129:14-132:14., 158:9-159:23, 167:5-169:17. Mr. Schuler further admitted in his deposition that:

- He never spoke to any reseller—whether inside or outside his professional circle—about the specific miners at issue here (Ex. 1 at 129:14-132:14., 158:9-159:23, 167:5-169:17);

- He made no attempt to verify whether the miners were in fact "too contaminated" to mine cryptocurrency profitably (Ex. 1 at 61:6-17, 63:2-17, 207:3-209:25); and

- His conclusion that "no one I know would buy it" is entirely speculative (Ex. 1 at 129:14-132:14., 158:9-15923, 167:5-169:17).

---

[2] Equally problematic is Mr. Schuler admitted he only conducted his analysis to provide a sur-rebuttal to Richard Peters' July 18, 2025, opinions about the lack of chain of custody and other potential sources of "contamination." Ex. 1 at 123:1-17. This admission directly contradicts SBI's representations to this Court that Mr. Schuler only offered rebuttal opinions to Mr. Peter's March 28, 2025 report. Hr'g Tr. (Sept. 30, 2025) at 33:8-19, attached as Exhibit 3.

**MOTION TO STRIKE MICHAEL SCHULER**                                                                          7

"[A] key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." *Daubert*, 509 U.S. at 593. Mr. Schuler's approach is purely subjective, untested, and impossible to test given his inability to identify the 30 miners he allegedly inspected and three he disassembled. Ex. 1 at 129:14-132:14., 158:9-159:23, 167:5-169:17. He offers no objective basis for his analysis, no measurable criteria, and no data capable of independent verification or replication. *Id*. As such, Mr. Schuler's conclusions rest entirely on personal impressions untethered to any recognized valuation method, industry standard, or accepted practice in assessing specialized cryptocurrency mining hardware. Expert testimony, however, must rest on "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. Mr. Schuler's opinion is not based on any objective market data nor is it independently verifiable. It is textbook ipse dixit reasoning that is rejected by courts in the Fifth Circuit. *Moore*, 151 F.3d at 276.

**B.     Mr. Schuler's Opinions Are Not the Product of Any Reliable Methodology.**

Federal Rule of Evidence 702 requires that expert testimony be "the product of reliable principles and methods" applied "reliably to the facts of the case." In its gatekeeping role, the court must conduct preliminary fact-finding and assess whether the reasoning or methodology underlying the testimony rests on a reliable foundation and "whether that reasoning or methodology properly can be applied to the facts in issue." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). To prove that an expert's methodology is reliable "requires some objective, independent validation of the expert's methodology;" the "expert's assurances that he has utilized generally accepted scientific methodology is insufficient." *See Moore*, 151 F.3d at 276. Courts are wary of expert methodologies created for the purpose of litigation and unsupported

by prior use in the relevant field. *See Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007) (methodology developed for litigation should be viewed "with caution").

Mr. Schuler's approach to valuing and condemning SBI's A10 miners fails to satisfy the reliable methodology standard required by Rule 702. Rather than relying on scientific or technical analysis, Mr. Schuler's opinions reflect conjecture and advocacy, evidenced by: (1) there is neither empirical evidence connecting the alleged contamination to the market values he claims, nor any recognized industry research or technical framework to support his conclusions; (2) his opinion is speculative, untested and unverifiable theories of performance loss; and (3) his opinion is neither peer reviewed or generally recognized in his industry.

*First*, Mr. Schuler's "unsellable" conclusion rests entirely on his subjective belief that the dust and clay he observed on 30 units is pervasive amongst all 20,000 units and that such condition would deter any reasonable buyer. Mr. Schuler concedes he is not a statistician. Ex. 1 at 204:23-25. Mr. Schuler claims to have relied on a CLT standard for determining the sample size. Although Mr. Schuler could not clarify what CLT meant (Ex. 1 at 202:11-203:16), it appears to be a reference to the Central Limit Theorem (CLT). *See* https://www.scribbr.com/statistics/central-limit-theorem/ (last visited October 30, 2025). The CLT is a statistical principle that explains how, under certain conditions, the distribution of sample means approaches a normal distribution as sample size increases. *See Id.* While a 30 sample size is sometimes cited as a convenient benchmark, this is a gross oversimplification of the theorem. A CLT analysis would require a sampling of *at least* 30 units depending on the overall size of the population. *See id.* The appropriate sample size depends on the size and variability of the population, and requires random, representative sampling to ensure the validity of the results. *Id.* Here, however, Mr. Schuler did not take into account the total amount of the population to derive at a statistical sample of 30. Ex. 1 at 202:1-10; 204:16-207:2. Mr. Schuler is admittedly not

**MOTION TO STRIKE MICHAEL SCHULER** 9

a statistical expert, but he did not ask for a statistician to help him come up with a sampling protocol either. Ex. 204:3-25, 205:19-206:3. Compounding the error, Mr. Schuler did not conduct a randomized sampling of the A10 miners to determine the actual prevalence of purported contamination across the inventory because it would be too burdensome. *See* Ex. 1 at 219:22-220:12. Instead, he inspected only 30 units that were in three crates that were stacked on top and readily accessible, and then extrapolated from this small and non-random subset that every other unit was in the same condition. *Id.* Mr. Schuler makes no effort to determine how his failure to conduct a truly random sample affected the statistical sampling he conducted. This type of convenience sampling fails to satisfy even the most basic principles of statistical methodology or industry-accepted inspection standards. Absent a proper sampling protocol, there is no reliable basis for Mr. Schuler's blanket conclusion regarding the entire inventory's condition. *See Kelley v. Am. Heyer-Schulte Corp.*, 957 F.Supp. 873, 880 (W.D. TEx. 2997) (excluding expert testimony because, in part, the small sample size was "not reasonably relied upon by experts to form [their] conclusions…."). His approach substitutes assumption for analysis and renders his opinion both unverifiable and methodologically unsound.

But to make matters worse, Mr. Schuler takes this imperfect "sampling" and assumes that all of SBI's A10 units have no value on the resale market. Again, Mr. Schuler offers no empirical support for this assumption — no records of attempted sales that failed due to cosmetic condition, no surveys of potential buyers, and no published valuation data establishing that superficial contamination renders otherwise functional cryptocurrency miners worthless. Ex. 1 at 129:14-132:14., 158:9-159:23, 167:5-169:17. Mr. Schuler's conclusion is not the result of any reasonable methodology; it's the result of him just parroting what SBI wants him to say because its consistent with their litigation narrative. Rather than applying any recognized appraisal method or conducting independent market research to support his opinions, Mr. Schuler simply inspected

**MOTION TO STRIKE MICHAEL SCHULER**　　　　　　　　　　　　　　　　　　　　　　　10

the equipment on August 5, 2025, presumed that visible dust and residue equated to zero resale potential, and he then unilaterally declared the units valueless. Mr. Schuler's failure to make any effort to test or challenge his own assumption creates the inescapable impression that Mr. Schuler's conclusion is shaped to fit SBI's litigation theory, rather than derived from a neutral, analytical process. *Id.* Without data, standards, or demonstrable reasoning, his opinion cannot be meaningfully validated, replicated, or relied upon. This is not a methodology; it is speculation.

*Second*, Mr. Schuler claims "reduced performance due to extensive overheating and contamination" yet never analyzed the impact of heat on any miner's ability to mine cryptocurrency. Ex. 1 at 72:24-73:14. His conclusions about "reduced performance" and "unsellable" condition rest solely on a visual review of thirty units and photographs and certain KaboomRacks pictures and videos from June 2021. Ex. 1 at 184:17-185:19, 207:3-209:25. Mr. Schuler did not measure the machine's hash rates, electrical functionality, or thermal performance to verify the alleged impairments. Ex. 1 at 99:11-22, 207:7-208:20, 256:13-260:18. He assumes without testing that contamination necessarily produces hash rate degradation, despite offering no thermal load data, fan efficiency measures, or chip-level diagnostics. No legitimate methodology underpins this opinion—only inference without evidence.

*Third*, Mr. Schuler cites no industry literature, technical papers, or peer-reviewed sources validating his method of opening crates, visually inspecting a small sample, and extrapolating market value across thousands of machines. *See generally* Ex. 2; Ex. 1 at 158:9-159:23. Instead, Mr. Schuler conducted an *ad hoc* examination devised solely for this case. Mr. Schuler provides no statistical justification, margin of error, or confidence level for his small sample, nor any error-rate analysis addressing variability in contamination or functionality across the entire 20,000-unit inventory. *See* Ex. 2. His report offers no evidence that Mr. Schuler followed any recognized valuation or inspection standards applicable to crypto mining hardware, IT asset disposition, or

**MOTION TO STRIKE MICHAEL SCHULER** 11

electronics failure analysis. *See* Ex. 2. His process is not tied to any established protocols. Mr. Schuler makes no showing that his litigation-devised inspection method is accepted in the electronics valuation, resale, or crypto-mining appraisal communities.

Rule 702 and *Daubert* require more than an expert's assurance that "this is how I chose to do it." Methods designed for litigation without independent validation carry heightened risks of bias and unreliability. *Johnson*, 484 F.3d at 434. Mr. Schuler's process here is a litigation construct, devoid of prior track record, market acceptance, or objective performance verification, and therefore cannot satisfy the reliability or independence requirements for admissible expert testimony. These reasons provide an independent basis for the Court to exclude Mr. Schuler's opinions.

C.    **Mr. Schuler's "Expertise" Is Irrelevant to the Subject Matter.**

Under Federal Rule of Evidence 702, an expert must be "qualified… by knowledge, skill, experience, training, or education" in the specific subject matter of the testimony. An expert's testimony on subjects in which he is not qualified must be excluded. *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).

Mr. Schuler's core expertise is in ITAD resale of a broad category of electronics, furniture, and used office equipment. Ex. 1 at 28:4-18, 29:8-23, 30:5-21. With respect to electronics, Mr. Schuler experience consisted of reselling personal computers (about 25% of his practice), data center equipment (about 60% of his practice) and miscellaneous peripherals constituted the balance of his practice to other IT resellers (which account for 95% of his practice). Ex. 1 at 30: 5-21. Mr. Schuler has only one anecdotal example of reselling crypto-mining equipment, but even then he was only tasked with reselling GPU machines, not ASIC machines like the ones at

issue here. Ex. 1 at 31:8-32:8. He made no efforts to sell the miners at-issue here to any end-user as well. Ex. 1 at 129:14-132:14., 158:9-159:23, 167:5-169:17.

Even if Mr. Schuler has some background in selling other categories of electronics, that does not make him qualified to opine on the resale market for cryptocurrency-specific A10 miners. His admitted lack of direct involvement in the crypto hardware market means his experience does not "fit" the subject of his testimony. Experience in reselling general electronics to other resellers not involved with cryptocurrency mining equipment does not make him an expert in reselling specialized, high-value, niche equipment such as A10 miners. Mr. Schuler neither offered an opinion nor discussed the distinct end-user market—which might have been interested in purchasing the miners and did include KaboomRacks, an end user that bought some of SBI's miners—which he did not consider. Ex. 1 at 147:24-148:1, 152:13-153:21, 155:20-25. Mr. Schuler has never appraised or performed an evaluation of cryptocurrency mining equipment. Ex. 1 at 73:17-22. Mr. Schuler's appraisal experience is rooted in mainstream IT equipment such as PCs, servers, and consumer electronics. Ex. 1 at 28:4-18, 29:8-23, 30:5-21. The crypto mining resale market is niche, with unique factors (i.e. hash rate competitiveness, difficulty adjustments, coin volatility), which impact value. Mr. Schuler provides no evidence of prior valuation engagements involving large-scale crypto miner fleets, nor publications or presentations focused on crypto-mining hardware economics. *See generally*, Ex. 2. Moreover, just because Mr. Schuler believes that no one in *his* network would want to buy SBI's used A10 miners, does not mean that *no one* would want to purchase the A10 miners. Mr. Schuler simply does not have the appropriate expertise to speculate that SBI's A10 miners have no value.

D.   **Even if Mr. Schuler is Qualified as an Expert, his Opinions Stray Beyond the Reasonable Confines of His "Expertise."**

Federal Rule of Evidence 702 does not permit even a generally qualified expert to offer opinions in subject areas beyond their demonstrated expertise. Under this rule, the main issue is

**MOTION TO STRIKE MICHAEL SCHULER**                                                                                    13

whether a particular expert has "sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156, (1999) (citations omitted). A court has discretion to keep an expert witness from testifying if it finds that the witness is not qualified to testify in a particular field or on a given subject. *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999).

To the extent Mr. Schuler has any expertise, it is in IT asset disposition and secondary market resale of used data center electronics. Ex. 1 at 30:5-21, 31:8-32:8. His experience involves marketing and remarketing PCs, servers, consumer electronics, and related hardware throughout their product lifecycles. *Id.* While that *may* qualify him to opine on general resale market conditions for IT equipment, Mr. Schuler ventures far beyond that limited domain into areas for which he has no demonstrable expertise. Mr. Schuler's report contains multiple conclusions—on OSHA compliance, statistical sampling methodology, industrial contamination causation, and specialized crypto-mining hardware performance—that lie outside the reasonable boundaries of his resale market experience.

*First*, Mr. Schuler opines on occupational safety and OSHA hazards without demonstrating any OSHA expertise. Ex. 1 at 255:6-13. Mr. Schuler asserts that contamination on the miners presents "an OSHA hazard" to ITAD companies or recyclers. Ex. 2. Determining OSHA hazards requires industrial hygiene measurement, workplace safety training, and regulatory compliance expertise — none of which fit Mr. Schuler's alleged experience. Mr. Schuler further admitted that he is not an OSHA expert. Ex. 1 at 255:6-13.

*Second*, Mr. Schuler has no expertise in statistical sampling and extrapolation. Mr. Schuler purports to extrapolate the condition of all 20,000 miners from a visual inspection of only 30 machines. Ex. 1 at 207:3-209:25. Designing a statistically valid sample and calculating confidence levels are tasks requiring training in statistics or quantitative analysis; Mr. Schuler's background

reflects no such expertise. *See* Ex. 2. Mr. Schuler further admitted that he is not an expert in statistical sampling. Ex. 1 at 204:3-25. Mr. Schuler's sampling design here is ad hoc and unsupported by recognized statistical methodology.

*Third*, Mr. Schuler is not an environmental contamination expert. *See* Ex. 1 at 126:17-129:3. Nevertheless, Mr. Schuler attributes contamination exclusively to Whinstone's facility based on dust patterns, without conducting environmental sampling or engaging in forensic contamination analysis. Ex. 2. Such causation opinions should be formed by environmental scientists, industrial hygienists, or engineers, not resale market specialists. This is an opinion that is, again, outside his professional scope.

*Fourth*, Mr. Schuler has no expertise in crypto mining hardware operation and performance. Ex. 1 at 45:4-10, 87:13-19, 92:19-20, 93:14-20, 105:23-106:24. Mr. Schuler has not operated or managed a cryptocurrency mining facility, nor does he hold any formal credentials or published experience in mining economics, blockchain technology, or hash rate optimization. *See generally*, Ex. 2; Ex. 1 at 71:15-72:10. Mr. Schuler further has no formal training in electronics engineering, thermal systems design, industrial contamination remediation, or component failure causation. Furthermore, Mr. Schuler claims that the contamination and overheating reduced crypto-mining performance and hash rates, but he did not conduct functional tests nor does he possess formal training in thermal systems engineering, electronics failure analysis, or crypto mining hardware operation. Ex. 1 at 207:23-208:20, 256:13-257:13, 260:14-18. His ROI performance projections and statements about operational impairment from alleged contamination require an understanding of mining algorithms, thermal management systems, and workload performance testing—technical disciplines outside his established expertise.

Rule 702 does not give an expert license to opine broadly in any area tangentially related to their field. It requires that each opinion be grounded in the witness's actual expertise. Because

**MOTION TO STRIKE MICHAEL SCHULER** 15

Mr. Schuler's qualifications do not match the breadth of the opinions he seeks to offer, the Court should exclude testimony outside the reasonable confines of his actual expertise, and limit any admissible testimony strictly to areas of demonstrated competence. At most, Schuler should be limited to addressing general resale market dynamics for used IT equipment, not technical, scientific, or regulatory matters for which he has no training or experience.

## IV. CONCLUSION

Because Mr. Schuler's testimony is speculative, not the product of a reliable, tested methodology, and, in many respects, offered without qualification in the relevant field, it cannot meet the Fifth Circuit's standards under Rule 702, *Daubert*, or *Kumho*. His opinions will not assist the trier of fact and instead risk misleading the jury with unfounded conclusions cloaked in the guise of "expertise." For these reasons, the Court should strike his testimony in its entirety.

Respectfully Submitted,

FOLEY & LARDNER LLP

By: */s/ Robert T. Slovak*
Robert T. Slovak
Texas Bar No. 24013523
rslovak@foley.com
Steven C. Lockhart
Texas Bar No. 24036981
slockhart@foley.com
Brandon C. Marx
Texas Bar No. 24098046
bmarx@foley.com
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667

**ATTORNEYS FOR DEFENDANT WHINSTONE US., INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2025, a copy of the foregoing document was filed electronically and a notice will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

*/s/ Brandon C. Marx*
Brandon C. Marx