IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| SBI CRYPTO CO., LTD., <br><br> Plaintiff, <br><br> v. <br><br> WHINSTONE US, INC., <br><br> Defendant. | Civil Action No. 6:23-cv-252 |

# DEFENDANT WHINSTONE US, INC.'S RESPONSE TO PLAINTIFF'S DAUBERT MOTION TO EXCLUDE THE TESTIMONY OF RICHARD PETERS UNDER FEDERAL RULE OF EVIDENCE 702

Robert T. Slovak
Texas Bar No. 24013523
rslovak@foley.com
Steven C. Lockhart
Texas Bar No. 24036981
slockhart@foley.com
Brandon C. Marx
Texas Bar No. 24098046
bmarx@foley.com
Foley & Lardner LLP
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667

**ATTORNEYS FOR DEFENDANT WHINSTONE US, INC.**

Plaintiff SBI Crypto Co., Ltd. ("SBI") erroneously asks this Court to exclude Richard Peters' testimony based on a heightened standard for expert testimony unsupported by case law. SBI's erroneous standard would only permit the Court to accept the testimony of niche specialists, which, if applied consistently, would disqualify SBI's own experts. The Court should reject SBI's heightened standard and instead apply the overwhelming Fifth Circuit case law that embraces Peters' expert credentials. Defendant Whinstone US, Inc. ("Whinstone") requests that the Court deny *Plaintiff's Daubert Motion to Exclude the Testimony of Richard Peters under Federal Rule of Evidence* 702 (Dkt #120).

## I. STANDARD OF REVIEW

An expert may only testify in the form of opinion if they meet the requirements of qualifications, reliability and fit. Fed. R. Civ. P. 702. Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)   the testimony is based on sufficient facts or data;

(c)   the testimony is the product of reliable principles and methods; and

(d)   the expert has reliably applied the principles and methods to the facts of the case."

Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). "The party offering the expert must prove by a preponderance of the evidence that the proffered testimony satisfies the [R]ule 702 test." *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002). The Supreme Court assigned to trial

courts the responsibility of determining whether expert testimony under Rule 702 is "not only relevant, but reliable." *Daubert*, 509 U.S. at 589. In this gate-keeping role, trial courts make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93.

The *Daubert* opinion lists a number of factors that a trial court may use in determining an expert's reliability. Trial courts are to consider the extent to which a given technique can be tested, whether the technique is subject to peer review and publication, any known potential rate of error, the existence and maintenance of standards governing operation of the technique, and, finally, whether the method has been generally accepted in the relevant scientific community. *See id.* at 593–94. These factors are not mandatory or exclusive; the district court must decide whether the factors discussed in *Daubert* are appropriate, use them as a starting point, and then ascertain if other factors should be considered. *See Black v. Food Lion*, 171 F.3d 308, 311–12 (5th Cir.1999).

## II. ARGUMENTS & AUTHORITIES

**A.    SBI's Heightened Standard Misconstrues the Law.**

SBI creates what it believes would be the quintessential expert for this case and cites all the ways that Peters does not fit the false mold it crafts. In doing so, SBI simply ignores controlling case law, which rejects SBI's proffered standard. *See EEOC v. Modern Grp., Inc.*, 725 F.Supp.3d 644, 663 (E.D. Tex. 2024) (Crone, Mag. J.). *See also Phoenix Process Equip. Co. v. Capital Equip. & Trading Corp.*, No. 3:16-CV-024-CHB, 2022 WL 10225005, at *6 (W.D. Ky. Aug. 30, 2022) ("[A]n expert does not necessarily need to have a perfectly aligned title to provide testimony as long as they have adequate experience with the underlying material."). "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue." *Huss*

*v. Gayden*, 571 F.3d 442, 454 (5th Cir. 2009). Mere differences in experts' expertise are relevant to weight given to the testimony by the trier fact rather than the admissibility of the testimony. *Id.* Indeed, "[a]s long as some reasonable indication of qualification is adduced, the court may admit the evidence without abdicating its gate-keeping function." *Ratheon Co. v. Indigo Sys. Corp.*, 598 F.Supp.2d 817, 820 (E.D. Tex. 2009) (Schell, Mag. J.) (citing *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. "[T]he rejection of expert testimony is the exception rather than the rule." *First v. AGCO Corp.*, No. 7:21-cv-0006-O, 2022 WL 1199211, at *2 (N.D. Tex. Mar. 8, 2022) (citing Fed. R. Evid. 702 advisory committee note). The *Daubert* factors are not intended to be rigidly applied—they are guideposts for courts to use to determine an expert's qualifications. *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 990-91 (5th Cir. 1997); *see e.g.*, *Modern Grp.*, 725 F.Supp.3d at 665 (the fact that an expert did not have experience in a precise role did not disqualify him as an expert where he had similar experience); *Headwater Research LLC v. AT&T Inc.*, 2:23-CV-397-JRG-RSP, 2025 WL 2212436, at *4-5 (E.D. Tex. Aug. 4, 2025) (Payne, Mag. J.) (the fact that an expert did not have formal training in coding, licensing, or patents did not disqualify him as an expert on the effect of patents on profits when he had 19 years of experience in the industry); *Bavely, Trustee of AAA Sports, Inc. v. Panini Am., Inc.*, No. 4:22-cv-00093, 2023 WL 12098406, at *4 (E.D. Tex. July 5, 2023) (Mazzant, J.) (the fact that an expert had a lifetime of personal and professional experience with sports cards collecting qualified him as an expert in appraising sports cards even without specialized training); *Nostrum Laboratories, Inc. v. Balboa Capital Corp.*, No. 16-01040-CV-W-ODS, 2018 WL 2470734, at *11-12 (W.D. Mo. June 1, 2018) (the fact that a business owner's experience with pharmaceutical equipment came from his business dealings did not disqualify him as an expert on the fair market value of the

equipment at issue); *U.S. v. Crater*, 93 F.4th 581, 590-91 (1st Cir. 2024) (the fact that a crypto expert's degrees were not in computer science did not disqualify her as an expert in cryptocurrency and blockchain).

For example, in *Sneed v. Crown Equipment Corporation*, the court determined that an expert in injury biomechanics whose expertise came from the automobile industry was qualified to testify regarding the safety mechanisms and design of a forklift. *See* No. 3:23-cv-743-K, 2025 WL 449330, at *6-7 (N.D. Tex. Feb. 10, 2025). In that same case, the court also found that an expert whose experience in forklifts came from his "extensive equipment/machinery operational and training experience, including forklifts, aerial lifts, construction and agricultural equipment throughout his career," was a qualified expert on the forklift's design. *See id.* at *10-11.

SBI attempts to analogize Peters' expertise that of a polymer scientist in *Smith v. Goodyear Tire & Rubber Co.* who sought to testify regarding the cause of a tire's failure and the proper design or manufacture of tires generally *even though he did not claim to be a tire expert*. *See* Mot. at 13-14; 495 F.3d 224, 226 (5th Cir. 2007). That analogy is misplaced. Peters' background better aligns with that of the real estate appraisal expert in *Whitehouse Hotel*. *See* 615 F.3d 321, 331 (5th Cir. 2010). Unlike *Smith*'s polymer scientist who could not tie his knowledge and experience with polymers to why a tire blew out, SBI complains that Peters' experience is not sufficiently specialized because Peters' expertise is in cybersecurity—another form of information technology-oriented experience. *Compare Smith*, 495 F.3d at 227 *with Whitehouse Hotel*, 495 F.3d at 226-27. In *Whitehouse Hotel*, the Fifth Circuit disregarded arguments that an expert needed "additional or different qualifications" and found that a real estate appraiser was qualified to give an expert opinion regarding an easement's effect on the value of real property. 615 F.3d at 331. Here, SBI asks this Court to impose a requirement that Peters have "additional or different qualifications" even though he has shown himself knowledgeable about cyptomining equipment

and hardware and offers expert testimony on those subjects. Mot. at 2. Peters' expert testimony regarding the value and maintenance of cryptomining equipment is a natural application of his expertise, and therefore expert testimony that he is qualified to provide.

**B.    Peters is a qualified expert under Rule 702.**

Peters offers expert testimony that (1) SBI should divest its Canann Avalon Miners and (2) SBI's experts failed to consider alternatives for the miners' failure. Peters' relevant experience comes from his over 25 years in the information technology security solutions industry. *See* Ex. A-1, Expert Report of Richard Peters at 10, Ex. A-2, Rebuttal Report of Richard Peters, Ex. F, Declaration of Richard Peters ¶ 1. Even SBI acknowledges that "Richard Peters is a cybersecurity expert." Mot. at 1. The flaws in SBI's challenge are two-fold: (1) SBI fundamentally misunderstands the scope of modern cybersecurity expertise and its direct relevance to the issues before this Court; and (2) the complete discounting of Peters' personal cryptocurrency mining experience (*i.e.*, a nascent industry).

First, cybersecurity, as Peters practices it, is not limited to defending networks from intrusion. It is a multidisciplinary field that intersects with IT hardware evaluation, physical facility audits, equipment lifecycle management, and operational reliability assessments. Peters explains that his experience in cybersecurity includes auditing physical security controls (Ex. B, Transcript of the Deposition of Richard Peters, dated October 14, 2025, 22:18-23:2), assessing server hardware and other IT equipment (Ex. B at 36:5-22, 70:12-20), and analyzing the integrity of data centers (Ex. B at 80:10-18). These tasks require a thorough understanding of how computing equipment is configured, maintained, and protected against physical and environmental degradation. Thus, Peters' experience in cybersecurity has provided him with comprehensive exposure to information technology systems, including cryptocurrency mining systems.

Far from being outside his domain, the subject matter of Peters' testimony fits squarely within the reasonable confines of his long-standing professional experience. His cybersecurity background includes both the technical and physical dimensions of IT systems management, which necessarily cover specialized computing devices such as ASIC miners. As such, Peters is qualified to opine on both the strategic disposition of SBI's mining hardware and the adequacy of alternative solutions overlooked by SBI's experts.

Second, unlike any of SBI's experts, Peters is actually familiar with cryptocurrency mining equipment because he has actually operated and mined cryptocurrency. *E.g.*, Ex. B at 70:7-73:16, Ex. F ¶ 4. SBI's complaint is that it's not in a "professional" capacity. *Id.* But there is no such qualifier in the plain language of Federal Rule of Civil Procedure 702. As detailed throughout, he is more than qualified to opine on the miners' resale value—which is really derived from *profitability and not "contamination."*

### 1. Peters is qualified to provide expert opinions regarding valuation.

Peters has direct experience appraising cryptocurrency miners. He assessed ongoing market rates of cryptominers by analyzing reputable sources for valuations like QuoteColo and Luxor.[1] *See* Ex. B at 40:8-20, 41:11-24, 42:7-16, 56:8-17, 146:24-147:1. He also has experience building crypto miner equipment and personally built two early GPU-based system. *See* Ex. B at 79:17-19, 129:9-20, 207:11:17. He also has experience inspecting crypto miner equipment and has visually inspected "dozens and dozens" of miners and internally studied four or five of them. *See* Ex. B at 135:17-25.

---

[1] Luxor is the same data source relied upon by SBI's expert Randall Valentine. *E.g.*, Ex. C, Transcript of the Deposition of Randall Valentine, dated October 24, 2025, 116:14-18.

**DEFENDANT WHINSTONE US, INC.'S RESPONSE TO PLAINTIFF'S**
**DAUBERT MOTION TO EXCLUDE THE TESTIMONY OF RICHARD**
**PETERS UNDER FEDERAL RULE OF EVIDENCE 702**                                          7

Peters has extensive certifications related to cryptomining including Crypto Compliance Specialist (TRM-CCS), Advanced Crypto Investigator (TRM-ACI), Digital Forensics and Cryptocurrency (TRM-DFC), Certified Investigator (TRM-CI), and Crypto Fundamentals (TRM-CFC). *See* Ex. A-1 at 14; Ex. B at 266:4-268:4. These certifications include qualification on the cryptomining hardware. *See* Ex. B at 268:11-19.

Peters' broader experience with cryptocurrency includes:

- Mining, buying, and selling crypto assets (Ex. A-1 ¶ 3);
- Reviewing various security areas of the crypto and blockchain ecosystems (*Id.*);
- Evaluating software and hardware wallets and multiple centralized exchange platforms (*Id.*);
- Personally participating in mining pools, liquidity protocols, lending and borrowing, staking, bonding, and similar decentralized finance ("DeFi") activities in Level 1 and Level 2 blockchains (*Id.*); and
- Regularly attending crypto-related conferences such as BlackHat, Defcon, and the DeFi Security Summit (*Id.* ¶ 4).[2]

To the extent that SBI complains of Peters' valuation methodology, longstanding Texas law provides that "[m]arket value is the amount a willing buyer, who is under no obligation to buy, would pay to a willing seller, who is under no obligation to sell." *Factory Mut. Ins. Co. v. Alon USA LP*, 705 F.3d 518, 521 (5th Cir. 2013) (citing *Thomas v. Oldham*, 895 S.W.2d 352, 359 (Tex. 1995)). Peters' report identifies offers made for SBI's miners in the parties' communications, which is per se evidence of the miners' market value. Ex. A-1 at 4-5.

---

[2] *See also* Ex. F ¶ 4.

**DEFENDANT WHINSTONE US, INC.'S RESPONSE TO PLAINTIFF'S DAUBERT MOTION TO EXCLUDE THE TESTIMONY OF RICHARD PETERS UNDER FEDERAL RULE OF EVIDENCE 702**  8

Peters' experience and training also undermines SBI's fixation on "IT equipment" expertise. Experience with buying, selling, or reselling IT equipment does not translate to cryptomining equipment. Traditional IT equipment is "multipurpose" because the microprocessors allow traditional IT equipment to be used in many different ways. Ex. B at 147:21-148:2. Cryptominers, on the other hand, are "purpose built system[s] that can only do one thing." Ex. B 148:4-5. As a result, the market for traditional IT equipment has more potential buyers than the cryptominer market. Ex. B at 148:16-22.

Nevertheless, to the extent SBI accepts generalized IT equipment experience, Peters has such experience and even teaches assessment of environmental conditions of physical IT hardware in one of his classes (Ex. B at 36:5-37:22); he has bought and sold servers and workstations (Ex. B at 23:20-24:3, 129:1-8), and he has built his own servers and systems (Ex. B at 70:12-20, 79:5-13).

### 2. Peters is qualified to offer rebuttal expert testimony.

Federal Rule of Civil Procedure 26(a)(2)(D)(ii) allows for the designation of a rebuttal expert witness "solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)." "The scope of rebuttal testimony is ordinarily a matter to be left to the sound discretion of the trial judge." *Tramonte v. Fibreboard Corp.*, 947 F.2d 762, 764 (5th Cir. 1991). "A 'rebuttal' report explains, repels, counteracts, or disproves evidence of the adverse party's initial report." *CEATS, Inc. v. TicketNetwork, Inc.*, 2018 WL 453732, at *3 (E.D. Tex. 2018) (Payne, Mag. J.).

The thrust of Peters' rebuttal testimony is to identify the multitude of shortcomings in SBI's experts' analyses. *See* Ex. F ¶¶ 6-13. As someone who specializes in diagnosing flaws in cryptomining and cyber operations, Peters readily determines that SBI's experts failed to consider (1) the population of each miner type (Ex. B at 140:6-15); (2) the operationality of the

miners (Ex. B at 141:25-142:4, 201:12-23); and (3) the pressure and temperature in the Rockdale facility (Ex B. 171:4-19, 174:11-21, 225:19-226:10).

For example, Peters offers rebuttal testimony that SBI's miners still have some value and SBI's expert failed to consider alternative explanations for SBI's miner failures. Ex. B at 243:11-244:2. Schuler, SBI's proffered "expert" on the value of SBI's miners (who notably has never sold or attempted to sell an ASIC miner and failed to even attempt to do so here), opines that the miners have no value. Ex. D, Expert Report of Michael Schuler at 15. Peters disagrees—not only for the reasons in his initial expert report identifying opportunities to sell SBI's miners—but because Schuler's analysis largely stopped once Schuler determined the miners were damaged by dust and dirt. *See* Ex. B at 243:11-244:2. Peters' analysis, on the other hand, included an inspection of SBI's miners before he issued his report (Ex. B at 133:18-20, 135:13-16) and a conversation with a potential broker[3] (Ex. B at 122:4-20). Peters further explains that pricing for the miners is "really based upon hash performance" (Ex. B at 43:2-17) and dismisses SBI's concern about dust and dirt on the miners as a common-place occurrence (Ex. B at 155:17-156:3).

As another example, SBI attempts to discount Peters' experience because he himself has never designed a data center, but this overstates what is required by Rule 702 and misses the value of Peters' background. Peters has extensive experience with data center design and has inspected dozens of data centers. *See* Ex. B at 22:18-23:2. Rule 702 does not require an expert to engage in some particular activity within an industry to function as an expert. *See, e.g.*, *Whitehouse Hotel*, 615 F.3d at 331. Here, Peters offers his expert testimony as someone who professionally

---

[3] SBI's complaints about Peters' conversations with "Mark V" from Lonestar Miners is without merit. Mot. at 15. If SBI wants to validate Peters' conversation with him, a simple Google search reveals how to contact "Mark V" on Twitter or LinkedIn or through the company website. *See, e.g.* https://www.linkedin.com/in/markgvalente; https://x.com/LoneStarMiner; https://www.lonestarminers.com/.

**DEFENDANT WHINSTONE US, INC.'S RESPONSE TO PLAINTIFF'S
DAUBERT MOTION TO EXCLUDE THE TESTIMONY OF RICHARD
PETERS UNDER FEDERAL RULE OF EVIDENCE 702**                         10

searches for ways to penetrate or breach the integrity of data centers. *See* Ex. B at 29:8-16. A central issue of this case is whether the subject miners were damaged as a result of flaws in Building B—who is better to opine on such an issue than someone who professionally looks for flaws? Moreover, Peters actually inspected the Rockdale facility—Schuler did not. *See* Ex. B at 51:18-22.

C.   **SBI's Own Expert Cannot Pass SBI's Heightened Standard.**

SBI's heightened standard for experts would disqualify its own expert, Michael Schuler, whose relevant credentials pale in comparison to Peters'. Peters outmatches Schuler, "a leader in the IT secondary market," on every score SBI raises in its motion:

| SBI Complaint | Schuler Shortcoming |
|---|---|
| "Peters never worked or consulted for a company that resells, repairs, or refurbishes IT equipment." Mot. at 4. | Schuler has only one anecdotal example of reselling crypto-mining equipment, but even then he was only tasked with reselling GPU machines, not ASIC machines like the ones at issue here. Ex. E, Transcript of the Deposition of Michael Schueler, dated October 17, 2025, at 31:8-32:8. |
| "Peters has only been retained once to offer an opinion on the value of used mining equipment." Mot. at 7. | Schuler has never been retained to offer an opinion on the value of used mining equipment. Ex. E at 73:17-22. |
| Peters "has never been retained to assess the impact of physical contamination on the value of used IT equipment, including miners." Mot. at 7. | Neither has Schuler. Ex. E at 72:6-10, 126:17-129:3. |
| Peters "has never worked or consulted for any company that manufactures or designs cryptocurrency mining equipment, power supply units, or any high-power computing equipment and does not have any prior involvement in the design or manufacturing process." Mot. at 8. | Schuler has neither designed cryptocurrency mining equipment nor "dealt with crypto" prior to this case. Ex. E at 71:25-72:10. |

| | |
|---|---|
| Peters "does not serve on any committees related to the design of data centers or operation of cyptocurrency mining equipment." Mot. at 9. | Neither does Schuler. *See generally* Ex. D. |
| Peters "did not conduct any testing, perform any calculations or take any measurements . . . other than the simple arithmetic." Mot. at 11. | Schuler didn't even perform the "simple arithmetic." Ex. E at 228:24-229:7. |
| "Peters claims SBI could have sold its miners overseas, but he does not identify any specific country or estimate how much the miners could sell for abroad." Mot. 14-15. | Schuler didn't even perform this analysis. He simply stated that no one in his network would purchase the miners. Ex. E at 130:11-131:3. |
| Peters only reached out to one broker. Mot. at 15. | Schuler didn't contact any. Ex. E at 168:15-169:17. |
| Peters' valuations considered the parties' emails without independent analysis. Mot. at 15. | Schuler didn't consider any offers. Ex. E at 147:24-148:8. |

Therefore, not only does SBI's heightened standard contradict Fifth Circuit precedent, it has the practical effect of disqualifying SBI's own witness.

### III. CONCLUSION

Richard Peters' qualifications and expert testimony will aid the jury "to understand the evidence or determine a fact in issue." *See* Fed. R. Evid. 702(a). Therefore, the Court should deny SBI's motion to exclude Peters' testimony.

Respectfully submitted,

FOLEY & LARDNER LLP

By:    */s/ Robert T. Slovak*
      Robert T. Slovak
      Texas Bar No. 24013523
      rslovak@foley.com
      Steven C. Lockhart
      Texas Bar No. 24036981
      slockhart@foley.com
      Brandon C. Marx
      Texas Bar No. 24098046
      bmarx@foley.com
      2021 McKinney Avenue, Suite 1600
      Dallas, Texas 75201
      Telephone: (214) 999-3000
      Facsimile: (214) 999-4667

**ATTORNEYS FOR DEFENDANT WHINSTONE US., INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2025, a copy of the foregoing document was filed electronically and a notice will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

      */s/ Brandon C. Marx*
      Brandon C. Marx