IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| **SBI CRYPTO CO., LTD.,** *Plaintiff,* v. **WHINSTONE US, INC.,** *Defendant.* | Civil Action No.: 6:23-cv-252-ADA-DTG |

**PLAINTIFF'S DAUBERT MOTION TO EXCLUDE THE TESTIMONY OF KAREN RAYMENT UNDER FEDERAL RULE OF EVIDENCE 702**

Plaintiff SBI Crypto Co., Ltd. ("Plaintiff" or "SBI") files this *Daubert* Motion to Exclude the Expert testimony of Karen Rayment under Federal Rule of Evidence 702 and respectfully shows this Court the following.

**I.
INTRODUCTION**

Karen Rayment ("Rayment") offers no affirmative opinions in this case. Instead, her entire opinion is merely a critique of SBI's technical experts, Philip Isaak and Charles Byers. The thrust of her opinions is that Isaak's and Byers' analyses lack sufficient evidentiary support. But Rayment failed to review material evidence supporting Isaak's and Byers' opinions and conclusions, and wholly failed to connect her own opinions to the contractual dispute at issue in this case.

Defendant Whinstone US, Inc. ("Defendant" or "Whinstone") designated Rayment as a rebuttal expert to critique SBI's experts' claims that Whinstone's cryptomining facility in Rockdale, Texas was poorly designed, did not meet contractual standards, and consequently caused the underperformance, damage, and/or destruction of SBI's miners.

Rayment's rebuttal opinions should be excluded because they are unreliable and would not be helpful to the jury. First, Rayment admits she completely ignored central documents and data in this case. In fact, she did not review the most critical document in this litigation—the contract between SBI and Whinstone.

Second, Rayment opines that cryptomining facilities lack any industry standards and that standards for traditional data centers are, therefore, inapplicable. Rayment offers no support for this opinion except for her own assertion. Not only is this opinion unhelpful to the jury, but it is also likely to confuse and mislead them into disregarding Whinstone's contractual requirements. For these reasons, as detailed further in this motion, Rayment's rebuttal opinion testimony should be excluded in its entirety.

## II.
## FACTUAL BACKGROUND

SBI contends Whinstone fraudulently induced it to enter into a contract in which Whinstone agreed to host and operate SBI's crypto-miners at a datacenter in Rockdale, Texas (the "Rockdale Facility") consistent with professional industry standards. A true and correct copy of the Hosting Service Agreement between SBI and Whinstone is attached hereto as **Exhibit "A,"** and incorporated herein by reference. Whinstone agreed to provide 50 megawatts of power for SBI's Canann Avalon A10 miners by mid-December 2019. Whinstone further agreed it would professionally maintain, repair, and operate SBI's miners. The Hosting Service Agreement required Whinstone to design the Rockdale Facility to maintain adequate airflow, operate SBI's miners below 29.5 degrees Celsius, and prevent dust accumulation.

After an eight-month delay in the deployment and operation of SBI's fleet of miners, the Rockdale Facility constructed by Whinstone was wholly substandard and

failed to meet basic contractual and industry standards. Whinstone failed to install filters to prevent the accumulation of dust and debris inside SBI's miners, failed to operate evaporative cooling curtains to control temperatures, and failed to install any intake or exhaust fans to ensure adequate airflow and heat dissipation. Whinstone's faulty design and operations led to over-pressurization of the hot aisle and recirculation of hot air into the cold aisle. According to Isaak and Byers, the grossly inadequate environmental conditions at the Rockdale Facility directly led to the underperformance and failure of SBI's equipment.

SBI alleges, among other things, that Whinstone's multiple breaches and fraudulent conduct resulted in the accumulation of dust and debris inside its miners, recirculation of hot air back through the miners and into the cold aisle, and excessive air intake temperatures, all of which caused significant damage to and/or contributed to the underperformance of SBI's miners. Whinstone continuously concealed these substandard conditions and instead represented the miners and/or their power supply units ("PSUs") were defective—without proof or the support of a single credible expert opinion.

As a result, a central issue the jury will have to decide is whether the environmental conditions at the Rockdale Facility caused or contributed to the underperformance and/or destruction of SBI's miners. To assist the jury in answering this question, SBI designated two experts—Phil Isaak and Charles Byers—to testify on these issues. Isaak is an industry leader in the design, operation, and maintenance of industrial data centers. Similarly, Byers has 35 years of experience in computer engineering, with specific experience researching, designing, and consulting on data centers involving cooling infrastructure for high-power servers, including ASIC (application-specific integrated circuits) computing platforms like the ASIC miners at issue in this case. He also holds 134

patents. Approximately two dozen of those patents relate to high-power computing and networking equipment.

Whinstone designated Rayment as a pure rebuttal expert, and she served her rebuttal report on July 18, 2025. A true and correct copy of Rayment's Rebuttal Report is attached hereto as **Exhibit "B,"** and incorporated herein by reference. A true and correct copy of excerpts from Rayment's deposition is attached hereto as **Exhibit "C,"** and incorporated herein by reference.

### A.   Rayment Offers No Affirmative Opinions.

Rayment made clear in her deposition that she is offering no affirmative opinions on the central issues in this case. Her opinions are "merely a critique" of SBI's experts Isaak and Byers:

> Q. ... So you understand that the scope of your opinion is merely a critique of Phillip Isaac and Charles Byers' opinions in this case, correct?
>
> **A. Yes.**
>
> Q. So you won't be offering any opinions outside of a critique of Charles Byers' and Phillip Isaac's report; is that correct?
>
> **A. I'm a rebuttal witness for them. My understanding of that role is that I agree to read, meet Mr. Isaac and his mechanical engineer on site with you there, sir. And just observe and review their documents and their opinions and then opine on their work.**

**Exhibit "C,"** at 38:7-20.

> Q. So you're not going to offer any opinion as to whether or not SBI's miners underperformed, given their specifications?
> ...
> **A. I can't. I don't have the data.**
>
> Q. So the answer is no?

> A. The answer is no.
>
> Q. So you're also not offering any opinions as to what caused SBI's A10 miners to underperform or otherwise fail?
> …
> A. No.
>
> Q. Are you offering any opinions as to whether [heat] could negatively have impacted SBI's A10 miners at the Rockdale facility?
>
> A. No.

*Id*. at 165:11-166:1.

B. **Rayment's Opinion that No Standards Exist for Cryptomining Facilities Lacks Any Support.**

Rayment attempts to discredit SBI's experts by claiming, without basis, that there are no applicable standards for cryptomining facilities and that the use of established data center standards by SBI's experts is irrelevant. *See* **Exhibit "B,"** at ¶¶ 23, 27. Specifically, Rayment testified that no standards exist for the Rockdale Facility:

> Q. … So what elements of a traditional data center facility are not applicable to the mining facility that was Rockdale?
>
> A. **None of them are applicable. None of the data center standards are applicable to the Rockdale facility.**
>
> Q. What standards are applicable?
>
> A. **There aren't any.**
>
> Q. So it's your opinion that there are no applicable standards whatsoever to evaluate the Rockdale facility's design?
>
> A. **It is not my opinion. They don't exist.**

*Id*. at 144:14-25.

> Q. Well, are you offering any opinions as to whether the Rockdale facility complied with industry standards for the design of a bitcoin mining facility?

>     ....
> A.   There are no standards.

*Id.* at 163:19-24. Rayment, however, could not identify any support or basis for her position. It is pure *ipse dixit.* Moreover, she even agreed that at least some overlaps exist between what she calls traditional data centers and cryptomining facilities:

> Q.   But you agree that there is at least some overlap in disciplines as it relates to the design of data centers and the design of cryptomining facilities?
> **A.   That depends on what the elements are.**
> Q.   But you did earlier identify some of those elements that overlap, correct?
> **A.   They overlap for me, yes. In my experience and academic pursuits they overlap for me. I can't say that all electrical or all electronics or all mechanical civil structure engineers would find an overlap. I don't think it's a universal statement.**
> Q.   But you at least acknowledge there is some overlap for you personally?
> OPPOSING COUNSEL.  Objection, form.
> **A.   I think I said some of the elements that would overlap for me, yes.**

*Id.* at 71:19-72:11. She even agreed that traditional data centers and cryptomining facilities have the same engineering process for evaluating cooling infrastructure:

> Q.   I wasn't asking the difference between commercial and industrial. I was asking if there is any similarities in evaluating a cooling system for a data center and a cooling system for a cryptomining facility?
> **A.   I see. The process of doing the engineering is the same. So the approach, the philosophy, the strategy, the process of documenting would be similar or the same.**

*Id.* at 72:22-73:5. According to Rayment, traditional data centers and cryptomining facilities have overlaps in their design, including the same engineering process for

evaluating cooling infrastructure, yet she opines that not a single standard for "traditional" data centers apply to the Rockdale Facility.

But contrary to Rayment's unsupported opinion, and essential to this case, the governing contract—the Hosting Service Agreement—does in fact refer to and specify applicable standards specific to this dispute. The Hosting Service Agreement establishes basic design requirements and specifies that Whinstone perform according to "industry standards." Specifically, Section 8.2 of the Hosting Service Agreement states: "Whinstone shall perform the Services as described herein and ***shall provide the Services in a professional manner consistent with industry standards***." **Exhibit "A"** at ¶ 8.2 (emphasis added).

The Hosting Service Agreement further defines the term "Services" as: "Hosting Service, Basic Remote Hands Service, and Advanced Remote Hands Service." *Id.* at 3. "Hosting Service means service providing electrical power and ventilation to the Customer Equipment as detailed in Clause 2.2 below." *Id.* at 2. And Clause 2.2 contains the important design, maintenance, and performance guarantees from Whinstone, including requirements to ensure an average air intake temperature below twenty-nine (29) degrees, maintaining sufficient airflow, preventing mixing of cool and hot exhaust air, use of evaporative cooling, use of filters, intake fans, and exhaust fans. *Id.* at 5. Rayment ignored these standards in the Hosting Service Agreement, and in fact, as set forth more fully below, did not even review the Hosting Service Agreement, nor did she opine on compliance with it. **Exhibit "C,"** at 182:2-9, 213:24-214:19.

**C.    Rayment Did Not Review All of the Data that SBI's Experts Analyzed, Including Critical Documents Like the Hosting Service Agreement.**

Rayment criticized Isaak and Byers for having what she considered to be

insufficient data. However, she admitted she did not even review all the data Isaak and Byers reviewed:

> Q. . . . You would agree that part of your opinion in this case is that Phil Isaac didn't have sufficient enough data to make the conclusions he makes in his report; is that fair?
>
> **A. That's fair.**

*Id.* at 199:13-17.

> Q. Okay. So as you sit here today, you can't confirm that you actually read all the evidence that Phil Isaac used to make the conclusions in his report?
>
> **A. It's not my role in this matter, sir, to go over everything he did. I'm up one level looking at his process that has huge holes in it.**

*Id.* at 200:9-15. Even more importantly, Rayment reviewed only a fraction of the documents considered by Isaak and Byers, and she admits to ignoring critical documents and information that were readily available in this case.

Specifically, Rayment testified she did not recall reviewing the primary document at issue in this case—the Hosting Service Agreement:

> Q. On Appendix A, under Sources Reviewed, number 17 you write, October 2019 hosting agreement, correct?
>
> A. Yes.
>
> Q. Do you recall reviewing the hosting agreement between SBI crypto and Whinstone in this case?
>
> **A. I don't recall it. This seems to have a different Bates number than the one I'm holding.**
>
> Q. But you don't recall reviewing the hosting agreement in this case?
>
> **A. I don't recall it specifically, no, sir.**

*Id.* at 214:9-19. Further, Rayment testified that she did not review any of the contractual responsibilities of Whinstone as it relates to this case:

> Q. Do you know what responsibilities contractually that Whinstone had with regard to maintenance of records?
>
> **A. No, I don't know that.**
>
> Q. Do you know if they were required to keep track of how many miners were running at any time?
>
> **A. I don't know that either.**
>
> Q. Do you know if Whinstone was required to keep track of the intake temperature of the miners?
>
> **A. I don't know that.**
>
> Q. Do you know if they were required under the contract to keep records as to the different hashrates for each miner?
>
> **A. No, I don't know. My understanding is there was software to track a lot of that.**
>
> …
>
> Q. So you haven't reviewed any of the contractual responsibilities of Whinstone in this case?
>
> **A. No.**
>
> Q. By "no" you mean you didn't review any of the contractual responsibilities of Whinstone in this case?
>
> **A. Yes, that's what I mean.**

*Id.* at 181:9-182:9. She testified she did not even know the terms of the Hosting Service Agreement:

> Q. Do you know if Whinstone agreed to prevent dust from collecting inside of SBI's equipment?
>
> **A. I don't know the contract terms, no.**

*Id.* at 234:19-21.

Rayment also admitted she did not review testimony from certain key Whinstone employees that were actually operating SBI's miners at the Rockdale Facility:

> Q. You didn't look at the testimony in this case of the individuals who were actually operating SBI's miners in Building B between June 2020 and 2021?
>
> …

---

**PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY OF KAREN RAYMENT        PAGE 9 of 17**

> A. No.
>
> Q. And you didn't review the site manager, Heath Davidson's, testimony in this case, correct?
>
> A. **I did not.**
>
> Q. You didn't review David Schatz, who was the operations manager in this case over Building B, correct?
>
> A. **That's correct.**

*Id.* at 204:15-205:2.

In fact, Rayment did not interview a single fact witness who worked at the Rockdale Facility to help inform her rebuttal opinions:

> Q. Did you conduct any interviews of any fact witnesses who worked at the facility or any personnel from Whinstone?
>
> A. **No.**

*Id.* at 125:21-24.

Next, Rayment admitted she did not review any data provided by Lancium, the entity who provided critical data regarding the real-time performance of SBI's miners at the Rockdale Facility, the condition and performance of SBI's miners, and the environmental conditions at the Rockdale Facility during the time SBI's miners were operating there. In fact, Rayment was not even familiar with Lancium. Rayment also admitted she did not review important telemetry data for SBI's miners:

> Q. Did you review any documents or data from the entity or company Lancium?
>
> A. **No, not that I can recall, no.**
>
> Q. Do you know who Lancium is?
>
> A. **Software, I think they're software.**

*Id.* at 125:25-126:4.

> Q. Did you review any telemetry data from these A10 miners while they were being operated at the Rockdale

>
> facility?
>
> A. **No, only what was in the reports.**

*Id.* at 209:7-10.

Rayment also did not conduct any testing or physical inspection of any of SBI's miners at issue in this case:

> Q. Did you conduct any testing of any miners in this case?
>
> A. **No.**
>
> Q. Did you physically inspect any miners in this case?
>
> A. **Just the ones that are not relevant that were on the shelves when I met you.**

*Id.* at 126:5-11. (Isaak, along with SBI's counsel, conducted a joint inspection of the Rockdale Facility in October 2024 *after* Whinstone's parent company, Riot Platforms, Inc., removed and replaced SBI's miners).

Rayment's complete lack of bases for her opinions regarding the difference between cryptomining facilities versus traditional data centers, and her failure to consider critical evidence or conduct any testing renders her opinions unreliable and unhelpful to the jury. As such, the Court should exclude Rayment's testimony.

## III.
### ARGUMENT AND AUTHORITIES

### A.   Legal Standard

Under Federal Rule of Evidence 702, courts have the fundamental responsibility to perform a "gatekeeping function" to ensure an expert is qualified and that her testimony is both reliable and relevant before allowing the expert to testify. *Daubert*, 509 U.S. at 597 (1993). This gatekeeping obligation "applies not only to testimony based on scientific knowledge, but also to testimony based on technical and other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

As the proponent of the expert testimony, Whinstone has the burden to prove, by a preponderance of the evidence, that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
> (b) the testimony is based on sufficient facts and data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED R. EVID. 702.

The Court's gatekeeping function consists of a two-part inquiry into reliability and relevance. First, the Court must determine whether the proffered expert testimony is reliable. *See Daubert*, 509 U.S. at 597. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The reliability inquiry requires the Court to assess whether the expert's reasoning and methodology underlying the testimony are valid. *See Daubert*, 509 U.S. at 593. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *See id.* at 590. "[F]undamentally unsupported" opinions "offer[] no expert assistance to the [trier of fact]" and should be excluded. *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005).

"The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (internal quotation marks omitted). "Where the expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009). Further, the Supreme Court has explained that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to

admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Rather, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

Second, the Court must determine whether the expert's reasoning or methodology "fits" the facts of the case, and whether it will thereby assist the trier of fact to understand the evidence. *See Daubert*, 509 U.S. at 591. In other words, it must determine whether it is relevant. *Id.* "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (quoting 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 702[02] (1988)).

Relevant here, rebuttal experts must meet the same strict requirements of Rule 702. *See Nairne v. Landry*, 151 F.4th 666, 698 (5th Cir. 2025) ("[r]egardless, his report had to comply with the strictures of Rule 702, which provide that his testimony be based on sufficient data or facts and the result of reliable principles and methods as well as reflect a reliable application of principles and methods to the facts of the case."). In distinguishing the expert proponent's supporting case law, the Fifth Circuit noted "[w]hile those cases allowed an expert to critique another expert, they do not stand for the proposition that a rebuttal expert's testimony can be unreliable and fail to disclose any scientific method. [the rebuttal expert's] opinions were riddled with serious issues, and the district court's decision to exclude his testimony was not erroneous." *Id.* at n. 21.

B.  **Rayment's Opinions Regarding Industry Standards Are Pure *Ipse Dixit* and Utterly Unhelpful to the Jury.**

As stated above, Rayment's threshold critique of Isaak's and Byers' opinions is that Plaintiff's experts looked to and relied on data pertaining to commercial data centers

rather than cryptomining facilities, and that because those two facilities are different, Plaintiff's experts' opinions are flawed. *See* **Exhibit "B,"** at ¶¶ 23, 27. Rayment's own deposition testimony contradicts her opinion. Rayment admits there are significant similarities in the facility standards and requirements of commercial data centers and cryptomining facilities. **Exhibit "C,"** at 72:22-73:5, 71:19-72:11.

Other than her own *ipse dixit* opinion that commercial data centers and cryptomining facilities are different, Rayment does not cite to any factual or data-driven basis that establishes what those differences are or how those differences render both Isaak's and Byers' opinions flawed. *See generally* **Exhibit "C."** Rayment only cites to a single article regarding the design of bitcoin mining facilities. *Id.* at 235:19-237:3. Tellingly, that article actually recommends the use of intake and exhaust fans, evaporative cooling, hot air containment, and filters, *i.e.,* the exact items SBI asserts Whinstone failed to install. A true and correct copy of Plaintiff's Exhibit 146, "Bitcoin Mining Facility Design-Airflow Management" (the "Altair Article") is attached hereto as **Exhibit "D,"** and incorporated by reference herein. Rayment attempted to claim that the Altair Article does not establish or suggest any industry standards, yet admitted she did not even read the document she cited to directly analyzing industry standards for cyptomining facilities. **Exhibit "C,"** at 239:18-25. ("I don't know. I didn't read it …").

Rayment's citation to a single article, that she did not read, and that actually contradicts her opinion, underscores that she does not have any substantive basis to support her opinions regarding the lack of applicable standards. Therefore, her opinion is unreliable on its face. Additionally, if Rayment's unsupported testimony were allowed, it would only create confusion for the jury. On one hand, Rayment accuses Plaintiff's experts of using the wrong industry standards. On the other hand, she claims that no

industry standards exist for cryptomining facilities. Furthermore, Rayment admits she did not even review the only document cited in her report that discusses the design of cryptomining facilities. Because her testimony lacks a factual basis, is unreliable, and would confuse the jury, it should be excluded. *See Daubert*, 509 U.S. at 590.

What's more, Rayment's opinion will confuse the jury as to the actual claims in this case—that Whinstone breached the terms of the Hosting Service Agreement. This is not a negligence case applying a duty of care derived from "industry standards." Rayment's decision not to review the Hosting Service Agreement, and complete lack of understanding of its reference to industry standards and Whinstone's responsibilities contained therein will not help the jury in determining whether Whinstone did in fact breach the Hosting Service Agreement. Rather, it will confuse the jury into thinking that no standard exists to which the jury may hold Whinstone accountable.

C.   **Rayment Lacks Sufficient Facts and Data to Offer Any Rebuttal Opinions Because She Did Not Review the Underlying Facts and Data of SBI's Experts' Reports.**

Rayment's opinions are also unreliable because she failed to consider many documents and information that are critically important to this case. With the exception of two additional references, the entire universe of documents Rayment reviewed in preparing her rebuttal report is listed in Appendix A to her report. **Exhibit "C,"** at 95:3-96:3. The documents Rayment reviewed represent only a fraction of what both Isaak and Byers reviewed when preparing their reports. Notably, Rayment tries to use her status as a mere rebuttal expert to justify her lack of sufficient document review. *Id.* at 200:9-15. She asserts that it is not her role to look at all of the evidence SBI's experts considered, even though her opinion is that the conclusions of SBI's experts lack sufficient support. *Id.*

Rayment cannot credibly assert that Isaak's and Byer's opinions lack sufficient support when she failed to review the material evidence supporting their opinions, including in particular, (1) the Hosting Service Agreement, (2) the deposition testimony from key Whinstone employees who operated the miners, (3) important telemetry data and documents from Lancium with critical data regarding the performance of SBI's miners. **Exhibit "C,"** at 200:9-23, 182:2-9, 204:15-205:18, 209:7-10, 125:25-126:2. Furthermore, most of Rayment's sources consist of external research rather than case-specific documents relevant here. **Exhibit "B,"** at Appendix A.

Not only did Rayment not review critical documents and information, but she also failed to conduct any testing of or even inspect SBI's miners at the center of this litigation. *Id.* at 126:5-20. Rayment's admitted failure to review critical data or conduct testing or inspection renders her opinions unreliable under Rule 702 which demands that expert testimony be based on sufficient facts and data. "Where an expert's opinion is based on insufficient information, the analysis is unreliable." *Paz*, 555 F.3d, at 388 (citing *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 671 (5th Cir. 1999)). It would be an absurd result to allow an expert to opine that no or insufficient data exists without reviewing the data itself. That is precisely what Rayment has done here. Therefore, because Rayment lacks sufficient facts and data for her opinions, the Court should exclude her opinions and preclude her from testifying in this case.

### III.
### CONCLUSION

For the foregoing reasons, SBI respectfully requests that the Court exclude the testimony and opinions of Defendant's rebuttal expert Karen Rayment in their entirety under Federal Rule of Evidence 702.

Respectfully submitted,

By: */s/ Joshua M. Sandler*
Joshua M. Sandler
  Texas Bar No. 24053680
  jsandler@winstead.com
Cory Johnson
  Texas Bar No. 24046162
  cjohnson@winstead.com
Andrew Patterson
  Texas Bar No. 24131573
  apatterson@winstead.com
John D. Janicek
  State Bar No. 24125636
  jjanicek@winstead.com

**WINSTEAD PC**
2728 N. Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (214) 745-5103
Facsimile: (214) 745-5390

**ATTORNEYS FOR PLAINTIFF
SBI CRYPTO CO. LTD**

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served in accordance with the Texas Rules of Civil Procedure via the court's e-filing system on November 4, 2025.

*/s/ Andrew Patterson*
Andrew Patterson