IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| SBI CRYPTO CO., LTD.,<br><br>Plaintiff,<br><br>v.<br><br>WHINSTONE US, INC.,<br><br>Defendant. | Civil Action No. 6:23-cv-252 |

**DEFENDANT WHINSTONE US, INC.'S MOTION TO STRIKE THE EXPERT OPINIONS OF RANDALL VALENTINE**

Robert T. Slovak
Texas Bar No. 24013523
rslovak@foley.com
Steven C. Lockhart
Texas Bar No. 24036981
slockhart@foley.com
J. Michael Thomas
Texas Bar. No. 24066812
jmthomas@foley.com
Brandon C. Marx
Texas Bar No. 24098046
bmarx@foley.com
Foley & Lardner LLP
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667

**ATTORNEYS FOR DEFENDANT WHINSTONE US, INC.**

Pursuant to Federal Rule of Civil Procedure 37(c) and Federal Rule of Evidence 702, Defendant Whinstone US, Inc. ("Defendant" or "Whinstone") moves to exclude the opinions and testimony of Randall Valentine, who Plaintiff SBI Crypto Co, Ltd. ("Plaintiff" or "SBI") designated to testify as to the amount of alleged lost profits SBI suffered "but for" Whinstone's alleged conduct.

## I. SUMMARY OF ARGUMENT

This motion stems from SBI's ongoing refusal to comply with this Court's orders and its disclosure obligations under the Federal Rules of Civil Procedure. When SBI served its expert reports on March 28, 2025, Rule 26 required SBI to disclose a "complete statement of all opinions the witness will express and the basis and reasons for them," "the facts or data considered by the witness in forming them," and "any exhibits that will be used to summarize or support them."[1] Additionally, on April 17, 2025, this Court ordered SBI to produce the "source data for any spreadsheet relied upon by SBI's expert witnesses" no later than April 25, 2025.[2] SBI complied with neither.

As revealed during the October 24, 2025, deposition of Randall Valentine ("Valentine"), SBI did not disclose, produce, or identify the underlying documents or source material for at least the following categories of material information:

- The methodology SBI used to allocate cryptocurrency amongst its mining pool participants—including SBI's Rockdale and Russian operations, other SBI mining operations, and external customers;[3]
- SBI's "internal records" (*i.e.*, the source data) evidencing those cryptocurrency pool allocations attributed to SBI's Rockdale and Russian operations, which SBI selectively and ***manually entered*** into Valentine's lost profits spreadsheet

[1] Fed. R. Civ. Proc. 26(a)(2)(i-iii).
[2] Disc. Order (Apr. 17, 2025) (ECF No. 74).
[3] R. Valentine Dep. Tr. (Oct. 24, 2025) at 261:18-262:1, 262:3-5, 262:7-10, 262:12, 262:16-263:11, 263:13-23, 263:25-264:20, 264:22-265:4, 265:6-13, 265:18-19, 265:21-23, 266:20-267:10, 267:12-13, attached as Exhibit 1.

from an unknown database;[4]

- The amounts and timing of alleged cryptocurrency sold by SBI, which "all came directly from SBI's [undisclosed] internal records," SBI also ***manually entered*** into Valentine's lost profits spreadsheet, and Valentine used this spreadsheet to calculate SBI's retention ratio (*i.e.*, the amount of cryptocurrency SBI claims it held for investment), which is the primary driver of SBI's alleged lost profits;[5]

- The Luxor dataset—a subscription-based dataset that is not publicly available in full—used by Valentine to calculate and purportedly verify the cryptocurrency SBI alleges that it would have mined during time periods 1 and 3 of his lost profits calculation;[6] and

- The inputs Valentine used to conduct his so-called regression analysis used to calculate the alleged outperformance of SBI's Russian mining operations as compared to Rockdale during time period 2 of his lost profits calculation.[7]

SBI's refusal to identify—much less produce—the underlying information that Valentine relies upon in reaching his conclusions is neither justified or harmless.[8] Discovery began over two years ago, and SBI has had numerous opportunities to comply with its discovery obligations under the Rules and this Court's orders. It did not. This lack of disclosure materially impaired Whinstone and its experts' ability to test and verify the assumptions and conclusions underlying SBI's claims—precisely the harm the Federal Rules of Civil Procedure are designed to prevent. The Court should strike Valentine from offering evidence in support of or testifying about the foregoing categories of information.[9]

---

[4] *Id.* at 337:15-338:18, 338:20-339:5, 339:7-10.

[5] *Id.* at 213:5-8, 307:15-17, 307:19-308:1, 308:3-6, 311:23-25, 312:2-18, 313:9-14, 316:6-9, 316:11-20, 316:22-317:4, 317:7-15, 318:12-20, 318:22-319:2, 319:4-7, 319:17-24, 320:9-11, 320:13-19, 320:22-321:2, 321:20-23, 321:25-322:5, 322:7-323:4, 323:6-323:15, 323:17-324:1, 324:3-5, 324:15-325:9.

[6] *Id.* at 49:9-11, 114:19-115:2, 115:21-116:10, 116:12-117:6, 117:10-16, 117:18-22, 119:9-12, 138:18-19, 138:21-25, 152:14-19, 186:8-9, 186:11-187:7, 190:7-9, 190:11-15, 339:17-18, 339:20-340:18, 340:20-25, 341:2-8, 341:13-16, 341:19-24, 342:2-3, 342:5-9, 342:17-22, 342:24-343:10, 343:13-18.

[7] *Id.* at 268:1-8, 268:10-269:7, 269:14-270:1, 270:3-7, 270:9-13, 270:15-17, 270:19-22, 272:3-25, 273:2-6, 273:8-273.19.

[8] Fed. R. Civ. Proc. 37(c)(1).

[9] Fed. R. Civ. Proc. 37(b)(2)(A); *e.g.*, *Honey-Love v. U. S.*, 664 Fed. Appx. 358, 361 (5th Cir. 2016) (affirming exclusion of expert witness when he did not specify which medical records he relied upon to form his opinions); *Headwater Research LLC v. Samsung Elecs. Co., Ltd.*, No. 2:23-CV-00103-JRG-RSP, 2025 WL 1071353, at *3 (E.D. Tex. Apr. 9, 2025) (striking expert witness for relying on "an undisclosed reference" in support of opinion); *Estevis v. City of Laredo*, No. 5:22-CV-22, 2023 WL 9312081, at *9 (S.D. Tex. Dec. 28, 2023) (striking expert witness that

Separately, Valentine's lost profits opinions and calculations fall short of the standards for admissibility under Rule 702 and *Daubert*, as they are not grounded in reliable methodology or relevant data, including because:

- Valentine lacks the data necessary to conduct his "event study" (*i.e.*, data evidencing the actual amount of cryptocurrency mined by SBI's Rockdale and Russian miners and how SBI allocates cryptocurrency amongst the mining pool);[10]
- Valentine "came up with" (*i.e.*, invented) his "retention ratio," which has no relationship to the amount of retained and sold Bitcoin, but rather is based on unspecified expense data provided by SBI;[11]
- Valentine's measure of lost profits does not derive "net income" from actual operating expenses and fixed costs (as required by Texas law); instead, his lost profits are calculated only from expenses identified in the contract, which he admits are only a "gross number" in period 2;[12]
- Valentine calculates alleged lost profits using the value of cryptocurrency at the time of his report and trial, ignoring Texas law mandating lost profit calculations on the value at the time of the alleged breach or fraudulent act;[13] and
- Valentine ignores the terms of the contract when calculating damages, thereby inflating damages in a manner not tied to the facts of this case.[14]

In short, Valentine's methodology does not satisfy either Rule 26 or *Daubert's* reliability and relevance requirements. His opinions would confuse, not assist, the trier of fact in resolving a

---

"did not detail any literature used to support his testimony in his expert report" and "disclosed the testimony for the first time in his deposition" "but was still unable to provide sources or studies which he relied upon to make his findings."); *In re Pearl Res. LLC*, No. 20-31585, 2023 WL 8642303, at *4 (Bankr. S.D. Tex. Dec. 13, 2023) (finding a Rule 26 violation occurred when expert did not disclose alleged publicly available data used to calculate damages).

[10] *Supra* nn.4-5.

[11] *E.g.*, Ex. 1 at 204:10-11, 204:13-20, 246:3-6, 246:8-14, 312:21-25, 313:2, 313:9-14, 316:6-9, 316:11-16, 335:12-15

[12] *E.g., id.* at 95:18-21, 95:23-96:7, 101:1-4, 101:6-17, 123:4-6, 123:8-22, 124:25-125:3, 125:5-7, 127:4-5, 127:7-10, 199:3-4, 199:6-9; *e.g., Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002) ("Lost profits are damages for the loss of net income to a business measured by reasonable certainty.").

[13] *Compare* Valentine Rpt. (Mar. 28, 2025) at 1 n.2 ("The value of one Bitcoin as of March 24, 2025 was $82,605[.]79. Should this matter go to trial, I intend to use the price of Bitcoin at the date of trial to calculate the lost profit damages SBI suffered.") *with e.g.*, *Miga*, 96 S.W.3d at 213 ("[T]he rule has long been that [breach of] contract damages are measured at the time of ***breach***, and not by the bargained-for goods' market gain as of the time of trial.") (emphasis added); *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997) (holding benefit-of-the-bargain damages and out-of-pocket losses are "measures determined at the time of the sale induced by fraud").

[14] Ex. 1 at 232:7-12.

technical question about how much lost profits SBI allegedly suffered. Valentine's opinions further invite speculation rather than informed analysis. This is precisely the type of litigation-driven opinion *Daubert* and Rule 702 were designed to exclude. The Court should strike Mr. Valentine's opinions in their entirety.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 26(a)(2) requires an expert that is "retained or specially employed to provide expert testimony in the case" to disclose a report that contains, in pertinent part:

(1) "[A] complete statement of all opinions the witness will express and the basis and reasons for them;"

(2) "[T]he facts or data considered by the witness in forming them;" and

(3) "[A]ny exhibits that will be used to summarize or support them."

Failure to comply with the foregoing is cause for the "disallowance of that information or witness to supply evidence for the case 'unless the failure was substantially justified or is harmless.'"[15] To determine "whether the failure was justified or harmless," the Fifth Circuit considers the following four factors: "(1) the explanation for noncompliance; (2) the prejudice to the other party of allowing the witness; (2) the possibility of curing the prejudice; and (4) the importance of the witness's testimony."[16] The non-disclosing party bears the burden to prove that its failure was "substantially justified or harmless."[17]

An expert may only offer opinion testimony if that opinion meets the requirements of reliability and fit.[18] Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert

[15] *Estevis*, 2023 WL 9312081, at *9.
[16] *Id.*
[17] *Id.*
[18] Fed. R. Civ. P. 702.

by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case."[19]

"The party offering the expert must prove by a preponderance of the evidence that the proffered testimony satisfies the [R]ule 702 test."[20] The Supreme Court assigned to trial courts the responsibility of determining whether expert testimony under Rule 702 is "not only relevant, but reliable."[21] In this gate-keeping role, trial courts make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[22]

The *Daubert* opinion lists several factors that a trial court may use in determining an expert's reliability. Trial courts are to consider the extent to which a given technique can be tested, whether the technique is subject to peer review and publication, any known potential rate of error, the existence and maintenance of standards governing operation of the technique, and, finally, whether the method has been generally accepted in the relevant scientific community.[23] These factors are not mandatory or exclusive; the district court must decide whether the factors discussed

[19] Fed. R. Evid. 702; *Daubert*, 509 U.S. 579; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).
[20] *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).
[21] *Daubert*, 509 U.S. at 589.
[22] *Id.* at 592–93.
[23] *See id.* at 593–94.

in *Daubert* are appropriate, use them as a starting point, and then ascertain if other factors should be considered.[24]

"[C]onclusions and methodology are not entirely distinct from one another."[25] "[A] reasonable or scientifically valid methodology is nonetheless unreliable where the data used is not sufficiently tied to the facts of the case."[26] "Likewise, 'ideal input data cannot save a methodology that is plagued by logical deficiencies or is otherwise unreasonable.'"[27] Where there is "simply too great an analytical gap between the data and the opinion proffered"—it should be excluded.[28]

## III. ARGUMENTS & AUTHORITIES

### A. Valentine's Repeated Rule 26 Violations Justify Exclusion.

SBI cannot meet its burden that Valentine's substantial and numerous non-disclosures are either substantially justified or harmless.[29]

First, there is no valid justification for SBI's failure to produce highly material information and source data that form the foundation of Valentine's lost profits calculation. When SBI disclosed its affirmative expert reports on March 28, 2025, it was readily apparent that SBI's experts (including Valentine) were relying on unproduced and undisclosed information. For that reason, Whinstone initiated a discovery dispute on April 11, 2025 to compel the production of that information.[30] After a hearing on April 16, 2025, the Court ordered, in part, that SBI produce "[t]he source data for any spreadsheet relied upon by SBI's expert witnesses."[31] During his deposition, Valentine confirmed that SBI failed to comply with this Court's order and failed to produce the

---

24 *See Black v. Food Lion,* 171 F.3d 308, 311–12 (5th Cir.1999).
25 *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).
26 *Exafer Ltd. v. Microsoft Corp.*, 719 F. Supp. 3d 749, 752 (W.D. Tex. 2024), *aff'd*, No. 1:20-CV-131-RP, 2024 WL 4526045 (W.D. Tex. Apr. 11, 2024).
27 *Id.*
28 *Joiner*, 522 U.S. at 146.
29 *Estevis*, 2023 WL 9312081, at *9.
30 Disc. Dispute (April 11, 2025).
31 Am. Hr'g Notice (Apr. 15, 2015) (ECF No. 72); Order (Apr. 17, 2025) (ECF No. 74).

information relied upon by Valentine.[32] There is no justification for SBI's non-compliance with this Court's orders and failure to provide information that is "entirely under [SBI's] own control."[33]

Second, SBI's failure to disclose material information in its exclusive possession severely prejudices Whinstone's ability to evaluate, test, and rebut SBI's experts' opinions. For example, Valentine opines that SBI has suffered alleged lost profits in excess of ***$175 million***.[34] This amount is comprised of alleged lost profits over the span of three different time periods.[35] In the first and third time periods (which accounts for ***$59 million*** and ***$65 million*** of SBI's damages, respectively),[36] Valentine claims that he used Luxor data to calculate a "theoretical" amount of Bitcoin that SBI "would" have mined "but-for" Whinstone's alleged misconduct.[37] This Luxor data requires a subscription, is not fully publicly available, and was not produced by Valentine in full or in the format that he obtained the data.[38]

In another example, for the second time period, Valentine claims that he conducted a regression analysis to opine that SBI's Russian operations outperformed Whinstone's operations by more than ***50%***, which accounts for more than ***$50 million*** of SBI's alleged lost profits.[39] But this regression analysis suffers from at least four non-disclosure issues: (1) Valentine failed to identify his specific calculation, including the specific inputs used for his regression analysis (other than just vaguely reference select components in a voluminous Excel spreadsheet);[40] (2) the

---

32 *Supra* nn.3-7.

33 *E.g.*, *Harmon v. Georgia Gulf Lake Charles L.L.C.*, 476 Fed. Appx. 31, 37 (5th Cir. 2012); *Barrett v. Atl. Richfield Co.*, 95 F.3d 375, 381 (5th Cir. 1996); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 571 (5th Cir. 1996); *H & A Land Corp. v. City of Kennedale, Tex.*, No. 4:02-CV-458-Y, 2005 WL 8159199, at *4 (N.D. Tex. Mar. 18, 2005).

34 Valentine Rpt. at 1, attached as Exhibit 2.

35 *Id*.

36 Ex. 2 at 1.

37 *Supra* n.6.

38 Ex. 1 at 115:21-24, 339:17-18, 339:20-340:18, 340:20-25, 341:2-8, 342:2-3, 342:5-11, 342:13-22, 342:24-343:10, 343:13.

39 Ex. 2 at 1, 12.

40 *E.g.,* Ex. 1 at 269:4-7, 269:14-270:1, 270:3-7, 270:9-13, 270:15-17, 270:19-22, 270:24-271:9, 271:14-272:25, 273:2-6, 273:8-19,

cryptocurrency amounts Valentine relied upon are really SBI's financial allocation of cryptocurrency across the mining pool (*i.e.*, it is not the actual mining data);[41] (3) SBI did not produce the mining pool data and, instead, selectively provided data to Valentine from an unknown database;[42] and (4) there is no evidence of how the allocation occurs, who participates in the pool, how many miners are in the pool, what type of miners are in the pool, etc.[43] Without this missing data, Whinstone cannot replicate or otherwise ascertain how these figures came to meaningfully rebut them.

Equally problematic, Valentine simply made up the 55%+ retention ratio.[44] In his own words, he "came up with" this model for this litigation, which as discussed further below violates applicable law.[45] Valentine applies this made up "retention ratio" to all three time periods, allegedly based on cryptocurrency sales data manually provided by SBI from another unknown data source.[46] And, using that made up ratio, Valentine claims that SBI kept approximately 55% of all cryptocurrency mined, which is the driver of ***all*** SBI's alleged lost profits.[47] Meaning, if SBI sold all the cryptocurrency it mined (*i.e.*, a 0% retention ratio), then SBI would have no alleged lost profits.[48] SBI wants this Court to simply take SBI's word for it. That's not how the Rules work.[49]

---

[41] *E.g., id.* at 267:8-10, 267:12-13.
[42] *E.g., id.* at 243:1-5, 243:8-17, 243:19-244:8, 244:10-22, 244:24-245:17, 245:19-246:2, 337:4-5, 337:7-338:15.
[43] *E.g., id.* at 96:18-24, 97:1, 261:18-262:1, 262:3-5, 262:7-10, 262:12, 264:10-15, 264:17-20, 264:22-265:4, 265:6-11, 265:18-19, 265:21-23, 266:20-23, 306:22-24.
[44] *Id.* at 313:9-14.
[45] Without Valentine tying his novel methodology to literature or accepted in the industry, his opinion is inadmissible. *E.g., Collins v. BNSF Ry. Co.*, No. 4:17-CV-3572, 2019 WL 1040952, at *3 (S.D. Tex. Mar. 5, 2019).
[46] *E.g., id.* at 204:10-11, 204:13-20, 246:3-6, 246:8-14, 312:21-25, 313:2, 313:9-14, 316:6-9, 316:11-16, 335:12-15.
[47] *Id.*
[48] *Id.*
[49] *E.g.*, *Davis v. Cisneros*, No. 1:21-CV-565-RP, 2024 WL 3799461, at *8 (W.D. Tex. Aug. 12, 2024) ("Due to the lack of clarity about which videos Dr. Dorothy relied upon in his report, Plaintiffs are prejudiced in their ability to properly address and challenge Dr. Dorothy's analysis. Therefore, his testimony must be excluded as violative of Rule 26 . . ."); *Witt v. Chesapeake Expl., L.L.C.*, No. 2:10-CV-22-TJW, 2011 WL 2790174, at *2 (E.D. Tex. July 14, 2011) ("Allowing Professor Silver to provide testimony at the class certification hearing based on data and analysis that was not disclosed in this expert report would unfairly prejudice Chesapeake, violate the dictates of Rule 26(a) (2)(B), and

Third, a continuance will not cure the prejudice caused by SBI's Rule 26 violations. Trial has already been continued multiple times. An additional continuance just means further delay and increased costs.[50] Moreover, SBI is guilty of repeated discovery abuse—including by issuing two new, untimely expert reports that this Court struck.[51] Granting a continuance now particularly without being accompanied by an award of attorneys and expert rebuttal witness fees to compensate Whinstone for analyzing the undisclosed information (whenever it is produced) and conducting additional depositions, simply forgives SBI for its repeated discovery abuses and does not deter SBI from engaging in similar conduct in the future.[52]

Finally, SBI cannot complain of the Court striking its damages expert. As the Fifth Circuit held in *Barrett v. Atlantic Richfield Co.*: "repeated dilatory behavior . . . renders hollow any claims of unfair prejudice."[53] The Court should strike Valentine's opinions that are based on violations of Rule 26.

### B. Valentine's Opinions Should Be Excluded Because They Are Unreliable and Irrelevant.

Even if the Court were to forgive SBI's repeated discovery abuses (and the Court should not), Valentine's "made for litigation"[54] opinions are ripe for exclusion because they are irrelevant and unreliable.

First, Valentine engages in speculation to calculate his alleged lost profits for each time

defeat one of the primary purposes that the expert report serves."); *McGuire v. Cirrus Design*, No. CIV. A. 1:07-CV-683, 2009 WL 383541, at *2 (E.D. Tex. Feb. 13, 2009) (striking expert who failed to disclose source data relied upon to form opinion because defendants' experts "could not verify his calculations or determine whether or not his opinion was based on reliable information").

[50] *Barrett*, 95 F.3d at 381 (affirming striking of expert because "it is likely that a continuance would have resulted only in additional delay and would have unnecessarily increased the expense of defending the lawsuit.").

[51] Min. Entry (Sept. 11, 2025).

[52] *Harmon*, 476 Fed. Appx. at 37, 39 (holding district court did not abuse discretion by refusing to grant continuance "to review the late disclosures" because "such a measure 'would neither punish [Appellants] for [their] conduct nor deter similar behavior in the future").

[53] *Barrett*, 95 F.3d at 381-82.

[54] *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 435 (6th Cir. 2007) ("If the proffered expert testimony is not based on independent research [from litigation], the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'").

period. Specifically, on one hand, he claims—using 10 cherry-picked months out of 17 available months of Russian "mining" data—that SBI's Russian miners mined at least 50% more Bitcoin than SBI's Rockdale miners.[55] But on the other hand, he acknowledges—as he must—that the data he actually relied upon is the amount of cryptocurrency that SBI unilaterally decided to allocate amongst the mining pool.[56] Meaning, the data he relies upon to calculate his second time period lost profits is simply a product of SBI financial reporting (*i.e.*, it is not what Valentine represents it to be—mining data—at all). And, as detailed above, Valentine does not know the mechanics of and participation in SBI's mining pool, and he made up his "retention ratio" calculation without the actual data needed to calculate that ratio (*i.e.*, the amount of Bitcoin SBI mined and sold).[57] He is simply regurgitating whatever SBI tells him, but there is an analytical chasm between the data he relies upon and the opinions he forms, which should be excluded.[58]

Second, Valentine's lost profits calculation is irrelevant to this case and unreliable under Texas law. Specifically, Texas law mandates lost profits calculations be net profits, accounting for actual expenses. Valentine calculates revenue by assuming all 20,000 miners run in "turbo" mode without interruption and ignores SBI's expenses, instead utilizing a fee called for under the Hosting Agreement as an input to his made up retention ratio.[59] He does not include an allocation of any other operating expenses and fixed costs associated with "carrying on" SBI's business, such as depreciation, rent, salaries, interest, taxes, etc.[60] Failing to account for these expenses' mandates

---

[55] *Supra* n.5; Ex. 1 at 275:7-13, 275:15, 279:24-280:3, 304:21-25.
[56] *Id.*
[57] *Supra* nn.10-11.
[58] *E.g.*, *Atl. Specialty Ins. Co. v. Porter, Inc.*, 742 Fed. Appx. 850, 854 (5th Cir. 2018) (affirming exclusion of expert witness when he "did not provide critical data" needed to determine cause of fire); *Burst v. Shell Oil Co.*, 650 Fed. Appx. 170, 173 (5th Cir. 2016) (affirming exclusion of expert witness opining that gasoline (which contains benzene) can cause acute myeloid leukemia ("AML") when expert made "no attempt" to demonstrate how gasoline can cause AML).
[59] *Supra* n.11; Ex. 1 at 110:15-18, 110:20-24, 111:1; Ex. 2 at 15-16.
[60] *Miga*, 96 S.W.3d at 213 ("Lost profits are damages for the loss of net income to a business measured by reasonable certainty."); *Tyler Title Co. v. Cowley*, No. 12-18-00043-CV, 2019 WL 1760105, at *6 (Tex. App.—Tyler Apr. 10,

dismissal of Valentine's opinions under Texas law.[61] By way of example, in *Motion Med. Techs., L.L.C. v. Thermotek, Inc.*, the Fifth Circuit has upheld the district court vacating the jury's lost profits award when the expert failed to account for "ThermoTek's other business expenses" outside of the cost of goods sold—thus recognizing that the expert's "lost profits" calculation is no evidence at all.[62] Likewise, the Fort Worth Court of Appeals reversed and rendered the same take nothing judgment in *Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.* when the expert did not deduct "other expenses incurred in carrying on the business of the appellee."[63] For that same reason, the Court should strike Valentine's opinions here.

Third, Valentine's opinion is not admissible under Texas law, which precludes lost profits derived by using the value of Bitcoin at the time of trial.[64] For example, in *Miga v. Jensen,* the jury awarded the plaintiff the increase in stock market value between the time he tried to purchase the

---

2019, no pet.) ("The calculation of lost profits damages must be based on net profits, not gross revenue or gross profits. ***Net profits*** are defined as the difference between a business's total receipts ***and all of the expenses incurred in carrying on the business***. ***Gross profits*** are the total sales revenue less the costs of the goods sold, ***no adjustment being made for additional expenses and taxes***. A claimant must demonstrate one complete calculation of lost profits.") (emphasis added) (internal citations omitted); *see also Blankenship v. Wolfenson*, No. 03-23-00513-CV, 2025 WL 2471790, at *3 (Tex. App.—Austin Aug. 28, 2025, no pet. h.) ("Expenses properly included in the calculation have included operational expenses, employee wages and benefits, food and beverage costs, insurance premiums, taxes, utilities, rent or mortgage payments, and interest paid or payable on a bank loan taken out to fund the business."); *Kellmann v. Workstation Integrations, Inc.*, 332 S.W.3d 679, 685 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ("The figures Laura Kay provided to the jury were purely gross numbers that did not account for any expenses, such as software licenses, medical insurance, rent, phone bills, taxes, employee salaries or any equipment costs."); *Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.*, 131 S.W.3d 203, 209 (Tex. App.—Fort Worth 2004, pet. denied) (holding expert witness did not calculate "net profits" because she only "deducted the 'incremental costs of selling the tools' and not other expenses incurred in carrying on the business of appellee."").

[61] *Miga*, 96 S.W.3d at 213; *Tyler Title*, 2019 WL 1760105, at *6; *see also Blankenship*, 2025 WL 2471790, at *3 *Insignia*, 2020 WL 2786676, at *6; *Kellmann*, 332 S.W.3d at 685; *Atlas*, 131 S.W.3d at 209.

[62] *Motion Med. Techs., L.L.C. v. Thermotek, Inc.*, 875 F.3d 765, 780 (5th Cir. 2017); *see also Atlas Copco*, 131 S.W.3d at 209 (vacating lost profits award because there was no evidence of lost profits).

[63] 131 S.W.3d at 209.

[64] *Miga*, 96 S.W.3d at 213; *Arthur Andersen*, 945 S.W.2d at 817; *see also Kinsel v. Lindsey*, 526 S.W.3d 411, 421 (Tex. 2017) (affirming that out-of-pocket losses arising from fraud are "determined at the time of the sale or transaction induced by the fraud"); *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007) ("[B]enefit-of-the-bargain damages, which derive from an expectancy theory, evaluate the difference between the value that was represented and the value actually received."); *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998) (holding the two measures of direct damages for fraud are out-of-pocket losses and benefit-of-the-bargain damages); *Woodyard v. Hunt*, 695 S.W.2d 730, 733 (Tex. App.—Houston [1st Dist.] 1985, no writ) ("[The jury] could not have made a proper award because damages are measured by comparing values represented and received at the time of sale, not at some future time.").

stock "years earlier" and the time of trial.[65] The Texas Supreme Court reversed the award because "the rule in Texas has long been that contract damages are measured at the time of breach, and not by the bargained-for goods' market gain as of the time of trial."[66] Similarly, in *Arthur Andersen & Co. v. Perry Equipment Corp.*, the Texas Supreme Court ordered a new trial when the jury was not instructed to determine the value of damages for alleged misrepresentations "at the time of sale."[67] But the value of Bitcoin at the time of trial is the sole basis for Valentine's damages calculation.[68] Nowhere in his report or spreadsheets does Valentine calculate the value of SBI's alleged lost profits as of the date of a specific breach or fraudulent act and calculate what those lost profits would be.[69] For this reason alone, his opinions are irrelevant and they should excluded.

Finally, Valentine's lost profits opinion does not fit the facts of the case as he ignores express material terms of the Hosting Agreement.[70] Courts routinely exclude expert opinions in such instances. For example, in *BP Products N. Am. Inc. v. Int'l Maint. Corp.*, the Southern District of Texas—Houston Division found expert testimony on lost profits "irrelevant" and worthy of exclusion because the parties to the at-issue contract waived any claims of lost profits.[71] Here, the Hosting Agreement contains a damages limitation provision that caps the amount of damages that SBI can recover for breach of contract (*i.e.*, SBI waived its right to recover breach of contract damages in excess of that cap).[72] Valentine simply ignores this provision in his calculation of damages.[73] Separately, Valentine ignores that the Hosting Agreement can be terminated by either

[65] 96 S.W.3d at 213.
[66] *Id*. at 214.
[67] 945 S.W.2d at 817; *see also Kinsel*, 526 S.W.3d at 421.
[68] *See generally* Ex. 2.
[69] *Id*.
[70] *Supra* n.14.
[71] *E.g.*, *BP Products N. Am. Inc. v. Int'l Maint. Corp.*, No. CIV.A. H-03-5218, 2005 WL 5976553, at *5 (S.D. Tex. May 27, 2005) ("Because IMC's lost profits claim is precluded by the contract with BP, Esquivel's opinions regarding the amount of lost profits are irrelevant and must be excluded.").
[72] Hosting Agmt. §§ 8.6-.7, attached as Exhibit 3.
[73] *See generally* Ex. 2.

SBI or Whinstone if there is a change of control,[74] and there is no dispute that Whinstone properly exercised that termination right.[75] Despite that provision, Valentine's third time period calculates alleged lost profits that could have theoretically occurred had Whinstone not terminated the Hosting Agreement due to the change of control that occurred when Riot Platforms, Inc. acquired Whinstone in May 2021. Valentine cannot opine on alleged lost profits that are not based in fact (regardless of the asserted cause of action).[76]

## IV. CONCLUSION

Whinstone respectfully requests the Court to strike Valentine's reports and preclude him from offering testimony on SBI's alleged lost profits at trial. Whinstone further requests all such other relief to which it is entitled.

[74] Ex. 3 § 13.3.

[75] Ex. 2 at 1; Am. Pet. (Jul. 7, 2023) (ECF No. 11).

[76] *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996) ("Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all."); *Rolls-Royce Corp. v. Heros, Inc.*, No. CIV.A. 307-CV-0739-D, 2010 WL 184313, at *6 (N.D. Tex. Jan. 14, 2010) ("Testimony is irrelevant, however, when an expert offers a conclusion based on assumptions unsupported by the facts of the case."); *Pittman v. Gen. Nutrition Corp.*, No. CIV.A. H-04-3174, 2007 WL 951638, at *7 (S.D. Tex. Mar. 28, 2007) ("The Court notes that Adams will not be permitted to calculate economic losses for Demeke based on a hypothetical promotion from an arbitrarily selected date."); *BP*, 2005 WL 5976553, at *5 (S.D. Tex. May 27, 2005) (excluding expert testimony contradicted by the terms of the at-issue contract).

Respectfully submitted,

FOLEY & LARDNER LLP

By: */s/ Brandon C. Marx*
Robert T. Slovak
Texas Bar No. 24013523
rslovak@foley.com
Steven C. Lockhart
Texas Bar No. 24036981
slockhart@foley.com
J. Michael Thomas
Texas Bar. No. 24066812
jmthomas@foley.com
Brandon C. Marx
Texas Bar No. 24098046
bmarx@foley.com
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667

**ATTORNEYS FOR DEFENDANT WHINSTONE US., INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that on November 7, 2025, a copy of the foregoing document was filed electronically and a notice will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

*/s/ Brandon C. Marx*
Brandon C. Marx