# EXHIBIT 6

## REBUTTAL REPORT OF RICHARD PETERS

4930-3571-2085.1

# <u>TABLE OF CONTENTS</u>

I.      Summary of Opinions ................................................................................................. 1

II.     Expert Qualifications.................................................................................................. 2

III.    Assumptions & Scope of Opinion ............................................................................ 4

IV.     Documents Considered .............................................................................................. 5

V.      Rebuttal to Mr. Michael Schuler ............................................................................. 5

VI.     Rebuttal to Mr. Charles C. Byers ......................................................................... 11

VII.    Issues with Wallet Attribution in Bitcoin Production Analysis ............................ 27

Appendix A:  Richard Peters Curriculum Vitae ................................................................. 33

Appendix B:  Documents Considered.................................................................................. 39

4930-3571-2085.1

I.        **Summary of Opinions**

1.   After thorough review and analysis of the available evidence and my independent research, it is my opinion that the conclusions reached by the SBI experts contain significant methodological and factual flaws, leading to assertions about the technical performance and economic valuation of the Canaan Avalon A10[1] miners at Whinstone's Rockdale facility that are not backed by any scientific, technical, or specialized method. Specifically, the SBI experts rely on incomplete, selectively filtered, and non-representative datasets, resulting in speculative and statistically invalid conclusions. Moreover, their assessments disregard industry-known reliability limitations inherent to early-generation Avalon ASIC miners, including documented chip instability, firmware immaturity, and component-level quality variations. In short, SBI's experts fail to consider alternative explanations that are widely known.  They further deliberately misconstrue environmental conditions at the Whinstone facility by inaccurately equating external ambient temperatures with miner intake temperatures, despite the lack of direct monitoring evidence. The SBI expert's' assumptions that external ambient temperatures equal internal equipment intake temperatures lack any supporting measurements or data from inside the facility. The SBI experts have provided no empirical basis for their conclusions that outdoor Texas temperatures would be identical to temperatures inside a building or at equipment intake points. Without actual temperature measurements from inside or outside the facility or at the miners themselves, their opinions appear to be speculation rather than analysis rooted in any scientific, technical, or specialized knowledge.  Additionally, SBI's expert analyses based on blockchain wallet activity for miner productivity comparisons are fundamentally flawed due to

---

[1] Throughout this document I use "A10" to reference the Avalon Miners used by SBI including, A1041, A1044, A1045, A1046, and A1047.

reliance on transitional wallets rather than direct coinbase[2] reward addresses, undermining the reliability of their performance claims. Collectively, these deficiencies render the SBI experts' conclusions about equipment failures, economic damages, and operational deficiencies unsupported, overstated, and lacking the necessary rigor for reliable expert testimony.

## II.    Expert Qualifications

2.   I am a Partner at HKA Global, Inc. ("HKA"), where I serve as a senior information security advisor, with a specialization in cybersecurity, crypto assets ("crypto"), and compliance. I have over two decades of experience managing, delivering, and assessing information security programs across various industries, including retail, medical, technology, financial, and manufacturing. I routinely conduct crypto asset tracing ("crypto tracing"), also known as cryptocurrency tracing or blockchain analysis, for various projects and matters, including theft and fraud investigations, wallet identification, transaction analysis and blockchain forensics. Crypto asset tracing is the process of tracking, investigating, and/or and analyzing the movement of digital assets, such as cryptocurrencies, across blockchain networks. This technique is used to uncover the flow of funds, identify involved parties, and investigate potential illicit activities. I also have strong familiarity with professional crypto asset tracing tools including TRM Forensics, Breadcrumbs Investigation, and Chainalysis along with blockchain explorers for numerous crypto assets.

3.   My experience includes actively using and evaluating cryptocurrencies since 2017, engaging in activities such as mining, buying, and selling crypto assets, purchasing services with crypto, and reviewing various security areas of the crypto and blockchain ecosystem. I have used and

---

[2] In this document, "coinbase" refers to the coinbase transaction which is the first transaction in each Bitcoin block that creates new bitcoin as a reward for the miner who successfully mines the block. This is the primary mechanism through which new bitcoin enters circulation. This term should not be confused with Coinbase, the cryptocurrency exchange company.

evaluated software and hardware wallets, multiple centralized exchange platforms, and participated in several decentralized finance ("DeFi") and game finance ("GameFi") protocols and blockchains. I am well-versed in numerous token types, such as platform, payment, governance, security, and utility tokens. Additionally, I have actively participated in mining pools, liquidity protocols, lending and borrowing, staking, bonding, and similar DeFi activities across the crypto/DeFi space in Level 1 and Level 2 blockchains. My security evaluations span Web2/Web3 infrastructure and smart contracts. I also serve as the moderator for a Reddit group focused on DeFi security. I successfully completed the Hack the Block security training program, with a focus on advanced techniques for attacking and exploiting vulnerabilities in smart contracts.

4.  I hold several certifications, including CISA (Certified Information Systems Auditor), CISSP (Certified Information Systems Security Professional), CTCE (Cryptocurrency Tracing Certified Examiner), CDPSE (Certified Data Privacy Solutions Engineer), and the Payment Card Industry's QSA (Qualified Security Assessor) designation. I also hold several TRM crypto designations including Crypto Compliance Specialist (TRM-CCS), Advanced Crypto Investigator (TRM-ACI), Digital Forensics and Cryptocurrency (TRM-DFC), Certified Investigator (TRM-CI) and Crypto Fundamentals (TRM-CFC). To maintain these certifications, I regularly engage in cybersecurity and crypto-related conferences such as BlackHat and Defcon and the DeFi Security Summit. Additionally, I speak on cybersecurity topics at various conferences to fulfill for continuing professional education requirements as well as engage in self-study.

5.  I graduated with a B.B.A. in Finance from the University of Texas at Austin in 1996. I have also served as an adjunct professor at the University of Houston in their accountancy and taxation department. In that capacity, I created and taught a course on the control and security of financial

information, which is one of four courses required for students to obtain an internal audit certification in addition to their degree.

6.  I have been cited in several articles related to cybersecurity and have spoken at several security conferences.

7.  A copy of my curriculum vitae is appended as Appendix A to this report.

**III.**   **Assumptions & Scope of Opinion**

8.  I have been retained by counsel to provide expert analysis in the SBI Crypto Co., Ltd. v. Whinstone US, Inc. matter.

9.  Counsel did not instruct me with respect to any conclusions I might draw or methodologies I might use in my analysis of the record of this case. The opinions contained in this expert report ("Report") are my own. For issues related to the methodology, analysis, and conclusions I rely on the documents provided by counsel, my investigation and research, SBI's expert reports and the materials relied upon or cited therein, and any authorities, sources, and materials cited in the footnotes of this Report as well as my years of experience and education in the field.

10. My billing rate for this matter is $545 per hour. My compensation in this case is not contingent upon my ultimate conclusions, which are wholly independent, or the outcome of this case. Throughout this Report, when I use the first person to describe my analysis, I am referring to work conducted by me personally as well as by my staff under my direction. I personally conducted or supervised all the research and analysis that is set forth in this Report, and therefore, I have personal knowledge of the matters described herein. The facts and data on which I base the opinions and inferences reflected in this Report are of a type reasonably relied upon by experts in the field of crypto, cybersecurity and compliance.

4930-3571-2085.1

11. It is my understanding that Dr. Valentine and Dr. Byers purported to serve a supplemental expert report on July 17, 2025—just two days before Whinstone's expert rebuttal report deadline. To the extent the supplement is permitted to stand, I reserve the right to respond further, including to any rebuttal of this rebuttal, if necessary. I understand that additional information relevant to my opinions may be disclosed in subsequent discovery, filings, or depositions. Accordingly, I reserve the right to amend my findings based upon such additional information.

## IV.    **Documents Considered**

12. I have reviewed several documents related to this matter which I have listed within Appendix B and within footnotes of this document.

## V.    **Rebuttal to Mr. Michael Schuler**

### 13. **Scope of Expertise and Foundation of Opinions**

14. Mr. Schuler's extensive experience in IT asset disposition, in the context of personal computers and enterprise hardware, appears fundamentally misaligned with the specialized nature of cryptocurrency mining equipment valuation. His curriculum vitae showcases four decades of expertise in PCs, servers, and retail returns which are markets where depreciation follows predictable Moore's Law cycles and assets retain value through alternative uses, parts harvesting, and enterprise refresh programs. However, his report reveals no evidence of hands-on experience with large-scale ASIC mining operations, where asset values are determined by entirely different economic forces: network difficulty adjustments, hashrate efficiency ratios, and cryptocurrency market dynamics. During the relevant period, these forces actually supported strong resale values for functional mining equipment.

15. This disconnect manifests throughout his analysis, most notably in his application of traditional PC depreciation curves to specialized SHA-256 mining hardware. Unlike general-purpose computers that Mr. Schuler has spent his career evaluating, ASIC miners are single-purpose machines

whose value correlates directly with their ability to generate cryptocurrency revenue. While a Dell server depreciates predictably over years, ASIC miners can command premium prices during bull markets or supply constraints which are precisely the conditions that existed during the COVID period Mr. Schuler himself acknowledges. His reliance on "Traditional Lifecycle Valuations" and "Lessons from the PC Industry" causes him to miss the crucial fact that functioning AvalonMiner A10 units retained significant value due to semiconductor shortages and rising Bitcoin prices.

16. Most critically, while Mr. Schuler identifies the physical contamination of the miners, his IT background appears to limit his analysis to surface-level concerns about cosmetic appearance and cleaning costs. The report lacks any substantive discussion of what actually drives value in the secondary mining market: quantifiable hashrate performance, efficiency ratios measured in J/TH, and revenue generation potential at prevailing network difficulty. Had these miners maintained their specified 31 TH/s output, the secondary market buyers would have valued them based on revenue potential, not cosmetic condition. His citations to PC industry recovery rates and remarketing programs for Dell, HP, and Apple products are simply inapposite as ASIC miners operate in a market where a functioning unit generating positive cash flow commands strong prices regardless of age, while a degraded unit becomes worthless. This mismatch in expertise undermines the credibility of his valuation conclusions, particularly his failure to recognize that functioning A10 units would have captured substantial value in the 2020-2021 market.

17. Further, Mr. Schuler did not inspect the Rockdale facility or any of the 20,000 miners, which were made available by SBI to others already to inspect. His work is explicitly "based on the pictures received in the amended complaint" and a small set of KaboomRacks photos and videos listed in his appendix. Without physical sampling, power-on diagnostics, or hash-board tests, he cannot credibly opine on the recoverability of the equipment.  Mr. Schuler's "zero-resale" opinion rests

entirely on a handful of photographs supplied by SBI, yet more than 20,000 Avalon A10 miners were deployed at Rockdale. Without statistically valid sampling or an on-site inspection, there is no basis to extrapolate the worst-looking units in a photo set to the entire fleet. Professional equipment appraisers generally conduct physical inspections or, at minimum, statistically valid sampling before making sweeping valuations of large equipment lots. Mr. Schuler's reliance solely on someone else's ad hoc selection of photographs (that are without any detail on location) fails to meet basic standards of thoroughness. Consequently, the conclusion that all A10's were "contaminated and abused" is speculative, not empirical.

18. **Incorrect Assertion of "No Resale Value"**

19. On page 16 of his report, Mr. Schuler states that "there is no resale value for these used units after deployment" and that any buyer "would assess charges to dispose of the material". This conclusion ignores three key facts:

20. **Documented market interest.** Contemporaneous correspondence produced in discovery reveals multiple unsolicited offers from established brokers and hosting operators seeking to purchase the Rockdale fleet in mid-2021 demonstrating active market demand. More significantly, SBI's own internal plans to redeploy these miners to another facility, as well as committing resources for decommissioning, packing, shipping, and reinstallation, provide compelling evidence of substantial remaining value. No rational economic actor would incur the significant costs of interstate and international equipment relocation for assets worth "less than zero" as Mr. Schuler claims. The combination of third-party purchase interest and SBI's willingness to invest in redeployment definitively establishes that these miners retained meaningful economic value despite their time at Whinstone.

21. **Standard refurbishment practice.** The Bitcoin-mining industry has a mature refurb ecosystem; companies such as D-Central Technologies advertise turnkey ultrasonic cleaning, hash-board repair, and full-unit restoration services for Bitmain, MicroBT and Canaan equipment, with published price lists in the USD 35 range per unit[3] which is under ten percent of the USD 500 residual value Schuler himself acknowledges similar A10's commanded in 2021. In other words, market participants already price normal cleaning into their offers; dust does not drive residual value to zero, it simply produces a modest reconditioning discount.

22. **Subsequent sale proves durable asset value despite market collapse.**  The December 30, 2022, sales agreement[4] of approximately 22,400 miners to The Computing Limited for $760,000 provides crucial market evidence that contradicts Mr. Schuler's valuation. This agreement occurred in dramatically worse conditions than existed in mid-2021: Bitcoin had crashed 76% from its peak, mining difficulty had increased substantially, and an additional eighteen months of depreciation had elapsed. Yet these units still achieved around $33 per unit in a forced liquidation arm's-length transaction. If miners retained marketable value in the depths of the 2022 crypto winter, it defies economic logic to claim that superior market conditions in 2021 would yield "less than zero" value. This real-world transaction data exposes the disconnect between Mr. Schuler's theoretical IT depreciation models and actual cryptocurrency mining equipment markets.

23. **Pricing Errors in the March 2025 Replacement-Cost Analysis**

24. Mr. Schuler's "current-market" prices[5] (page 19) prices three flagship rigs as follows:

- **Antminer S19 XP – USD 11,000**

- **Whatsminer M50 – USD 10,500**

---

[3] https://d-central.tech/asic-repairs/ (Last accessed July 10, 2025)
[4] SBIC0006421.pdf
[5] Ex. E – Michael Schuler Expert Report.pdf

- **AvalonMiner 1366 – USD 9,500**

25. These figures exceed observable spot quotations by a factor of two to four:

| Model | Mr. Schuler price | Actual market price per rig |
|---|---|---|
| S19 XP (141TH) | $11,000 | $1,150 – 1,529 ($9 to 11/TH)[6] |
| Whatsminer M50 (114TH) | $10,500 | $1,303 – 2,567 ($11 to 23/TH)[7] |
| Avalon A1366 (130TH) | $9,500 | $2,850 ($22/TH)[8] |

26. Mr. Schuler's page-19 replacement-cost schedule[9] overstates the capital expense of each miner by a factor of two to four times. As of March–April 2025, *asicminervalue.com* show the Antminer S19 XP selling between USD 1,190 and 2,569 per unit (≈ USD 9-18 / TH), the Whatsminer M50 between USD 1,303 and 2,567 (≈ USD 11-23 / TH), and the Canaan Avalon A1366 at roughly USD 2,850 (≈ USD 22 / TH). By contrast, Mr. Schuler assigns list prices of USD 11,000, USD 10,500 and USD 9,500 respectively tripling the capital outlay that an informed purchaser would actually incur.

27. **Apples-to-oranges hashrate comparison inflates costs.** Mr. Schuler's replacement cost analysis contains a fundamental comparison error that those familiar with mining operations would immediately recognize. He uses 740 PH/s which is the hashrate SBI theoretically could have achieved by running every single one of their A10 miners in "turbo mode" (overclocked for higher performance) but then calculates replacement costs using miners at their standard factory settings. This is like measuring a race car's speed with nitrous boost, then pricing a replacement based on stock vehicles without boost.

---

[6] https://www.asicminervalue.com/miners/bitmain/antminer-s19-xp-140th (Last accessed July 10, 2025)
[7] https://www.asicminervalue.com/miners/microbt/whatsminer-m50 (Last accessed July 10, 2025)
[8] https://www.asicminervalue.com/miners/canaan/avalon-made-a1366 (Last accessed July 10, 2025)
[9] Ex. E – Michael Schuler Expert Report.pdf

9

28. The 20,000 A10 units SBI operated were rated at 31 TH/s each under normal conditions, which equals 620 PH/s total[10]. Through turbo mode operation, SBI could have theoretically pushed these same 20,000 units to achieve 740 PH/s, a 19% performance increase. However, when Mr. Schuler prices replacement units, he uses their standard specifications while targeting the boosted 740 PH/s figure. This mismatch inflates his calculations by nearly 20%.

29. Moreover, an experienced mining operator knows that achieving 740 PH/s from a 620 PH/s-rated fleet requires not just overclocking, but also maintaining spare capacity for routine maintenance, repairs, and downtime. From my understanding, there were no miners even available as spares, nor any (or at the very least a limited amount of) replacement parts purchased to maintain such uptime. Mr. Schuler's analysis assumes 100% uptime and peak performance from every unit which is a scenario that further demonstrates his unfamiliarity with real-world mining operations. His mixing of operational achievements with catalog specifications, combined with unrealistic uptime assumptions, produces replacement cost figures that are significantly overstated.

30. Further, the supporting references in Mr. Schuler's report on page 19 do not withstand scrutiny. The very first footnote [1] hyperlink Schuler offers to substantiate his Bitmain pricing does not point to an S19 XP data sheet at all, rather it directs the reader to information on the older, lower-efficiency S19 Pro, underscoring the unreliability of his sources. The citation offered for Whatsminer M50 in footnote [2] links to a general best crypto mining machines of 2024 page that makes no mention of the M50 model, and the citation purportedly supporting the Avalon A1366 cost in footnote [3] resolves to an unrelated "Data Mining" journal article having nothing to do with Bitcoin hardware or Bitcoin mining. Because these links fail to substantiate the values presented and conflict with widely-used market indices, the cost and profitability conclusions drawn from them are unreliable.

---

[10] https://www.zeusbtc.com/manuals/user-manuals/Avalonminer-1041-Manual.pdf (Last accessed July 10, 2025)

31. Finally, Schuler contends that even scrap recovery is uneconomic because "logistics alone would exceed the value." This ignores the heavy aluminum heat-sink array, metals and the power supply in each unit which are components that recyclers purchase in bulk. Declaring a negative scrap value disregards clear, published commodity bids and further exaggerates the asserted loss.

## VI.    Rebuttal to Mr. Charles C. Byers

### 32. Expected Failure Rates

33. Dr. Byers claims that miners "should have an annualized failure rate of less than 1% per year" (page 37). This assertion is fundamentally flawed. He provides no empirical support or citations for this figure such as manufacturer documentation, peer-reviewed studies, or real-world failure rate benchmarks. In fact, it appears the SBI facility in Russia had well more than a 1% failure rate as well. In chat messages between Chad Harris of Whinstone and Carson Smith of SBI, Carson discusses being able "..to get our other batch to 80% running without PSU replacements. But took lots of work."[11] Early-generation ASIC miners such as the Canaan Avalon A10 series are documented in blogs and user forums to have experienced significantly higher failure rates across the industry. One blog summarizes user reported issues "…like DOA (dead on arrival) units and 30% failure rates within the first year." And "One of the most frequent complaints is that the power supplies overheat…".[12]  As with most emerging technologies, especially in a high-stress environment like cryptocurrency mining, early iterations often suffer from reliability challenges that are later corrected in subsequent models.

34. Moreover, these devices were deployed in 2019–2020, during a period when the Bitcoin mining ecosystem was still maturing, and manufacturers were prioritizing rapid innovation over stability. The Avalon miners in question contained hundreds of hashing ASICs, all operating 24/7 under

---

[11] SBIC0005864.pdf
[12] https://compulove.ca/canaan-avalon-miners-the-good-the-bad-and-the-ugly/ (Last accessed July 10, 2025)

maximum load, without redundancy or workload variance which are conditions that are far more taxing than traditional data center operations. These constant, high-intensity workloads inherently generate more thermal stress, increasing the likelihood of hardware degradation. Expecting these miners to maintain a 99% availability over multiple years, without factoring in this operational context, demonstrates a fundamental misunderstanding of real-world mining environments.

35. **Evidence of PSU Defects from Lancium's Analysis**

36. In August 2020, Lancium conducted teardown examinations of failed A10 miners from the Rockdale facility. Ian Rock reported finding "a power MOSFET voltage regulator blown in both units" they examined.[13] This hardware failure in the PSUs was confirmed through physical inspection, with photographs showing the blown MOSFETs.  Importantly, when Lancium replaced the defective PSU with a functioning one, the A10 miner "brought it up on the test bench,"[14] demonstrating that the miner itself was operational once provided with a working power supply.

37. **Widespread PSU Failure Rates**

38. The scope of the PSU problem was significant. Ian Rock reported "They are finding PSU failures at rate of 10-15% where the PSU does not deliver enough power to keep the unit online" as early as July 27, 2020[15]. This high failure rate occurred within days of the miners coming online, suggesting manufacturing defects rather than environmental causes.

39. **PSU Specification Mismatch**

40. A critical issue identified was that the PSUs were improperly specified for the A10 miners. The A10 miners were observed drawing 2.9 kilowatts on initial power-up, but the PSUs were only rated for 2,450 watts[16]. As Ian Rock noted in his deposition, this meant the miners were "drawing 450

---

[13] LAN-SBI_00000283.pdf
[14] LAN-SBI_00000283.pdf
[15] LAN-SBI_00000197 .pdf
[16] LAN-SBI_00000283.pdf

4930-3571-2085.1

watts more than the power supplies were specified for"[17]. Thomas Salvatore explained that "the PSUs adjust to keep a hashrate and that they'll keep going up in power usage if it gets hot until it meets that number or it crashes whichever comes first"[18].

### 41. Chad Harris' Assessment

42. Even Chad Harris, Whinstone's CEO, discussed the PSU problem when communicating with SBI. On August 13, 2020, Harris texted Carson Smith: "Carson - we believe we have the evidence that shows the power supplies are bad on the A10's. The voltage regulators are blown in each unit we took apart"[19]. Crucially, Harris stated "Clearly, this is not a heat related event" and expressed concern that "this could be on every machine"[20]. Harris further noted that "my Engineers tested the PSU and the are incorrectly sized for the miner"[21].

### 43. A10 Failures at Other Facilities

44. The issues were not limited to the Rockdale facility. On February 4, 2021, Carson Smith informed Chad Harris that "at one of other farms we had about 8000 A10s down. They were able to get about 5000 of those working"[22]. This significant failure rate at a completely different facility strongly indicates that the problems were inherent to the A10 hardware itself, not environmental conditions specific to Rockdale. If heat or facility design were the cause, these failures would not have occurred at other locations with different environmental conditions and facility designs.

### 45. Firmware Issues Compounding PSU Problems

46. The PSU problems were exacerbated by firmware issues. Ian Rock mentioned "issues being worked on with Canaan on 5000 out of 20,000 PSU controller FW", indicating that 25% of the

---

[17] Rock, Ian 040225 ROUGH DRAFT.txt
[18] LAN-SBI_00000283.pdf
[19] Smith 25.pdf
[20] Smith 25.pdf
[21] Smith 25.pdf
[22] Pre Marked 22.pdf

miners had PSU firmware problems[23]. Later firmware updates attempted to "fix" the issue but "still exist just not as bad", suggesting the fundamental problem remained unresolved[24].

### 47. Technical Analysis Contradicts Heat Theory

48. The technical evidence strongly contradicts Byers' heat-related failure theory. The blown MOSFETs found during teardown are indicative of electrical overstress, not thermal damage. The fact that miners operated normally when provided with functioning PSUs demonstrates that the mining hardware itself was not damaged by heat. Furthermore, the 10-15% PSU failure rate occurring within days of deployment is inconsistent with gradual heat-related degradation but entirely consistent with manufacturing defects or specification mismatches.

49. This evidence collectively demonstrates that the A10 miner failures at Rockdale were most likely caused by defective and under-specified PSUs with problematic firmware, not by excessive heat as Byers contends. The direct examination of failed units, the identification of specific component failures, Whinstone's own assessment, and the occurrence of similar failures at other facilities all point to PSU-related issues as the root cause of the miner failures.

50. The industry norm at the time was to assume that ASIC miners would need major refurbishment or complete replacement by two years.[25]    In fact, miners were routinely decommissioned or sent for ultrasonic cleaning and hashboard repairs at this stage. To frame the observed failure rates at Whinstone as anomalous, rather than reflective of industry-wide expectations for early-generation hardware, is both inaccurate and misleading.

---

[23] LAN-SBI_00000232.pdf
[24] LAN-SBI_00000283.pdf
[25] https://www.researchgate.net/publication/354554919_Bitcoin's_growing_e-waste_problem#pf10 (Last accessed July 10, 2025)

51. **Temperature Analysis**

52. Dr. Byers repeatedly emphasizes temperature excursions above 30°C (86°F) as a critical failure mechanism throughout his report, using this lower Turbo Mode max threshold as the basis for his causation analysis against Whinstone. However, Dr. Byers' own cited references appear to contradict this approach. The manufacturer documentation he references in footnotes 16, 20, and 41 indicates that "the device runs in [normal] mode most of the time," which would make the appropriate temperature threshold 35°C (95°F), not 30°C. This raises a fundamental question about Dr. Byers' analysis: if SBI was operating these miners in Turbo Mode contrary to manufacturer recommendations, then any resulting thermal stress and elevated failure rates may be attributable to SBI's operational decisions rather than Whinstone's industrial mining facility conditions. Dr. Byers' selective use of the more restrictive Turbo Mode temperature limits, while ignoring the manufacturer's guidance about normal operating modes, appears designed to exaggerate temperature violations and create a causation narrative that may not reflect the actual operating conditions or the true source of the performance issues. Further Dr. Byers references an Avalon Miner 1066pro spec sheet for some of his references on page 22 as well as for his footnote 41 which is not an identical miner to the A10 models used by SBI at Whinstone. Further, Dr. Byers appears to guess at the ASICs maximum temperature rating is on page 22 as well where he discusses ASICs maximum temperature rating "believed to be 85°C or 185°F". Reviewing the Canaan User Manual states "A single ASIC chip of 104X series could withstand up to 115°C"[26] with is 239°F, much higher than Dr. Byers' guess.

53. In his report on pages 57-58, Dr. Byers analyzes a photograph of status LEDs on a small portion of miners at the Rockdale facility, drawing conclusions about heat-related failures despite never having visited the site. While Byers notes that the visible LEDs show 40 miners with green

---

[26] KABOOM_00000002.pdf

4930-3571-2085.1

(normal) status, 46 with yellow status, 13 with red status, and 1 off, his interpretation of this data appears to mischaracterize the actual problems facing these miners.

54. Critically, Byers acknowledges that yellow LEDs indicate "Initializing / abnormal software state" according to Canaan's own documentation, yet he groups these 46 yellow-status miners, representing nearly half of all visible units, together with his heat-related failures theory when calculating his 60% "problem" rate. This is a fundamental misrepresentation of the data. The yellow LEDs explicitly indicate software or initialization issues, not heat problems. These yellow LEDs are far more likely to represent the known firmware and software issues rather than any heat-related problems.

55. Dr. Byers' heat-related failure theory also fails to account for the actual distribution patterns of failed miners visible in the KaboomRacks images he analyzed. If excessive heat were truly the primary cause of miner failures as Byers contends, we would expect to see clear patterns in the failure distribution that align with basic thermodynamic principles.

56. First, if the facility suffered from inadequate heat management, we would expect to see a concentration of failed miners toward the top of the racks, where hot air naturally rises and accumulates. Hot air's lower density causes it to rise, creating temperature stratification with the hottest conditions at higher elevations. Yet the photographic evidence shows no such pattern as the problematic miners appear randomly distributed across all rack heights rather than clustering at the top where heat stress would be greatest.

57. Second, Byers himself suggests that non-functional miners could allow hot air to recirculate from the hot aisle back into the cold aisle, creating localized hot spots. If this theory were correct, we would expect to see clustering patterns where failed miners are surrounded by other failed units, as the recirculating hot air would create a cascading failure effect on adjacent miners. However,

the images show failed miners interspersed seemingly randomly among normally operating units (green LEDs), with no apparent clustering around non-functional units.

58. This random distribution pattern is far more consistent with manufacturing defects, PSU failures, and firmware issues, which would affect miners regardless of their physical location, than with heat-related failures, which would follow predictable thermodynamic patterns. The absence of these expected heat-related failure patterns in the very images Byers relies upon undermines his theory, yet he neither addresses nor attempts to explain why the failure distribution doesn't match what physics would predict if heat were the primary cause. This oversight represents a significant analytical gap in his assessment of the miner failures at the Rockdale facility.

59. Additionally, Dr. Byers attempts to correlate outdoor ambient temperatures with internal mining facility conditions, arguing that the intake air to the miners routinely exceeded the 29.5°C contractual maximum. However, he acknowledges that no data existed for internal cold aisle temperatures during the period in question nor is there any chip temperature data to support this. Air intake temperature does not equal chip temperature. This omission critically undermines his argument. Without on-site intake temperature readings, it is impossible to credibly assert that miner thermal limits were breached. Instead, Dr. Byers uses weather data from a station located 42 miles away at Easterwood Airport in College Station, Texas as a proxy. This extrapolation introduces substantial uncertainty and cannot support claims of breach with scientific rigor.

60. Furthermore, Dr. Byers overlooks key thermal dynamics within Building B. The facility was constructed with a high degree of thermal mass as its steel frame and concrete slab would have moderated temperature fluctuations and reduced heat accumulation and at a minimum is a shaded environment. Additionally, while he emphasizes that the wet curtain wall cooling system was not operational, this overlooks other architectural and passive cooling features. Natural convection driven

17

by the clearstory design would have enhanced vertical airflow, allowing hot exhaust to rise and escape through roof vents while drawing in cooler outside air at ground level. In low-humidity conditions, the intake air may also have benefitted from passive evaporative cooling even without the curtain wall system.

61. Taken together, these factors undermine the argument that miners were routinely exposed to intake temperatures above specification. No direct evidence such as sensor logs or miner error logs correlating to high temperatures is provided. The conclusions drawn from indirect proxies like regional weather data and theoretical airflow models are speculative at best.

62. **Lancium Data Analysis**

63. One of the most critical flaws in Dr. Byers' analysis lies in his use of the Lancium telemetry dataset. He cites this dataset, consisting of more than 61 million entries, as the foundation for his analysis of miner health and failure patterns. However, when filtering for specific conditions to support his conclusions (as illustrated in his Figures 18 and 19) he retrieves only 34,157 records. This represents just 0.056% of the total dataset. Drawing inferences from such a minuscule sample violates the foundational principles of statistical analysis.

64. There is no discussion in Dr. Byers' report regarding the representativeness of this subset. He does not explain what happened to the remaining 99.944% of the data; whether it was incomplete, null, or simply excluded because it did not meet the conditions he set. It is possible that some of the incomplete data, or data fields that show 'null' is also attributable to SBI but didn't get recorded properly.  Perhaps there were events associated with SBI that did not get properly or fully captured which would counter Dr. Byers' theories.  This creates an inherent selection bias. By filtering for records with complete data fields only, he may be disproportionately analyzing periods of known instability or edge-case behavior, rather than the day-to-day performance of the miner fleet.  Further,

Dr. Byers does not explain why under client_id 2, that he indicates is attributed to SBI, has another miner model listed besides the A10. My understanding is that this other miner model (an M30S within the Lancium data) was not a miner owned or operated by SBI at the Whinstone facility but is yet linked to them. This also demonstrates that this data is not reliable for drawing conclusions upon.

65. Moreover, the sparse and filtered dataset introduces the risk of misattributing normal operational patterns as systemic faults. For instance, temporary offline statuses could have been caused by planned maintenance, firmware updates, or participation in ERCOT demand-response events, none of which reflect environmental failure. The absence of continuous monitoring data further renders any trend analysis unreliable. Ultimately, Dr. Byers' conclusions based on this filtered data are not supported by rigorous data science practices and should be treated with skepticism.

66. Dr. Byers' reliance on the Lancium dataset violates established principles of statistical sampling and data integrity. According to fundamental statistical theory, when analyzing a population, the sample must be both representative and sufficiently large to draw valid inferences. The fact that Dr. Byers can only utilize 0.056% of the available data points raises serious questions about systematic data collection failures or selection criteria that inherently bias the results. Furthermore, Dr. Byers admits the Lancium data only covers "about the last four months of the approximately 20-month deployment" (page 43), meaning his entire temporal analysis is based on less than 20% of the operational period and specifically the period after significant failures had already accumulated. This temporal selection bias is compounded by his acknowledgment that "Before that, the Lancium telemetry was apparently not being collected for the SBI miners" (page 43). Statistical literature consistently warns against drawing causal conclusions from datasets with such severe temporal

truncation and missing data patterns.[27]  When 99.944% of a dataset must be excluded and the remaining fragment contains demonstrable errors in basic categorization, any conclusions drawn from such data are methodologically unsound and would not withstand peer review in any reputable technical journal.

67. Besides the unreliable data, alternative explanations should be considered.  Dr. Byers' analysis of the Lancium data in his Figures 19 and 20, which shows a declining miner count over time, fails to consider a critical business context that provides an alternative explanation for this trend. The contract between SBI and Whinstone was scheduled to end around June 2021, a fact that fundamentally changes how we should interpret the declining miner counts in the months leading up to contract termination.

68. As the contract end date approached, there would be little business incentive for either party to invest time and resources into repairing failed miners that would soon be decommissioned and removed from the facility. Operators might shift from active maintenance and repair to simply maintaining operational units until decommissioning. The economics would be straightforward: why spend money and labor repairing a miner in April or May 2021 when the entire operation will be shut down in June?

69. **Root Cause Theories**

70. Dr. Byers' analysis of miner failures suffers from a critical methodological flaw: he fails to differentiate failure rates among the four distinct miner models deployed at Rockdale. In Section 6.3.2, Dr. Byers acknowledges that the installation included four different Avalon miner types (A1044, A1045, A1046, and A1047), yet nowhere in his 83-page report does he analyze whether certain models

---

[27] Little, R.J.A. and Rubin, D.B. (2019) "Statistical Analysis with Missing Data, Third Edition" https://onlinelibrary.wiley.com/doi/book/10.1002/9781119482260 and Meng, X.L. (2018) "Statistical Paradises and Paradoxes in Big Data (I): Law of Large Populations, Big Data Paradox, and the 2016 US Presidential Election," Annals of Applied Statistics, 12(2), 685-726. (Last accessed July 10, 2025)

experienced disproportionate failure rates. This omission is particularly glaring given his own data showing only 13,060 active miners responding out of 20,000 installed (page 44), and his claim that "almost 7000 miners (35% of the fleet) had failed" (page 35). A competent failure analysis would necessarily examine whether specific miner models were more prone to failure, as disparate failure rates between models would strongly suggest manufacturing defects rather than environmental conditions as the root cause.

71. The absence of model-specific failure analysis becomes even more suspicious when examining Dr. Byers' status report from June 26, 2021, which conspicuously shows only one (1) active A1044 miner out of the entire fleet, and zero A1041 miners. This raises fundamental questions that Dr. Byers ignores: Were the A1041 or A1044 model's early production runs with manufacturing defects?  Did Canaan improve or fix known issues in subsequent models (A1045-A1047)?  If the A1041 or A1044 models experienced catastrophic failure rates while later models performed better under identical environmental conditions, this would completely undermine Dr. Byers' theory that Whinstone's mining facility conditions caused the failures.  Instead, it would point directly to manufacturing defects in certain miner models which is a possibility Dr. Byers appears to have deliberately avoided investigating, perhaps because it would contradict his predetermined conclusion that Whinstone was at fault.

72. **Russia Mining Facility Comparison**

73. Dr. Byers repeatedly claims that SBI deployed "identical miners installed in another datacenter located in Russia" (pages 26, 49), yet his analysis contains a glaring omission: he never identifies the specific miner model mix deployed in Russia. While he acknowledges in Section 6.3.2 that Rockdale contained four different Avalon models (A1044, A1045, A1046, A1047) with notably only one A1044 unit remaining operational, he provides no comparable breakdown for the Russian

facility. This omission is critical because if the Russian deployment excluded the potentially defective A1041/A1044 models or consisted primarily of later, improved versions (A1046/A1047), then any performance comparison becomes meaningless. Dr. Byers cannot claim the miners were "identical" while failing to provide basic model composition data.

74. Furthermore, Dr. Byers' comparison is fundamentally flawed on multiple levels. The Russian facility came online approximately six months after Rockdale, providing Canaan valuable time to address manufacturing defects and SBI crucial opportunity to implement firmware upgrades, configuration optimizations, and operational improvements based on lessons learned in Texas. Dr. Byers provides no information about: (1) whether and when the Russian miners received updated firmware versions, (2) what hardware revisions or manufacturing improvements Canaan may have implemented, (3) whether and when SBI operated the Russian miners in normal mode versus the potentially problematic Turbo Mode, or (4) what maintenance and repair protocols were established based on Rockdale experiences.

75. The two environments also differ dramatically in climate (Siberian cold versus Texas heat and humidity), electricity pricing structures, regulatory conditions, network latency to mining pools, and specific hosting arrangements which are all factors that significantly impact mining profitability and operational decisions. Without controlling for these variables or even acknowledging their existence, Dr. Byers' simplistic revenue comparison (Figure 22) tells us nothing about the root causes of performance differences. His assertion that the Russian facility's superior performance proves Whinstone's liability is a textbook example of the post hoc ergo propter hoc fallacy, assuming causation from mere correlation without rigorous analysis of confounding variables.

76. **Laboratory Dust Sample Analysis**

77. In his analysis beginning on page 51, Dr. Byers presents findings from dust samples collected from SBI's miners as if they are representative of conditions inside the Whinstone facility. However, the chain of custody and environmental context for these samples is not disclosed or documented. The miners had been removed from Rockdale, transported to a facility in Chicago and sat dormant for years, and later moved to a storage warehouse in Houston. During this time, the miners were stored in shipping containers, some of which had already been opened before my own inspection of the equipment. This movement and exposure inherently introduce variables that could significantly affect the nature and quantity of dust accumulation.

78. Further compounding the issue, Dr. Byers does not include any control samples or environmental dust measurements from inside the Whinstone facility itself. Without this point of comparison, it is impossible to conclude whether the dust observed on the miners originated from the Rockdale environment or from their post-operational handling and storage. Dust accumulation during transit or warehousing could easily differ in composition and volume from the facility's operational environment. Any attempt to draw conclusions about mining center conditions from these unverified, post-hoc samples is speculative and lacks scientific rigor. The absence of control samples undermines the integrity of the comparison and makes the findings unreliable for attributing environmental degradation.

79. The condition of the A10 miners during packing versus their condition after shipping and storage provides further evidence that contradicts Dr. Byers' dust-related failure theory. When the miners were decommissioned and packed at the Whinstone facility in July 2021, photographic evidence shows units that were clean on their exterior surfaces. The images taken during the crating

process reveal miners with minimal visible dust or debris when they were crated for shipping. That is because the evidence demonstrates that Whinstone cleaned the miners prior to crating.



*Figure 1: A10 miners packed for leaving Whinstone (WHIN_SBI_0000395.pdf)*

80. In stark contrast, when these same units were later inspected at the Houston storage facility in February 2025, they were found to be heavily covered in dust. The dramatic difference in dust accumulation between the packing date and the storage inspection cannot be overstated, units that appeared relatively clean when leaving Whinstone were now visibly coated with significant dust deposits. This transformation occurred entirely during the shipping and storage period, not during their operational life at the Rockdale facility.



*Figure 2: Dusty miners found at Houston warehouse (DSC00011.jpg)*

81. This evidence is crucial because it demonstrates that the dust contamination Dr. Byers may have observed or been told about could be a post-operational phenomenon. The shipping process, which involved transporting uncovered miners in crates (as noted in Carson Smith's email expressing concern about "a couple inches of space open that would cause damage to the miners while in transit[28]), combined with extended storage in potentially dusty shipping and warehouse conditions, created the heavy dust accumulation, not the operational environment at Rockdale. Dr. Byers makes no attempt to investigate the chain of custody and consider other possible alternatives.

82. **Miner Teardown and Failure Analysis**

83. Dr. Byers conducted a teardown of five SBI miners and concluded, based primarily on visual inspection, that dust contamination was a primary contributor to their failure. However, his methodology lacks any meaningful technical rigor and is without foundation. He does not even know if these miners have failed. Indeed, there is no indication that Dr. Byers even attempted to power on

---

[28] WHIN_SBI_0000387.pdf

25

the miners or perform even the most basic functional testing to determine whether they were operational. It is entirely possible that the units selected for teardown were still fully functional, and without testing power output, network response, or onboard diagnostics, there is no basis to assert the miners failed—let alone prescribe a reason for such alleged failure.

84. Furthermore, his examination appears to be limited to superficial visual cues. He does not report performing any voltage or current measurements, does not use a multimeter to validate PSU outputs, and provides no data from component-level testing of fans, control boards, or ASIC hashboards. These are all standard procedures in electronic failure analysis. Without such objective testing, his conclusion that "dust equals failure" is entirely speculative.

85. It is particularly notable that Dr. Byers offers no quantification of dust particle density nor comparison to manufacturer specifications for dust tolerance. He does not establish whether the observed dust levels exceeded operational norms for industrial equipment, nor does he assess the airflow obstructions or thermal implications quantitatively. In short, his teardown process reflects a confirmation bias: he assumes failure and attributes it to dust without conducting the minimum investigative steps necessary to confirm causation.

86. **Technical Deficiencies in Dr. Byers' Analysis**

87. Throughout the report, Dr. Byers consistently fails to apply rigorous statistical methodology. At no point does he provide error margins, confidence intervals, or hypothesis testing to validate his claims. His conclusions rest heavily on circumstantial evidence and selective data interpretation, rather than demonstrable causality.

88. Additionally, there is a conspicuous absence of comparison against other known Avalon A10 deployments in similar environments. Without this context, it is impossible to determine whether

the observed performance was anomalous or typical for this generation of hardware. This omission renders unreliable his argument that Whinstone's facility was uniquely problematic.

89. Finally, Dr. Byers repeatedly implies causation based solely on correlation, yet his own evidence contradicts his conclusions. While Dr. Byers emphasizes that outdoor temperatures exceeded 29.5°C on 205 days (33.8%) during the deployment period, his own Figure 17 reveals a critical fact he downplays: the average daily temperature (shown by the grey line) barely exceeds 29°C during only three months of the year (June, July, and August), and remains well below this threshold for the vast majority of the deployment period. Even more telling, Dr. Byers focuses on daily maximum temperatures while ignoring that miners operate 24 hours per day, meaning that for the majority of each day, even during summer months, temperatures were substantially below the maximum values he highlights. This selective presentation of temperature data becomes even more problematic when considering that the 29.5°C threshold applies to indoor cold aisle temperatures at miner intake, not outdoor temperatures, and almost any roofed structure should maintain some temperature differential between outdoor and indoor conditions through basic ventilation and airflow management. The temporal alignment of high outdoor temperatures and miner failures is treated as definitive evidence of causality, without consideration for other plausible contributors such as firmware crashes, manufacturing defects in early miner models, grid curtailments, continuous Turbo Mode operation, or normal hardware aging. Such analytical shortcuts. cherry-picking maximum temperature readings while ignoring average operating conditions, do not meet any scientific methodology and appear designed to manufacture a causation narrative rather than objectively analyze the data.

## VII.    Issues with Wallet Attribution in Bitcoin Production Analysis

90. Separate from the technical analysis of miner performance, there are broader concerns with the data relied upon by SBI experts, particularly the use of blockchain wallet activity to infer mining

output. In several supporting documents, such as SBIC0005997.xlsx, the quantity of Bitcoin attributed to each facility (Whinstone in Texas and the Russian deployment) is derived from wallet activity, specifically the addresses bc1qj2uqyqx9kduvz9dtqzv50ea953mhcxzezjlhyd (Whinstone) and bc1qhu9dryux3t8kudh0y68a7gry9rxh095zd8m672 (Russia). However, a review of the blockchain transaction history for these wallets shows that they are not the direct mining reward recipient wallet addresses. Instead, these wallets appear to serve as transitional or intermediary wallets, used to consolidate, redistribute, or forward funds that have been commingled with other operations.

91. The transaction patterns between these addresses include not only deposits from external wallets but also inter-wallet transfers between the two facilities' addresses. These movements complicate the attribution of mining productivity to a specific facility. Without a clear link between a facility's mining operations and a coinbase reward transaction (the direct output of mining), any attempt to measure mining productivity using these transitional wallets introduces significant uncertainty. The presence of incoming and outgoing transactions unrelated to newly mined Bitcoin, especially those that cross between the Texas and Russia-associated wallets, makes it impossible to isolate each site's actual mining yield based solely on these addresses.

92. Therefore, relying on these addresses as a definitive record of Bitcoin mined at either facility is methodologically unsound. Absent verifiable coinbase attribution or a detailed ledger correlating miner activity to specific wallet deposits, the comparative production figures used by SBI experts are neither accurate nor reliable. Without transparency into the flow of mined coins from source to final aggregation point, any financial or performance conclusions drawn from these addresses cannot be substantiated and, therefore, are unreliable.

93. As an example, when I review the provided data for March 1, 2021, within the SBIC0005997.xlsx spreadsheet for the 'texas data' and 'russia data' tabs, it appears that the Russia

28

mining facility received 3.20482847 net BTC while the Texas mining facility received 2.47153172 net BTC. When reviewing this transaction on the blockchain it becomes apparent that several SBI Crypto wallets are contributing BTC into the transaction including the Russia mining facility both receiving and sending BTC to the transaction, including sending 2.50329801 to the Texas facility. This suggests some formula or manual mechanism is in place to assign or give some percentage of the transaction to the Texas facility address (partially from the Russia facility address). This has not been explained or a methodology provided by SBI as far as I know or even considered by SBI's experts. Additionally, it is also noteworthy to see that the spreadsheet attributed amount is not accurately reflected for the Texas facility address. The spreadsheet attributes 2.47153172 BTC to Texas while the actual amount as recorded on the blockchain is 2.50329801 BTC. This is just one example as most if not all the transactions seem to share BTC between the accounts and seem to short the amount of BTC sent to the Texas wallet address as compared to the provided data in the spreadsheet.

94. The following image in figure 1 displays the transaction id 8541252f4b42c7a1fba3f8e16277fbbb46d462bc569d1baa08a1edb29ded1810 from the SBIC0005997.xlsx spreadsheet that was completed on March 1, 2021. Visually, you can see that there are several participants within the single transaction. The wallet address bc1qhu9dryux3t8kudh0y68a7gry9rxh095zd8m672 attributed as the Russia mining wallet on the right of the image both received and sent BTC within the transaction which also included the Texas mining wallet bc1qj2uqyqx9kduvz9dtqzv50ea953mhcxzezjlhyd receiving some of the BTC. The BTC amount sent is different than what is attributed in the spreadsheet as noted above.



*Figure 3: Visual of March 1, 2021, Bitcoin Transaction*

95. Figure 1 below presents the exact same blockchain data in a different visual which shows the inputs and outputs of the transaction. Again, to place any reliance upon this data would require an explanation and analysis of the manual methodology used to attribute these allocations by SBI as well as an explanation as to why the provided data within the spreadsheet appears inaccurate from what is on the blockchain.

30



*Figure 4: Additional view of March 1, 2021, Bitcoin Transaction*

96. In conclusion, any technical and operational challenges faced during the SBI deployment at the Whinstone facility must be viewed in the proper context of early-generation ASIC miner characteristics, evolving industry practices, and shared responsibility between the host and the miner operator. Assertions made by Dr. Byers and Mr. Schuler frequently rely on incomplete or unreliable data, unvalidated assumptions, or methodologically flawed analysis. From the absence of actual temperature sensor data to the misuse of large-scale but sparsely filtered telemetry, and the speculative interpretation of visual dust evidence without functional testing, their conclusions do not reflect the standards of rigor expected in engineering or forensic analysis. Moreover, efforts to draw revenue comparisons between the Texas and Russian deployments using unknown miner versions between the two facilities as well as transitional wallets or unverifiable reward attributions are methodologically unsound. My professional opinion is that these issues collectively undermine the reliability and

31

credibility of the SBI expert conclusions and that the claims attributing widespread miner failure and underperformance to the Whinstone facility are overstated and insufficiently supported by the evidence.

EXPERT SIGNATURE

Respectfully submitted,

_____
Richard Peters
Partner
HKA


_____
  July 18, 2025

Date

32

**Appendix A:  Richard Peters Curriculum Vitae**

**RICHARD PETERS**
HKA Global, Inc.
1717 Main Street, Ste. 3075
Dallas, Texas 75201
Direct: 713.412.4105
richardpeters@hka.com

**Richard Peters, CISA, CDPSE, CISSP, QSA, CTCE** is a senior information security advisor, specializing in cybersecurity, investigations, and compliance.  He brings over 25 years of experience managing, performing, and delivering information technology security solutions. This experience includes technology risk management, IT auditing, IT security assessments, compliance assessments, attack-and-penetration testing services, and security analysis in domestic and global entities in the energy, technology, medical, financial, and manufacturing industries.

Mr. Peters is skilled in designing, assessing, and testing against multiple security standards and frameworks, including ISO 27001/27002, Payment Card Industry Data Security Standard (PCI-DSS), Health Insurance Portability and Accountability Act (HIPAA), and the National Institute of Standards and Technology (NIST CSF and 800 series). He has been a professor at the University of Houston teaching information security. He is a frequent speaker and leader at security conferences around the country.

Mr. Peters has considerable experience within the penetration testing niche for applications, networks and hardware. This deep technical skillset is also being utilized within the crypto asset/currency and DeFi space for forensics, investigations and security assessments.   He has knowledge and background in client/server environments, mainframes, and databases, as well as application and hardware experience. He has provided PCI-related services for 18 years, including PCI-DSS assessments, PA-DSS assessments, and ASV services. Mr. Peters also has experience communicating with and between executive leadership and technical teams regarding understanding of risk.

**EDUCATION**
**B.B.A. Finance**              **The University of Texas at Austin, 1996**


**PRESENT EMPLOYMENT**
**HKA GLOBAL, INC., DALLAS, TX**
PARTNER
Feb 2025 – Current
- Serves as an expert in cybersecurity, investigations, and crypto-related matters, providing advisory and expert witness services for litigation, regulatory, and risk management matters.

4930-3571-2085.1

- Manages and delivers cybersecurity assessments, penetration testing, digital forensics, and incident response services for clients across industries, including financial services, healthcare, technology, and energy.

- Leads engagements involving crypto asset forensics, tracing, and investigations, including assessments of decentralized finance (DeFi) platforms, smart contract security, and blockchain-related fraud analysis.

- Advises clients on regulatory compliance and security frameworks, including NIST, ISO 27001/27002, PCI DSS, HIPAA, and emerging compliance standards.

- Provides expert reports, testimony, and litigation support for disputes involving cybersecurity breaches, digital assets, and financial fraud cases.

- Works closely with legal teams, corporate executives, and technical professionals to bridge the gap between cybersecurity risks, regulatory requirements, and business strategy.

- Contributes to HKA's thought leadership initiatives, including publications, industry panels, and training programs focused on cybersecurity, crypto assets, and emerging technology risks.

## PREVIOUS POSITIONS

### BERKELEY RESEARCH GROUP LLC, HOUSTON, TX
MANAGING DIRECTOR
Feb 2022 – Feb 2025

- Managed all cybersecurity related projects for the Discovery & Forensic Technology Services Practice including penetration testing, vulnerability scanning and research, security assessments, security compliance, and incident response activities.

- Served as national leader for all PCI DSS and HIPAA security assessments. BRG serves as a QSAC company providing PCI DSS assessments and ASV scanning for clients.

- Managed hardware and software security assessments including medical devices, Internet of Things (IoT), Industrial Control Systems (ICS), and mobile.

- Performed crypto asset forensics (crypto tracing) and decentralized finance (smart contract) security audits and assessments across all major chains.

- Assisted with crypto asset technical diligence, token valuation and historical pricing, and supportive damages calculations related to crypto assets.

- Crypto investigations for hidden assets, movement of assets, fraud, and crime matters.

### UHY CONSULTING, INC., HOUSTON, TX
PRINCIPAL
2017 – 2022

- Information security leader for all security related projects for UHY. Act as Penetration Testing Lead and Red Team/Purple Team Lead for all attack and penetration engagements. Engagements typically include all areas of cyber security, forensics, physical security, and

34

social engineering in numerous verticals including banking, industrial control systems, healthcare, and high tech.  Also leads the Cyber Security Advisory Service, which includes open-source intelligence gathering, active threat hunting, breach intelligence gathering, and incident response.  Leads hardware (including medical devices) and software security testing, compliance assessments for PCI and HIPAA and a liaison for executive and board-level security advisory strategy and risk management.

## BERKELEY RESEARCH GROUP LLC, HOUSTON, TX
DIRECTOR
2014 – 2017
- Global director for PCI DSS Compliance projects and advanced penetration testing assignments.   Provide PCI assessment services, scope reduction exercises, risk assessments, forensic investigations, and overall security practice leadership.  Provided direction, guidance, and implementation of security strategy for Fortune 1000 clients across the country.  Manage development of products and information security testing lab for medical devices, internet of things (IoT), firewalls, IDS/IPS and networking devices.  Review security of next-gen firewall, anti-virus/malware technologies, and threat prevention implementations.

## UNIVERSITY OF HOUSTON, HOUSTON, TX
ADJUNCT PROFESSOR, C.T. BAUER COLLEGE OF BUSINESS, ACCOUNTANCY & TAXATION
2009 - 2014
- Created and taught the course Accounting 4380 and 5397 'Control and Security of Financial Information' for both Graduate and  Undergraduate students. One of four total courses that are required for students to obtain an Internal Audit Certificate in  addition to their degree.

- Assisted the C.T. Bauer College of Business achieve a partner-level membership in the Internal Auditing Education Partnership  created by the Institute of Internal Auditors (IIA). Only 19 colleges in the world hold this membership.

- Provide future Chief Financial Officers, Controllers, and business leaders foundational education in information security, governance, control and security frameworks in modern organizations.

## UHY ADVISORS, HOUSTON, TX
SENIOR MANAGER, TECHNOLOGY ASSURANCE & ADVISORY SERVICES
2009 - 2014
- National practice leader for Information Security practice as well as national leader for Payment Card Industry Data Security Standard (PCI DSS), Payment Application Data Security Standard (PA DSS) and Payment Card Industry Approved Scanning Vendor (PCI ASV) for firm.

- Subject matter expert for all penetration testing, vulnerability scanning, breach investigations, and security assessment projects for Houston and Dallas offices and key growth regions around the US.

- Lead numerous security assessments (ISO and NIST based), code reviews, reverse engineering, incident response and application development projects.

- Managed multiple key client projects consisting of numerous UHY professionals and client staff. Pursued excellence in service delivery and client satisfaction, consistently producing successful results and increased business opportunities within each client.

- Expanded the client base, professional staff base, and revenue of information security and PCI practice each year. Managed and lead sales meetings, RFP preparation, marketing material production, sales training, and firm leadership events.

- Supported several individual projects surrounding ERP project management and architecture design, mobile device management, SharePoint assessments, Firewall rule set reviews, SAP segregation of duties, and HIPAA compliance.

- Managed several global security assessments for multi-national corporations to establish baseline security posture for executive management.

- Advised and established FISMA/NIST compliance program for corporation awarded a multimillion-dollar contract with NASA.

**JEFFERSON WELLS INTERNATIONAL, HOUSTON, TX**
ENGAGEMENT MANAGER, TECHNOLOGY RISK
MANAGEMENT
2005 – 2009

- Performed professional services for mid-large corporations with emphasis on information technology project management, compliance controls, security, and disaster recovery across the enterprise. For example:

- Assessed PCI Compliance for large Oil & Gas Corporations, tested remote locations as well as headquarters for all PCI requirements. Designed future-state PCI programs for several organizations.

- Performed security reviews for organizations, networks, and applications. Performed penetration testing activities as well as vulnerability assessments.

- Performed Sarbanes Oxley compliance testing for International Insurance and Securities Company, focusing on controls for mainframe as well as client-server applications.

- Managed team deliverables and project timelines, and tested controls for SOX compliance for major Software Development Company using Oracle, Siebel CRM, SharePoint and security applications.

- Audited security policies for multi-billion-dollar global enterprise, developed security control objectives, testing procedures, and remediation efforts.

**CERTIFICATIONS**

2024 TRM Crypto Compliance Specialist [TRM-CCS]

2024 TRM Advanced Crypto Investigator [TRM-ACI]

2024 TRM Digital Forensics and Cryptocurrency [TRM-DFC]

2024 TRM Certified Investigator [TRM-CI]

2024 TRM Crypto Fundamentals [TRM-CFC]

2023 Cryptocurrency Tracing Certified Examiner [CTCE]

2020 Certified Data Privacy Solutions Engineer [CDPSE]

2013 Payment Application Qualified Security Assessor [PA QSA]

2012 Common Security Framework Practitioner [HITRUST CSFP]

2008 Certified Information Systems Auditor [CISA]

2007 Qualified Security Assessor (Payment Card Industry) [QSA]

2006 Symantec Certified Technology Architect [SCTA], Sygate Enterprise Protection training

2005 Certified Information Systems Security Professional [CISSP]

2003 Astaro Firewall Certification

2002 Certified StoneGate Firewall Engineer, Certified StoneGate Firewall Architect, Certified StoneGate Firewall Trainer

2001 Foundstone Ultimate Hacking

1999 Microsoft Certified Systems Engineer [MCSE]

1998 Microsoft Certified Professional


**TESTIMONY**

November 2022 - *Matar v. Coinbase (Case No. 01-21-0004-7542)* – Arbitration testimony related to expert report created for Coinbase counsel on representative security posture of the exchange versus competitors.

June 2025 **–** *In re Nathan Alexander Fuller & Privvy Investments LLC* (Case No. 24-34773, Bankr. S.D. Tex.) – Provided expert witness testimony and sealed cryptocurrency-asset-tracing report on behalf of the Chapter 7 Trustee; court relied on my findings when issuing a criminal referral for post-petition concealment and embezzlement of estate funds.

## DEPOSITIONS

January 2017 - *Shane Flaum v. Doctor's Associates, Inc. (Case No. 16-61198-CIV-ALTONAGA/O'Sullivan)* – Deposition on expert report created related to criminal usage of credit card information for a FACTA matter.

April 2024 - *Tyler Baker, et al. on behalf of themselves and all others similarly situated v. Parkmobile, LLC (Case No. 1:21-cv-02182-SCJ)* – Deposition on expert report created for class on cracking hashed passwords and credential stuffing attacks.

December 2024 – *IROBOT Corporation v. Expeditors International of Washington, Inc. (No.: 2:2023-cv-00580)* – Deposition on expert report created regarding the security posture and incident response procedures in place at Expeditors at the time of a ransomware event.

January 2025 - *POC USA LLC vs. Expeditors International of Washington, Inc. (Case No.:2:23-cv-01816-RSM)* – Deposition on expert report created regarding the security posture and incident response procedures in place at Expeditors at the time of a ransomware event.

January 2025 – Thomas Karczewski v. PNC Financial Services, Inc. (Case No.:01-23-0004-1946) – Deposition related to opinions on an online elder fraud matter.


## ARTICLES AND QUOTATIONS

**Wall Street Journal**
  *https://www.wsj.com/articles/ransomware-attackers-begin-to-eye-midmarket-acquisition-targets-11646130601*

**Wall Street Journal**
  **https://www.wsj.com/articles/hot-market-for-cyber-insurance-begins-to-stabilize-11668460092**

**Houston Chronicle (appears no longer available online)**
  *Cybersecurity Oil & Gas Article – Comments on rise in attacks on oil and gas companies.*

**Medical Device Magazine (appears no longer available online)**
  *Used Medical Device Cybersecurity Article – Comments on vulnerabilities that may impact used/pre-owned medical devices.*

**LinkedIn**
  *https://www.linkedin.com/pulse/lets-make-ransomware-unprofitable-richard-peters-cissp-cisa-qsa/*

**StrategicCFO360.com**
  *https://strategiccfo360.com/in-2021-middle-market-executives-face-challenges-related-to-talent-cybersecurity/*

4930-3571-2085.1

## Appendix B:  Documents Considered

| | | |
|---|---|---|
| _Plaintiff's Expert Disclosures, 3.28.25.pdf | LAN-SBI_00000232.pdf | LAN-SBI_00000079.pdf |
| LAN-SBI_00000082.pdf | LAN-SBI_00000012.pdf | KABOOM_00000002.pdf |
| LAN-SBI_00000261.pdf | 2022.06.03 Ltr - SBI Crypto to Harris, Theriot (Whinstone) re Claim for Damages.pdf | 2023.07.07 [Dkt #11] Plf's Amended Complaint[55].pdf |
| WHIN_SBI_0014437.pdf | LAN-SBI_00000276.pdf | LAN-SBI_00000283.pdf |
| LAN-SBI_00000316.pdf | LAN-SBI_00000323.pdf | LAN-SBI_00000197.pdf |
| LAN-SBI_00000021.pdf | Ashton Harris - 12-19-2024_Condensed.PDF | Documents cited/relied upon by Dr. Byers |
| CANAAN-00001.pdf | CANAAN-00021.pdf | CANAAN-00043.pdf |
| CANAAN-00062.pdf | Chuck Byers Expert Report, 3.27.25.pdf | DX 11 - Canaan Contract (PSUs).pdf |
| DX 13 - Email (Jun 3, 2022).pdf | DX 2 - Pyote Agreement.pdf | DX 4 - Canaan Contract.pdf |
| DX 6 - Rockdale Agreement.pdf | WHIN_SBI_0000387.pdf | SBIC0001702.pdf |
| SBIC0000511.pdf | SBIC0000508.pdf | Event_Study_CAR_Calculations.xlsx |
| Ex. A - Chuck Byers CV.pdf | Ex. C - Phil Isaak Report.pdf | Ex. D - Michael Schuler CV.pdf |
| Ex. E - Michael Schuler Expert Report.pdf | Ex. F - Randall Valentine CV.pdf | GMO00427896.pdf |
| H&K_0000213.pdf | H&K_0000227.pdf | Isaak Docs.zip |
| KABOOM_0000001.pdf | KABOOM_0000002.pdf | KABOOM_0000016.pdf |
| KABOOM_0000017.pdf | KABOOM_0000017.TXT | KABOOM_0000018.pdf |
| KABOOM_0000018.TXT | KABOOM_0000019.pdf | KABOOM_0000020.pdf |
| KABOOM_0000021.pdf | KABOOM_0000022.pdf | KABOOM_0000023.pdf |
| KABOOM_0000024.pdf | KABOOM_0000025.pdf | KABOOM_0000026.pdf |
| KABOOM_0000027.pdf | KABOOM_0000028.pdf | KABOOM_0000029.pdf |
| KABOOM_0000030.pdf | KABOOM_0000031.pdf | KABOOM_0000032.pdf |
| KABOOM_0000033.pdf | KABOOM_0000034.pdf | KABOOM_0000035.pdf |
| KABOOM_0000036.pdf | KABOOM_0000037.pdf | KABOOM_0000038.pdf |
| KABOOM_0000039.pdf | KABOOM_0000040.pdf | KABOOM_0000041.pdf |
| KABOOM_0000042.pdf | KABOOM_0000043.pdf | KABOOM_0000044.pdf |
| KABOOM_0000045.pdf | KABOOM_0000046.pdf | KABOOM_0000047.pdf |
| KABOOM_0000048.pdf | KABOOM_0000049.pdf | KABOOM_0000050.pdf |
| KABOOM_0000051.pdf | KABOOM_0000052.pdf | KABOOM_0000053.pdf |
| KABOOM_0000054.pdf | KABOOM_0000055.pdf | KABOOM_0000056.pdf |
| KABOOM_0000057.pdf | KABOOM_0000058.pdf | KABOOM_0000059.pdf |
| KABOOM_0000060.pdf | KABOOM_0000117.pdf | KABOOM_0000118.pdf |
| KABOOM_0000119.pdf | KABOOM_0000120.pdf | KABOOM_0000121.pdf |
| KABOOM_0000122.pdf | KABOOM_0000123.pdf | KABOOM_0000124.pdf |
| KABOOM_0000125.pdf | KABOOM_0000126.pdf | KABOOM_0000127.pdf |
| KABOOM_0000128.pdf | KABOOM_0000129.pdf | KABOOM_0000130.pdf |
| KABOOM_0000131.pdf | KABOOM_0000132.pdf | KABOOM_0000133.pdf |
| KABOOM_0000134.pdf | KABOOM_0000135.pdf | KABOOM_0000136.pdf |
| KABOOM_0000137.pdf | KABOOM_0000138.pdf | KABOOM_0000139.pdf |
| KABOOM_0000140.pdf | KABOOM_0000141.pdf | KABOOM_0000142.pdf |
| KABOOM_0000143.pdf | KABOOM_0000144.pdf | KABOOM_0000145.pdf |
| KABOOM_0000146.pdf | KABOOM_0000147.pdf | KABOOM_0000148.pdf |
| KABOOM_0000149.pdf | KABOOM_0000150.pdf | KABOOM_0000151.pdf |
| KABOOM_0000152.pdf | KABOOM_0000153.pdf | KABOOM_0000154.pdf |
| KABOOM_0000155.pdf | KABOOM_0000156.pdf | KABOOM_0000157.pdf |
| KABOOM_0000158.pdf | KABOOM_0000159.pdf | KABOOM_0000160.pdf |
| KABOOM_0000161.pdf | KABOOM_0000162.pdf | KABOOM_0000163.pdf |
| KABOOM_0000164.pdf | KABOOM_0000165.pdf | KABOOM_0000166.pdf |

| | | |
|---|---|---|
| KABOOM_0000167.pdf | KABOOM_0000168.pdf | KABOOM_0000169.pdf |
| KABOOM_0000170.pdf | KABOOM_0000171.pdf | KABOOM_0000172.pdf |
| KABOOM_0000173.pdf | KABOOM_0000174.pdf | KABOOM_0000175.pdf |
| KABOOM_0000176.pdf | KABOOM_0000177.pdf | KABOOM_0000178.pdf |
| KABOOM_0000179.pdf | KABOOM_0000180.pdf | KABOOM_0000181.pdf |
| KABOOM_0000182.pdf | KABOOM_0000183.pdf | KABOOM_0000184.pdf |
| KABOOM_0000185.pdf | KABOOM_0000186.pdf | KABOOM_0000187.pdf |
| KABOOM_0000188.pdf | KABOOM_0000189.pdf | KABOOM_0000190.pdf |
| KABOOM_0000191.pdf | KABOOM_0000192.pdf | KABOOM_0000193.pdf |
| KABOOM_0000194.pdf | KABOOM_0000195.pdf | KABOOM_0000196.pdf |
| KABOOM_0000197.pdf | KABOOM_0000198.pdf | KABOOM_0000199.pdf |
| KABOOM_0000200.pdf | KABOOM_0000201.pdf | KABOOM_0000202.pdf |
| KABOOM_0000203.pdf | KABOOM_0000204.pdf | KABOOM_0000205.pdf |
| KABOOM_0000206.pdf | KABOOM_0000207.pdf | KABOOM_0000208.pdf |
| KABOOM_0000209.pdf | KABOOM_0000210.pdf | KABOOM_0000211.pdf |
| KABOOM_0000212.pdf | KABOOM_0000213.pdf | KABOOM_0000214.pdf |
| KABOOM_0000215.pdf | KABOOM_0000216.pdf | KABOOM_0000217.pdf |
| KABOOM_0000218.pdf | KABOOM_0000219.pdf | KABOOM_0000220.pdf |
| KABOOM_0000221.pdf | KABOOM_0000222.pdf | KABOOM_0000223.pdf |
| KABOOM_0000224.pdf | KABOOM_0000225.pdf | KABOOM_0000226.pdf |
| KABOOM_0000227.pdf | KABOOM_0000228.pdf | KABOOM_0000229.pdf |
| KABOOM_0000230.pdf | KABOOM_0000231.pdf | KABOOM_0000232.pdf |
| KABOOM_0000233.pdf | KABOOM_0000234.pdf | KABOOM_0000235.pdf |
| KABOOM_0000236.pdf | KABOOM_0000237.pdf | KABOOM_0000238.pdf |
| KABOOM_0000239.pdf | KABOOM_0000240.pdf | KABOOM_0000241.pdf |
| KABOOM_0000242.pdf | KABOOM_0000243.pdf | KABOOM_0000244.pdf |
| KABOOM_0000245.pdf | KABOOM_0000246.pdf | KABOOM_0000247.pdf |
| KABOOM_0000248.pdf | KABOOM_0000249.pdf | KABOOM_0000250.pdf |
| KABOOM_0000251.pdf | KABOOM_0000252.pdf | KABOOM_0000253.pdf |
| KABOOM_0000254.pdf | KABOOM_0000255.pdf | KABOOM_0000256.pdf |
| KABOOM_0000257.pdf | KABOOM_0000258.pdf | KABOOM_0000259.pdf |
| KABOOM_0000260.pdf | KABOOM_0000261.pdf | KABOOM_0000262.pdf |
| KABOOM_0000263.pdf | KABOOM_0000264.pdf | KABOOM_0000265.pdf |
| KABOOM_0000266.pdf | KABOOM_0000267.pdf | KABOOM_0000268.pdf |
| KABOOM_0000269.pdf | KABOOM_0000270.MOV | KABOOM_0000270.pdf |
| KABOOM_0000271.pdf | KABOOM_0000272.MOV | KABOOM_0000272.pdf |
| KABOOM_0000273.pdf | KABOOM_0000274.MOV | KABOOM_0000274.pdf |
| KABOOM_0000275.pdf | KABOOM_0000276.MOV | KABOOM_0000276.pdf |
| KABOOM_0000277.pdf | KABOOM_0000278.MOV | KABOOM_0000278.pdf |
| KABOOM_0000279.pdf | KABOOM_0000280.MOV | KABOOM_0000280.pdf |
| KABOOM_0000281.pdf | KABOOM_0000282.MOV | KABOOM_0000282.pdf |
| KABOOM_0000283.pdf | KABOOM_0000284.MOV | KABOOM_0000284.pdf |
| KABOOM_0000285.pdf | KABOOM_0000286.pdf | KABOOM_0000287.pdf |
| KABOOM_0000288.pdf | KABOOM_0000289.pdf | KABOOM_0000290.pdf |
| KABOOM_0000291.pdf | KABOOM_0000292.pdf | KABOOM_0000293.pdf |
| KABOOM_0000294.pdf | KABOOM_0000295.pdf | KABOOM_0000296.pdf |
| KABOOM_0000297.pdf | KABOOM_0000298.pdf | KABOOM_0000299.pdf |
| KABOOM_0000300.pdf | KABOOM_0000301.pdf | KABOOM_0000302.pdf |
| KABOOM_0000303.pdf | KABOOM_0000304.pdf | KABOOM_0000305.pdf |
| KABOOM_0000306.pdf | KABOOM_0000307.pdf | KABOOM_0000308.pdf |
| KABOOM_0000309.pdf | KABOOM_0000310.pdf | KABOOM_0000311.pdf |
| KABOOM_0000312.pdf | KABOOM_0000383.pdf | KaboomRacks Chat.pdf |
| KaboomRacks Report.pdf | LAN-SBI_00000126.pdf | LAN-SBI_00000163.pdf |
| LAN-SBI_00000170.mp4 | LAN-SBI_00000181.pdf | LAN-SBI_00000186.pdf |

| | | |
|---|---|---|
| LAN-SBI_00000276.pdf | LAN-SBI_00001111.CSV | LAN-SBI_00001112_Highly Confidential - Attorneys' Eyes Only.CSV |
| Lyle Theriot - 01-16-2025_Condensed.PDF | Miner Photos Prior to Shipping.zip | Muroo.pdf |
| Muroo2.pdf | Muroo3.pdf | Muroo4.pdf |
| MVA Dust Analysis 16139 Report, 2.18.25.pdf | PERRY 0001-0072.pdf | Perry-0033-72.pdf |
| Randall Valentine Expert Report.pdf | SBI Crypto Calculations.xlsx | SBI_0000482.pdf |
| SBIC_0002333-2355.pdf | SBIC_0003883-3906.pdf | SBIC0000144.pdf |
| SBIC0000147.pdf | SBIC0000490-English.txt | SBIC0000490.pdf |
| SBIC0000506-English.txt | SBIC0000506.pdf | SBIC0000509-English.txt |
| SBIC0000509.pdf | SBIC0000510-English.xlsx | SBIC0000510.xlsx |
| SBIC0000511-English.txt | SBIC0000511.pdf | SBIC0000561-English.txt |
| SBIC0000561.pdf | SBIC0000923.pdf | SBIC0001015.pdf |
| SBIC0001623.pdf | SBIC0001630.pdf | SBIC0001631.pdf |
| SBIC0001782-English.txt | SBIC0001782.pdf | SBIC0001995.pdf |
| SBIC0002014.pdf | SBIC0002067.pdf | SBIC0002099.pdf |
| SBIC0002120.xlsm | SBIC0002121.xlsx | SBIC0002321 - English.xlsx |
| SBIC0002321.xlsx | SBIC0003072-3076.pdf | SBIC0003075.xlsm |
| SBIC0003076.xlsm | SBIC0003083-3085.pdf | SBIC0003085.xlsx |
| SBIC0003254-3255.pdf | SBIC0003362-English.txt | SBIC0003362.pdf |
| SBIC0003699.pdf | SBIC0003723-English.txt | SBIC0003723.pdf |
| SBIC0003883-3906.pdf | SBIC0005789.xlsm | SBIC0005813-English.xlsx |
| SBIC0005813.xlsx | SBIC0005816.xlsx | SBIC0005817.pdf |
| SBIC0005819.pdf | SBIC0005821.pdf | SBIC0005823.pdf |
| SBIC0005825.pdf | SBIC0005882.xlsx | SBIC0005892.pdf |
| SBIC0005937.xlsm | SBIC0005938.pdf | SBIC0005950.pdf |
| SBIC0005951.pdf | SBIC0005955.pdf | SBIC0005956.pdf |
| SBIC0005960.pdf | SBIC0005971.pdf | SBIC0005972.pdf |
| SBIC0005973.pdf | SBIC0005974.pdf | SBIC0005975.pdf |
| SBIC0005976.pdf | SBIC0005978.pdf | SBIC0005982.pdf |
| SBIC0005984.pdf | SBIC0005990.pdf | SBIC0005995.pdf |
| SBIC0005996.pdf | SBIC0005997.pdf | SBIC0005997.xlsx |
| SBIC0005998.pdf | SBIC0005999.pdf | SBIC0006000.pdf |
| SBIC0006001.pdf | SBIC0006002.pdf | SBIC0006003.pdf |
| SBIC0006004.pdf | SBIC0006005.pdf | SBIC0006006.pdf |
| SBIC0006007.pdf | SBIC0006008.pdf | SBIC0006009.pdf |
| SBIC0006010.pdf | SBIC0006011.pdf | SBIC0006012.pdf |
| SBIC0006013.pdf | SBIC0006014.pdf | SBIC0006015.pdf |
| SBIC0006016.pdf | SBIC0006017.pdf | SBIC0006018.pdf |
| SBIC0006019.pdf | SBIC0006020.pdf | SBIC0006021.pdf |
| SBIC0006022.pdf | SBIC0006023.pdf | SBIC0006024.pdf |
| SBIC0006025.pdf | SBIC0006026.pdf | SBIC0006027.pdf |
| SBIC0006028.pdf | SBIC0006029.pdf | SBIC0006030.pdf |
| SBIC0006031.pdf | SBIC0006032.pdf | SBIC0006033.pdf |
| SBIC0006034.pdf | SBIC0006035.pdf | SBIC0006036.pdf |
| SBIC0006037.pdf | SBIC0006038.pdf | SBIC0006039.pdf |
| SBIC0006040.pdf | SBIC0006041.pdf | SBIC0006042.pdf |
| SBIC0006043.pdf | SBIC0006044.pdf | SBIC0006045.pdf |
| SBIC0006046.pdf | SBIC0006047.pdf | SBIC0006048.pdf |
| SBIC0006049.pdf | SBIC0006050.pdf | SBIC0006051.pdf |
| SBIC0006052.pdf | SBIC0006053.pdf | SBIC0006054.pdf |
| SBIC0006055.pdf | SBIC0006056.pdf | SBIC0006057.pdf |
| SBIC0006058.pdf | SBIC0006059.pdf | SBIC0006060.pdf |
| SBIC0006061.pdf | SBIC0006062.pdf | SBIC0006063.pdf |

| | | |
|---|---|---|
| SBIC0006064.pdf | SBIC0006065.pdf | SBIC0006066.pdf |
| SBIC0006067.pdf | SBIC0006068.pdf | SBIC0006069.pdf |
| SBIC0006070.pdf | SBIC0006071.pdf | SBIC0006072.pdf |
| SBIC0006073.pdf | SBIC0006074.pdf | SBIC0006075.pdf |
| SBIC0006076.pdf | SBIC0006077.pdf | SBIC0006078.pdf |
| SBIC0006079.pdf | SBIC0006080.pdf | SBIC0006081.pdf |
| SBIC0006082.pdf | SBIC0006083.pdf | SBIC0006084.pdf |
| SBIC0006085.pdf | SBIC0006086.pdf | SBIC0006087.pdf |
| SBIC0006088.pdf | SBIC0006089.pdf | SBIC0006090.pdf |
| SBIC0006091.pdf | SBIC0006092.pdf | SBIC0006093.pdf |
| SBIC0006094.pdf | SBIC0006095.pdf | SBIC0006096.pdf |
| SBIC0006097.pdf | SBIC0006098.pdf | SBIC0006099.pdf |
| SBIC0006100.pdf | SBIC0006101.pdf | SBIC0006102.pdf |
| SBIC0006103.pdf | SBIC0006104.pdf | SBIC0006105.pdf |
| SBIC0006106.pdf | SBIC0006107.pdf | SBIC0006108.mov |
| SBIC0006108.pdf | SBIC0006109.mov | SBIC0006109.pdf |
| SBIC0006110.mov | SBIC0006110.pdf | SBIC0006111.mov |
| SBIC0006111.pdf | SBIC0006112.pdf | SBIC0006113.pdf |
| SBIC0006114.pdf | SBIC0006115.pdf | SBIC0006116.pdf |
| SBIC0006117.pdf | SBIC0006118.pdf | SBIC0006119.pdf |
| SBIC0006120.pdf | SBIC0006121.pdf | SBIC0006122.pdf |
| SBIC0006123.pdf | SBIC0006124.pdf | SBIC0006125.pdf |
| SBIC0006126.pdf | SBIC0006127.pdf | SBIC0006128.pdf |
| SBIC0006129.pdf | SBIC0006130.pdf | SBIC0006131.pdf |
| SBIC0006132.pdf | SBIC0006133.pdf | SBIC0006134.pdf |
| SBIC0006135.pdf | SBIC0006136.pdf | SBIC0006137.pdf |
| SBIC0006138.pdf | SBIC0006139.pdf | SBIC0006140.pdf |
| SBIC0006141.pdf | SBIC0006142.pdf | SBIC0006143.pdf |
| SBIC0006144.pdf | SBIC0006145.pdf | SBIC0006146.pdf |
| SBIC0006147.pdf | SBIC0006148.pdf | SBIC0006149.pdf |
| SBIC0006150.pdf | SBIC0006151.pdf | SBIC0006152.pdf |
| SBIC0006153.pdf | SBIC0006154.pdf | SBIC0006155.pdf |
| SBIC0006156.pdf | SBIC0006157.pdf | SBIC0006158.pdf |
| SBIC0006159.pdf | SBIC0006160.pdf | SBIC0006161.pdf |
| SBIC0006162.pdf | SBIC0006163.pdf | SBIC0006164.pdf |
| SBIC0006165.pdf | SBIC0006166.pdf | SBIC0006167.pdf |
| SBIC0006168.pdf | SBIC0006169.pdf | SBIC0006170.pdf |
| SBIC0006171.pdf | SBIC0006172.pdf | SBIC0006173.pdf |
| SBIC0006174.pdf | SBIC0006175.pdf | SBIC0006176.pdf |
| SBIC0006177.pdf | SBIC0006178.pdf | SBIC0006179.pdf |
| SBIC0006180.pdf | SBIC0006181.pdf | SBIC0006182.pdf |
| SBIC0006183.pdf | SBIC0006184.pdf | SBIC0006185.pdf |
| SBIC0006186.pdf | SBIC0006187.pdf | SBIC0006188.pdf |
| SBIC0006189.pdf | SBIC0006190.pdf | SBIC0006191.pdf |
| SBIC0006192.pdf | SBIC0006193.pdf | SBIC0006194.pdf |
| SBIC0006195.pdf | SBIC0006196.pdf | SBIC0006197.pdf |
| SBIC0006198.pdf | SBIC0006199.pdf | SBIC0006200.pdf |
| SBIC0006201.pdf | SBIC0006202.pdf | SBIC0006203.pdf |
| SBIC0006204.pdf | SBIC0006205.pdf | SBIC0006350.xlsx |
| SBIC0006351.xlsx | SBIC0006352.xlsx | SBIC0006353.xlsx |
| SBIC0006354.xlsx | SBIC0006355.xlsx | SBIC0006356.xlsm |
| SBIC0006451.pdf | SBIC0006472.pdf | SBIC0006479.xlsx |
| SBIC0006480.xlsx | SBIC0006829.pdf | SBIC0006885-English.txt |
| SBIC0006885.pdf | SBIC0007596-English.txt | SBIC0007596.pdf |
| SBIC0007696-English.txt | SBIC0007696.xlsm | SBIC0008549-English.txt |
| SBIC0008549.pdf | SBIC0008590-English.txt | SBIC0008590.pdf |

| | | |
|---|---|---|
| SBIC0008944-English.txt | SBIC0008944.pdf | SBIC0008945-English.xlsx |
| SBIC0008945.pdf | SBIC0008964-English.xlsx | SBIC0008964.xlsx |
| SBIC0009282-English.xlsx | SBIC0009282.xlsx | SBIC0009601-English.txt |
| SBIC0009601.pdf | SBIC0009764-English.txt | SBIC0009764.pdf |
| SBIC0010241.pdf | SBIC0010243.xlsx | Scenario_alpha Valentine.xlsx |
| Schuler Docs | Schuler Docs.zip | Smith 21.pdf |
| Smith 23.pdf | Smith 25.pdf | Smith 26.pdf |
| Smith 27.pdf | Smith, Carson 041525 Condensed.pdf | Tanemori 04.pdf |
| Tanemori 11.pdf | Tanemori 12.pdf | Tanemori 13.pdf |
| Tanemori 19.pdf | Valentine Docs.zip | WHIN_SBI_0000285.pdf |
| WHIN_SBI_0000390.pdf | WHIN_SBI_0000391.pdf | WHIN_SBI_0000392.pdf |
| WHIN_SBI_0000393.pdf | WHIN_SBI_0000394.pdf | WHIN_SBI_0000395.pdf |
| WHIN_SBI_0000396.pdf | WHIN_SBI_0000397.pdf | WHIN_SBI_0000398.pdf |
| WHIN_SBI_0000399.pdf | WHIN_SBI_0000400.pdf | WHIN_SBI_0000401.pdf |
| WHIN_SBI_0000402.pdf | WHIN_SBI_0000403.pdf | WHIN_SBI_0000404.pdf |
| WHIN_SBI_0000405.pdf | WHIN_SBI_0000406.pdf | WHIN_SBI_0000407.pdf |
| WHIN_SBI_0000408.pdf | WHIN_SBI_0000409.pdf | WHIN_SBI_0000410.pdf |
| WHIN_SBI_0000460.pdf | WHIN_SBI_0000465.pdf | WHIN_SBI_0000484.pdf |
| WHIN_SBI_0000498.pdf | WHIN_SBI_0000507.pdf | WHIN_SBI_0001453.pdf |
| WHIN_SBI_0001462.pdf | WHIN_SBI_0003681.pdf | WHIN_SBI_0005026.pdf |
| WHIN_SBI_0005944 (instead of 5955).pdf | WHIN_SBI_0006843.pdf | WHIN_SBI_0007582.pdf |
| WHIN_SBI_0007620.pdf | WHIN_SBI_0007622.pdf | WHIN_SBI_0007625.pdf |
| WHIN_SBI_0007628.pdf | WHIN_SBI_0007631.pdf | WHIN_SBI_0007634.pdf |
| WHIN_SBI_0007644.pdf | WHIN_SBI_0007647.pdf | WHIN_SBI_0007650.pdf |
| WHIN_SBI_0007653.pdf | WHIN_SBI_0007656.pdf | WHIN_SBI_0007660-7744.pdf |
| WHIN_SBI_0007801.pdf | WHIN_SBI_0007813.pdf | WHIN_SBI_0007879.pdf |
| WHIN_SBI_0007882.pdf | WHIN_SBI_0007883.pdf | WHIN_SBI_0007884.pdf |
| WHIN_SBI_0007887.pdf | WHIN_SBI_0007889.pdf | WHIN_SBI_0007892.pdf |
| WHIN_SBI_0007894.pdf | WHIN_SBI_0008058.pdf | WHIN_SBI_0008287.pdf |
| WHIN_SBI_0008530.pdf | WHIN_SBI_0009826.pdf | WHIN_SBI_0009949.pdf |
| WHIN_SBI_0009955.pdf | WHIN_SBI_0009956.pdf | WHIN_SBI_0010740-10751.pdf |
| WHIN_SBI_0012507.pdf | WHIN_SBI_0012508.pdf | WHIN_SBI_0014203.pdf |
| WHIN_SBI_0014340.pdf | WHIN_SBI_0015014.pdf | WHIN_SBI_0015084.pdf |
| WHIN_SBI_0015178.pdf | WHIN_SBI_0015179.pdf | WHIN_SBI_0015200.pdf |
| WHIN_SBI_0016078.pdf | WHIN_SBI_0016083.pdf | WHIN_SBI_0016087.pdf |
| WHIN_SBI_0016091.pdf | WHIN_SBI_0016130.pdf | WHIN_SBI_0016133.pdf |
| WHIN_SBI_0016613.pdf | DSC00011.jpg | 2024.12.27 Whinstone's Rsp to 2nd Rogs.pdf |
| 2025.04.11 SBIC's 1st Amd Rsp to Whinstone's Rogs.pdf | 2025.04.11 Whinstone-SBIC Dispute.pdf | Pre Marked 22.pdf |
| Pre-Marked Carson 25.pdf | Pre-Marked Harris 88.pdf | Rock 101.pdf |
| Rock 102.pdf | Rock 103.pdf | Rock 104.pdf |
| SBIC0006421.pdf | SBIC0006425.pdf | Smith 43.pdf |