IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| **SBI CRYPTO CO., LTD.,** *Plaintiff,* v. **WHINSTONE US, INC.,** *Defendant.* | Civil Action No.: 6:23-cv-252-ADA-DTG |

**PLAINTIFF'S RESPONSE TO WHINSTONE'S MOTION TO STRIKE THE EXPERT OPINIONS OF MICHAEL SCHULER**

Plaintiff SBI Crypto Co., Ltd. ("Plaintiff" or "SBI") files this Response to Defendant Whinstone's Motion to Strike the Expert Opinions of Michael Schuler (Dkt. 125) ("Motion") and respectfully shows this Court the following:

## I.
### INTRODUCTION

Whinstone's Motion fundamentally misconstrues the gatekeeping role of Federal Rule of Evidence 702 and *Daubert*. Instead of applying the governing legal standards, Whinstone urges this Court to impose an unduly restrictive definition of expertise—limiting it to ASIC crypto-mining equipment appraisers—in an attempt to exclude an expert with over forty years of experience in the resale of IT and computing equipment. The Motion misrepresents Mr. Schuler's right to draw upon his expert knowledge and employ widely accepted industry methodologies when assessing the cost of replacing SBI's damaged miners. At bottom, Whinstone's challenge concerns the weight of the evidence supporting Mr. Schuler's opinions, not the reliability or admissibility of those opinions under *Daubert*. For these reasons, the Court should deny Whinstone's Motion.

## II.
## FACTUAL BACKGROUND

Whinstone fraudulently induced SBI to enter into a contract wherein Whinstone agreed to construct a datacenter in Rockdale, Texas (the "Rockdale Facility") pursuant to certain industry and contractual standards, and then install, maintain, and operate SBI's Canaan Avalon A10 miners ("SBI's miners") (the "Agreement"). Whinstone agreed it would have the Rockdale Facility ready-for-use by mid-December 2019. Upon completion of the Rockdale Facility, Whinstone would install, maintain, and operate SBI's miners, and guaranteed the miners would average at least a 98.35 percent uptime percentage. The Agreement required Whinstone to design the Rockdale Facility to mitigate a number of environmental conditions, including dust, airflow, and heat.

After a significant delay in the installation and operation of SBI's miners, the Rockdale Facility failed to meet numerous contractual and industry standards, including but not limited to the failure to install filters to prevent the accumulation of dust and debris on the miners, the failure to operate evaporative cooling curtains, the failure to install intake and exhaust fans, the failure to ensure air intake temperatures below 29 degrees Celsius, over-pressurization of the hot aisle, and the failure to prevent the recirculation of hot air into the cold aisle.

SBI alleges, among other things, that Whinstone's various breaches and fraudulent conduct resulted in the accumulation of dust and debris inside its miners, recirculation of hot air back through the miners and into the cold aisle, and excessive air intake temperatures, all of which caused the underperformance and failure of SBI's miners. Whinstone continuously concealed these substandard conditions and instead, represented that the miners and/or their power supply units ("PSUs") were defective—a

position it maintains in this litigation.

As part of its damages, SBI claims the exposure to excessive dust and heat from the Rockdale Facility's environmental conditions foreclosed any reasonable resale value for the fleet of miners. SBI designated Michael Schuler ("Schuler"), a leader in the IT secondary market with over 40 years of experience in the field, as an expert to provide testimony on the lost value of SBI's miners. A true and correct copy of Schuler's Supplemental and Rebuttal Report is attached hereto as **Exhibit "A,"** and incorporated herein by reference. Specifically, Schuler opines that SBI should have been able to recover the original $15 million purchase price for their miners if they had been resold in Q3 2019—prior to their deployment at the Rockdale Facility due to high market demand in Q3 2019. *Id.* at 3. In Q3 and Q4 2020, if unused, the miners could have resold for more than $22.5 million due to supply chain constraints caused by the impact of COVID on the manufacturing and supply of semiconductors. *Id.* If used at a standard hosting facility without contamination and excessive heat, the miners could have resold for approximately two-thirds of their original value for a total of $10 million. *Id.* However, because of the contamination and thermal throttling of these miners at the Rockdale Facility, Schuler concludes that no buyer would willingly purchase the miners as-is upon seeing pictures of the miners, or otherwise observing their condition. *Id.* Moreover, because of the excessive contamination of the miners, the cost to process and transport the miners would exceed any scrap metal value for the miners, thereby constituting a complete loss in value for SBI's miners. *Id.*

In addition, Schuler also opines that the cost to replace the computing equivalency of SBI's damaged miners in Q3 of 2021 would have been approximately $41,110,000, based on prices of comparable miners available at that time. *Id.* at 4, 19.

In forming these opinions, Schuler relies, in part, on his over four decades of experience in the IT secondary market or Information Technology Asset Dispositioning ("ITAD") industry as it is known. *See id.* at 4; *see also* Schuler's Curriculum Vitae attached hereto as **Exhibit "B,"** and incorporated herein by reference; *see* Deposition Transcript of Michael Schuler at 48:6-9, attached hereto as **Exhibit "C,"** and incorporated herein by reference. ITAD companies provide customers recovery value for IT equipment following upgrades or replacements at the end of the products' useful life. **Exhibit "C,"** at 29:8-23, 49:16-53:15. After spending three years in the Marines, including two-and-a-half years in advanced electronics schools, Schuler began his career in the ITAD industry in 1981. *Id.* at 23:2-9, 27:25-28:3, 50:1-54:15. Schuler's role in the secondary market is to facilitate major corporations, schools, government agencies, and data centers' ability to recover value for their IT equipment, and to clean the IT equipment of any data prior to resale. *Id.* at 29:8-23. Throughout his career, Schuler has visited numerous data centers across the United States. *Id.* at 58:20-71:14.

Schuler's experience spans all products across the entire spectrum of IT equipment, including the valuation of a fleet of crypto miners. *Id.* at 28:8-23. Most of the equipment Schuler resold came from data centers and included servers and networking equipment. *Id.* at 30:13-31:13. Schuler even has experience appraising a fleet of 400 crypto miners and selling the equipment to a recycler. *Id.* at 31:14-37:25, 74:12-25, 106:25-107:10.

Schuler's expertise is widely recognized in the ITAD industry. Schuler has served in various leadership positions for industry organizations including the Computing Technology Industry Association ("CompTIA"), Association of Service, Communication, Data, and ITAD Providers, ("ASCDI"), and Advanced Framework for Simulation,

Integration, and Modeling ("AFSMI"). **Exhibit "A,"** at 4. He served on the executive council for IT Services & Support Community for CompTIA from 2004 through 2013 and served as the council's chairman in 2013. *Id.* He has served as a CompTIA Ambassador since 2011. *Id.* Additionally, Schuler has presented at dozens of industry conferences including CompTIA, Warranty Chain Management, ITAD Summit, E-Scrap, United Network Equipment Dealers Association ("UNEDA"), and Global Sustainable Development Congress. *Id.*

In appraising the value of computing equipment, Schuler has extensive experience analyzing contaminants, heat, and other types of environmental impact on IT equipment. *Id.* at 72:11-73:14; 207:23-208:20. Schuler applied the standard industry methodology used for valuing and selling equipment in the ITAD space. *Id.* at 193:11-195:5, 274:20-275:17. In his report, Schuler identifies the standard factors considered by experts in the ITAD space in assessing a product's useful life cycle and corresponding value recovery. **Exhibit "A,"** at 7. These include: the original cost of the product, the recognition of the OEM, product name, total quantity deployed, a product's specialized functionality, features, and utility to perform, the product's cost efficiency compared to newer models, costs related to service, repairs, and software/firmware upgrades, the condition of the product, the cost of decommissioning, logistics, and service required to prepare the product for resale, and the services required to mitigate risks related to data management and environmentally responsible recycling. *Id.* Schuler further identified the specific factors affecting the demand and resale value of ASIC crypto miners, *id.* at 9, 13, 14, and the useful lifecycle of crypto miners. *Id.* at 17-18. Specifically, Schuler identified the following factors as affecting the demand and resale value of ASIC crypto miners: rapid depreciation, specific design, market demand and volatility, hash rates, energy use, brand

recognition, mining difficulty, technological innovations, warranties, and maintenance and condition. *Id.* at 9. Schuler also provided various graphs and charts showing the useful life cycle of IT equipment, the useful life of crypto miners, and the standard depreciation of crypto miners before and after the COVID-19 pandemic, which led to a widely-known shortage in microprocessors or chips. *Id.* at 6, 8, 17-18.

Relying on the standard practices in the ITAD industry, Schuler applied the factors to the facts of this case to reach his valuation opinions. *Id.* at 3, 15-16, 24; **Exhibit "C,"** at 193:11-195:5, 274:20-275:17. Specifically, Schuler reviewed the types of documents he typically would such as the sales contract for the miners and various photographs and videos of the fleet of miners and conditions of the data center. *See* **Exhibit "A,"** at 14-16, 28. Additionally, Schuler conducted research on the major OEMs, Canaan, miners, and miner prices. *See generally id.* Schuler later conducted an audit of SBI's miners which further validated his opinion that the extensive contamination of SBI's miners eliminated any resale value. *Id.* at 20-23.

### III.
### ARGUMENT & AUTHORITIES

#### A.  Legal Standard

Federal Rule of Evidence 702 permits a witness "qualified as an expert by knowledge, skill, experience, training, or education" to offer opinion testimony if (1) the witness's expertise will help the trier of fact to understand the evidence or to determine a fact in issue, (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods, and (4) the expert has reliably applied the principles and methods to the facts of the case. FED. R. EVID. 702; *Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I, L.L.C.*, 753 Fed. Appx. 191, 195 (5th Cir.

2018). A district court must ensure an expert and his testimony meet the requirements of Rule 702. *Roman v. W. Mfg., Inc.*, 691 F.3d 686, 692 (5th Cir. 2012). District courts have broad discretion in deciding the admissibility of expert testimony. *Id.*; *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).

The role of the court as the gatekeeper of expert testimony "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). The court, however, "does not judge the expert's conclusions themselves." *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 623 (5th Cir. 2018). The district court's role as gatekeeper does not replace the adversary system, or the jury's role as the arbiter of disputes. *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., State of Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993).

"Rule 702 does not require that an expert be highly qualified in order to testify about a given issue." *Williams*, 898 F.3d at 623. In admitting a witness as an expert, the district court need only find "sufficient indicia that an individual will provide a reliable opinion on the subject." *Id.* at 625. The Fifth Circuit has made clear that Rule 702 is not meant to be a "battle of labels" between experts. *Id.*; *see also Roman*, 691 F.3d at 693. The required expertise should not be so narrowly drawn as to "irrationally exclude[]" qualified experts from testifying. *Williams*, 898 F.3d at 625. Differences in expertise between opposing experts generally go towards the weight, not the admissibility of expert

testimony. *Id*. at 624.[1]

A witness's general experience in a field may qualify the witness as an expert. *Huval v. Offshore Pipelines, Inc.*, 86 F.3d 454, 458 (5th Cir. 1996); *Roman*, 691 F.3d at 693; *Cedar Lodge*, 753 Fed. Appx. at 195–96 ("A lack of specialization should generally go to the weight of the evidence rather than its admissibility, and an expert witness is not strictly confined to his area of practice, but may testify concerning related applications."). In *Williams*, the Fifth Circuit noted the absurdity of the plaintiff's argument that a "mechanical engineer with a background in warnings and small-crane design" could not testify as "an expert about warnings for a crawler crane" because the expert did not have specific experience with crawler cranes. *See Williams*, 898 F.3d at 625. Similarly, the Fifth Circuit in *Huss* found that the district court abused its discretion in striking defendant's expert – board-certified internist who treated patients with heart conditions – because the expert did not have specific experience with the drug at issue. *See Huss*, 71 F.3d at 454-455. The Fifth Circuit explained that his opinions were "a natural extension of his medical and public health training and his experience as a practicing physician of fifteen years." *Id*. at 454. Recently, a district court in the Eastern District of Texas rejected a *Daubert* challenge to a doctor's qualifications based on the assertion that the doctor lacked experience "in the precise role of a vocational MRO." *Equal Employment*

---

[1] Whinstone's challenge of Schuler fundamentally differs from SBI's challenge of the qualifications of Richard Peters ("Peters") for several reasons. First, Whinstone challenges the sufficiency of Schuler's qualifications because, it alleges, Schuler's four decades of experience in the ITAD secondary market does not extend to the resale of an emerging technology – ASIC miners. SBI asserts that Peters does not have *any* relevant experience in the ITAD secondary market. Second, Peters goes beyond opining on the value of SBI's miners to also offer rebuttal engineering opinions that SBI's miners and/or power supply units were defective and a defect more likely caused the underperformance of SBI's miners than any environmental conditions or data center design flaw. Peters has no expertise in mechanical or electrical engineering, in the design of miners or data center design, or any failure mode analysis which he necessarily must have. The Fifth Circuit has consistently applied a stricter requirement for technical opinions, requiring a closer match between the subject matter of the testimony and the expert's qualifications. Third, Peters' rebuttal opinions are not a natural extension of his expertise in cybersecurity, but rather a total departure from the field.

*Opportunity Comm'n v. Modern Group, Ltd.*, 725 F. Supp. 3d 644, 660 (E.D. Tex. 2024). The court explained that the doctor had sufficient qualifications based on his knowledge, experience, and training, including his MRO certification and his analogous duties in his medical practice." *Id.* at 665.

Experts providing appraisals may rely on their experience in the field, even if they do not have specific experience with the specific product or property at issue. *See Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 525 (5th Cir. 2013) (the expert was qualified because he "demonstrated his familiarity with industrial plants broadly, even if he had little experience with Scalfuel [waste treatment] plants in particular."); *Whitehouse Hotel Ltd. P'ship v. C.I.R.*, 615 F.3d 321, 331 (5th Cir. 2010) (real estate appraiser was "sufficiently qualified to value a specific type of property interest—even one as esoteric and specialized as a conservation easement."); *Bavely, Tr. of AAA Sports, Inc. v. Panini Am., Inc.*, No. 4:22-CV-00093, 2023 WL 12098406, at *4-5 (E.D. Tex. July 5, 2023) (A "lifetime sports trading collector" who "made a career out of appraising ... sports trading cards" was sufficiently qualified to appraise the specific cards at issue, and to testify about market factors.).

"As a general rule, questions relating to the bases and sources of an expert's opinion affect the ***weight*** to be assigned that opinion rather than its ***admissibility*** and should be left for the jury's consideration." *14.38 Acres*, 80 F.3d at 1077 (emphasis added) quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir.1987). Moreover, "Rule 702 plainly contemplates" that experts may rely on their knowledge or experience in the field, "including generally accepted knowledge in [their] field." *EEOC*, 725 F. Supp. 3d at 669. In *Bavely*, the Trustee argued that the defendant's expert's opinions were unreliable because he "ma[de] conclusions with virtually no support or authority." 2023 WL

12098406, at *4. The district court rejected this argument, explaining that the expert could reach opinions by relying on his knowledge and experience in the field. *Id.* at *5. The Fifth Circuit rejected similar attacks at an expert's methodology and bases for his opinions in *14.38 Acres* holding that the "perceived flaws in the testimony" should be "tested in the crucible of adversarial proceedings." 80 F.3d at 1079.

Accordingly, Whinstone's attacks on Schuler's qualifications, methodology, and supporting documents go towards the weight of Schuler's testimony, not its admissibility.

**B.      Schuler's more than four decades of experience in the ITAD secondary market qualify him as an expert in the resale of IT equipment, including crypto mining equipment.**

Whinstone seeks to impose the narrowest qualification requirement possible. Whinstone argues that Schuler does not have sufficient qualifications because he does not possess expertise specific to the A10 series miners in this case. [Dkt. 125 at 2.]. Schuler has over four decades of experience in the ITAD secondary market appraising the whole spectrum of IT equipment. *See* **Exhibit "A,"** at 1; *see* **Exhibit "B"**; *see also* **Exhibit "C,"** at 29:8-30:21. Schuler's role in the secondary market is to facilitate major corporations, schools, government agencies, data centers, etc. get rid of their IT equipment. **Exhibit "C,"** at 29:8-23. Schuler would process the fleet of equipment, wipe the data, and then resell the fleet of equipment. *Id.* That necessarily involved assessing the useful life of the equipment, appraising the equipment, and then reselling the equipment. *Id.* Most of the equipment came from data centers and included servers and networking equipment. *Id.* at 30:13-31:13. Schuler even has experience appraising a fleet of 400 crypto miners and selling the equipment to a recycler. *Id.* at 31:14-37:25, 74:12-25, 106:25-107:10.

Whinstone then takes its already narrow definition of a crypto miner resale expert and further narrows it by arguing that Schuler's experience appraising the 400 crypto miners is irrelevant because they were GPU miners and not ASIC miners. Dkt. 125 at 12-13. Under this narrow scope, not even one of Whinstone's experts is qualified to offer any opinions in this case. In fact, Whinstone's narrow definition would make it near impossible for anyone to qualify as an expert on the resale of crypto miners because it is small, emerging market within the ITAD secondary market. **Exhibit "C,"** at 31:8-13, 42:18-43:24. Resellers within the ITAD secondary market rarely see fleets of mining equipment because most equipment remains deployed until the end of its useful life. *Id.* at 40:8-48:5. Additionally, the first cryptocurrency was not developed until 2010, with early miners arriving thereafter. *Id.* at 26:12-27:22. As such, it is not a well-cultivated market and has only a small number of dedicated crypto mining equipment resellers. *Id.* at 133:18-134:7. He also testified that the brokers he regularly conducted business with likely did some transactions involving crypto miners. *Id.* at 165:17-166:10. In fact, Whinstone's expert, Peters, relied primarily on an email from Ray Redding at Smith & Associates for his appraisal of SBI's miners. Schuler trained the head of Smith & Associates ITAD Operation and worked with him for 17 years. **Exhibit "C,"** at 141:10-142:16. Schuler knows how other Smith & Associates would likely approach purchasing miners and other IT equipment because he taught the person running their ITAD operation and has familiarity with how others in the industry appraise IT equipment. *Id.*

Whinstone does not provide a single reason why Schuler's vast experience in the ITAD secondary market does not qualify him to opine on a product – crypto miners – that falls within the ITAD secondary market. Schuler, on the other hand, explained that the resale of crypto miners does not substantively differ from the resale of other IT

equipment. *Id.* at 106:25-108:6. Because of his experience in the ITAD secondary market, including the prior appraisal of mining equipment, he has familiarity with crypto miners. *Id.* at 31:14-37:25, 74:12-25, 106:25-107:10. As Schuler explained, and Whinstone has not addressed, crypto miners possess many similar characteristics to servers, which he has extensive experience appraising and reselling. *Id.* at 72:24-74:25, 106:25-108:6, 266:25-270:4, 273:25-275:10.

Whinstone repeatedly misrepresents Schuler's testimony throughout its motion on his prior experience, knowledge, and expertise. First, Whinstone states that Schuler used vague phrases such as "I imagine." Dkt. 125 at 2. Whinstone asked a series of questions targeting Schuler's knowledge of firmware, to which Schuler provided a thorough understanding of how firmware generally works on computing equipment. **Exhibit "C,"** at 76:2-77:5. Schuler testified that he "imagine[d]" that firmware operates on miners similar to other electrical equipment. *Id.* Next, Whinstone suggests that Schuler only knew of cryptocurrency "anecdotally" prior to this case. Dkt. 125 at 2. Schuler responded to Whinstone's question as to when cryptocurrency hit the market in 2010, to which Schuler responded that he knew about it anecdotally. **Exhibit "C,"** at 26:1-6. Whinstone also misrepresents that Schuler had never appraised or evaluated cryptocurrency mining equipment prior to this case. Dkt. 125 at 2. Schuler actually testified that he had actual experience with the resale of crypto miners prior to this case. **Exhibit "C,"** at 31:14-37:25, 74:12-25, 106:25-107:10. Similarly, Schuler never testified that he did not have familiarity with crypto miners prior to this case. *Id.* at 27:5-24, 31:14-37:25, 74:12-25, 106:25-107:10.

**C.   Schuler's appraisal of the miners reliably applies his experience and expertise to the objective facts and evidence in this case.**

Whinstone relies on inapplicable cases applying the strict requirements in the

medical community for providing a diagnosis or causation opinion, wholly irrelevant to appraisals of equipment such as crypto miners. *See* Dkt. 125 at 6-7; *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) (doctor relied on a clearly erroneous assumption); *Seaman v. Seacor Marine L.L.C.*, 326 Fed. Appx. 721, 725 (5th Cir. 2009) (doctor had no expertise treating the condition at issue and relied solely on assumptions from counsel); *Moore v. Int'l Paint, L.L.C.*, 547 Fed. Appx. 513, 515 (5th Cir. 2013) (doctor relied on assumptions contradictory to undisputed facts and made assumptions with no underlying rationale); *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 278 (5th Cir. 1998) (doctor had no experience treating the condition at issue); *Kelly v. American Heyer-Schulte Corp.*, F. Supp. 873, 876 (W.D. Tex. 1997), dismissed, 139 F.3d 899 (5th Cir. 1998) (doctor did not meet the Fifth Circuit's standard for medical doctors to opine on causation). The only case Whinstone cites to that does not involve the standard for medical opinions is *Hathaway v. Bazany*. In *Hathaway*, the Fifth Circuit upheld the exclusion of a law enforcement expert because he offered opinions "not based on any discernable training in or use of a scientific methodology suitable to the reconstruction… ." 507 F.3d 312, 318 (5th Cir. 2007). Whinstone then applies the standard for scientific opinions to an appraisal opinion, despite clear case law rejecting such an approach.

Notably, Whinstone's Motion does not reference the *Panini* case it relies on in defending its designation of a cybersecurity expert, Richard Peters, to opining on the resale value of SBI's miners Response to SBI's motion to exclude . Dkt. 130 at 5. *Panini* is particularly instructive to Whinstone's challenge in this case. In *Panini*, the Trustee objected to the opinions of Panini's appraiser as unreliable arguing that the expert "makes conclusions with virtually no support or authority" and that the expert "relies on *ipse dixit*

conclusions that are not based on any stated methodology or metrics that are entirely untethered to the facts and the data." 2023 WL 12098406 at *4. Panini responded that its expert identified relevant market factors based on his experience in the industry, and that the factors identified are the accepted method of evaluating and appraising sports trading cards. *Id*. The district court agreed explaining that the Federal Rules of Evidence permit an expert to reach an opinion based on his experience. *Id.* at *5. The expert identified the market factors based on his years of experience in the industry and review of relevant materials, and applied these factors to the facts of the case to form his appraisal. *Id*. Here, Schuler identified the relevant market factors based on his extensive experience in the ITAD industry and review of relevant materials and then applied the factors to the objective facts of this case. As the court recognized in *Panini*, Whinstone can raise any issues it has regarding any supposed deficiencies in Schuler's methodology through cross-examination at trial. *Id.*

Whinstone is plainly wrong in its contention that Schuler cannot rely on his 40 years of personal experience and observations in the ITAD industry as the foundation for his opinions. *See, Kumho*, 526 U.S. at 156 ("no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience"); *Kozak v. Medtronic, Inc.*, 512 F. Supp. 2d 913, 918 (S.D. Tex. 2007) ("An expert's testimony does not always have to be based on scientific testing; it can be based on personal experience."); *see also* FED. R. EVID. 702, adv. comm. notes (2000) ("Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony.").

Whinstone spends a substantial amount of their Motion arguing about sampling

requirements and whether Schuler's audit of the miners satisfied some statistical standard Whinstone does not even identify. This argument goes towards the weight, not the admissibility of Schuler's opinions. Schuler has not offered any statistical opinions in this case. Schuler explained how he chose the thirty miners to inspect during his audit, which he did based on standard practices in the ITAD industry. **Exhibit "C,"** at 202:1-22. Contrary to Whinstone's assertions, Schuler does not opine that the thirty miners he inspected establish that every single one of SBI's 20,000 miners had the same level of contamination observed in the thirty miners. Nor has he opined that every one of the 20,000 miners could not turn on. *Id.* at 207:3-17. Schuler opines that no buyer in his experience would have offered their own capital to purchase the miners, after seeing the level of dust contamination illustrated in the pictures of the miners and facility while at Whinstone. **Exhibit "C,"** at 129:18-131:3, 145:9-21, 295:13-296:4. In addition, Schuler testified that Whinstone's failure to segment the miners poses additional challenges to the resale because any reseller would have to individually clean, audit, and process all 20,000 miners for resale. *Id.* at 145:9-147:19. This would require significant capital costs just to take on the project. *Id.* Schuler estimated that it would take approximately 20,000 hours to complete this process. *Id.* Spilt among ten full-time personnel as 2,080 hours per person, which is a year just to get the miners to market. *Id.* As such, no reseller in the ITAD industry would take on such a project. *Id.* This also demonstrates the impracticability of Whinstone's criticism that Schuler did not inspect and test all 20,000 miners.

Moreover, criticisms of an expert for failure to follow a specific methodology go towards the weight, not the admissibility of the expert's testimony. *Whitehouse*, 615 F.3d at 331. In *Whitehouse*, another case relied on by Whinstone in its Response to SBI's

Motion to Exclude Richard Peters, the Fifth Circuit upheld the admissibility of a real estate appraiser's appraisal despite his failure to follow the Uniform Standards of Professional Appraisal Practice ("USPAP"). *Id.* The Fifth Circuit noted that it was not aware of any authority that a failure to strictly follow the USPAP is the sole determining factor whether an appraiser's valuation report is reliable. *Id.* at 332. Deviations from the USPAP go toward the credibility, or weight, of the opinion, not admissibility. *Id.* Here, Whinstone does not identify any methodology that an ITAD appraiser must strictly follow. Thus, Whinstone's assertions that Schuler should have performed additional work such as inspecting additional miners or testing miners go towards the weight of his testimony.

Whinstone's assertion that Schuler's testimony is simply crafted to fit SBI's litigation narrative has no basis. It is undisputed that physical contamination of miners, including the accumulation of dust inside the miners, can cause the degradation and underperformance of miners. KaboomRacks, a third-party hired by SBI to inspect the Rockdale Facility in June 2021 prior to the removal of SBI's miners took photographs and videos documenting significant accumulation of dust inside of the miners. **Exhibit "C,"** at 145:9-147:19, 186:16-187:5. Schuler reviewed KaboomRacks' photographs and videos in this case. *Id.* at 145:9-147:19, 186:16-187:5. The disputed fact between Whinstone and SBI is not whether or not dust accumulated on the miners, but to what extent it impacted SBI's miners. Based on his extensive experience in the industry, review of the KaboomRacks photos and videos, and own inspection of the miners, Schuler reached the opinion that buyers observing the clearly visible and substantial contamination on the miners would not take on the substantial risk and cost associated with attempting to resell the fleet of miners. **Exhibit "C,"** at 72:11-73:14, 145:9-147:19, 186:16-187:5, 207:23-

208:20. Whinstone's assertion that the contamination would not affect the miners is an issue meant for the jury to decide.

## IV.
## CONCLUSION

For the foregoing reasons, the Court should deny Whinstone's Motion to Exclude Michael Schuler.

Respectfully submitted,

By: */s/ Joshua M. Sandler*
Joshua M. Sandler
　Texas Bar No. 24053680
　jsandler@winstead.com
Cory Johnson
　Texas Bar No. 24046162
　cjohnson@winstead.com
Andrew Patterson
　Texas Bar No. 24131573
　apatterson@winstead.com
John D. Janicek
　State Bar No. 24125636
　jjanicek@winstead.com
**WINSTEAD PC**
2728 N. Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (214) 745-5103
Facsimile: (214) 745-5390

**ATTORNEYS FOR PLAINTIFF
SBI CRYPTO CO. LTD**

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served in accordance with the Texas Rules of Civil Procedure via the court's e-filing system on November 14, 2025.

*/s/ Andrew Patterson*
Andrew Patterson