# EXHIBIT 2

Civil Action No.: 6:23-cv-252

---

**SBI Crypto Co., Ltd.,**

    *Plaintiff*,

       v.

**Whinstone US, Inc.,**

    *Defendant*.

---

## INITIAL EXPERT REPORT OF DR. RANDALL VALENTINE
## Dated: March 28, 2025

### CONFIDENTIAL
### SUBJECT TO PROTECTIVE ORDER

Valentine Forensic Finance
Randall Valentine, B.S., M.S., Ph.D.
P.O. Box 6566
Gulfport, MS 39501
(228) 236-4133

## A.     Executive Summary

1.     The Plaintiff, SBI Crypto Co., Ltd. ("SBI"), claims that its crypto miners generated less Bitcoins and mining rewards than those miners otherwise would have but for the alleged acts and omissions of Defendant Whinstone US, Inc. ("Whinstone").

This Initial Report quantifies the lost net profit damages SBI suffered, assuming Whinstone is liable to SBI, pursuant to SBI's various claims that its crypto miners would have generated significantly more Bitcoins had Whinstone but for the alleged conduct of Whinstone, and that but for the conduct of Whinstone, the facility operated by Whinstone would have comparably performed to a similar facility operated for SBI in Russia.[1] The report segments the damages into 3 separate periods: The period between December 15, 2019 and June 30, 2020 (representing the period the contract was valid prior to the RFU date), July 1, 2020 to July 31, 2021 (the period of actual mining but underperformance), and August 1, 2021 to December 14, 2023 (which represents the expected useful life of the SBI miners deployed in Whinstone's facility).

2.     My valuation includes scenarios of lost net profits resulting from the additional Bitcoin that would have been mined during the period from December 15, 2019 to March 24, 2025 but for the conduct of Whinstone as well as the appreciation in the market value of the retained additional mined Bitcoin from the dates of December 15, 2019 to December 14, 2023. This period falls under the operation of Whinstone's Texas facility under the Agreement to the present, under the conservative assumption that the Agreement would have resulted in operation of SBI's miners for four years from the initial "Ready For Use Date" or "RFU" Date as determined by the trier of fact. I have estimated SBI's economic losses as of March 24, 2025 based upon the market price of cryptocurrency Bitcoin as of that date[2] at **$59,708,082** for the period prior to RFU (period 1), and **$65,301,163** for the period after the termination of the contract (period 3).

In addition to the foregoing range, I have calculated inefficiencies in mining operations at the Whinstone facility (period 2) that resulted in additional lost net profits of **$50,563,212**, attributed to increased operational costs, downtime, and suboptimal production levels when compared to SBI's operation of the same number and type of A10 miners at a data center facility in Russia. These figures bring the total estimated loss as of March 24, 2025, to **$175,572,457.** This amount was calculated by reviewing actual and comparable transactions since December 15, 2019, ensuring each was evaluated against current market rates for hash rates, comparable transactions, and the economic terms of the Agreement (see SBI Crypto Calculations; Time Period Calculations Sheet).

---

[1] Hosting Service Agreement, Bates-stamped SBIC0003883-3906.

[2] The value of one Bitcoin as of March 24, 2025 was $82,605,79. Should this matter go to trial, I intend to use the price of Bitcoin at the date of trial to calculate the lost profit damages SBI suffered.

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

3.    Adjustments have been made to each number by a factor of 55.07%, which accounts for the percentage SBI Crypto kept as mined Bitcoin between December 15, 2019 and December 14, 2023.

4.    I have estimated losses based on different scenarios of relevant time frame.

5.    The table below provides a breakdown of the total estimated losses:



6.    Each transaction within the analyzed period adhered to market-standard pricing and aligned with contractual agreements. This evaluation quantifies the net lost profits damages attributable to Whinstone's alleged failure to perform pursuant to the terms of the Agreement and is based on industry norms, comparable performance at a similar facility, and historical transaction data.

7.    I have been asked to determine value of SBI's economic losses as of March 24, 2025 (current market value) for the purposes of this litigation matter. The definition of fair market value is the price at which an asset would change hands between a willing buyer and willing seller, with neither being under a compulsion to buy or sell and both having reasonable knowledge of all relevant facts.

8.    My opinion of the value is subject to the assumptions and limiting conditions set forth in the report within a reasonable degree of economic certainty.

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

**B.      Expert Witness Qualifications**

1.      I am qualified to express an expert opinion on damages in this matter as a result of my education, training and experience. I hold a PhD in Finance and have academic and professional experience of over 25 years, including published research, financial analysis, financial technology, investment strategy, artificial intelligence, and quantitative analysis. I have been retained as an expert witness in over 100 matters, with a significant number of these involving those involving cryptocurrency and financial damages. My CV and Rule 26 disclosures are shown at Appendix A to this report.

**C.      Assumptions and Limiting Conditions**

1.      As part of my analysis and estimate of economic damages in this matter, I have considered the financial statements and other analysis prepared by SBI. The financial statements consist of income statements and statements of account transactions. Based upon my examination of these statements and my discussion with representatives of SBI, I consider them relevant and reliable for the purposes of my analysis and initial opinions on damages. The preparation and contents of the financial statements is the sole responsibility of the management of SBI.

2.      I have met with Carson Smith, Nick Vitalis, and Jonathan Tanemori, representatives of SBI, to learn about the background and history of the mining activity and transactions, as well as counsel for SBI.

3.      Additionally, I have obtained data from publicly-available sources that are commonly used and relied on in my field for purposes of my analysis and opinions on damages, including information retrieved from the SEC, Luxor Technologies, and Coindesk.

4.      The facts and data as set forth in this Initial Report were obtained from sources considered to be reliable.

5.      This Initial Report is based upon facts and conditions existing as of the date of this report. I have not considered subsequent events. Unless specifically requested by the client and agreed upon by me, I have no obligation to update my report for such events and conditions.

6.      The estimate of value opined to in this report applies only to SBI's Economic Losses as of March 24, 2025.

**D.      Financial Analysis**

1.      *Analysis of Portfolio Statements*

a.      I reviewed certain SBI's data, including records on mining, hosting, and hashrate operations. This access allowed me to conduct a comprehensive review of

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

all mining transactions. starting from December 15, 2019. My analysis focused on examining historical transaction records, verifying market-consistent pricing, and assessing the financial impact of any interruptions or inefficiencies in SBI's mining operations. The gathered data played a crucial role in calculating the economic damages SBI incurred due to lost mining opportunities and the resulting loss of appreciation income.

b.      The calculations of these economic damages were based on both lost mining revenue and the foregone appreciation that SBI would have generated had mining activities proceeded in accordance with the terms of the Agreement and in a manner otherwise experienced by SBI in a very comparable facility in a similar timeframe in Russia. The hashrate, hosting agreements, and mining data used in this assessment were sourced directly from SBI's contractual agreements (SBIC0003883), and therefore the analysis aligned with the terms of the business arrangement. Additionally, external third-party sources such as Coinmarketcap, Coingecko, Luxor Technologies, and publicly available SEC filings were used to validate market conditions and industry benchmarks. This multi-source verification approach provided a reliable foundation for estimating financial damages within a reasonable range of certainty.

c.      Appreciation rate calculations within the economic model were determined by evaluating the historical rate of return for Bitcoin over a specified period. The assessment specifically examined Bitcoin's performance from December 15, 2019, to March 24, 2025, representing the potential return that SBI could have earned if uninterrupted mining operations had taken place as intended. This approach offers a conservative yet realistic estimation of the financial loss stemming from the alleged breach of contract and other claims. By utilizing industry-standard methodologies and verifiable financial data, the analysis provides a reasonable quantification of SBI's lost net earnings and the broader financial consequences resulting from operational disruptions.

d.      The formula used to calculate the rate of return to be applied to each month of relevant mining activity is below:

$$R = (Pf - Pi) / Pi \times 100$$

Where:
- R = Rate of return (%)
- Pf = Final price (price of Bitcoin at the end of the period, i.e. the date of this Initial Report)
- Pi = Initial price (price of Bitcoin at the date that p additional Bitcoin should have been mined but for the conduct of the defendants)

e.      Bitcoin (BTC), as a decentralized digital asset, presents unique challenges compared to traditional financial instruments like stocks or bonds. Unlike these conventional assets, Bitcoin does not have a direct correlation with any specific market index or asset class, making it more volatile and complex to assess in financial

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

litigation. When calculating damages related to lost Bitcoin, determining the appropriate methodology is essential to ensure a fair assessment of economic impact.

   f.  The Internal Revenue Service (IRS) classifies cryptocurrency as property rather than currency[3]. This designation means that profits from selling Bitcoin or other digital assets are subject to capital gains tax, similar to traditional investments such as equities. The IRS requires taxpayers to report gains or losses from Bitcoin transactions based on their fair market value at the time of sale or exchange. Proper documentation of transaction history, valuation methodologies, and historical price trends plays a crucial role in meeting IRS compliance standards and avoiding potential legal or tax-related consequences.

   g.  Given the absence of an index or asset class that directly mirrors Bitcoin's performance, a commonly-used, appropriate method for calculating damages in cases involving lost Bitcoin is to determine change in market value over the relevant time period. Unlike stocks, which can be compared against benchmarks like the S&P 500, Bitcoin operates within its own market structure, driven by factors such as supply constraints, institutional adoption, regulatory developments, and macroeconomic trends. As a result, assessing economic losses from lost Bitcoin holdings requires a historical price analysis to determine the potential appreciation that would have occurred had the digital asset remained in possession. In my experience this methodology provides a fair and data-driven evaluation of damages in legal proceedings.  I understand that recently, a Texas appellate court found using Bitcoin appreciation to be permissible. *Ahlgren v. Ahlgren,* 703 S.W.3d 378 (Tex. App—Corpus Christi 2023), review denied, (Dec. 15, 2023).

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER





CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER





CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER



Redaction

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER



Redaction

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

2.    *Adjustments for Differential Inefficiency in Mining (Time Period 2)*

a.    An event study methodology is a widely used analytical tool in financial and economic research to assess the impact of a specific event on various performance metrics. This method is particularly useful in cases where it is necessary to isolate the effects of an event from broader market trends. In traditional finance, event studies typically examine stock price movements before and after an event to determine whether it has led to abnormal returns (ARs) or cumulative abnormal returns (CARs). However, this methodology extends beyond financial markets and can be effectively applied to operational analyses, including the evaluation of mining efficiency in different geographic locations. Event studies traditionally focus on discrete, well-defined events. However, the methodology can still be applied to analyze market reactions to cumulative or ongoing events, such as regulatory noncompliance or sustained failure to meet industry standards. In the context of crypto mining performance, this is used to compare the operations at Whinstone with SBI's comparable Russian mining operations.

b.    The Peterson (1989) approach follows the standard event study framework, utilizing statistical equations to calculate expected returns, abnormal returns, and significance tests to determine whether an event had a measurable impact. In the context of SBI's comparable Russian mining operations, applying an event study methodology would allow for a quantitative comparison between the operational inefficiencies at the Whinstone facility versus those in Russia. By treating the decision to mine in Whinstone as the event of appreciation, I can analyze deviations from expected mining efficiency, profitability, and downtime, measuring whether the observed performance differed significantly from what would have been anticipated had the machines been located in Russia.

c.    The application of event study methodology in this case is particularly valuable due to the inherent volatility in cryptocurrency mining performance and the operational differences between SBI facilities in Texas (Whinstone) and Russia. Some of the key advantages of using this method for comparative analysis include:

i.    <u>Isolating the impact of different locations</u>. The mining efficiency and cost-effectiveness of machines can be influenced by multiple factors, such as electricity prices, climate conditions, and hosting agreements. By applying event study analysis, it is possible to control for market-wide Bitcoin price fluctuations and focus specifically on differences in operational efficiency between the two locations.

ii.    <u>Assessing abnormal mining returns</u>. Similar to how abnormal returns (ARs) measure the deviation of stock performance from expected values, an event study can calculate abnormal mining efficiency (AMEs) by comparing expected hash rates, power consumption, and operational uptime across locations. This approach enables a direct evaluation of whether Whinstone's inefficiencies resulted in significant underperformance relative to what was expected.

iii.    <u>Measuring cumulative mining losses</u>. Just as cumulative abnormal returns (CARs) aggregate abnormal returns over a defined period, cumulative abnormal mining losses (CAMLs) can be used to assess the total economic impact of

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

operational inefficiencies over time. This helps quantify the financial consequences in terms of lost mining revenue and increased costs.

    iv. <u>Statistical testing for significant differences</u>. Using standard event study statistical tests, it is possible to determine whether the inefficiencies observed at Whinstone were statistically significant or within expected variance. If the SBI Whinstone operation consistently underperforms against the benchmark of SBI Russia's mining performance and conditions, this would provide strong empirical evidence supporting SBI's claims of financial and economic damages.

    d. Below are the key equations:

    i. <u>Estimating Expected Returns</u>. Expected returns are calculated using the market model, which assumes a linear relationship between the stock return and the market return:

$$E(Ri,t)=\alpha i+\beta iRm,t E(R_{i,t}) = \alpha_i + \beta_i R_{m,t} E(Ri,t)=\alpha i+\beta iRm,t$$

- $E(Ri,t)E(R_{i,t})E(Ri,t)$ = Expected return for stock $iii$ at time $ttt$
- $\alpha i\backslash alpha\_i\alpha i$ = Intercept term (firm-specific)
- $\beta i\backslash beta\_i\beta i$ = Market beta of stock $iii$ (sensitivity to market movements)
- $Rm,tR_{m,t}Rm,t$ = Return of the market index at time $ttt$

The parameters $\alpha i\backslash alpha\_i\alpha i$ and $\beta i\backslash beta\_i\beta i$ are estimated using an ordinary least squares (OLS) regression over an estimation window. In this case, I use the monthly data from the SBI Russian miners starting in November of 2019. This data was selected specifically because it excludes the ramp up and wind down periods of the SBI Russian miners. This gives an estimation period that has validity and reliability due to the hashrate and performance being benchmarked against miners in Russia using the same model numbered machines.



CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

ii.    <u>Abnormal Returns (AR)</u>.  Abnormal return is the difference between the **actual** return and the **expected** return:

$$ARi,t=Ri,t-E(Ri,t) AR\_{i,t} = R\_{i,t} - E(R\_{i,t}) ARi,t=Ri,t-E(Ri,t)$$

or, substituting the market model:

$$ARi,t=Ri,t-(\alpha i+\beta iRm,t) AR\_{i,t} = R\_{i,t} - (\alpha_i + \beta_i R\_{m,t}) ARi,t=Ri,t-(\alpha i+\beta iRm,t)$$

- $ARi,t AR\_{i,t} ARi,t$ = Abnormal return of stock $iii$ at time $ttt$
- $Ri,t R\_{i,t} Ri,t$ = Actual return of stock $iii$ at time $ttt$
- $E(Ri,t) E(R\_{i,t}) E(Ri,t)$ = Expected return from the market

| Date | Redacted | Expected (Russia Avg) | Redacted | Redacted |
|---|---|---|---|---|
| Jul-20 | | 111.86 | | |
| Aug-20 | | 111.86 | | |
| Sep-20 | | 111.86 | | |
| Oct-20 | | 111.86 | | |
| Nov-20 | | 111.86 | | |
| Dec-20 | | 111.86 | | |
| Jan-21 | | 111.86 | | |
| Feb-21 | | 111.86 | | |
| Mar-21 | | 111.86 | | |
| Apr-21 | | 111.86 | | |
| May-21 | | 111.86 | | |
| Jun-21 | | 111.86 | | |
| **Mean Abnormal Return** | | -50.74 | | |

iii.    <u>Statistical Analysis</u>.

T-Statistic: -7.47
P-Value: 0.00003

The t-test results indicate a statistically significant difference between the estimated and actual mining performance. With a t-statistic of -7.47 and a p-value of 0.00003, I can conclude that the operational inefficiencies at the Whinstone facility are significantly different from the expected performance benchmarked against the Russian facility's estimated efficiency.  A P-value of 0.00003 indicates strong statistical significance. It means there is only a 0.003% chance that the observed result (or something more extreme) would occur.  This suggests that the effect or relationship being tested is highly unlikely to be due to random chance.

e.    Using event study methodology, ***I find that the Whinstone operations were 50.74% less efficient than mining operations in Russia***.  This

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

is important to note because (1) the hashrate and performance being benchmarked against miners in Russia using the same model numbered machines and (2) the Russian miners were in a 2nd world country, where there is an expectation that energy grids would be less efficient than in the 1st world countries (Ponce-Jara et. Al 2017).

f.      For the months that the Whinstone agreement was operational, an additional 50.74% is added to the total amount mined for the months of July 2020-June of 2021.



Based on these calculations, the negative abnormal return after adjusting for the operational inefficiencies of the Whinstone mining operation total (**$50,563,212.10**)[4] reflecting the price of Bitcoin as of the date of this Initial Report.

g.      This document presents a comparison of mining operational losses in terms of percentage loss and financial impact of the inefficiencies in mining at Whinstone over the period from July 2020 to June 2021. The data highlights the decline in mining performance and its financial consequences.

## E.      Valuation Methods Rejected

1.      *Book Value Method*.  The book value of SBI's Economic Losses as of March 24, 2025, is deemed inapplicable for valuation purposes because the valuation of a

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

financial technology assets is predicated not on the book value of its assets but on the intrinsic value of its coding, blockchain, and intangible assets. Book value, an accounting measure, is calculated by subtracting total liabilities from total assets. However, this measure fails to account for the fair market value of a portfolio's assets and liabilities, as well as the fair market value of any intangible assets. Consequently, it does not provide a reflection of the fair market value as of the valuation date. Therefore, despite considering the book value of SBI's crypto portfolio and compensation, I have determined that it is not a reliable indicator of the business's fair market value as of March 24, 2025 in this matter.

2.    *Liquidation Value Method*.  Liquidation value is the value of the business's assets (minus liabilities) valued as if they were to be sold in an orderly, piecemeal manner. Although I considered the liquidation value of SBI's portfolio, I rejected the method as a indicator of its fair market value as of March 24, 2025 due to my opinion that liquidation value ignores any opportunity costs associated with lost appreciation earning from any sales.  Further, since I understand that the equipment was irreparably damaged due to heat at the Whinstone facility, the net liquidation value of production assets is understood to be negligible.  When time period 2 was examined, a direct liquidation value comparison between Russia and Whinstone was excluded due multiple months of Russian production corresponding to Whinstone output where excluded due to economic sanctions against Russia nearly halting production.

3.    *Adjusted Book Value Method*.    A business's adjusted book value is determined by recalibrating the company's assets and liabilities from their book value to their estimated fair market value as of the valuation date. In the context of a going concern, fair market value typically corresponds to the depreciated replacement cost. As of March 24, 2025, the adjusted book value of SBI's Economic Losses was deemed inapplicable due to the presence of substantial intangible value. Similar to the book value method and the liquidation value method, the adjusted book value method fails to account for the business's earnings capacity. This method is principally employed to value holding companies or businesses devoid of goodwill value. Given that portfolio value is primarily derived from its projected earnings flow, I have rejected the adjusted book value method as a suitable approach for determining the  fair market value.

4.    *Triangulation Method*.  Triangulation methods, which involve comparing a target asset with similar assets to determine its value, are not well-suited for valuing a cryptocurrency portfolio due to several factors. Unlike traditional assets such as stocks or bonds, cryptocurrencies often lack sufficient comparables with similar liquidity, volatility, and usage characteristics. The highly speculative and rapidly evolving nature of the crypto market means that factors affecting one cryptocurrency can differ significantly from those affecting another. Additionally, cryptocurrencies operate in a decentralized and often opaque manner, with many variables like market sentiment, regulatory changes, and technological developments influencing their value unpredictably. These unique characteristics make it challenging to apply traditional triangulation techniques effectively, as it lacks consistent and reliable benchmarks hinders  for valuation.

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

## F.    Optimal Valuation Methods

In determining the fair market value of SBI's Economic Losses as of March 24, 2025, it is my opinion that the primary method to be used is an analysis discounted net cash flows deriving from the percentage gain in Bitcoin since time periods 1 and 2. Time period 3 was calculated using an event study, which allows us to use Russian mining using the same model equipment and its production output against the Whinstone operation. This includes inflows, transactions, trading, and outflows. Using this method is particularly applicable to a high frequency trading of crypto because it provides a way to estimate the present value of the portfolio based on current market values and the transfer of wallets and assets. This method considers the time value of money, risk associated with a crypto portfolio, and provides a clear picture of potential asset transfers, which is crucial for a case and the settling of crypto assets.

## G.    Time Periods and Models Considered

1.    Clause 13.1 of the Hosting Service Agreement provided that "[t]his Agreement shall commence on the Effective Date and shall continue for a period of twenty-four (24) months from the RFU Date ("Initial Term") unless and until terminated in accordance with this Clause 13. This Agreement shall be automatically extended for a period of twenty-four (24) months ("Extended Term") at the end of the Initial Term and at the end of each Extended Term. Notwithstanding above, the Customer can terminate the Agreement at the end of the twelfth month of the Initial Term or during any Extended Term with no penalty by notifying Whinstone in writing sixty (60) days prior to the end of the Agreement." It is my understanding that the life of the machines housed at Whinstone encompass a 4-year life span, which is reflected in the damage modeling.

2.    This valuation employs a structured scenario-based approach to quantify the economic losses sustained by SBI allegedly due to Whinstone's alleged non-performance. The damages analysis spans from December 15, 2019, through March 24, 2025, and includes two primary components: (1) the net profits SBI would have realized from mining additional Bitcoin during this period had Whinstone performed according to contractual obligations, and (2) the associated appreciation in the market value of that foregone Bitcoin that would have been retained.

3.    To provide the most accurate and reliable indication of value, I applied the "but-for" methodology widely used in forensic economic and commercial litigation contexts. This method models a counterfactual scenario, what would have occurred "but for" the breach/fraud and compares it to the actual outcomes. In this case, the counterfactual assumes timely deployment and operation of SBI's mining equipment at Whinstone's Texas facility.

The valuation periods were divided as follows:

- **Period 1: Pre-RFU Period (December 15, 2019 – June 30, 2020)**
  This period reflects the delay between the contractual start date and the "Ready For Use" (RFU) date, which is to be determined by the output of mining. During this time, SBI was unable to mine due to Whinstone's alleged delay. I calculated

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

the Bitcoin SBI would have mined had the RFU occurred on schedule, using historical hashrate output benchmarks and actual BTC block rewards, and priced those coins using historical spot market values on dates of potential sale.

- **Period 2: Operational Period July 1, 2020 to July 31, 2021 (from RFU Date through early termination)**
  As the event study methodology was specified in the prior section, this period reflects actual or partial operation and is excluded from loss estimation to maintain a conservative position. This period directly compares Whinstone mining output to the output of the same model number machines mining in Russia.

- **Period 3: Post-Termination Period (after early contract termination, August 1, 2021 through December 14, 2023)**
  This segment models continued mining operation under the Agreement for at least two years following the RFU date, aligning with standard industry practice and SBI's expectations under the contract. It is my understanding that the RFU date was never fully actualized.  Also, the life of the machines is 4-years, which is reflected in the damage model for this agreement.  Expected output was calculated using estimated miner performance, adjusted for network difficulty, and BTC price appreciation was accounted for to reflect the opportunity cost of not holding or liquidating the mined Bitcoin.

Based on this framework, and using publicly verifiable spot prices for Bitcoin as of **March 24, 2025**, the projected economic losses are as follows:

- **$59,708,082** for Period 1 (foregone profits due to delayed operations prior to the RFU date)
- **$50,563,212.**10 for Period 2 (based on underperformance of mining operations at Whinstone)
- **$65,301,163** for Period 3 (foregone profits and appreciation losses following contract termination)

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER





CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

These estimates are calculated using conservative assumptions and reflect net profits, taking into account reasonable operating costs, power consumption, and standard industry margins for similar mining operations.

## H.    Value Conclusion

The findings of my analysis demonstrate the significant economic damages incurred by SBI are reasonably tied to the facts of the case and to the Plaintiff's allegations of breach of contract and other claims. The evaluation of various scenarios has provided a comprehensive view of the financial implications, and allows for the selection of the appropriate methodology among those accepted in my field.  Based on the information contained in this Initial Report, the fair market value of a 100% appreciation stake in SBI's economic losses as of March 24, 2025, is estimated at **$175,572,457**. This figure includes appreciation lost from the date of loss to present, calculated under a conservative assumption that the life of the machines housed at Whinstone is 4-years.

Key Findings

1.    *Economic Impact*.  Among the core issues alleged by the Plaintiff in this case is the fraudulent inducement, fraudulent concealment, and a failure to adhere to the contractual agreement. Assuming Whinstone is liable, my analysis shows that SBI's expected revenue from continuous operations was severely impacted due to operational inefficiencies resulting in substantial lost net profits.

2.    *Market Consistency and Transaction Validity*.  A thorough review of all transactions since December 2019, confirmed that each transaction was consistent with prevailing market rates for hash rates and comparable transactions. SBI's operations were structured around industry-standard economic principles, ensuring that the financial model used for loss assessment was both valid and reliable. The consistency of SBI's transactions further underscores that the losses were not a result of  unrealistic expectations but were directly tied to the alleged breach of contract and other claims, measured  by comparison to a comparable facility.

3.    *Time Segments Analysis and the Accepted Model*.  The three time periods in this damages analysis were constructed to reflect distinct phases of potential mining activity affected by Whinstone's alleged non-performance. Period 1 (Pre-RFU) spans from December 15, 2019, to the date on which the miners would have been "Ready For Use" (RFU), representing the time SBI lost due to delayed facility readiness; expected mining output during this phase was modeled using historical hashrate performance and Bitcoin market prices. Period 2 (Operational Period) represents the window from the RFU date to the early termination of the Agreement, and although it reflects partial or limited mining activity, it was conservatively excluded from the core damages claim. Period 3 (Post-Termination) begins at contract termination and extends through December 14, 2023, under the assumption that SBI's miners would have continued operating for at least two additional years had the contract remained in effect; this period accounts for both lost mining output and the appreciation of Bitcoin that would have been mined. These

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

periods collectively provide a structured and conservative basis for quantifying SBI's lost economic opportunity.

4.    *Mining Differential Inefficiencies at Whinstone vs. Russia.* Another major component of the total damages stems from the differential inefficiencies in mining operations at the Whinstone facility compared to equivalent mining setups in Russia. Despite utilizing essentially, the same machines, the operational inefficiencies at Whinstone resulted in a loss of **$50,563,212**. The difference in mining output and operational reliability between the two locations further reinforces the claim that SBI suffered financial harm due to circumstances beyond their control, directly tied to the breach of contract and other claims asserted by SBI.

5.    The conclusions drawn from this analysis are based on well-documented financial and operational models, historical market data, industry standards and verifiable contract terms. Damages of **$175,572,457** reflect a fair market valuation of the economic damages suffered by SBI within a reasonable range of certainty. The scenario analysis further reinforces the fairness, relevance and reliability of these calculations, as the methodology  adheres to the contractual terms and industry standards. Furthermore, each transaction reviewed aligns with market norms, further proving that the financial assessment is based on factual economic conditions rather than speculative or inflated projections.

6.    Assuming breach of contract and fraud alleged resulted in financial losses that extend beyond direct economic impact. SBI's ability to operate efficiently, maintain its planned growth trajectory, and scale its mining operations was severely hindered.  My conclusions presented in this Initial Report provide a clear and compelling justification for the calculated damages.

7.    The financial damages suffered by SBI are real, quantifiable economic harms that resulted from the breach of contract and other claims. The inability to fulfill the agreed-upon operational timeframe, combined with the subsequent relocation costs and inefficiencies, had a substantial financial impact. The assessment provided in this Initial Report is based on a rigorous financial analysis, ensuring that the total damages of **$175,572,457** reflect a fair market valuation. The strength of the data and the thoroughness of my analysis provide a robust basis for SBI's claim of lost net profits, demonstrating that the economic damages were are sufficiently tied to  the alleged failure to meet contractual obligations and other claims.

## I.    Certification of Appraiser

I certify that, to the best of my knowledge and belief:

1.    The statements of fact contained in this report are true and correct.

2.    The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions, and conclusions.

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

3.    I have no present or prospective appreciation in the property that is the subject of this report, and I have no personal appreciation or bias with respect to the parties.

## J.    Documents and Data Considered in the Preparation of this Initial Report

1.    The rate of return formula is commonly used in financial calculations and is explained in-depth by Investopedia. Source: Investopedia - Rate of Return

2.    Calculating Bitcoin returns is crucial in legal and tax contexts, as cryptocurrency is treated as property by the IRS, making return calculations important for compliance. Source: IRS - Cryptocurrency Tax Reporting

3.    **M.A. Ponce-Jara, E. Ruiz, R. Gil, E. Sancristóbal, C. Pérez-Molina, M. Castro**, Smart Grid: Assessment of the past and present in developed and developing countries, Energy Strategy Reviews, Volume 18, 2017, Pages 38-52, ISSN 2211-467X, https://doi.org/10.1016/j.esr.2017.09.011.

4.    **Peterson, P. P. (1989).** Event studies: A review of issues and methodology. *Quarterly Journal of Business and Economics, 28*(3), 36–66.

5.    *Ahlgren v. Ahlgren*, 703 S.W.3d 378 (Tex. App—Corpus Christi 2023), review denied, (Dec. 15, 2023).

6.    Rockdale Hosting Service Agreement, Bates-stamped SBIC0003883-3906.

7.    Texas vs Russia Excel spreadsheet, Bates-stamped SBIC00005997.

8.    SBIC's Lost Profit spreadsheet, Bates-stamped SBIC0005882.

9.    SBI Python Code spreadsheet

10.    A list of all other discovery documents, data files, workpapers, calculations, pleadings, professional or academic literature referenced, and external research considered in the preparation of this Initial Report is included at Appendix B.

## K.    Disclosed Excel Spreadsheets including the calculations referred to in this Initial Report

1.    The following Microsoft Excel Worksheets, which contain the calculations of amounts appearing in this report, have been disclosed contemporaneously with this Initial Report and are incorporated herein by reference:

a.    Scenario_alpha Valentine

b.    SBI_Crypto_Calculations

c.    Event_Study_CAR_Calculations

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

**L.     Compensation**

1.     I am being compensation for my work on this Initial Report at the rate of $300 per hour.

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

Appendix A



Randall Valentine, Ph.D.

## Associate Professor of Finance

Graduate Certificate in AI
Wharton College of Business, University of Pennsylvania 2025

Graduate Certificate in FinTech
Wharton College of Business, University of Pennsylvania 2024

Ph.D. in Finance
Mississippi State University

2006

MS in Finance/Statistics
Mississippi State University
2001

BS in Finance
Arkansas State University
1997

Academic

*associate professor finance millsaps college• aug 2024 to present*

*associate professor of practice finance• Texas tech university aug 2021 to aug 2024*

*professor of finance• William carey university • aug 2014 to aug 2021*

*Asst/Associate professor of finance•Georgia southwestern state university•aug 2005 to aug 2014*

professional

*Conference chair • academy of business research • www.aobronline.com*

Co-Chair of the Academy of Business Research since 2004. Currently, ABR has over 1,000 individuals attend its 4 conferences annually with representatives from over 30 countries. ABR publishes 5 journals. ABR has media mentions in several international publications and in the Wall Street Journal.

*Quant Analyst • Handsboro Capital • 2015-2021*

Chief quant analyst for a $50-100 million portfolio consisting of distressed debt/equity investments. This is done in coordination with a group of hedge funds and investment banks.

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

## research

Current research appreciations include recent "A" rated journals in FINTECH and COVID-19

## awards

Finalist for Outstanding Teacher, Rawls College of Business Texas Tech University 2022,2023

Distinguished Research Awards 2008,2013, 2020,2022

## Service highlights

Faculty Advisor Rawls Finance Association (initiated connections and internships with Goldman Sachs, J.P. Morgan, and many others) 2021-Present

Faculty Advisor Business Valuation 2021-Present

Online Instruction Coordinator 2014-2021

Chair IRB 2012-2014

Head of AACSB Committee

Research list—A and A* rated journals (abdc list)

"An Inquiry into FinTech Research: Analysis of Methodologies and Investigative Foci" Journal of Banking and Finance Law and Practice (Z. Jourdan, K. Corley, A. Tran)

"FINTECH:  A Content Analysis of Finance and Information Systems Literature" Electronic Markets, (Volume 33, 2023). (Z. Jourdan, K. Corley, A. Tran)

"Investigating the Relationship of School Reopening to Increases in COVID-19; The Case of the Delta Variant", *Journal of Public Health*, fdaa373, https://doi.org/10.1093/pubmed/fdab373 (Volume 45 Issue 1, 2023).

"Irrational Exuberance or the Money-Trust Power Grab: Was the Panic of 1907 Truly a Speculative Bubble or a Financial Coup D'état? ," Journal of Behavioral Finance, (Volume 24, 2022). (R. Larocca, T. Cunningham)

"Behavioral Predictors of Fraud Motivation within Common and Uncommon Demographic Groups," Journal of Banking Finance Law and Practice, (Vol 31, 2020). (E. Heneke)

"Relationship of 2020 Protests to Increases in COVID-19 Cases Using Event Study Methodology, *Journal of Public Health*, , fdaa127, https://doi.org/10.1093/pubmed/fdaa127 **(Was in Top 5 Most Read/Downloaded Articles in all of PubMed and highest AltMetric of any finance author with 579)**

Research list
"Examining COVID-19 Infection Rates Using Data Analytics: The Case of Lifting Mask Mandates," Journal of Data Analytics, Forthcoming (R. LaRocca)

"Examining the Relationship Between Earnings and Patent Filings Among Pharmaceutical Companies in Asia," International Journal of Economic and Financial Issues, Vol 3 2020 (A. Okun)

"Does Health Locust of Control and Self Efficacy Impact Attitudes Towards Direct to Consumer Advertising in the

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

2007-2010             US," e-<u>Journal of Social and Behavioral Research in Business, Vol 11 Issue 1, 2020</u> (C. Maldanado)

"Online Vs. On Ground:  Academic Honesty in Online Classes," <u>Presented at International Organization of Social Sciences and Behavioral Research Conference 2018</u> (R. Reich, D. Valentine)

"International Currency Exchange Rate and Gasoline Price," <u>Southern Journal of Business and Economics</u>, Spring 2016 (F. Xu and D. Wang).

"The Virtual Professor," <u>Administrative Issues Journal</u>, Fall 2014 (R. Bennett).

"An Examination of Risk Adjusted Returns Caused by Terrorist Attacks," <u>Journal of Insurance Research</u>, Spring 2012 (C. Bishop).

<u>Real Estate Analysis</u>, Spring 2011 (Co-editors Diaz and Hansz).
Personal Finance 1st Edition, Spring 2011 (Co-editors Kapoor, Dahlby, and Hughes).

"Forecasting Economic Data Based on Terrorist Attacks," <u>Journal of the Academy of Financial Management</u>, 2010 (J. Kooti and M. Fahti).

"Management Forecasting and Measuring Accuracy of Forecasting Techniques," <u>International Journal of Business, Marketing, and Decision Sciences</u>, 2010 (M. Fahti and J. Kooti).

<u>The Next Great Depression</u>, Fall 2009.   Was on Best Seller List in Economics/Inflation.

"The Implications of Gramm-Leach-Bliley on the 2008 Economic Downturn," <u>Franklin Business and Law Review</u>, Volume 4, 2008.

"The Bad Neighbor:  A Case Study of State Farm in Hurricane Katrina," <u>Conflict Negotiation and Resolution Journal</u>, Volume 1, 2008 (A.J. Kooti and J. Kooti).

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

"Using the Buffet Model:  The K-Mart Recovery," <u>Journal of Global Education</u>, Volume 1, 2008 (S. Murrie, A.J. Kooti and D. Valentine).

"Identifying Marketing Strategies for a new product; A Case Study," <u>Business Journal for Entrepreneurs</u>, Volume 1, 2008 (D. Valentine).

"Distribution Channels of Online Commodities*,"* <u>Conflict Resolution and Negotiation Journal</u>, Summer, 2007 (B. Kinard).

"The Theory of Efficient Capital Markets...A Review of Literature," <u>Journal of Business for Entrepreneurs</u>, Spring 2007.

"Accreditation and Assessment:  A Provocative Approach," <u>Journal of College Teaching and Learning</u>, Fall 2007 (J. Kooti and D. Valentine).

"Minority Marketing in the Finance Industry," <u>Global Journal for International Financial Analysts</u>, Volume 8, Spring 2007 (J. Kooti and D. Valentine).

"Explaining January Returns: The Santa Clause Hypothesis," <u>Journal of Applied Financial Research</u>, Volume 1, Issue 1 2007 (J. Kooti).

"Workforce Capacity and Employer Satisfaction in Southwest Georgia: A Case Study in Rural Economic Development Needs," <u>Journal of Business for Entrepreneurs</u>, Volume 2006, Issue 1 (J. Kooti).

*"*E-Pricing:  Cruising in the South*,"* <u>Bottom Line</u>, Fall 2006 (D. Valentine, B. Heshizer, and C. Howell).

"November Effect and Tax Loss Selling:  An Empirical Investigation," <u>The Journal of International Business Research,</u> Fall 2006 (J. Kooti).

"Perceptions of a Family-Based Community: Predictors from a Rural Community," <u>Insights to a Changing World</u>, Volume 2005, Issue 4 (J. Kooti and D. Valentine).

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

"The Performance Measure of U.S. and International Mutual Funds Versus the Standard and Poors 500 Index Fund," <u>Journal of International Financial Management</u>, Summer 2005 (B. Hayes).

"Retail vs. Etail, a Look at Expedia.com," <u>Coastal Business Journal,</u> Summer 2005 (D. Valentine and B. Kinard).

"How Groupthink Influenced the Ford/Firestone Fiasco," <u>Ethics and Critical Thinking</u>, Volume 2005, Issue 1 (D. Valentine and N. McMinn).

"The World Series Stock Market Predictor," <u>Journal of Business, Industry, and Economics</u>, Spring 2005 (M. Foster and C. Hopkins).

"Student Attributes and Successful Performance, An Empirical Examination," <u>Insights for a Changing World</u>, Fall 2004 (F. David).

"K Mart: A Roadmap to Bankruptcy," <u>Ethics and Critical Thinking Quarterly Journal</u>, Fall 2004 (R. Schifer).

"Efficient Markets and E-Commerce:  The Hotel Industry," <u>World Sports and Entertainment Journal</u>, Summer 2004 (B. Kinard and R. Schifer).

"The Use of the IRAs in the Teaching of Finance," <u>The American Academy of Financial Management Journal</u>, Volume 5, Summer 2004.

"E-Pricing: The Transportation Market in the South," <u>Business Journal for Entrepreneurs</u>, Volume 2004, Issue 2 (D. Bendall, B. Kinard, and B. Barnes).

"Cheaters Never Win....Or Do They Just Graduate With Honors?" <u>Ethics and Critical Thinking Quarterly Journal</u>, Spring 2004 (F. David and B. Kinard).

"The Internet in the Instruction of Finance," <u>Insights to a Changing World Journal</u>, Volume 2004, Issue 2 (G. de Haas).

"Travel in Arkansas:  The Airline Industry," <u>Arkansas Review of Business and Economics</u>, 2005 (D. Bendall, B. Kinard, and B. Barnes).

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

| testimony | Prior case testimony for the previous 4 years |
|---|---|
| | Waller vs. McNeil 2024, California |
| | Hessam Majd vs. Rekor Inc. 2023, Maryland |
| | Lynd vs. Lynd 2024, Nebraska:  Case Number CI 23-103 |
| | Estate of Mitchell Fox 2024, Michigan Probate Court:  2021-399, 493-DE |
| | Squiri vs. Shultz 2023, Ohio A2300533 |
| | Oliver vs. Independent Bank 2024, Texas C2023162 |
| | Aloke Chadhuri vs. Rekor Inc. 2024, New York |

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

Appendix B

## **LIST OF DOCUMENTS CONSIDERED**

Plaintiffs' Amended Complaint in *SBI Crypto Co., Ltd. v. Whinstone US, Inc.*

WHIN_SBI_0005955 – SBIC's Claim for Damages Letter

Carson Smith's deposition transcript and exhibits

Chuck Byer's draft report dated 3.5.25

SBIC0003883 - 3906 - Rockdale Hosting Agreement

SBIC0003072–3076 – 2 yr Avg Matrix Simulation 6.23.20

SBIC0003076 - Texas Projection 6.24.20 spreadsheet

SBIC0003083-3085 - 2 yr Avg Matrix Simulation 6.10.20

SBIC0003085 - 2 yr Avg Matrix Simulation 6.23.20 spreadsheet

SBIC0003254-55 - Early Termination Options

SBIC0005816 – Profit Loss with Tx Fee Rewards dated 7.23.24 spreadsheet

SBIC0005882 – Profit Loss with Tx Fee Rewards dated 8.8.24 spreadsheet

SBIC0005817-5825 - SBIC Financials dated 3.31.20 – 3.31.24

SBIC0005937 - Whinstone-Mining-PNL spreadsheet

SBIC0003076 - Texas Projection 6.24.20 spreadsheet

SBIC0005997 - Russian vs. Texas spreadsheet

SBIC0005938-6044 – documents pertaining to SBIC's Russian operations

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| SBI CRYPTO CO., LTD., | |
| Plaintiff, | Civil Action No. 6:23-cv-00252-ADA-DTG |
| v. | |
| WHINSTONE US, INC., | |
| Defendant. | |

**ORDER GRANTING DEFENDANT'S UNOPPOSED MOTION FOR LEAVE TO FILE UNDER SEAL**

Before the Court is Defendant's Unopposed Motion for Leave to File Under Seal. The Court has considered this motion and finds that it should be, and is hereby GRANTED.

The Clerk is hereby directed to file the "Sensitive Documents," which are attached as Exhibits 1-3 to Whinstone's Emergency Motion to Strike Plaintiff SBI Crypto Co., Ltd.'s Untimely "Supplemental" Expert Reports and Undisclosed Expert, under seal until further order from the Court.

SIGNED ON THIS _____ day of _____, 2025.

_____
DEREK T. GILLILAND
UNITED STATES MAGISTRATE JUDGE
WESTERN DISTRICT OF TEXAS