# EXHIBIT 3

Initial:

# Hosting Service Agreement

This Hosting Service Agreement ("Agreement") shall be effective upon the date of receipt of the electronic signature by Whinstone US, Inc.

BY AND BETWEEN

Whinstone US, Inc., a company having its registered office located at 4304 Firestone Road, Metairie, LA 70001 ("Whinstone")

AND

SBI Crypto Co., Ltd., a registered company in Tokyo, Japan located at 1-6-1 Roppongi, Minato-ku, Tokyo, Japan, ("Customer"),

Whinstone and the Customer are referred to individually as "Party" and collectively as "Parties".

WHEREAS

    (A)    The Parties entered into an agreement for Whinstone to provide, and the Customer to purchase, services to host, provide electrical power and ventilation, and maintain the Customer's cryptocurrency mining equipment at its Data Center on 10 July 2019; and

    (B)    The Parties want to continue that arrangement under modified terms.

NOW THEREFORE, the parties hereby agree as follows:

## 1.   DEFINITIONS

1.1.   In this Agreement the following words and expressions shall have the meanings set out below. Additional terms may be defined in the context of particular provisions of this Agreement:

"**AUP**" or "**Acceptable Usage Policy**" means Whinstone Acceptable Usage Policy from time to time which, at the date of this Agreement, is set out in Schedule to this Agreement;

"**Advanced Remote Hands Service**" means repair and maintenance services that require taking Customer Equipment off rack as detailed in Clause 2.4 below;

"**Basic Remote Hands Service**" means repair and maintenance services performed without taking Customer Equipment off rack as detailed in Clause 2.3 below;

"**Business Day**" means a day which is not a Saturday, Sunday or a public holiday in United States or Japan;

"**Change of Control**" means the sale of all or substantially all the assets of a Party; any merger, consolidation or acquisition of a Party with, by or into another corporation, entity or person; or any change in the ownership of more than fifty percent (50%) of the voting capital stock of a Party in one or more related transactions;

"**Confidential Information**" means the terms of this Agreement and all information whether in written or any other form which has been or may be disclosed in the course of the

1



CONFIDENTIAL

SBIC0003883

Initial: ⟋

discussions leading up to the entering into or performance of this Agreement and which is identified as confidential or is clearly by its nature confidential including information relating to this Agreement or the Services, data used or generated in the provision of the Services, or any of Customer's products, operations, processes, plans or intentions, know-how, trade secrets, market opportunities, customers and business affairs;

"**Customer Equipment**" means the Customer equipment installed in the Licensed Area;

"**Data Center**" means the Whinstone leased site located at the former Alcoa Rockdale Energy Sandow Mine facility in Rockdale, Texas; located on FM 1736, Rockdale, TX 76567;

"**Data Center Rules**" means the rules applying to the Customer's use of the Data Center;

"**Data Protection Laws**" means the laws and regulations governing the use of personal data;

"**Defaulting Party**" means the Party that is in default of its obligations under this Agreement;

"**Extended Term**" shall have the meaning set out in Clause 13.1 below;

"**Force Majeure**" means any event beyond the reasonable control of either or both of the parties including but without limitation to war, civil war, armed conflict or acts of terrorism or a public enemy or other catastrophes, riot, civil commotion, malicious damage, compliance with any law or governmental order, rule or regulation or direction coming into force after the date of this Agreement, epidemics, pressure waves caused by devices traveling at supersonic speeds, nuclear accident, and acts of God and strikes, slowdowns, lockouts or other labor stoppages excluding employee(s) of Whinstone affecting third parties which in each case causes either party to be unable to comply with all or a material part of its obligations under this Agreement;

"**Hosting Service**" means service providing electrical power and ventilation to the Customer Equipment as detailed in Clause 2.2 below;

"**Initial Term**" shall have the meaning set out in Clause 13.1 below;

"**Intellectual Property**" means all intellectual property, including patents, utility models, trade and service marks, trade names, domain names, rights in designs, copyrights, moral rights, topography rights, rights in databases, trade secrets and know-how, in all cases whether or not registered or registrable and including registrations and applications for registration of any of these and rights to apply for the same, rights to receive equitable remuneration in respect of any of these and all rights and forms of protection of a similar nature or having equivalent or similar effect to any of these anywhere in the world;

"**IP Connection Service**" means the connection to the Customer Equipment permitting communication with the Internet as specified in the Service Details;

"**Licensed Area**" means the floor area for operating or storing Customer Equipment

"**Maintenance**" means any work carried out by Whinstone in order to upgrade, improve or maintain the Service including any modification, change, addition or replacement which does not detract from, reduce or impair the overall quality or performance of the Service;

2

SBIC0003884

Initial: 

"**Miners**" means cryptocurrency mining machines, which are part of the Customer Equipment that connect using the IP Connection Service and send computation results to the Mining Pool;

"**Mining Pool**" is the pooling of resources by Miners, who share their processing power over a network, to split the reward equally, according to the amount of work they contributed to the probability of finding a block;

"**Party**" means Whinstone and the Customer (as the case may be) and shall include their permitted assignees and "**Parties**" shall mean both of them;

"**Personal Data**" shall have the meaning as defined under the Data Protection Laws;

"**RFU Date**" means the Ready For Use Date, which is the date Whinstone will fully provide the Customer the Services under Clause 3.13.1;

"**Representatives**" means, in relation to any party, its officers, employees and agents;

"**Scheduled Maintenance**" means Maintenance that is: (i) carried out between the hours of 12:00 am to 6:00 am; and (ii) notified to the Customer at least five (5) Business Days in advance;

"**Service Details**" means service details in the format provided by Whinstone pursuant to which the Customer may request Services;

"**Services**" collectively means Hosting Service, Basic Remote Hands Service, and Advanced Remote Hands Service;

"**Specified Power Draw**" shall have the meaning set out in Clause 3.13 below; and

"**Whinstone Equipment**" means any equipment which is supplied by or on behalf of Whinstone to the Customer for the purpose of providing the Services and includes any equipment specified in Service Details.

1.2.    In the event of any conflict between any of the documents referred to in this Clause 1.2, they shall be given the following order of priority:

1.2.1.    the terms of the relevant Service Details;

1.2.2.    the terms set out in this Agreement; and

1.2.3.    the terms set out in the AUP.

1.3.    In the Agreement:

1.3.1.    references to Clauses, paragraphs and sub paragraphs are references to clauses, paragraphs, sub- paragraphs of or to this Agreement;

1.3.2.    the headings contained in this Agreement are for convenience only and shall not influence the interpretation of this Agreement;

1.3.3.    any reference to a statute, statutory provision, subordinate legislation, code or guideline ("legislation") is a reference to such legislation as amended and in force

3

SBIC0003885

Initial: 

from time to time and to any legislation which re-enacts or consolidates (with or without modification) any such legislation.

1.4.  Whinstone and the Customer each represents and warrants to each other that it has the power to enter into, exercise its rights under and perform and comply with its obligations under this Agreement and all actions, conditions and things required to be taken, fulfilled and done by it to so enter into, exercise its rights under and perform and comply with its obligations under this Agreement and ensure that those obligations are valid, legally binding and enforceable have been taken, fulfilled and done.

## 2.    SERVICE DESCRIPTION

2.1.  Data Center Facilities

2.1.1.  Whinstone will provide an installation environment for the Customer Equipment including, but not limited to, the Licensed Area in two buildings, rack systems, electricity supply (including PDU), transforming equipment, free air cooling (including evaporative-cooling), smoke detection, IP Connection Service and physical security. Physical security includes 24-hour patrol, camera security, and a fence around the Licensed Area.

2.1.2.  Whinstone shall grant the Customer, free of charge, escorted access to the Data Center for equipment inspections, installation, removal, additions, subtractions or physical maintenance by prior appointment.

2.1.3.  With written prior consent of the Customer, Whinstone may relocate the Customer Equipment within the Data Center or to another facility operated by Whinstone provided that there are no changes to the terms of this Agreement. Any such relocation of the Customer Equipment will be carried out by Whinstone. Any costs incurred in relation to such relocation will be borne by Whinstone. The Customer shall reserve the right to inspect the new facility beforehand.

2.1.4.  When the Customer visits the Data Center or accesses the Data Center network remotely the Customer shall at all times comply with the Data Center Rules that have been provided to the Customer in advance; provided, however, that the Customer shall only be obligated to comply with such Data Center Rules to the extent that they are reasonable. Whinstone shall provide the Customer a copy of the Data Center Rules and shall send a new copy if there are any changes made therein.

2.1.5.  Whinstone represents and warrants that building or other permits, city inspection, or certification is not required with regard to providing services under this Agreement.

2.2.  Overview of Hosting Service

Whinstone shall be responsible for the following:

2.2.1.  License of the Licensed Area.

2.2.2.  Provision of the cabling for a connection to the IP Connection Service by way of a CAT 5e Ethernet cable.

4

**SBIC0003886**

Initial: _____

2.2.3. Escorted access by the Customer's employees to the Customer Equipment at any time from 10 am to 5 pm Monday through Friday.

2.2.4. Monitored alarm and security call out service.

2.2.5. Physical Security: The facility will be surrounded by fence and monitored by security cameras. Whinstone shall implement Access control policies to ensure non-authorized persons are not able to enter the facility. Armed personnel will be onsite at all times.

2.2.6. IT Security: Whinstone will install a firewall and implement an IT security policy to prevent unauthorized access physically or remotely, viruses and ransomware.

2.2.7. Fire detection and alarm system.

2.2.8. Equipment parts storage and inventory management.

2.2.9. Acceptance of delivery of the Customer Equipment between 10:00 am to 4:00 pm on Business Days, subject to two (2) Business Days' notice to Whinstone, to be stored prior to installation.

2.2.10. Whinstone will be solely responsible for handling any complaints from third parties with respect to the noise from the Customer Equipment and shall hold the Customer harmless from any responsibility or costs arising out of or in relation to such complaints.

2.2.11. Whinstone will install all customer equipment on the Data Center racks, provide power and internet connection within thirty (30) days of RFU Date. Installation includes unpacking, assembly and installation, LAN cable and power connection, initial setting, and garbage disposal.

2.2.12. Whinstone will provide stable power supply to the Customer's equipment at 240V. The manufacturer specifications for turbo-mode power consumption of the equipment is 2.361 kW. The equipment's power consumption may be adjusted by following instructions from the manufacturer. Whinstone will comply with any request from the Customer to adjust the power consumption if the total power consumption of all Customer equipment does not exceed the Specified Power Draw, or fall below eighty percent (80%) of the Specified Power Draw, unless both Parties mutually agree to do so.

2.2.13. Whinstone will follow the Service Level Agreement in Clause 4 and make its best efforts to ensure:

   i.    Average air intake temperature into the Customer's miners is not greater than twenty-nine (29) degrees Celsius by maintaining sufficient airflow, preventing mixing of cool and hot exhaust air from the equipment in the Data Center, and using evaporative cooling;

   ii.   Filters are used in the air intake system of the Data Center facility, and the air inside the Data Center is free of dust, insects, corrosion, precipitation and condensation.

5

SBIC0003887

Initial: ⟋

iii.   Dust or trash particles do not collect inside the Customer equipment.

iv.   Intake and exhaust fans are free of obstruction or debris.

2.2.14.  Whinstone will label all the Customer Equipment, cables, replacement parts to track inventory, replacement parts, and to make Basic Remote Hand Service the most efficient.

i.   Whinstone will reference miners with a unique identifiable identification number when giving reports to the Customer;

ii.   For equipment other than miners which may not have a unique ID number, Whinstone will properly label and store the equipment separate from other customers in the Data Center.

2.2.15.  Whinstone will provide monthly reports to the Customer. These reports shall contain a summary of metrics gathered from Whinstone's monitoring system, summary of equipment maintenance queue, and stock numbers of all Customer equipment, monthly power draw as measured from power consumption meters.

2.2.16.  In pursuance of Clause 2.2.6, Whinstone will provide Basic Remote Hands Service at no extra charge as outlined in Clause 2.3.1, and will offer Advanced Remoted Hands Service for additional cost as outline in Clause 2.3.2.

2.2.17  Customer may inspect the site before shipping its equipment and supplies to bring the Customers miners online.  Upon completion of the inspection, the Customer may reduce the Specified Power Draw cited in Clause 3.13.1 if the site does not meet Customer's expectations, and reduce the Advanced Remote Hands Service fee by the same proportionate amount as the reduction of Specified Power Draw.

2.3.   Basic Remote Hands Service

2.3.1.   Basic Remote Hands Service is available twenty-four (24) hours a day, seven (7) days a week. Where requested by the Customer, Whinstone staff shall be available to perform the following tasks only on the instructions of the Customer in respect of the Customer Equipment:

i.   Remote monitoring of equipment performance and status;

ii.   Remote fault diagnosis;

iii.   Pushing a button;

iv.   Switching a toggle;

v.   Power cycling (turning on/off) the Customer Equipment;

vi.   Re-setting, rebooting the Customer Equipment;

vii.   Securing cabling to connections;

viii.   Observing, describing and/or reporting to the Customer indicator lights or display information on machines or consoles;

6

SBIC0003888

Initial: _____

    ix.    Cable organization;

    x.    Modifying basic cable layout, labelling and/or re-labelling of the Customer Equipment;

    xi.    Cable patching;

    xii.    Checking alarms for faults; and/or

    xiii.    Inserting/removing discs or equivalent storage devices into/ from the Customer Equipment.

2.4.    Advance Remote Hands Service

    2.4.1.    The following Advanced Remote Hands Services, are not included in the Basic Remote Hands Service, but may be provided by Whinstone to the Customer on a best effort basis pursuant to the prior agreement between the parties. Unless explicitly expressed in Clause 2.3.1, in cases of ambiguity between Advanced Remote Hands Services and Basic Remote Hands Services, Advanced Remote Hands Services shall come into effect if the Customer Equipment must be taken off the rack:

        i.    Installing applications or software to the Customer Equipment;

        ii.    Uploading of data to the Customer Equipment;

        iii.    Configuring the Customer Equipment operating system;

        iv.    Configuring any software or applications on the Customer Equipment;

        v.    Customer Equipment component fault diagnosis;

        vi.    Software component fault diagnosis;

        vii.    Rectifying problems caused by the Customer Equipment or software;

        viii.    Rectifying problems caused by the Customer; or

        ix.    Any service whatsoever requiring the opening of the outer casing of any of the Customer Equipment.

    2.4.2.    Communication for Advance Remote Hands Service shall be done via email or Whinstone's ticketing system. Whinstone will follow the Service Level Agreement as well as the work schedule specified in Clause 4.

    2.4.3.    Advanced Remote Hands Service shall be provided by Whinstone to the Customer from the time Customer Equipment is being installed for a fixed monthly charge as detailed in Clause 3.12, separately from Hosting Fees which includes only the Basic Remote Hands Service.

## 3.    CHARGES AND PAYMENTS

3.1.    In consideration of the provision of the Services, the Customer shall pay charges in accordance with this Clause 3.

CONFIDENTIAL        SBIC0003889

Initial: ⟋

3.2. Whinstone shall issue a monthly invoice to the Customer no later than the tenth day of the following month containing all charges and fees for providing the Services under this Agreement, including the Hosting Fees prepayment under Clause 3.11.2. The Customer shall pay the undisputed amounts of such invoice no later than the last day of the month in which the Customer receives it.

3.3. If the Customer requests Whinstone to provide any services other than contemplated in this Agreement, Whinstone shall be entitled to invoice the Customer for any and all changes to such services pursuant to the agreement between the parties.

3.4. If the either Party fails to pay any amount owed under this Agreement by the dates set forth herein:

    3.4.1. The Party to receive payment shall be entitled but not obliged to charge the Customer interest five percent (5%) per year on the overdue amount commencing three (3) business days after the due date up to the date of actual payment.

    3.4.2. Actual power consumption is measured at the end of each month, and a credit or debit is applied toward the next hosting fee prepayment invoice. If the credit or debit is not paid or applied on that invoice, the Party to receive payment shall be entitled but not obliged to charge the other Party interest five percent (5%) per year on the overdue amount commencing three (3) business days after the due date of the invoice to the date of actual payment.

3.5. All charges and payments referred to in this Agreement are inclusive of value-added or sales tax (if applicable) and all similar taxes and duties payable in respect of such payments. To the extent that additional tax is properly chargeable to the Customer, the Customer shall pay at the by the end of the month following the date the invoice was received by the Customer.

3.6. All amounts due under this Agreement shall be paid in accordance with all work performed and services provided. In the event that the parties change the scope of the Services, Whinstone and the Customer will agree on all billing changes and handle each credit or debit once there is a mutual agreed amount.

3.7. In the event of any failure by the either Party to make full payment to other Party of any and all amounts due to pursuant to this Agreement, the Party owing payment shall be responsible for all costs and expenses (including legal fees) which the other party reasonably incurs in collecting such amounts.

3.8. The Parties may combine charges and invoices and offset any amounts owed to the other Party.

3.9. Security Deposit

    3.9.1. The Customer will pay a security deposit of ▮▮▮▮▮▮▮▮▮▮▮▮ by October 31, 2019 into a third-party escrow account mutually agreed upon by both Parties. Both Parties shall equally bear escrow costs and fees therein. The escrow fund must pay interest on security deposit at a commercially reasonable rate. All interest earned on the funds in the escrow account shall remain with the Customer.

8

SBIC0003890

Initial: ⟋

3.9.2. The Customer may repossess the security deposit in full upon termination of the contract.

3.9.3. Whinstone shall notify the Customer of delinquent payments. If not cured within seven (7) business days, Whinstone may withdraw the delinquent amount from the security deposit upon notification to the Customer.

3.9.4. Neither party shall withdraw for any other reason from the escrow account without mutual consent of the Parties.

3.10.   Installation Fees

3.10.1. The Customer shall pay an installation fee of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ per miner for installation service and initial configuration. Fifty percent (50%) is due before installation begins, fifty percent (50%) is due after installation is complete.

3.10.2. Installation is considered complete when the miner is seen remotely connecting to the Mining Pool and sending computation. In cases of faulty equipment, installation will be considered complete when Whinstone diagnoses the fault, sends a report to the Customer, and completes installation of alternative equipment.

3.10.3. If Whinstone fails to install the Customer equipment within thirty (30) days of the RFU Date, the Whinstone shall pay the Customer ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ miner installed after thirty (30) days past the RFU date.

3.11.   Hosting Fees

3.11.1. The Hosting Fees cover all services and items specified in this Agreement except for Installation Fees in Clause 3.10 and Advanced Remote Hands Service in Clause 3.12 and is calculated based on the power consumption of the Customer's equipment and shall not include Whinstone's own equipment (PUE) or the equipment of Whinstone's other customers. The Hosting Fee rate shall be ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ per kilowatt-hour (▮▮▮▮▮▮) ("Hosting Fee Rate"). Whinstone will install power consumption meters between the breaker panel and the server racks holding the Customer's equipment.

3.11.2. Hosting Fee prepayments will be invoiced sixty (60) days in advance according to forecasted power consumption for the number of days in the applicable billing month. Actual power consumption for all billing months will be measured from the power consumption meters at the end of each month and adjustments for actual power not consumed or overconsumed will be made as a credit or debit on the next invoice. Whinstone shall provide Customer with relevant payment details, such as the destination bank account and other relevant information, and keep the Customer updated from time to time.

3.11.3. Forecasted usage for the first two months after the RFU date for 20,000 machines will be calculated using ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ From the third billing month of the initial contract term, Whinstone will invoice an average consumption rate for the Hosting Fee prepayment.

9

SBIC0003891

Initial: _____

3.11.4. Whinstone shall **deduct** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮ each month during the Initial Term for twenty-four (24) consecutive
months from any invoiced Hosting Fee prepayments in 3.11.3 above.

3.12.  Advanced Remote Hands Service Fee

3.12.1. Whinstone will invoice the Customer a fixed monthly fee of ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮ for the Advanced Remote Hands Services
based on a scale of 20,000 Miners. If Whinstone provides the service for less than
20,000 Miners, this fee will be reduced by a proportionate amount. Whinstone will
invoice Advanced Remote Hands Services together with the Hosting Fees and the
applicable period for services rendered shall be the same month as the Hosting Fees
unless otherwise specified.

3.12.2. Whinstone will adhere to all sections of the Service Level Agreement in Clause 4 as
well as those specifically detailed for the Advanced Remote Hands Service.

3.13.  Specified Power Draw

3.13.1. Whinstone will provide the Customer with at least five (5) MW of power available
for the Services by October 31, 2019, and at least fifty (50) MW ("Specified Power
Draw") for the Customer equipment by 15 December 2019. As a minimum
commitment from the RFU date, regardless of power consumption, the Customer
shall pay for Hosting Fees for greater than or equal to eighty percent (80%) of the
Specified Power Draw at the rate specified in Clause 3.11.1. As an example only and
not intended by the parties to change the above provision:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3.13.2. If the Customer uses less than two percent (2%) over and above the Specified Power
Draw, the Customer will be charged for additional usage at the Hosting Fee Rate. The
Customer acknowledges and understands that Whinstone cannot provide more than
two percent (2%) over the Specified Power Draw. If Customer wants to use a power
draw for more than two percent (2%) over and above the Specified Power Draw, the
Parties must first enter into a separate written agreement, under which Whinstone
shall offer the Customer the Hosting Fee Rate for two (2) years.

3.13.3. If Whinstone determines that the over-usage of power cannot be reasonably permitted,
Whinstone reserves the right to require the Customer to remove or deactivate
sufficient Customer Equipment to prevent such over-usage within twenty-four (24)
hours of notification, which will describe in detail the reasons for the removal or
deactivation. Whinstone shall consult with the Customer in good faith before
determine to remove or deactivate.

3.14.  One-time Prepayment

3.14.1. The Customer will pay a one-time prepayment of ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ by October 31, 2019.
Whinstone shall use that prepayment to provide the Services ("One-time
Prepayment").

10

Initial: _____

3.14.2. If this Agreement is terminated by Whinstone during the Initial Term, if the Customer terminates the Agreement because Whinstone is a Defaulting Party during the Initial Term, or if this Agreement is terminated due to a Change of Control, Whinstone shall return a portion of One-time Prepayment amount as calculated based on the differential between ▉▉▉▉ /kWh less Hosting Rate and # of months from RFU to date of termination x ▉▉▉▉



3.14.3 Whinstone shall return said amount to the Customer within thirty (30) days of termination of the Agreement, unless otherwise agreed upon by both Parties.

## 4.    OPERATIONS AND SERVICE LEVEL AGREEMENT ("SLA")

4.1.    Whinstone reserves the right to vary the technical specifications of the Services where necessary for operational reasons and without detracting from, reducing or impairing the overall quality or performance of the Services, after giving reasonable written notice to the Customer (except in the case of an emergency where notice is not possible; provided, however, that in such case, Whinstone shall provide notice to the Customer then as soon as reasonably possible).

11

Initial: ✍

4.2.    Without prejudice to Clause 4.1, Whinstone reserves the right to, after providing the Customer with reasonable advanced written notice (provided, however, that in the event of an emergency, as soon as reasonably possible) at any time to make any change, addition to or replacement of any part of the Services where this is required to conform with any applicable safety, statutory or legal requirement, provided that this does not detract from, reduce or impair the overall quality or performance of the Services.

4.3.    The Customer may report any claims including failures of performance of the Services by Whinstone to the Whinstone support center at any time. Whinstone shall take all actions necessary to remedy such failures as soon as possible.

4.4.    Interface or access to inventory, monitoring and Hashtrend software is provided to the Customer at no additional charge.

4.5.    Uptime Guarantee

    4.5.1.    Whinstone guarantees an uptime percentage (percentage of time to maintain uninterrupted performance of the total Customer Equipment) of ninety-eight point thirty-five percent (98.35%) and no more than six (6) days of planned downtime due to loss of power, construction, or network outage.

    4.5.2.    Whinstone will give at least twenty-four (24) hours advance notice to the Customer via email before any Data Center downtime, or any downtime affecting more than one hundred (100) machines at one time.

    4.5.3.    If any unplanned event causes more than ten percent (10%) of equipment to go offline, Whinstone will acknowledge the alert within 1 hour and report immediately to the Customer. Whinstone will attempt to begin remedy of the issue within one (1) hour of alert acknowledgement and shall provide a full incident report within five (5) business days of alert acknowledgement to the Customer.

4.6.    Performance Guarantee

    4.6.1.    Whinstone will perform maintenance and repairs to ensure total daily average hashrate of all machines does not fall by more than five percent (5%) below the Customer Equipment manufacturer's specified range.

    4.6.2.    If total hourly average hashrate of all Customer Equipment falls more than ten percent (10%) compared to the previous hour, Whinstone will respond to the incident within one (1) hour and provide a full incident report within five (5) business days of the incident to the Customer.

    4.6.3.    Whinstone will make best effort to employ a monitoring system to monitor uptime, performance and other machine metrics.

    4.6.4.    Whinstone shall maintain average hashrate over all Customer Equipment within the tolerance range of the equipment manufacturer's specifications.

    4.6.5.    Whinstone shall acknowledge alerts from its monitoring system within thirty (30) minutes, and respond within one (1) hour. If the problem cannot be corrected, the

12

Initial: 

equipment will be place in a maintenance queue and reported to the Customer by the next business day.

4.6.6.   Whinstone will reply to notices from the Customer on the same business day.

4.6.7.   Whinstone shall maintain an intake temperature of less than twenty nine point five (29.5) degrees Celsius. If any machines are overheating, Whinstone shall turn them off as soon as possible and report the issue to the Customer.

4.7.   Advanced Remote Hands Service

4.7.1.   Whinstone will provide Advanced Remote Hands Service from 9 am to 9 pm, seven (7) days a week. This service includes repairs, unracking/racking units, and replacement of parts such as hashboards, fans, controller boards.

4.7.2.   If the hourly hashrate performance of a single miner drops more than ten percent (10%), Whinstone will respond within thirty (30) minutes, and attempt to repair or replace faulty parts and components within 1 hour. If the issue cannot be resolved within one (1) hour, Whinstone will place the equipment into a maintenance repair queue.

4.7.3.   Whinstone shall reduce the maintenance repair queue at all times it is not responding to any incidents.

## 5.   WHITELABELING OF SERVICES

5.1.   The Customer may white label the Services and arrangements under this Agreement on a back-to-back basis to specifically named third parties upon thirty-day notification to Whinstone, and Whinstone shall accept such execution of this right provided there are no changes to the terms of this Agreement. Any requested changes to warranties, representations, obligations, or service levels to be provided by Whinstone shall be negotiated in good faith by the Parties. Unless prior arrangement is made, the Customer shall be responsible for billing and collection associated with any white label offering.

## 6.   OWNERSHIP AND INTELLECTUAL PROPERTY

6.1.   The Parties acknowledge and agree that the Customer Equipment is the sole property of the Customer. In no event shall Whinstone claim ownership of any of the equipment.

6.2.   The Parties acknowledge and agree that any outcomes or productivities, including but not limited to, block chains, hash and digital currencies, generated from the operation of the equipment are the sole property of the Customer. In no event shall Whinstone claim the ownership of any of such outcomes or productivities.

6.3.   Whinstone shall not sell or create any mortgage, lien, or any kind of encumbrance on the Customer Equipment, the Intellectual Property, or any outcomes or productivities owned by the Customer.

6.4.   The Customer will have a non-transferable license to use any IP address allocated by Whinstone to the Customer for the duration of this Agreement. If this Agreement is

13

Initial: _____

terminated for any reason, the Customer's license to use the IP address shall automatically terminate.

6.5.   Customer owns any Developed IP. "**Developed IP**" means any intellectual property other than Background IP created or discovered by the parties in connection with this Agreement, including without limitation any reports Whinstone provides to Customer. "**Background IP**" means all intellectual property owned or licensed by a party before starting services under this Agreement or independent of services under this Agreement. The Developed IP is a work made for hire to the extent permitted by applicable law, and Customer retains all intellectual property rights in the Developed IP. To the extent that Contractor or its personnel own any rights in the Developed IP, Contractor assigns, or will procure the assignment of, all rights, title, and interest in the Developed IP to Customer. If applicable law prevents future assignments, Contractor will assign, or will procure the assignment of, such rights as these are created. If applicable law prevents Contractor from transferring ownership of any Developed IP to Customer, Contractor grants Customer a perpetual, irrevocable, exclusive, royalty-free, fully-paid, transferable, worldwide license, with the right to sublicense, to: (1) reproduce, prepare derivative works of, distribute, publicly perform, publicly display, and otherwise use such Developed IP; and (2) make, use, sell, offer for sale, import, export any component of, and otherwise dispose of such Developed IP. This agreement does not transfer any rights associated with Background IP, which will remain vested with their owners.

6.6   Whinstone will defend Customer and its affiliates, and indemnify them against liabilities in any third-party legal proceeding to the extent arising from an unaffiliated third party's allegation that Customer or its affiliate's use of the Services or any deliverable under this Agreement from Whinstone infringes or misappropriates the third party's Intellectual Property Rights.

## 7.   CONFIDENTIALITY

7.1.   The parties agree that Confidential Information:

7.1.1.   shall be used solely for the purpose for which it was furnished in connection with performance of this Agreement;

7.1.2.   shall be maintained in strict confidence and shall not be disclosed to third parties, provided, however, that Whinstone and the Customer may disclose Confidential Information to its affiliates and sub-contractors and their respective employees who need to have access to such Confidential Information for the purposes of providing the Services on the condition that Whinstone and the Customer shall procure compliance by such sub-contractors or affiliates and their respective employees with the terms of this Clause 7; provided, however, that Whinstone and the Customer shall be responsible for any breach of the obligations set forth in this Clause 7 by such sub-contractors or affiliates and their respective employees; and

7.1.3.   upon termination of this Agreement shall be returned to the disclosing party, together with all copies, or (at the disclosing party's option) destroyed.

7.2.   Any disclosure of Confidential Information permitted under Clause 7.1.2 shall be in confidence, and only be to the extent that any persons to whom the information is disclosed

14

Initial: ⟋

need to know the same for the performance of their duties and the receiving party shall be obliged to procure that all such persons are aware of the obligation of confidentiality and undertake to comply with it.

7.3.   The obligations of confidentiality and restricted use set out in Clauses 7.1 and 7.2 are not applicable to Confidential Information that:

7.3.1.   was previously or becomes known to the receiving party, free from any obligation to keep the same confidential (provided that Confidential Information disclosed in contemplation of the provision of the Services shall still remain subject to such obligations);

7.3.2.   is or becomes generally available to the public, other than as a direct or indirect result of unauthorized disclosure by the receiving party, its affiliates or a person engaged by the receiving party or its affiliates contrary to their respective obligations of confidentiality;

7.3.3.   is shown to have been independently developed by the receiving party, its officers, employees, agents or contractors;

7.3.4.   the parties agree in writing that it need not be kept confidential; or

7.3.5.   is required to be disclosed by law or by regulation or by the order of any governmental authority or court provided that, to the extent permitted by law, prior to any disclosure, the receiving party notifies the disclosing party of the information to be disclosed and the circumstances in which the disclosure is alleged to be required as early as reasonably possible before such disclosure must be made and, at the disclosing party's request and cost, assists the disclosing party in avoiding or limiting any such disclosure.

7.4.   Without prejudice to any other rights and remedies that the disclosing party may have, the receiving party agrees that if Confidential Information is used or disclosed or threatened to be used or disclosed other than in accordance with the terms of this Agreement, the disclosing party shall, without proof of special damage, be entitled to seek an injunction, specific performance or other equitable relief for any actual or threatened breach of this Clause 7.

7.5.   Notwithstanding Clause 7.1, Whinstone will request in writing to the Customer and request the customer to participate in its advertising and/or promotional literature and other materials. The Customer has the right to opt out of any and all advertising requests.

7.6.   In order for Whinstone to provide the Services, the Customer will need to supply certain information or data. Where such information or data constitutes Personal Data, Whinstone will comply with the Data Protection Laws. The parties shall duly observe and comply with all their obligations under the Data Protection Laws in relation to any Personal Data processed in connection with this Agreement and shall render such assistance and cooperation as is reasonably necessary or reasonably requested by the other party in respect thereto.

7.7.   It shall be the Customer's responsibility to keep any Personal Data provided to Whinstone up to date and the Customer warrants and undertakes to Whinstone that all of its Personal Data and contact details are accurate and complete.

15

Initial: ⟋

7.8.    Whinstone may pass the Customer's Personal Data to Whinstone affiliates and to any third-party suppliers Whinstone may use to provide services that involve processing data on Whinstone's behalf for the purpose of providing the Services and as contemplated by the terms of this Agreement; provided, however, that Whinstone shall be responsible for any breach of the obligations set forth in this Clause 7 by such affiliates and third party suppliers.

## 8.    LIABILITY, REPRENSATIONS, WARRANTIES, AND IDEMNIFICATIONS

8.1.    Both Parties represent and warrant that they have the right and capacity to enter into this Agreement and fully perform their respective obligations hereunder;

8.2.    Whinstone shall perform the Services as described herein and shall provide the Services in a professional manner consistent with industry standards.

8.3.    Whinstone hereto agrees to indemnify and hold harmless the Customer and any of its respective successors, licensees and assignees, from any and all losses, costs, liabilities, damages and expenses, including but not limited to, reasonable attorney fees resulting from any breach of any obligations, representation, warranty and/or covenant under this Agreement. Notwithstanding any provisions herein, Whinstone agrees to indemnify the Customer for any losses directly or indirectly caused by gross negligence or intentional or willful misconduct of Whinstone in its performance of obligations under this Agreement, including but not limited to, faulty operations, bad design, or misuse of the facilities in the Data Center.

8.4.    If electrical supply is suspended for five (5) or more consecutive days, or more than seven (7) days in any twelve (12) month period due to any cause other than due to force majeure event, the Customer is entitled to suspend or terminate this Agreement by giving a written notice to Whinstone. Written notice will be signed and emailed to Whinstone, and a physical copy will be sent to Whinstone's registered address. The timestamp of the email will be considered the date of the receipt of such notice. If the Customer terminates this Agreement for the aforementioned reason, Whinstone shall pay for the costs to decommission, clean, package onto pallets and for the shipping cost to transport all Customer's equipment to a new location.

8.5.    Neither party excludes or limits its liability to the other party for:

8.5.1.    death or personal injury caused by its negligence;

8.5.2.    fraud or fraudulent misrepresentation.

8.6.    Subject to Clauses 6, 8.5, 8.7, and claims for outstanding payment, the aggregate liability of each party to the other in contract, tort (including negligence), for breach of a statutory duty or otherwise arising under or in connection with this Agreement or its subject matter shall be limited to a sum equal to the greater of: (i) the aggregate Charges payable by the Customer to Whinstone in the twelve-month period immediately prior to the date on which the cause of action first arose or, if the Agreement had been in force for less than twelve (12) months at that date, the annualized amount of the Charges payable by that date; and (ii) United States

8.7.    Subject to Clause 8.5 but notwithstanding anything else in this Agreement, the aggregate liability of:

16

Initial: ✗

8.7.1.  the Customer to Whinstone for damage to property, in contract, (including negligence) or otherwise arising under or in connection with this Agreement shall be limited to a sum equal to the aggregate Charges payable by the Customer to Whinstone in the twelve-month period immediately prior to the date on which the cause of action first arose or, if the Agreement has been in force for less than twelve months on such date, the annualized amount of the Charges payable by that date; and

8.7.2.  Whinstone to the Customer for damage to property, in contract, tort (including negligence) or otherwise arising under or in connection with this Agreement shall be limited to a sum equal to the aggregate Charges payable by the Customer to Whinstone in the twelve-month period immediately prior to the date on which the cause of action first arose or, if the Agreement has been in force for less than twelve months on such date, the annualized amount of the Charges payable by that date.

8.8.    In no event will Whinstone have any liability for non-provision or delay in the provision of the Services which:

8.8.1.  can be reasonably attributed to the acts or omissions of the Customer, its affiliates, employees, workers, sub-contractors, agents or customers including but not limited to failure to provide complete, accurate information in a timely manner for Whinstone;

8.8.2.  arises from or as a consequence of use of the Services other than in accordance with the express terms of this Agreement; and/or

8.8.3.  occurs during any period of suspension in accordance with Clause 12, provided, however, that this Clause 8.8 shall not apply in the case of willful misconduct or negligence by Whinstone, its affiliates, employees, workers, subcontractors or agents.

8.9.    The Customer acknowledges that Whinstone would not enter into this Agreement at the prices herein without the foregoing limitations of liability. Each party acknowledges that the allocation of risk in this Agreement (including the exclusions and limitations set out in this Clause 8) has been freely negotiated at arm's length and is regarded by it as reasonable. The Customer acknowledges that it has had an opportunity to consider adequate insurance cover and to obtain professional advice in relation to this Clause 8.

8.11    Whinstone shall not be liable for any claim arising under this Agreement unless the Customer gives Whinstone written notice of the claim within twelve months of becoming aware of the circumstances giving rise to the claim.

8.12.   Whinstone shall maintain minimum general business liability insurance in the amount of ███████ per occurrence or replacement value of the Customer's equipment, whichever is lower. This coverage will not include business income interruption coverage. The Customer is responsible for insuring their equipment and business income interruption insurance.

8.13    Whinstone represents and warrants to the Customer that it has secured rights to at least one hundred (100) acres of leased land for at least (2) two years for the Data Center and secured for commercial access up to one (1) gigawatt of aggregated electricity that can be delivered to the Data Center, of which a portion of that may be incrementally offered to the Customer.

17

Initial: ∠

## 9.  ASSIGNMENT

9.1.  This Agreement and all rights and obligations hereunder, in whole or in part, may not be assigned or transferred by either Party without the prior written consent of the other Party. The Party is and shall remain liable to the other Party for any act or omission of any of its Representatives and/ or customers.

9.2.  Whinstone may, upon receipt of the Customer's prior written consent, assign, sub- license or deal in any other manner with this Agreement or any rights under the Agreement, or sub-contract any or all of any or all of obligations under this Agreement to one or more of its affiliates or to any third party upon a sale of all or substantially all of its assets and will provide notice to the Customer of any such assignment, provided, however, that the Customer is provided with the Services under the same terms and conditions as those of this Agreement until the expiration of the Initial Term or the relevant Extended Term, as the case may be, of this Agreement.

## 10.  FORCE MAJEURE

10.1.  Neither party shall in any circumstances be liable to the other for any loss of any kind whatsoever including any damages whether directly or indirectly caused or incurred by the other party by reason of any failure or delay in the performance of its obligations hereunder which is due to Force Majeure.

10.2.  If either of the parties becomes aware of circumstances of Force Majeure which give rise to or which are likely to prevent the performance of any obligations on its part, it shall as soon as reasonably possible and in any event within five (5) Business Days after commencement of the Force Majeure serve notice in writing on the other party specifying the nature and extent of the circumstances giving rise to Force Majeure.

10.3.  If either party is prevented from performance of substantially all of its obligations by Force Majeure for more than two (2) months in total, the other party may terminate this Agreement by giving notice in writing to the other party at any time, in which case neither party shall have any liability to the other except that rights and liabilities which accrued prior to such termination shall continue to subsist.

## 11.  NOTICES

11.1.  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the Party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective Parties at their address as set forth below, or to such e-mail address, as subsequently modified by written notice given in accordance with this Clause 11 herein:

18

Initial: _____

11.2. The addresses of the parties for the purposes of Clause 11.1 are:

11.2.1. **Whinstone US, Inc.**
**4304 Firestone Road Metairie, LA 70001**
**Marked for the attention of: Lyle Theriot**
**Email: Lyle.Theriot@whinstone.us**
**Attention: Lyle Theriot**

11.2.2. **SBI Crypto Co., Ltd.**
**1-6-1 Roppongi, Minato-ku, Tokyo, Japan**
**Email: cbsmith@sbigroup.co.jp**
**Attention: Carson Blake Smith**

11.3. In proving service, it shall be sufficient to prove that the envelope containing such notice was addressed to the address of the relevant party set out in Clause 11.2 (or as otherwise notified by that party under this Clause) and delivered to that address.

## 12. SUSPENSION OF SERVICE

12.1. Whinstone reserves the right to suspend the Services for the following reasons:

12.1.1. to carry out Maintenance with the prior written consent of the Customer;

12.1.2. to make any modification, change, addition to, or replacement of, the Whinstone Equipment or any part of the IP Connection Service or the Services where this is required to conform with any applicable safety, statutory or legal requirements, provided that such modification, change, addition or replacement does not detract from, reduce or impair the overall quality or performance of the Services with prior written consent of the Customer;

12.1.3. where the Customer fails to pay any undisputed Charges in accordance with Clause 3;

12.1.4. where Whinstone is obliged to comply with an order, instruction or request of Government, court, law enforcement agency or other competent administrative or regulatory authority, in which case Whinstone shall provide notice to the Customer as soon as possible, and cooperate with the Customer to mitigate losses or take other appropriate actions;

12.1.5. in an emergency; or

12.1.6. where Whinstone has reason to suspend the Services in accordance with its terms.

12.2. Where suspension of the Services is necessary in accordance with the provisions of Clause 12.1.2, Whinstone will carry out such work as Scheduled Maintenance but in circumstances where this is not possible, Whinstone shall use all reasonable endeavors to perform such work between the hours of midnight and 6am and shall restore the Services as soon as reasonably practical in the circumstances.

19

CONFIDENTIAL

Initial: ⟋

12.3. If Whinstone exercises its right of suspension under this Clause, this will not exclude its right to terminate this Agreement later in respect of that or any other event, nor will it prevent Whinstone claiming damages from the Customer in respect of any breach.

## 13. TERMINATION

13.1. This Agreement shall commence on the Effective Date and shall continue for a period of twenty-four (24) months from the RFU Date ("Initial Term") unless and until terminated in accordance with this Clause 13.

This Agreement shall be automatically extended for a period of twenty-four (24) months ("Extended Term") at the end of the Initial Term and at the end of each Extended Term. Notwithstanding above, the Customer can terminate the Agreement at the end of the twelfth month of the Initial Term or during any Extended Term with no penalty by notifying Whinstone in writing sixty (60) days prior to the end of the Agreement.

13.2. Termination for Cause. Either party (the "Non-Defaulting Party") may terminate this Agreement (without prejudice to its other rights and remedies) with immediate effect by written notice to the other party (the "Defaulting Party") if:

13.2.1. the Defaulting Party commits a material breach of any of its material obligations under this Agreement (including failing to pay any sums payable under this Agreement by the due date) and if the breach is capable of remedy, fails to remedy it during the period of thirty (30) days starting on the date of receipt of notice from the Non-Defaulting Party specifying the breach and requiring it to be remedied; or

13.2.2. the Defaulting Party becomes insolvent including being unable to pay its debts as they fall due and/or that the value of its assets is less than the amount of its liabilities taking into account its contingent and prospective liabilities, proposes an individual, company or partnership voluntary arrangement, has a receiver, administrator or manager appointed over the whole or any part of its business or assets; if any petition shall be presented, order shall be made or resolution passed for its winding up (except for the purpose of a bona fide amalgamation or reconstruction), bankruptcy or dissolution (including the appointment of provisional liquidators/interim receivers or special managers); if it shall otherwise propose or enter into any composition or arrangement with its creditors or any class of them; if it ceases or threatens to cease to carry on business or if it claims the benefit of any statutory moratorium; or

13.2.3. the Defaulting Party suffers, or there occurs in relation to that party, any event which is analogous to any of the events referred to in Clause 13.2.2 in any part of the world.

13.2.4. In the case that the Customer terminates this Agreement due to Whinstone's failure to cure a default, or the matters specified in Clause 13.3 or 13.4, Whinstone will pay for the costs to decommission, clean, package onto pallets and ship the Customer equipment to a new location. Whinstone will also pay Customer's lost revenue from mining resulting from such termination converted to US dollars, which shall be calculated based on the average market price of the mined digital asset and mining difficulty levels for a period of four calendar weeks from the date of the termination.

20

SBIC0003902

Initial: _____

13.3.   Either Party may terminate this Agreement by thirty (30) days prior written notice to the other Party upon occurrence, at any time, of any Change of Control event. For the avoidance of doubt, any mergers or consolidation, transfer or acquisition of stock within the SBI Group shall not be a Change of Control event.

13.4.   It is in the best interest of both Parties to pursue all reasonable efforts to remedy any issues with the Services or Service Level Agreement without termination or penalties. In cases of negligence or failure to maintain the Service Level Agreement for more than two (2) consecutive months, the Customer shall be entitled to the right to terminate the Agreement.

13.5.   If Whinstone fails to install all of the Customer Equipment within sixty (60) days of the RFU Date, the Customer shall be entitled to terminate or suspend the Agreement, and Whinstone shall refund the customer ninety percent (90%) of the installation charges.

13.6.   Either party may terminate this Agreement with immediate effect by written notice and without further obligation or liability to the Customer if required by any law enforcement or other government or regulatory organization or authority or by the courts.

13.7.   All rights and obligations of the parties shall cease to have effect immediately upon termination of this Agreement, except that termination shall not affect:

13.7.1.  accrued rights and obligations of the parties at the date of termination; and

13.7.2.  the continued survival and validity of the rights and obligations of the parties under Clauses 7, 8, this Clause 13.7 and Clauses 15, 17 and 19 and any other provisions of this Agreement necessary for the interpretation or enforcement of this Agreement.

13.8.   For the avoidance of doubt, save where otherwise agreed in writing between the parties, termination of any Services at a Site does not constitute termination of this Agreement, and, where this Agreement has been terminated in accordance with its terms, all Services will automatically terminate upon such termination.

13.9.   Upon termination of this Agreement, the Customer shall at its own cost and expense return to Whinstone all IP addresses provided to it by Whinstone.

## 14.   ANTI-BRIBERY AND CORRUPTION

Each party warrants and represents that it has not and will not carry out any act that could be an offense under anti-bribery laws.

## 15.   APPLICABLE LAW

This Agreement shall be governed by Texas Law and the parties hereby submit to the exclusive jurisdiction of the Texas courts.

## 16.   GENERAL

16.1.   No failure or delay of either party in exercising its rights hereunder (including the right to require performance of any provision of this Agreement) shall be deemed to be a waiver or release of such rights. Any waiver or release must be specifically granted in writing signed by the party waiving its rights and shall:

21

SBIC0003903

Initial: _____

16.1.1.  be confined to the specific circumstances in which it is given;

16.1.2.  not affect any other enforcement of the same or any other right; and

16.1.3.  unless it is expressed to be irrevocable, be revocable at any time in writing.

Any single or partial exercise of any right, power or remedy provided by law or under this Agreement shall not preclude any other or further exercise of it or the exercise of any other right, power or remedy.

16.2.  If at any time any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, that shall not affect or impair:

16.2.1.  the legality, validity, or enforceability in that jurisdiction of any other provision of this Agreement; or

16.2.2.  the legality, validity, or enforceability under the law of any other jurisdiction of that or any other provision of this Agreement.

16.3.  All work performed by Whinstone under this Agreement shall be performed as an independent contractor and not as an agent of the Customer and neither party shall be, nor represent itself to be, the employee, agent, representative, partner or joint venture of the other. Neither party shall have the right or authority to assume or create an obligation on behalf of or in the name of the other or to otherwise act on behalf of the other. The performing party shall be responsible for its employees' compliance with all applicable laws, rules, and regulations while performing work under this Agreement.

16.4.  No modification, amendment or other Change may be made to this Agreement or any part thereof unless reduced to writing and executed by authorized representatives of Whinstone and the Customer. Unless expressly so agreed, no modification or variation of this Agreement shall constitute or be construed as a general waiver of any provisions of this Agreement, nor shall it affect any rights, obligations or liabilities under this Agreement which have already accrued up to the date of such modification or waiver, and the rights and obligations of the parties under this Agreement shall remain in full force and effect, except and only to the extent that they are so modified or varied.

## 17.  ENTIRE AGREEMENT

17.1.  This Agreement constitutes the entire understanding between the parties concerning the subject matter of the Agreement and supersedes any previous agreement or understanding between the parties in relation to the subject matter.

17.2.  With effect from the date of this Agreement all Services shall be provided solely in accordance with the terms of this Agreement and all prior agreements and understandings between the parties in relation to the same shall be deemed terminated from the date hereof. Save in respect of rights and liabilities arising prior to such date, all such prior agreements and understandings shall cease to be of effect from the date of signature of this Agreement. In no event shall the pre-printed terms and conditions found on any Customer purchase order, acknowledgement, or other form be considered an amendment or modification of this Agreement, even if such documents are signed by representatives of both parties; such pre-printed terms and conditions shall be null and void and of no force and effect.

CONFIDENTIAL

SBIC0003904

Initial: _A_

17.3.   Each party acknowledges and agrees that in entering into the Agreement or in amending any part of this Agreement, it has not relied on any statement, representation, warranty, understanding, undertaking, promise or assurance (whether negligently or innocently made) of any person (whether party to this Agreement or not) other than as expressly set out in the Agreement. Each party irrevocably and unconditionally waives all claims, rights and remedies which but for this clause it might otherwise have had in relation to any of the foregoing.

17.5.   Nothing in Clauses 17.1 to 17.3 (inclusive) shall limit or exclude any liability for fraud.

## 18.   COUNTERPARTS

18.1.   This Agreement shall be executed in two originals, each Party shall retain one original respectively. This Agreement shall not be effective until each of the parties has executed at least one counterpart.

18.2.   Each counterpart shall constitute an original, but all the counterparts shall together constitute one and the same instrument.

## 19.   THIRD PARTIES

It is agreed that this Agreement is not intended to and does not give to any other person who is not a party to this Agreement any rights to enforce directly any provisions contained in this Agreement except for any person to whom the benefit of this Agreement is assigned or transferred in accordance with Clause 9.

## 20.   FURTHER ASSURANCE

Each party shall, if requested by the other party and at the other party's cost, execute or cause to be executed all documents and do or cause to be done all further acts and things as may be necessary in order to vest in and secure to the other party and its successors in title the full benefit of the assets, rights and benefits to be transferred or granted to the other party under this Agreement and for the protection and enforcement of the same and otherwise to give effect to this Agreement and to the rights and obligations contained within this Agreement.

## 21.   TERMINATION OF PRIOR HOSTING AGREEMENT

Both Parties confirm and hereby acknowledge that this Agreement replaces the Hosting Service Agreement executed July 5, 2019 ("Prior Hosting Agreement") and that the Prior Hosting Service Agreement is hereby terminated.

The Agreement shall come into force from the seal or signature date by both parties, and this Agreement is made out in two original copies, one copy to held by each party in witness thereof.

<Signature Page Follows>

23

Initial: _____

## Signatory page for Hosting Service Agreement

CUSTOMER:

On behalf of SBI Crypto Co., Ltd.

WHINSTONE:

On behalf of Whinstone US, Inc.

Name: Carson Blake Smith

Title: Representative Director

Date: 2019 - 10 - 24

Name: Aroosh Thillainathon

Title: CEO

Date: 24.10.2019

24

CONFIDENTIAL

SBIC0003906