**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| **SBI CRYPTO CO., LTD.,** | |
| *Plaintiff*, | |
| v. | Civil Action No.: 6:23-cv-252-ADA-DTG |
| **WHINSTONE US, INC.,** | |
| *Defendant*. | |

## PLAINTIFF'S DAUBERT MOTION TO EXCLUDE THE TESTIMONY OF JEFFREY G. MATTHEWS UNDER FEDERAL RULE OF EVIDENCE 702

Plaintiff SBI Crypto Co., Ltd. ("Plaintiff" and/or "SBI") files this *Daubert* Motion to Exclude the expert testimony of Jeffrey G. Matthews under Federal Rule of Evidence 702 and respectfully shows this Court the following:

## I.
### INTRODUCTION

Defendant Whinstone US, Inc. ("Defendant" or "Whinstone") designated Jeffrey G. Matthews ("Matthews"), a certified public accountant, as a rebuttal expert to opine on SBI's damages expert, Dr. Randal Valentine, Ph.D.'s ("Valentine") lost profit calculations. As demonstrated by this motion, Matthews offers no affirmative opinions in this case. Instead, he limits his opinions to a critique of Valentine's methodology. As a rebuttal expert, Matthews is held to the same standards under Federal Rule of Evidence 702 as an affirmative expert.

The thrust of Matthews' opinion is that Valentine's calculations lack sufficient evidence. However, Matthews' rebuttal opinions are fatally flawed because Whinstone erroneously instructed him to ignore admissible evidence, rendering his opinions

unreliable and unhelpful to the jury. Specifically, while the Magistrate Judge determined that Valentine's Supplemental Report should be stricken, that determination does not affect any otherwise admissible evidence referred to by Valentine in his supplemental report.

Whinstone told Matthews to disregard the evidence identified in Valentine's Supplemental report, even though the Court has not excluded any evidence in this case. Whinstone instructed Matthews to ignore documents produced *during* fact discovery and *before* Matthews' rebuttal report was due. For that reason alone, the Court should strike his testimony as unreliable because Matthews wholly failed to consider evidence directly relevant to his analysis. In other words, the Court should not allow Matthews to opine on the sufficiency of SBI's lost profit evidence because Whinstone instructed him to disregard relevant evidence produced in this case.

For example, while Matthews' report emphatically and unequivocally insists that Valentine deducted no costs in his calculations, Matthews later admitted during his deposition that Valentine did deduct costs as part of his lost profits analysis. Matthews further admits that, in one of his primary critiques—the supposed lack of "Blockchain wallet records"—he did not consider all of the wallet addresses that SBI identified and produced. In fact, acting at Whinstone's direction, Matthews relied on limited evidence and incomplete data to support his critique that Valentine failed to support his opinions.

Matthews also offers impermissible legal opinions when he misinterprets the terms of the Hosting Service Agreement in an attempt to limit SBI's damages. Finally, Matthews opines on technical and engineering subjects outside his area of expertise. He simply repeats opinions provided by other experts in this case, which Texas law does not permit. For these reasons, the Court should exclude Matthews' testimony in its entirety.

## II.
### FACTUAL BACKGROUND

SBI contends Whinstone fraudulently induced it to enter into a contract in which Whinstone agreed to host and operate SBI's crypto-miners at a datacenter in Rockdale, Texas (the "Rockdale Facility") consistent with professional industry standards. A true and correct copy of the Hosting Service Agreement between SBI and Whinstone is attached hereto as **Exhibit "A,"** and incorporated herein by reference. Whinstone agreed to provide 50 megawatts of power for SBI's Canann Avalon A10 miners by mid-December 2019. Whinstone further agreed it would professionally maintain, repair, and operate SBI's miners. The Hosting Service Agreement required Whinstone to design the Rockdale Facility to maintain adequate airflow, operate SBI's miners below 29.5 degrees Celsius, and prevent dust accumulation.

After an eight-month delay in deploying and operating SBI's fleet of miners, SBI discovered that the Rockdale Facility, which Whinstone constructed, proved wholly substandard and failed to meet basic contractual and industry standards. Whinstone failed to install filters to prevent the accumulation of dust and debris inside SBI's miners, failed to operate evaporative cooling curtains to control temperatures, and failed to install any intake or exhaust fans to ensure adequate airflow and heat dissipation. Whinstone's faulty design and operations led to over-pressurization of the hot aisle and recirculation of hot air into the cold aisle. According to SBI's technical experts, the grossly inadequate environmental conditions at the Rockdale Facility directly led to the underperformance and failure of SBI's equipment.

SBI alleges, among other things, that Whinstone's multiple breaches and fraudulent conduct resulted in the accumulation of dust and debris inside its miners,

recirculation of hot air back through the miners and into the cold aisle, and excessive air intake temperatures, all of which caused significant damage to and/or contributed to the underperformance of SBI's miners. Whinstone continuously concealed these substandard conditions and instead represented that SBI's miners and/or their power supply units ("PSUs") were defective—without proof or the support of a single credible expert opinion.

If the jury decides that the environmental conditions at the Rockdale Facility caused or contributed to the underperformance and/or destruction of SBI's miners, they will be asked to determine the proper amount of damages SBI incurred. To assist the jury in answering this question, SBI designated Dr. Valentine to testify regarding SBI's lost profit damages. Dr. Valentine has over twenty years of experience in the finance industry, and more specifically here, he testified in eight cases in the last four years involving cryptocurrency and damages. Dr. Valentine holds a Ph.D. in finance and a master's degree in statistics, as well as two graduate certificates from the Wharton College of Business in artificial intelligence and financial technology. Dr. Valentine testified as an expert witness in over 100 cases. He is an experienced and accomplished damages expert with specific experience in cryptocurrency cases.

Whinstone designated Matthews as a pure rebuttal expert, and he served his rebuttal report on July 18, 2025. A true and correct copy of Matthews' Rebuttal Report is attached hereto as **Exhibit "B,"** and incorporated herein by reference. A true and correct copy of excerpts from Matthews' deposition are attached hereto as **Exhibit "C,"** and incorporated herein by reference.

One of Matthews' primary critiques of Dr. Valentine is he claims Valentine "fails to deduct a single cost … thus claiming full recovery for lost 'revenue' not profits." **Exhibit "B,"** at 7, 10, 12. Matthews doubled down on his assertion in his deposition:

> Q.    What costs did you contend that Dr. Valentine should
> have, but did not, deduct from his analysis?
>
> **A.    Actually, I don't think Dr. Valentine deducts a
> single cost. If you look at his first report, he
> doesn't even use the word expenses in it, so
> there's not a single cost that he deducts.**

**Exhibit "C,"** at 90:16-22.

> Q.    And it's your testimony today that his report doesn't
> even mention the word "expenses" in it?
>
> **A.    That's correct.   He does not deduct a single
> expense in his report, not a single one.**

*Id.* at 92:3-7.

When questioned about Dr. Valentine's calculations, Matthews admitted that Dr.
Valentine includes costs in his analysis. Matthews then tried to distinguish between
estimated costs and actual or anticipated costs, a distinction that the Court should find
unreasonable. Regardless, it is clear Dr. Valentine did, in fact, include costs specific to the
Hosting Service Agreement in his analysis. Matthews' assertions about Dr. Valentine not
considering costs are simply wrong:

> Q.    Earlier you testified that Dr. Valentine did not deduct a
> single cost.   Would you agree that this spreadsheet
> shows that he was, in fact, calculating an expected cost?
>
> MR. SLOVAK:  Objection, form.
>
> **A.    I believe this is an estimated cost based on the
> contract.  So, no, that is not an actual cost or an
> anticipated cost.   It's simply a calculation that
> he's pulling based on the contract terms.  It has
> nothing to do with what they ultimately
> expected, what they ultimately budgeted for. It
> is simply a contract provision.**

*Id.* at 141:5-16.

> Q.    So SBI reduced this to a contract and the contract
> contains various costs, but it's your testimony that SBI
> did not expect for this to be the costs to run its mining
> operations?

> MR. SLOVAK:  Objection, form.
>
> **A.**    **Well, let me be more clear. This is what is referred to in the contract as a hosting fee adjusted for a smart hands in a monthly credit. That contract only contains a provision for that one cost, and there is no evidence that that's what they actually expected to occur.**

*Id*. at 142:14-25.

> Q.    When you say the one cost in the contract, what cost in the contract are you referring to?
>
> ...
>
> **A.**    **But if you look at how he arrives at these costs, he is pulling that from a different spreadsheet and that different spreadsheet rolls in and calls for the expected hosting fee netted against the smart hands cost. It's coming straight out of the contract.**

*Id*. at 143:20-21, 144:4-8.

Matthews also criticizes Dr. Valentine's projections because his fellow expert, Peters,[1] performed a blockchain analysis using TRM Labs data to trace SBI's crypto wallet activity. Matthews claims that this analysis of two SBI wallets showed that SBI sold all of the bitcoin that it mined. **Exhibit "B," at 16-17.** But, during his deposition, Matthews admitted that he learned SBI had additional wallets to conder, but he intentionally chose not to consider those.

> Q.    And for the additional wallets that have been produced since then, have you gone back and run any queries on TRM Labs with those additional wallet addresses?
>
> **A.**    **I have not.**
>
> Q.    Is there a reason why you have not ran any additional queries?

---

[1] *See* **Exhibit "C,'** at 41:25-42:9, 54:12-55:5, 74:8-13, 78:6-11, 112:18-21.

> **A.    I was comfortable with my analysis. I was able to tie this back to the financial statements that I had at the time. I haven't been asked to rerun the queries based on the new information.**

**Exhibit "C,"** at 76:11-21.

> Q.    Well, you did testify earlier that one of the things that was produced after May 2nd, 2025, was additional wallet addresses, correct?
>
> MR. SLOVAK:  Objection, form.
>
> **A.    I understand that that information was excluded and it was no longer relevant to this particular report.**
>
> Q.    Who told you that the information related to additional wallet addresses was excluded?
>
> **A.    The wallet information that I had was contained in Dr. Valentine's supplemental report. He attempted to, again, support the analysis that he couldn't the first time. That's the information that I saw that contained additional wallet data.  But, like I said, I didn't know where it came from, I didn't know who had created it. And as I sit here, it wasn't relevant to this particular report.**

*Id.* at 81:11-82:3.

> Q.    Did counsel provide you with that information?
>
> **A.    I recall counsel provided me with Dr. Valentine's supplement and Dr. Valentine's supplement had additional wallet data, but shortly after I was provided with that information. I was told to stand down pending certain hearings. Once that -- Dr. Valentine was stricken, I didn't do any more work. I focused on this report and what Dr. Valentine had initially disclosed.**

*Id.* at 84:20-85:4.

Matthews also critiques Dr. Valentine based solely on his legal interpretation of

the Hosting Service Agreement's limitation of liability, notice, and termination provisions. For example, Matthews contends that based on his "reading of the contract," Valentine should be precluded from offering testimony related to lost profits SBI incurred following the Agreement's termination.

> Q.    But as far as whether -- so what is the section -- you include Section 13.3 in here regarding the termination of the Hosting Service Agreement. What is -- how does Section 13.3 pertain to a calculation of damages in this case?

> **A.    Dr. Valentine computes a scenario 3 in which he has damages that occurred post termination. And in my reading of the contract, there is already a formula that would apply in that situation. And this is what I would consider as an expert if I were looking to compute damages in a post-termination situation. There are some limitations here. So if a party could terminate this agreement 30 days prior to written notice, I feel it would be unreasonable, as a damages expert, to extend your damages past that 30-day period. There is no reasonable degree of certainty that the contract would continue into the future when a provision like this is in the contract.**

*Id.* at 117:21-118:17. Similarly, Matthews seeks to opine on the contractual provisions related to the return of certain prepayments undisputedly owed to SBI following Whinstone's termination. Based on his erroneous legal interpretation of the Hosting Agreement, Matthews seems to suggest that Whinstone's return of certain unused prepayments should have been considered as part of Valentine's lost profit "formula."

> Q.    Okay. You would agree that this was money that Whinstone owed to SBI based on the terms of the contract, correct?
>
> MR. SLOVAK: Objection, form.

> **A.    That's -- that's my understanding, is that that's what was agreed upon and returned to SBI –**

Q.     Okay.

**A.     -- as it relates to those contract provisions.**

Q.     And what is agreed upon and what was returned to SBI is different than the damages that SBI is claiming in this case, correct?

**A.     That's correct, those -- those numbers are different than what Dr. Valentine computes.**

Q.     Right. Because what was -- what SBI was already entitled to under the contract is different than the profits that it lost out on based off of Whinstone's breach; isn't that right?

       MR. SLOVAK:  Objection, form.

**A.     No, I couldn't agree with that.**

Q.     But you'd agree that regardless of whether or not there was a breach of the contract, SBI would be entitled to the return of its security deposit?

       MR. SLOVAK:  Objection, form.

**A.     I -- I see where they agreed to return the security deposit. Whether they were obligated or entitled, that would -- that would be a legal opinion. I just see where that was agreed upon, and it was ultimately returned.**

Q.     Well, is it your opinion today that the security deposit was meant to cover the damages that SBI sustained in this case?

**A.     It's just my understanding that that was what was called for in the -- in the contract. And if I were computing a breach of contract damage computation, I would look to the contract to provide me with those formulas, especially as it relates to the specific breaches that were identified.**

*Id.* at 124:7-125:21.

Q.     Sure. And -- and what my question is -- is getting at,

Mr. Matthews, is -- is it your understanding, based off of the provisions that you read in the contract, that these calculations, the ones that 3.4.2, 3.9, and looks like 3.14.2 that you identify in Table 8, that those were provisions that were there to calculate a party's damages should there be a breach of the agreement?

MR. SLOVAK:  Objection, form.

**A.     Again, I -- I -- I can't opine on the intent of the parties or what the expectation was, but, you know, that's certainly the formula that's called for in the contract, and this was the result of applying that formula.**

Q.     Can you tell me where in the contract it says that if a party is in breach, the damages to be calculated are to be used under 3.14.2?

MR. SLOVAK:  Objection, form.

**A.     Well, if -- if you've got the contract, I can show you what it is I'm -- I'm referring to here. I think it's more specific to the breaches that have been alleged, not just an overall general statement like that.**

*Id*. at 126:4-127:1.

During his deposition, Matthews admitted he lacks technical expertise in many of the areas addressed by his opinions:

Q:     Do you have any certifications specific to cryptocurrency?

**A:     I'm not aware of there being specific certifications to cryptocurrency.**

Q:     Regardless of whether or not you are aware, you don't have a certification that is specific to the field of cryptocurrency; is that right?

**A:     Can you be more specific as to what you are referring to as cryptocurrency? What do you mean by that?**

Q:     Do you have any certification that is specific to the

mining of bitcoin or other cryptocurrencies?

**A:**    **I'm not a bitcoin mining expert, nor have I been designated as one.**

*Id.* at 17:5-20

Q:    The question is whether or not you consider yourself to be an expert on the design of cryptocurrency mining equipment. And you do not consider yourself to be an expert in that field, correct?

MR. SLOVAK:  Objection, form.

**A:**    **I am not holding myself out as an expert in that field.**

*Id.* at 38:3-10.

Q:    [...] Do you claim to have any expertise on determining the technical feasibility of operating cryptocurrency miners?

**A:**    **No, not the operation of the miners.**

*Id.* at 300:22-25.

Q:    Mr. Matthews, you would agree that you are not an expert on computer engineering; correct?

**A:**    **I'm not offering an opinion on computer engineering.**

Q:    You would agree that you are not an expert on computer engineering, correct?

**A:**    **I am not a computer engineer.**

*Id.* at 36:1-8.

### III.
### ARGUMENT AND AUTHORITIES

## A.    Legal Standard

Under Federal Rule of Evidence 702, courts have the fundamental responsibility

to perform a "gatekeeping function" to ensure an expert is qualified and that his testimony is both reliable and relevant before allowing the expert to testify. *Daubert*, 509 U.S. at 597 (1993). This gatekeeping obligation "applies not only to testimony based on scientific knowledge, but also to testimony based on technical and other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

As the proponent of the expert testimony, Whinstone has the burden to prove, by a preponderance of the evidence, that:

(a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;

(b)  the testimony is based on sufficient facts and data;

(c)  the testimony is the product of reliable principles and methods; and

(d)  the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED R. EVID. 702.

The Court's gatekeeping function consists of a two-part inquiry into reliability and relevance. First, the Court must determine whether the proffered expert testimony is reliable. *See Daubert*, 509 U.S. at 597. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The reliability inquiry requires the Court to assess whether the expert's reasoning and methodology underlying the testimony are valid. *See Daubert*, 509 U.S. at 593. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *See id.* at 590. "[F]undamentally unsupported" opinions "offer[] no expert assistance to the [trier of fact]" and the court should exclude them. *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005).

"The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the

conclusion, *et alia.*" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (internal quotation marks omitted). "Where the expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009). Further, the Supreme Court has explained that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Rather, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

Second, the Court must determine whether the expert's reasoning or methodology "fits" the facts of the case, and whether it will thereby assist the trier of fact to understand the evidence. *See Daubert*, 509 U.S. at 591. In other words, it must determine whether it is relevant. *Id.* "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (quoting 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 702[02] (1988)).

Additionally, under Rule 702, in order to provide opinion testimony to a jury, an expert witness must be qualified by "knowledge, skill, experience, training, or education." The Fifth Circuit has repeatedly held that "a district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Huss*, 571 F.3d at 452. (citing *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)). The witness's expertise must match the subject matter of the witness's testimony. *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1101 (8th Cir. 2006); *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007) (the primary concern is the application of the science to the facts of the case).

Relevant here, rebuttal experts must meet the same strict requirements of Rule 702. *See Nairne v. Landry*, 151 F.4th 666, 698 (5th Cir. 2025) ("[r]egardless, his report had to comply with the strictures of Rule 702, which provide that his testimony be based on sufficient data or facts and the result of reliable principles and methods as well as reflect a reliable application of principles and methods to the facts of the case."). In distinguishing the expert proponent's supporting case law, the Fifth Circuit noted "[w]hile those cases allowed an expert to critique another expert, they do not stand for the proposition that a rebuttal expert's testimony can be unreliable and fail to disclose any scientific method. [The rebuttal expert's] opinions were riddled with serious issues, and the district court's decision to exclude his testimony was not erroneous." *Id*. at n.21.

**B.  Matthews Admittedly Did Not Consider the Relevant, Available Data Supporting Valentine's Opinions.**

Matthews' criticism of Dr. Valentine's lost profits calculations, and in particular, his supposed lack of analysis of "Blockchain wallet records," is fundamentally flawed. **Exhibit "B,"** at p. 15. Matthews admits that he knew SBI provided comprehensive wallet data, but he did not review it because Whinstone (erroneously) declared the evidence excluded. **Exhibit "C,"** at 76:11-21, 81:11-82:3, 84:20-85:4.

> Q.    Well, you did testify earlier that one of the things that was produced after May 2nd, 2025, was additional wallet addresses, correct?
>
> MR. SLOVAK:  Objection, form.
>
> **A.    I understand that that information was excluded and it was no longer relevant to this particular report.**
>
> Q.    Who told you that the information related to additional wallet addresses was excluded?
>
> **A.    The wallet information that I had was contained in Dr. Valentine's supplemental**

> **report. He attempted to, again, support the analysis that he couldn't the first time.**
>
> **That's the information that I saw that contained additional wallet data. But, like I said, I didn't know where it came from, I didn't know who had created it. And as I sit here, it wasn't relevant to this particular report.**

Q.   I'm not asking what you consider is relevant.

You made the statement that these wallet addresses were never provided to you prior to your report, and it sounds like these wallet addresses were, in fact, provided to you or at least available before issuing your report; isn't that true?

MR. SLOVAK:  Objection, form.

A.   **It's really hard for me to consider information that was excluded. There wasn't a lot that I could do with that information for this report, because I didn't know what was going to be allowed in.**

*Id.* at 38:3-10.

In fact, Matthews admits he knew additional, highly relevant data existed, but he chose not to consider it. *Id.* More specifically, Matthews was aware that additional SBI wallet addresses were available through TRM Labs' data that were highly relevant to Matthews' rebuttal opinions, but he chose to ignore them. *Id.*

When an expert intentionally omits relevant facts, his opinions are unreliable and should be excluded. "[A]n opinion based on 'insufficient, erroneous information,' fails the reliability standard." *Moore v. Int'l Paint, LLC,* 547 Fed. Appx. 513, 515 (5th Cir. 2013) (quoting *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 389 (5th Cir. 2009)).

Additionally, not only does Matthews use incomplete information to form his opinions regarding Dr. Valentine's projections, he also has not produced any of the underlying data from TRM Labs. His report simply includes screenshots of summaries.

Matthews has not produced any of the underlying data, the queries, the transactions, or the receiving wallet addresses.

Because Matthews' rebuttal opinions are based on insufficient information, they are unreliable and the Court should exclude them.

## C.    Matthews' Opinion That Valentine's Analysis Deducted "Absolutely No Costs" is Demonstrably False and Underscores the Unreliability of his Opinions.

Despite Matthews' insistence that Dr. Valentine did not deduct a single cost, the evidence shows that Dr. Valentine did, in fact, deduct costs in his analysis. Dr. Valentine's spreadsheet contains entries for various costs, which Matthews ultimately admitted capture the hosting fees. **Exhibit "B,"** at 7, 10, 12; **Exhibit "C,"** at 90:16-22, 92:3-7, 141:5-16, 142:14-25, 143:20-21, and 144:4-8. A court may strike an expert's opinion if the expert relies on clearly erroneous information or on information contradicted by established facts. *Paz*, 555 F.3d at 388-89; *Jacked Up, LLC v. Sara Lee Corp.*, 291 F. Supp. 3d 795, 802 (N.D. Tex. 2018). In particular, an opinion based on 'insufficient, erroneous information,' fails the reliability standard." *Id.* (citing *Moore v. Int'l Paint, L.L.C.*, 547 F. Appx. 513, 515 (5th Cir. 2013) (excluding an expert report because the expert failed to assess whether a document he relied on was valid and because Plaintiff could not show that the expert's assumptions had a factual basis and were not merely speculative); *Montgomery County v. Microvote Corp.*, 320 F.3d 440 (3d Cir. 2003) (excluding the testimony of Microvote's expert witness as unreliable because the witness conceded that he did not review actual election use data in evaluating electronic voting equipment that had malfunctioned).

Expert testimony based on unreliable data or flawed methodology is unreliable and does not satisfy the relevancy requirement. *Dockery v. Fischer*, 253 F. Supp. 3d 832, 843

(S.D. Miss. 2015) *(citing Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (stating that to be admissible, the "expert's testimony must be reliable at each and every step, in other words, "[t]he reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia."). Unreliable expert testimony renders the expert's testimony inadmissible. *United States v. 4.620 Acres of Land*, 576 F. Supp. 3d 467, 476 (S.D. Tex. 2021) (stating that under *Daubert*, any step that renders the analysis unreliable … renders the expert's testimony inadmissible).

Although the *Daubert* reliability analysis is flexible and the proponent of the expert evidence need not satisfy every one of its factors, 'the existence of sufficient facts … is in all instances mandatory.'" *Id.* (quoting *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007)). Thus, "expert testimony that relies on 'completely unsubstantiated factual assertions' is inadmissible." *Id.* (quoting *Hathaway*, 507 F.3d at 319, n.4).

The Court should exclude Matthews' rebuttal opinions critiquing Dr. Valentine's damage calculations because they rely on erroneous facts and are therefore unreliable.

## D.    Matthews Impermissibly Offers Legal Opinions and Misapplies Certain Provisions of the Hosting Service Agreement Which Will Confuse the Jury.

Expert opinions that attribute legal significance to certain facts are not helpful to the trier of fact and must be excluded under Rule 702. *FLST, Ltd. V. Explorer Pipeline Co.*, No. 4:16-cv-17-KPJ; 2017 WL 3668140, *3 (E.D. Tex. Aug. 25, 2017) (excluding expert's construction of legal document); *Orthoflex, Inc. v. Thermotek, Inc.*, 986 F. Supp. 2d 776, (N.D. Tex. 2013) (excluding expert's opinion regarding what information was "confidential"); *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997) (excluding expert's opinion whether company's "officers and directors fulfilled their fiduciary duties to the

Company, its creditors, and shareholders").

Here, Matthews' opinions regarding limitations on SBI's damages due to the Hosting Agreement are both incorrect and constitute impermissible legal opinions. **Exhibit "C,"** at 117:21-118:17, 124:7-125:21, 126:4-127:1. Experts can provide insight into the meaning of technical terms as used in the industry, but otherwise cannot provide opinions on the meaning, interpretation, or parties' obligations under a contract. *Musket Corp. v. Suncor Energy (U.S.A.) Mktg., Inc.*, No. CV H-15-100, 2016 WL 7374225, at *3 (S.D. Tex. Dec. 20, 2016); *see also Atlas Glob. Techs. LLC v. TP-Link Techs. Co., Ltd.*, No. 221CV00430JRGRSP, 2023 WL 5003789, at *2 (E.D. Tex. Aug. 4, 2023). The Eastern District of Texas held as much in *Atlas Global Technologies*:

> What he is not allowed to do is to offer his view of what 'FRAND principles' require. He has already opined that his understanding of those 'principles' includes a requirement that an offer be made before suit, which the Court has found to have no basis in the applicable law. He also advances other opinions based on his view of what FRAND principles require as far as when and how *offers* are to be made. Those are his opinions as to what the law requires, a topic well beyond his area of expertise and beyond the purview of evidence. All of his opinions based on his understanding of 'FRAND principles' are hereby stricken.

*Id.*

"Nevertheless, an expert may never render conclusions of law. Nor, may an expert go beyond the scope of his expertise in giving his opinion." *Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009). "The Court is responsible for deciding disputed questions of law..." *Metaswitch Networks Ltd. v. Genband US LLC*, No. 2:14-CV-744-JRG-RSP, 2016 WL 866715, at *1 (E.D. Tex. Mar. 5, 2016). "Federal courts have consistently held that legal opinions are not a proper subject of expert testimony because they do not assist the trier of fact in understanding the evidence, instead merely telling the trier of fact what result to reach." *BNY Mellon, N.A. v. Affordable Holdings, Inc.*, No. 1:09CV226-SA-JAD,

2011 WL 2746301, at *1 (N.D. Miss. July 12, 2011) (collecting Fifth Circuit cases). "Each courtroom comes equipped with a legal expert [...] called a judge." *Id.* Legal conclusions are reserved for the court, not expert witnesses. *Highland Capital Mgmt., L.P. v. Bank of Am., N.A.*, 574 Fed. Appx. 486, 491 (5th Cir. 2014).

The Court should exclude Matthews' opinions regarding alleged limitations imposed by the Hosting Service Agreement because they are impermissible legal opinions.

### E. Matthews Opines on Subjects For Which He Has No Expertise, or He Simply Impermissibly Parrots Other Experts' Opinions.

Matthews' opinions on technical and engineering matters related to SBI's cryptominers are outside the scope of his expertise and cumulative of Whinstone's other experts. Experts must have specific experience applying their expertise to the subject matter of their opinion. *See Smith v. Goodyear Tire & Rubber Co*., 495 F.3d 224, 227; *Carlson v. Bioremedi Therapeutic Sys., Inc*., 822 F.3d 194, 201 (5th Cir. 2016).

In his deposition, Matthews confirmed that he is not an expert in the design of cryptocurrency miners or mining facilities, is not an engineer, and does not have any expertise in operating miners. **Exhibit "C,"** at 38:3-10, 300:22-25, 36:1-8. Yet, in his rebuttal report, Matthews asserts various opinions as to the reliability of SBI's miners, certain technical defects, as well as the useful life of the miners. **Exhibit "B,"** at 27-30.

To the extent Matthews is simply parroting the opinions of other experts on these issues, that is equally impermissible under Texas law. An expert may rely on the opinions of another expert, but cannot merely act as a conduit for another expert's opinion. They must add some independent analysis to be able to offer their opinion. *Ramirez v. Escajeda*, No. EP-17-CV-00193-DCG, 2021 WL 1131721, at *14 (W.D. Tex. Mar. 24, 2021).

In *Ramirez*, the Western District of Texas held:

> However, in relying on Leonesio's opinion, Katsaris must make some independent findings of his own; he cannot act as a mere conduit for Leonesio and regurgitate his opinion on Escajeda's use of force. Otherwise, Katsaris's opinion will be of no assistance to the factfinder because he 'merely parrots [Leonesio's] testimony' and is therefore, cumulative under Rule 403.

*Id.*

Opinions that solely reiterate communications and do not offer any independent, reliable analysis do not meet the requirements of *Daubert* and should rather be presented through non-expert witnesses. *Musket Corp. v. Suncor Energy (U.S.A.) Mktg., Inc.*, No. CV H-15-100, 2016 WL 7374225, at *7 (S.D. Tex. Dec. 20, 2016).

The Court should exclude Matthews' opinions on technical and engineering issues because he is unqualified to address matters outside his expertise and moreover, he merely repeats the opinions of other experts.

## IV.
### CONCLUSION

For the foregoing reasons, SBI respectfully requests that the Court exclude the testimony and opinions of Defendant's rebuttal expert, Jeffrey Matthews, in their entirety under Federal Rule of Evidence 702 and *Daubert*.

Respectfully submitted,

By: */s/ Joshua M. Sandler*

Joshua M. Sandler
  Texas Bar No. 24053680
  jsandler@winstead.com
Cory Johnson
  Texas Bar No. 24046162
  cjohnson@winstead.com
Andrew Patterson
  Texas Bar No. 24131573
  apatterson@winstead.com
John D. Janicek
  State Bar No. 24125636
  jjanicek@winstead.com
**WINSTEAD PC**
2728 N. Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (214) 745-5103
Facsimile: (214) 745-5390
**ATTORNEYS FOR PLAINTIFF
SBI CRYPTO CO. LTD**

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served in accordance with the Texas Rules of Civil Procedure via the court's e-filing system on November 20, 2025.

*/s/ Andrew Patterson*
Andrew Patterson