# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

|  |  |
|---|---|
| **SBI CRYPTO CO., LTD.,** | |
| *Plaintiff*, | |
| v. | Civil Action No.: 6:23-cv-252-ADA-DTG |
| **WHINSTONE US, INC.,** | |
| *Defendant.* | |

## PLAINTIFF'S RESPONSE TO WHINSTONE'S MOTION TO STRIKE THE EXPERT OPINIONS OF RANDALL VALENTINE

Plaintiff SBI Crypto Co., Ltd. ("Plaintiff" or "SBI") files this Response to the Motion to Strike the Expert Opinions of Randall Valentine (Dkt. 136) (the "Motion") filed by Defendant Whinstone US, Inc. ("Defendant" or "Whinstone") and respectfully shows the Court as follows:

### I.
### INTRODUCTION

Whinstone cannot credibly contend that the testimony of Dr. Randall Valentine ("Valentine") is unreliable. The foundation for his analysis comes from historic crypto mining data, referred to in his report as "Luxor Data." Luxor Data is the industry-standard record which calculates what crypto miners historically generated based on the amount of the hash rate deployed. It is used by Whinstone's parent company, Riot, in its public filings and relied upon by Whinstone's own expert, Richard Peters, in this case. In his Initial Report[1]—as well as his Supplemental Report[2]—Valentine uses Luxor Data to

---

[1] The Initial Report is attached hereto as **Ex. "B,"** and incorporated herein by reference.
[2] The Supplemental Report is attached as **Ex. "C,"** and incorporated herein by reference.

validate and calculate the amount of Bitcoin revenue SBI's 20,000 miners should have generated "but for" Whinstone's conduct.

Whinstone's Motion misleads the Court. Its contention that SBI failed to provide the "source data" relied upon by Valentine is patently false. SBI produced, *inter alia*, its crypto wallet addresses and Luxor data (despite its public availability). Whinstone's Motion directly contradicts its prior acknowledgement that it was "withdrawing the issues of Valentine's citation of 690 unique wallet addresses and the Luxor data." Whinstone's assertion that SBI's supposed lack of disclosure "impaired ... its experts' ability to test and verify" SBI's claims is inconsistent with its experts' deposition testimony and fails to disclose that Whinstone directed its rebuttal expert to ignore certain evidence, such as SBI's wallet addresses.

Whinstone misapplies and ignores case law governing the presentation of lost profit damages. Contrary to Whinstone's assertions, Valentine plainly identified and deducted all material costs to reach his lost profit calculations. Pursuant to Rule 26, SBI requests that the Court confirm the admission of calculations found in his Initial Report. *See* the Declaration of Dr. Randall Valentine, a true and correct copy of which is attached hereto as **Ex. "A"** and incorporated herein by reference.

Specifically, the Declaration identifies and highlights the net profit totals that Whinstone complains he did not identify. As a "logical extension" of certain lost profit calculations disclosed in his Original Report, SBI should be allowed under Rule 26, as well as the *Sierra* factors, to present this testimony and evidence to the jury. For the foregoing reasons, Whinstone's Motion should be denied in its entirety.

## II.
### FACTUAL AND PROCEDURAL BACKGROUND

### A.    Allegations Supporting Claim for Lost Profit Damages

SBI is a cryptocurrency mining company that entered into a Hosting Service Agreement with Whinstone for the hosting and management of SBI's mining equipment at Whinstone's facility in Rockdale, Texas (the "Rockdale Facility") on October 25, 2019 (the "Hosting Agreement"). *See* Hosting Agreement, a true and correct copy of which is attached hereto as **Ex. "G"** and incorporated herein by reference. In this suit, SBI alleges Whinstone fraudulently induced SBI to enter into and continue performing under the Hosting Agreement through a series of material misrepresentations and omissions. *See generally*, Dkt. 11.

In accordance with the Hosting Agreement, Whinstone promised to build the infrastructure and supply 50 megawatts of power to SBI's 20,000 Canaan Avalon A-10 miners ("SBI's Equipment") by December 15, 2019—the "Ready-for-Use Date" under the Hosting Agreement. *See* **Ex. "G,"** at 3, 10. Whinstone concealed, *inter alia*, its absolute inability to deliver services by the Ready-for-Use Date and knowingly misrepresented that the design of the Rockdale Facility could meet contractual specifications for SBI's Equipment and that Whinstone was fully permitted to perform all contractual obligations. To secure SBI's continued performance under the Hosting Agreement, Whinstone concealed and failed to disclose major operational problems at the Rockdale Facility, including overheating of SBI's equipment due to nonexistent air-flow, cooling, and dust filtration infrastructure.

SBI asserts that Whinstone's fraudulent acts and omissions caused an eight-month delay in operations followed by the mass failure and underperformance of SBI's

Equipment. Indeed, Whinstone was incapable of fully powering all of SBI's 20,000 miners due to the facility's poor design. Instead of fixing their defective facility, Whinstone reached for an exit strategy. Whinstone unlawfully disclosed the terms of Hosting Agreement to a potential buyer, Riot Platforms, by explicitly pitching the idea of terminating SBI's contract and replacing SBI's miners for Riot's miners.

The delay in operations, the failure and underperformance of SBI's miners, and the subsequent termination obtained through Whinstone's breach and fraud caused SBI to lose millions in lost profits.

**B.    Valentine's Unchallenged Qualifications**

SBI designated Valentine to testify as to SBI's lost profit damages. Valentine has over twenty years of experience in the finance industry, and more specifically here, he testified in eight cases in the last four years involving cryptocurrency and damages. *See* **Ex. "A,"** at ¶ 2; **Ex. "B,"** at 27; **Ex. "C,"** at 28. Valentine holds a Ph.D. in finance and a master's degree in statistics, as well as two graduate certificates from the Wharton College of Business in artificial intelligence and financial technology. **Ex. "A,"** at ¶ 2; **Ex. "B,"** at 22; **Ex. "C,"** at 23. Valentine served as an expert witness in over 100 cases. **Ex. "B,"** at 3. He is an experienced and accomplished damages expert with specific experience in cryptocurrency cases. *See id.* Whinstone has not challenged Valentine's qualifications to perform a lost profits calculation in this case.

**C.    Whinstone's Effort to Ignore and Exclude "Source Data" Evidence**

SBI served Valentine's Original Report on March 28, 2025. On April 11, 2025, Whinstone submitted a discovery dispute chart to the Court related to three narrow issues: (1) "SBI's Kyrgyzstan and Russia Documents & Communications"; (2) "Nicholas

Vitalis Deposition"; and (3) "SBI's Slack and Teams Messages."[3] The Court then issued an Order that SBI produce, among other things, "source data for any spreadsheet relied upon by SBI's expert witnesses." [Dkt 74]. None of the documents, information, or data subsequently produced were "relied upon by SBI's expert," Valentine, as part of his Initial Report. However, in the interim before the close of fact discovery,[4] SBI produced—and its experts reviewed—subsequent productions of SBI's Bitcoin wallet data, Deloitte audit documents, and other documents related to SBI's operation of a separate fleet of 20,000 Canaan Avalon A-10 miners in the Russian facility. These documents—produced after SBI's original expert reports—provided further validation of previously disclosed expert opinions (e.g., Valentine's March 28, 2025 Original Report).

Consistent with Rule 26,[5] SBI submitted a supplement to Valentine's Initial Report, incorporating newly-produced documents and data in order to update certain calculations found in Valentine's Initial Report. *See generally* **Ex. "C."** In response, Whinstone filed emergency motions to strike supplemental reports, to reopen written discovery, for supplemental depositions, continuance, amended scheduling order, and protective order, as well as a subsequent discovery dispute chart. No formal order has

---

[3] 04/11/25 Discovery Dispute Submission [sic] Chart, a true and correct copy of which is attached hereto as **Ex. "H"** and incorporated herein by reference. Whinstone identified the discovery dispute as concerning the production of documents and communications related to SBI's "other" operation of Canaan A-10 miners in Russia—not Rockdale. *Id*. (Explaining Whinstone served discovery concerning the "performance of SBI's other cryptocurrency mining operations"... specifically, "the location that housed the 20,000 other Canaan A-10 miners that SBI purchased in the same batch" as the 20,000 miners operated in Rockdale).

[4] On May 16, the parties jointly moved to extend the fact and expert discovery deadlines to July 11 and September 12, respectively as well as the trial date (February 2). [Dkt 84]. The Court granted the joint motion to amend scheduling order and continuance on May 19. [Dkt 85].

[5] Federal Rule of Civil Procedure 26(e) requires parties to supplement previous disclosures, including expert reports, if the party learns that such disclosures are incorrect or incomplete. FED. R. CIV. P. 26; *In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 371 (5th Cir. 2016). Absent an order to the contrary, parties have until the deadline for pretrial disclosures to supplement prior disclosures. *Id*. Mere logical extensions, clarifications of underlying assumptions, or elaborations on a prior report constitute supplemental testimony. *See Holcombe v. United States*, 516 F. Supp. 3d 660, 671 (W.D. Tex. 2021).

ever been entered by the Court on these Motions.

### D. Valentine's Declaration Identifies SBI's Unappreciated Damages, which was Previously Disclosed

In the attached Declaration, Valentine identifies in the spreadsheets attached to his Initial Report where he calculates and deducts expenses to arrive at the net lost profit numbers contained in his Initial Report. **Ex. "A,"** at ¶¶ 4-7. Additionally, he identifies the precise tab and column in his Scenario_Alpha_Valentine spreadsheet where he calculated the lost net bitcoin for each month, the value of the bitcoin at the time it was mined, and the lost net profit in USD all based on the Luxor data set. *Id.* He then sums the net lost profit in bitcoin and the lost profit in USD based on the price of bitcoin when it was mined. *Id.* Further, he identifies where he previously used the Luxor data in the same spreadsheet to calculate the lost net bitcoin and lost profits in USD for time period 2. *Id.* Valentine explains where he disclosed all this data in his Scenario_Alpha_Valentine spreadsheet. *Id.* The only additional calculations he makes is simply summing the lost net bitcoin and the lost net profits in USD for each time period, and one subtraction of $9,103.35 for 1.07 bitcoin mined in Period 1. *Id.*

### III.
### ARGUMENT & AUTHORITIES

### A. SBI Produces Evidence and Whinstone Erroneously Instructs its Experts to Ignore Evidence Produced

Whinstone wrongly contends SBI failed to "disclose, produce, or identify" on the following categories of information:

- SBI's methodology for allocating of mining profit rewards;

- SBI's records evidencing the allocation of mining profit rewards;

- The amount and timing of cryptocurrency sold by SBI;

- The Luxor dataset;

- The inputs used by Valentine to conduct his event study.

Dkt. 136 at 2-3. For example, Whinstone previously conceded that: "We are withdrawing the issues of Valentine's citation of 690 unique wallet addresses and the **Luxor data**." Email from Whinstone re Outstanding Issues (Sept. 1, 2025), a true and correct copy of which is attached hereto as **Ex. "F"** and incorporated herein by reference (emphasis added).

Following the Court's ruling to exclude Valentine's Supplemental Report, Whinstone has taken the position that evidence, documents, or data referenced in his Supplemental Report was excluded. However, that is not the case. Exclusion of a supplemental report is not an exclusion of the evidence referenced in that report. Whinstone's complaints about "source data" is just willful blindness. Whinstone claims entitlement to additional evidence, but refused to review the evidence produced. Paradoxically, it then erroneously instructed its experts that such information has been excluded, but directed its experts to opine that the opinions of SBI's experts should be excluded because the opinions of SBI's experts lack evidence and should be excluded. *See* Discussion *supra* II.C.

1.  Rule 26 does not require the disclosure of documents not reviewed by an expert.

Rule 26 requires the disclosure of "the facts or data considered by the witness in forming [its opinions]." FED. R. CIV. P. 26. Rule 26 does not require that a party produce documents not considered by an expert, even if they may have some relation to the

documents reviewed.[6] The movant must present sufficient evidence "that allows the Court to make a reasonable deduction that other documents may exist or did exist and have been destroyed or must point to the existence of additional responsive material." *VeroBlue Farms USA Inc. v. Wulf*, 345 F.R.D. 406, 420 (N.D. Tex. 2021) (internal quotations omitted). If the documents sought have not been reviewed by an expert, then it is not an expert discovery issue but rather a fact discovery issue. *Deal*, 2009 WL 10700909. SBI has produced and/or identified the documents and data that Valentine considered in forming his opinions in this case and Whinstone's arguments to the contrary are irrelevant to the admissibility of Valentine's opinions. Dkt. 96-1.

    2.    <u>Whinstone's pattern of willful blindness does not entitle it to any relief.</u>

In many ways, *Texas Grain* mirrors the present dispute. In that case, the plaintiff moved to strike a summary spreadsheet relied on by the defendant's damages expert and the expert's opinions related to the spreadsheet because, it argued, the spreadsheet was made during litigation by the defendant and it did not disclose or produce the source data for the spreadsheet. 2009 WL 10700909 at *1-3. The court rejected entering a finding that the defendant violated its discovery obligations because "there [was] no basis ... other than Texas Grain's speculation that Monsanto has documents it did not produce ... " *Id.* at *7. Similarly, Whinstone has done nothing more than speculate that SBI has withheld documents or information from Whinstone. None of the deposition testimony cited by

---

[6] *Deal v. Louisiana ex rel. Dep't of Justice*, No. CIV.A. 11-743-JJB, 2013 WL 4546772, at *6 (M.D. La. Aug. 28, 2013) (requiring the production of tax returns for 2004-2009 reviewed by the expert, but not subsequent tax returns the expert did not review); *cf. Sanchez v. Gomez*, No. EP-17-CV-00133-PRM, 2019 WL 12536398, at *3 (W.D. Tex. Apr. 29, 2019) (citing to *Deal*, 2013 WL 4546772, at *4) (required production of certain documents reviewed by the expert). The movant has the burden of showing a "specific or material deficiency" in the other party's production. *VeroBlue Farms USA Inc. v. Wulf*, 345 F.R.D. 406, 420 (N.D. Tex. 2021); *see also Baker v. Walters*, 652 F. Supp. 3d 768, 786 (N.D. Tex. 2023); *see also Tex. Grain Storage, Inc. v. Monsanto Co.*, No. CV SA-07-CA-673-OG, 2009 WL 10700909, at *7 (W.D. Tex. May 26, 2009).

Whinstone contains any admissions that Valentine reviewed additional documents, spreadsheets, or data other than what comprised his own spreadsheets.

SBI has produced the Luxor data set at least three separate times in this case. First, Carson Smith downloaded the Luxor data set and SBI produced it in spreadsheet form. Dkt. 96-1 at 5-6; Deposition of SBI's Corporate Representative, attached hereto as **Ex. "I,"** at 15:1-16:15, and incorporated herein by reference. Second, Valentine downloaded and produced the Luxor data set in his Scenario_Alpha_Valentine spreadsheet and produced the python script used to download the data from Luxor so that Whinstone could also download the data. Dkt. 96-1 at 5-6; Deposition of Randall Valentine, attached as **Ex. "D,"** at 116:19-117:6, 339:4-343:18. Finally, Valentine produced the data set in Luxor's own spreadsheet format along with detailed step-by-step instructions on how to download the data directly from Luxor. *Id.* Following the last production, Whinstone not only recognized SBI's production of the Luxor data set but withdrew its discovery dispute related to the Luxor data. **Ex. "F."**

Next, Whinstone cites Valentine's deposition testimony on pages 261-267 to suggest that SBI has not produced or disclosed its methodology used to allocate cryptocurrency. Dkt. 136 at 2, n.3. In those pages, Whinstone's counsel asked Valentine about  specific spreadsheet he considered, and Valentine testified to his understanding of the spreadsheet, how he verified the data contained therein, and generally how pool allocations work.[7] **Ex. "D,"** at 258:4-269:3.

Next, Whinstone cites to pages 337 to 339 to suggest that SBI has not produced "internal records (*i.e.*, the source data)" regarding the pool allocations and that SBI

---

[7] Notably, Valentine first disclosed his review of SBI's mining transactions in his initial report. **Ex. "B,"** at 3-4. He further explained his independent verification and analysis of 690 blockchain transactions in his supplemental report. **Ex. "C,"** at 14-15. Whinstone has also conceded to this. **Ex. "F."**

manually entered the information into Valentine's spreadsheets. Dkt. 136 at 2-3, n.4. Valentine actually testified that he, not SBI, entered the information into his spreadsheets. **Ex. "D,"** at 337:22-25, 338:21-339:3. He further explained that the information from his spreadsheet came from various spreadsheets produced by SBI in this case. *Id.* at 338:7-15, 339:11-24. Prior to Valentine's deposition, SBI voluntarily identified the precise spreadsheets in response to Whinstone's requests. **Ex. "B,"** at 28; **Ex. "C,"** at 29; **Ex. "I,"** at 15:1-16:5; Dkt. 96-1. The information contained in the spreadsheets from SBI contain contemporaneously recorded pool allocations for SBI's mining operations at Rockdale and Russia.[8] **Ex. "I,"** at 131:21-133:7; 134:24-135:18, 135:23- 137:11. Regardless, a party preparing a summary spreadsheet for its expert to review and use is standard practice and does not render the spreadsheet or the opinions based thereon unreliable. *Texas Grain*, 2009 WL 10700909 at *7.

Notably, Whinstone complains about not understanding how SBI allocates mining pool rewards in the spreadsheets it produced but did not ask any questions on the topic during the deposition of SBI's corporate representative or Vitalis, its current CEO. Moreover, Whinstone creates categories of information outside of SBI's possession, custody, and control wholly irrelevant to the lost profit calculations such as companies other than SBI that participated in the pool, what type of miners they used, how many, etc. Dkt. 136 at 9. Whinstone does not explain why any of this information has any relevance to Valentine's lost profit damages, nor do they provide any supporting testimony or declaration.

Whinstone further misrepresents Valentine's testimony regarding SBI's sale of

---

[8] The mining pool data is publicly available on the blockchain and SBI's corporate representative walked Whinstone's counsel through the process by which the mining pool data can be viewed. **Ex. "I,"** at 131:21-133:7.

cryptocurrency. Valentine did not testify that these figures originated from undisclosed internal records, nor that SBI manually entered the numbers into his spreadsheet. In fact, he testified that it is "not correct" that his spreadsheet does not reflect the sale of bitcoin by SBI. **Ex. "D,"** at 212:10-213:4. He further testified that he analyzed specific sales of bitcoin and included that within his Scenario_Alpha_Valentine spreadsheet. *Id.* at 213:9-214:11. Whinstone objects that because Valentine used the phrase "internal records"—the specific records he lists in his report[9]—instead of recalling a specific bates number, that the records have not been disclosed. This is pure speculation and cannot support exclusion of Valentine's testimony.

Finally, Whinstone wrongly asserts that Valentine did not disclose the inputs he used for his event study analysis in for period 2. Dkt. 136 at 3. Valentine did not testify that he failed to produce the input data for his event study analysis. Rather, he testified that the inputs came from Texas and Russian mining data produced in this matter. **Ex. "D,"** at 268:7-270:6. The formulas for his event study are provided in his Initial Report. **Ex. "B,"** at 11-12; **Ex. "D,"** at 271:22-272:2. The outputs from his calculation are contained within his SBI Crypto Calculations spreadsheet produced with his initial report. **Ex. "D,"** at 272:3-15.

Whinstone's decision to instruct its experts not to review SBI's production is what "materially impaired … its experts' ability to test and verify the assumptions and conclusions underlying SBI's claims," not SBI.

---

[9] **Ex. "B,"** at 28.

3.    <u>The Court should allow Valentine's summations of the previously disclosed unappreciated lost profit damages.</u>

As explained in his Declaration, Valentine previously disclosed his calculation of the lost net bitcoin, the historic price of bitcoin, and lost net profits based on the historic price of bitcoin on a monthly basis in his Loss of Profit Calculation 2 tab in his Scenario_Alpha_Valentine spreadsheet produced with his Initial Report. **Ex. "A,"** at ¶¶ 4-8. By summing the monthly totals to arrive at a complete calculation of each time period Valentine does not introduce any new methodology or data, which is an appropriate supplement. *See Union Oil Co. of California v. Buffalo Marine Serv.*, No. 1:10-CV-195, 2012 WL 13034559, at *3 (E.D. Tex. Jan. 10, 2012) ("Lerman's supplement does precisely what is required by Rule 26(e)(2), as it corrects miscalculations contained in his initial report and revises his prior estimates of Union Oil's lost profits."); *see also Bavely, Tr. of AAA Sports, Inc. v. Panini Am., Inc.*, No. 4:22-CV-00093, 2023 WL 12098406, at *3 (E.D. Tex. July 5, 2023) ("The Supplements did not go beyond proving up the opinions contained in the Wulkan Report; thus, the Court sees no reason to strike the Supplements."); *Rex Real Est. I, L.P. v. Rex Real Est. Exch. Inc.*, No. 19-CV-00696, 2022 WL 1087564, at *2 (W.D. Tex. Apr. 8, 2022) ("updating his prior analyses to incorporate the additional information and updated data produced–is appropriate supplementation."). Therefore, the *Sierra Club* factors do not apply.

Alternatively, the Court should determine that the additional calculations contained in Valentine's Declaration are otherwise admissible under the *Sierra Club* factors. First, there is no prejudice to Whinstone as all of this information has previously been disclosed, Valentine just provides the sum of his prior calculations—simple

addition.[10]

Second, the Court previously relied on Whinstone's argument that Valentine's supplemental report was unimportant SBI "can just rely on the original reports." **Ex. "J,"** at 47, 52. Now, Whinstone asserts that Valentine's Initial Report is defective for not copying the unappreciated damages from his spreadsheet into his Initial Report. The Fifth Circuit has consistently recognized that striking a plaintiff's damages expert is the most extreme sanction that should be reserved for the most extreme cases. *Eagle Railcar Services-Roscoe, Inc. v. NGL Crude Logistics*, LLC, No. 1:16-CV-0153-BL, 2018 WL 2317696, at *11 (N.D. Tex. May 22, 2018) (citing *Betzel v. State Farm Lloyds*, 480 F.3d 704, 708 (5th Cir. 2007)); *see also* Dkt. 91. SBI maintains that no basis exists to exclude Valentine, but should the Court even determine that the summation contained in the Declaration is necessary for Valentine to testify at trial, the Court should allow the summation rather than exclude his opinions.

## B. Valentine reliably applied an established methodology to industry-standard data to calculate a reasonably certain amount of lost profits.

Federal Rule of Evidence 702 permits a witness "qualified as an expert by knowledge, skill, experience, training, or education" to offer opinion testimony if (1) the witness's expertise will help the trier of fact to understand the evidence or to determine a fact in issue, (2) the testimony is based on sufficient facts or data; (3) the testimony is the

---

[10] Whinstone also previously substantially overstated its prejudice and the time and cost necessary to review and rebut. Matthews testified that that prior to issuing his rebuttal report, he reviewed Valentine's supplemental report and the only "changes in methodology" he identified was an alleged change in the explanation of Valentine's retention ratio, the hardcoded data in his spreadsheet being sourced to the Luxor data, and an updated value of bitcoin. **Ex. "E,"** at 66:8-68:23. Moreover, he testified that running queries through TRM labs – none of which he has produced – provides results within a few seconds, and his analysis of the results takes only a couple of hours. *Id.* at 114:5-14. It cannot be the case that it would have taken Matthews 228 hours to review and rebut Valentine's report. Moreover, the additional data was information produced during fact discovery that Matthews should have reviewed regardless but was instructed not to review. *Id.* at 38:3-10, 76:11-21, 81:11-82:3, 84:20-85:4.

product of reliable principles and methods, and (4) the expert has reliably applied the principles and methods to the facts of the case. FED. R. EVID. 702; *Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I, L.L.C.*, 753 Fed. Appx. 191, 195 (5th Cir. 2018).

Texas law governs the requirements for the calculation of lost profit damages. *See DP Sols., Inc. v. Rollins, Inc.*, 353 F.3d 421, 428 (5th Cir. 2003) (state substantive law governs the measure of damages in diversity cases). Under Texas law, lost profits must be reasonably certain. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992); *Homoki v. Conversion Services, Inc.*, 717 F.3d 388, 399 (5th Cir. 2013). Reasonably certain, however, does not require an exact calculation. *Homoki*, 717 F.3d at 399 *(citing ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex.2010)). Reasonably certain is a "fact intensive determination." *Holt*, 835 S.W.2d at 84. "Uncertainty as to the ***fact*** of legal damages is fatal to recovery, but uncertainty as to the ***amount*** will not defeat recovery." *Homoki*, 717 F.3d at 399 *(citing Swinnea*, 318 S.W.3d at 876) (emphasis added). A discrepancy between two reasonable amounts will not defeat recovery for lost profit damages. *Swinnea*, 318 S.W.3d at 876. The plaintiff must show that competent evidence exists to establish some reasonably certain amount of lost profits. *Id.* at 880. Here, Whinstone's objections go to the amount of lost profits, not the existence of lost profits.

    1.    <u>Valentine relied on facts and data consistently recognized as sufficiently reliable by courts.</u>

In calculating lost profits, experts may rely on the relevant contract and invoices. *See, e.g.*, *Rollins,* 353 F.3d at 429–30; *Hiller v. Manufacturers Prod. Research Group of N. Am., Inc.*, 59 F.3d 1514, 1525 (5th Cir. 1995) ("A binding contract which would have

resulted in ascertainable profits can satisfy the plaintiff's burden of proving lost profits with reasonably certainty."); *Fiberlok, Inc. v. LMS Enterprises, Inc.*, 976 F.2d 958, 963 (5th Cir. 1992) (finding the contract was sufficiently specific to allow for the calculation of lost profits with reasonably certainty). Additionally, the personal knowledge and testimony of a business's management can provide a sufficient basis for the calculation of lost profits. *Homoki*, 717 F.3d at 399; *Naegeli Transp. v. Gulf Electroquip, Inc.*, 853 S.W.2d 737, 740 (Tex. App.—Houston [14th Dist.] 1993, writ denied).

Moreover, experts can rely on summary spreadsheets prepared by their client, even made for the purposes of or in the course of litigation. *Tex. Grain Storage, Inc. v. Monsanto Co.*, No. CV SA-07-CA-673-OG, 2009 WL 10700909, at *7-8 (W.D. Tex. May 26, 2009); *B.J. Tidwell Indus., Inc. v. Diversified Home Products, Inc.*, No. CIVA SA06CA-0264FBNN, 2007 WL 3118300, at *2 (W.D. Tex. 2007). The objecting party has the burden to show that any errors or missing information in a spreadsheet material impacts any calculations based on the spreadsheet. *Id.* at *8.

Whinstone first contends Valentine's calculations using the event study for time period 2 are unreliable because he does not have actual mining data and instead relies on "SBI['s] financial reporting." Dkt. 136 at 11. Nowhere does Whinstone explain why a damages expert cannot rely on financial statements created by a litigant to calculate its lost profits. If a damages expert cannot rely on the financial reporting of his client, no damages expert will ever qualify under Rule 702.

There is no suggestion whatsoever that the underlying financials are untrustworthy or unreliable. Whinstone cannot credibly make that argument because it knows it can easily be verified through an examination of the blockchain ledger, Whinstone's invoices, and the Luxor data set, all which Valentine analyzed in his Initial

Report.[11] Valentine also calculated SBI's lost profits under the Luxor data set in his spreadsheets attached to his Initial Report. **Ex. "A,"** at ¶¶ 4-6. Both methods provide a reliable calculation of SBI's lost profits by either relying on the industry standard, historic Luxor dataset or by conducting an event study comparing the performance of 20,000 miners at Rockdale to the 20,000 miners at Russia, that all came from the same production batch of A10 miners.

Once again, *Texas Grain* is instructive here. The plaintiff in *Texas Grain* made identical objections as Whinstone to a summary spreadsheet considered by an expert. *See*, 2009 WL 10700909, at *2-3. The plaintiff argued that the expert's reliance on a summary spreadsheet created by his client after litigation began rendered the expert's opinions related to that spreadsheet unreliable. *Id.* The plaintiff also asserted that the spreadsheet contained errors and was not independently verified by the expert. *Id.* The district court rejected these objections, noting a client preparing a spreadsheet for its witness does not make the spreadsheet or the expert's consideration of it unreliable, and any discrepancies go to weight, not admissibility. *Id.* at *7-8. Similarly, in *BJ Tidwell*, the court rejected similar objections noting it is reasonable for an expert to rely on the financial statements, spreadsheets, or other such documents prepared by a party for its expert. *B.J. Tidwell Indus., Inc.*, 2007 WL 3118300, at *2. Whinstone makes no attempt to show why any of its criticisms of the SBI's financial documents materially impacted Valentine's calculations in this case.

Next, Whinstone's assertion that Valentine "does not know the mechanics of and

---

[11] Note, Whinstone does not dispute the reliability of the Luxor data because Luxor is the industry-standard data set for determining the actual historic daily global computational difficult and pool-wide reward structure. It is relied on by Whinstone's own experts and by its parent company, Riot, in its SEC filings. **Ex. "A,"** at ¶ 9.

participation in SBI's mining pool, and he made up his retention ratio calculation ... " has no support and is contradicted by Matthews' testimony.[12] As stated in his Initial Report, Valentine discussed SBI's business practices with its representatives Smith, Vitalis, and Tanemori. **Ex. "B,"** at 3. He testified that his understanding, based on his conversations with SBI, was that SBI only sold bitcoin as necessary to cover expenses. **Ex. "D,"** at 204:10-20. He explained that he understood that there were other participants in SBI's mining pool but that he verified the information in his report by performing his own tracing analysis. *Id.* at 97.2-10; 227:9-21. Contrary to Whinstone's assertions, Valentine further explained his retention ratio reflects the net Bitcoin retained after calculating expenses incorporating the periodic exchange rate for Bitcoin over a four-year period. *Id.* at 186:8-187:12; 203:23-204:9; 212:19-213:8; 308:7-309:20.

2.   <u>Valentine considered all material costs, and Whinstone's purely speculative assertion that additional costs exist goes towards the weight, not admissibility of Valentine's opinions.</u>

Whinstone misrepresents Valentine's actual calculation of SBI's lost profits, and the variables considered. First, Whinstone incorrectly states that Valentine assumed all 20,000 miners ran in the manufacturer-specified turbo mode without interruption. Dkt. 136 at 11. Valentine actually included a 5 percent downtime buffer for the miners. **Ex. "D,"** at 109:9-16.

Second, Whinstone asserts that Valentine ignored SBI's expenses because he relied

---

[12] Matthews testified that the industry-standard methodology for calculating a retention ratio is bitcoin retained divided by total bitcoin mined, then multiplied by 100. Deposition of Jeffrey Matthews, attached as **Ex. "E,"** at 104:8-12. He also agreed that bitcoin retained equals the amount of bitcoin mined minus the bitcoin sold. *Id.* at 105:18-106:3. He further agreed that if a company had a policy to only sell the amount of bitcoin needed to cover expenses, then bitcoin retained is simply bitcoin mined minus the bitcoin in expenses. *Id.* at 106:4-107:1. In determining a company's policy on bitcoin retention, he would look to the executives of the company and their official position. *Id.* at 107:9-17. That is precisely what Valentine did. **Ex. "D,"** at 203:23-204:9.

on SBI's contractually required expenses. Dkt. 136 at 11. The Hosting Agreement includes all of the expenses associated with SBI's operations at the Rockdale Facility. *See* **Ex. "A,"** at 10, Figure 7; **Ex. "D,"** at 335:19-336:10. Specifically, it includes electricity (the most significant cost in mining operations), SBI's prepayment of $7.5 million, and the advanced remote hands service fee. **Ex. "D,"** at 214:14-216:5; *see also* **Ex. "A."** The contractually-required fees form the basis for Valentine's calculation of SBI's expected costs. *Id.*; **Ex. "D,"** at 335:19-336:10.

Whinstone asserts, without any basis, that SBI had "other operating and fixed expenses" related to its operations at Rockdale "such as depreciation, rent, salaries, interest, taxes, etc." Dkt. 136 at 11. Whinstone has the burden to provide sufficient evidence that these additional "expenses" exist and are material to the calculations. *Swinnea*, 318 S.W.3d at 878. "Were this not so, every facially adequate calculation of lost profits would be susceptible to an unsubstantiated challenge that something is missing." *Id.* Not every cost a business incurs is relevant to a lost profits calculation. *See*, *e.g.*, *id.* at 879 ("However, it is not necessarily the case that a company will incur increased expense or overhead…"); *Digital Generation, Inc. v. Boring*, No. 12-15271, 2013 WL 4483497, at *9 (E.D. Mich. Aug. 20, 2013) ("The costs relevant to lost profits are the costs attributable to performance."); *Motion Med. Techs., L.L.C. v. Thermotek, Inc.*, 875 F.3d 765, 780 (5th Cir. 2017) (Omission of overhead expenses is not fatal if the party "could have performed profitable services using only its existing resources.").

Whinstone provides no evidence that Valentine missed any material expenses. In fact, Whinstone's expert, Jeff Matthews, testified that the additional expenses he identified (and that Whinstone now relies on) were immaterial, and he did not actually know what additional expenses SBI would have incurred. **Ex. "E,"** at 168:22-169:3,

172:14-174:4, 184:13-25, 186:2-23, 189:12-190:8. Matthews went so far as to call it a "half-baked guess." *Id*. Importantly, this was a service contract that contained all material costs. Whinstone's "half-baked guess" that SBI could have had additional expenses is the exact kind of rank speculation that the Texas Supreme Court warned against in *Swinnea*.

> 3.    <u>Whinstone's remaining arguments do not target the reliability of Valentine's calculations, but rather SBI's entitlement to damages in general.</u>

Whinstone's arguments regarding the appreciation of bitcoin, the limitation of liability provision, and the termination provision have no bearing on the reliability of Valentine's lost profits calculation and, therefore, are not the proper subject of a *Daubert* motion. First, Whinstone incorrectly states that Texas law "precludes lost profits derived by using the value of Bitcoin at the time of trial." Dkt. 136 at 12. Whinstone does not identify a single case involving *any* damages calculation involving bitcoin. Moreover, *Miga* and *Anderson*, cited by Whinstone, did not render take-nothing judgments nor did they strike expert calculations. *See generally Miga v. Jensen*, 96 S.W.3d 207 (Tex. 2002); *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812 (Tex. 1997).

The only Texas court that has addressed the recoverability of the value of bitcoin at the time of trial is *Ahlgren v. Ahlgren. See generally*, 703 S.W.3d 378 (Tex. App.—Corpus Christi-Edinburg 2023, pet. denied). In *Ahlgren*, the court found it appropriate for the lost bitcoin to be valued at the time of trial because it is an appreciating asset. *Id*. at 402. Here, as indicated in his Initial Report, Valentine applied the value of bitcoin at the time of the Initial Report to the net lost bitcoin to arrive at his damages numbers. **Ex. "B,"** at 3. He also included the historic price of bitcoin in his Scenario_Alpha_Valentine spreadsheet, which he used to determine the unappreciated value of Bitcoin as well. **Ex. "A,"** at ¶¶ 5-8. Regardless of the factor applied to convert the lost bitcoin into dollars, it

does not change the amount of lost bitcoin. Thus, any challenge as to whether the value of bitcoin should be determined at the time of mining or at the time of trial, goes towards the amount of lost profits and not the fact of lost profits.

Whinstone's assertion that SBI waived its rights to recover under the limitation of liability provision has already been expressly rejected by this Court. Dkt. 9, 24, and 28. Moreover, the limitation of liability provision unambiguously does not apply to SBI's fraud allegations. *See* **Ex. "G,"** at 16. Therefore, it provides no basis to exclude Valentine's calculations as unreliable.

Lastly, Whinstone asserts that SBI cannot recover post-termination damages. First, whether SBI can recover for post-termination damages and whether Valentine calculated lost profits post-termination are two different inquiries. *See Chem. Distributors, Inc. v. Exxon Corp.*, 1 F.3d 1478, 1487 (5th Cir. 1993). Whinstone's objections do not attack the reliability of analyzing the historic Luxor data to determine the profitability of SBI's mining operations as Valentine did in period 1. Dkt. 136 at 12-13. Whinstone only attacks whether SBI has a legal right to recover post-termination. *Id.* Second, Whinstone again ignores SBI's fraud allegations. Whinstone should not be allowed to cut SBI's recovery for a contract it fraudulently induced simply because it breached confidentiality to negotiate its purchase by Riot in order to get out of its contract with SBI. *See Phillips v. Carlton Energy Group*, LLC, 475 S.W.3d 265, 280 (Tex. 2015).

## CONCLUSION

For the foregoing reasons, the Court should deny Whinstone's Motion to Exclude Randall Valentine, find that the opinion testimony expressed in the Declaration of Valentine constitute an admissible addendum to his Initial Report, and grant all other relief to which SBI may be justly entitled.

Respectfully submitted,

By: */s/ Joshua M. Sandler*
Joshua M. Sandler
  Texas Bar No. 24053680
  jsandler@winstead.com
Cory Johnson
  Texas Bar No. 24046162
  cjohnson@winstead.com
Andrew Patterson
  Texas Bar No. 24131573
  apatterson@winstead.com
John D. Janicek
  State Bar No. 24125636
  jjanicek@winstead.com
**WINSTEAD PC**
2728 N. Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (214) 745-5103
Facsimile: (214) 745-5390

**ATTORNEYS FOR PLAINTIFF**
**SBI CRYPTO CO. LTD**

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served in accordance with the Texas Rules of Civil Procedure via the court's e-filing system on November 21, 2025.

/s/ Andrew Patterson
Andrew Patterson