1               UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
2                     WACO DIVISION

3   SBI CRYPTO, LTD.          ) Docket No. WA 23-CA-252 ADA
                              )
4   vs.                       ) Waco, Texas
                              )
5   WHINSTONE US, INC.        ) September 11, 2025

6

7         TRANSCRIPT OF DISCOVERY AND MOTION HEARING
            BEFORE THE HONORABLE DEREK T. GILLILAND

8

9   APPEARANCES:

10  For the Plaintiff:        Mr. Cory C. Johnson
                              Mr. Andrew J. Patterson
11                            Winstead, PC
                              500 Winstead Building
12                            2728 North Harwood Street
                              Dallas, Texas 75201

13

14  For the Defendant:        Mr. Brandon C. Marx
                              Mr. J. Michael Thomas
15                            Foley & Lardner, LLP
                              2021 McKinney Avenue, Suite 1600
16                            Dallas, Texas 75201

17

18  Transcriber:             Ms. Lily Iva Reznik, CRR, RMR
                              501 West 5th Street, Suite 4153
19                            Austin, Texas 78701
                              (512)391-8792

20

21

22

23

24

25  Proceedings reported by digital sound recording,
    transcript produced by computer aided-transcription.

```
 1                (Proceedings commence at 9:00 a.m.)

 2           THE COURT:  Ms. Copp, would you please call the

 3    case?

 4           THE CLERK:  Yes, your Honor.

 5           Calling Case No. WA-23-CV-252, styled, SBI Crypto

 6    Company, Limited vs. Whinstone U.S., Incorporated.  Called

 7    for motions and discovery hearing.

 8           THE COURT:  All right.  Could I get announcements

 9    starting with the plaintiff?

10           MR. JOHNSON:  Yes.  Good morning, your Honor.

11           Cory Johnson and then, my colleague, Andrew

12    Patterson, on behalf of the Plaintiff SBI Crypto.

13           THE COURT:  All right.  Good morning.

14           And for the defense?

15           MR. MARX:  Brandon Marx arguing today, also

16    observing today, Michael Thomas of Foley & Lardner on

17    behalf of Defendant Whinstone US, Inc.

18           THE COURT:  Okay.  Very good.  All right.  So I

19    don't know.  We've got a dispute chart, the motion, kind

20    of all intertwined, I suppose.  So I guess, Mr. Marx, do

21    you want to lead off and tell us where we are since it was

22    defendant's motion to strike?

23           MR. MARX:  Sure, your Honor.  I plan on leading

24    with the arguments since the plaintiff init -- or the

25    defendant initiated all three -- two of the motions and
```

1    then, the discovery dispute.

2          One housekeeping request is that we think that

3    the motion to strike will largely be dispositive of many

4    of the issues today, and for the sake of efficiency, we

5    would request that if the Court's inclined to decide that

6    issue and then, we can determine whether a continuance and

7    reopening discovery and attorneys' fees are necessary, and

8    then, we would just need to clean up with housekeeping on

9    some of the discovery issues.

10          How would the Court like us to proceed?

11          THE COURT:  No.  And that makes sense from my

12    review of the motions is that that was really the crux of

13    the issue today is going to be that motion to strike --

14          MR. MARX:  Okay --

15          THE COURT:  So why don't we start with that.

16          MR. MARX:  Thank you, your Honor.  May I approach

17    the stand?

18          THE COURT:  You may.  Yes.

19          MR. MARX:  And again, I appreciate -- greatly

20    appreciate your Honor taking the time to hold this hearing

21    today on an expedited timeframe as that will greatly

22    assist the parties in moving this case forward.  We are

23    here today because SBI served three new and untimely

24    expert reports and failed to disclose an expert witness.

25    Specifically, SBI blind-sided us by serving new expert

1    reports over a hundred days late that occurred just before

2    on and three weeks after Whinstone's rebuttal expert

3    deadline.  Each of these new expert reports include new

4    fact, opinions and analysis concerning information that

5    has always been in SBI's possession, custody or control.

6         Additionally, one of these new expert reports

7    relies upon a lost profits analysis compiled by Carson

8    Smith, who has never been disclosed, is an expert witness,

9    and that lost profit analysis was not produced until after

10   the fact discovery deadline.  As the Court can see, SBI

11   has had years to prepare and compile its affirmative

12   expert reports using SBI's own information, yet, these

13   reports were not served until 108 and 133 days after SBI's

14   March 28th, 2025 affirmative expert disclosure deadline.

15        After we learned from briefing on Whinstone's

16   motion to strike and motion for continuance, the alleged

17   need for these new reports arose from information SBI was

18   compelled to produce by this court back in April 2025.

19   Notwithstanding the deadline in that order to produce the

20   information, SBI made an additional untimely production on

21   June 24th, 2025, just three weeks before the rebuttal

22   deadline.

23        Given that SBI's experts did not cite to any of

24   the documents in these productions, we did not expect

25   SBI's experts to be relying on this information, but now

1    they do.  At no time during the parties' numerous

2    meet-and-confers on amending the scheduling order or other

3    discovery-related items did SBI ever raise the need to

4    supplement or change the affirmative expert disclosure

5    deadline.  You'll recall the parties submitted a sixth

6    amend -- or a fifth amended scheduling order in May that

7    kept the same date of March 28th.  We believe SBI's

8    conduct is patently improper and that new reports should

9    be stricken and Mr. Smith should be prohibited from

10   testifying on his lost profit analysis.

11          Therefore, given the nature of the dispute today,

12   we would propose that the Court decide whether SBI's new

13   reports are timely and permitted to stand.  And as -- if

14   that is the case or if those reports are stricken, then as

15   we discussed just a moment ago, then we can move on to the

16   discovery issue; otherwise, we'll need to address the

17   prejudice that's been caused to Whinstone.

18          As far as the law, SBI's improperly trying to use

19   its duty to supplement as cover to issue the new reports,

20   which are nothing but supplements.  And as the Court well

21   knows, Rule 37 provides that any untimely report or

22   nondisclosure results in automatic exclusion unless the

23   failure were substantially justified or harmless.  Case

24   law is clear that it is SBI, not Whinstone, that bears the

25   burden of proving an exception to that automatic striking.

1    Specifically, SBI must prove, number one, the new reports

2    are permitted under Rule 26(e) or, number two, the failure

3    to timely serve the new reports and the nondisclosures are

4    substantially justified are harmless.

5             SBI cannot meet that burden because there's no

6    valid justification for SBI's conduct which has caused --

7    greatly prejudices Whinstone.  Whinstone spent a

8    substantial amount of time and money preparing the reports

9    to SBI's original March 28, 2025 expert reports.

10   Whinstone should not be forced to spend additional amounts

11   of money and time responding to untimely new reports and a

12   nondisclosure.  Again, it's undisputed that these new

13   reports were served over a hundred days after SBI's

14   disclosure deadline and Carson Smith was never disclosed

15   as an expert and his lost profit analysis was relied upon

16   in one of these supplemental new reports was produced

17   after the fact discovery deadline.

18             As a result, the rules require the new reports

19   and Smith be automatically stricken unless SBI establishes

20   an exception, which it cannot.  And Whinstone will reserve

21   the remainder of its time to rebut those factors as it's

22   SBI's burden.

23             THE COURT:  All right.  Thank you, Mr. Marx.

24             Mr. Johnson.

25             MR. JOHNSON:  Yeah.  Thank you, your Honor.

1          THE COURT:  Assuming you're going to be

2     responding on it.  I didn't know if maybe Mr. Patterson

3     was -- oh.

4          MR. JOHNSON:  Can I share my presentation, your

5     Honor?

6          THE COURT:  You may.  Yeah.  We'll just need to

7     get the one taken down, I guess, is Mr. Thomas' screen.

8          MR. THOMAS:  I'm trying to, Judge.

9          THE COURT:  Yeah.  That's all right.  Takes a

10    second.  There we go.

11         MR. JOHNSON:  Thank you, your Honor.

12         I would like to just give the Court some context

13    and background on this case to sort of put in context

14    these reports --

15         THE COURT:  Okay.  And if you don't mind, I'm

16    going to ask you to move to the podium.

17         MR. JOHNSON:  Okay.

18         THE COURT:  For your remarks.

19         MR. JOHNSON:  So this is a case between a crypto

20    mining company plaintiff -- crypto mining is a business in

21    which a company will establish or deploy mining equipment

22    or these computers that mine for cryptocurrency.

23    Whinstone, the defendant in this case, is a miner hosting

24    company.  In this instant, they provide the facilities and

25    environment in which these miners are operated as well as

1  the electricity.

2          In this case, there's been three witnesses on

3  behalf of the Plaintiff SBI Crypto.  Their CEO -- their

4  former CEO Carson Smith, their former General Manager

5  Jonathan Tanemori, and their current CEO Nick Vitalis.

6  The primary witnesses that were appearing on behalf of

7  Whinstone were Chad Harris, Lyle Theriot and Ashton

8  Harris.  These are important in this case in the sense

9  that these are the individuals who effectively designed

10 and constructed the facility that became -- at issue in

11 this case.

12          This is the early pictures of the facility.

13 There are essentially three customers early on in the

14 first couple of years of this facility.  GMO, which is

15 Building A on the far right.  SBI Crypto occupied the

16 middle building and -- which is Building B, and Rhodium

17 occupied Building C and part of Building B.

18 Interestingly, your Honor, all three of these companies

19 have sued Whinstone related to the environmental

20 conditions at their company and the performance of their

21 contracts in this -- in various forms.

22          Here's a hosting service agreement which is the

23 primary document in this case.  Important provisions in

24 that contract include a promise to have delivered to SBI

25 50 megawatts for their 20,000 miners by December 2019.

1   Their representation that the facility had one gigawatt of

2   capacity, that no permits were needed to construct this

3   facility, and that the facility would be built with intake

4   and exhaust fans to ensure adequate airflow.  That the

5   facility would be built with dust filters, have

6   evaporative curtains and adequate temperature control,

7   which is very important for running these miners.

8          To optimize their performance, they have to be

9   ran below a certain temperature under certain conditions

10  in order to produce their expected profit.  The

11  allegations in this case are that Whinstone misrepresented

12  and/or breached all the provisions of this contract,

13  including the delivery of 50 megawatts of power by that

14  date, which they knew as we alleged that they would never

15  reach.  We also -- they also, their promise with regard to

16  the capacity of the facility was also false -- false

17  representation in that they never had -- they didn't have

18  a power purchase agreement at the time of the contract.

19         They also despite representations needed a storm

20  water permit and to the extent that they promised that

21  they would build these facilities with fans, dust filters

22  and temperature control infrastructure, they knew that

23  they couldn't deliver that for various reasons that I

24  won't get into fully, but essentially, these were both

25  breaches and representations that they knew at the time to

1  be false.

2      This resulted in the destruction because they had

3  no fans, no filters, and no temperature control, this is

4  what happened to our -- these are -- on the right side are

5  essentially pictures of the internal parts of some of our

6  mining machines.  The allegations of this case are that

7  due to their performance and fraudulent conduct, they

8  destroyed and damaged our equipment.  It also led to

9  millions of dollars in lost Bitcoin earnings that they

10  have otherwise received.

11      If you notice on this chart, your Honor, there's

12  a section about the construction delay.  That's where we

13  allege that they falsely promised to have our miners up

14  and running by December 2019 when they finally did get it

15  running some nine months later, these machines grossly

16  underperformed due to the conditions at their facility,

17  which included overheating, excessive dust and a

18  completely -- knowingly mis-designed facility.  So this is

19  the sort of comparison of what the expected performance of

20  Bitcoin that should have been generated versus what the

21  actual was.  This appears in both the initial report of

22  our damages expert and his supplement thereto.

23      These are the four experts that SBI intends to

24  present.  Phil Isaak, a licensed engineer, his expertise

25  is in the construction and operation of data centers.  He

1    has extensive experience related to the completion of more

2    than 190 data centers.  These three experts are the three

3    experts to the right who've actually supplemented their

4    reports.  Charles Byers is a computer engineer, holds 134

5    patents, many patents related to the cooling of and proper

6    operation of CPUs in computer systems.  Dr. Valentine is

7    an associate professor of finance with significant

8    academic and litigation experience analyzing

9    cryptocurrency-related matters.  And finally, Michael

10   Schuler is an expert in the resale of these computers and

11   resale in the secondary market of these computers.

12        And essentially going to the next slide, Phil

13   Isaak didn't supplement, your Honor, but they cancelled

14   the deposition anyway with no basis.  None of these

15   experts have been deposed.  Charles Byers is essentially

16   -- let me go back to Phil Isaak.  Phil Isaak essentially

17   will be testifying as to the industry standards for these

18   data centers and whether they were met and whether this

19   facility met the contractual terms as expected.

20        Charles Byers is essentially the causation expert

21   who will describe in more detail how the facility and the

22   environmental conditions therein resulted in the

23   under-performance damage and failure of SBI's machines.

24   Randall Valentine is essentially the lost profits and lost

25   Bitcoin damage expert who will testify as to the net

1 profits or expected Bitcoin that SBI should have generated

2 but for the acts and omissions of Whinstone.  And finally,

3 Mr. Schuler, who has the experience in reselling

4 computers, will also testify as to the impact of the

5 damages to SBI's equipment.

6         I think if the Court were just to simply review

7 the cases all submitted by both parties, it would become

8 fairly obvious that courts do not strike disclosures made

9 prior to depositions.  Looking at all these cases in which

10 they apply the Sierra factors, all of these cases involve

11 instances where the Court determined that the reports were

12 untimely and, therefore, a new report.  But the court

13 admitted those cases in because essentially here's why.

14 The Fifth Circuit has repeatedly emphasized that the

15 opportunity to depose the expert is a preferred remedy

16 even if a supplement is ultimately determined by this

17 court to be untimely.

18         In all of those cases, depositions were taken and

19 the court still allowed either supplemental deposition

20 and/or did not strike the testimony because in every one

21 of these cases, your Honor, the remedy -- an appropriate

22 remedy is to let the challenging party depose the expert,

23 then come before the court and challenge it with a Daubert

24 challenge or a strike then.

25         Here, Whinstone is prematurely just come in and

1  characterizes reports without deposing these experts and

2  then, have demanded that this court immediately decide

3  these issues without depositions, without factual

4  background sufficient to even make a determination as to

5  whether these supplements -- these are adequate

6  supplements that merely constitute a logical extension of

7  the prior reports or at least consistent with the law

8  governing supplements.

9        And by that, I mean, your Honor, the Court has to

10  decide whether this is merely a supplement of the prior

11  reports and by that, merely a logical extension or

12  elaboration on the initial report.  An untimely report

13  contains -- under the case law can be characterized as

14  either entirely new opinions or a report that addresses

15  subject matters outside the initial report.  And we're

16  prepared to show that these are, in fact, supplemental

17  reports.  But even if they -- the Court determines that

18  they are not supplemental reports, we would contend that

19  under the Sierra factors, these are substantially

20  justified or harmless, which is the standard for

21  determining whether or not to strike.  And these are

22  typically referred to as Sierra Club factors.

23        Also, under Rule 26(e), there's a duty to

24  supplement when a party discovers that they -- to be --

25  they believe to be an error or incompleteness in their

1    report.  And so, let me get into -- because as Whinstone's

2    counsel's pointed out, it is our burden to show this.

3          So the damages expert on lost profits, Dr.

4    Valentine identifies in his supplemental report

5    corrections to his initial report.  Specifically, he

6    realized that he omitted a full month of lost profit

7    calculations for July 2021.  And then, in terms of his

8    other error that he realized is that he charged double or

9    twice for expenses.  As the Court knows, in calculating

10   lost profit damages, you calculate your gross revenue and

11   then apply expenses.

12         In these complicated spreadsheets and

13   calculations, Dr. Randall Valentine believes he in his

14   initial report applied expenses, particularly related to

15   the charging of electricity under the contract to generate

16   these profits, and then, reapplied those same expenses in

17   a retention ratio when calculating the appreciation of the

18   Bitcoin that we allege should -- we should be able to

19   recover under these -- under this case.  I'll explain in

20   more detail as we go along.

21         THE COURT:  Okay.

22         MR. JOHNSON:  So the lost profit model is

23   effectively explained in this graph.  There is an expected

24   performance for these 20,000 A10 miners in terms of

25   generation of Bitcoins over this relevant time period as

1  reflected in that top line.  The bottom line reflects the

2  actual performance or the actual Bitcoin generated.

3  Valentine corrects his initial report in the sense that,

4  as I explained earlier, by moving his double counting of

5  expenses and his addition of an omission of one month.

6  However, the vast majority of the increase is related to

7  ours -- our assertion or SBI's assertion that they should

8  be able to collect on the current value of Bitcoin that

9  should have otherwise been generated.

10          And we cite to a case Ahlgren vs. Ahlgren in

11  which the plaintiff was allowed to recover on the

12  appreciation of Bitcoin value at the time -- as calculated

13  at the time of trial.  This was disclosed in his initial

14  report where he said he's calculating on the value -- his

15  damage model is being calculated on the value of Bitcoin

16  at the time, March 24th, which is just prior to his

17  initial report in March at $82,000, approximately.

18          He said in his initial report should this matter

19  go to trial, I intend to use this price of Bitcoin at the

20  date of trial to calculate the lost profit damages SBI

21  suffered.  In his supplemental report, since he was doing

22  a correction anyway, he then applied the value of Bitcoin

23  around the time of his supplemental report which had then

24  increased to $119,000.  In the initial report, he cited to

25  the case explaining why he intends to apply the actual

1    contemporaneous price of Bitcoin at the time of trial --

2    at or near the time of trial and he again cited to the

3    same case in his supplemental report.  This is just a

4    continuity and a logical extension when you're doing a

5    supplement.  It isn't some, hey, we found a new way to

6    improve our report.  It's something we disclosed in the

7    initial report and it appears in his supplemental report.

8         So going to the Sierra Club factors, even if the

9    Court determines that his report is untimely -- his

10   supplemental report is untimely, the Court still must

11   weigh the Sierra Club factors, including the importance of

12   the witness' testimony, the alleged prejudice to the

13   opposing party, and the possibility of curing such

14   prejudice by granting a continuance, and the explanation

15   we have for as to why we didn't -- SBI didn't comply with

16   the discovery order.

17        So in this case, obviously -- the importance is

18   obvious, he's the lost profit damages expert in this case

19   and, frankly, your Honor, there's been minimal to no

20   prejudice to Whinstone in the presentation of a

21   supplemental report five weeks before his noticed

22   deposition.  If you look at all the cases they cite to

23   you, typically when a court even considers striking a

24   report, it involves a instance of when an expert typically

25   files an affidavit as part of a response to a summary

1    judgment in an effort to rescue some error or rescue some

2    -- after a rebuttal, you realize an expert's done

3    something wrong so they try and correct.

4            In this case, we identified the corrections that

5    needed to be made, made the correction before the rebuttal

6    report, and then offered to Whinstone, hey, we identified

7    these errors, it's six weeks before his deposition.  If

8    you want an extension on your rebuttal to analyze this

9    supplement, let us know what you want and we'll work with

10   you.  They instead decided that it would be advantageous

11   to take their shot at striking the entire supplemental

12   report.

13           Curing prejudice can easily be done through an

14   extension of the rebuttal deadline which was offered and

15   rejected and through a deposition of Valentine.  Once

16   again, our explanation is that this was a correction of

17   errors.  There was also subsequent production during fact

18   discovery that warranted the supplementation of his

19   report.

20           Now, I'm going to go on to Chuck Byers.  Chuck

21   Byers, once again, was a causation expert.  He's the one

22   with the expertise in -- I guess the way I thought of

23   this, your Honor, Phillip Isaak is the expert in the macro

24   sense.  He's built data centers and has advised on how to

25   build data centers.  Charles Byers has built computer

1    systems at the micro legal, i.e., at the CPU miner level,

2    and so, he's there to provide information and testify as

3    to why the environmental conditions at the facility

4    resulted in the under-performance of the construction of

5    these miners.

6         However, what we will show is that this is

7    supplemental which he merely extended -- did a logical

8    extension of his prior report comparing the conditions at

9    the Whinstone facility versus a Russian facility.  So let

10   me explain the background here.  SBI bought 40,000 Cannan

11   A10 miners, same time, same batch, same model.  They sent

12   20,000 of those miners to defendant's facility in

13   Rockdale, Texas, and then, they sent 20 of those -- 20,000

14   of those miners to Russia sometime later.

15        So we have a perfect comparison, your Honor, in

16   terms of -- or a controlled experiment essentially in

17   which you take the same batch of miners and send them to

18   two different environmental environments and one of the

19   issues in this case or one of the assertions in this case

20   by Whinstone, at least at -- by their witnesses, not

21   necessarily by their experts, are that the

22   under-performance and failure of these A10 miners were the

23   result of them being defective.  The reason why we do the

24   comparison between the 20,000 miners in Russia and the

25   20,000 miners in Rockdale is to show that these same batch

1  of miners work fine in Russia, but in their performance

2  and operation in Rockdale, there were mass failures and

3  under-performance.

4         So when you look at the Byers initial report, he

5  offers a chart of root cause theories related to data

6  center design, inadequate heat dissipation, lack of

7  adequate airflow, and a number of factors.  This is

8  initial report.  He also in his initial report, your

9  Honor, did a comparison of the Rockdale facility to the

10  Russian facility.  This is his initial report.

11         After his initial -- this initial report on March

12  24th, Whinstone complained that we hadn't produced enough

13  Russian data and that there was surprise to them that we

14  were doing this comparison.  So we said, what do you want

15  us -- we'll go look for more stuff.  So one of the key

16  documents related to this supplementation was a document

17  that after the initial report was provided and before they

18  filed their motion to compel, additional Russian -- for

19  additional Russian documents, this was produced on April

20  11th.  We found -- SBI found a paper copy of the --

21  describing the facility and assessment of the facility by

22  the operator.  Here's a copy of that.  It's in Japanese.

23  The supplemental report merely takes that information and

24  puts it in the supplement because it was produced after

25  his report.

1          To the extent the rules apply to striking a -- in

2   determining whether or not something's supplemental or

3   not, it's whether that information was available to the

4   expert.  Here, it wasn't made available to the expert

5   until after his initial report.  Here's a comparison.

6   Importantly, what the comparison shows, your Honor, on the

7   left here, we have the graphic from his initial report,

8   from Byers' initial report where he describes how the

9   design of the Whinstone facility in Rockdale essentially

10  resulted in -- because of the lack of fan, excess heat and

11  pressure in the -- what's called the heating aisle.

12  That's -- I'm talking about the picture on the left --

13  which caused our machine to overheat and essentially burn

14  up.

15          If you recall, I showed you the three pictures of

16  SBI's witnesses, Chad Harris, Ashton Harris.  None of

17  those individuals who designed this facility have an

18  engineering background, but they're the ones who decided

19  to build this facility without fans despite the contract

20  requirement to build fans.  And so, one of the central

21  claims in this case, your Honor, is they designed a

22  facility in which the miners themselves were essentially

23  the HVAC system.  The fans on the miners were essentially

24  the only movement of air in this facility.

25          Well, your computer at home, your laptop at home

1  isn't designed even if you put 20,000 of those in there to

2  act as your airflow.  And so, our allegation is that they

3  knowingly designed this facility inadequately and not --

4  despite promising to put in intake fans, they failed to do

5  so.  And so, you put 20,000 fans -- excuse me, 20,000

6  machines in a building like this, they proceeded to burn

7  up quickly and fail quickly because their fans aren't

8  built to push that much air out of a building.  And when

9  you put them back-to-back here as designed on the left,

10  that hot air blows into a single aisle and burns the

11  machines up.  Really simple.

12        The supplement merely added the design document

13  that was found after his initial report and the design on

14  the right just shows how the Russian facility was designed

15  and how their airflow works consistent with industry

16  standards.  So after the initial report, Byers essentially

17  redid his report to compare it to the Russian facility.  I

18  know that's really small, but essentially, it's the same

19  information with the Rockdale facility and the Russian

20  facility largely based on that same information.

21        Also, as I showed you on the initial report, you

22  have a line graph based on a spreadsheet created by Carson

23  Smith, which they've deposed Carson Smith on both a year

24  ago and in their most recent corporate rep deposition, and

25  then, the change, your Honor, effectively in the

1  supplement is to change that line graph to a bar graph.

2  It's not -- changing the demonstrative effectively and

3  changing what amounts to monthly mining revenue in dollars

4  to monthly mining -- monthly Bitcoin mine totals is not

5  the type of change but is merely -- is not a wholly new

6  change -- a wholly new report on a different subject

7  matter.  It's just the presentation of the same evidence

8  in different form.  That's solely appropriate.  I imagine

9  when we get to trial, they'll have their own additional

10  demonstratives and the like.  Nobody's going to sit there

11  and make -- file three separate motions trying to strike

12  information such as this.

13      Once again, this is just a logical extension, an

14  elaboration on the initial report.  The information they

15  complain about in terms of Carson Smith, this is

16  information that data, even though it may have appeared in

17  a different form or a different spreadsheet, is the same

18  data.  And it's just used like, for example, in this

19  instance, to take the same data that they've been aware of

20  and you calculate the percentages, but it's the same data

21  that was provided before.

22      So imagine if, for example, if you say these are

23  the different performances, well then, you do the

24  supplement and you say, well, this is a percentage

25  calculation of the same data.  You're just providing the

1  same information from -- in a more easily digestible form

2  essentially, but it isn't a new report and it's certainly

3  based on the same -- it's not a deviation from the core

4  information provided in the initial report.

5          But once again, if the Court determines that the

6  supplement was untimely, it applies the Sierra factors,

7  the importance of this testimony is obvious.  It's

8  plaintiff's causation expert, prejudice was minimal in the

9  sense that we provided the supplement four weeks before

10  the noticed deposition.  And all the scheduling orders,

11  your Honor, the rebuttal reports were due a month after

12  the initial report.  We've had four scheduling orders in

13  this case.

14          And so, in all the prior scheduling orders, the

15  -- Whinstone was prepared to issue a rebuttal report a

16  month after the initial report.  They've had these initial

17  reports since March and are now suggesting that these mere

18  supplements require a four-month continuance.  At a

19  minimum, that's an admission under the Sierra factors that

20  a condition -- that a continuance would cure the

21  prejudice.

22          THE COURT:  Okay.  The -- and just to make sure,

23  too, I'm tracking that Japanese language document on the

24  Russian facility, that was plaintiff's -- that was SBI's

25  document.

1          MR. JOHNSON:  Yes, your Honor.

2          THE COURT:  I didn't -- it didn't jump out at me

3    at least, but what was the explanation for it not being

4    found earlier in the case?

5          MR. JOHNSON:  The explanation was that when

6    Whinstone came back and said, hey, you've introduced this

7    evidence related to Russia, we believe that there are --

8    there's additional information.  We then did a doubling of

9    our efforts to find anything and everything related to

10   this information.  And frankly, your Honor, this was the

11   type of information that wasn't easily identifiable.  It's

12   literally in the sense that it was a paper copy in a -- as

13   opposed to electronic we can do searches for.  It's a

14   paper copy of a presentation that was in a file cabinet

15   that they found.

16         THE COURT:  Okay.

17         MR. JOHNSON:  It's just --

18         THE COURT:  The additional search --

19         MR. JOHNSON:  Right.

20         THE COURT:  -- resulted in it being found?

21         MR. JOHNSON:  Yes.

22         THE COURT:  Okay.

23         MR. JOHNSON:  Also, the explanation is for the

24   supplement is that this -- that that particular document

25   was found after his initial report.  But regardless, under

1    the Sierra factors, that's a legitimate basis for the

2    Court to essentially allow this supplement in.

3              THE COURT:  Okay.

4              MR. JOHNSON:  And all the cases say that.

5              THE COURT:  All right.  Let me get you to pause

6    for just a second.  Are we on the sealed record or are we

7    on the public -- we're on the public record?  Oh, okay.

8    Okay.  Folks just came in may be looking for another

9    courtroom.  I doubt they wanted to hear about Bitcoin

10   miners.

11             MR. JOHNSON:  It's fascinating.  Fascinating.

12             THE COURT:  I wasn't sure if we were on the

13   sealed record so I wanted to just check that.  But go

14   ahead.  Go ahead.  Sorry.

15             MR. JOHNSON:  Thank you, your Honor.

16             So going to the third expert, his initial report,

17   as I said, Mr. Schuler has 40 years history reselling

18   computers and from networks to servers to cryptocurrency.

19   His testimony relates to the value of SBI's machines after

20   we allege they were destroyed and operated in an

21   inadequate facility with excessive dust and excessive

22   heat.  That was his initial report.  He says that there is

23   zero resale value when they're -- for these miners when

24   they should have at least had 10 -- had the contract been

25   performed as expected, these miners should at least

1  retained a $10 million value in 2021.  And part as you'll

2  recall, your Honor, there was a huge shortage of computers

3  during COVID and these should have had a high value, but

4  these didn't have that value because of the condition they

5  were in and the condition they were operated in at

6  Whinstone's facility.

7        So that initial report was sent -- that initial

8  report was made in March.  There was also an affirmative

9  report made by Whinstone.  There was an affirmative report

10  -- I believe they made this affirmative report regarding

11  -- which is a contrary valuation of these miners in which

12  their expert issues -- and I believe they're asserting it

13  on the grounds of mitigation and that same time in March,

14  Whinstone's expert asserted that Whinstone should

15  immediately sell or quickly try and sell their miners

16  despite the fact they've been in storage so that they

17  could recoup some of their investment.  So that's their

18  affirmative report, competing affirmative report as to the

19  valuation.

20        So Schuler in his rebuttal report, he files a

21  rebuttal to their affirmative report, timely filed.  And

22  in the rebuttal report, he says -- he reserves the right

23  to supplement his rebuttal report to do a physical

24  inspection.  What happened, your Honor, was very simple.

25  The reports were going to be due on July -- the rebuttal

1  report's going to be due in July.  Unfortunately, Mr.

2  Schuler needed a hip operation.  His doctor said he can't

3  travel despite the -- after his hip operation because you

4  can't really get on the plane, blood clots and the like,

5  things like that.  And so, we informed them that, hey,

6  we're going to supplement by having a physical inspection

7  of the facility as supplemental, effectively to his

8  rebuttal.

9           Interesting enough, they complain about the

10 alleged destruction of -- or our inspection or disassembly

11 of some of these miners without being in their presence

12 but they also -- their expert also disassembled some of

13 the miners.  Regardless, the conclusion -- after the audit

14 was conducted -- and by audit, he just went and physically

15 looked at the miners that are in storage in the Houston

16 facility and added to his report -- added to his rebuttal

17 essentially three pages regarding his physical assessment

18 of the miners which merely confirmed what he said in his

19 initial report, and he said the same thing in his

20 supplemental rebuttal.

21          Applying the Sierra factors, your Honor, this is

22 plaintiff's equipment damages.  This is important

23 testimony.  It's plaintiff's equipment damages expert, at

24 minimal to no prejudice because this supplemental report

25 was noticed well before his deposition, and the cure is

1    just depose Schuler or extend the rebuttal deadline.  It

2    wasn't -- I don't believe it was necessarily four weeks.

3    We've moved the deposition dates for all these witnesses

4    on a number of occasions.  But once again, the explanation

5    for the supplement was that he had hip surgery, prevented

6    travel to do just this physical examination of the miners.

7            Just in summary, importance of the testimony,

8    damages experts and causation experts are essential to the

9    case so they're important.  Prejudice to the opposing

10    party importantly, courts have found minimal to no

11    prejudice if supplement's served before the expert's

12    deposition and the close of expert discovery.  That's

13    consistent in all the cases.  So that's even when the

14    Court determines that the supplement is an untimely

15    supplement.

16            If they have the opportunity to depose the expert

17    and it's before the close of discovery then the courts

18    almost universally allow it in.  I challenge them to find

19    a single case that would suggest to the contrary that if

20    you're giving -- if the supplement is served before the

21    deposition and before the close of discovery, they need to

22    identify a case in which the Court strikes that

23    supplement.

24            Possibility of curing, the Court has repeatedly

25    emphasized that the preferred means of dealing with this,

1    untimely disclosures or is a continuance.  And they

2    rejected the continuance until we pointed out to them in

3    the case law and they decided to file a whole 'nother

4    motion on follow-on to their motion to strike asking for

5    the continuance that they rejected from us when we gave

6    them the supplements.  Once again, a short continuance can

7    cure any prejudice.

8         Scheduling orders -- previous scheduling orders

9    gave them a month that we've -- all the -- so they

10   expected to have a month to do their rebuttals.  We

11   offered them the extension on their rebuttals, they

12   rejected it and Whinstone has not articulated any reason

13   why it could not review or rebut the supplemental reports

14   within 30 days.

15        We've already gone through the explanations, but

16   broadly speaking, these supplements were made weeks before

17   and well in time for them to prepare for depositions.

18   Instead of taking the depositions and then complaining

19   about it as part of a Daubert challenge or a subsequent

20   motion to strike, instead, they prematurely ask this court

21   to decide two separate motions and then, presumably, are

22   going to come back and try and strike some or all of these

23   -- this testimony later.

24        A more efficient process and consistent with the

25   rules would have been to take the deposition and if you

1　still believe that the report was untimely or worthy of

2　being stricken, then save the Court's time, our time and

3　everybody's time by simply filing that motion, a singular

4　motion, which would have been consistent with the cases

5　cited in their briefing and ours.  And I'll stop right

6　there.  There are other numerous issues presented, but as

7　the Court said, the Court wants to make a determination on

8　the motion to strike.  So I'll stop here.

9　　　　　THE COURT:  Well, and I was going to ask about

10　Mr. Smith, too, because they attack Mr. Smith --

11　　　　　MR. JOHNSON:  Yes.

12　　　　　THE COURT:  -- as an untimely expert.

13　　　　　MR. JOHNSON:  Yes.  So if you look at the case

14　law, your Honor, and in my experience of 20 years as a

15　litigator, CEOs and high-level executives are allowed to

16　compile information and essentially summarize information

17　that experts can use as part of the presentation of lost

18　profit damages or a number of issues.  They can present

19　this as lay witnesses.  And in fact, under Rule 701, the

20　advisory committee expressly agreed that admitting

21　corporate officer -- high-level corporate officers to

22　testify on lost profits is completely appropriate.

23　　　　　They've also been given the op -- the

24　spreadsheets they're complaining about, your Honor, to the

25　extent -- and let me clarify.  There's a singular

1  spreadsheet that was an exhibit in Carson's original --

2  Carson Smith's original deposition.  I don't have it

3  before you.  They're complaining about a spreadsheet that

4  was attached to Byers' original -- supplemental report.

5  They're essentially the same -- they are essentially the

6  same set of information on there.

7          So if you look here, that's his original --

8  that's the initial report, Texas versus Russia spreadsheet

9  that was created by Carson Smith.  He testified to it.  It

10  was produced to Whinstone in 2024, prior to his deposition

11  so more than a year ago.  His compilation of how SBI would

12  typically expect their miners to perform and the amount of

13  money they should have otherwise generated.  If you would

14  like me -- I can try and explain very quickly that.

15          THE COURT:  Sure.

16          MR. JOHNSON:  Yeah.

17          THE COURT:  Just quick.

18          MR. JOHNSON:  So these miners have specs on them.

19  They have a certain hash rate and so, when you run these

20  miners at their expected hash rate, then there's a fairly

21  straightforward calculation as to how much Bitcoin that

22  could generate over a certain amount of time.  And so,

23  these -- the information provided in these reports -- I

24  mean, excuse me, these spreadsheets are just that

25  calculation of expected performance of these miners

1   operating at an expected hash rate.

2          Now, the expenses in terms of calculating the

3   cost for generating that amount of Bitcoin is also fairly

4   simple to calculate in that the primary or central cost in

5   generating Bitcoin, your Honor, is electricity.  If you

6   buy the machines, they have a certain amount of computing

7   power, you run electricity through them and have them do

8   their computing power, they will generate X amount or an

9   expected -- very scientifically expected value of Bitcoin

10  -- Bitcoin rewards.  It's a little more complicated than

11  that but that's essentially what it is.

12         So in the initial report, the spreadsheet

13  identified here in Byers' initial report and describing

14  the monthly expected revenue and if you look at this, the

15  bottom line is the Rockdale performance of the miners and

16  then, the same 20,000, identical 20,000 miners in Russia,

17  you'll see that there wasn't a perfect overlap in time.

18  The Rockdale miners were ramped up and operated before the

19  Russian facility got up and operating.  And then, the

20  Rockdale contract was terminated as seen below and so,

21  those are the actuals on there, and then, the actuals for

22  Russia is above that.

23         The supplement is merely a line graph to a bar

24  graph and a change from dollars to Bitcoin.  Bitcoin has a

25  certain value.  They are complaining about this

1    supplement.

2         THE COURT:  Okay.

3         MR. JOHNSON:  But this is the -- this is all

4    information in data for which they've already deposed

5    Carson Smith.  And interesting enough, your Honor, if

6    you'll recall in our hearing related to the production of

7    their compelling additional Russian documents, we produced

8    documents before that hearing.  We walked into court and

9    said, hey, Judge, we're going to go look for additional

10   Russian documents.  We don't need to have a whole hearing

11   on this.  And they presented -- but he's not a undisclosed

12   expert.  This is perfectly allowable testimony under Rule

13   701.

14        But I would also point out to the Court that at

15   that hearing related to producing more Russian documents,

16   the other side presented a proposed order in which they

17   were asking for essentially a supplemental deposition of

18   Carson because of the fact that we were going to be

19   producing more documents, the day before this hearing,

20   they'd already deposed Carson literally the day before for

21   seven hours and which is his second deposition because he

22   was a corporate rep dep -- representative of this company.

23   So they've had 14 hours of deposing Carson Smith.

24        We gave them the offer the day before his

25   deposition and said, you know, we're producing additional

1   documents.  If you want to postpone Carson Smith's

2   deposition or the corporate rep's deposition, you can do

3   so.  They said no, we're going to proceed, and then, took

4   the opportunity to come back to the Court the next day and

5   they reserved their right during that deposition; and

6   then, they tried to argue to the Court the following day,

7   we also should be entitled to a third deposition of Carson

8   Smith, the corporate representative.

9           We had a discussion on the record about that and

10  the Court denied that relief.  So they're now here for a

11  fourth time or another time asking to depose Carson Smith

12  on data and information that they've had 14 hours of

13  deposition testimony to get.  And to the extent that

14  they're going to argue that somehow, well, this is a new

15  spreadsheet, in title, yes, it's a new spreadsheet that

16  Byers reviewed, but in substance, it's the same.  It's the

17  same as -- it's the same data in terms of hash rate,

18  miners operating, electricity needed to operate these

19  miners to generate X amount of Bitcoin.

20          THE COURT:  If it's the same data just converted

21  from dollars to Bitcoin, then why is the supplementation

22  even necessary?

23          MR. JOHNSON:  In terms of it's necessary in order

24  to provide additional, essentially, information or

25  illustration to our damages.  So in the initial report,

1    Bitcoin is in -- it's calculated in Bitcoin.  In fact, how

2    you get to the monetary lost profit damage number is

3    essentially you say you would have generated X amount of

4    Bitcoin.  You generate X amount of Bitcoin and that

5    Bitcoin would have had X amount of value at the time of

6    its generation.  You would have had -- and that's

7    essentially your lost profits.  That's your gross profits

8    minus what the cost of electricity, the cost of hosting

9    fees that go to Whinstone to generate that amount.

10        The supplement merely brings forth in this

11   example that I showed you, merely puts the Bitcoin number

12   next to the dollar amount number.  You understand?

13        THE COURT:  I do.

14        MR. JOHNSON:  That's effectively what it does.

15        THE COURT:  Okay.

16        MR. JOHNSON:  But the Bitcoin numbers are

17   expressly in that initial --

18        THE COURT:  Initial report.

19        MR. JOHNSON:  -- original because that's how

20   they're calculated so it's just a column so you could

21   either show this in the final number of dollars or you can

22   show it in terms of Bitcoin lost.  And one of the reasons

23   why you want to show it in terms of Bitcoin loss is to

24   also highlight for the Court and the trier of fact that we

25   lost Bitcoin and that our intention was to retain this

1    Bitcoin, and had we retained this Bitcoin, we would have

2    been able to capture the appreciation of Bitcoin.

3              THE COURT:  Understood.  Okay.  And then, with

4    regard to the Byers report at least, I guess is what I

5    heard you say on a use of -- yeah, the use of the Russian

6    document is simply to further elaborate on the comparison

7    of the construction, I guess, or the design of the Texas

8    versus Russian facilities?

9              MR. JOHNSON:  Yes.  40,000 miners were bought by

10   our company, or SBI.  20,000 of the same batch model

11   miners was sent to Texas, one to Russia.  It's typically

12   been Whinstone's position that, oh, the reason why SBI's

13   miners underperformed was because they were defective.

14   They have no evidence of that.  But they said that your

15   miners were defective, not our fault, while we say, well,

16   we have a control comparison in Russia and they operated.

17   And so, that information is vital.

18             THE COURT:  And that, I guess, high level -- from

19   a high level that was in Byers' initial report.

20             MR. JOHNSON:  Oh, absolutely.

21             THE COURT:  Okay.  And then, it's just this

22   Japanese language document and some of the more detailed

23   design documents that got added later?

24             MR. JOHNSON:  Yes.  Let me explain.  The Russian

25   facility was not operated by Whinstone.

```
 1              THE COURT:  Right.
 2              MR. JOHNSON:  They hired a agent to essentially
 3  operate their miners there.  Nobody from Whinstone ever
 4  visited the facility.  They just ship their miners there.
 5  It's effectively in Siberia.  I think it's literally in
 6  Siberia.  That part of Russia.  So they have limited
 7  information as it relates to that particular facility.  To
 8  the extent they had any information, that information was
 9  often conveyed to them in person.  And this is in Carson
10  testimony, in person by their agent who --
11              THE COURT:  By SBI's agent?
12              MR. JOHNSON:  By -- yes, Muroo.
13              THE COURT:  Okay.
14              MR. JOHNSON:  Yeah.
15              THE COURT:  Just making sure I --
16              MR. JOHNSON:  So there's limited documentation.
17  I would also point out in this case, Rockdale or Whinstone
18  hasn't been able to produce their own as-built plans for
19  their own facility that are right here in Texas.  There
20  isn't some endless amount of information related to even
21  both of these facilities.  I deposed their corporate rep
22  back in July asking about maintenance records.  They
23  didn't have maintenance records effectively.  They didn't
24  have a lot of records.
25              So for them to come here and say that we're
```

1  withholding documents related to the facility to which

2  SBI's personnel never visited and that somehow we have --

3  we haven't produced enough information related to this, we

4  have an explanation just as why -- the same as why they

5  haven't -- they have explanations why they don't have

6  certain records of their facility.

7          THE COURT:  Okay.

8          MR. JOHNSON:  Thank you.

9          THE COURT:  All right.  Thank you.

10          MR. MARX:  May I approach, your Honor?

11          THE COURT:  You may.  Yes.

12          MR. MARX:  Just a few points that I want to

13  address directly.

14          THE COURT:  And let me just -- sorry to orient

15  myself a little bit.  Has Whinstone produced its

16  responsive reports as of today or is that on hold?

17          MR. MARX:  Yes, your Honor, on July 18th.

18          THE COURT:  Okay.  Go ahead.

19          MR. MARX:  Counsel for SBI made a reference about

20  documents, the Japanese documents that was located in a

21  file cabinet produced on April 11th.  Until Whinstone

22  filed its motion to compel with this court on April 11th,

23  SBI didn't produce that information.  They produced that

24  information the same day.  And previously, SBI claimed

25  that everything with regard to Russia was off the table

1    and irrelevant.  This court had to answer a motion --

2    enter an order on April -- within April.  I apologize for

3    the exact date -- compelling production of all information

4    related to Russia -- and we'll get to see the order in a

5    minute -- requiring production on April 24th.

6         Much of the documents that SBI's experts are

7    trying to rely upon in its, quote, unquote, supplements

8    comes from those later productions, including on June

9    24th, three weeks before our a deadline which was in

10   Japanese again.  That was why we had to extend the

11   rebuttal discovery deadline from one month after to four

12   months, as your Honor will recall, to digest the Russian

13   information to allow the Japanese information to be

14   translated.

15        And not once including since April that Mr. Byers

16   now found -- at that point found a need to supplement his

17   report, no explanation's been offered why his report was

18   supplemented the day of our rebuttal reports were due.

19   The first time that issue of supplementation was ever

20   raised with Whinstone occurred the moment that we received

21   the supplemental Valentine report two days before our

22   rebuttal deadline during meet-and-confer, at which point,

23   it was noticed that Mr. Byers would supplement his report.

24   We didn't get that until the day of the recovery -- day of

25   rebuttal deadline and we didn't know that Schuler would be

1  supplementing his report until his report was served on

2  the rebuttal deadline.

3         The point being is that all of this information

4  has always been in SBI's possession, custody and control.

5  It withheld information, was compelled to produce it and

6  when it served its benefit, it then decided to use the

7  information, never raised the issue of supplementation for

8  four months, and then, sandbagged, and now Whinstone has

9  been prejudiced by having to spend additional time and

10 money to respond to those reports.  The rules mean

11 something and as we'll get to, the rules require

12 exclusion.

13        And one last comment.  Richard Peters was an

14 affirmative expert on lack of mitigation.  That was the

15 scope of his purpose.  SBI had a Winstead attorney present

16 during that inspection.  No one was invited to participate

17 in Michael Schuler's inspection.

18        THE COURT:  And I guess with Schuler's -- is

19 Schuler's supplementation, is it a -- could it be properly

20 seen as a rebuttal to -- I guess to Smith's affirmative

21 report?

22        MR. MARX:  I'm not sure what it was, your Honor.

23 I mean, it's either untimely surrebuttal or it's an

24 untimely rebuttal.

25        THE COURT:  Okay.

1          MR. MARX:  I mean, those miners have been in --
2    in SBI's possession, custody and control since July of
3    2021 so they've offered no justification for why an
4    inspection couldn't occur at the time Michael Schuler's
5    affirmative expert report was served March 28th of 2025.
6          THE COURT:  Okay.
7          MR. MARX:  To get back to our presentation,
8    again, SBI hasn't met its burden, supplementation under
9    Rule 26(e).  Supplements are only permitted to cure
10   material errors or omissions.  That's why expert reports
11   are required to be detailed and complete as of March 28th
12   and they weren't in this case; otherwise, discovery
13   becomes an indefinite, iterative process and which is why
14   we're here today where there's a continuous amending and
15   additional information of supplemental reports.  The rules
16   exist and these tests exist to cut that off and establish
17   certainty.
18          These new reports are not corrections.  In
19   response to the motion to strike, SBI admits that with
20   respect to Byers and Schuler.  As you can see here, they
21   say that he had additional information related to the
22   Russian facility.  Schuler had an audit that occurred
23   after the deadline and SBI misleads the Court when it
24   refers to Valentine's being -- Valentine's report being a
25   more accurate accounting.  We will show some examples of

1  the new analysis and opinions in that untimely report.

2          His new report is 22 pages long of new

3  information.  His original report is 21 pages long.  I'm

4  not sure how that could be a correction.  And if it's the

5  same information, then it's certainly not necessary for a

6  supplement.

7          THE COURT:  I'm sorry.  Just so I follow you, are

8  you saying the supplemental report added 22 pages or it

9  just --

10         MR. MARX:  Correct --

11         THE COURT:  -- went from 21 to 22?

12         MR. MARX:  It's 22 pages long of new information.

13         THE COURT:  Okay.

14         MR. MARX:  So it's longer.  One page longer than

15 the original.

16         THE COURT:  Okay.

17         MR. MARX:  And so, when district courts have

18 faced similar situations, they've held when the analysis

19 and opinions in the second report are largely new rather

20 than supplementary, they cannot qualify as a supplemental

21 report under Rule 26(e).  And that's a decision from this

22 year from Judge Horan in the Northern District.  And as an

23 example -- another example in Wal-Mart, Judge Pitman of

24 the Western District struck an additional expert report

25 that contained new analyses concerning alcohol consumption

1    was absent from the original report.  And as the Court can

2    see here, this isn't an accurate -- more accurate

3    accounting.  It's brand-new methodology.

4         Here, he -- Dr. Valentine in time period two in

5    his original report, he compared actual mining data in

6    both Russia and Rockdale to come to his conclusions.

7    Here, he compares actual mining data with Rockdale but

8    then, creates an expected theoretical model and then,

9    compares that to determine his -- the amount of lost

10   profits.  So that's not true.  They've added new

11   methodology.  They've also made adjustments to account for

12   certain factors and now have created a range of damages.

13        And to buttress his opinions in the next slide,

14   Dr. Valentine now relies on alleged internal and external

15   audits and Muroo service information and other data to

16   buttress his opinions to show that SBI's mining figures

17   are accurate and complete.  That's absent from his

18   original report.  We've never served discovery regarding

19   internal and external audits.

20        It turns out after the fact, it's been revealed

21   through this briefing is SBI gratuitously produced

22   internal and external documents on June 24th in Japanese

23   to use for its supplemental opinions, never raised the

24   need to supplement.  And we've reviewed the documents.  We

25   had no need to translate it because we've already had

1  SBI's expert reports.  Our reports are rebuttal reports.

2  These documents haven't been identified.  Why would we

3  even think that they were relevant?  So naturally, we

4  never respond to them.  Next slide.

5          And with respect to the second Byers report, this

6  is 16 pages long.  This section, an overview of the

7  Russian data center, he analyzes that, quote, unquote,

8  PowerPoint presentation that was found on April 11th,

9  which why it took three months has not yet provided an

10  explanation for why it couldn't occur earlier, it goes

11  through the data center design and construction.  That's

12  entirely brand-new.  The only thing in his original report

13  concerning Russia is mentioned a few times the words

14  "Russia" and looking simply at a comparison of Bitcoin

15  between the two.

16          And additionally, Carson Smith's spreadsheet is

17  dated 7-16 and there's additional analysis that is

18  performed by Carson Smith in that spreadsheet.  It is a

19  different spreadsheet that did not exist at the time of

20  his deposition in August of 2024 when he testified he was

21  not a corporate -- was not retained as an expert and when

22  he was designated as a corporate rep in April of 2025.  So

23  that spreadsheet did not exist.  Next slide.

24          With Schuler, he performed an audit of 30

25  additional miners.  Again, we have rebuttal experts that

1    are designed to rebut the landscape that has been

2    identified as under Rule 26 by SBI's affirmative experts.

3    We cannot continue this reiterative path of sur-replies

4    and additional new information.  That's why the rules cut

5    it off and that's what's been happening.

6          Now, SBI's retort is that Whinstone compelled the

7    production of information so naturally, SBI can rely on

8    it.  But that's not the case under federal law as Judge

9    Pitman held in Wal-Mart, courts routinely reject untimely

10   supplemental expert testimony where the opinions are based

11   upon information available prior to the deadline for

12   expert disclosures and the disclosure departs from or

13   expands upon the original report in a material aspect.

14   All this information was within their possession, custody

15   and control.  For one reason or another, they withheld the

16   information, they were required to produce it, and now

17   they're using gamesmanship to try to advance some --

18   impose undue burden and cost on our client.

19          Of course, Whinstone doesn't -- excuse me.  Of

20   course that's what's happened here.  They have identified

21   in the response to the motion to amend the information

22   that their experts rely upon, as you can see, this

23   information's been available April, March, June.  This is

24   all information, hasn't been new and they never -- have

25   yet to provide a justification or even explanation for the

1   Court why they were silent for three months about the need

2   to supplement.  They're simply new reports.  They've had

3   years to get their affirmative expert reports ready and

4   there's just no justification.

5        Not substantially justified or harmless for these

6   same reasons.  These are the Sierra factors and I'll point

7   out that one of the cases that SBI cites, the Holcombe

8   case that goes to the Sierra factors.  In that case, they

9   excluded -- the Court excluded expert -- untimely expert

10  testimony when that information was available prior to the

11  deadline.  But these are the four factors.  There's no

12  justification for the reasons that I won't belabor the

13  Court, we've already discussed enough today.

14       Again, and this is another thing that SBI's been

15  both silent on in its briefing and silent today before the

16  Court.  That is both Wal-Mart, Judge Pitman, and then,

17  UWorld with Judge Horan.  They've held that it's

18  sufficient that increased costs responding to untimely

19  reports is sufficient for striking.  And that has been

20  absent from any discussion or case law that's been offered

21  today.

22       The rule is not if there's additional time to

23  expert -- to depose experts, that's not the rule.  The

24  rule is, is the information available and does it impose

25  an undue hardship?  And yes, it does because we responded

1    and rebutted SBI's March 28th reports, not these new

2    supplements.  Now we're going to have to spend additional

3    time and money.  We put forth and as an attachment to our

4    -- in our motion to amend briefing, the estimated cost of

5    how much that would be.  It's going to cost hundreds of

6    thousands of dollars that we estimate we don't have a

7    determination yet because we'd still need to conduct

8    additional discovery and then, re-depose Carson Smith or

9    an SBI corporate representative depo and -- at a depo and

10   then, issue new rebuttal reports.

11          So that cost alone is sufficient to strike.  And

12   this is important because in the next slide, the original

13   report still exists.  There's -- SBI's offered no

14   explanation for why they can't rely on those.  If it's

15   just as counsel suggests in the Byers report, it's just a

16   different presentation of math as your Honor astutely

17   pointed out, why do you need to supplement?  I'm not sure.

18   You can just rely on the original reports.  They still

19   have a damages expert.  They still have two design

20   experts.  They still have a resale expert.  I mean,

21   subject to Daubert challenges, we can still depose them on

22   those.  So I mean, the testimony is just not before you.

23          And as far as Carson Smith, there's been no

24   explanation.  He at a minimum, he should be designated as

25   a hybrid witness under Rule 26(a)(2)(C), he testified as

1  -- so he -- Carson Smith is no longer an employee of SBI,

2  but he's testified that he's been retained to engage in

3  this case.  As a corporate representative in April, he

4  testified that he's been paid at least $50,000 today, as

5  of that date, to participate in this case so he's a

6  retained expert.  He's offering specialized, technical

7  knowledge that goes more than just -- that goes beyond

8  more than just historical lost profits.  He is trying to

9  be undisclosed expert testimony to buttress expert

10  testimony for -- expert testimony such as Mr. Byers, who's

11  not qualified to opine on lost profits, but they're trying

12  to backdoor that testimony under the guise of a fact

13  witness and that's just not the case.  He's testifying

14  upon theoretical Bitcoin mine.  He's performing

15  statistical analysis.  Byers is trying to adopt that and

16  pass it off as his own.

17          And with respect to even if Carson Smith were to

18  be a fact witness, that spreadsheet, which is different

19  from all the other spreadsheets in substance and in date,

20  that didn't exist at prior depositions and was produced

21  after the fact discovery deadline.  So no matter which way

22  you slice it, your Honor, it's untimely.  Next slide.

23          The most practical, fair and efficient solution

24  is to strike.  Substantial costs will be avoided.  This

25  case can remain on track for a trial in February.  It is

only the expert discovery deadline needs a minor

adjustment and a few discovery issues need to be resolved

and SBI can still remain -- rely on its original reports

for this moment in time.  Therefore, Whinstone requests

the Court strike the second Valentine and Byers reports,

the third Schuler report, as well as prohibit Smith from

testifying on his lost profit analysis, and then, extend

the discovery deadline for depositions -- expert

depositions.  And that's all, your Honor.

THE COURT:  All right.  Thank you, Mr. Marx.

MR. JOHNSON:  Just may I --

THE COURT:  You may --

MR. JOHNSON:  -- just very quickly --

THE COURT:  -- briefly, Mr. Johnson.

MR. JOHNSON:  Very briefly.  I'll be very brief,

your Honor.

THE COURT:  Okay.

MR. JOHNSON:  What I want to show your Honor is

the amended -- the last amended scheduling order which was

jointly submitted by the parties in which the parties

jointly acknowledge that they would need additional time

because -- it's highlighted here, the parties have -- and

this is a joint motion to amend the scheduling order.

Parties have recently supplemented their document

production and due to ongoing discovery disputes,

1    additional supplementation may be necessary.  We also

2    expressly said the parties' experts need time to review

3    the supplemental productions, anticipating that there

4    would be the possibility of supplementations because of

5    new information.  The parties also needed to conduct

6    additional deposition.  Essentially fact discovery

7    continued after the March initial reports.  For them to

8    somehow -- for Whinstone to now be surprised that some of

9    this information was then incorporated, additional

10   information was incorporated or necessarily supplemented,

11   that seemed completely appropriate and they were on notice

12   of that.

13           Finally, your Honor, I just would ask the Court

14   to review the case law that's cited by Whinstone.  For

15   example, in the Wal-Mart court -- case they cite to, that

16   involved a supplement -- supplementary report that came

17   after the deposition of that expert.  It was a true

18   surrebuttal report in that the report was made after the

19   rebuttal report was issued and after the deposition of

20   that expert.  That's not the fact -- that's not the facts

21   in this case.

22           And all the cases they cite to aren't the facts

23   in this case in which a supplement or even a timely report

24   was submitted weeks before the deposition.  And so, Sierra

25   factors look at the prejudice as opposed to having the

1    court to perform that analysis of, well, is this a -- just

2    a mere logical extension or is this a new report. The

3    courts inevitably and the courts -- you'll look in the

4    case law, it's kind of unclear. I'll admit it, it's kind

5    of unclear what's new, what's a supplement, what's just

6    logical extension so they inevitably fall back on the

7    Sierra factors and typically, in fact, universally allow

8    supplements under these -- the facts in this case.

9              THE COURT:  Okay.  All right.  Thank you, Mr.

10   Johnson.  Let's do this.  I'm going to take a brief recess

11   so we'll be in recess for about 10 minutes.

12             (Proceedings recess at 10:22 a.m.

13              and resume at 10:39 a.m.)

14             THE COURT:  All right.  So after review of both

15   the supplemental reports and the case law cited by the

16   parties as well as arguments of counsel at the hearing

17   today and the brief, I am with regard to the Schuler

18   report, I'm going to deny the request to strike Mr.

19   Schuler as it appears the only thing he did was go out and

20   inspect a Bitcoin miner, which is something likely would

21   have been done at some point anyhow.

22             With regard to the Valentine's second report and

23   Byers' second report, I'm going to sustain the motion to

24   -- or grant the motion to strike those reports.  Both of

25   those reports as described in the hearing and as

1    discussed, primarily in the hearing if they -- they don't

2    appear to be all that important if they truly are just

3    elaborating on additional or prior stated opinions.

4    Additionally, the information that was added that resulted

5    in those was information that appears to have been in the

6    plaintiff's possession, custody or control, and I don't

7    find a sufficient justification for the late production of

8    that evidence.

9           And also, given the number of extensions that

10   have happened in the case, I did not believe that -- and

11   in light of defendant's evidence regarding the cost and

12   burden imposed granting an extension, I don't find that a

13   continuance could sufficiently address the prejudice

14   caused by allowing the late supplementations.

15          And then, with regard to Mr. Smith, I'm going to

16   deny the requested relief on him as he's not been

17   attempted to be presented as an expert or identified late

18   as an expert, and the information he provided that was

19   relied on by Valentine is in Valentine's second

20   supplemental report which is being struck.  So what Mr.

21   Smith can do at a future point is going to be decided at

22   that point and not ruling on him today since I didn't see

23   any indication that he was trying to be designated as a

24   late expert, I'm going to just deny any requested relief

25   as to Mr. Smith without prejudice to re-raising it at a

1  later time in light of how he's attempted to be used.

2         So hopefully, that makes it clear.  I'm going to

3  deny the request to extend the schedule.  The case will

4  remain on the pending schedule if y'all need -- y'all can

5  adjust the dates, but the trial date's going to stay where

6  it is.  And with that, is there anything else we need to

7  take up this morning?  Mr. Johnson?

8         MR. JOHNSON:  Yes, your Honor, briefly.  We've

9  asked for a special setting for this February 9th date.

10  We have to coordinate a lot of experts and people from a

11  number of different foreign countries.

12         THE COURT:  Right.

13         MR. JOHNSON:  So I don't know what -- this case

14  is set to be -- appear before Judge Albright.

15         THE COURT:  Right.

16         MR. JOHNSON:  I don't know if --

17         THE COURT:  I'll -- what I can do -- I can't

18  control, obviously, Judge Albright's calendar so I can

19  communicate the request to Judge Albright and then, how he

20  addresses, it will be up to Judge Albright.  But I

21  understand what you're saying with regard to a special

22  setting as you want to be number one on the docket and

23  going absent some extreme event.

24         MR. JOHNSON:  And then, clarification on -- so

25  we're not -- the Court isn't allowing the changing of any

1   dates from the last scheduling order?

2          THE COURT:  Not at this time, yeah, or there's

3   some -- I mean, I'm not -- if in light of the Court's

4   rulings of the motion to amend the schedule I understood

5   to be kind of dovetail off of if the Court granted the --

6   or denied the motion, then the schedule would need to be

7   modified.  Now that you have the ruling on the motion to

8   strike experts, if y'all want to meet and confer and

9   adjust some dates, you could do so, but we're not moving

10  the trial date.  So when you meet and confer, just keep

11  that in mind.

12         MR. MARX:  Understood, your Honor.  And as far as

13  the remaining discovery dispute, I think we can try to

14  resolve that on our own.

15         THE COURT:  Okay.  Y'all meet and confer on that.

16  If there are any issues, obviously, bring them back to the

17  Court.

18         MR. JOHNSON:  I will bring to the Court's

19  attention that tomorrow's the close of expert discovery.

20  If the Court were to -- reviewed the motion for

21  continuance, one of the issues we brought before the Court

22  is that, effectively, Whinstone has stayed expert

23  discovery so there hasn't been any depositions.  And so,

24  the issue now is the --

25         THE COURT:  You need more time to get the expert

1   depos done?

2          MR. JOHNSON:  Yes, your Honor.  But under the --

3   we'll try and work it out but I -- I would just say that

4   plaintiffs reserve the right to move to strike given the

5   current deadlines.

6          THE COURT:  Okay.  I guess -- and I don't know

7   that there's any ruling for me to make on that --

8          MR. JOHNSON:  Yes.

9          THE COURT:  -- at this time.  I guess in light of

10  the Court's ruling, I can -- about all I'm comfortable

11  saying is I look favorably on any agreement or motion to

12  extend those expert deadlines should the parties think

13  that's necessary, but what I'll do is order y'all to meet

14  and confer about that before I issue any affirmative

15  ruling.

16         MR. MARX:  Yes.  We will meet and confer with the

17  opposing party on expert deadlines.  Thank you.

18         THE COURT:  All right.  Anything else that we

19  need to take up today?

20         MR. MARX:  No, your Honor.

21         MR. JOHNSON:  No, your Honor.

22         THE COURT:  All right.  Thank y'all very much.

23  I'll -- since it was defendant's motion, Mr. Marx, I'll

24  ask you to submit a proposed order within a week.

25         MR. MARX:  I will.

1          THE COURT:  On the Court's ruling today.  And

2    with that, we'll be adjourned.  Thank you very much.

3          MR. MARX:  Thank you.

4          (Proceedings conclude at 10:45 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*LILY I. REZNIK, CERTIFIED REALTIME/REGISTERED MERIT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

```
1

2

3                    REPORTER'S CERTIFICATE

4

5      I, LILY I. REZNIK, DO HEREBY CERTIFY THAT THE FOREGOING

6   WAS TRANSCRIBED FROM AN ELECTRONIC RECORDING MADE AT THE

7   TIME OF THE AFORESAID PROCEEDINGS AND IS A CORRECT

8   TRANSCRIPT, TO THE BEST OF MY ABILITY, MADE FROM THE

9   PROCEEDINGS IN THE ABOVE-ENTITLED MATTER, AND THAT THE

10  TRANSCRIPT FEES AND FORMAT COMPLY WITH THOSE PRESCRIBED BY

11  THE COURT AND JUDICIAL CONFERENCE OF THE UNITED STATES,

12  ON THIS 13th DAY OF OCTOBER, 2025.

13

14

15                     Lily Iva Reznik

16             ~~~~~~~~~~~~~~~~~~~~~~~~~
               LILY I. REZNIK, CRR, RMR
17             Official Court Reporter
               United States District Court
18             Austin Division
               501 West 5th Street, Suite 4153
19             Austin, Texas 78701
               (512)391-8792
20             SOT Certification No. 4481
               Expires:  1-31-27
21

22

23

24

25
```