**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| **SBI CRYPTO CO., LTD.,** | |
| *Plaintiff*, | |
| v. | Civil Action No.: 6:23-cv-252-ADA-DTG |
| **WHINSTONE US, INC.,** | |
| *Defendant.* | |

## PLAINTIFF'S RESPONSE TO WHINSTONE'S MOTION TO STRIKE THE EXPERT OPINIONS OF CHARLES BYERS AND RANDY BOLTIN

Plaintiff SBI Crypto Co., Ltd. ("Plaintiff" or "SBI") files this Response to Defendant Whinstone's Motion to Strike the Expert Opinions of Charles Byers and Randy Boltin (Dkt. 148) ("Motion") and respectfully shows this Court the following:

## I.
### INTRODUCTION

Whinstone's Motion to Exclude SBI's expert, Charles Byers, rests on two demonstrably false premises: that Byers failed to disclose supporting data and methodology, and that his conclusions are unreliable due to a supposed lack of factual support and scientific methodology. The record refutes both. SBI engaged Byers—an expert in data centers, electrical, and computer engineering—to conduct a detailed analysis of the environmental conditions and operational defects at Whinstone's Rockdale facility. Byers' comprehensive report, based on months of telemetry data, photographs, videos, architectural documents, equipment inspections, manuals, comparative performance data, deposition testimony, and other evidence, shows that facility design flaws and poor operational practices caused SBI's equipment to fail and

underperform. Contrary to Whinstone's claims, Byers' findings are anchored in accepted industry standards and methodologies, coupled with his extensive and thorough analysis of the reliable data and evidence—not speculation.

Whinstone also asserts that SBI failed to disclose Randy Boltin and the MVA Dust Analysis Report, and claims deficiencies in Byers' opinions due to supposed data flaws. These assertions are unfounded. SBI did not retain Boltin as a testifying expert and does not intend to offer his testimony at trial; thus, SBI needed only to produce the MVA Dust Analysis Report, which Byers reasonably relied upon in forming his opinions. The methodology and accuracy of the MVA testing are undisputed, and Byers' reliance on this data conforms to established expert practice under Rule 703. Whinstone's challenges to the admissibility and reliability of Byers' opinions and the evidence he considered misrepresent the facts and the applicable law, and should be rejected in their entirety.

**II.**
**FACTUAL AND PROCEDURAL BACKGROUND**

**A.     Factual Allegations**

SBI is a cryptocurrency mining company that entered into a Hosting Service Agreement with Whinstone for the hosting and management of SBI's mining equipment at Whinstone's facility in Rockdale, Texas (the "Rockdale Facility") on October 25, 2019 (the "Hosting Agreement").[1] In this suit, SBI alleges Whinstone fraudulently induced SBI to enter into and continue performing under the Hosting Agreement. *See generally*, Dkt. 11. Once operations began, Whinstone concealed and failed to disclose major operational problems at the Rockdale Facility, including overheating of SBI's Equipment due to

---

[1] *See* Hosting Agreement, a true and correct copy of which is attached hereto as **Ex. "D,"** and incorporated herein by reference.

nonexistent air-flow, cooling, and dust filtration infrastructure. *Id.* at 13-14. The failure and underperformance of SBI's miners caused SBI to lose millions in lost profits.

**B.    Byers' Qualifications, Methodology, and Conclusions Analyzing the Rockdale Facility and the Causes of the Failures and Underperformance of SBI's Fleet of A-10 Miners**

As part of this litigation, SBI engaged data center experts Philip Isaak and Charles Byers. Byers is an established data center expert with additional significant expertise in computer engineering and hardware. SBI's technical experts were tasked with evaluating the environmental conditions at the Rockdale Facility and determining what caused the failure and underperformance of SBI's miners. Isaak's 116-page report detailed the deficiencies in the design and environmental conditions present at the Rockdale Facility. Building on Isaak's report, Byers submitted an 83-page report explaining how the environmental conditions at the Facility "caused the poor bitcoin mining productivity and unacceptably high failure rate of the SBI miners."[2] **Ex. "A,"** at 1.

As detailed in his report, Byers conducted a failure mode analysis of SBI's Equipment by reviewing and analyzing the Rockdale Facility's mechanical systems—power, airflow, cooling, and dust abatement infrastructure according to traditional data center industry standards. **Ex. "A"** at 11-16, 27-39. Byers also analyzed the specific characteristics of SBI's Equipment and their use and configuration for crypto mining according to industry standards—including their hardware specs, integrated circuits (or chips), and their firmware, software, and network applications for crypto mining. *Id.* at 10, 17-27. Byers then analyzed a myriad of documents, information, and data related to the deployment and operation of SBI's Equipment at the Rockdale, including months of

---

[2] A true and correct copy of Byers' Initial Report is attached hereto as **Ex. "A,"** and incorporated herein by reference.

telemetry data, photos, videos, contemporaneous communications, architectural design documents, and deposition testimony. *Id.* at 35-75. Byers also personally conducted an inspection of SBI's Equipment; disassembled five miners; and collected dust samples that were sent to MVA Labs, where a technician, Randy Boltin, returned a dust composition report. *Id.* at 61-71.[3] Byers also compared the performance of an identical batch 20,000 Canaan Avalon A-10 miners, purchased by SBI, that were operated in a data center in Russia. *Id.* at 8, 19, 26-27, 49. Then, applying his specialized experience and knowledge in data centers, electrical, and computer engineering, Byers draws conclusions regarding the observed conditions at the Rockdale Facility and the observed performance of SBI's Equipment. *Id.* at 47-48, 71-76.

Byers' analysis identified several causal factors of the miners' performance problems. **Ex. "A,"** at 1, 48. Specifically, he concluded that "[v]arious design flaws, configuration problems, and poor operational procedures that significantly departed from the contracted hosting agreements and industry accepted practices led to a 45-55% reduction in the productivity of SBI's miners." *Id.* at 77. These design flaws include an inadequate cooling system due to a lack of intake and exhaust fans, lack of dust filters, presence of an inoperable wet curtain wall, and an inadequate hot aisle containment. *Id.* at 1, 48. The configuration problems and poor operational procedures include miner installation and configuration problems; inadequate cleaning procedures; failure to monitor air intake temperature; failure to promptly identify and repair failed miners; failure to operate the wet curtain walls; and inadequate data monitoring and record keeping. *Id.* at 71-76.

---

[3] A true and correct copy of the MVA Dust Analysis Report is attached hereto as **Ex. "C."**

Whinstone does not directly challenge Byers' qualifications to perform a failure mode analysis on cryptocurrency mining equipment hosted by a data center. *See generally* Dkt. 148. Instead, it only objects to Byers issuing meteorological and statistical opinions, which he did not provide. *Id.* at 12-13. Byers possesses a Bachelor of Science in Electrical and Computer Engineering and a Master of Science in Electrical Engineering from the University of Wisconsin. **Ex. "A,"** at 6. He has over 35 years of experience as an electrical and computer engineer during which he has developed expertise in numerous fields related to electrical engineering including, but not limited to, data center design, cooling, power sources, and power design, modular platform infrastructure, edge computing, and ASIC design.[4] **Ex. "B,"** at 51:13-55:13. Byers holds over 130 patents, including about two dozen related to cooling high power computing equipment and network equipment. **Ex. "A,"** at 6. His professional experience includes completing nearly 100 consulting projects related to datacenter cooling, power, interconnect, IT equipment, semiconductors, optics, software, blockchain, and artificial intelligence. *Id.* He has served on numerous industry-standards committees and is a Bell Labs Fellow. *Id.*; **Ex. "B,"** at 50:15-51:12. He has also published several articles and presented at numerous industry conferences on these topics. **Ex. "A,"** at 7.

In his Initial Report, Byers explained the methodology he employed to conduct his failure mode analysis in this case. *See* **Ex. "A,"** at 7-9, ("5.4 Overview of Study Methodology"). However, because SBI's miners had been decommissioned, crated, and removed from the Rockdale data centers in July 2021 and eventually transported to a facility in Houston, Texas, Byers could not feasibly recreate the conditions at the Rockdale

---

[4] A true and correct copy of Byers' Deposition Transcript is attached hereto as **Exhibit "B,"** and incorporated herein by reference.

Facility. Instead, he analyzed available evidence and data, inspected the subject miners, collected dust from miners, had dust from the miners tested, conducted his own research, applied relevant industry standards, and determined the probable root causes of the underperformance and failures of SBI's miners. *Id*.[5]

### C.     Whinstone's Repeated Misrepresentations About the MVA Dust Analysis Report

As part of his work in this case, Byers personally collected two dust samples after inspecting SBI's miners stored at a warehouse in Houston. **Ex. "A,"** at 51; **Ex. "B,"** at 250:21-24, 253:22-254:15. Byers then had MVA Scientific Consultants test the dust samples for its material and chemical composition. **Ex. "A,"** at 52; **Ex. "B,"** at 33:17-34:1. Byers utilized the results from MVA's testing to opine on both the impact of the dust on SBI's miners and the likely source(s) of the dust. **Ex. "A,"** at 52-54; **Ex. "B,"** at 83:12-21. MVA preserved the dust sample and returned it to Byers. SBI produced the full MVA Dust Analysis Report together with Byers' Initial Report on March 28, 2025—six months before the close of expert discovery. Whinstone never requested the samples to conduct its own testing, nor did it make any effort to collect its own dust sample from the miners for testing.[6]

Moreover, Whinstone's experts, Richard Peters ("Peters") and Karen Rayment ("Rayment"), both reviewed the MVA Dust Analysis Report. True and correct copies of

---

[5] Byers further provides his "Flow of Reasoning" demonstrating each step of his methodology which involved analyzing thousands of items of evidence, "consisting of computer files, text message thread transcripts, contracts, spreadsheets, data sheets, log files, climate observations, photos, videos, scientific laboratory reports, depositions, and web sites." *Id*. at 77. Byers further referred Whinstone's counsel to his "Flow of Reasoning" section in his deposition, but Whinstone chose not to depose him on this section or much of his methodology in general. *See* **Ex. "B,"** at 238:15-240:12.

[6] Whinstone conducted a full inspection of SBI's miners in February 2025, but chose not to test or disassemble any miners following their inspection. Tellingly, none of its experts even reference Whinstone's inspection of SBI's miners as part of their reports.

Peters' Rebuttal Report and Rayment's Rebuttal Report are attached hereto as **Exhibits "E" and "F,"** respectively, and incorporated by reference herein. Whinstone's experts do not dispute the testing methodology, results, or accuracy of the MVA Dust Analysis Report, nor does Whinstone raise any such objection in its Motion. *See* **Ex. "E,"** at 23-25; **Ex. "F,"** at 8-9, 27-29. Peters specifically testified that he did not have any disagreements with the results of MVA's testing. Richard Peters Dep., attached as **Exhibit "G,"** at 246:7-247:19.

Whinstone now claims SBI had been ordered to produce information related to the MVA Dust Analysis Report, but failed to do so. Once more, Whinstone's claims are false. On April 11, 2025, Whinstone submitted a discovery dispute chart[7] to the Court related to three narrow issues: (1) "SBI's Kyrgyzstan and Russia Documents & Communications"; (2) "Nicholas Vitalis Deposition"; and (3) "SBI's Slack and Teams Messages." The Court then issued an Order requiring SBI to produce, among other things, "source data for any spreadsheet relied upon by SBI's expert witnesses." [Dkt 74]. Byers did not rely on any of the subsequently-produced documents, information, or data for his Initial Report. However, in the interim before the close of fact discovery,[8] SBI produced additional documents, including SBI's Bitcoin wallet data, Deloitte audit documents, and other records related to SBI's operation of a separate fleet of 20,000 Canaan Avalon A-10 miners in the Russian facility. These documents, produced after SBI's original expert reports (March 28, 2025), provided further validation of previously disclosed expert

---

[7] Notably absent from Whinstone's discovery dispute chart and the Court's order is anything related to Randy Boltin or the MVA Dust Analysis Report.

[8] On May 16, the parties jointly moved to extend the fact and expert discovery deadlines to July 11 and September 12, respectively as well as the trial date (February 2). [Dkt 84]. The Court granted the joint motion to amend scheduling order and continuance on May 19. [Dkt 85].

opinions. However, Whinstone erroneously instructed its experts not to consider these documents claiming they had been excluded. Jeffrey Matthews Dep., attached as **Exhibit "M,"** at 38:3-10, 76:11-21, 81:11-82:3, 84:20-85:4.

### III.
### ARGUMENT & AUTHORITIES

**A.    Whinstone Erroneously Challenges SBI's Rule 26 Disclosures by Misrepresenting the Court's Prior Order, SBI's Disclosures, and the Testimony in this Case.**

Whinstone incorrectly asserts that SBI (1) failed to disclose Boltin as a retained testifying expert, (2) failed to disclose all of Byers' opinions, and (3) that SBI failed to produce the "source data" underpinning Byer's and Boltin's opinions. [Dkt. 148 at 3-4]. Whinstone's assertions run contrary to the facts and law.

1.    <u>Whinstone's contention that SBI failed to properly disclose Boltin is an irrelevant point designed to mislead the Court.</u>

Whinstone erroneously labels Boltin as a testifying expert under Rule 26. Whinstone provides no support for this assumption, nor can they, because it simply is not true. Rule 26(a)(2)(B) only applies to retained testifying experts. FED. R. CIV. P. 26. SBI did not retain Boltin, nor does SBI intend to offer any testimony by Boltin at trial. Therefore, SBI had no obligation to produce anything more than the MVA Dust Analysis Report which was considered by Byers. FED. R. EVID. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.").[9]

---

[9] *See* Fed. R. Evid. 703 advisory committee's note, "1972 Proposed Rules" ("[T]he rule is designed to broaden the basis for expert opinions beyond that current in many jurisdictions and to bring the judicial practice into line with the practice of the experts themselves when not in court. Thus a physician in his own

Second, Byers utilized MVA as an analytical lab simply to perform a chemical analysis to determine the composition of the dust from SBI's miners. *See* **Ex. "L,"** at ¶ 6. Rule 703 allows experts to base their opinions on the work of other experts. *Tajonera v. Black Elk Energy Offshore Operations, L.L.C.*, No. 13-0550, 2016 WL 3180776, at *10–11 (E.D. La. June 7, 2016). Here, Byers reviewed the results from MVA's testing, identified relevant findings, and used them as additional support for his contamination opinions. *See* Charles Byers Declaration, attached as **Exhibit "L,"** at ¶ 7. To be clear, the MVA testing alone did not form the basis for Byers' opinions. *Id.*; **Ex. "B,"** at 36:10-16, 259:17-260:3. Byers considered the totality of the evidence, including witness testimony, photographic and video evidence, Isaak's inspection of the Rockdale Facility, and his own inspection of the miners. **Ex. "B,"** at 259:17-260:3. The evidence leads to the conclusion that the substantial physical contamination of SBI's miners at the Rockdale Facility caused or contributed to the failure and underperformance of SBI's miners. **Ex. "A,"** at 3, 77. This is akin to a doctor coming to a diagnosis by taking a blood sample, sending it to the lab, and interpreting the results. **Ex. "L,"** at ¶ 6. Courts do not require parties to designate laboratory technicians as testifying experts. *Tajonera*, 2016 WL 3180776, at *10–11.[10]

2. <u>Whinstone's contention that SBI failed to disclose Byers' opinion on the time scale for temperature misstates Byers' testimony and report.</u>

During Byers' deposition, Whinstone's counsel questioned Byers on whether the

---

practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays.").

[10] Lastly, this Court should not apply the *Sierra Club* factors because this is not an untimely disclosure, however, even under the *Sierra Club* factors, Whinstone's argument fails. Whinstone cannot credibly claim any prejudice because it had notice of Boltin and the MVA Dust Analysis Report as of March 28, 2025, had its experts review and rebut the MVA Dust Analysis Report, and examined Byers on his use of the MVA Analysis Report. *See supra* II.C.

air intake temperature exceeding the Agreement's 29.5 degrees Celsius maximum would constitute a breach of the contract. **Ex. "B,**" at 164:13-166:4. Byers answered Whinstone's question by explaining that "the contract has language that specifies the average temperature," and in his "engineering judgment, the most appropriate time scale for that averaging is represented by the thermal time constraints of the systems involved." *Id*. Byers further explained that historic weather data indicated multiple days of temperatures exceeding 29.5 degrees Celsius, and that such exposure would have the potential to damage the miners because it exceeds the manufacturer's specifications. *Id*. Whinstone's assertion that this is an undisclosed opinion is a matter of semantics.

Byers testified that this issue of thermal time constraints is implied in his analysis, but that he did not specifically use the term "thermal time constraint" in his report. *Id*. Regardless, Byers opines extensively in his report on the miners' specifications, sensitivity to heat, data center cooling infrastructure, and the impact of high ambient air temperatures on the miners. *See generally* **Ex. "A."** Byers' use of the phrase "thermal time constraints" during deposition merely elaborates on his previously disclosed opinion that intake air temperatures above 29.5 degrees Celsius caused of contributed to SBI's miners overheating. *See Holcombe v. United States*, 516 F. Supp. 3d 660, 671 (W.D. Tex. 2021).

3. <u>Whinstone's contention that SBI failed to disclose Byers' source documents ignores the evidence.</u>

Whinstone does not identify any source documents SBI failed to produce as part of the MVA Dust Analysis Report, nor does Whinstone credibly contest the reliability or accuracy of the testing performed, nor does it dispute the results of the testing contained within the report. *See supra* II.C. Unsupported by any case law, rule, procedural history,

or facts, Whinstone nakedly asserts that additional "source data" exists for the MVA Dust Analysis Report, that SBI had an obligation to produce such information, or that the failure renders the analysis unreliable and excludable. [Dkt. 148 at 4, 11]. Therefore, the Court should summarily deny Whinstone's objection regarding the MVA source data.

Similarly, Whinstone's assertion that SBI has not produced information regarding mining pool allocation is nothing more than yet another instance of Whinstone's pattern of intentional and willful blindness. [Dkt. 148 at 3, 100]. First, an expert is allowed to rely on information and data from a party or client. *Tex. Grain Storage, Inc. v. Monsanto Co.*, No. CV SA-07-CA-673-OG, 2009 WL 10700909, at *1 (W.D. Tex. May 26, 2009). Second, the reliability of data underlying an expert's opinion goes to the weight of this evidence, but should not serve as basis for its exclusion. *Gen. Elec. Cap. Bus. Asset Funding Corp. v. S.A.S.E. Military Ltd.*, No. CIV. SA-03-CA-189-RF, 2004 WL 5495590, at *4 (W.D. Tex. Oct. 21, 2004); *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 392–393 (5th Cir. 2002) (refusing to exclude where there was no evidence that expert's data base was itself unreliable). Third, Whinstone offers no argument or evidence as to why the data from SBI is unreliable. Whinstone simply characterizes the data as being "manually input" from an "unknown 'mining pool database'" by SBI. [Dkt. 148 at 3]. However, as explained by SBI's corporate representative, SBI's pool allocation data for Rockdale and Russian operations was contemporaneously entered into spreadsheets and audited by SBI personnel. *See* SBI Corp. Rep Dep., attached hereto as **Exhibit "K,"** at 131:21-133:7; 134:24-135:18, 135:23-137:11. Finally, Whinstone's contention that its experts were not given sufficient evidence to test the validity of SBI's data is false. [Dkt. 148 at 4]. Rather, Whinstone instructed its experts not to review relevant evidence. **Ex. "M,"** at 38:3-10, 76:11-21, 81:11-82:3, 84:20-85:4.

Whinstone's objection to Byers alleged failure to disclose his internet searches misstates his testimony and does not impact the reliability of his opinions. [Dkt. 148 at 3]. No expert has disclosed their internet search history in this case, nor do experts regularly do so.[11] Byers acknowledged he conducted generic background research, including scholarly papers and URLs; Byers stated that none of this research "resulted in words" in his report and only a "small fraction" of this research may have even been relevant, but not worthy of citation given his other "98 references cited" in his report." **Ex. "B,"** at 147:11-148:9. Moreover, Whinstone's objection that it cannot "adequately rebut Byers' opinion that most large-scale cryptocurrency miners adhere to his advocated industry standards" is belied by Whinstone's rebuttal expert, Karen Rayment, who opines that no industry standards exist for crypto-currency mining facilities. [Dkt. 148 at 10, 16-17]; **Ex. "F,"** at 12-22. Whinstone's objection is unsupported by both the facts of this case and established expert practice, and offers no legitimate grounds for excluding any of Byers' testimony.

**B.    Whinstone Erroneously Claims Byers is Opining on "Meteorology" and "the Statistical Meaning and Significance" of Certain Data.**

Whinstone asks the Court to broadly prohibit Byers from "offering any opinions that rely on, or pertain to, meteorology or statistical analysis." Dkt. 148 at 13. Whinstone's complaints about meteorological or statistical analysis are misplaced.

First, Byers' opinions do not rely on weather forecasting or analysis. SBI alleges, *inter alia*, that Whinstone fraudulently concealed its breach of Clause 4.6.7 of the Hosting Agreement: "Whinstone shall maintain an intake temperature of less than twenty nine

---

[11] Indeed, Karen Rayment testified that she did not disclose all of the documents she reviewed or considered, but rather only the documents she relied upon. Karen Rayment Dep., attached as **Exhibit "N,"** at 96:17-97:9, 102:21-103:20, 106:12-19, 109:16-21, 113:20-114:11, 116:13-24.

point five (29.5) degrees Celsius." **Ex. "D,"** at 13. SBI alleges that that Rockdale Facility lacked an operating cooling system and that the "intake temperatures" for SBI's miners were equal to (or greater than) the outside air temperatures. **Ex. "A,"** at §§ 6.5.6 & 6.6.2. To the extent that Byers opines on "meteorological" data, he simply collected the "daily maximum temperature" historically recorded at an airport in College Station, Texas to approximate the temperature of air entering into the Rockdale Facility and SBI's miners.[12] In so doing, Byers found that the outdoor temperature exceeded the maximum temperature (29.5°C) for intake air into SBI's Equipment "205 days during the 607 days of miner deployment (33.8%)." Collecting historical daily temperatures or calculating percentages does not require expertise in meteorology or statistics. Whinstone offers no reason why this testimony should be excluded beyond Byers' admission that he is not a meteorologist. [Dkt. 148 at 12-13]. As presented, this testimony is relevant and reliable information and should not be restricted, much less excluded.

Similarly, Whinstone offers no justification for a blanket prohibition restricting Byers from "any opinions that rely on, or pertain to … statistical analysis." Dkt. 148 at 13. Whinstone nakedly asserts that "Byers is ***not qualified*** to opine on: any statistical or quantitative comparison between SBI's Rockdale and Russian mining [or] … expected mining operations," [or] the statistical meaning and significance "of the three months' worth of Lancium data; … photos and videos occurring during one day in June 2021; [a

---

[12] Whinstone's challenge is nonsensical on several levels. First, Whinstone attacks Byers' "qualifications" as a meteorologist, because he used temperature data from College Station when the online source (wunderground.com) referenced in his Initial Report (March 28, 2025) has historic temperature data for Rockdale. Byers explained in his deposition that when he collected the data in Dec. 2024 or Jan. 2025, there was no online temperature data for Rockdale. **Ex. "B,"** at 174:15-176:3. Second, a party does not need to precisely reproduce the conditions at issue to offer expert testimony. *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 790 (N.D. Tex. 2013) ("Expert testimony is not unreliable simply because there are differences between the test unit and the unit at issue") (citing *Barnes v. General Motors Corp.*, 547 F.2d 275, 277 (5th Cir.1977) (noting that conditions of experimental evidence need not be "precisely reproduced")).

data] ping of miners at … during one day in June 2021; [or] his … disassembly of five out of 20,000+ SBI miners from Rockdale." *Id.* at 13-14 (emphasis added).

First, as a computer and electrical engineer and Bell Labs Fellow, with more than 35 years of experience, 130 patent (including almost two dozen related to cooling high power computing and network equipment), Whinstone cannot credibly challenge Byers' "qualifications" to opinion on the foregoing evidence or topics. **Ex. "A,"** at 6. Moreover, Byers is allowed to offer quantitative observations and draw conclusions based on his experience and review of the evidence.[13] Additionally, at no point does Whinstone identify a single error in his "statistical or quantitative" analysis or explain why any of his data sets are fundamentally flawed or unreliable. *See generally*, Dkt. 148. Lastly, Byers does not offer a statistical regression analysis anywhere in his report, nor does he need to. *See generally* **Ex. "A."** Instead, Byers "considered several thousand items of evidence, consisting of computer files, text messages, thread transcripts, contracts, spreadsheets, data sheets, log files, climate observations, photos, videos, scientific laboratory reports, depositions and" other evidence to reach his conclusions. **Ex. "A,"** at 77. Then, based on his methodological review of the totality of the evidence[14] and "failure modes" that SBI's miners suffered, Byers concludes, *inter alia*, that there is a direct correlation between Rockdale's environmental conditions and the underperformance and failure of SBI's miners. *Id.* at 1. ("Environmental conditions in the Whinstone datacenter caused the poor bitcoin mining productivity and unacceptably high failure rate of the SBI miners"). To the

---

[13] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 155 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience"); *Kozak v. Medtronic, Inc.*, 512 F. Supp. 2d 913, 918 (S.D. Tex. 2007) ("An expert's testimony does not always have to be based on scientific testing; it can be based on personal experience.").

[14] *See supra*, II.B pp. 4-5.

extent he offers any "statistical analysis," Byers explains that "[c]orrelation is an engineering term as well as a statistical term. And my use of the term means that a certain failure mode symptom occurs in conjunction with a certain root cause." **Ex. "B,"** at 181:3-12; **Ex. "A,"** at 44. (Chart listing "Issues" and "Failure Modes Caused" with corresponding "Whinstone Culpability").

Byers is plainly qualified to offer his opinions. Furthermore, based on a review of the totality of the evidence his methodology is both relevant and reliable. Whinstone's objection here is not a challenge to Byers' qualifications as a "statistician" or his methodology, but an attack on the sample size of certain data sets he considered. However, because Byers relies on other evidence, Whinstone's objections to the statistical significance of certain data go to weight, not admissibility. *See, e.g.*, *Orthoflex*, 986 F. Supp. 2d at 801-02 (finding that small sample sizes are not *per se* excluded and that the challenge to expert's sample size went to "weight, not admissibility, of his opinion" because his engineering opinion was "supplemented by other evidence," nor was his opinion "based on any kind of regression analysis."). Therefore, to the extent Byers' opinions are partially based on "three months' worth of Lancium data"; photos and videos "occurring during one day in June 2021"; a data query "ping of miners [from] one day in June 2021"; and his "disassembly of five out of 20,000," miners those observations and corresponding analyses should not be excluded or otherwise restricted.

## C.    Contrary to Whinstone's Assertions, Byers' Opinions are highly Relevant and Unquestionably Reliable.

The record does not support Whinstone's contention that Byers' opinions are unreliable and irrelevant.

1.    <u>Byers uses valid and reliable methodology.</u>

Whinstone's contention that Byers "did not adhere to a single scientifically valid methodology to form his opinions" strains credulity. [Dkt. 148 at 14]. While citing the five *Daubert* factors courts consider in determining reliability, Whinstone fails to note that those factors are "non-exclusive," and "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of [the] testimony." *Kumho*, 526 U.S. at 150, 119 S.Ct. 1167.

For example, Whinstone vaguely contends that "[i]f Byers cannot test his own theories, it is impossible for Whinstone to adequately replicate those same theories." First, Whinstone cites no authority that *Daubert* requires testing in this context.[15] Whinstone falsely claims Byers did not cite a any "type of authority that supports his opinions" [Dkt. 148 at 15] when, in fact, he cites The American Society of Heating, Refrigeration and Airconditioning Engineers' (ASHRAE) guidelines and best practices for datacenter thermal design. **Ex. "A,"** at 13, 72. Whinstone's vague assertion that "none of Byers's analyses have been subjected to peer review or publication" is belied by his nearly two dozen patents related to cooling high power computing equipment and network equipment. **Ex. "A,"** at 6. Needless to say, patents are "peer reviewed" and published.

Whinstone's assertion that Byers does not identify "a verifiable or recognized methodology to reach his conclusions" is false. [Dkt. 148 at 16]. Byers expressly identified the methodology he employed to conduct his failure mode analysis in this case, as well as

---

[15] *See Orthoflex*, 986 F. Supp. 2d 802 (denying motion to exclude expert who only inspected two units, but analyzed parts and photographic evidence of failure modes; finding that the issue that the expert "did not perform extensive scientific experiments to examine the functionality of the devices goes to the weight, not the admissibility" *citing Kumho*, 526 U.S. at 150–51 (explaining that the Daubert factors do not establish a rigid checklist and testing is but one factor to be considered)).

a "Flow of Reasoning" diagram summarizing each step of his methodology and analysis. *See* **Ex. "A,"** at 7-9, ("5.4 Overview of Study Methodology") & 77.[16]

   2.    Byers' opinions are plainly relevant.

To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) (quoting *Daubert*, 509 U.S. at 591, 113 S.Ct. at 125). "Relevance depends upon 'whether [the *783 expert's] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786). Whinstone argues that Byers' opinions are irrelevant because he "attempts to impose traditional data center standards on Whinstone" when there were, according to Whinstone's expert, "no industry standards for cryptocurrency mining facilities existed at the time Whinstone's Rockdale facility was being designed and constructed in 2019 (and still don't exist to this day)." [Dkt. 148 at 16].

First, this contention directly contradicts Whinstone's express agreement to "provide the Services[17] in a professional manner consistent with industry standards." **Ex. "D,"** at Clause 8.2. Whinstone's contention that there are no industry standards plainly contradicts the terms of the Hosting Agreement.

Second, there are, in fact, industry standards. And those applicable industry standards are well known. *See* **Ex. "B,"** at 269:9-17 (Byers explaining how the minimum

---

[16] Byers' report also describes in detail how he analyzed available evidence and data. *See supra* II.B.

[17] "Services" are defined as the Hosting Service [Clause 2.2 et al.], Basic Remote Hands Service [Clause 2.3, et al.], and Advance Remote Hands Service [Clause 2.4 et al.,]. **Ex. "D,"** at pp.1-3. Clause 2.2.13 under the "Hosting Service" clause [2.2] further provides that "Whinstone will follow the Service Level Agreement in Clause 4 ... " Accordingly, Whinstone expressly agreed to hosting services (Clauses, 2.2, 2.3, 2.4 & 4) "consistent with industry standards." *Id.* at Cl. 8.2.

professional standards for heating, ventilation, and cooling as provided by American Society of Heating, Refrigerating and Air-Conditioning Engineers ("ASHRAE") informed his methodology for evaluating the Rockdale Facility); *see also* Phil Isaak Dep., attached as **Exhibit "J,"** at 66:3-68:8 (Isaak explaining that in his experience consulting on crypto mining facilities the engineers applied ASHRAE standards).

Third, Whinstone's own expert, Karen Rayment, who posited this "no standards" theory, conceded there were at least some overlaps between what she calls "traditional data centers" and "cryptomining facilities." **Ex. "N,"** at 71:19-73:5. Here, Byers' application of "traditional data center standards" to the Rockdale Facility are plainly relevant to issues in this case which concern whether Whinstone's acts and omissions caused the underperformance and failure of SBI's miners.

3.    Whinstone's contention that Byers' opinions lack foundation is meritless.

Whinstone's contention that "it is impossible for Byers—who admits that he lacks certain data—to perform the analysis necessary to determine causation, thereby rendering any conclusion concerning the same as speculation" is nonsensical and contrary to established Fifth Circuit standards for expert foundation.

Courts exclude expert opinions if the expert does not "offer[] any plausible data support that opinion." *Wackman v. Rubsamen*, 602 F.3d 391, 403 (5th Cir. 2010). Courts do not strike expert opinions where an expert acknowledges limitations in the data and explains the reliability of their opinion. *Id.* Conclusory allegations that an expert lacks foundation, the challenging party must show why the allegedly missing data or discrepancies in the data render the expert opinion unreliable. *Id.* Here, Whinstone

makes conclusory allegations that Byers lacked necessary data—pool allocation data,[18] data on the variation in miner models, and contemporaneous temperature data—to form his opinions. [Dkt. 148 at 17]. Whinstone does not explain why any of this data is necessary and the lack thereof renders Byers' opinions unreliable. Here, Byers did not rely on any one particular data point but rather reviewed and relied on the totality of the evidence to reach his conclusions. *See supra* II.C.

Moreover, Whinstone misstates Byers' testimony in suggesting that he lacked data necessary to perform his conclusions. Specifically, as in *Wackman*, Byers acknowledged a limitation in the data—Whinstone was required to but failed to record or monitor the air intake temperature at the Rockdale Facility. **Ex. "B,"** at 162:18-163:10, 270:2-271:23. He further explained why the use of the College Station temperature data provided a reliable comparison. *Id.* at 174:1-25, 196:16-197:5.

Additionally, while the Rockdale airport historic temperatures were unavailable when Byers completed his Initial Report, he reviewed the Rockdale airport temperature data and found it actually recorded hotter temperatures than College Station, meaning Byers used a more conservative dataset initially. **Ex. "L,"** at 7. The *Wackman* Court held that use of more conservative data set does not render the opinions unreliable. *See* 602 F.3d at 403. Additionally, Byers explained that while Whinstone failed to record the number and model of miners they installed, any variation in model is immaterial to his analysis. **Ex. "B,"** at 92:17-93:12, 127:8-130:4. Regardless, Whinstone offers no explanation as to why these discrepancies, when considered with the totality of the evidence, renders Byers' failure mode opinions unreliable. Even Whinstone's expert,

---

[18] As previously explained, SBI has produced the contemporaneously recorded pool allocation data. *See supra* II.D, pp. 10-11.

Peters, who offered rebuttal opinions to Byers, agreed that excessive heat and dust accumulation can cause miners to fail or underperform. **Ex. "G,"** at 150:3-10, 151:20-155:11, 157:18-158:2. This is not a case where an expert has offered an opinion without any supporting data, and therefore, the Court should not exclude Byers' opinions for a lack of foundation.

    4.    <u>Byers is not offering ultimate legal conclusions beyond assessing facts supporting SBI's claims for breach and fraud.</u>

Whinstone incorrectly asserts that Byers offered inadmissible legal opinions on the contractual requirements of the Agreement and how Whinstone breached it. Opinions that "touch on legal topics" are not automatically inadmissible. *Olivier v. Exxon Mobil Corp.*, 596 F. Supp. 3d 606, 611 (M.D. La. 2022). "[A]n expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied ... " *Butler v. BNSF Ry. Co.*, No. 1:22-CV-00367-MJT, 2024 WL 2735020, at *5 (E.D. Tex. Mar. 26, 2024) (*citing Olivier v. Exxon Mobil Corp.*, 596 F. Supp. 3d 606, 611 (M.D. La. 2022)). The court must determine "whether the expert's opinions bear on some factual inquiry or whether they bear solely on the legal conclusions urged." *Olivier*, 596 F. Supp. 3d at 611. Here, Byers does not offer opinions on purely legal matters. Rather, he opines on the facts supporting SBI's breach of contract and fraud claims but does not render purely legal opinion. *See supra* III.B. For example, opining on whether the air intake temperature exceeded 29.5 degrees Celsius is a permissible opinion on the facts that also indicates that Whinstone breached a contractual obligation.

## IV.
### <u>CONCLUSION</u>

For the foregoing reasons, Whinstone's Motion to Strike the Expert Opinions of Charles Byers and Randy Boltin should be denied in its entirety.

Respectfully submitted,

By: */s/ Joshua M. Sandler*
Joshua M. Sandler
  Texas Bar No. 24053680
  jsandler@winstead.com
Cory Johnson
  Texas Bar No. 24046162
  cjohnson@winstead.com
Andrew Patterson
  Texas Bar No. 24131573
  apatterson@winstead.com
John D. Janicek
  State Bar No. 24125636
  jjanicek@winstead.com
**WINSTEAD PC**
2728 N. Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (214) 745-5103
Facsimile: (214) 745-5390
**ATTORNEYS FOR PLAINTIFF
SBI CRYPTO CO. LTD**

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served in accordance with the Texas Rules of Civil Procedure via the court's e-filing system on December 1, 2025.

*/s/ Andrew Patterson*
Andrew Patterson