# EXHIBIT "H"

IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN
DISTRICT OF TEXAS WACO DIVISION

**SBI CRYPTO CO., LTD.,**

*Plaintiff,*

v.

**WHINSTONE US, INC.,**

*Defendant.*

Civil Action No.: 6:23-cv-252-ADA-JCM

Jury Trial Demanded

## DISCOVERY DISPUTE SUMBISSION CHART

| Discovery Dispute at Issue | Requesting Party's Position | Responding Party's Position |
| --- | --- | --- |
| **SBI's Kyrgyzstan and Russia Documents & Communications:** | **Kyrgyzstan/Russia Operations:** | **Kyrgyzstan/Russia Operations:** |
| Over a year and a half ago, Whinstone US, Inc. ("Whinstone") served discovery on SBI ("SBI") asking for the production of documents and communications concerning the equipment and performance of SBI's other cryptocurrency mining operations—namely, the location that housed the 20,000 other Canaan A-10 miners that SBI purchased in the same batch as the 20,000 Canaan A-10 | SBI sat behind a log for nearly two years and now attempts to conduct a trial by ambush. SBI initially sought approximately $31 million in alleged lost profits and equipment damage. Am. Compl. (Jul. 7, 2023) ¶¶ 59-60 (ECF No. 11). But now, SBI *quintuples* that number, claiming *hundreds of millions* of dollars in purported lost profits and miner value based on alleged "defects" in the design and deficient Facility operation. | First, SBI has conducted a diligent search and produced voluminous records related to SBI's operations of miners in Russia. SBI first produced documents in October 2023, including emails, invoices, and spreadsheets. SBI has consistently supplemented its production when additional documents were located. SBI produced at least 61 documents referencing the operator of the Russian facility, Muroo, and 34 documents referencing Russia |

miners used at Whinstone's cryptocurrency mining facility ("Facility") in Rockdale, Texas. E.g., SBI Resp. Whinstone Req. Prod. Nos. 15-18, 20, 31, 36-37, 88, 133-34. Later, Whinstone served discovery requesting information concerning SBI's other facilities, operations, layout, and design and any replacement of any Canaan A-10 miners and power supply units. E.g., SBI Resp. Whinstone Req. Prod. Nos. 143-144, 146-153.

Rather than produce this responsive information, however, SBI improperly asserted general boilerplate objections (which are waived) and is either refusing to adequately collect or withholding critical information that SBI itself relies upon to support its claims.

**Nicholas Vitalis Deposition:**

SBI did not disclose Nicholas Vitalis as a witness that would likely have information discoverable in support of SBI's claims pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)(i).

Despite this non-disclosure, one of SBI's damages expert, Randall Valentine, cited to his conversations with Mr. Vitalis to support Mr.

Critically, Whinstone contends the 20,000 Canaan A-10 miners and accompanying power supply units ("PSUs") purchased by SBI and installed at the Facility caused SBI's alleged losses because the miners to draw fail or improperly work. Indeed, Whinstone notified SBI of those claims concerning the PSUs in 2020.

Yet five years later—and for the first time on April 1, 2025 expert disclosures—SBI's damages were derived from a comparison between performance of Canaan A-10 miners in a facility located in Russia. However, as detailed in the "Discovery Dispute at Issue," SBI failed and refused to disclose information to test the credibility of this comparison. Instead, SBI largely relies upon after-the-fact, made-for-litigation spreadsheets and refuses to produce the underlying operational, performance, and financial data upon which the spreadsheets are purportedly based. That is contrary to Federal Rule of Evidence 1006.

In another troublesome instance, SBI produced communications indicating that it conducted an investigation of 20,000 Canaan A-10 miners that were awaiting in deployment in Kyrgyzstan

generally. In response to Whinstone's recent demands, SBI recently conducted additional searches for records and promptly produced the additional records found. SBI believes it has produced all responsive documents it has in its possession, and the bulk of the documents were produced in October 2023.

Second, SBI maintains its objections to Whinstone's Requests. Whinstone's Request Nos. 15-18, 20, 31, 36, 37, 88, 133 and 134 in their First Requests for Production were overly broad, unduly burdensome, vague, sought, irrelevant information, and clearly just a fishing expedition. Whinstone made no attempts to narrow their requests for production to the operation of the model of miners at issue in this case, but are also seeking documents related to the operation of different types of miners at different facilities. They broadly sought any documents, communications, etc. relating to SBI's cryptomining operations at any other facility. SBI responded with these objections and by producing documents related to SBI's operations at a Russian facility that had the same model miner as those at the Rockdale Facility. Request Nos. 143, 144, and 146-153 have similar issues which is why SBI

Valentine's opinions contained in his expert report. R. Valentine Exp. Rpt. at 3. That disclosure occurred on March 28, 2025—just _two weeks_ before the close of discovery.

Whinstone immediately requested Mr. Vitalis' deposition the next business day—but SBI refused to offer him as a fact witness until April 8, 2025. Moreover, despite expecting Mr. Vitalis to be present at trial, SBI refused to make him available in person—only by Zoom.

**SBI's Slack and Teams Messages:**

During his deposition on August 15, 2024, Jonathan Tanemori of SBI affirmatively testified that he communicated via Slack and Teams regarding SBI's operations at the Facility. J. Tanemori Dep. Tr. (Aug. 15, 2024) at 67:21-68:18, attached as Exhibit 1. Despite this admission, SBI has yet to produce any such Slack or Teams messages.

(later deployed in Russia). Chat (Sept. 1, 2020), attached as Exhibit 2.[1] Upon information and belief, those miners exhibited the **same** performance issues experienced at the Facility and SBI **pre-emptively** replaced the PSUs and/or fixed the PSUs to avoid future performance issues when Canaan A-10 miners were eventually deployed in Russia. _Id_; SBIC0003699.

Yet SBI has failed and refused to provide information surrounding this investigation, its communications with Canaan, and other details regarding SBI's operations (such as the design of other facilities and performance data) relevant to the parties' claims and defenses in this lawsuit—even though Carson Smith of SBI has testified that such documents exist. _E.g._, C. Smith Dep. Tr. (Aug. 21, 2024) at 51:03-52:02, 57:08-23, 95:8-14, 115:11-22, 116:15-25, 119:7-125:23, 143:2-147:24, 256:20-257:1, attached as Exhibit 3. Instead of SBI obfuscated by lodging general, boilerplate objections. Those objections are automatically waived under the Rules. Fed. R. Civ. Proc. 33(b)(4); _Phillips v. Murphy Oil USA, Inc._, No. EP-23-CV-00294-KC, 2024 WL 677711,

raised appropriate objections. Whinstone has never narrowly tailored requests to the Russia location, even after the production in October 2023. Whinstone continues to broadly seek information on SBI's mining operations at facilities located anywhere in the world, involving any model miner, and during any time period. All the while, Whinstone hides behind objections and has refuses to produce any documents related to (1) miners hosted by other companies in Building B of the Rockdale Facility, claiming such information is irrelevant, (2) Riot's operation of miners in Building B after Riot kicked out SBI and moved Riot's miners into SBI's space, and (3) any other building at the Rockdale Facility. Whinstone's attorneys, the same attorney's representing Riot, even instructed Riot's corporate representative not to testify during his deposition to topics not very narrowly tailored to Building B.

Third, to the extent that SBI's experts have reviewed and/or relied on data or documents related to SBI's operations at the Rockdale and Russia facilities, SBI has produced the documents

---

[1] SBI belatedly produced the investigation report on April 4, 2025—after Whinstone set SBI the initial draft of this dispute. SBI has yet to produce any communications regarding this investigation or attempts to address the issues identified by the investigation.

at *2 (W.D. Tex. Feb. 12, 2024); *Heller v. City of Dallas*, 303 F.R.D. 466, 483 (N.D. Tex. 2014).

Moreover, despite its reliance on alleged performance data of identical miners at its other facilities, SBI erroneously claims the requested information is irrelevant. SBI's position is directly at odds with its own expert reports—which are primarily premised on the contention the 20,000 Canaan A-10 miners located in Russia **outperformed** the 20,000 Canaan A-10 miners at the Facility. SBI cannot have it both ways.

Perhaps most troublesome is SBI's counsel relying on SBI to unilaterally collect documents and determine responsiveness. *E.g.*, Ex. 3 at 269:12-270:25. SBI has **not** imaged its custodian email accounts and provided that image to its counsel for review. *See id.* That haphazard conduct is patently improper with hundreds of millions of dollars at stake. *See, e.g., Sage Products, LLC v. Chemrite Copac, Inc.,* No. 19 CV 5308, 2021 WL 5299789, at *5 (N.D. Ill. Nov. 12, 2021) ("[T]he fact that Sage is seeking in excess of $62 million in damages from ChemRite weighs heavily in favor of requiring Sage to respond to ChemRite's

identified by SBI's experts and will timely supplement such production prior to expert depositions if necessary. SBI's increase in damage valuation following the retention of expert witnesses and two years of discovery does not suddenly make Whinstone's requests any less objectionable, nor does it excuse their repeated discovery abuses.

Fourth, Whinstone's comparison of the number of documents produced is wholly irrelevant and hides the abusive discovery practices it has engaged in that have resulted in this Court granting two motions to compel brought by SBI – one against Whinstone and one against Riot. Whinstone has consistently withheld plainly relevant information until compelled by a court, and even then waits until the eve of depositions, or in the case of Lyle Theriot and Ashton Harris, produced numerous documents **after** their depositions, forcing SBI to seek supplemental depositions.

Fifth, Whinstone identified for the first time on April 2, 2025, an attachment to a WhatsApp text message sent to Whinstone. After much effort, SBI located and produced a copy of the attachment Whinstone requested but

| | |
|---|---|
| reasonable request for relevant information."); *Kolon Indus., Inc. v. E.I. Du Pont de Nemours & Co.*, No. 3:11CV622, 2012 WL 604137, at *5 (E.D. Va. Feb. 23, 2012) (compelling production of computer images and dumpster files when evidence showed document production was not complete).<br><br>Indeed, the document production discrepancy in this case is apparent—Whinstone has produced over 4,180 documents comprised of over 16,700 pages to date. In comparison, SBI has only produced a paltry 2,140 documents consisting of 6,450 pages.<br><br>In sum, SBI must be compelled to collect and produce the critical information regarding the source data upon which SBI's experts rely (*e.g.*, financial, operational, and performance data), PSU and miner replacements, installation, operational, maintenance, and troubleshooting in Kyrgyzstan and Russia, and Kyrgyzstan and Russia facility layout, design, construction, and operation (including photos). Alternatively, SBI's expert opinions reliant on these claims must be excluded. | that should have already been in its possession given that the document was transmitted to Ashton Harris at Whinstone/Riot.<br><br>Subject to SBI's objections, SBI has conducted a thorough and diligent search for responsive documents related to its operations in Russia and is not withholding any non-privileged documents related to its operation of miners in Russia.<br><br>**Nicholas Vitalis Deposition:**<br><br>SBI has offered and is still willing to produce Mr. Vitalis for a zoom deposition. Mr. Vitalis resides in Tokyo, Japan and requiring an in-person deposition would impose an undue hardship. Plaintiff relies on caselaw to suggest that there is no hardship for an out-of-town witness. Mr. Vitalis is not just out of town; he is on the other side of globe.<br><br>**SBI's Slack and Teams Messages:**<br><br>SBI has already stated that it will produce responsive communications |

subject to SBI's objections. Whinstone's requested relief, just like its Requests for Production, are entirely over broad, unduly burdensome, and seek irrelevant information. Whinstone has no basis to require an unlimited forensic imaging of Messrs. Tanemori and Smith's Slack and Teams messages. Whinstone has not narrowed their requested relief to messages likely to lead to the discovery of relevant evidence as this request has no limitations in scope to the subject matter of this lawsuit.

**Requested Relief:** Whinstone requests that the Court order SBI to actually image Jonathan Tanemori and Carson Smith's emails, overrule SBI's objections to Whinstone Request for Production Nos. 15-18, 20, 31, 36-37, 88, 133-34, 143-144, and 146-153 and compel SBI to conduct a reasonable and diligent search and produce such documents without objection within 7 days of the Court's order. Time is of the essence, as discovery closes on April 11, 2025 and expert discovery closes on May 16, 2025 (per the parties' agreement).

**Nicholas Vitalis Deposition:**

"The general rule is that a plaintiff must make herself available for deposition in the forum where the action is brought." *Leamon v. KBR, Inc.*, No. CV H-10-253, 2011 WL 13340583, at *1 (S.D. Tex. Nov. 1, 2011). SBI sued Whinstone in Texas. The Parties' counsel are located in Dallas. There should be no dispute depositions should occur in Texas.

With that in mind, Whinstone requested Mr. Vitalis—who is SBI's only *current* employee driving this litigation, provides information to SBI's experts, and expects to be present at trial as SBI's corporate representative—

appear for an in-person deposition in Texas.

SBI initially refused. Only after repeated rebuffed requests did SBI offer to make Mr. Vitalis available remotely. That is not proper—there is no extreme hardship Mr. Vitalis can show that excuses his in-person deposition in Dallas. *E.g.*, *Williams v. Sprint/United Mgmt. Co.*, No. 03-2200-JWL, 2006 WL 1867471, at *3 (D. Kan. June 30, 2006) ("Absent a specific showing of hardship tied to an individual's circumstances, a general order requiring that the depositions of out-of-town plaintiffs be taken telephonically is not warranted.").

**Requested Relief:** Whinstone requests that the Court order Mr. Vitalis to appear for an in-person deposition at the office of SBI's counsel in Dallas, Texas no later than May 16, 2025.

**Slack/Teams Messages:**

Despite sworn testimony that Mr. Tanemori conducted SBI business via Slack/Teams, SBI has not collected or produced any Slack/Teams messages. Given the large void in SBI's document production, a reasonable investigation demands that SBI image this

| | information and provide to its counsel for review.<br><br>**Requested Relief**: Whinstone requests that the Court order SBI to image Messrs. Tanemori and Smith's Slack and Teams messages and provide a copy to SBI's counsel for review. Alternatively, SBI should submit a sworn declaration detailing the efforts to search for such information and the reasons why the information cannot be located. |
|---|---|

Respectfully submitted,

/s/
Joshua M. Sandler
Texas Bar No. 24053680
jsandler@winstead.com
Cory Johnson
Texas Bar No. 24046162
cjohnson@winstead.com
**WINSTEAD PC**
2728 N. Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (214) 745-5103
Facsimile: (214) 745-5390

4916-2497-6435.3

**ATTORNEYS FOR PLAINTIFF**
**SBI CRYPTO CO. LTD**

/s/
Robert T. Slovak
Texas Bar No. 24013523
rslovak@foley.com
Brandon C. Marx
Texas Bar No. 24098046
bmarx@foley.com
FOLEY & LARDNER LLP
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
**ATTORNEYS FOR DEFENDANT**
**WHINSTONE US, INC.**

4916-2497-6435.3

# EXHIBIT 1



CONFIDENTIAL -- ATTORNEYS' EYES ONLY

# Transcript of Jonathan Tanemori

**Date:** August 15, 2024
**Case:** SBI Crypto Co., Ltd. -v- Whinstone US, Inc.

**Planet Depos**
**Phone:** 888.433.3767 **| Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Confidential -- Attorneys' Eyes Only
Transcript of Jonathan Tanemori
Conducted on August 15, 2024

1 (1 to 4)

---

**1**

```
1          UNITED STATES DISTRICT COURT
2          WESTERN DISTRICT OF TEXAS
3               WACO DIVISION
4                 --o0o--
5  SBI CRYPTO CO., LTD.,        )
6          Plaintiff,          )
7          vs.                 ) 6:23-cv-252-ADA-JCM
8  WHINSTONE US, INC.,          )
9          Defendant.          )
10
11    ** Confidential -- Attorneys' Eyes Only **
12  -----------------------------------------------
13          VIDEO DEPOSITION OF
14          JONATHAN TANEMORI
15           August 15, 2024
16  -----------------------------------------------
17    DEPOSITION OF JONATHAN TANEMORI, produced as
18  a witness, duly sworn by me at the instance of the
19  DEFENDANT, was taken in the above-styled and numbered
20  cause on August 15, 2024, from 9:01 A.M. to 5:16 P.M.,
21  before BRANDON D. COMBS, CSR, RPR, in and for the State
22  of Texas, reported by computerized machine shorthand
23  at:
24       2728 North Harwood Street, Fifth Floor,
25             Dallas, Texas
```

**2**

```
1          APPEARANCES
2
3       FOLEY & LARDNER LLP, 2021 McKinney Avenue,
4  Suite 1600, Dallas, TX 75201, represented by
5  ROBERT T. SLOVAK and BRANDON C. MARX, Attorneys at Law,
6  appeared as counsel on behalf of the Defendant.
7       Email: rslovak@foley.com
8
9
10      WINSTEAD PC, 2728 North Harwood Street,
11  Dallas, TX 75201, represented by CORY JOHNSON and
12  JOSHUA M. SANDLER, Attorneys at Law, appeared as
13  counsel on behalf of the Plaintiff.
14      Email: cjohnson@winstead.com
15
16
17
18    ALSO PRESENT:
19      Jesse Castro, Videographer
20
21
22
23
24
25
```

**3**

```
1                  INDEX
2                              PAGE
3    Examination by MR. SLOVAK      7
4
5
6  EXHIBITS                        PAGE
7
8  Exhibit 1   Complaint            77
9
10 Exhibit 2   Hosting Service Agreement   80
11
12 Exhibit 3   Email to               94
13             a.thillai@whinstone.co.uk,
14             Jun 14, 2019, re Whinstone
15             financial review request
16
17 Exhibit 4   International Sales Contract   93
18
19 Exhibit 5   Email to Carson Smith, Jun 20,  125
20             2021, re Whinstone 80% counter
21             calculation
22
23 Exhibit 6   Hosting Service Agreement   130
24
25 Exhibit 7   Whinstone Trip report        150
```

**4**

```
1  Exhibit 8   Email to              186
2             lyle.theriot@northerndata.de
3
4  Exhibit 9   Email to Arooh Thillai, Aug 12,  190
5             2020, re issues in Whinstone
6
7  Exhibit 10  Email to Mathias Daehn, Oct 21,  197
8             2020, re open items
9
10 Exhibit 11  International Sales Contract   208
11
12 Exhibit 12  Email to Ray Redding, Jul 28,   230
13             2021, re Avalon A10 miners
14
15 Exhibit 13  Email to Chad Harris, Jun 3,    246
16             2022, re notice of claim
17
18 Exhibit 14  Email to Jonathan Tanemori,     249
19             Jul 29, 2021, re SBI contract
20
21 Exhibit 15  Email to jles@riotblockchain.com,  252
22             Dec 16, 2021, re adjustment for
23             June 2021 payment
24
25
```

---

**Page 5**

| Exhibit 16 | Email to c.harris@whinstone, | 255 |
| | Mar 2, 2022, re details for | |
| | shipping | |
| Exhibit 17 | Email to | 264 |
| | lyle.theriot@whinstone.us, | |
| | Aug 10, 2020, re SBI Crypto | |
| | hosting contract amendment | |
| Exhibit 18 | Email to Jonathan Tanemori, | 273 |
| | May 30, 2021, re emailing new | |
| | Whinstone Hosting Agrt | |
| Exhibit 19 | Email to Carson Smith, Jun 3, | 279 |
| | 2021, re Whinstone options | |

---

**Page 7**

1  Wooding.

2      THE VIDEOGRAPHER:  The court reporter

3  today is Brandon Combs, also representing

4  Planet Depos.

5      The witness may now be sworn.

6      JONATHAN TANEMORI,

7  having been first duly sworn, testified as follows:

8      EXAMINATION

9    Q.  (BY MR. SLOVAK)  Mr. Tanemori, my name is

10  Rob Slovak.  We just met this morning.  As you know,

11  I represent Whinstone US, Inc. in a lawsuit that

12  SBI Crypto, Limited has filed.

13      Are you aware of that lawsuit?

14    **A.  Yes, I am.**

15    Q.  And were you involved in the process of

16  approving that that lawsuit be filed?

17    **A.  What do you mean by approving?**

18    Q.  Well, did you have any say in whether the

19  lawsuit was filed or not?

20    **A.  As an SBI Crypto employee at the time, we**

21  **had discussed internally but I was not the decision**

22  **maker.**

23    Q.  Who was that decision maker?

24    **A.  That would have been ultimately Carson.**

25    Q.  Is that Carson Smith?

---

**Page 6**

1      THE VIDEOGRAPHER:  Here begins Media 1 in

2  the videotaped deposition of Jonathan Tanemori, in

3  the matter of SBI Crypto Co., Ltd. v. Whinstone US,

4  Inc.

5      In the United States District Court for

6  the Western District of Texas, Waco Division,

7  Case Number 6:23-cv-252-ADA-JCM.

8      Today's date is August 15, 2024.  The time

9  on the video monitor is 9:02 A.M.

10      The videographer today is Jesse Castro,

11  representing Planet Depos.

12      This video deposition is taking place at

13  2728 North Harwood Street, Suite 500, Dallas,

14  Texas 75201.

15      Would counsel please voice-identify

16  themselves and state whom they represent.

17      MR. SLOVAK:  Rob Slovak, along with

18  Brandon Marx, from Foley & Lardner.  We represent

19  Whinstone USA.

20      MR. JOHNSON:  Cory Johnson and Josh

21  Sandler of Winstead, representing the plaintiff

22  SBI Crypto Co., Limited.  And I also believe via

23  Zoom we have the CEO of Plaintiff, Nick Vitalis.

24      MR. SLOVAK:  Okay.  And I think we also

25  have our in-house counsel for Whinstone, Patrick

---

**Page 8**

1    **A.  Yes.**

2    Q.  Okay.  And have you been deposed before?

3    **A.  No, I haven't.  First time.**

4    Q.  Okay.  So, couple of things I want to make

5  sure that we're on the same page.

6      I'm going to ask you questions.  The court

7  reporter is doing everything possible to take down

8  what I say, and he's doing everything possible to

9  take down what you say.

10      So if you'll do me a favor and allow me to

11  finish my question before you answer, that way it

12  comes out clean on the record.  I'll do my best to

13  allow you to finish your answer before I ask the

14  next question.

15      Can we have that agreement?

16    **A.  Sure.**

17    Q.  And because he's trying to take down what

18  you say, we'll need you to answer verbally; right?

19  Nods and uh-huh's don't make it on the record very

20  well, so if you could say affirmatively yes or no or

21  state your answer.

22      Can we have that agreement?

23    **A.  Sure, yes.**

24    Q.  You're not being held captive here today.

25  If at any point in time you need a break, as long as

65

1    A.  That's really kind of all we discussed.
2    Q.  Have you exchanged written communications
3  with Carson Smith since you left SBI?
4    A.  We've -- there's an email chain that we
5  have requested -- me asking him a few questions
6  about, you know, when did this happen or that.  But
7  not -- you know.
8    Q.  Have you provided that email chain to your
9  lawyers?
10   A.  No, I haven't.
11   Q.  Do you still have it?
12   A.  It would be available.
13   Q.  Do you have any issue with providing it to
14 your lawyers?
15       MR. JOHNSON:  Objection.  Form.
16       THE WITNESS:  No.
17   Q.  (BY MR. SLOVAK)  Okay.  And so you talked
18 to Carson Smith last night generally about when you
19 got here.  Anything else in particular you remember
20 talking to him about?
21   A.  No.
22   Q.  You said you had spoken to him about the
23 lawsuit since left in March on some other
24 occasions.  Tell us about those.
25   A.  Because we're also friends as well, and so

66

1  what events we're going to, you know, outside of
2  work, things like that.  So didn't necessarily
3  pertain to the litigation.
4    Q.  How often do you speak to Carson Smith?
5    A.  Again, that would have been about two or
6  three times in total.
7    Q.  Do you exchange text messages with Carson
8  Smith?
9    A.  On occasion, yes.
10   Q.  Did you when you were employed by SBI?
11   A.  Generally not.
12   Q.  Okay.  Did you exchange text messages with
13 anyone at SBI about the events at Rockdale while you
14 were at SBI?
15   A.  When you say messages?
16   Q.  Text messages.
17   A.  I preferred emails and in person.
18   Q.  Okay.  And I don't mean to quibble with
19 you, I'm just asking, do you recall specifically
20 when you were at SBI exchanging text messages with
21 anyone else at SBI about the events surrounding
22 Rockdale?
23   A.  No.
24   Q.  Did you have a cell phone when you worked
25 at SBI?

67

1    A.  A cell phone, yes.
2    Q.  Was it your personal cell phone or a
3  company cell phone?
4    A.  It was my personal one.
5    Q.  Did you turn it in to SBI when you left
6  their employ?
7    A.  No.
8    Q.  What kind of phone is it?
9    A.  It's an Android.
10   Q.  And do you back that cell phone up,
11 messages?
12   A.  On occasion, yes.
13   Q.  Did you utilize any personal email to
14 conduct business on behalf of SBI?
15   A.  No.
16   Q.  Obviously, now you must; right?
17   A.  Right.
18   Q.  But while you were employed, did you do
19 so?
20   A.  To the best of my knowledge, no.
21   Q.  Did SBI communicate by any internal
22 messaging apps, like Teams?
23   A.  The platforms were Slack and Teams.
24   Q.  What about Telegram or WeChat or WhatsApp,
25 any of those?

68

1    A.  Those were nothing that I used personally
2  for professional.
3    Q.  Understand.  Do you know whether those
4  were apps that were used by anyone at SBI related to
5  business between Whinstone and SBI?
6    A.  I wouldn't know about that.
7    Q.  Okay.  But there was Slack messaging used
8  by SBI; right?
9        Is that a yes?
10   A.  Yes.
11   Q.  Do you recall communicating by Slack with
12 anyone at SBI about any events surrounding the
13 Rockdale facility?
14   A.  The general day-to-day on invoicing, did
15 you get the invoice, things like that, would have
16 been part of regular Slack communication.
17   Q.  Okay.  Anything else?
18   A.  Not that I recall.
19   Q.  Okay.  Do you recall -- go back to a
20 question I asked before.
21       I know that you said that you and Carson
22 Smith visited the Rockdale site in September of
23 2019.  After that visit, are you aware of anyone
24 else affiliated with SBI that visited the Rockdale
25 site?

Confidential -- Attorneys' Eyes Only
Transcript of Jonathan Tanemori
Conducted on August 15, 2024

74 (293 to 296)

293

1              --oOo--
2         I declare under penalty of perjury that the
3    foregoing is true and correct.  Subscribed at
4    _____, this _____ day of
5    _____, 2024.
6
7
8    _____
9    JONATHAN TANEMORI
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

294

1         CERTIFICATE OF REPORTER
2
3         I, BRANDON D. COMBS, a Certified Shorthand
     Reporter, hereby certify that the witness in the
4    foregoing deposition was by me duly sworn to tell
     the truth, the whole truth, and nothing but the
5    truth in the within-entitled cause;
6         That said deposition was taken in
     shorthand by me, a disinterested person, at the time
7    and place therein stated, and that the testimony of
     the said witness was thereafter reduced to
8    typewriting, by computer, under my direction and
     supervision;
9         That before completion of the deposition,
     review of the transcript was requested.  If
10   requested, any changes made by the deponent (and
     provided to the reporter) during the period allowed
11   are appended hereto.
12        I further certify that I am not of counsel
     or attorney for either or any of the parties to the
13   said deposition, nor in any way interested in the
     event of this cause, and that I am not related to
14   any of the parties thereto.
15
16        DATED: August 29, 2024
17
18
19   _____
20
     BRANDON D. COMBS
21   RPR, Texas CSR 10927, California CSR 12978
22
23
24
25

# EXHIBIT 2

← Ashton Harris

September 1, 2020

Do you have WeChat? 00:26 ✓✓

Yes, @akenharris 08:02

📄 电源检查报告.docx
1 page • 8.5 MB • DOCX
09:50 ✓✓

Miner PSU issues. Had A10s in in Kyrgyzstan investigated. These miners never turned on before. 09:52 ✓✓

Oh wow. Same batch as your miners we host here? 10:12

Yep 10:12 ✓✓

Yikes. 10:13

Well, all of this documentation should really help our case here 10:13

Yeah 10:13 ✓✓

Yeah we'll keep it plus anymore. Good for lawyers. 10:14 ✓✓

September 30, 2020

Here's a message from Canaan

Message

                    SBIC0005909

# 电源检查报告

随机选取了 5 个未使用过的 **阿瓦隆电三原** 电源，进行了通电测试。

其中 1，3，4，5 号输出电压 **13.45V,** 2 号电源无输出电压。

拆开观察，发现 2 号电源有明显烧焦迹象，下图：

Power supply inspection report                    Five unused Avalon power supplies were randomly selected and tested.                    The output voltage of No. 1, 3, 4 and 5 is 13.45v, and No. 2 power supply has no output voltage.                    It is found that the No.2 Power supply has obvious signs of scorching, as shown in the following figure:

1



2



Z4 与 d13 焊锡相连接

Z4 is connected with D13 solder

WHIN_SBI_0008560

3



4

WHIN_SBI_0008561



5



WHIN_SBI_0008562

正面整流桥未破损：

The front rectifier bridge is not damaged



WHIN_SBI_0008563



WHIN_SBI_0008564

# EXHIBIT 3



**Planet Depos®**
We Make It *Happen*™

<span style="color:darkred">**CONFIDENTIAL - ATTORNEYS' EYES ONLY**</span>

# Transcript of Carson Smith

**Date:** August 21, 2024
**Case:** SBI Crypto Co., Ltd. -v- Whinstone US, Inc.

**Planet Depos**
**Phone:** 888.433.3767 **| Email:** transcripts@planetdepos.com
**www.planetdepos.com**
Michigan #8598 | Nevada #089F | New Mexico #566

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Confidential - Attorneys' Eyes Only
Transcript of Carson Smith
Conducted on August 21, 2024

---

**Page 1**

```
            UNITED STATES DISTRICT COURT

            WESTERN DISTRICT OF TEXAS

                   WACO DIVISION

SBI CRYPTO CO., LTD.,  )
                       )
         Plaintiff,    )
                       )
VS                     )  CIVIL ACTION NO.
                       )  6:23-cv-252-ADA-JCM
WHINSTONE US, INC.,    )
                       )
         Defendant.    )

*********************************************

            VIDEOTAPED DEPOSITION OF

                   CARSON SMITH

                  August 21, 2024

         CONFIDENTIAL - ATTORNEYS' EYES ONLY

*********************************************




Job No. 546220

Pages 1 - 371

Stenographically Reported by:

Susan S. Klinger, RMR-CRR, CSR
```

---

**Page 2**

```
                    August 21, 2024



     VIDEOTAPED DEPOSITION OF CARSON SMITH, produced

as a witness at the instance of the Defendant, and

duly sworn, was taken in the above-styled and

numbered cause on the 21st of August, 2024, from

9:08 a.m. to 7:05 p.m., before Susan S. Klinger,

RMR-CRR, CSR in and for the States of Texas and

California, reported by stenographic method, at Winstead,

2728 North Harwood, Suite 500, Dallas, Texas, pursuant

to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.
```

---

**Page 3**

1   A P P E A R A N C E S
2   ON BEHALF OF THE PLAINTIFF:
3       Cory Johnson, Esquire
4       Joshua Sandler, Esquire (Via Zoom)
5   WINSTEAD PC
6       2728 North Harwood Street, Suite 500
7       Dallas, Texas  75201
8       214.745.5400
9   ON BEHALF OF THE DEFENDANT:
10      Robert T. Slovak, Esquire
11      Brandon C. Marx, Esquire
12  FOLEY & LARDNER LLP
13      2021 McKinney Avenue, Suite 1600
14      Dallas, Texas  75201
15      214.999.3000
16  ON BEHALF OF THE WITNESS:
17      K. Reed Mayo, Esquire
18      REED MAYO LAW FIRM, P.C.
19      4604 Berrywood Road
20      Virginia Beach, Virginia  23464
21      757.621.2216
22  Also Present:
23      Patrick Wooding, Esquire - Whinstone
24      Nicholas Vitalis - SBI Crypto
25      Jesse Castro, videographer

---

**Page 4**

1       I N D E X
2
3   WITNESS                        PAGE
4   CARSON SMITH
5   EXAMINATION BY MR. SLOVAK            7
6
7       E X H I B I T S
8   No.        Description
9   Exhibit 20  Email, SBIC0000900        105
10  Exhibit 21  Canaan invoice, SBIC0003267    110
11  Exhibit 22  Messages, SBIC0005860      117
12  Exhibit 23  Messages, SBIC0005573      216
13  Exhibit 24  Email, SBIC0000026        239
14  Exhibit 25  Messages, SBIC0005892      247
15  Exhibit 26  Visit notes, SBIC0003777    289
16  Exhibit 27  Balance Sheet, SBIC0005819    319
17  Exhibit 28  Excel columns           323
18
19      Previously marked
20  Exhibit 1   Plaintiff's Amended Complaint   126
21  Exhibit 2   Hosting Service Agreement,      136
22          SBIC0003447
23  Exhibit 4   International Sales Contract,    134
24          SBIC0003153
25  Exhibit 5   Email, SBIC0003245

Confidential - Attorneys' Eyes Only
Transcript of Carson Smith
Conducted on August 21, 2024

2 (5 to 8)

---

**5**

1  Exhibit 6  Hosting Service Agreement,      187
2        SBIC0003883
3  Exhibit 7  Whinstone Trip Report,          78
4        SBIC0005782
5  Exhibit 8  Email, SBIC0002069              261
6  Exhibit 9  Email, SBIC0000149              271
7  Exhibit 10  Email, SBIC0002873             340
8  Exhibit 12  Email, SBIC0001267             309
9  Exhibit 13  Email, SBIC0000393             181
10 Exhibit 18  Email, SBIC0000068             350
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**6**

1        P R O C E E D I N G S
2        VIDEOGRAPHER:  Here begins Media Number 1
3  in the videotaped deposition of Carson Smith in
4  the matter of SBI Crypto Co., Ltd. v. Whinstone
5  US, Inc. in the United States District Court for
6  the Western District of Texas, Waco Division, Case
7  Number 6:23-CV-252-ADA-JCM.
8        Today's date is August 21st, 2024.  The
9  time on the video monitor is 9:09 a.m.  The
10 videographer is Jesse Castro representing Planet
11 Depos.  This video deposition is taking place at
12 2728 North Harwood Street, Suite 500, Dallas,
13 Texas 75201.
14        Would counsel please voice-identify
15 themselves and state whom they represent?
16        MR. SLOVAK:  Rob Slovak, along with
17 Brandon Marx of Foley & Lardner on behalf of
18 Whinstone US, Inc.  Also with us is our in-house
19 lawyer, Patrick Wooding.
20        MR. MAYO:  Reed Mayo on behalf of the
21 witness, Carson Blake Smith.
22        MR. JOHNSON:  Cory Johnson and Josh
23 Sandler via Zoom from Winstead here on behalf of
24 the plaintiff, SBI Crypto, along with SBI Crypto's
25 CEO, Nicholas Vitalis.

---

**7**

1        VIDEOGRAPHER:  The court reporter today is
2  Susan Klinger, also representing Planet Depos.
3  The witness may now be sworn.
4        CARSON SMITH,
5  having been first duly sworn testified as follows:
6        EXAMINATION
7  BY MR. SLOVAK:
8     Q Good morning, Mr. Smith.  How are you?
9     **A Good morning.**
10    Q My name is Rob Slovak, and as you know, I
11 represent Whinstone.  You are aware that there is
12 a lawsuit that exists between SBI Crypto Limited
13 and Whinstone US, Inc.?
14    **A Yes.**
15    Q Okay.  And were you -- let me start here.
16       Have you been deposed before?
17    **A No, I have not been deposed.**
18    Q Okay.  So I'm going to ask questions.  The
19 court reporter is going to try to take down
20 everything that I say.  She also is going to try
21 to take down everything that you say.
22       So if we can have an agreement not to talk
23 over one another, I will try to allow you to
24 finish your answer if you will allow me to finish
25 my question so she gets everything on the record.

---

**8**

1  Can we have that agreement?
2     **A Okay.**
3     Q And if at any point in time today you
4  don't understand what I'm asking or the question
5  is not clear, just please ask me to clarify.  If
6  you answer the question without asking for
7  clarification, we will understand -- we will
8  assume that you understood it.  Can we agree to
9  that?
10    **A Can you repeat the last part one more**
11 **time?**
12    Q Sure.  If I ask a question that you don't
13 understand and you answer it, I will assume that
14 you understood it unless you tell me otherwise.
15    **A Okay, okay.**
16    Q Are you under -- are you on any
17 medications or do you have any physical issues
18 that would interfere with your ability to answer
19 questions here today truthfully and accurately?
20    **A No.**
21    Q And you understand that you are under
22 oath?
23    **A Yes.**
24    Q Okay.  Just like you would be in a court
25 of law testifying before a judge or a jury.  Do

---

49

1  so I can't remember that with better recollection.
2      The operations of the miners started
3  around February 2018, and that continued on
4  into -- I believe it was 2019. It may have
5  continued on to 2020, and then the operations
6  ended.
7      Q  What were the type of miners that you were
8  operating out there?
9      A  BITMAIN S9s.
10     Q  Do you remember approximately how many?
11     A  10,000. I think it was a little over
12  10,000.
13     Q  Do you remember how much power was
14  available?
15     A  I don't remember the exact power.
16     Q  And you said there was a written contract,
17  but you weren't involved in it because it was
18  procured before you were the CEO; is that right?
19     A  Yes, that's correct.
20     Q  Okay. So you-all also operated a facility
21  in Russia at some point, right?
22     A  Yes.
23     Q  What years?
24     A  The facility in Russia operated -- when it
25  turned on, I think it was late 2020 or early

50

1  2021 when that began operations as an --
2  operations being that the miners turn on and are
3  hashing.
4      Q  Understood. When did the operations in
5  Russia end?
6      A  They ended in around April, May 2022.
7      Q  And what kind of miners were being
8  operated out there?
9      A  Avalon A10s.
10     Q  The Canaan Avalon A10s?
11     A  Yes.
12     Q  Are those the same ones that you-all
13  operated out at --
14     A  Yes.
15     Q  -- Rockdale?
16     A  Yes.
17     Q  And those --
18     A  That was the same purchase -- the same
19  production batch.
20     Q  Okay. And approximately how many were
21  operated in Russia?
22     A  20,000 machines.
23     Q  And how much power did you have available?
24     A  50 megawatts.
25     Q  50. And what was the failure rate?

51

1      A  The failure rate was a -- I don't remember
2  exactly, but it was a few -- a few percent.
3      Q  Okay. And so how did you determine the
4  failure rate?
5      A  By reports that the operator of the
6  facility gave to us of the number of miners
7  running as well as the amount of Bitcoin
8  production. And the -- and from that, what is the
9  effective hashrate, the effect of computational
10  power, as that is tied to the Bitcoin production
11  that we see, and what do we expect versus 20,000
12  miners.
13     Q  And so how often did they provide the
14  reports?
15     A  I don't remember how often, but it was
16  regularly.
17     Q  Okay. And were those the kinds of records
18  that SBI, at least while you were there, would
19  retain?
20     A  SBI Crypto should retain -- should retain
21  those records.
22     Q  Are you aware of whether those records
23  themselves have been provided to Whinstone?
24     A  That I don't know.
25     Q  I'm sorry, to Winstead, have they been

52

1  provided to Winstead?
2      A  That I don't know.
3      Q  Okay. Were you involved in the
4  negotiation of the contract for the operations in
5  Russia?
6      A  Yes, I was.
7      Q  Okay. What was your role?
8      A  I was the CEO, and I was involved in
9  negotiating the terms of the contract.
10     Q  Okay. Did you have outside counsel?
11     A  No.
12     Q  Was there in-house counsel at SBI
13  Holdings?
14     A  Yes, there was.
15     Q  Okay. Did you work with inside counsel on
16  the terms of the contract for the operations in
17  Russia?
18     A  Yes.
19     Q  And who was that in-house counsel?
20     A  Their names?
21     Q  Yes.
22     A  I don't remember all their names. There
23  were several. Some names I can recall is Okuyama.
24     Q  Okay.
25     A  Jake, Jake Chauncy. Another name -- now

---

**57**

Beach facility?

    MR. MAYO:  Object to the form.

    MR. JOHNSON:  Objection to form.

    MR. SLOVAK:  What is your objection?

    MR. MAYO:  Compound question.

    MR. JOHNSON:  I think it also misstates

prior testimony.

    Q  You received reports from Russia about the

operations from which you were able to determine

failure rates, correct?

    A  They gave us emails or some reports.  They

gave us information that determined -- of how many

of -- what was their number of -- they show for a

number of machines running.

    Q  Okay.  And earlier you characterized those

as reports, right?

    A  By "reports," I mean reporting as they're

emailing or that is an email that is in a

document, and that is in written form.

    Q  Okay.  And those documents in written form

were the kinds of records that, at least while you

worked there, that SBI retained, correct?

    A  Yes, they should be retained.

    Q  Were there similar kinds of communications

from which you could ascertain failure rates with

**58**

respect to the Virginia Beach facility?

    A  No.

    Q  What about Sweden?

    A  I don't recall.

    Q  What about Iceland?

    A  Iceland does have some reports of

equipment for how -- number of equipment running.

    Q  Okay.  And to your knowledge, were those

also the kinds of records that SBI retained while

you were there?

    A  SBI Crypto should have them retained.

    Q  Okay.  And what about with respect to

Rockdale, did they provide reports or

communications of a similar nature?

    A  No.

    Q  Okay.  Did you request them?

    A  Yes, multiple times.

    Q  From who?

    A  I requested Aroosh, I requested from Chad,

and maybe a few others.

    Q  Okay.  And in what format did you request

them?

    A  I don't recall giving them a specific

format.  I think maybe one time I gave them an

example to reference from, here is an example

**59**

format that you can use for some report.

    I do not recall, though, if that was for

uptime of machines, but there was problems in

requesting reports for uptime of machines, for

downtime, and for a lot of notifications of --

that we would expect to have from Whinstone that

were not -- often not provided.

    Q  Well, and maybe I wasn't clear in my

question.  My question was not the format of the

report that you requested, but the format in which

you made the request.  Were these telephone calls,

text messages, emails?

    A  They would be phone calls as well as

emails.

    Q  Okay.  And you said that some of those

requests were made of Aroosh?

    A  Aroosh, yes, was one.

    Q  And he worked for --

    A  And Chad.

    Q  He worked Northern Data, right?

    A  He worked -- as represented to me, he

worked for Northern Data and for Whinstone.

    Q  When you say "as represented to you," what

does that mean?

    A  As I understood it, he was employed and

**60**

worked for Northern Data and for Whinstone.

    Q  Well, you answered a different question

than I asked.  My question was not what you

understood.  My question was, why did you

understand it.  Is it your testimony that Aroosh

represented to you that he worked for Winstead?

    MR. JOHNSON:  Objection, form.

    A  For Winstead?

    Q  I mean for Whinstone.

    MR. JOHNSON:  You do it all the time.

    A  Aroosh -- repeat the -- repeat the

question.

    Q  Sure.  There was a lot of talking there,

sorry.

    A  Yes.

    Q  You said that it was your understanding

that Aroosh represented Whinstone?

    A  Yes.

    Q  And my question is, what is the basis for

that understanding?

    A  Because he was CEO of Whinstone.

    Q  Well, I mean, with all due respect, he was

never CEO of Whinstone.

    So my question to you is, did he make some

affirmative representation to you that enabled you

93

1  remember that was around July 2020.
2      Q  Okay.  When were the miners delivered to
3  Rockdale?
4      A  I can't remember exactly.  They weren't --
5  from what I do remember, they weren't delivered
6  all at once.  It was in batches from November to
7  February -- November 2019 to February 2020.
8      Q  Okay.  And when were the miners delivered
9  to Russia?
10     A  That I can't remember.
11     Q  Do you recall when Russia came online to
12  mine cryptocurrency?
13     A  As I previously said, it would be late
14  2020, November/December 2020 or early 2021,
15  January/February 2021, within those months.
16     Q  And between Visit 1 and Visit 2 at the
17  Rockdale site, did you ever request anyone from
18  Whinstone to provide photographs of the operating
19  conditions of the Rockdale site?
20     A  I may have, but I don't think so.  I --
21  photos of the data centers, like inside the data
22  centers, I don't think so.
23     Q  What about videos?
24     A  I don't think so.
25     Q  Why not?

94

1      A  I don't recall.
2      Q  For the mining operations that took place
3  in Russia, did you-all -- well, did you personally
4  observe those mining operations in Russia?
5      A  What do you mean, "personally observe"?
6      Q  Did you go to the facility --
7      A  In Russia?
8      Q  -- and observe the --
9      A  No, I did not.
10     Q  Okay.  What about in Virginia Beach?
11     A  Yes, I did.
12     Q  What about Iceland?
13     A  Yes, I did.
14     Q  What about Sweden?
15     A  No, I did not.
16     Q  Okay.  How many occasions did you
17  personally go observe the operations in Virginia
18  Beach?
19     A  How many occasions?  It has been too long.
20  I don't remember.
21     Q  Well, is it more than two?
22     A  I don't remember.  I think it was at least
23  two.
24     Q  What about Sweden?
25     A  I didn't visit Sweden.

95

1      Q  Sorry.  Iceland?
2      A  I think -- that I also can't remember, but
3  I think that was at least two.
4      Q  Okay.  And I think I asked, but I want to
5  make sure, you never physically observed the
6  Russian site?
7      A  I never physically observed.
8      Q  Did you ever receive any photographs of
9  the operating conditions of the Canaan A10 miners
10  at the Russian site?
11     A  I think I did.
12     Q  Okay.  What about videos?
13     A  I can't remember if videos were included
14  or not.
15     Q  Did SBI hire any outside parties like
16  Kaboomracks to perform physical inspections of the
17  operations of the Russian site?
18     A  No.
19     Q  What about Sweden?
20     A  No.
21     Q  What about Iceland?
22     A  I can't remember.
23     Q  What about Virginia Beach?
24     A  Virginia Beach, I can't remember, but I
25  want to say I don't think so.

96

1      Q  When did you first hear of Whinstone?
2      A  I can't remember if that was either in
3  2018 or when I met them in around February 2019.
4      Q  When you say when you met them around
5  February of 2019, what do you mean by that?
6      A  I went to Louisiana around that time.
7      Q  Okay.
8      A  It may be January, it may be March, but I
9  think it was February.
10     Q  Okay.  And we will take a look at
11  something that might refresh your recollection on
12  that, but had you -- when did you first hear about
13  Northern Data?
14         MR. JOHNSON:  Objection, form.
15     A  Northern Data wasn't -- didn't originally
16  exist as Northern Data.  It existed as Northern
17  Bitcoin, and I wasn't aware of them until later
18  when Whinstone became part of Northern Data, or it
19  became part of Northern Bitcoin, which then
20  changed their name to Northern Data.
21     Q  So when did -- when did you become aware
22  of that fact that Whinstone became part of the
23  Northern Data?
24     A  I don't remember when.  I'm guessing here.
25  So to clarify that, that would be around late

---

113

1     But had you -- do you recall when you went
2 to Louisiana to meet Whinstone?
3    **A It was right around this time.**
4    Q Okay.
5    **A I was closing -- I was trying to close**
6    **both the purchase contract and the -- Whinstone**
7    **on -- meeting with them and negotiating**
8    **original -- one of the basic terms for a**
9    **hosting -- for a hosting contract at the same**
10    **time.**
11    Q Okay. So let me ask about the -- we'll
12 more firmly establish the timing here in a second,
13 but how did you decide to purchase Avalon A10
14 miners?
15    **A I looked at recent generation of miners**
16    **from the main manufacturers, and in this**
17    **particular case, it was Canaan and MicroBT.**
18    Q Okay. And what -- when you say you looked
19 at information about the manufacturers, like what
20 specific diligence did you do to determine that
21 these were good miners to buy?
22    **A I looked at one of the aspects of the**
23    **miners that they were producing or preparing to**
24    **produce that year and their prototypes. I**
25    **visited -- around this time I visited China. I**

114

1    **visited Beijing to Canaan's office. I toured**
2    **their factory. I also took their miner to a**
3    **nearby facility and did thermal testing on the**
4    **miner and tested that.**
5    **Then in that same trip, I also visited**
6    **MicroBT's office to see there what is miner -- I**
7    **can't remember the exact model. I think it was**
8    **the M20S or the M21S, and I saw that miner model**
9    **or their prototype. They had one in the office**
10    **and spoke with them. That was in Shenzhen, China,**
11    **all around this time.**
12    Q When you say "all around this time" --
13    **A Yes.**
14    Q -- I assume that you didn't make the
15 decision to actually get the quote and make the
16 purchase until after you had been to China to do
17 that due diligence, correct?
18    **A Yes.**
19    Q So it would stand to reason that that due
20 diligence came before April the 17th of 2019,
21 right, sir?
22    **A I'm trying to remember the dates, if I**
23    **went before the quote or after. I think so, but**
24    **it has been a long time, but I can't remember --**
25    Q Okay.

115

1    **A -- exactly.**
2    Q What airlines did you fly?
3    **A I don't remember.**
4    Q Did you submit expenses for reimbursement
5 for that trip?
6    **A I very likely did.**
7    Q Okay. And would it be the ordinary course
8 when you were working at SBI for them to maintain
9 records related to those business expenses?
10    **A Yes.**
11    Q Okay. Where were you in the process of
12 the negotiation with the potential operator in
13 Kurzikstan at the time that you received this
14 quote from Canaan that is Exhibit 21?
15    **A That I don't remember. Some of those**
16    **negotiations came because the Kurzikstan operator**
17    **had a relationship with SBI Holdings, the parent**
18    **company, through some other business.**
19    Q But in either event, originally there was
20 an intent to put 20,000 of these Canaan miners in
21 Kurzikstan, right?
22    **A Yes.**
23    Q And ultimately they ended up in Russia?
24    **A That's correct.**
25    Q 20,000 of them went to the Russian

116

1 location sometime around December of 2020?
2    **A Sometime around December --**
3    **November/December 2020 to January/February 2021.**
4    Q And installed a few hundred of them at a
5 time, right?
6    **A A few hundred or a few thousand, that I**
7    **can't remember the installation rate.**
8    Q What happened to those miners, the ones
9 that went to Russia?
10    **A We ultimately had to sell those off due to**
11    **sanctions placed on Russia.**
12    Q But after they were installed, they
13 immediately began failing, right?
14    **A No.**
15    Q Okay. Well, were they tested? Did SBI
16 perform any testing on Russian miners to determine
17 the adequacy of their performance?
18    **A We turned on the machines and they were**
19    **running. They needed some firmware updates in the**
20    **beginning. Firmware updates and all installation**
21    **procedures were done, and some other work that**
22    **needed to be done that the data center operator**
23    **talked with Canaan and worked closely with Canaan**
24    **to get going, and then most of the miners ran as**
25    **expected.**

Confidential - Attorneys' Eyes Only
Transcript of Carson Smith
Conducted on August 21, 2024

---

117

1    Q So I'm going to hand you what -- let's
2  mark this then as 22.
3       (Exhibit 22 marked.)
4    Q So first of all, what is this?
5    **A These are messages between me and Chad**
6  **Harris.**
7    Q This message chain the green is you,
8  right?
9    **A Yes, the green is me.**
10    Q Okay. And so on or about February the 4th
11  of 2021, you are messaging Chad Harris to say:
12  Update on the PSUs, 4,000 are being produced to
13  send to Texas.
14       Did I get that right?
15    **A That is what it says.**
16    Q Okay. And that is -- those are PSUs being
17  produced by who?
18    **A I can't remember the manufacturer name.**
19    Q Okay. And you need the PSUs in order to
20  run the miners, right?
21    **A The PSUs were requested by Whinstone.**
22    Q That wasn't my question.
23       MR. SLOVAK: Object, nonresponsive. Move
24  to strike.
25    Q You need the PSUs in order to run the

---

118

1  miners, right, sir?
2    **A The miners had existing PSUs, and those**
3  **you need to run the miners.**
4    Q Right. And those existing PSUs had
5  failed, so you're ordering new ones, right, sir?
6    **A I don't know if they actually failed.**
7  **Whinstone -- I said Whinstone represented that**
8  **they had failed and that we needed to order new**
9  **PSUs, so that is what I did.**
10    Q You didn't do anything to test that,
11  right?
12    **A Whinstone test -- Whinstone tested that.**
13    Q Did you understand my question?
14    **A Yes.**
15    Q I didn't ask you if Whinstone tested it.
16  Did you do anything to test the -- whether those
17  PSUs failed, sir?
18    **A Me, personally, I was not on site and do**
19  **not --**
20    Q Did anyone --
21    **A -- do the test.**
22    Q Did anyone on behalf of SBI test those to
23  determine whether the PSU failed?
24    **A Whinstone tested on behalf of SBI.**
25    Q Okay. Did anyone other than Whinstone

---

119

1  test on behalf of SBI?
2    **A I don't know, other than if Whinstone had**
3  **a third-party contractor.**
4    Q Did you guys hire a third-party contractor
5  to test them?
6    **A SBI did not.**
7    Q Okay. And then you also say: Also at one
8  of the other farms we had about 8,000 A10s down?
9    **A Yes.**
10    Q Is that a true statement, or were you
11  lying?
12       MR. JOHNSON: Objection, form.
13       MR. MAYO: Objection.
14    **A Let me read this. (Reviewing document.)**
15  **We had some 8,000 A10s not working at a particular**
16  **time, yes.**
17    Q In Russia, right?
18    **A In Russia.**
19    Q And you said: They were able to get about
20  5,000 of those working, right?
21    **A Yes, at this -- at this particular time,**
22  **yes.**
23    Q This is in February of 2021, right, sir?
24    **A Yes.**
25    Q And you said: I think we will try to

---

120

1  figure out how to send a couple of those guys over
2  so we can use their knowledge?
3    **A Yes.**
4    Q Who are those guys?
5    **A The operators that were working at the**
6  **Russia facility.**
7    Q Okay. Did that happen?
8    **A I don't think it ever happened.**
9    Q Okay. Did the other 3,000 of the 8,000
10  ever get back to operating?
11    **A I think they did.**
12    Q When?
13    **A I don't know.**
14    Q What was the problem with them?
15    **A I don't know all of the exact problems,**
16  **but from what I recall, I think many of the**
17  **problems were they needed firmware. There was**
18  **things -- they told me there were firmware updates**
19  **required, and some of these firmware updates**
20  **needed multiple updates to successfully install.**
21  **Some needed manual IP address**
22  **configuration, and a few other things that**
23  **required the work of the technicians at the data**
24  **center. Those technicians worked with Canaan to**
25  **figure out what needed to be done.**

---

Confidential - Attorneys' Eyes Only
Transcript of Carson Smith
Conducted on August 21, 2024

31 (121 to 124)

---

**121**

1    Q   Those 8,000 miners were installed in -- in
2  or around January of 2021, right?
3    A   January or December 2020 maybe, around
4  that time.
5    Q   And there were 8,000 of them down within a
6  month or two of the time that they were installed.
7  That is what happened, according to this
8  contemporaneous message, right, sir?
9    A   There were 8,000 down at this particular
10  time.
11   Q   Okay.
12   A   I don't recall if that was 8,000 down from
13  the moment they were installed up until this or
14  this was for this moment in time.
15   Q   You also say in this next message:  Will
16  let you know when I have an update on PSUs or
17  sending some guys to the U.S.?
18   A   Yes.
19   Q   Who were you going to send to the U.S.?
20   A   Yes.  Let me think about that.  That may
21  be trying to get some of the Canaan guys or I may
22  be referring to the -- I think I'm likely
23  referring to the people that were operating at the
24  Russian facility, considering that they were able
25  to get basically all the miners, or almost all of

---

**122**

1  the miners working, and Whinstone had not been
2  able to do that.  So hopefully that -- using their
3  experience, they could help Whinstone get things
4  working.
5    Q   Did you send them over?
6    A   They were never able to go over.
7    Q   So that was a no?
8    A   That was a no.
9    Q   Okay.  And you didn't send anybody else
10  over to inspect the facility, look at the
11  operation of the miners, check the condition of
12  the miners in February of 2021, in March of 2021,
13  in April of 2021, and May of 2021, not until you
14  went there in June of 2021, right, sir?
15   A   We were trying to send --
16   Q   Did you understand my question?
17   A   Yes, but you didn't let me finish the
18  previous question.
19   Q   Okay.  Go ahead.
20   A   We were trying to send them.  I do
21  remember there being some issues because I think a
22  number of them were Chinese and they had visa
23  issue, difficulties of getting visas to visit the
24  U.S.
25      There were still some COVID restrictions,

---

**123**

1  especially for Chinese nationals traveling to the
2  U.S., and there were a number of difficulties of
3  just getting them, and that took time to plan out
4  and get going.
5    Q   But you never actually sent any of them to
6  the United States, right?
7    A   So because of that, they never actually
8  went to the United States.
9    Q   So the answer to my original question is
10  you never sent them to the United States, right,
11  sir?
12   A   Because of that, they didn't go to the
13  United States.
14   Q   Not in February, right?
15   A   Not in February because of the visas and
16  such --
17   Q   Not in March, right?
18   A   -- they did not go to the United States.
19   Q   Not in April, right?
20   A   Not in April.
21   Q   Not in May, right?
22   A   Not in May.
23   Q   Not even in June, right?
24   A   Not in June.
25   Q   Never, right?

---

**124**

1    A   Not in June.
2    Q   You testified just a second ago that the
3  people in Russia were communicating with Canaan.
4  How do you know that?
5    A   Because they told me, and I also helped
6  set up a communication channel between them and
7  Canaan.
8    Q   Great.  And did you have access to that
9  communication channel?
10   A   Yes, I did.
11   Q   Okay.  And are those messages -- was the
12  communication channel in a format like this that
13  you could actually retrieve and provide?
14   A   It wasn't in a format like this.
15   Q   Okay.  What format was it?
16   A   That would likely be in WeChats.
17   Q   And are those records that continue to
18  exist, to your knowledge, at SBI?
19   A   That I don't know.
20   Q   Have you checked for those?
21   A   No, I have not.
22   Q   Did you ask the folks in Russia to
23  communicate by email with Whinstone about how they
24  were solving these alleged problems?
25   A   I did ask the folks in Russia and

---

Confidential - Attorneys' Eyes Only

Transcript of Carson Smith

Conducted on August 21, 2024

---

125

1  Whinstone to comunicate.
2      Some of the guys in Russia were also in a
3  group chat between Canaan and Whinstone on WeChat.
4  They were also in the group chat with -- that
5  Whinstone and Canaan had.
6      Q  And was it SBI's practice to retain WeChat
7  messages, do you know?
8      A  No, it was not SBI's practice.
9      Q  Okay.  So we can't look at these
10  communications because they no longer exist,
11  right?
12      MR. JOHNSON:  Objection, form.
13      A  The WeChat messages exist and I think have
14  been produced.
15      Q  Okay.  The WeChat messages that you claim
16  exist between Russia and Canaan, to your
17  knowledge, do those still exist?
18      A  I don't know if they still exist.
19      Q  I don't either.  That is why I'm asking
20  you the question.
21      Have you seen any email communications
22  between the Russian folks and anyone at Whinstone?
23      A  I can't recall.
24      MR. SLOVAK:  Okay.  So it is about 10
25  minutes to noon.  Do you want to take a lunch

---

126

1  break now and come back, or do you want to keep
2  plowing through?  We have been going about an hour
3  and a half.  I don't care.  I'll do either.
4      MR. JOHNSON:  I'll ask the witness.  Let's
5  go off the record.
6      MR. SLOVAK:  You bet.
7      VIDEOGRAPHER:  We are going off the
8  record.  The time is 11:51 a.m.
9      (Recess, 11:51 to 12:50 p.m.)
10      VIDEOGRAPHER:  We are going back on the
11  record.  The time is 12:50 p.m.
12      MR. SLOVAK:  Okay.  Let's take a look at
13  what we previously marked as Exhibit 1.  Can you
14  pull that for me, Brandon?
15      Q  This is the plaintiff's amended complaint
16  in this case, and I think when we talked earlier
17  about what you did to prepare to testify.  You
18  mentioned that you had reviewed the complaint.  Is
19  this the complaint that you reviewed?
20      (Exhibit 1 discussed.)
21      A  It looks like the complaint I reviewed.
22      Q  Okay.  And did you provide any input in
23  drafting this document?
24      A  Yes, I provided input in drafting the
25  original complaint.

---

127

1      Q  Okay.  This is an amended complaint.  Do
2  you recall providing input on this complaint
3  specifically?
4      A  The amended complaint, I think I provided
5  some input on the amended complaint.
6      Q  Okay.  And who was involved in the
7  decision on behalf of SBI to sue?
8      MR. JOHNSON:  Objection, form.  I'm going
9  to instruct you not to reveal any attorney-client
10  communications as part of responding to this
11  question.  If you can't answer this question
12  without revealing any attorney-client
13  communications, then I'm going to instruct you not
14  to answer, but answer to the extent you can
15  without revealing any client-attorney
16  communications.
17      Q  Well, the question was who was involved,
18  so I didn't ask for any communications.  So let's
19  start there.
20      Who was involved in the decision on behalf
21  of SBI to sue?
22      A  The board of SBI Crypto.
23      Q  Okay.  And who is that?
24      A  That would be me, Morita and Kitao
25  Yoshitaka, as well as -- now, I can't remember --

---

128

1  Nishi -- I can't remember the name.  The name
2  escapes me now, Nishiyama.
3      Q  Do you recall when the decision was made
4  to file the lawsuit?
5      A  No, I can't recall when the decision was
6  made.
7      Q  Okay.  And at the time the lawsuit was
8  filed, you were the CEO, right?
9      A  Yes, I was.
10      Q  And so were you the person that was
11  designated to sort of lead this effort on behalf
12  of SBI?
13      A  Yes, I was.
14      Q  Okay.  And did anyone other than you
15  provide specific factual input regarding what is
16  alleged in the complaint, to your knowledge?
17      A  Jonathan Tanemori from -- within SBI.
18      Q  Yes.
19      A  Jonathan Tanemori as well -- there was a
20  review with SBI Holdings' internal legal
21  department.
22      Q  Okay.  And just -- I want to make sure
23  that my question was clear.
24      The facts that are alleged in the
25  complaint itself, was there anyone other than you

---

Confidential - Attorneys' Eyes Only
Transcript of Carson Smith
Conducted on August 21, 2024

36 (141 to 144)

---

141

1    Q  Okay.  So you moved the Virginia Beach
2  miners to Lancium?
3    A  That is correct.
4    Q  But never put them back into operation?
5    A  That is correct.
6    Q  How old were the miners at the time that
7  you moved them from Virginia Beach to Lancium in
8  Houston?
9    A  Because I don't remember the exact date of
10  when we moved them, I can't say how old they were,
11  but they were aging.
12    Q  Okay.
13    A  And there were new generations of miners
14  coming online, so it was preferred to prioritize a
15  new generation of miners.
16    Q  Why did you buy Avalon A10s as opposed to
17  BITMAIN S9s for use in Texas?
18    A  Because S9 was not a good generation to
19  run profitably at the time and going forth for the
20  next few years in the future, it would be better
21  to purchase a current generation of miner at that
22  time.
23    Q  Okay.  But what in particular about the
24  Avalon A10s was better?
25    A  The efficiency of the machines was better,

---

142

1  they produced more computing power for a specific
2  power consumption, and that is what efficiency
3  means.  And they had a good thermal response, and
4  ultimately by those parameters they were more
5  profitable to run than the S9s at the time in
6  2019.
7    Q  Did SBI ever submit any warranty claims to
8  Canaan?
9    A  No.  The warranty had expired.
10    Q  Well, I don't know what you mean by that,
11  but we can talk more about it.
12      Did SBI ever submit any warranty claims to
13  Canaan for any product of any kind?
14    A  We were trying to get a warranty provision
15  for Canaan to -- when Whinstone claimed to SBI the
16  failures in the miners, we tried to get Whinstone
17  to work with Canaan to diagnose the issues for
18  Canaan to accept the diagnosis and either provide
19  methods to replace or for replacements of the
20  hardware.
21      MR. SLOVAK:  So I'm going to object as
22  nonresponsive and move to strike.
23    A  I did respond.
24    Q  Just try to pay attention to the question
25  I ask.

---

143

1    A  I did respond.
2    Q  Did SBI ever submit a warranty claim to
3  Canaan, yes or no?
4    A  I would consider that a warranty claim.
5  As we were trying to request a warranty
6  replacement we can --
7    Q  Is there anything about my English that is
8  difficult for you to understand?
9      MR. JOHNSON:  Objection, form.
10      MR. MAYO:  Objection.
11    Q  Are we having trouble communicating here?
12      MR. JOHNSON:  Objection, form.
13    A  I am --
14    Q  The question is:  Did SBI ever submit a
15  warranty claim to Canaan, yes or no?
16      MR. MAYO:  Objection, asked and answered.
17    A  We did, as part of these talks with
18  Canaan, try to get a warranty replacement with
19  Canaan.
20    Q  Okay.  So you did submit a warranty claim
21  to Canaan?
22    A  We did try to get a warranty replacement
23  from Canaan.
24    Q  When did you submit a warranty claim to
25  Canaan?

---

144

1    A  This was part of the ongoing talks with
2  Canaan to -- for them to understand the issues
3  with the miners that these were -- that these
4  would be a warranty issue that Canaan would be
5  subject to replace.
6      There was also discussions, too, because
7  the warranty had expired for the miners.  The
8  180-day warranty had expired for the miners.
9    Q  So I will ask the question again.
10      When did you submit a warranty claim to
11  Canaan?
12    A  This discussion for the warranty started
13  shortly after Whinstone reported problems with the
14  miners to us.
15    Q  Were those discussions in writing?
16    A  They were discussions in the WeChat group.
17    Q  Okay.  Do you have any idea why none of
18  those have been produced in this litigation?
19      MR. JOHNSON:  Objection, form.
20    A  I think they were produced.
21    Q  Okay.  I mean, I haven't seen them, but do
22  they still exist?
23    A  If they have been produced, they should
24  exist.
25    Q  I don't -- I don't know if they exist or

---

Confidential - Attorneys' Eyes Only

Transcript of Carson Smith

Conducted on August 21, 2024

---

145

1  they don't. That is my question. Well, let me
2  ask it differently.
3      Have you reviewed them in preparation for
4  your testimony here today?
5      A I reviewed WeChat conversations.
6      Q With -- between Canaan and SBI submitting
7  warranty complaints?
8      A There is no specific form that says
9  warranty complaint. This is a complaint for
10 Canaan to -- that their equipment is defective
11 based on the representations and reports made by
12 Whinstone of the hardware failures, and then for
13 setting up the group for Canaan to diagnose and
14 accept that these are warranty -- that these are
15 equipment failures and getting them to acknowledge
16 this and accept to provide a warranty replacement.
17     Q Okay. So those WeChat conversations you
18 reviewed in preparing for your deposition here
19 today?
20     A Yes.
21     Q And when did you review those
22 communications?
23     A I don't remember when -- what exact day I
24 reviewed them.
25     Q Okay.

---

146

1      A But recently.
2      Q Okay. And where did you obtain them?
3      A The WeChat conversations were WeChat
4  conversations that I originally produced at the
5  beginning when the complaint was filed in the
6  initial discovery.
7      Q So when you say that you originally
8  produced, you mean that you provided to counsel?
9      A Yes.
10     Q Okay. Were the WeChat documents that you
11 just testified about, were they Bates stamped?
12 You know what I'm talking about, the stamp on the
13 bottom right-hand corner?
14     A I don't know.
15     Q And when you said "recently," did you
16 review them yesterday?
17     A I don't recall reviewing them yesterday.
18     Q When did -- when did the conversation
19 requesting that Canaan warranty their products
20 begin?
21     A I don't recall the exact date, but it
22 would be shortly after Whinstone complained that
23 Canaan's hardware is defective and having trouble.
24 And we took that as the -- we took the claims from
25 Whinstone as the experts operating the facility.

---

147

1  And we provided that information to Canaan, and so
2  that would be shortly after the time that
3  Whinstone first made that claim.
4      Q Did Canaan come inspect the miners?
5      A No, they did not.
6      Q Did you request that they come inspect the
7  miners?
8      A I can't remember if I specifically
9  requested it, but I think I did or wanted to have
10 them inspect.
11     Q Did SBI sue Canaan?
12     A No, SBI did not sue Canaan.
13     Q Why not?
14     A Because at the time we were -- we didn't
15 have a decision to sue Canaan, and we were also
16 still trying to figure out the -- at this time
17 when we were setting up the WeChat and
18 discussions, we were relying on the statements
19 made by Whinstone that it is hardware failures.
20 Canaan is rejecting that. We're having them
21 communicate to get down to the bottom of the issue
22 and for both parties to agree so that we can truly
23 understand like what is the problem. And then for
24 Canaan to provide replacements.
25     Q Okay. So why haven't you sued Canaan?

---

148

1      A Because as that -- as those discussions
2  came, and later when I visited the facility in
3  Whinstone and saw the conditions, it was very
4  clear what the problem was.
5      Q Did you ever perform any testing on the
6  miners?
7      A As I said, I performed some thermal
8  testing on a miner, physically myself, when I
9  visited their facility in Beijing.
10     Q Well, I guess that is a different
11 question. Did you perform any actual testing on
12 any of the miners that were deployed at the
13 Rockdale site?
14     A Testing, the testing I did not perform it.
15 Whinstone performed the testing.
16     MR. SLOVAK: I'm going to object as
17 nonresponsive.
18     Q Did you perform any testing of any of the
19 miners that were deployed at the Rockdale site,
20 sir?
21     A I did not perform direct testing
22 typically.
23     Q What does that mean? What -- did you
24 perform indirect testing?
25     A That would be assessment of -- looking at

Confidential - Attorneys' Eyes Only
Transcript of Carson Smith
Conducted on August 21, 2024

64 (253 to 256)

253

1  not.
2    Q  And then there is a -- there is a PDF with
3  PSU analysis.
4    **A  Uh-huh.**
5    Q  What is that?
6    **A  It contains -- I think it contains mainly**
7  **these screenshots and then --**
8    Q  Is there -- I'm sorry, I didn't mean to
9  interrupt you.  Go ahead.
10   **A  And then there is, I think, some**
11 **annotation or circling showing -- pointing out**
12 **certain parts of the picture.**
13   Q  Well, so you screenshotted it, and I can't
14 tell what it is.  Do you still have access to the
15 PDF itself?
16   **A  Yes.  I think I provide -- I provided that**
17 **as well to counsel.**
18   Q  Okay.  And so to be clear, once you
19 obtained this communication from Chad Harris,
20 you-all didn't hire somebody independently to test
21 these machines and determine the source of the
22 problem, right?
23   **A  No.  We asked Whinstone to further look**
24 **into the problem and to further investigate in**
25 **collaboration with Canaan.**

254

1    Q  Okay.  And you say on the next response on
2  the third page of Exhibit 25:  Could be something
3  else driving signals to the MOSFET, or the PSU or
4  miner controller.  The MOSFET is Japanese,
5  and not a poor quality Chinese one.  That's not to
6  say the other components are good.
7    Did I read that correctly?
8    **A  Yes.**
9    Q  Okay.  And he says:  Workmanship seems to
10 be the issue.  My engineers tested the PSU and
11 they are incorrectly sized for the miner.
12   Did you do anything to independently
13 corroborate whether that statement was true or
14 false?
15   **A  Which statement?**
16   Q  That his engineers tested the PSU and they
17 are incorrectly sized for the miner.
18   **A  No, I did not do any independent.**
19   Q  And then you say:  That could happen in
20 China.  I've seen similar things for previous
21 versions of BITMAIN miners.
22   Did I read that correctly?
23   **A  Yes.**
24   Q  Okay.  And then you say:  The vendors I
25 believe that supplied Canaan their PSU are

255

1  AplusPower and Gospower.
2    Do you see that?
3    **A  Yes.**
4    Q  Did you contact AplusPower or Gospower to
5  investigate whether there was some --
6    **A  No.**
7    Q  Whether these PSUs were incorrectly sized
8  for the miners?
9    **A  No, I did not.**
10   Q  Why not?
11   **A  I did not have direct communications with**
12 **them.**
13   Q  Okay.  Why not?
14   **A  I just knew the vendor -- I just knew the**
15 **names on the PSUs.  These are names I had**
16 **previously seen on --**
17   Q  Was there anything that stopped you from
18 communicating with AplusPower or Gospower about
19 whether the PSUs were properly sized for these
20 miners?
21   **A  The PSUs we purchased directly from**
22 **Canaan, and so the issues from -- for Canaan and**
23 **the -- for the PSUs, we -- as I said, Whinstone**
24 **is -- they're saying they have engineers to test**
25 **and -- and understand the issues of the PSUs.**

256

1    So we rely on their statements.  They're
2  **the ones with the experts and they had the --**
3  **they're going to have the engineers to test and**
4  **deal with these, and that is also part of the**
5  **advanced smart hand service.**
6    **So we set up communications for them with**
7  **Canaan, who we purchased the PSUs from, to**
8  **evaluate and investigate the problem and**
9  **ultimately get -- hopefully get Canaan to supply**
10 **replacement PSUs if it turns out that is, indeed,**
11 **the problem.**
12   Q  Okay.  So let's try the question again.
13 Was there anything that prevented you from
14 contacting AplusPower or Gospower to investigate
15 this issue, sir?
16   **A  I did not have direct communications with**
17 **them, and I don't speak Chinese.**
18   Q  Was there anything --
19   **A  I did not know how to --**
20   Q  Was there anything that prevented you from
21 asking Canaan to reach out to those suppliers?
22   **A  I asked Canaan, as they were the ones who**
23 **negotiated with the suppliers, and they also, too,**
24 **work with the suppliers to have the PSUs to the**
25 **specs needed for the Canaan miner, and because we**

Transcript of Carson Smith
Conducted on August 21, 2024

257

1 purchased the miners from Canaan and --
2    Q  When were the miners delivered to
3 Rockdale?
4    A  They were delivered, I think, in batches
5 between November and December of 2019, up to
6 February 2020.
7    Q  And who directed them to be delivered
8 during that period of time?
9    A  I did.  To add when they were delivered,
10 they were delivered on site.  There was one batch,
11 or maybe it was two batches.  There was a period
12 where one of the delivery was delivered next door
13 to the facility owned by BITMAIN or Bitdeer as an
14 incorrect delivery, and they had to move the
15 miners over to Whinstone's storage or facility or
16 wherever Whinstone held the miners.
17    MR. SLOVAK:  Okay.  I'll strike that as
18 nonresponsive.
19    Q  So on the last page of Exhibit 25, you are
20 saying:  I see the current average internal temp
21 is about 83 Celsius.  This may not cause problems
22 immediately, but with our past experience, it will
23 eventually.  Internal temp sensors should be about
24 70 Celsius or less.
25    What does 83 Celsius translate into

258

1 Fahrenheit?
2    A  I don't know what it is in Fahrenheit.
3    Q  And what Chad says in response is:  Water
4 walls are being done now - I will get you a time -
5 the manufacture delivered late - and the excuse -
6 COVID.  So I could not argue.
7    You say:  It's a risk we're taking now.
8 Probably worth it.  With difficulty and price
9 rising, it's likely better to take it for a short
10 period of time than avoid it.
11    A  Yes.
12    Q  Did I read that correctly?
13    A  For a short period of time.
14    Q  Okay.  And that is your statement, right?
15    A  Yes.
16    Q  Okay.  Did you ever go to the facility or
17 send anyone to the facility to determine when
18 and -- when the water walls were delivered?
19    A  No.
20    Q  Did you ever go -- send anyone to the
21 facility to determine whether the water walls were
22 working?
23    A  No.
24    MR. SLOVAK:  Why don't we take a short
25 break.  We've been going another hour.

259

1    VIDEOGRAPHER:  We are going off the
2 record.  The time is 3:47 p.m.
3    (Recess, 3:47 to 4:16 p.m.)
4    VIDEOGRAPHER:  We are going back on the
5 record.  The time is 4:16 p.m.
6    Q  So we were talking earlier about the
7 delivery of the miners, and you authorized those
8 miners to be delivered, right?
9    A  Yes.
10    Q  And you authorized them to be delivered
11 starting in the fall of 2019, right?
12    A  Yes.
13    Q  And you knew that the facility wasn't
14 done, right?
15    A  Yes.  I knew there were delays.
16    Q  And when the problems first arose, looking
17 at the chain with Chad Harris, the folks at
18 Whinstone were working with SBI to try to solve
19 the problem, right?
20    A  In the beginning they were working with
21 SBI and Canaan.
22    Q  And they continued to work with Canaan
23 until you told Ashton to stop working with Canaan,
24 right?
25    A  I didn't tell Ashton to stop working.  I

260

1 don't think I did.
2    Q  Well, if Ashton testifies that you, in
3 fact, told him to stop working with Canaan, are
4 you going to say he's lying?
5    A  I don't think I told him to stop working
6 with Canaan.
7    Q  Okay.  Well, let me ask it very
8 specifically:  Are you saying definitively that
9 you did not tell him to stop working with Canaan?
10    A  I remember him ask -- telling me or asking
11 me that I stop working with Canaan as you told me
12 to, and I responded to him that I don't think I
13 told you to do that, and I rebutted that statement
14 that he made.
15    Q  So, again, this is the one time I have to
16 talk to you under oath before trial.  My question
17 is, are you affirmatively saying that you did not
18 tell Ashton to start working with Canaan?
19    MR. MAYO:  Objection to the form.
20    MR. JOHNSON:  You said start working with.
21    A  Repeat that question.
22    Q  Sure.  Are you affirmatively saying that
23 you did not instruct Ashton to stop working with
24 Canaan?
25    A  I don't remember instructing Ashton to do

Confidential - Attorneys' Eyes Only
Transcript of Carson Smith
Conducted on August 21, 2024

68 (269 to 272)

---

269

1    A I can't remember if I did or not.
2    Q Do you know --
3    A It would be --
4    Q -- if that raw --
5    A -- easier to take screenshots.
6    Q Do you know if the raw data still exists?
7    A For WeChat?
8    Q Yes, sir.
9    A I don't have access to the WeChats now,
10   but Ashton Harris or anyone else in the group
11   should have access.
12   Q So what specific -- when you were
13   gathering documents when the lawsuit was filed,
14   what did you gather generally? How did you gather
15   them?
16   A There was a lot of data to gather. I
17   think -- so which data? Because there was --
18   Q Well, I guess let me ask it differently.
19   When you gathered data, did you do it by
20   collecting the entirety of the custodian file, or
21   did you go in and select the emails, for example,
22   that you chose to provide?
23       MR. JOHNSON: Objection, form.
24   A What is a custodian file?
25   Q Go in and pull up the PST file. Let me

---

270

1    ask it this way: Is the email for SBI's Outlook?
2    A SBI uses Outlook and Gmail.
3    Q Okay. And was there a collection made of
4    the entirety of email PST files for specific users
5    or did someone go in and review by -- manually
6    those files and determine which emails were
7    responsive or otherwise --
8    A No.
9    Q -- if you know?
10   A I don't think emails were reviewed, which
11   ones were responsive or otherwise. The emails
12   were searched based on communication of -- with
13   Whinstone and with Northern Data and to represent
14   the relevant people, and all the emails that were
15   pulled up, every single email was included and
16   provided.
17   Q Who performed the searches?
18   A This was me, IT at SBI Holdings, as well
19   as Jonathan Tanemori.
20   Q And who provided the search terms?
21   A I can't remember who provided the search
22   terms.
23   Q Okay. Do you remember in what format the
24   search terms were provided?
25   A Format? No, I don't remember the format.

---

271

1    Q Okay. In paragraph -- can you pull 9,
2    Exhibit 9.
3        So this an email from you to Aroosh and
4    Mathis Schultz in August of 2020.
5        (Exhibit 9 discussed.)
6    Q Do you recall this email?
7    A I generally recall this email.
8    Q Did you review it in preparation for this
9    deposition?
10   A I remember seeing this email in
11   preparation.
12   Q So you say: I would like to thank you for
13   the hard work your team in Europe and Texas has
14   done these past few months.
15       What work in Europe?
16   A Repeat that question.
17   Q What work in Europe are you referring to?
18   A I'm referring to it because work regarding
19   Whinstone, Aroosh is -- at this time is physically
20   located in Europe, and this still all revolves
21   around Whinstone.
22   Q So when you are referring to work of the
23   team in Europe and Texas --
24   A Yes.
25   Q -- you're not referring about location or

---

272

1    nexus of the work. It is where the people
2    themselves were located?
3    A Yes.
4    Q Okay. And where was Mathis Schultz
5    located?
6    A I think he was likely located in Europe,
7    also being at Northern Data.
8    Q Okay. In paragraph -- numbered paragraph
9    3 you say: Changing start dates or impossible
10   promises with little follow-up. Nine to 10 months
11   of multiple delays with communication sometimes
12   good and sometimes bad. We thank you for your
13   work to help compensate for the delays.
14       How did they compensate for the delays?
15   A Northern Data provided a -- when they
16   requested funding for -- they requested additional
17   funding for the data center, they requested it
18   through the security of a convertible bond. And
19   the convertible bond is what I'm referencing here.
20   Q Okay. And so that is something you asked
21   for and they agreed to?
22   A That is something that they offered.
23   Q And you agreed to it?
24   A Yes.
25   Q Okay. And then you say in -- later in

---

369

1  answer the next time you ask this question.  Go
2  ahead and answer this question for the fifth time.
3  You can answer.
4      **A  Please ask the question again.**
5      Q  I mean --
6          MR. SLOVAK:  Read it back.
7          (Record read.)
8          MR. JOHNSON:  Objection, asked and
9  answered.
10     **A  I did ultimately disclose to them at a**
11 **later date that we intended to open legal action**
12 **to them.**
13     Q  Before they paid you, did you disclose it
14 to them?
15     **A  Before they paid what?**
16     Q  Before they paid you the amount that
17 you-all squared up in March of 2022 for
18 outstanding invoices and issues between the
19 parties, did you disclose to them before that
20 happened that you intended to sue them?
21     **A  I don't remember disclosing to them**
22 **consideration to do so.**
23         MR. SLOVAK:  Nothing further.
24         MR. JOHNSON:  All right.  The plaintiff
25 reserves all questions for this witness at trial.

370

1  We want to read and sign.
2      I will also be designating certain
3  portions -- reserve the right to designate certain
4  portions of this deposition as confidential,
5  confidential, attorneys' eyes only, pursuant to
6  the provisions provided in the protective order.
7      VIDEOGRAPHER:  This concludes the
8  deposition of Carson Smith.  The time on the
9  monitor is 7:05 p.m.
10     (Deposition adjourned at 7:05 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

371

1          CERTIFICATE OF SHORTHAND REPORTER
2
3      I, Susan S. Klinger, the officer before
4  whom the foregoing deposition was taken, do hereby
5  certify that the foregoing transcript is a true
6  and correct record of the testimony given; that
7  said testimony was taken by me stenographically
8  and thereafter reduced to typewriting under my
9  direction; that reading and signing was
10 requested; and that I am neither counsel for,
11 related to, nor employed by any of the parties to
12 this case and have no interest, financial or
13 otherwise in its outcome.
14     Time on the record:
15     Mr. Slovak:  7:30
16     IN WITNESS WHEREOF, I have herunto set my
17 hand on the 2nd of September, 2024.
18
19
20     _____
21     Susan S. Klinger, RMR-CRR, CSR
22     Texas CSR 6531, Exp:  10/23/25
23     California CSR 14487, Exp:  11/30/24
24
25