# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| **SBI CRYPTO CO., LTD.,** *Plaintiff*, v. **WHINSTONE US, INC.,** *Defendant*. | Civil Action No.: 6:23-cv-252 |

**DECLARATION OF CHARLES BYERS IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO STRIKE THE EXPERT OPINIONS OF CHARLES BYERS AND RANDY BOLTIN**

Pursuant to 28 U.S.C. § 1746, I, Charles Byers, declare and state the following under penalty of perjury:

1. My name is Charles Byers. I am over the age of eighteen and competent to testify to the matters contained herein. The facts and opinions contained in this affidavit are based on my personal knowledge, my professional experience, and my review of the materials described in my Preliminary Technical Report dated March 27, 2025.

2. The methodology I used in the study is shown in section 5.4 of the Preliminary Technical Report. It analyzes hundreds of pieces of evidence from many sources, field research, failure mode analysis of physical miners, and industry best practices, and then generates conclusions based upon my 40 years of experience in the architecture, implementation and deployment of high-performance electronic systems. The goals were to carefully consider the evidence, and understand the situation at the Whinstone Rockdale datacenter in order to identify the root cause(s) of the observed

performance deficits experienced by the SBI miners installed there.

3. Much of the data is non-numerical and therefore requires analysis as to its relevance in the investigation, but no detailed statistical analysis. Examples of this are the photos taken by KaboomRacks, the observations from the teardowns of miners, equipment manuals, understanding of emails, and review of the various technical plans of the datacenter. Other evidence was more numerical in nature, for example hashrates, bitcoin mining production and meteorological data, typically presented in the form of tables or spreadsheets. However, the analysis done on this second type of data required only rudimentary mathematical processing, such as the calculation of sums and averages that one can master after several semesters of college-level mathematics, and not heavy statistical analysis. This basic type of analysis is adequate to support the conclusions in the report, and is common practice for this type of analysis in the electrical engineering, datacenter design, and bitcoin mining expert community worldwide. No advanced training as a statistician is needed.

4. Section 6.8.1.3 of the Preliminary Technical Report describes the process used to sample dust from the stored miners. Based upon photographic evidence, and the deep contamination observed in all of the miners that were torn down (as well as the hundreds more inspected from their crates at the World Tiana Supply Chian Warehouse), no substantial differences were observed in the degree of contamination or the character of the dust removed across the fleet of miners. This makes sense, as all the miners were exposed to similar environmental and airborne duct contamination conditions at Rockdale.

5. Section 6.8.2 describes the process used and the analytical findings of the chemical analysis performed by MVA Scientific. Their role here is primarily as an

**CHARLES BYERS DECLARATION** 2

analytical lab, accepting the two samples prepared as described in the report, and performing chemical analysis to determine the composition of the dust. The required equipment and the technical knowledge to operate it is quite specialized, and not something typical experts on electronics, semiconductors, bitcoin mining and datacenter infrastructure would have. According to the methods section of the MVA report: "Representative subsamples of particulate were collected for analysis by polarized light microscopy (PLM) and scanning electron microscopy-energy dispersive x-ray spectrometry (SEM-EDS). Select polymer particles from Sample 2 were analyzed by Fourier transform infrared microspectroscopy (FTIR)." The results of the chemical analysis are presented in detail in their report.

6. I received this analysis, and applied my extensive experience in the reliability implications of various types of contamination and environmental problems on high performance electronics to draw conclusions on the impact of the dust on the critical components of the miners. While at Cisco, and as a Bell Labs Fellow at Alcatel-Lucent, I was a primary system architect of many different systems, and routinely designed and specified cooling air systems, air filters, and contamination control measures (including datacenter and outside plant equipment), and performed failure mode analysis of malfunctioning products returned from the field. This is analogous to a doctor taking a blood sample, sending it to an analytical lab, and using the analytical results to make a diagnosis. The MVA report also contains a short section on Potential Impact Evaluation, which doesn't draw final conclusions, but points out posable areas of concern in the results (this would be similar to the report from blood test lab in our analogy color coding results that are outside normal ranges to highlight possible areas of concern). Mr. Randy Boltin, the research scientist at MVA Scientific is not an expert witness on the effects of

**CHARLES BYERS DECLARATION** 3

dust on miners, but an expert on running the chemical analysis apparatus, and reporting his results to those drawing the conclusions.

7.    I selected the relevant aspects of the dust report (for example, metallic, conductive, thermally insulating or hygroscopic chemical components that would impact the function of the miners if ingested), and did not include other findings from the MVA report that would have little impact on the miner operation (like the discovery of insect parts, plastic fragments, paper, and small textile fibers). This selection demonstrated the clear demarcation between the chemical analysis that Boltin performed using analytical instruments, and the detailed understanding of that analysis and its implications on miner failure modes that I performed, and included in my Preliminary Technical Report.

8.    Concerns have been raised about the validity of the weather data downloaded from the Weather Underground web archive. It was pointed out that data for Rockdale is currently available. However, when the technical reports were in preparation in Winter/Spring of 2025, neither I nor Isaac were able to locate historical weather data observations at Rockdale, so I used a nearby station at Easterwood Airport in College Station, TX (42 miles east). On November 26, 2025, I downloaded the data for the hottest month in the installation interval (August 2020) and compared the newly-available Rockdale data (collected at H. H. Coffield Regional Airport Station in Rockdale, which is about 6.7mi / 10.8km away from the datacenter) to the data used in my Preliminary Technical Report. Here is a graph comparing the high temperature observations for the month of August 2020 for Easterwood Filed Station and the Rockdale airport:



9. Notice that the data tracks remarkably well, with a variance of only one- or two-degrees Fahrenheit. In fact, the new Rockdale data is actually hotter (worse) than the Easterwood data I used in my analysis for 18 of the 31 days that month, with an average high temperature in Rockdale of 97.94°F, compared to 97.16°F in Easterwood. The conclusion is that the Easterwood data I selected is adequate for the analysis I used it for, and arguably a bit conservative for the purposes of this study. Formal training in meteorology is not required to determine that based upon this historical weather data, the air entering the Rockdale datacenter was too hot for the safe and reliable operation of the miners.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 1, 2025, in Dallas, Texas.

DocuSigned by:

*Charles C. Byers*
_____
0217FF000BFA4C5...
Charles Byers