# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | |
|---|---|
| **SBI CRYPTO CO., LTD.,** | |
| *Plaintiff*, | |
| v. | Civil Action No.: 6:23-cv-252-ADA-DTG |
| **WHINSTONE US, INC.,** | |
| *Defendant.* | |

## PLAINTIFF'S RESPONSE TO WHINSTONE'S
## MOTION TO STRIKE THE EXPERT OPINIONS OF PHIL ISAAK

Plaintiff SBI Crypto Co., Ltd. ("Plaintiff" or "SBI") files this Response to Defendant Whinstone's Motion to Strike the Expert Opinions of Philip Isaak [Dkt. 184] ("Motion") and respectfully shows this Court the following:

## I.
### INTRODUCTION

Whinstone's motion to exclude the testimony of Plaintiff's expert, Philip Isaak, is without merit and the Court should deny it in its entirety. Whinstone does not dispute Isaak's exceptional qualifications in data center design and operations—an area in which he is internationally recognized. Instead, Whinstone wastes the Court's time by mischaracterizing Isaak's opinions, methodology, and the scope of his expertise in this motion.

Whinstone's objections that Isaak is unqualified to reference historical temperature and humidity data, that he offers "statistical" or "legal" opinions, and that his methodology is unreliable are legally and factually baseless. Isaak's use of publicly available environmental data does not transform his engineering analysis into

meteorology or statistics, and his application of industry standards to the facts of this case is precisely the type of technical expertise contemplated by Federal Rule of Evidence 702 and *Daubert*. Moreover, Isaak does not offer impermissible legal conclusions. His opinions address whether Whinstone's design and operation of the Rockdale Facility complied with contractual and industry standards—factual issues that are well within the permissible scope of expert testimony under Fifth Circuit precedent. *See Hess Corp. v. Schlumberger Tech. Corp.*, 26 F.4th 229, 234–35 (5th Cir. 2022).

Ultimately, Whinstone's motion reflects a disagreement with Isaak's conclusions, not a legitimate challenge to their admissibility. Such disputes go to the weight of expert testimony, not its admissibility. Because Isaak's opinions are relevant, reliable, and will assist the trier of fact in determining whether Whinstone met its contractual and industry obligations, the motion should be denied.

## II.
### FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Allegations

SBI is a cryptocurrency mining company that entered into a Hosting Service Agreement with Whinstone for the hosting and management of SBI's mining equipment at Whinstone's facility in Rockdale, Texas (the "Rockdale Facility") on October 25, 2019 (the "Hosting Agreement").[1] In this suit, SBI alleges Whinstone fraudulently induced SBI to enter into and continue performing under the Hosting Agreement. *See generally*, [Dkt. 11]. Once operations began, Whinstone concealed and failed to disclose major operational problems at the Rockdale Facility, including overheating of SBI's Equipment due to nonexistent air-flow, cooling, and dust filtration infrastructure. *Id.* at 13-14. The failure

---

[1] *See* Hosting Agreement, attached as **Ex. D** and incorporated herein by reference.

and underperformance of SBI's miners caused SBI to lose millions in lost profits.

## B.    Isaak's Unchallenged Qualifications.

Whinstone does not dispute that Isaak is an expert in data center design and operations, nor could it. Isaak is universally recognized as an expert in data center design and operations around the world—having clients located in 28 countries and territories across six continents. **Ex. A** at 1. Isaak received his Bachelor of Science in Electrical Engineering from the University of Manitoba in 1996, and then promptly began providing data center engineering design and operations consulting services. **Ex. A** at 2, **Ex. B** at 6. He holds Professional Engineer licenses in Manitoba and Arizona. **Ex. A** at 2. He is a Registered Communications Distribution Designer ("RCDD") and Data Center Design Consultant ("DCDC") through Building Industry Consulting Service International ("BICSI").[2] *Id.*

He currently serves as the Senior Engineer and President of Isaak Technologies, Inc. ("IsaakTech"). In addition to his design and operations consulting services, Isaak also provided training to professionals at every level of data center design and operations including data center owners, directors, managers, operators, architects, engineers, system administrators, construction and integration professionals, and vendors who manufacture or distribute products used within the data center industry. **Ex. B** at 6. To date, he has been involved in the design or construction of approximately 190 data centers. **Ex. C** at 49:14-22.

Isaak's extensive experience, achievements, and contributions to the data center industry resulted in numerous recognitions and awards by the major professional

---

[2] "BICSI is an organization that develops manuals and standards around networking infrastructure and data center infrastructure." Isaak Dep., Ex. C at 36:2-5.

associations and standards organizations.[3] **Ex. A** at 3-4. The Institute of Electrical and Electronics Engineers ("IEEE") elected him to the grade of Senior Member – a position held by only 9 percent of IEEE's members. *Id.* at 3. He serves on numerous industry standards organizations and committees in various capacities including acting as the Chair of BICSI's Data Center Operations and Maintenance Best Practices Standard Work Group. *Id.* at 6-9. He has presented at data center industry conferences around the world on data center design and best practices. *Id.* at 16-20.

Isaak's data center experience includes data centers that mine cryptocurrency using air-cooled miners. **Ex. C** at 49:23-50:3; 51:22-52:3. When consulting on these projects, Isaak relies on the ANSI/BICSI and ASHRAE standards. *Id.* at 50:9-51:3. Engineers designing data centers used to operate cryptocurrency miners rely on and follow the ANSI/BICSI and ASHRAE standards for data center design and operation. 66:3-15, 66:22-68:8. In fact, it seems only Whinstone's expert, Karen Rayment, is the only engineer who contends that ANSI/BICSI and ASHRAE have no applicability to data centers housing cryptocurrency miners.

Nevertheless, consistent with his professional experience, Isaak analyzed relevant industry standards, publications, and product information, personally inspected the Rockdale Facility, reviewed deposition testimony, and analyzed the documents produced in this case. He also performed a CFM analysis using the miner's specifications and building dimensions. Cubic Feet per Minute or "CFM" is a measurement of airflow volume. He then applied his expertise to the facts of this case to determine that the design

---

[3] The International Organization for Standardization ("ISO") recognized him for his work contributing to the final publication of several standards related to IT & Data Centers. **Ex. A** at 3-4. The American Society of Heating, Refrigerating and Air-Conditioning Engineers ("ASHRAE") recognized Isaak for his work revising the 2023 ASHRAE Handbook. *Id.*

and operation of the Rockdale Facility failed in numerous ways to comply with relevant industry standards and Whinstone's contractual requirements. He concluded that Whinstone's failure to comply with data center industry standards and its contractual requirements contributed to the failure and underperformance of SBI's miners.

### III.
### ARGUMENTS & AUTHORITIES

**A.    Whinstone Erroneously Claims Isaak is Opining on "Meteorology" and "the Statistical Meaning and Significance" of Certain Data.**

Whinstone asks the Court to broadly prohibit Isaak from "offering any opinions that rely on, or pertain to, meteorology or statistical analysis." [Dkt. 184 at 8]. Whinstone's complaints about meteorological or statistical analysis are misplaced.

      1.    <u>Whinstone wrongly asserts that Isaak requires an expertise in meteorology to opine on Whinstone's compliance with established industry standards regularly used by him and others in his field.</u>

Whinstone conflates two of Isaak's opinions to wrongly assert that each requires expertise in meteorology and statistics. [Dkt. 184 at 2]. Specifically, Whinstone asserts that he opines "that the miner intake temperature and humidity in Rockdale, Texas was too hot and humid approximately 32.6% and 80.6% of the time, respectively." *Id*. Isaak's opinions do not rely on weather forecasting or analysis, but rather historical temperature and humidity data.

First, with regard to the excessively hot air intake temperatures, SBI alleges, *inter alia*, that Whinstone fraudulently concealed its breach of Clause 4.6.7 of the Hosting Agreement: "Whinstone shall maintain an intake temperature of less than twenty nine point five (29.5) degrees Celsius." **Ex. D** at 13. SBI alleges that that Rockdale Facility lacked an operating cooling system and that the "intake temperatures" for SBI's miners were equal to (or greater than) the outside air temperatures. *Id*. at §§ 6.5.6 & 6.6.2. To the

extent Isaak opines on "[t]emperature data," he simply collected the "Daily Temperature Data" historically recorded at the Taylor Municipal Airport, approximately 20 miles from the Rockdale Facility. **Ex. B** at 59, n.132. Using this historically recorded data, Isaak calculated that for 198 days, the outside ambient temperature exceeded 29.5 degrees Celsius, or stated differently, 32.6 percent of the days SBI's miners operated at the Rockdale Facility. *Id*. at 60.

Second, Isaak's humidity opinion relates to the corrosion of SBI's miners and the interaction of humidity with the excessive dust accumulation. **Ex. B** at 43-45; **Ex. C** at 122:13-18, 220:5-224:22. Similarly here, Isaak relied on historic data of the maximum, average, and minimum levels of humidity recorded by an airport near College Station, Texas. **Ex. B** at 43-44. Isaak compared the historical humidity data to the ASHRAE standards on humidity for data centers and a study used by ASHRAE which found that humidity inside of a data center should remain below 60 percent. *Id*. at 43; **Ex. C** at 185:5-12, 221:11-23. Isaak determined that: on 604 out of 609 days (99.2 percent of days) the maximum humidity was greater than or equal to 60 percent; on 491 out of 609 days (80.6 percent of days) the average humidity was greater than or equal to 60 percent; and on 141 out of 609 days (23.2 percent) the minimum humidity was greater than or equal to 60 percent. **Ex. B** at 44.

Collecting historical daily temperatures and humidity data does not require expertise in meteorology, nor does calculating percentages of days exceeding a certain temperature or humidity level require an expertise in statistics. Whinstone offers no reason why this testimony should be excluded other than its assertion that Isaak is not a meteorologist. [Dkt. 184 at 2, 7]. As Bob Dylan explained, "you don't need to be a

weatherman to know which way the wind blows." As presented, Isaak's testimony is relevant and reliable information and should not be restricted, much less excluded.

Worse yet, Whinstone blatantly misstates Isaak's deposition testimony. Whinstone cites Isaak's deposition testimony on page 96 lines 17 through 23 and page 225 lines 1 through 14 for the proposition that "Isaak admits he has never performed an analysis on the purported existence of environmental conditions (such as humidity) and their impact on cryptocurrency mining equipment." *Id.* at 8, n.33. Whinstone did not ask this question, nor did Isaak testify to this.

Whinstone asked if he had previously "been engaged to analyze the impact of dust on a cryptocurrency miner performance before this case"[4] and if he performed any testing of the equipment in this case to see the amount of dust or corrosion.[5] Isaak actually testified that: he has "been engaged in numerous cases where [he has] been involved in evaluating heat produced by IT equipment and identifying the requirements for building infrastructure … for multiple types of applications and multiple types of hardware;"[6] that this is "irrespective of the application or the hardware;"[7] and that ASHRAE has published standards on temperature[8] and humidification control[9] which he applied in this case. Whinstone has not made any showing that Isaak lacks sufficient expertise in applying the ANSI/BICSI and ASHRAE standards for data center best practices, including those for temperature and humidification control to offer opinions on whether the Rockdale

---

[4] **Ex. C** at 96:17-23.
[5] *Id.* at 225:1-14.
[6] *Id.* at 99:2-11
[7] *Id.*
[8] *Id.* at 174:16-175:24, 185:5-12, 226:7-227:5, 230:9-231:9, 278:23-280:17.
[9] *Id.* at 100:2-16, 185:5-12, 198:18-200:10, 221:11-224:22, 226:7-227:5.

Facility complied with those standards given the historic temperature and humidity data.

Therefore, the Court should deny Whinstone's Motion.

2. <u>Whinstone's assertion that Isaak offers statistical opinions has no basis in law or fact to exclude his opinions.</u>

Whinstone nakedly asserts, without any explanation, that Isaak has offered opinions on the "statistical meaning and significance of" "temperature data," "KaboomRacks photos and videos," "Isaak's one-time November 7, 2024 [site] visit," and "[m]onthly reports identifying the number of SBI's miners operating at Rockdale." [Dkt. 184 at 2-3]. Whinstone fails to articulate what specific ***statistical*** opinions Isaak offers. Whinstone provides a string of cases, almost exclusively outside of the Fifth Circuit, without any explanation or analysis tying them to its challenge of Isaak's opinions. *Id.* at 7-8. Moreover, the cases Whinstone relies upon involve experts specifically opining on specific statistical analysis such as a standard deviation analysis,[10] rebutting a statisticians' methodologies,[11] and using binomial distribution to conclude a person over the age of 40 was statistically more likely to be fired.[12] Whinstone does not contend, nor could it, that Isaak offers any standard deviation analysis as in *Kendrick*; that Isaak has offered rebuttal opinions to any statistical methodologies employed by Whinstone as in *Arista*; or that Isaak performed a specific statistical analysis such as binomial distribution

---

[10] *Hearts with Haiti, Inc. v. Kendrick*, No. 2:13-CV-00039-JAW, 2015 WL 3936224, at *6 (D. Me. June 26, 2015), dismissed, 856 F.3d 1 (1st Cir. 2017) (plaintiff's expert performed a standard deviation analysis in a defamation case without any prior experience, training, or education pertaining to a standard deviation analysis.).

[11] *Arista Records LLC v. Lime Group LLC*, No. 06 CV5936KMW, 2011 WL 1674796, at *5 (S.D.N.Y. May 2, 2011) (defendant's rebuttal expert had no qualifications related to statistical analysis and could not answer questions about any statistical methodologies and thus the court precluded the expert from offering criticisms of the plaintiff's experts surveying techniques and statistical analysis, including challenging the "demographics, population sampling methods, or statistical weighing.").

[12] *Reid v. Albemarle Corp*., 207 F. Supp. 2d 499, 502-504 (M.D. La. 2001) (the court's expert found numerous flaws in the plaintiff's expert's statistical analysis in which he purported to use a binomial distribution to prove that persons over the age of 40 were statistically more likely to be terminated by plaintiff's employer.)

as in *Reid*. Therefore, the Court should deny Whinstone's Motion for Whinstone's failure to articulate any argument that specifies the actual statistical analysis Isaak allegedly performed and the resulting opinions.

Regardless, Isaak possesses more than sufficient qualifications[13] to review the evidence in his case and draw conclusions based on his observations, experience, and application of the ANSI/BICSI and ASHRAE standards. "[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 155 (1999).

Whinstone's arguments are misplaced because Isaak has not offered "an opinion about statistical significance nor is his opinion based on any kind of regression analysis." *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 802 (N.D. Tex. 2013). In *Orthoflex*, the court recognized the distinction between an engineering opinion and a statistical opinion. *See id.* The expert's engineering opinion on the defective design of a product based on his observations of the evidence did not qualify as a statistical opinion. *Id.* Thus, any challenges as to the statistical validity of his methodology used to draw his conclusion that the product was defectively designed went towards the weight of the evidence, not admissibility of his opinion. *Id.* Here, Isaak does not offer any opinions on the statistical significance of any data set or perform any regression analysis that would put his opinions into the category of statistical opinions.

**B.      Isaak Does Not Offer Any Pure Legal Conclusions.**

---

[13] Whinstone also misstates Isaak's testimony about his qualifications. [Dkt. 184 at 2]. Whinstone suggests that Isaak could not define the word "statistician" than proceeds to quote testimony in which Isaak explicitly asked for clarification from Whinstone's counsel as to how Whinstone's counsel was using the word. Ex. C at 178:7-17. Whinstone's counsel did not clarify what he meant or how he was using the term. *Id.* Yet Whinstone now seeks to launch an irrelevant ad hoc attack on Isaak for asking clarification from Whinstone's counsel after he asked a vague, non-descript question. Whinstone's "gotcha" tactics and cherry-picked testimony do not provide any basis to exclude Isaak.

Whinstone's disjointed contention that Isaak offered impermissible legal arguments is conclusory and inconsistent with Fifth Circuit precedent. First, Whinstone falsely asserts that Isaak has offered impermissible legal opinions interpreting the Agreement. [Dkt. 184 at 8-9]. Whinstone then proceeds to present only testimony related to the underlying facts of whether Whinstone met the technical, contractual requirements. *Id.* Whinstone does not present any evidence that Isaak offered impermissible legal opinions regarding the interpretation of the Agreement. Moreover, the Fifth Circuit has expressly rejected Whinstone's argument that expert testimony on contract interpretation for unambiguous contracts is impermissible. [Dkt. 184 at 10]; *Hess Corp. v. Schlumberger Tech. Corp.*, 26 F.4th 229, 234 (5th Cir. 2022).

In *Hess*, the Fifth Circuit affirmed the district court's reliance on testimony from expert witnesses who helped draft the industry standards on what "was required to comply" with the industry standards. *Id.* at 234-235. The Fifth Circuit explained that "even if a contract is unambiguous as a matter of law, a court may still consider surrounding facts and circumstances as an aid in the construction of the contract's language." *Id.* at 234. Thus, the district court properly relied on expert witness testimony in determining what was required to comply with the section of the contract that adopted the industry standards. *Id.* at 234-235.

Here, the Agreement expressly adopts an industry standard requirement for Whinstone's performance of Hosting Services: "Whinstone shall perform the Services[14] as described herein and shall provide the Services in a professional manner consistent

---

[14] "Services" are defined as the Hosting Service [Clause 2.2 et al.], Basic Remote Hands Service [Clause 2.3, et al.], and Advance Remote Hands Service [Clause 2.4 et al.,], Ex. "D," at pp.1-3. Clause 2.2.13 under the "Hosting Service" clause [2.2] further provides that "Whinstone will follow the Service Level Agreement in Clause 4 … " Accordingly, Whinstone expressly agreed to hosting services (Clauses, 2.2, 2.3,  2.4 & 4) "consistent with industry standards." Id. at Cl. 8.2.

with industry standards." **Ex. D** at Clause 8.2. Therefore, any explanation of industry standard requirements as applied to the Agreement and circumstances of this case does not qualify as an impermissible legal opinion. Further, it does not constitute a legal opinion for Isaak to opine on whether Whinstone's Rockdale Facility complied with the ANSI/BICSI and ASHRAE standards.

Moreover, Isaak may opine on the factual circumstances related to compliance with what Whinstone describes as "unambiguous" contract requirements. Opinions that "touch on legal topics" are not automatically inadmissible. *Olivier v. Exxon Mobil Corp.*, 596 F. Supp. 3d 606, 611 (M.D. La. 2022). "[A]n expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied ... " *Butler v. BNSF Ry. Co.*, No. 1:22-CV-00367-MJT, 2024 WL 2735020, at *5 (E.D. Tex. Mar. 26, 2024) (citing *Olivier v. Exxon Mobil Corp.*, 596 F. Supp. 3d 606, 611 (M.D. La. 2022)). The court must determine "whether the expert's opinions bear on some factual inquiry or whether they bear solely on the legal conclusions urged." *Olivier*, 596 F. Supp. 3d at 611.

Factual compliance with a contract is not an impermissible legal opinion. *See Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 435 (5th Cir. 2006). In fact, courts consistently allow technical experts to testify as to whether the defendant complied with industry standards and contractual requirements. *Nucor Corp. v. Requenez*, 578 F. Supp. 3d 873, 892 (S.D. Tex. 2022) (allowing expert testimony as to whether the steel joists complied with industry standards required by the contract); *BP Products N. Am. Inc. v. Int'l Maint. Corp.*, No. CIV.A. H-03-5218, 2005 WL 5976553, at *3 (S.D. Tex. May 27, 2005) (expert had "extensive experience dealing with invoices to ensure they comply with contractual requirements" and "[a]s a result, he may present evidence based on his

education and experience regarding what billing was proper or improper based on his understanding of the meaning of the contract provisions when considered in light of industry practices."); *Soo Line R. Co. v. Fruehauf Corp.*, 547 F.2d 1365, 1375 (8th Cir. 1977) (expert may testify as to the defendant's noncompliance with the contract where the contract includes complex technical specifications.). Here, Isaak's opinions go towards the fact issue of compliance with the contractual requirements. Isaak's opinions do not cross over into directing the jury to conclude that Whinstone has contractual liability.

Whinstone's reliance on *Morris v. Equifax Info. Services LLC*, is misplaced. No. CIV.A. H-04-423, 2005 WL 5976334, at *1 (S.D. Tex. Jan. 19, 2005). In *Morris*, the challenged expert opined as to whether joint contractual liability ever attached to specific accounts at issue and that "[t]here [was] no 'contract' that establishes contractual liability under Texas law without the agreement of the parties to the alleged contract." *Id.* The court concluded that "testimony regarding joint contractual liability under Texas law is improper because it expresses a legal opinion and invades the province of the Court."

Here, Whinstone does not assert, nor do the facts suggest, that Isaak intends to offer testimony as to what Texas law is or how it should apply to this case. Nor does he offer opinions as to whether a valid contract exists or whether Whinstone is subject to contractual liability.

The scope of Isaak's report stands in stark contrast to the report of Whinstone's expert, Jeffrey Matthews. His report is replete with examples of impermissible legal opinions wherein he opines as to the evolution of Texas law on the new business rule[15] and what Texas law allows SBI to recover.[16] Isaak's testimony does not come close to such

---

[15] **Ex. E** at 10.
[16] *See id.* at 27.

opinions. Whereas Isaak's report stays within the permissible realm of testifying as to industry standards, compliance with industry standards, and factual compliance with contractual requirements. Therefore, the Court should deny Whinstone's objections that Isaak offers impermissible legal conclusions.

## C.    Isaak's Opinions Are Reliable and Relevant.

Whinstone wholly misrepresents Isaak's testimony and the facts of this case to assert that Isaak's consideration of the totality of the evidence in this case and application of industry standards is somehow irrelevant and unreliable. [Dkt. 184 at 11].

1.    <u>Whinstone's objections regarding industry standards misstates deposition testimony and relies on the *ipse dixit* opinions of its own expert.</u>

Whinstone's argument is fundamentally flawed for at least four reasons. First, Whinstone relies on Karen Rayment's unfounded assertion that no industry standards exist for bitcoin mining facilities. Second, Whinstone completely misstates Isaak and Byers' testimony. Third, Whinstone's objection directly contradicts the Agreement. And fourth, Whinstone's objection goes to the weight, not the admissibility of Isaak's opinions.

Rayment attempts to draw a distinction between what she calls traditional data centers and cryptocurrency mining facilities has no basis in fact. *See* [Dkt. 131 at 5-7]. During her deposition, Rayment could not identify any support for this position. *Id.*; *see also* **Ex. F** at 144:14-25, 163:19-24. Yet even Rayment admitted overlaps exist between what she calls "traditional data centers" and "cryptomining facilities." *Id.* at 71:19-72:11, 72:22-73:5. Whinstone seems to have found the only engineer willing to say that cryptomining facilities have no applicable standards.

Moreover, Whinstone contractually agreed to "provide the Services in a professional manner consistent with industry standards." **Ex. D** at Clause 8.2.

Whinstone's contention that there are no industry standards plainly contradicts the terms of the Agreement.[17]

Next, Whinstone flatly misrepresents Byers' and Isaak's testimony regarding the applicable industry standards. Whinstone asserts that Byers corroborated Rayment's opinion that no standards exist. [Dkt. 184 at 11]. Byers actually explained that the ASHRAE standards apply to any data center, including the Rockdale Facility. **Ex. G** at 269:5-270:1. Whinstone also asserts that Isaak "fails to identify a single cryptocurrency miner industry participant that actually adheres to such standards." [Dkt. 184 at 12]. Isaak actually testified, repeatedly, that the ANSI/BICSI and ASHRAE applied to the Rockdale Facility and that every engineer he has worked with follows these standards, including the engineers of record for data centers designed for the specific application of cryptocurrency mining. *E.g.*, **Ex. C** at 66:22-68:8. Additionally, Whinstone erroneously asserts that "Isaak's opinions rest exclusively on irrelevant standards." [Dkt. 184 at 11]. Irrespective of the existence of industry standards, Isaak's analyses and opinions as to how the design and operation of the Rockdale Facility contributed to the underperformance and failure of SBI's miners still apply. For example, regardless of whether the ASHRAE standards require certain dust filters, his opinion that Whinstone's lack of filters allowed for the accumulation of dust on SBI's miners which contributed to their failure does not change.

Regardless, Isaak's opinions are plainly relevant. To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) (quoting *Daubert*, 509 U.S.

---

[17] Whinstone's assertion now that no industry standards exist further evidences that Whinstone never had the intention of performing its obligations under the Agreement.

at 591, 113 S.Ct. at 125). "Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786). Isaak's testimony on industry standards will assist the jury in determining whether Whinstone complied with the Agreement. *See Hess*, 26 F.4th at 234-235.

2. <u>Whinstone's contention that "Isaak's CFM analysis is fatally compromised" misrepresents Isaak's opinions, the facts of this case, and rests on evidence which Whinstone refused to produce.</u>

First, Whinstone asserts that Isaak ignored "the presence of thousands of other miners" and that approximately "1,600+ SBI S9 miners ... operated alongside SBI's A-10 miners." [Dkt. 184 at 12-13]. Whinstone did not keep nor has it produced any evidence as to when, if ever, it installed and then operated "SBI's S9 miners" and the total number of the S9 miners. At a minimum, the S9 miners were not installed from the very beginning with SBI's A10 miners when the miners began to fail and underperform. *See* C. Harris Nov. 19, Email re S9 Installation, **Ex. H**. Moreover, the number of S9 miners was minimal, and would not have impacted his analysis or opinion that the Rockdale Facility could not support the full 20,000 A10 miners. **Ex. C** at 119:3-120:13, 120:23-121:10.

Second, Whinstone asserts that SBI's miners shared the same space with miners from one of Whinstone's other clients, Rhodium. [Dkt. 184 at 13]. Isaak explained that Building B of the Rockdale Facility had a north and a south section. **Ex. C** at 141:3-22. The south section had only SBI's A10 miners and would not function with the quantity of miners in that section. *Id.* at 142:12-143:2. Thus, whether Whinstone partitioned off the north section where its other client had miners installed has no bearing on the analysis performed by Isaak. *Id.*

Moreover, Whinstone did not allow Isaak access to the area where Rhodium installed its miners and Whinstone did not produce any materials related to the operation of Rhodium's miners. *Id.* at 144:7-17. In fact, Whinstone precluded SBI from discovering any information related to the side of the building used by Rhodium. [Dkt. 55 at 8]. Whinstone cannot now credibly claim that Isaak should have considered information regarding the operation of Rhodium's miners.

Third, Whinstone's assertions that "Isaak utilized incorrect measurements and failed to include other variables" also fails. [Dkt. 184 at 13]. Whinstone never specifies what the "incorrect measurements" are or how they would impact Isaak's analysis. *Id.* Whinstone similarly provides no explanation or analysis for why the variables it contends Isaak did not consider in his CFM analysis would render his analysis unreliable. *Id.* In fact, in the deposition testimony cited by Whinstone, Isaak explained that outside air movement "would not have been a significant factor." **Ex. C** at 90:1-93:6. He further explained that in his analysis he considered "the totality of variables that would impact CFM" and he "identified the ones that were the most dominant." *Id.* Performing a Computational Fluid Dynamic or "CFD" analysis on the exterior of the Rockdale Facility "would take months" and "wouldn't have impacted the results of [his] analysis significantly enough to affect [his] opinions." *Id.* at 93:7-14.

Finally, Whinstone's footnote erroneously argues Isaak did not disclose his calculations for his "equilibrium figures." [Dkt. 184 at n.34]. Isaak includes 25 pages of calculations in his Report, including the calculations used to determine that the 20,000 miners could not function. **Ex. C** at 110:7-112:17; **Ex. B** at 72, 91-106. Isaak disclosed his methodology, his calculations, and the data used in his calculations. *Id.* Simply because Whinstone chose not to have any of its experts perform any kind of airflow analysis, rebut

Isaak's CFM analysis, or perform any calculations of their own does not mean Isaak failed in any way to disclose the information necessary for such calculations.

    3.    <u>Whinstone's contention that "Isaak's opinions are not governed by any valid scientific methodology" is meritless.</u>

Whinstone once again ignores that the five *Daubert* factors it cites are "non-exclusive," and "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of [the] testimony." *Kumho*, 526 U.S. at 150, 119 S.Ct. 1167. Moreover, experts do not need to conduct extensive scientific testing and experimentation for their opinions to be considered reliable. *See Orthoflex*, 986 F. Supp. 2d 802 (denying motion to exclude expert who only inspected two units, but analyzed parts and photographic evidence of failure modes; finding that the issue that the expert "did not perform extensive scientific experiments to examine the functionality of the devices goes to the weight, not the admissibility" citing *Kumho*, 526 U.S. at 150–51 (explaining that the Daubert factors do not establish a rigid checklist and testing is but one factor to be considered)).

Throughout its entire argument, Whinstone never specifies which of Isaak's methodologies it is specifically challenging. Whinstone simply makes vague, demonstrably false statements that Isaak's opinions cannot be tested, that he lacks data, or that his method is not subject to any peer review, publications, standards, etc. [Dkt. 184 at 13-14]. The Court should summarily deny Whinstone's Motion for its complete lack of specificity as to the methodology being challenged.

Whinstone's contention that Isaak "admit[ted] that he only considered one specific variable" is completely wrong. [Dkt. 184 at 13]. In this line of questioning, Isaak testified he calculated that the Rockdale Facility could not support the 20,000 A10 miners. **Ex. C**

**Plaintiff's Response to Whinstone's Motion to Strike the**
**Expert Opinions of Philip Isaak**
    **Page 17 of 21**

at 266:19-270:5. Whinstone's counsel asked Isaak if he calculated the exact amount of miners that failed as a result of over-heating, which Isaak explained he did not do. *Id.* Rather, the exact number of miners that failed as a result of overheating would not be a constant number and would vary on different variables. *Id.* Thus, Isaak did not find it prudent to calculate the exact number of miners that failed on each day because he already determined that the Rockdale Facility could not support the 20,000 contracted number of miners (less than 15,000). *Id.* Whinstone vaguely asks, "[i]f Isaak cannot test his own theories, then how is it possible for Whinstone to replicate them?" The answer is simple: use the 25 pages of equations, calculations, and data sets provided by Isaak.

Whinstone asserts that Isaak's method has no established standards, has not been the subject to peer review or publication, and has not been generally accepted by other experts in his field has no basis. But the testimony that Whinstone cites establishes the exact opposite of its contention. Specifically, in the cited testimony, Isaak testified to the applicability of the ANSI/BICSI and ASHRAE standards. **Ex. C** at 73:6-11, 158:1-15. Moreover, Isaak's 116-page report consistently cites to the ANSI/BICSI and ASHRAE standards which are followed by the engineers of record for data centers designed to operate cryptocurrency mining equipment. *See generally* **Ex. B**; **Ex. C** at 66:22-68:8. Whinstone's attack on Isaak's methodology is nothing more than a reassertion of its erroneous contention that no industry standards exist. This clearly goes to the weight, not the admissibility of Isaak's opinions. *See Kim v. Nationwide Mut. Ins. Co.*, 614 F. Supp. 3d 475, 486 (N.D. Tex. 2022); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

3.    Isaak had sufficient facts and data to form his opinions.

First, to the extent that Whinstone re-asserts its argument that Isaak should have performed "testing," experts are not required to conduct the testing Whinstone urges. This does not create any analytical gap in Isaak's opinions.

Second, Whinstone's criticisms that "Isaak did not identify how many miners failed" is a red herring and does not impact the reliability of Isaak's opinions as previously explained above. Similarly, this does not constitute an analytical gap. Furthermore, as previously explained, Isaak did not testify that other factors contributed to the miners failing or underperforming in this case. Regardless, the possible existence of other unknown contributing factors does not create an analytical gap or impact the reliability of Isaak's opinion that the design and operation Rockdale Facility did not comply with industry standards and that those omissions caused the failure of SBI's miners. Whinstone cites no authority that requires Isaak to identify the exact number of miners that failed at any given time and the exact cause(s) for that failure.

Whinstone then asks "[w]ithout understanding the landscape, how can Isaak opine with any certainty as to what actually occurred?" However, Whinstone's failure to understand the landscape of Rockdale, Texas was part of the problem in this case. Whinstone does not identify any specific error in any of Isaak's calculations. Whinstone does not identify or explain how any specific conclusion he reached regarding the design of the Rockdale Facility is unreliable or inaccurate. Additionally, Whinstone did not identify how, for example, Isaak's opinion that the lack of dust filters could result in the accumulation of dust on SBI's miners, as confirmed by the evidence, is unreliable or lacks foundation.

Third, Whinstone next broadly asserts that Isaak cannot offer any opinions because he allegedly did not consider: "miner model composition and differentiation information, the number of miner failures (including as to by model), the reason why a particular model failed, firmware issues and manufacturing defects, various temperature data and rates of change, and contemporaneous data evidence evidencing environmental conditions." [Dkt. 184 at 15-16]. Isaak expressly considered temperature data and "contemporaneous data evidence evidencing environmental conditions." *Id*.[18]

Moreover, part of the problem in this case is that Whinstone did not comply with the Agreement by not keeping records of events or data such as SBI's miner failures or the air intake temperatures. Whinstone cannot use its own wrongful omissions (i.e., maintaining basic records) to avoid liability.

Whinstone also provides no reason why any of the categories of information it identified must be considered for Isaak's opinions to be reliable. In fact, both of SBI's experts, Isaak and Byers expressly rejected Whinstone's argument that differentiations, if any, in the A10 model would have had any impact in either of their analyses. **Ex. C** at 122:19-128:14; **Ex. G** at 92:17-94:22. Regardless, objections to the quality of the data considered by an expert go to the weight, not the admissibility of his opinions and should be challenged through cross-examination. *Kim*, 614 F. Supp. 3d at 486; *see also Daubert*, 509 U.S. at 596.

<u>CONCLUSION</u>

For the foregoing reasons, Whinstone's Motion to Strike the Expert Opinions of Philip Isaak should be denied in its entirety.

---

[18] In fact, Whinstone's quite literally objects that Isaak offered statistical analyses and opinions on temperature and humidity data. Isaak also considered, for example, the KaboomRacks photos and videos taken during the operation of SBI's miners in June 2021.

Respectfully submitted,

By: */s/ Joshua M. Sandler*
Joshua M. Sandler
  Texas Bar No. 24053680
  jsandler@winstead.com
Cory Johnson
  Texas Bar No. 24046162
  cjohnson@winstead.com
Andrew Patterson
  Texas Bar No. 24131573
  apatterson@winstead.com
John D. Janicek
  State Bar No. 24125636
  jjanicek@winstead.com
**WINSTEAD PC**
2728 N. Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (214) 745-5103
Facsimile: (214) 745-5390
**ATTORNEYS FOR PLAINTIFF**
**SBI CRYPTO CO. LTD**

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served in accordance with the Federal Rules of Civil Procedure via the court's e-filing system on December 15, 2025.

*/s/ Andrew Patterson*
Andrew Patterson