# EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| SBI CRYPTO CO., LTD.,<br><br>Plaintiff,<br><br>v.<br><br>WHINSTONE US, INC.,<br><br>Defendant. | Civil Action No. 6:23-cv-252 |

### CONTENTIONS OF THE PARTIES

### Plaintiff SBI's Contentions:

On June 12, 2019, Whinstone sent SBI a pitch deck for a facility to be built at the HODL Ranch in Pyote, Texas ("Pyote Facility"). Whinstone represented to SBI that the Pyote Facility would be ready to begin "onboarding miners" and "ramping up in August 2019." Whinstone also promoted its "proprietary rack system that decreases heat [and] increases server density …." Whinstone also implied that it had already secured a power purchase agreement ("PPA") for delivery of electricity. On July 3, 2019, Chad Harris (Whinstone's future CEO) informed its then CEO, Aroosh Thillainathan ("Aroosh"), that Whinstone's data center at the HODL Ranch in Pyote was dead. Instead of informing SBI of the failed deal, Whinstone executed the Hosting Service Agreement for the Pyote Facility on July 10, 2019, and then strung SBI along for weeks with the belief that SBI's miners would be up and running in Pyote by October.

In anticipation of an October start date, SBI's representatives in Japan asked to schedule a visit to the Pyote Facility on August 30, 2019. To hide their deception, Whinstone's CEO explained that the Pyote deal had fallen through "due to an impasse in the contract documents of the facility." Whinstone then completed its bait-and-switch by claiming that it "used all the construction documents, power contract, and resource[s] [sic] procured for the [Pyote] location to speed the bidding process and prepare a ready-made project that [could] be deployed in 20 weeks" in Rockdale, Texas ("Rockdale Facility").

SBI's CEO, Carson Smith, and SBI's general manager, Jonathan Tanemori, met with Whinstone's representatives, Aroosh (CEO), Lyle Theriot (COO), and Chad Harris, in September 2019. Whinstone represented that the move to the Rockdale Facility would only delay ramp-up of SBI's miners by two months as Whinstone was using the "[s]ame designs and contractors to be used as Pyote site." Whinstone further represented that it had "1 GW of power, enough for other potential future power/mining requirements by

1

SBI and other clients" and that it had secured a 10-yr power purchase agreement. Whinstone also claimed that it would not have to secure any permits for the Rockdale Facility.

On October 24, 2019, Whinstone fraudulently induced SBI to enter into the Hosting Service Agreement in Rockdale by falsely representing, *inter alia*, Whinstone (1) had "secured for commercial access up to one (1) gigawatt of aggregated electricity" for its Rockdale facility; (2) that building or other permits were "not required with regard to providing services"; and (3) that Whinstone would deliver 50 MW of power for SBI's miners by December 15, 2019 (Ready-For-Use ("RFU Date")). Specifically, Whinstone falsely represented that it had secured 1GW of power despite having not secured a power purchase agreement ("PPA"), falsely represented it did not have to secure any permits despite having to secure a storm water permit, and falsely represented that it could deliver 50 megawatts (MW) of power to SBI's miners by December 2019 when it had no intent to do so. In addition, Whinstone falsely represented that it would use the same design as the proposed Pyote facility—despite designing the Rockdale Facility without any intake or exhaust fans in the building. Whinstone also falsely represented that the Rockdale facility would utilize dust filters and maintain an intake temperature below 29.5 Celsius when it had no plans or intent to do so. Whinstone also falsely represented that it would perform services under the Agreement consistent with industry standards, despite having no intent to do so.

Following the execution of the Agreement, Whinstone continued its pattern of stringing SBI along by not acknowledging that the RFU Date (Dec. 15, 2019) was "impossible" and instead suggesting that construction was "moving at a record pace"—despite not having secured a storm water permit necessary for construction or a power purchase agreement to actually deliver power for SBI's miners. Whinstone had also failed to secure sufficient water rights from the Rockdale Facility's landlord to operate evaporative cooling walls at the facility. Whinstone's fraudulent acts and omissions caused an eight-month delay in operations followed by the mass failure and underperformance of SBI's Equipment.

After the long-delay, ramp-up of SBI's miners finally began in July and August of 2020; however, Whinstone failed to disclose that SBI's equipment was suffering from overheating. In the summer of 2020, Whinstone employed Lancium, an energy infrastructure company, to assist with ramp-up of customers' miners. Lancium personnel repeatedly warned Whinstone on multiple occasions that the facility was too hot to run miners consistent with customer expectations. Lancium and Whinstone personnel both witnessed miners overheating and hot air "cooking" SBI's miners, but Whinstone failed to disclose this information to SBI. Instead, Chad Harris told Smith that the issues with SBI's equipment were due to undersized power supply units ("PSUs") on SBI's miners and not "heat related." Having been provided contrary facts related to the performance of SBI's equipment, Whinstone owed SBI a duty to disclose information related to inadequate airflow, excessive heat, and other environmental conditions at the Rockdale Facility. Instead, Chad Harris and Ashton Harris continued to conceal the truth and informed SBI that its miners were defective. In so doing, Whinstone committed fraud by nondisclosure and fraudulent concealment.

2

Instead of disclosing the truth about its facility, Whinstone sought an exit strategy. In October 2020, only three months after installing and powering on SBI's miners, Whinstone began soliciting its acquisition by a company called Riot Platforms, Inc. ("Riot"). The Agreement between SBI and Whinstone, however, expressly prohibited Whinstone from disclosing the terms of SBI's contract to third parties. Despite this fact, Whinstone disclosed to Riot how much power SBI had been contractually allocated and the price SBI paid Whinstone for electricity. Then, in February 2021, Whinstone representatives explicitly pitched the idea that Riot could terminate SBI's contract and take over SBI's space by invoking a "Change of Control" provision in the Agreement.

When Whinstone notified SBI that it was being acquired by Riot in April 2021, Whinstone secured a consent from SBI that it would not invoke the "Change of Control" provision and terminate the contract due to the acquisition. On May 26, 2021, Riot formally acquired Whinstone. Two days later, on May 28, 2021, Chad Harris falsely informed Smith via email that Riot had "undert[aken] a post-closing integration and resource allocation assessment." As a result, Riot terminated the Agreement pursuant to the Change of Control provision.

In addition to Whinstone's fraudulent conduct, Whinstone continuously and repeatedly breached the Agreement. Whinstone breached the Agreement because, *inter alia*, it: failed to meet the December 2019 RFU date; failed to install intake and exhaust fans; failed to install dust filters; failed to install and/or operate evaporative curtains; failed to ensure an average air intake temperature of less than 29 degrees Celsius; failed to ensure the air intake temperature never exceeded 29.5 degrees Celsius; needed to obtain a stormwater permit to provide services to SBI; failed to ensure the datacenter and the air inside was free of dust, dirt, insects, and corrosion; failed to prevent dust, trash, and insect particles from collecting inside SBI's equipment; failed to provide Advanced Smart Hands Service; failed to measure actual power consumption; failed to maintain an uptime percentage of 98.35%; failed to issue reports when 10% of SBI's machines were offline; failed to respond within the required time; failed to provide maintenance or regular reports when SBI's hashrate fell below threshold levels; failed to provide services in accordance with industry standards; and disclosed the terms of the Agreement to Riot.

SBI seeks to recover the damages it sustained as a result of Whinstone's fraudulent conduct and breaches. Specifically, SBI seeks to recover its lost bitcoin caused by the delay in operations, the failure and underperformance of SBI's miners during operations, and the loss of bitcoin mining profits it should have otherwise obtained following termination of the Agreement. Further, because SBI's monetary losses are directly tied to the number of bitcoins it lost, SBI asserts that it is entitled to recover the value of bitcoin at the time of trial. SBI also seeks to recover its out-of-pocket expenses, including, but not limited to, the amounts paid to Whinstone and replacement costs for its miners and/or the miners' computing power.

**Defendant Whinstone's Contentions:**

SBI's evolving narrative is demonstrably false. This case is about a business relationship that operated smoothly for nearly two years, during which SBI did not complain about the issues it now contends led to hundreds of millions of dollars in "damage." The "fraud" allegations SBI now asserts are, in substance, attempts to repackage standard contract provisions into claims of deception. SBI ignores express disclaimers of fraud (*i.e.*, Section 17.3 of the Hosting Services Agreement) and notice damages limitations (Sections 8.11 and 11.1 of the Hosting Service Agreement), which were carefully negotiated between sophisticated parties. Even putting aside this effort to recast contract issues as fraud, the underlying accusations do not withstand factual scrutiny.

In 2019, Whinstone's founders had the vision to build one of the largest industrial-scale bitcoin mining facilities in the world. The founders recognized an opportunity to secure competitive Texas power agreements and construct a purpose-built facility to host large-scale mining operations.

In April 2019, before SBI ever contacted Whinstone, SBI acquired 40,000 Canaan A-10 prototype miners. Needing a location to host 20,000 of those miners, a third party introduced SBI to Whinstone about potentially utilizing a facility that Whinstone was trying to construct in Texas. When Whinstone's initial development site in Pyote, Texas did not proceed, the company pivoted quickly to Rockdale, Texas—a location with abundant electrical infrastructure, ample space for an industrial buildout, and an available workforce that was searching for employment given that Alcoa had closed its aluminum plant just two years prior. SBI expressly acknowledged and agreed in the Hosting Services Agreement for Rockdale that the Pyote deal was terminated and replaced with the new Hosting Services Agreement (*e.g.*, Section 17.2 of the Hosting Services Agreement) for operations at Whinstone's new facility ("Facility") in Rockdale.

Before committing to the Facility, SBI's leadership (Carson Smith and Jonathan Tanemori) personally visited Rockdale in September 2019. SBI witnessed first-hand the Rockdale location and saw that construction could not reasonably be completed and ready for operations by mid-December as originally anticipated. Still, SBI proceeded to negotiate and enter the Hosting Services Agreement with full understanding of the Facility's stage of development, its location, and the available power capacity. The Hosting Services Agreement expressly disclaims reliance on the kinds of so-called "assurances" that SBI first complained of more than a year after the contract validly terminated (*e.g.*, Section 17.3 of the Hosting Agreement).

In the Hosting Services Agreement, SBI specifically negotiated for specific contractual remedies for the delayed start (*i.e.*, RFU) date. So, when construction of the Facility was delayed, SBI did not elect to cancel the contract. Instead, SBI received a convertible bond worth tens of millions of Euro and price concessions as compensation for the delayed start. Further, SBI breached section 3.13.1 of the Hosting Services Agreement first by failing to pay hosting fees for the greater than or equal to eighty percent of the Specified Power Draw at the rate required by Clause 3.11.1 of the agreement.

4

For the Facility, Whinstone "secured for commercial access up to 1GW of power." SBI takes issue with the fact that Whinstone had not yet secured 1GW of power at the moment it expressed its plan to do so—ignoring that SBI never lacked the electricity it needed to operate at Rockdale.

For almost a year, SBI successfully mined Bitcoin at Whinstone's one-of-a-kind industrial mining facility. SBI took a uniquely "hands-off" approach to its operations. While its miners were in operation, SBI briefly visited the Facility only once during the entire period it mined tens of millions worth of Bitcoin. And that singular visit only occurred after Whinstone terminated the Hosting Services Agreement.

Further, SBI operated prototype, Chinese-manufactured miners and equipment (despite being aware of historical quality problems of Chinese equipment). Having committed to this equipment before even engaging with Whinstone, SBI opted to make do with its underperforming investment to salvage its prior investment, rather than upgrading to better hardware. And when issues arose, SBI failed to replace or upgrade defective or failing equipment it selected, despite repair notifications from Whinstone.

During its operations, SBI had full transparency through real-time data reflecting miner operations. SBI never issued the written notice of its purported operational concerns (as mandated by Sections 8.11 and 11.1 of the Hosting Service Agreement), because, in reality, no valid concerns existed that were attributable to Whinstone or the Facility. Whinstone provided exactly what the Hosting Services Agreement required:

- Competitive hosting services and below-market electricity pricing;

- Remote hands support, when requested,

- Promptly installing equipment and replacement equipment when supplied by SBI; and

- Full remote monitoring so SBI could, at any time, view how its miners were performing and see production data in real time.

In 2021, Whinstone's founders and its parent company elected to sell Whinstone to Riot Platforms, Inc. — a legitimate and transparent transaction. The Hosting Services Agreement contained a "change of control" provision that allowed either party to terminate in the event of an acquisition (Section 13.3 of the Hosting Services Agreement). When Whinstone invoked this contractual right to terminate the Hosting Services Agreement after the Riot deal closed, SBI did not contest that termination. SBI knew that Riot was considering the acquisition of Whinstone and was expressly advised that Whinstone would invoke its right to terminate the Hosting Services Agreement due to the change of control. SBI, however, never asserted its newly fabricated claim for breach of confidentiality and raised the issue for the first time in its motion for summary judgment three months before trial and after discovery closed.

Following termination, SBI negotiated the return of $7 million of its initial payment and the return of its miners. SBI did not retrieve its equipment itself; Whinstone

5

boxed and shipped it to a warehouse in Chicago, Illinois per SBI's direction. SBI did not redeploy those miners and instead let them sit in the Chicago warehouse for years. At no point during this process did SBI claim operational defects, environmental problems, or fraudulent conduct.

Nearly a year after its operations ceased—and after Whinstone returned SBI's miners and paid SBI $7 million settle any disputes—SBI manufactured complaints that the Facility's conditions were unacceptable, its equipment had underperformed, and that Whinstone somehow had engaged in "fraud," seeking reimbursement for full cost of its experimental miners. In so doing, SBI breached the parties' settlement agreement and fraudulently induced Whinstone into entering the agreement (by failing to disclose SBI intended to sue Whinstone once Whinstone performed the settlement agreement), thereby causing damage to Whinstone in the form of attorneys' fees, costs, and expenses incurred by this lawsuit (which Whinstone seeks to recover here).

Whinstone fulfilled every obligation under the Hosting Services Agreement openly, transparently, and in good faith. SBI got precisely what it contracted for, made millions during the term of the Hosting Services Agreement, and did not timely obtain the equipment upgrades that could have enhanced its performance. SBI was compensated for the delayed startup, including because it received a convertible bond and profited tens of millions of Euro. In short, SBI mined millions of dollars in Bitcoin without providing notice of any so-called fraud or ever pointing to any alleged breach of the parties' Hosting Services Agreement. And, when Whinstone invoked the change of control provision—which SBI itself drafted—to terminate, SBI did nothing. SBI did not contest the termination. SBI did not re-deploy its miners. SBI did not attempt to sell its miners.

If that were not enough, SBI's damages claims are barred by well-established law. SBI was required to put forth evidence of alleged lost profits and equipment damage at the time of each purported breach or fraudulent act. SBI did not do so. Nor can SBI establish its lost profits that accounts for expenses as required by Texas law. Nor did SBI expend any money on replacement equipment. Nor did SBI plead for recovery of its out-of-pocket expenses for money paid under the Hosting Services Agreement (*i.e.*, disgorgement, rescission) or replacement computing power. Whinstone objects to SBI's untimely and unpled effort to obtain this relief now. Further still, SBI wholly ignores the Hosting Services Agreement's limitations on contractual damages in Sections 3.10.3, 13.5, 13.3 3.14.2, and 8.6-8.11. SBI's claims and damages are factually and legally without merit at every level.

Whinstone objects to SBI's contentions on several grounds. First, SBI improperly attempts to interject claims and damages that were not pled, including claims that Whinstone:

- Misrepresented the design of Whinstone's intended cryptocurrency mining facility in Pyote, Texas (the "Pyote Facility");

- Misrepresented the design and effectiveness of the "proprietary rack system" that was intended to be used at the Pyote Facility;

6

- Failed to disclose that the Pyote Facility was "dead" and concealing the same with misrepresentations;

- Misrepresented that Whinstone had a secured a 10-year power purchase agreement;

- Misrepresented that Whinstone would use the Pyote Facility design, power contract, and resources to build the Facility;

- Failed to disclose that a storm water permit was needed for the Facility;

- Misrepresented that the Facility would have dust filters;

- Misrepresented that Whinstone had no intent to provide Hosting Services Agreement services in accordance with industry standards;

- Failed to obtain "sufficient water rights . . . to operate evaporative cooling walls" at the Facility;

- Failed to disclose purported Lancium statements about miner overheating;

- Had Riot acquire Whinstone as an "exit strategy;"

- Disclosed the terms of the Hosting Services Agreement to Riot as part of the acquisition;

- Pitched Riot on the idea of terminating the Hosting Services Agreement after acquisition;

- Obtained a waiver from SBI not to terminate the Hosting Services Agreement due to Riot's acquisition;

- Terminated the Hosting Services Agreement due to Riot's acquisition;

- Failed to ensure that air intake temperature never exceeded 29.5 degrees Celsius;

- Failed to measure actual power consumption; and

- Failed to maintain an uptime percentage of 98.35%.

Second, Whinstone objects because SBI fails to provide fair notice of its contract claims. For example, SBI now claims that Whinstone breached the Hosting Services Agreement at least 19 different ways, but fails to cite any specific Hosting Services Agreement provision. By way of example, SBI alleges an unspecified breach of "Advanced Smart Hands Service," which is a term not included in the Hosting Services Agreement at all. To the extent SBI intends to refer to "Advanced Remote Hand Services," that term

7

includes numerous items and pre-conditions. In other instances, SBI appears to cherry-pick obligations in the Hosting Services Agreement and reframe them. In another example, SBI alleges that air intake temperature should "never exceed" 29.5 degrees Celsius, but the obligation differs in Hosting Services Agreement Section 4.6.7 and arguably invokes additional obligation for a breach. SBI must specifically identify each provision that Whinstone allegedly breached and the facts alleged to support that breach. Otherwise, SBI fails to provide fair notice of its claims. *See, e.g.*, *Doe 1 v. Baylor Univ.*, 240 F. Supp. 3d 646, 668 (W.D. Tex. 2017) ("Thus, '[t]o plead a breach of contract claim, a plaintiff must identify a specific provision of the contract that was allegedly breached. . . . Without these factual allegations, Plaintiffs' breach of contract claim does not provide Baylor with fair notice of their claim required by Federal Rule of Civil Procedure 8.'") (Pitman, J.).

Third, many of the alleged breaches that SBI attempts to try are not supported by the plain terms of the Hosting Services Agreement, including, in some instances, in which SBI seeks to recover on non-existent contract obligations. For instance, the Hosting Services Agreement Section 2.2.13 only requires Whinstone to use its "best efforts" with respect to average air intake temperature, airflow, evaporative cooling, filters, dust, insects, corrosion, precipitation, condensation, and trash. Further, there is no requirement for Whinstone to obtain a storm water permit. Rather, Section 2.1.5 is a representation and warranty that permits are not required to perform services. Further still, Whinstone is not obligated to provide "services under the [Hosting Services Agreement] consistent with industry standards," but rather to "provide the Services" (as defined in § 1.1) "in a professional manner consistent with industry standards." SBI cannot try a breach of contract case that has no basis in the at-issue Hosting Services Agreement.

Fourth, SBI now seeks to recover its purported "out-of-pocket expenses" for "the amounts paid to Whinstone and replacement costs for its . . . miners' computing power"—which was not pled. SBI may not try these claims now. *See* Third Am. Sched. Order (Nov. 25, 2024) at 1 (setting November 15, 2024 deadline to amend pleadings); Fed. R. Civ. Proc. 16(b).

Finally, SBI has only pled generally that Whinstone has a duty not to fraudulently induce another into entering a contract. SBI has not, however, pled any factual allegations sufficient of establishing a duty to disclose the post-contract events it attempts to put at issue, such as issues with overheating, inadequate airflow, dust and other environmental conditions. With no such duties independent of the Hosting Services Agreement, SBI's fraud by non-disclosure claims cannot be tried (as briefed in Whinstone's motion for summary judgment).

8