# EXHIBIT 3

Confidential -- Attorneys' Eyes Only
Transcript of Jonathan Tanemori
Conducted on August 15, 2024

1 (1 to 4)

---

**Page 1**

```
            UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF TEXAS
                   WACO DIVISION
                     --o0o--
SBI CRYPTO CO., LTD.,        )
                             )
         Plaintiff,          )
                             )
    vs.                      ) 6:23-cv-252-ADA-JCM
                             )
WHINSTONE US, INC.,          )
                             )
         Defendant.          )

     ** Confidential -- Attorneys' Eyes Only **
  ---------------------------------------------------
              VIDEO DEPOSITION OF
                JONATHAN TANEMORI
                 August 15, 2024
  ---------------------------------------------------
       DEPOSITION OF JONATHAN TANEMORI, produced as
a witness, duly sworn by me at the instance of the
DEFENDANT, was taken in the above-styled and numbered
cause on August 15, 2024, from 9:01 A.M. to 5:16 P.M.,
before BRANDON D. COMBS, CSR, RPR, in and for the State
of Texas, reported by computerized machine shorthand
at:
       2728 North Harwood Street, Fifth Floor,
                    Dallas, Texas
```

**Page 2**

```
                      APPEARANCES

        FOLEY & LARDNER LLP, 2021 McKinney Avenue,
Suite 1600, Dallas, TX 75201, represented by
ROBERT T. SLOVAK and BRANDON C. MARX, Attorneys at Law,
appeared as counsel on behalf of the Defendant.
        Email: rslovak@foley.com


        WINSTEAD PC, 2728 North Harwood Street,
Dallas, TX 75201, represented by CORY JOHNSON and
JOSHUA M. SANDLER, Attorneys at Law, appeared as
counsel on behalf of the Plaintiff.
        Email: cjohnson@winstead.com




        ALSO PRESENT:
        Jesse Castro, Videographer
```

**Page 3**

```
                        INDEX
                                                  PAGE
     Examination by MR. SLOVAK                      7


 EXHIBITS                                         PAGE

 Exhibit 1   Complaint                              77

 Exhibit 2   Hosting Service Agreement              80

 Exhibit 3   Email to                               94
             a.thillai@whinstone.co.uk,
             Jun 14, 2019, re Whinstone
             financial review request

 Exhibit 4   International Sales Contract           93

 Exhibit 5   Email to Carson Smith, Jun 20,        125
             2021, re Whinstone 80% counter
             calculation

 Exhibit 6   Hosting Service Agreement             130

 Exhibit 7   Whinstone Trip report                 150
```

**Page 4**

```
 Exhibit 8   Email to                              186
             lyle.theriot@northerndata.de

 Exhibit 9   Email to Arooh Thillai, Aug 12,       190
             2020, re issues in Whinstone

 Exhibit 10  Email to Mathias Daehn, Oct 21,       197
             2020, re open items

 Exhibit 11  International Sales Contract          208

 Exhibit 12  Email to Ray Redding, Jul 28,         230
             2021, re Avalon A10 miners

 Exhibit 13  Email to Chad Harris, Jun 3,          246
             2022, re notice of claim

 Exhibit 14  Email to Jonathan Tanemori,           249
             Jul 29, 2021, re SBI contract

 Exhibit 15  Email to jles@riotblockchain.com,     252
             Dec 16, 2021, re adjustment for
             June 2021 payment
```

Confidential -- Attorneys' Eyes Only
Transcript of Jonathan Tanemori
Conducted on August 15, 2024

5 (17 to 20)

---

Page 17

1  SBI Investments?
2     A.  That would have been, if I recall
3  correctly, sometime in 2022.
4     Q.  Okay.  And so prior to 2021, where you had
5  the title of GM for SBI Crypto, what titles did you
6  have with the SBI organization?
7     A.  A manager in SBI Holdings' finance
8  division, the overseas business administration
9  division.  And then prior to that was a business
10 development officer for a subsidiary called SBI
11 BITS.
12    Q.  In roughly what years did you hold the
13 title of manager in SBI Holdings finance?
14    A.  That would have been in October 2020
15 through -- for about one year, if I recall
16 correctly.
17    Q.  Until you ascended to GM for SBI Crypto?
18    A.  Yes.
19    Q.  And then you mentioned that prior to being
20 the manager at SBI Holdings finance for the overseas
21 business division, that you were the business
22 development manager for SBI BITS?
23    A.  Right.  That was from August 2017, when I
24 first joined, to September -- well, the following
25 year, 2019.

Page 18

1     Q.  To '19?  So was there a title between '19
2  -- between the time you were a business development
3  manager at SBI BITS --
4     A.  Maybe if I go chronologically.
5     Q.  Yeah, that's probably -- it would have
6  been better if I just let you do that; right?
7     A.  No problem.  Yeah, there are different --
8  so I started off at SBI BITS in the business
9  development manager, and so that would have been
10 from August 2017 to September a year later, so 2019.
11        Then moved into the finance division at
12 SBI Holdings.  So also then concurrently, in October
13 of 2020 -- or '19, assigned to -- it's been several
14 years.  To Crypto, and then I maintained that
15 throughout, through March.
16        On the other end, my finance division
17 assignment was reassigned to the overseas business
18 administration division, and then over to
19 SBI Investment.  So about a year, year and a half
20 stint each.
21    Q.  So generally speaking, you were -- well,
22 let me ask it differently.
23        What was your role, if any, in finding a
24 location to mine cryptocurrency in Texas?
25    A.  That would not have been my scope of work.

Page 19

1     Q.  Who was involved in that process?
2     A.  I believe it was Carson Smith.
3     Q.  Okay.  Were you involved in the
4  negotiations of any agreements between my client
5  Whinstone and SBI?
6     A.  Yes, I was.
7     Q.  What was your role in negotiating those
8  agreements?
9     A.  That would have been negotiating the
10 financial aspects of it, helping support the
11 contractual, just production of the documents and
12 general back office administration, liaising with
13 the parent company.  Kind of a back office
14 administrative function.
15    Q.  Were you involved in any direct
16 discussions with any representative of Whinstone
17 about the actual terms of agreements between
18 Whinstone and SBI?
19    A.  Yes, I was.
20    Q.  With whom did you speak at Whinstone?
21    A.  That would have been Aroosh and then Chad.
22 And I believe I met a couple other people during my
23 site visit as well.
24    Q.  So Aroosh and Chad Harris and who else?
25    A.  Right.  I believe I met Lyle.  Were the

Page 20

1  people I recall.  May have been one other person or
2  so, but...
3     Q.  And you mentioned -- I'll come back to
4  this in a minute, but you mentioned that you had a
5  site visit?
6     A.  That's correct.
7     Q.  And by a site visit, to what location are
8  you talking about?
9     A.  So this would have been the
10 September 2019.  Carson and I went to visit or meet
11 with Aroosh regarding potential hosting at a newer
12 site called -- at the Rockdale site.
13        And so I had discussions with Aroosh and
14 then an actual site visit the following day.
15    Q.  And that was in September of 2019?
16    A.  That's correct.
17    Q.  Was that the only time that you've ever
18 visited the Rockdale site?
19    A.  Yes.
20    Q.  And so just to be clear, you understand
21 that Aroosh actually worked for Northern Data;
22 right?
23    A.  Yes.
24    Q.  And you said that you had had some
25 discussions with Chad Harris.  When did you have

**Page 97**

so that I didn't mess up my order.
   MR. JOHNSON: I'm sorry.
   MR. SLOVAK: That's okay. I was trying to keep you on your toes.
   THE WITNESS: I need to use a bathroom break.
   MR. SLOVAK: Sure.
   THE VIDEOGRAPHER: We're going off the record. The time is 11:16 A.M.
   (Off the record.)
   THE VIDEOGRAPHER: We're going back on the record. The time is 11:19 A.M.
   Q. (BY MR. SLOVAK) So take a look at Exhibit 3. It's an email from you to athillai@whinstone in the UK.
   Do you see that, copying Carson Smith?
   A. Yes.
   Q. Okay. And you're -- and that's an email to Aroosh; right?
   A. Yes.
   Q. And you're inquiring about financial information related to Whinstone; right?
   A. Yes.
   Q. Okay. And in response to one of your questions Aroosh says that, the construction cost is

**Page 98**

to complete the construction of two buildings, with a total of 110-megawatt of transformers.
   Did I read that correctly?
   A. Construction cost is to complete the construction of two buildings, with a total -- I'm reading the answer. Okay. So this is in reply -- his answer in reply to Question 2.
   And the question was confirming --
   Q. What he says to you is that they're going to complete the construction of two buildings, with a total of 110 megawatts of transformers.
   Do you see that?
   A. Yes.
   Q. There's no representation in here that there will be any more than 110 megawatts of transformers; right?
   A. For these first two buildings, yes.
   Q. And, to your knowledge, was there ever any agreement between SBI and Whinstone for any more than two buildings?
   A. Not that I'm aware of.
   Q. Was there ever any discussion between SBI and Whinstone about the use of any more than two buildings?
   A. Not that I'm aware of.

**Page 99**

   Q. SBI ever express any intent to Whinstone to use more than the 50 megawatts of power that it contracted for with Whinstone?
   MR. JOHNSON: Objection. Form.
   THE WITNESS: Can you repeat that again.
   Q. (BY MR. SLOVAK) Did SBI ever represent to Whinstone an intent to contract for more than the 50 megawatts of power that it contracted for at the Rockdale facility?
   MR. JOHNSON: Objection. Form.
   THE WITNESS: I don't believe there's any representation or promise that we would do above and beyond the initial 50.
   Q. (BY MR. SLOVAK) So if you go back to the back page of Exhibit 3, you'll see SBIC1022. At the bottom there's an email from Carson Smith to Aroosh.
   A. Okay.
   Q. And in it he's introducing you to Aroosh.
   Do you see that?
   A. Yes, I do.
   Q. And prior to June 19 of -- June 12, 2019, had you ever had any dialogue of any kind with Aroosh?
   A. I cannot say for certain, but I don't believe there would be a reason that I would have

**Page 100**

had.
   Q. Do you know when Carson Smith first met Aroosh?
   A. No, I don't.
   Q. Do you have any reason to disagree that the first introduction that he had to Aroosh was on April 16 of 2019?
   MR. JOHNSON: Objection. Form.
   THE WITNESS: I wouldn't know.
   Q. (BY MR. SLOVAK) Okay.
   A. Be able to provide any insight on that.
   Q. And you'll see at Exhibit 3, SBIC1023, that in that email on the last page, that Carson Smith is providing a small summary of the key financial points of the contract.
   Do you see that?
   A. Small summary of the key financial points of the contract.
   Q. Yes, sir, do you see that?
   A. Yes, I do.
   Q. And it was .0375 per kilowatt hour hosting for approximately 50 megawatts, 20,000 Avalon A10, for colocation, power, network and on-rack maintenance.
   Do you see that?

**101**

1  A. Yes, I do.
2  Q. And those Avalon -- 20,000 Avalon A10s
3  were the ones that were committed to purchase from
4  the purchase order back in April, which is
5  Exhibit 4; right?
6  A. I believe, yes.
7  Q. And 20,000 of them were to be used at the
8  Texas facility and another 20,000 to be used at the
9  Russia facility; right?
10  A. That's my understanding.
11  Q. When did you all procure the Russia
12  facility?
13  A. I don't recall.
14  Q. Was it procured before you signed the
15  purchase order in Exhibit 4?
16  A. I don't believe we had found the Russia
17  site yet at that time.
18  Q. Was there any representation made by the
19  operator of the Russia facility that you contend was
20  material to you all entering into the purchase order
21  that's in Exhibit 4?
22      MR. JOHNSON: Objection. Form.
23      THE WITNESS: I'm sorry, can you repeat
24  the question.
25  Q. (BY MR. SLOVAK) Sure. Is there anything

**102**

1  that SBI contends that the Russian operator
2  represented to you that was material to the decision
3  to sign the purchase order in Exhibit 4?
4      MR. JOHNSON: Objection. Form.
5      THE WITNESS: If I recall correctly, prior
6  to the Russia site, the same operator,
7  -- and SBI was planning another site in
8  Kyrgyzstan. And because the power could not be
9  provided there, we ended up going to the site in
10  Russia.
11      And so the context being that there had
12  been a planned site for the other 20,000 miners, not
13  necessarily Russia though.
14  Q. (BY MR. SLOVAK) And the plan for the
15  20,000 was made before you purchased all 40,000;
16  right?
17  A. That I -- the timing I don't recall.
18  Q. Well, it would be kind of silly to go buy
19  40,000 miners if you had no plan for them; right?
20  A. There were a lot of lead times for the
21  production of miners. And so before actual delivery
22  of the miners was made, there's oftentimes a few
23  months that one could either finalize negotiations
24  at a potential site or shop around, if you will.
25  Q. When did you all finalize negotiations for

**103**

1  the Russia site?
2  A. It would be stated in the contract, but,
3  again, I believe there was another site prior to the
4  Russia site.
5  Q. Okay. You all never intended to use more
6  than the 20,000 miners at the -- either the Pyote or
7  the Rockdale site; right?
8      MR. JOHNSON: Objection. Form.
9      THE WITNESS: That I can't speak to.
10  Q. (BY MR. SLOVAK) Well, certainly in
11  Exhibit 3, the representation of the terms here is
12  to deploy 20,000 sites [verbatim] and 50 megawatts;
13  right?
14  A. Initially, yes, that's what is in here.
15  Q. And ultimately that's what happened in
16  Texas; right?
17  A. Yes.
18  Q. And the other 20,000 that were purchased
19  pursuant to Exhibit 4, were deployed in Russia;
20  right?
21  A. In the end, yes.
22  Q. No one at Whinstone told SBI to purchase
23  those Avalon miners, did they?
24      MR. JOHNSON: Objection. Form.
25      THE WITNESS: I wouldn't know.

**104**

1  Q. (BY MR. SLOVAK) No one at Whinstone
2  advised SBI on what miners to purchase; right?
3  A. I wouldn't think so.
4  Q. No one at Whinstone told SBI when to take
5  delivery of the miners; right?
6  A. Not to my knowledge.
7  Q. No one at Whinstone advised the folks at
8  SBI when or how they should purchase miners to
9  deploy in Russia; right?
10  A. Or any other site. Again, I don't know
11  what Whinstone would have said or told Carson.
12  Q. Okay. SBI and -- you called them Aroo
13  Systems; is that right?
14  A.                .
15  Q.                  They had a loan agreement
16  that they entered into in or around April 26, 2019;
17  right?
18  A. There may have been, yes.
19  Q. Yeah. What was the purpose of that loan
20  agreement?
21  A. I believe that was for the site in
22  Kyrgyzstan.
23  Q. And so that site loan was procured in
24  April, after there was already a purchase order for
25  the miners in Exhibit 4; right?

113

1  resell that under -- you know, since he's not a
2  utility, he could not, without license, be able to
3  resell that power without special regulations or
4  conformance to the power industry, something.
5       And so he said, we've got that all taken
6  care of.
7   Q.  Anything else?
8   A.  He also told us that the site, if we
9  wanted to go see the Rockdale site, if we wanted to
10 go see it, had total physical capacity of 2.2
11 gigawatts of power physically there.
12  Q.  Okay. Anything else?
13  A.  And that he had the 1 gigawatt of power
14 there. It would take time to ramp up to be made
15 available to us commercially, but that the
16 50 megawatts of power would be there by
17 December 2019.
18      And that the building design's all ready
19 to go, we're reusing a lot of that stuff from the
20 old site, and we have experience in Louisiana doing
21 this.
22  Q.  Okay. Anything else?
23  A.  There may have been other smaller things,
24 but those for me were, personally, were the key
25 drivers.

114

1   Q.  Okay. And who said those things?
2   A.  Aroosh.
3   Q.  Okay. And you know that Aroosh worked for
4  Northern Data; right?
5   A.  That's correct.
6   Q.  And were there any written communications
7  that reflect these representations?
8   A.  I believe there would have been in the
9  emails back and forth, maybe not bullet points per
10 se.
11  Q.  Okay. Has SBI ever operated with 1
12 gigawatt of power, enterprise-wide?
13  A.  No.
14  Q.  Does it have the infrastructure to
15 actually deploy enough miners to use a gigawatt of
16 power anywhere, with all of its facilities in the
17 world?
18  A.  No. And the intent was not that SBI would
19 consume all of that power.
20      We wanted to make sure there was
21 sufficient power for us to perhaps grow to several
22 hundred megawatts of power, without constraining the
23 facility or monopolizing it, but making sure there
24 was enough capacity for other customers that may
25 have been there.

115

1   Q.  Do you know how much capacity the Rockdale
2  facility has, as we sit here today?
3       MR. JOHNSON: Objection. Form.
4       THE WITNESS: As of today, now? No, I
5  wouldn't know that.
6   Q.  (BY MR. SLOVAK) Are you aware that it has
7  350 megawatts of power out there?
8   A.  The 10K that I saw in May '21 would
9  suggest it was about 300 or 350, yeah, would have
10 been deployed or deployable.
11  Q.  And SBI never represented to Whinstone
12 that it intended to consume more than 50 megawatts
13 of power; right?
14      MR. JOHNSON: Objection. Form.
15      THE WITNESS: We always discussed the
16 first batch would have been 50 megawatts.
17  Q.  (BY MR. SLOVAK) And that's what you
18 contracted for; right?
19  A.  That's correct.
20  Q.  Did you all promise them that you would
21 contract for more?
22  A.  Not that I know of.
23  Q.  And so you never intended, at least at the
24 time you signed the contract, specifically to
25 contract with Whinstone for more than 50 megawatts

116

1  of power?
2       MR. JOHNSON: Objection. Form.
3       THE WITNESS: No, I wouldn't say that the
4  lack of a promise or written agreement precludes any
5  of that. There was always the gentleman's agreement
6  that if things go well in the first phase, that we
7  could certainly contract for more.
8   Q.  (BY MR. SLOVAK) Did you spend any money
9  to use more than 50 megawatts of power, at Rockdale?
10      MR. JOHNSON: Objection. Form.
11      THE WITNESS: What do you mean by that?
12  Q.  (BY MR. SLOVAK) Did you purchase any
13 equipment to consume more than 50 megawatts of power
14 out there?
15  A.  No, because we couldn't even get the
16 initial batch up and running.
17  Q.  So your answer is no; right? You didn't
18 spend any money to consume more than 50 megawatts of
19 power at Rockdale; right, sir?
20  A.  Because the first initial --
21  Q.  I didn't ask because.
22      MR. JOHNSON: Let him finish.
23  Q.  (BY MR. SLOVAK) I'll object and move to
24 strike.
25      If your lawyer wants to ask you follow-up

### 117

1 questions, he can. My question is really simple.
2     Did SBI spend any money, procure any
3 resources to consume more than 50 megawatts of power
4 at Rockdale?
5    A. At that time, or --
6    Q. At any time.
7    A. Not so far, no.
8    Q. And did SBI affirmatively represent to
9 Whinstone an intent to consume more than
10 50 megawatts of power at Rockdale?
11     MR. JOHNSON: Objection. Form.
12     THE WITNESS: Not that I would be aware
13 of.
14    Q. (BY MR. SLOVAK) One of the other factors
15 that you cited in response to the persuasion that
16 was referenced in paragraph 20 of Exhibit A
17 [verbatim] is speed and design of the building.
18     What specifically was represented to you
19 about speed and design of the building?
20    A. Well, everything that was required, from
21 the building designs to the supply chain, had
22 already been established. And I recall that Aroosh
23 said we didn't need business permits or that what
24 was required had already been taken care of.
25    Q. What else?

### 118

1    A. Those were the key big factors.
2    Q. Those are the representations made about
3 speed and design of the building that you contend
4 persuaded SBIC to enter into the new agreement?
5    A. And so we tried to reflect that
6 understanding in the hosting agreement.
7    Q. And was it reflected in the hosting
8 agreement?
9    A. I believe it was in terms of requirements
10 for the way it was operated.
11     Well, that's actually more Number 3. But
12 in terms of how the building was to have been
13 constructed and regards to the business permits,
14 licensing and permissions and things like that.
15    Q. And the representations about speed and
16 design of the building were made by Aroosh?
17    A. Yes.
18     Well, I'm sorry. Aroosh and then, of
19 course, in the actual site visit the following day,
20 we discussed the very same things with Chad or --
21 yeah.
22    Q. The very same things, what does that mean?
23    A. About how they were going to build the
24 buildings and reusing the design from the Pyote site
25 and how they are going to build it in the Greenfield

### 119

1 up there, and that they're -- yeah.
2    Q. Anything else?
3    A. That was the main gist of our
4 conversation, if I recall correctly.
5    Q. Are you aware of any specific requirement
6 in the contract about the actual design of the
7 building?
8    A. Actual design, I believe it calls for
9 different aspects of the building to contain --
10 temperature control measures, for example, would
11 have been part of the design of the building.
12    Q. What else?
13    A. Dust control would have been part of the
14 design of the building.
15    Q. So, what else?
16    A. Go through the contract, or I believe the
17 complaint would have spelled out specifically,
18 addressed some of those more specific design
19 elements.
20    Q. I'm just asking you which ones you believe
21 are in the contract. You said dust control and
22 temperature control. What else?
23    A. Right. There would have been water
24 cooling measures that would have been incorporated
25 into how the building was designed. The --

### 120

1    Q. What else?
2    A. -- two buildings aspect I think was, if I
3 recall correctly, was to allow growth or expansion
4 of one building without shutting off the other. But
5 I think that was more of a physical deployment
6 aspect.
7    Q. What else?
8    A. There would have been power meters to
9 measure accurately power to the racks or the
10 transformers. That would have been part of the
11 infrastructure hygiene.
12    Q. What else?
13    A. Those are the big ones in my mind that I
14 recall.
15    Q. Okay. And at the time that the agreement
16 was terminated, there were seven buildings on the
17 property; right?
18    A. I wouldn't know.
19    Q. At the time the building [verbatim] was
20 terminated, there was actually power to those seven
21 buildings; right?
22    A. I wouldn't know.
23    Q. Those buildings had temperature controls;
24 right, sir?
25    A. I wouldn't know.

293

--oOo--

I declare under penalty of perjury that the foregoing is true and correct. Subscribed at

_____, this ____ day of

_____, 2024.

_____

JONATHAN TANEMORI

294

CERTIFICATE OF REPORTER

I, BRANDON D. COMBS, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript was requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: August 29, 2024

*Brandon Combs*

BRANDON D. COMBS
RPR, Texas CSR 10927, California CSR 12978